Dan Stormer, Esq. [S.B. # 101967]
Josh Piovia-Scott, Esq. [S.B. #222364]
Mohammad Tajsar, Esq. [S.B. #280152]
HADSELL STORMER
    RICHARDSON & RENICK LLP
128 N. Fair Oaks Avenue
Pasadena, California 91103
Telephone: (626) 585-9600
Facsimile:  (626) 577-7079
Email: dstormer@hadsellstormer.com
        jps@hadsellstormer.com
        mtajsar@hadsellstormer.com

[Additional Counsel for Plaintiffs continued on next page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Estate of JOSHUA CLAYPOLE, deceased, by and through SILVIA GUERSENZVAIG, as Administrator; SILVIA GUERSENZVAIG, <br><br> Plaintiff, <br><br> vs. <br><br> COUNTY OF SAN MATEO; SHERIFF GREG MUNKS, in his individual and official capacity; COUNTY OF MONTEREY; SHERIFF SCOTT MILLER, in his individual and official capacity; SERGEANT E. KAYE, in his individual and official capacity; CITY OF MONTEREY; MONTEREY POLICE DEPARTMENT CHIEF PHILIP PENKO, in his individual and official capacity; BRENT HALL, in his individual and official capacity; CALIFORNIA FORENSIC MEDICAL GROUP; DR. TAYLOR FITHIAN, in his individual and official capacity; COMMUNITY HOSPITAL OF MONTEREY PENINSULA; and DOES 1 through 30, <br><br> Defendants. | Case No: <br><br> **COMPLAINT FOR DAMAGES** <br><br> 1. Failure to Provide Medical Care in Violation of Fourteenth Amendment; <br> 2. Failure to Protect from Harm in Violation of Fourteenth Amendment; <br> 3. Deprivation of Substantive Due Process in Violation of First and Fourteenth Amendments; <br> 4. Medical Malpractice; <br> 5. Failure to Furnish Medical Care; <br> 6. Negligent Supervision, Training, Hiring, and Retention; <br> 7. Wrongful Death. <br><br> **DEMAND FOR JURY TRIAL** |

[Additional Counsel]

Lori Rifkin, Esq. [S.B. # 244081]
RIFKIN LAW OFFICE
P.O. Box 19169
Oakland, CA 94619
Telephone: (415) 685-3591
Email: lrifkin@rifkinlawoffice.com

Attorneys for Plaintiffs

**INTRODUCTION**

1.      On May 4, 2013, 20-year-old Joshua Claypole committed suicide in a cell at Monterey County Jail by hanging himself from a bed sheet. Three days prior, Claypole had been arrested for the fatal stabbing of Daniel Garcia Huerta, a taxi driver, during a bipolar episode. These two tragic deaths should not have happened—and would not have happened—if Defendants in this case had fulfilled their duties as public safety agencies and followed policies and procedures that are standard in their fields and required by law.

2.       Defendants are California municipalities, Sheriffs' departments, health care providers, and their employees. Each Defendant entity had multiple contacts with Claypole in the days before his death. Had Defendants followed standard protocols and training, they would have identified Claypole's acute mental health crisis and risk factors, and intervened to protect him and the public. However, Defendants did not have the appropriate policies and procedures in place, and ignored the obvious warning signs.  As a result, two families lost their loved ones.

3.      The Estate of Joshua Claypole and Claypole's mother, Silvia Guersenzvaig, bring this action for damages against Defendants for violations arising out of Defendants' deliberate indifference and negligence that caused the needless suffering and death of Joshua Claypole.

**JURISDICTION**

4.      This Complaint seeks damages for violations of the civil rights, privileges, and immunities guaranteed by the First and Fourteenth Amendments of the United States Constitution, pursuant to 42 U.S.C. §§ 1983 and 1988, and for violations of California state law.

5.      This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. §§ 1331 and 1343.

///

COMPLAINT FOR DAMAGES

6.     This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367, because the claims form part of the same case or controversy arising under the United States Constitution and federal law.

## VENUE

7.     Plaintiffs' claims arose in the Counties of San Mateo and Monterey, California. Venue therefore lies in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2).

8.     Rule 3 of the Federal Rules of Civil Procedure and Local Rule 3-2(e) authorizes assignment to this division because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the counties served by this division.

## PARTIES

9.     Plaintiff Silvia Guersenzvaig, as Administrator of the Estate of Joshua Kannon Claypole, brings this action pursuant to California Code of Civil Procedure §§ 377.10 *et seq*. At the time of his death, Joshua Claypole was a 20-year-old citizen of the United States and resident of the County of Monterey in the State of California. The survival causes of action in this matter are based on violations of Joshua Claypole's rights under the First and Fourteenth Amendments, and on violations of California state law.

10.     Silvia Guersenzvaig is the mother of Joshua Claypole. She is suing individually for violations of civil rights under the First and Fourteenth Amendments and California state law.

11.     Defendant County of San Mateo is a public entity, duly organized and existing under the laws of the State of California. Under its authority, Defendant County of San Mateo operates and manages the Maguire Correctional Facility and is and was at all relevant times mentioned herein responsible for the actions and/or inactions and the policies, procedures, and practices/customs of the San Mateo

COMPLAINT FOR DAMAGES

County Sheriff's Department and the Maguire Correctional Facility, and each entity's respective employees and/or agents. San Mateo County Sheriff's Department operates the Maguire Correctional Facility, and is and was responsible for ensuring the provision of emergency and medical and mental health care services to all Maguire Correctional Facility inmates.

12.     Defendant Greg Munks is, and was at all relevant times mentioned herein, the Sheriff of the County of San Mateo, the highest position in the San Mateo County Sheriff's Department. As Sheriff, Defendant Munks is and was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all San Mateo Sheriff's Department custodial employees and/or agents and Does 1 through 10. Defendant Munks is and was charged by law with the administration of the Maguire Correctional Facility, with the assistance of a small group of executive officers. Defendant Munks also is and was responsible for the promulgation of the policies and procedures and allowance of the practices/customs pursuant to which the acts of the San Mateo County Sheriff's Department alleged herein were committed. Defendant Munks is being sued in his individual and official capacities.

13.     Defendant County of Monterey is a public entity, duly organized and existing under the laws of the State of California. Under its authority, Defendant County of Monterey operates and manages Monterey County Jail and is and was at all relevant times mentioned herein responsible for the actions and/or inactions and the policies, procedures, and practices/customs of the Monterey County Sheriff's Department and Monterey County Jail, and each entity's respective employees and/or agents. Monterey County Sheriff's Department operates Monterey County Jail, and is and was responsible for ensuring the provision of emergency and medical and mental health care services to all Monterey County Jail inmates.

14.     Defendant Scott Miller is, and was at all relevant times mentioned herein, the Sheriff of the County of Monterey, the highest position in the San Mateo

-3-

COMPLAINT FOR DAMAGES

County Sheriff's Department. As Sheriff, Defendant Miller is and was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all San Mateo Sheriff's Department custodial employees and/or agents and Does 11 through 20.  Defendant Miller is and was charged by law with the administration of the Monterey County Jail, with the assistance of a small group of executive officers.  Defendant Miller also is and was responsible for the promulgation of the policies and procedures and allowance of the practices/customs pursuant to which the acts of the Monterey County Sheriff's Department alleged herein were committed.  Defendant Miller is being sued in his individual and official capacities.

15.    Defendant E. Kaye is, and was at all relevant times mentioned herein, a Sergeant in the County of Monterey's Sheriff's Department. As a Sergeant, Defendant Kaye is a supervisor at the Monterey County Jail. On May 1, 2013, Defendant Kaye was the on-duty Sergeant at the Monterey County Jail who received notice from a subordinate deputy that Joshua Claypole was suicidal. She had direct control over the placement of Claypole in a safety cell, and for ensuring he was placed on suicide watch during his detention at Monterey County Jail. Her failure to ensure adequate protection and monitoring of Claypole led to his suicide. Defendant Kaye is being sued in her individual capacity.

16.    Defendant City of Monterey is a municipality duly organized and existing under the laws of the State of California. The Monterey Police Department is a duly formed agency of the City of Monterey. Under its authority, Defendant City of Monterey is and was at all relevant times mentioned herein responsible for the actions and/or inactions and the policies, procedures, and practices/customs of the Monterey Police Department and its respective employees and/or agents. City of Monterey police officers arrested and detained Joshua Claypole on May 1, 2013, and were privy to numerous suicidal statements made by Claypole while in their custody.

-4-

COMPLAINT FOR DAMAGES

1    17.    Defendant Philip Penko is, and was at all relevant times mentioned

2    herein, the Chief of the Monterey Police Department, the highest position in the

3    Department. As Chief, Defendant Penko is and was responsible for the hiring,

4    screening, training, retention, supervision, discipline, counseling, and control of all

5    Monterey Police Department employees and/or agents and Does 21 through 30.

6    Defendant Penko also is and was responsible for the promulgation of the policies

7    and procedures and allowance of the practices/customs pursuant to which the acts

8    of the Monterey Police Department alleged herein were committed.  Defendant

9    Penko is being sued in his individual and official capacities.

10    18.    Defendant Brent Hall is, and was at all relevant times mentioned

11    herein, an Officer of the Monterey Police Department. According to police records,

12    Defendant Hall responded to the crime scene in Monterey on May 1, 2013, and

13    transported Joshua Claypole to the Monterey County Jail, where Claypole was

14    booked into the facility. Defendant Hall is being sued in his individual and official

15    capacities.

16    19.    Defendant California Forensic Medical Group ("CFMG") is a

17    California corporation headquartered in Monterey, California. CFMG is a private

18    correctional health care provider that services approximately 65 correctional

19    facilities in 27 California counties. The County of Monterey contracts with CFMG

20    to provide medical, mental health, and dental services for the Monterey County Jail.

21    At all relevant times mentioned herein, CFMG was responsible for the health

22    services provided to Joshua Claypole during his detention in the Monterey County

23    Jail.

24    20.    Defendant Taylor Fithian is, and was at all relevant times mentioned

25    herein, the co-founder, President, and Medical Director for Defendant CFMG.

26    Defendant Fithian is a Board-certified psychiatrist and oversees the delivery of

27    medical, mental health and dental care in all CFMG-served facilities, including

28    standards of medical care and utilization review. Dr. Fithian is also listed on the

-5-

COMPLAINT FOR DAMAGES

website of the Community Hospital of Monterey Peninsula as an affiliated doctor. Defendant Fithian is and was responsible for the promulgation of the policies and procedures and allowance of the practices/customs pursuant to which the acts of CFMG alleged herein were committed. In addition, Defendant Fithian personally evaluated Joshua Claypole on at least one occasion while he was held at Monterey County Jail, and was involved in the decision to remove Claypole from suicide watch on May 4, 2013. Defendant Fithian is sued in his individual capacity.

21.     Defendant Community Hospital of Monterey Peninsula ("CHOMP") is a California non-profit health care provider based in Monterey, California. It encompasses a main hospital, a mental health clinic, laboratories, and a short-term nursing facility, among others, that provide services spanning a range of health care needs, including primary care, cardiology, oncology, behavioral health, and emergency care. CHOMP provided outpatient mental health care to Joshua Claypole from approximately March 2012 through August 2012. Medical records indicate CHOMP-affiliated doctors were involved in prescribing medication to Claypole as late as October 2012.

22.     The true names and identities of Defendants Does 1 through 10 are presently unknown to Plaintiffs. Plaintiffs allege that each of Defendants Does 1 through 10 was employed by the County of San Mateo and/or the San Mateo County Sheriff's Department at the time of the conduct alleged herein. Plaintiffs allege that each of Defendants Does 1 through 10 was deliberately indifferent to Joshua Claypole's medical needs and safety, failed to provide necessary psychiatric care to him or take other measures to prevent him from attempting suicide, violated his civil rights, wrongfully caused his death, and/or encouraged, directed, enabled and/or ordered other defendants to engage in such conduct. Plaintiffs further allege that Defendants Does 1 through 10 violated Plaintiffs' First and Fourteenth Amendment rights and rights under California state law. Plaintiffs further allege that each of Defendants Does 1 through 10 was responsible for the hiring,

-6-
COMPLAINT FOR DAMAGES

1  screening, training, retention, supervision, discipline, counseling, and control of

2  medical, mental health, and jail custody employees and/or agents involved in the

3  conduct alleged herein.

4      23.    The true names and identities of Defendants Does 11 through 20 are

5  presently unknown to Plaintiffs.  Plaintiffs allege that each of Defendants Does 11

6  through 20 was employed by County of Monterey, and/or the Monterey County

7  Sheriff's Department, and/or California Forensic Medical Group at the time of the

8  conduct alleged herein. Plaintiffs allege that each of Defendants Does 11 through

9  20 was deliberately indifferent to Joshua Claypole's medical needs and safety,

10  failed to provide necessary psychiatric care to him or take other measures to prevent

11  him from attempting suicide, violated his civil rights, wrongfully caused his death,

12  and/or encouraged, directed, enabled and/or ordered other defendants to engage in

13  such conduct.  Plaintiffs further allege that Defendants Does 11 through 20 violated

14  Plaintiffs' First and Fourteenth Amendment rights, and rights under California state

15  law.  Plaintiffs further allege that each of Defendants Does 11 through 20 was

16  responsible for the hiring, screening, training, retention, supervision, discipline,

17  counseling, and control of medical, mental health, and jail custody employees

18  and/or agents involved in the conduct alleged herein.

19      24.    The true names and identities of Defendants Does 21 through 30 are

20  presently unknown to Plaintiffs.  Plaintiffs allege that each of Defendants Does 21

21  through 30 was employed by the City of Monterey and/or the Monterey Police

22  Department at the time of the conduct alleged herein.  Plaintiffs allege that each of

23  Defendants Does 21 through 30 was deliberately indifferent to Joshua Claypole's

24  medical needs and safety, failed to provide necessary psychiatric care to him or take

25  other measures to prevent him from attempting suicide, violated his civil rights,

26  wrongfully caused his death, and/or encouraged, directed, enabled and/or ordered

27  other defendants to engage in such conduct.  Plaintiffs further allege that

28  Defendants Does 21 through 30 violated Plaintiffs' First and Fourteenth

COMPLAINT FOR DAMAGES

Amendment rights, and rights under California state law.  Plaintiffs further allege that each of Defendants Does 21 through 30 was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of medical, mental health, and jail custody employees and/or agents involved in the conduct alleged herein.

25.    Plaintiffs will seek to amend this Complaint as soon as the true names and identities of Defendants Does 1 through 30 have been ascertained.

26.    Defendants Greg Munks, Scott Miller, E. Kaye, Philip Penko, Brent Hall, Taylor Fithian, and Does 1 through 30 engaged in the acts or omissions alleged herein under color of state law.

27.    Plaintiffs are informed and believe and thereon allege that at all times mentioned in this Complaint, Defendants were the agents, employees, servants, joint venturers, partners and/or co-conspirators of the other Defendants named in this Complaint and that at all times, each of the Defendants was acting within the course and scope of said relationship with Defendants.

## EXHUASTION OF PRE-LAWSUIT PROCEDURES FOR STATE LAW CLAIMS

28.    Plaintiffs filed governmental tort claims with the State and Defendant County of Monterey, including on behalf of the Estate of Joshua Claypole, on October 28, 2013.  By correspondence dated December 13, 2013, the County of Monterey rejected the governmental tort claims on behalf of Joshua Claypole.

29.    By correspondence dated March 10, 2014, Plaintiffs notified Defendants County of Monterey, Sheriff Miller, CFMG, and Dr. Taylor Fithian of their intention to file suit against them based on their negligence in providing professional health care services, as required by Section 364 of the California Code of Civil Procedure.

///

///

COMPLAINT FOR DAMAGES

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# FACTUAL ALLEGATIONS

## I.  History of Inadequate Mental Health Care in Monterey County Jail

30.  County of Monterey and CFMG have been on notice that their provision of mental health care to inmates at the Monterey County Jail is inadequate and results in needless harm since at least 2007, when the Monterey County Sheriff's Office and the Monterey County Board of Supervisors hired an outside consulting firm to perform a needs assessment for the Jail.

31.  The independent assessment was updated in 2011 and found County of Monterey and CFMG's policies and practices for screening, supervising, and treating prisoners at risk for suicide inadequate. (*See* Exhibit 1.) The 2011 Assessment identified structural and design flaws of cells and dormitories that do not minimize suicide hazards in the facilities and fail to prevent self-harm. (*See* Exhibit 1 at EX.3.)  The Assessment also found that Monterey County Jail's physical facilities lack sufficient treatment space and therefore prevent adequate delivery of medical and mental health care. (Exhibit 1 at EX.3, A.3.)

32.  In addition to the Jail's structural issues the Assessment found that chronic understaffing hinders County of Monterey's ability to provide medical care, classify and move inmates within the facility, maintain inmate safety and security, and transport inmates to and from outside agencies. (Exhibit 1 at G.1–G.3, J.2–J.3.) In addition, understaffing and overcrowding at the Jail creates what the Assessment called "an indirect supervision facility," which impairs the Jail's ability to "recognize, manage and treat" mental health issues among the inmate population (as opposed to direct supervision from experienced physicians and psychologists). (*Id.* at EX.3.)

33.  These deficiencies are even more troubling in light of the Assessment's finding that approximately 15–20% of the Jail's inmates suffer from mental health issues. (Exhibit 1 at A.3 n. 4.)

///

COMPLAINT FOR DAMAGES

34.     The Assessment's findings were confirmed in a 2013 draft report by an expert hired by County of Monterey, Dr. Richard Hayward ("Hayward Report"). (*See* Exhibit 2.) The County tasked Dr. Hayward with evaluating mental health care at Monterey County Jail in response to a federal class action lawsuit challenging County of Monterey's provision of medical and mental health care at the Jail. *See Hernandez v. Cnty. of Monterey*, No. 13-cv-2354-PSG (N.D. Cal. filed May 23, 2013). The Hayward Report, dated December 6, 2013, affirmed that understaffing of mental health professionals led to inadequate mental health care for inmates (*see* Exhibit 2 at 5), compounding the 2011 Assessment's findings of problems associated with crowded and space-limited clinics at the Jail.

35.     In addition, the Hayward Report identified other serious deficiencies in the delivery of mental health care at the Monterey County Jail, including:

a.     Lack of a complete mental health screening process that leads to inadequate identification of arrestees with a potential for self-harm or a history of mental disorders. (Exhibit 2 at 2.)

b.     Lack of mental health questions on intake forms that could adequately log an inmate's symptoms and treatment history, prior providers, past diagnoses and medications, and history of self-harm. (Exhibit 2 at 4.)

c.     County of Monterey employs only a total of four mental health professionals, which the Hayward Report concluded was "insufficient to meet the mental health needs of the inmates." (Exhibit 2 at 5.)

d.     Lack of mental health care clinicians assigned to the jail on weekends "results in insufficient services to mentally ill inmates," relevant because Claypole committed suicide on a Saturday. (Exhibit 2 at 2.)

e.     Inadequate supervision of inmates placed on suicide watch in designated "Safety Cells," including delays of up to an hour or more between checks of designated inmates who should be monitored twice each thirty minutes. (Exhibit 2 at 12.)

COMPLAINT FOR DAMAGES

36.     County of Monterey's failures to timely identify, adequately treat, or effectively monitor prisoners at risk for suicide have had tragic consequences. According to the allegations contained in the *Hernandez v. County of Monterey* complaint, there had been three completed and over a dozen attempted suicides in the four years prior to Claypole's suicide. According to that complaint, the rate of completed suicides at the Monterey County Jail is nearly twice the national average for jail facilities.

37.     Moreover, on April 15, 2013, prior to Joshua Claypole's death, County of Monterey was again specifically put on notice of the serious problems with mental health treatment in the jail, as well as its disproportionately high suicide rate, in a letter written by *Hernandez* class counsel. (*See* Exhibit 3.)

## II.     Joshua Claypole's Detentions and Suicide

### A.     *Claypole's Mental Health History*

38.     Joshua Claypole was born in Monterey, California, and was raised primarily in Big Sur, California, by his mother Silvia Guersenzvaig.

39.     Starting in or around his junior year in high school, Claypole began struggling with substance abuse and exhibiting symptoms of mental illness, including anxiety, panic disorders, and bipolar disorder. He eventually dropped out of high school in December of his senior year.

40.     Guersenzvaig sought help for Claypole from numerous mental health therapists and practitioners from approximately 2010 through 2013.

41.     During this period, Claypole was treated by at least one psychiatrist at CHOMP, Dr. Marshal Alan Blatt. Dr. Blatt worked with Claypole between March 2012 and August 2012, but abruptly terminated his relationship with Claypole with no follow up care or referral to another care provider.

42.     In this time, Claypole would fluctuate between normative behavior and his more agitated, disturbed periods. When on his prescribed medications, he was funny, loving, creative, and thoughtful, often talking openly about his growth as a

-11-

young adult and the lessons he learned from his past experience and from others. During periods of instability, however, he struggled with anxiety, aggression, and substance abuse. This behavior led to two arrests, one for a DUI and vandalism and the other for minor possession of cocaine. As part of his sentences for these arrests, Claypole successfully completed several rehabilitation programs.

### B.   *First Detention in San Mateo County*

43.     Joshua Claypole's mental health issues came to a head in April 2013. On April 24, Silvia Guersenzvaig scheduled Claypole to see his treating psychiatrist, Dr. John R. Donaldson, on May 2. By approximately April 27, Claypole stopped sleeping, believed he had telepathy, and thought that others were communicating to him through their thoughts.

44.     Five days before the May 2 appointment with his psychiatrist, Joshua Claypole experienced a psychotic episode.  On April 28, 2013, while at his mother's home, Claypole began acting strangely, exhibited aggressive and paranoid behavior, and left the home without telling Guersenzvaig where he was going.

45.     Claypole traveled to the home of friends that evening, but did not sleep the entire night. During the night, he told them he thought the singer of the music they were listening to was going to come out of the music to kill him.

46.     The next day, Claypole returned to his mother's home, collected his belongings, and left without answering her questions about where he was going. He appeared agitated and paranoid.

47.     Worrying about her son's health, Silvia Guersenzvaig called Joshua Claypole's psychiatrist Dr. Donaldson on April 29 and spoke with his office staff about Claypole's behavior. She asked Dr. Donaldson's staff to provide further assistance to Claypole in his upcoming May 2 appointment.

48.     Guersenzvaig called Dr. Donaldson's office again on April 30, 2013, to confirm that Claypole would be receiving assistance and treatment from Dr. Donaldson at his appointment in two days.

COMPLAINT FOR DAMAGES

49.     After leaving his mother's home on April 29, records reflect that Joshua Claypole was arrested on suspicion of driving under the influence at 1:00 a.m. on the morning of April 30, 2013, by California Highway Patrol officers in Redwood City, California. According to San Mateo Sheriff's Department records, he was booked and detained at the Maguire Correctional Facility operated by County of San Mateo at approximately 4:30 a.m., and his car was impounded. A jail property slip indicates that he was arrested with medication in his possession, among other items.

50.     California Highway Patrol records indicate that CHP officers performed a narcotics test on Claypole, but San Mateo records do not reflect any review by San Mateo personnel of the test or its results.

51.     Although the San Mateo Arrest Report/Booking Sheet for Claypole noted that he was under the influence and his speech was slow and slurred, and the San Mateo Correctional Health Services Intake Sheet notes that his arrest was primarily for drug intoxication, San Mateo staff's medical examination of Claypole checked "no" for "any signs of alcohol/drug intoxication and/or withdrawal" and failed to check the box noting slurred speech.

52.     San Mateo's medical records also indicate that Claypole reported his psychiatric history and prescriptions for medications including Adderall (prescribed primarily for attention deficit hyperactivity disorder) and Klonopin (prescribed to treat anxiety disorders, panic disorders, and psychosis) to the screening nurse at Maguire Correctional Facility. Adderall and Klonopin are known to have side effects including irritability and aggression, cognitive impairments and hallucinations, depression, suicidal thoughts, and mood swings.  According to San Mateo's medical records, staff then prescribed Claypole three psychotropic medications: Hydroxyzine, Quetiapine, and Lithium Carbonate. All three medications are used to treat bipolar disorder, schizophrenia, psychosis, and mania. However, no referral for further medical health monitoring or treatment appears to

-13-

COMPLAINT FOR DAMAGES

1    have been made.

2        53.    Despite notice of Claypole's serious mental illness, erratic behavior,

3    and the dangerous mix of narcotics and psychotropic medication he was suspected

4    to have consumed, County of San Mateo released Joshua Claypole on April 30,

5    2013, at 11:24 a.m. on the condition that he promise to appear for his DUI

6    arraignment.

7        **C.**    ***Claypole's Repeated Visits to the CHOMP Facility Where He Had***

8              ***Previously Received Treatment***

9        54.    After his release from San Mateo, Joshua Claypole traveled south to

10   Monterey.

11       55.    At approximately 8:30 a.m. on May 1, 2013, Joshua Claypole arrived

12   at the Hartnell Professional Center, which houses CHOMP. He had been treated by

13   CHOMP between March and August 2012, and that morning went to the outpatient

14   behavioral health clinic on the second floor where he had previously been a patient.

15   Despite CHOMP's prior relationship with Claypole and his obvious symptoms of a

16   mental health crisis, CHOMP personnel did not provide medical or mental health

17   treatment to Claypole.  Rather, they directed Claypole to leave, and called the

18   Monterey Police Department. By the time police officers arrived, Claypole had

19   already left.

20       56.    Joshua Claypole returned to CHOMP later that same morning at

21   approximately 11:00 a.m. He again visited CHOMP's behavioral health clinic. This

22   time, CHOMP personnel responded by deploying their internal security officers to

23   escort him out of the building, again failing to examine or treat Claypole. Despite

24   their physical custody of Claypole, and awareness of his troubled mental state,

25   CHOMP personnel refused to treat him, examine him, detain him, or provide any

26   medical or mental health assistance to him. Instead, CHOMP security officers threw

27   Claypole out of the building and again called the Monterey Police Department.

28   ///

                                          COMPLAINT FOR DAMAGES

57.     Immediately after CHOMP security officers physically ejected him, Claypole went to a local Wells Fargo bank branch in Monterey, presumably to obtain money for a rental car so he could return to Redwood City for his impounded car. Wells Fargo employees confirmed that his strange behavior was clearly observable, later telling Monterey Police Department officers that Claypole appeared to be "on a substance," "very unstable," "out of it," and "in and out of consciousness." They stated that Claypole displayed mood changes and would at times be unresponsive to conversation. At the register of the bank, he did not talk and made strange movements with his head. After withdrawing money from a bank account he shared with his mother, Claypole requested Wells Fargo staff hale him a taxi cab.

### D.   *Detention in Monterey County*

58.     According to Monterey Police Department reports, Claypole got into a taxi shortly thereafter outside of the Wells Fargo branch, and, at approximately 1:10 p.m., fatally stabbed the taxi driver, Daniel Garcia Huerta, outside an Enterprise Rent-A-Car Company location on Del Monte Avenue in Monterey, California. Claypole was then detained by Seaside Police Department officers a short distance away in a stolen pickup truck. Monterey Police Department officers arrived at the scene thereafter and took custody of Claypole. After the owner of the pickup truck identified Claypole, Monterey Police Department personnel arrested him.

59.     According to police reports, when Claypole was seated in the back of Defendant MPD Officer Brent Hall's squad car, he spontaneously asked Defendant Hall, "Can you ask for the [lethal] injection?" He also told Defendant Hall, "I had to do it."

60.     During the booking process, Claypole asked Defendant Hall "Should I go? I should just take the injection."

61.     While waiting to be interviewed by a detective, Joshua Claypole asked Hall "Is my mom going to get my remains?" Claypole again told Hall that he

COMPLAINT FOR DAMAGES

1  wanted to die by lethal injection and that he wanted to have his body cremated.

2       62.    Despite these suicidal comments, neither Defendant Hall nor

3  Defendant Monterey Police Department informed the Monterey County Sheriff's

4  Department that Joshua Claypole was acting strangely or a suicide risk. Rather than

5  assessing his mental health issues adequately, or notifying the County of Monterey,

6  his subsequent custodian, Defendants Hall and City of Monterey failed to take any

7  appropriate or necessary action in the face of a clearly paranoid and suicidal

8  detainee.

9       63.    At approximately 8:30 p.m. on May 1, Joshua Claypole met with his

10  criminal defense lawyer, John Klopfenstein. During the meeting, Claypole appeared

11  paranoid and talked about killing himself. Klopfenstein then spoke to Officer Candi

12  McGregor at the jail at approximately 8:45 p.m. and requested that Claypole be

13  placed on suicide watch, per a memorandum drafted by McGregor. McGregor

14  noted that she immediately contacted Defendant Sergeant E. Kaye, the on-duty

15  Sergeant. Sergeant Kaye advised McGregor that she would follow up on the

16  situation.

17       64.    According to County of Monterey records, an "Intake Health

18  Screening" of Joshua Claypole was conducted at 9:05 p.m. on May 1, 2013. During

19  the screening, Claypole told the screening deputy that he was taking medication for

20  anxiety.  However, the screening form used to document the examination did not

21  indicate that any questions were asked regarding Claypole's history of mental

22  health diagnoses or prior mental health treatment. Despite Claypole's suicidal

23  statements to the transporting police officers and reports from Claypole's lawyer to

24  jail staff that Claypole was unstable and talked about killing himself, the Intake

25  Health Screening shows the "no" box checked for "Does behavior suggest a danger

26  to self or others?"  Similarly, despite Claypole's self-report that he took anxiety

27  medications, the Intake Health Screening does not reflect any referral of Claypole

28  to a psychiatrist or other mental health staff.

-16-

COMPLAINT FOR DAMAGES

65.     County of Monterey Sheriff's personnel also completed a form entitled "Classification Inmate Intake Screening Questionnaire," dated May 1, 2013, at 9:05 p.m. Notwithstanding the recent events, Claypole's statements to the police officers, Claypole's psychiatric history, and his attorney's report of suicidal symptoms and request to have him placed on suicide watch, the Questionnaire indicates that Claypole had not shown any bizarre behavior and that he was not now nor had he ever been under psychiatric care.

66.     Monterey County Jail staff failed to place Claypole on suicide watch on May 1, 2014, despite his attorney's direct report of suicidal symptoms and request for such precautions.

67.     On May 2, Klopfenstein visited Claypole at the Jail. During this second meeting, Claypole asked Mr. Klopfenstein to have his mother bring his medications to the jail.

68.     On May 3, Joshua Claypole made his first appearance in court regarding the criminal charges. That same day, Claypole exhibited severe mental instability, believing that others were speaking to him telepathically through his thoughts. Mr. Klopfenstein assumed that the Jail had responded appropriately to his request to place Claypole on suicide watch.

69.     However, the medical records from County of Monterey reflect that it was not until 2:35 p.m. on May 3, two days after Klopfenstein first requested suicide watch, that Defendants finally placed Claypole on suicide watch and transferred Claypole to a safety cell where he was supposed to be observed by Jail staff.

70.     Fewer than twenty-four hours later, at approximately 6:30 a.m. on May 4, Defendants inexplicably released Claypole from suicide watch without any further suicide risk precautions.

71.     At approximately 1 p.m. on May 4, 2013, Silvia Guersenzvaig arrived at Monterey County Jail to visit her son and to bring him his psychotropic

-17-

1   medications, per his request.  However, Jail staff refused to allow her to see her son,

2   telling her that Claypole had been moved to a different housing unit and visitation

3   hours for that unit had not begun. Guersenzvaig gave Claypole's medications to a

4   Jail nurse summoned by the on-duty officer. Denied the ability to visit her son,

5   Guersenzvaig said to the nurse, "Please tell Josh I love him regardless of what

6   happened."

7        72.    On information and belief, Jail staff did not provide the medications

8   brought by Silvia Guersenzvaig to Joshua Claypole.

9        73.    At a "welfare check" conducted at approximately 2:30 p.m. on May 4,

10  2013, Monterey County Deputy Sheriff Raymond Gordano found Joshua Claypole

11  hanging from a cloth noose made of torn bed sheets inside his cell.

12       74.    According to the declaration of Dr. Pablo Stewart, an expert whose

13  declaration was filed by plaintiffs in *Hernandez v. County of Monterey*, Jail staff

14  failed to appropriately and timely respond to Claypole's suicide. Rather than

15  immediately open the cell to cut down the ligature, Gordano requested back up by

16  custody and medical staff. (*See* Exhibit 4 at ¶ 96.) Staff did not open Claypole's cell

17  and begin to assist him until other staff arrived on the scene. (*Id.*) Jail personnel

18  eventually cut the ligature using a knife, with some difficulty. (*Id.*)

19       75.    At the time of his suicide, Claypole was housed in A Pod, an

20  administrative segregation housing unit. The cell included a set of sturdy metal

21  braces on the wall, which are suicide hazards in cells used for inmates in mental

22  health crisis. Claypole tied the sheet he used to hang himself to these metal braces.

23       76.    Jail records reflect the failure of jail staff to follow their own policies

24  and procedures during and after suicide watch.  During the period when Claypole

25  was placed in suicide watch, Jail personnel did not perform the required checks

26  twice every 30 minutes, instead checking on him only once in some one-hour

27  periods.  After removing him from suicide watch, Jail personnel did not check on

28  Claypole hourly, as required by Jail policies. County of Monterey's Hourly Safety

COMPLAINT FOR DAMAGES

Check log indicates that at the time staff discovered him hanging, staff had not performed a safety check for Claypole in over 6 hours.

77.    According to jail policies and procedures, as recounted by Dr. Hayward, no mental health personnel are on site at the Jail on weekends. Nevertheless, County of Monterey removed Claypole from suicide watch on Saturday when, upon information or belief, no mental health care staff were on site at the Jail.  Once Claypole was removed from suicide watch and placed back in general population, there were no mental health staff at the jail to monitor his condition, and custody staff failed to perform the required hourly safety checks.

78.    Defendant's failure to appropriately staff its jail facility and monitor Claypole despite known and foreseeable suicide risks resulted in Claypole hanging himself just a few hours after his removal from suicide watch.

79.    After staff discovered him hanging, Joshua Claypole was transferred to the care of emergency room personnel at Natividad Medical Center, then transported to the Trauma Center at San Jose Regional Medical Center via helicopter.

80.    Shortly after finding his body, Jail deputies found a handwritten suicide letter written by Claypole in his cell. Addressing his mother, Claypole wrote: "I love you mama. I'm sorry for all the pain I have brought you mama. I love you very much. Maybe I will see you again. Love, Joshua."

81.    On May 9, 2013, Joshua Claypole was declared dead. A subsequent County of Monterey postmortem examination conducted on May 13, 2013, concluded that he died from asphyxia due to hanging.

///

///

///

COMPLAINT FOR DAMAGES

# CLAIMS FOR RELIEF

## First Claim for Relief

**Deliberate Indifference to Serious Medical and Mental Health Needs in Violation of the Fourteenth Amendment to the Constitution of the United States (Survival Action – 42 U.S.C. § 1983)**

**(Against Defendants County of San Mateo, Greg Munks, County of Monterey, Scott Miller, E. Kaye, California Forensic Medical Group, Taylor Fithian, and Does 1 through 20)**

82.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 81 as though fully set forth herein.

83.     Defendants have inadequate policies, procedures, and practices for identifying inmates in need of medical and mental health treatment and providing appropriate medical and mental health treatment. Defendants also fail to appropriately train and supervise staff regarding the provision of treatment to inmates with medical and mental health issues.

84.     Defendants have consistently failed to meet their constitutional obligation to provide adequate mental health care to prisoners in their jails.  The mental health care provided by Defendants to prisoners in their jails is woefully inadequate and falls far short of all of the minimum elements of a constitutional mental health care system.  Defendants' failure to correct their policies, procedures, and practices, despite notice of significant and dangerous problems, evidences deliberate indifference in the provision of mental health treatment.

85.     Defendants knew or should have known that there was a strong likelihood that Joshua Claypole posed a threat to himself or others.

86.     Defendants failed to provide necessary medical and mental health evaluation and treatment to Joshua Claypole while he was held at the Maguire Correctional Facility and Monterey County Jail, despite his history of serious mental illness, obvious symptoms of mental health crisis, and information that he

COMPLAINT FOR DAMAGES

was under the influence of narcotics.

87.     Defendants' acts and/or omissions as alleged herein, including but not limited to their failure to provide Joshua Claypole with appropriate medical or psychiatric care and to identify suicide risk, along with the acts and/or omissions of the Defendants in failing to train, supervise and/or promulgate appropriate policies and procedures in order to identify suicide risk and provide treatment, constituted deliberate indifference to Joshua Claypole's serious medical needs, health and safety.

88.     As a direct and proximate result of Defendants' conduct, Joshua Claypole experienced physical pain, severe emotional distress, and mental anguish over a period of five days, as well as loss of his life and other damages alleged herein.

89.     The aforementioned acts of Defendants were willful, wanton, malicious, and oppressive, thereby justifying an award to Plaintiff of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## Second Claim for Relief

**Failure to Protect from Harm in Violation of the Fourteenth Amendment to the Constitution of the United States (Survival Action – 42 U.S.C. § 1983) (Against Defendants County of San Mateo, Greg Munks, County of Monterey, Scott Miller, E. Kaye, City of Monterey, Philip Penko, Brent Hall, California Forensic Medical Group, Taylor Fithian, and Does 1 through 30)**

90.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 89 as though fully set forth herein.

91.     Each Defendant could have taken action to prevent unnecessary harm to Joshua Claypole, but refused or failed to do so.

92.     Defendants failed to have minimally necessary policies and procedures concerning the adequate identification and housing of Claypole, whom they knew

COMPLAINT FOR DAMAGES

or should have known to be at risk of self-harm.

93.     City of Monterey, Philip Penko, and Brent Hall failed to take necessary precautions to ensure that Claypole would not harm himself or others after he communicated clearly suicidal thoughts to Monterey Police Department officers. They also failed to create minimally necessary policies and procedures for ensuring that other entities and municipalities were informed of suicide risks among Monterey Police Department arrestees who are transferred from their custody. Lastly, they failed to adequately train and supervise officers to protect arrestees from harm.

94.     County Defendants failed to implement minimally sufficient policies and procedures to protect inmates from harm. County Defendants failed to appropriately train and supervise staff regarding identification and handling of detainees at risk of harm. With respect to Joshua Claypole, County Defendants failed to follow even their own suicide prevention procedures to identify, house, and monitor detainees at risk of self-harm.

95.     Defendants' acts and/or omissions as alleged herein, including but not limited to their failure to take appropriate measures to protect Joshua Claypole from harm, along with the acts and/or omissions of the Defendants in failing to train, supervise and/or promulgate appropriate policies and procedures in order to protect Joshua Claypole from harm, constituted deliberate indifference to Joshua Claypole's serious medical needs, health, and safety.

96.     As a direct and proximate result of Defendants' conduct, Joshua Claypole experienced physical pain, severe emotional distress, and mental anguish over a period of five days, as well as loss of his life and other damages alleged herein.

97.     The aforementioned acts of Defendants were willful, wanton, malicious, and oppressive, thereby justifying an award to Plaintiffs of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter

COMPLAINT FOR DAMAGES

1   such conduct in the future.

2   **Third Claim for Relief**

3   **Deprivation of Substantive Due Process Rights in Violation of First and**

4   **Fourteenth Amendments to the Constitution of the United States – Loss of**

5   **Parent/Child Relationship (42 U.S.C. § 1983)**

6   **(Against Defendants County of San Mateo, Greg Munks, County of Monterey,**

7   **Scott Miller, E. Kaye, City of Monterey, Philip Penko, Brent Hall, California**

8   **Forensic Medical Group, Taylor Fithian, and Does 1 through 30)**

9   98.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through

10  97 as though fully set forth herein.

11  99.     The aforementioned acts and/or omissions of Defendants in being

12  deliberately indifferent to Joshua Claypole's serious medical needs, health and

13  safety, violating Joshua Claypole's constitutional rights, and their failure to train,

14  supervise, and/or take other appropriate measures to prevent the acts and/or

15  omissions that caused the untimely and wrongful death of Joshua Claypole

16  deprived Plaintiff Guersenzvaig of her liberty interest in the parent-child

17  relationship in violation of her substantive due process rights as defined by the First

18  and Fourteenth Amendments to the United States Constitution.

19  100.   As a direct and proximate result of the aforementioned acts and/or

20  omissions of Defendants, Plaintiffs suffered injuries and damages as alleged herein.

21  101.   The aforementioned acts and/or omissions of the individually named

22  Defendants were willful, wanton, malicious, and oppressive, thereby justifying an

23  award of exemplary and punitive damages to punish the wrongful conduct alleged

24  herein and to deter such conduct in the future.

25  ///

26  ///

27  ///

28

-23-

COMPLAINT FOR DAMAGES

**Fourth Claim for Relief**

**Professional Negligence / Medical Malpractice (Survival Actions – California State Law)**

**(Against Defendants County of Monterey, Scott Miller, E. Kaye, California Forensic Medical Group, Community Hospital of Monterey Peninsula, Taylor Fithian, and Does 1 through 20)**

102.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 101 as though fully set forth herein.

103.   Defendants failed to comply with professional standards in the treatment of Joshua Claypole's serious mental illness by failing to appropriately assess and evaluate his mental health and suicide risk, failing to take appropriate and timely suicide prevention measures, prematurely removing Claypole from suicide watch and returning him to an unsafe cell, failing to provide appropriate mental health treatment, and failing to prescribe or provide appropriate and necessary psychiatric medications and ensure compliance with those medications.

104.   Defendants also failed to appropriately supervise, review, and ensure the competence of medical staff's and custody staff's provision of treatment to Claypole, and failed to enact appropriate standards and procedures that would have prevented such harm to him.

105.   As a direct and proximate cause of this negligence and failure to meet the professional standards of care, Joshua Claypole and Silvia Guersenzvaig suffered injuries and damages as alleged herein.

106.   The negligent conduct of Defendants was committed within the course and scope of their employment.

107.   The aforementioned acts of Defendants were willful, wanton, malicious, and oppressive, thereby justifying an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

-24-

COMPLAINT FOR DAMAGES

## Fifth Claim for Relief

**Failure to Furnish / Summon Medical Care (Survival Action – California State Law)**

**(Against Defendants County of Monterey, Scott Miller, E. Kaye, California Forensic Medical Group, Community Hospital of Monterey Peninsula, Taylor Fithian, and Does 1 through 20)**

108.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 107 as though fully set forth herein.

109.   Defendants owed Joshua Claypole a duty of care to provide him immediate medical and mental health care.

110.   The conduct of Defendants alleged herein, including but not limited to the facts that Defendants knew or had reason to know that Joshua Claypole was in need of immediate medical and mental health care and that Defendants failed to take reasonable action to summon or provide that care, resulting in Joshua Claypole's death as alleged herein, violated California state law, including Cal. Govt. Code §§ 844.6 and 845.6.

111.   Defendants also failed to timely and appropriately respond to Joshua Claypole's expressions of suicidal ideation, in which he requested that he be killed and stated his desire to kill himself on numerous occasions before hanging himself in his cell.

112.   The alleged conduct of Defendants was committed within the course and scope of their employment.

113.   As a direct and proximate result of Defendants' breach, Joshua Claypole and Silvia Guersenzvaig suffered injuries and damages causing great pain and leading to his death, as alleged herein.

114.   The aforementioned acts of Defendants were willful, wanton, malicious, and oppressive, thereby justifying an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in

COMPLAINT FOR DAMAGES

the future.

## Sixth Claim for Relief

**Negligent Supervision, Training, Hiring, and Retention (Survival Action –**

**California State Law)**

**(Against Defendants County of Monterey, Scott Miller, E. Kaye, California**

**Forensic Medical Group, Community Hospital of Monterey Peninsula, Taylor**

**Fithian, and Does 1 through 20)**

115.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 114, as though fully set forth herein.

116.   Defendants had a duty to hire, supervise, train, and retain employees and/or agents so that employees and/or agents refrain from the conduct and/or omissions alleged herein.

117.   Defendants breached this duty, causing the conduct alleged herein. Such breach constituted negligent hiring, supervision, training, and retention under the laws of the State of California.

118.   As a direct and proximate result of Defendants' failure, Joshua Claypole and Plaintiff suffered injuries and damages as alleged herein.

## Seventh Claim for Relief

**Wrongful Death – California Code Civ. Proc. § 377.60**

**(Against Defendants County of Monterey, Scott Miller, E. Kaye, California**

**Forensic Medical Group, Community Hospital of Monterey Peninsula, Taylor**

**Fithian, and Does 1 through 20)**

119.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 118, as though fully set forth herein.

120.   Joshua Claypole's death was a direct and proximate result of the aforementioned wrongful and/or negligent acts and/or omissions of Defendants. Defendants' acts and/or omissions thus were also a direct and proximate cause of Plaintiff' injuries and damages, as alleged herein.

COMPLAINT FOR DAMAGES

121.   As a direct and proximate result of Defendants' wrongful and/or negligent acts and/or omissions, Plaintiff incurred expenses for funeral and burial expenses in an amount to be proved.

122.   As a direct and proximate result of Defendants' wrongful and/or negligent acts and/or omissions, Plaintiffs suffered the loss of the services, society, care, and protection of the decedent, as well as the loss of the present value of his future services to his mother.  Plaintiffs are further entitled to recover prejudgment interest.

123.   Plaintiff Estate of Joshua Claypole is entitled to recover punitive damages against individual Defendants who, with conscious disregard of Joshua Claypole's rights, failed to provide Joshua Claypole with mental health treatment services meeting the professional standard of practice and failed to adhere to the legal mandates of prisoner supervision.

124.   The aforementioned acts of Defendants were willful, wanton, malicious, and oppressive, thereby justifying an award to Plaintiff of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

1.   For compensatory, general and special damages against each Defendant, jointly and severally, in an amount to be proven at trial;

2.   For damages related to loss of familial relations as to Plaintiff Silvia Guersenzvaig;

3.   Funeral and burial expenses, and incidental expenses not yet fully ascertained;

4.   General damages, including damages for physical and emotional pain, emotional distress, hardship, suffering, shock, worry, anxiety, sleeplessness, illness and trauma and suffering, the loss of the services, society, care and protection of the

COMPLAINT FOR DAMAGES

decedent, as well as the loss of financial support and contributions, loss of the
present value of future services and contributions, and loss of economic security;

5. Prejudgment interest;

6. For punitive and exemplary damages against each individually named
Defendant and CHOMP in an amount appropriate to punish Defendant(s) and deter
others from engaging in similar misconduct;

7. For costs of suit and reasonable attorneys' fees and costs pursuant to
42 U.S.C. § 1988, and as otherwise authorized by statute or law;

8. For restitution as the court deems just and proper;

9. For such other relief, including injunctive and/or declaratory relief, as
the Court may deem proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury in this action.

Dated: June 12, 2014            Respectfully Submitted,

                                        RIFKIN LAW OFFICE

                                        HADSELL STORMER

                                               RICHARDSON & RENICK LLP

                                     By:  /s/ Dan Stormer

                                            Dan Stormer
                                           Josh Piovia-Scott
                                           Mohammad Tajsar
                                           Attorneys for Plaintiffs

COMPLAINT FOR DAMAGES