1
2
3
4

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| Estate of JOSHUA CLAYPOLE, deceased, by and through SILVIA GUERSENZVAIG, as Administrator; and SILVIA GUERSENZVAIG, individually,<br><br>        Plaintiffs,<br><br>    v.<br><br>COUNTY OF SAN MATEO, et al.,<br><br>        Defendants. | Case No.  14-cv-02730-BLF<br><br>**ORDER (1) GRANTING IN PART CITY OF MONTEREY DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND; (2) GRANTING IN PART COUNTY OF MONTEREY DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND; AND (3) DENYING COUNTY OF MONTEREY DEFENDANTS' MOTION TO STRIKE**<br><br>[Re:  ECF 28, 33] |

Plaintiff Silvia Guersenzvaig ("Plaintiff") brings this lawsuit following the suicide of her twenty-year old son in a Monterey County Jail cell.  The deceased, Joshua Claypole ("Claypole"), had been at the jail for three days following his arrest for fatally stabbing a taxi driver.  Plaintiff asserts federal and state law claims on behalf of herself and Claypole's estate, seeking to impose liability upon the County of Monterey and other public entities and individuals who interacted with Claypole in the days before his death.

Two motions currently are before the Court:  (1) a motion by the City of Monterey ("City"), Monterey Police Chief Philip Penko ("Penko"), and Monterey Police Officer Brent Hall ("Hall") (collectively, "City Defendants"), seeking dismissal of the entire Complaint with prejudice under Federal Rule of Civil Procedure 12(b)(6); and (2) a motion by the County of Monterey ("County"), Sheriff Scott Miller ("Miller"), and Sergeant E. Kaye ("Kaye") (collectively, "County Defendants"), seeking dismissal of certain claims under Federal Rule of

Civil Procedure 12(b)(6) and seeking to strike Plaintiff's punitive damages request under Federal Rule of Civil Procedure 12(f).  The Court has considered the briefing and the oral argument presented at the hearing on October 2, 2014.  For the reasons discussed below, both motions to dismiss are GRANTED IN PART with leave to amend and the motion to strike is DENIED.

## I.    BACKGROUND[1]

Claypole was raised in Big Sur, California by his mother.  He started having mental health issues in high school, when he began exhibiting symptoms of anxiety, panic disorders, and bipolar disorder.  He saw a number of therapists and doctors, including doctors at Defendant Community Hospital of Monterey Peninsula ("CHOMP").  Claypole did well when he took his prescribed medications, but when he was not medicated he struggled to maintain normal behavior.  In late April 2013, he stopped sleeping, believed he had telepathy, and began acting in an aggressive and paranoid manner.  On April 29, 2013, he collected his belongings and left his mother's home without answering her questions about where he was going.

**April 30, 2013**

At 1:00 a.m. on the morning of April 30, 2013, Claypole was arrested by California Highway Patrol officers in Redwood City, California on suspicion of driving under the influence. He was booked and detained at the Maguire Correctional Facility operated by Defendant County of San Mateo, and his car was impounded.  Facility staff took Claypole's medical history from him and then prescribed him three psychotropic medications that typically are used to treat bipolar disorder, schizophrenia, psychosis, and mania:  Hydroxyzine, Quetiapine, and Lithium Carbonate. Claypole was released at 11:24 a.m. on the morning of April 30, 2013.

**May 1, 2013**

At 8:30 a.m. on May 1, 2013, Claypole went to the outpatient behavioral health clinic at CHOMP, located in Monterey, California, where he had been treated in 2012.  CHOMP staff did not provide treatment to Claypole; instead, they told him to leave and called the Monterey Police Department ("MPD").  By the time MPD officers arrived, Claypole had left.  However, he

---

[1] The background facts are drawn from the allegations of the Complaint, which are accepted as true for pleading purposes.

1  returned later that morning.  CHOMP personnel directed building security officers to escort

2  Claypole out of the building and again called the MPD.[2]

3         After being ejected from CHOMP, Claypole went to a local Wells Fargo branch and

4  withdrew money, then asked bank staff to call him a taxi.  Wells Fargo staff later told MPD

5  officers that Claypole appeared "out of it," displayed mood changes, made strange movements

6  with his head, and exhibited other unusual behavior.  Claypole got into the taxi and, at

7  approximately 1:10 p.m., he fatally stabbed the taxi driver.  Shortly thereafter, he was detained by

8  Seaside Police Department officers until MPD officers arrived and took custody.  Thereafter,

9  while Claypole was seated in the back of Defendant Hall's squad car, Claypole asked Hall, "Can

10  you ask for the [lethal] injection?"  Compl. ¶ 59.  He also told Hall that he "had to do it."  *Id.*

11  Later, during booking, Claypole asked Hall, "Should I go?  I should just take the injection."  *Id.* ¶

12  60.  While waiting to be interviewed by a detective, Claypole asked Hall, "Is my mom going to get

13  my remains?"  *Id.* ¶ 61.

14         MPD thereafter transferred custody of Claypole to the Monterey County Sheriff's

15  Department.  Neither Hall nor any other MPD officer informed County personnel that Claypole

16  was acting strangely or that he might be a suicide risk.  At approximately 8:30 p.m. on May 1,

17  2013, Claypole met with his criminal defense attorney.  After the meeting, Claypole's attorney

18  asked Officer Candi McGregor at the jail to place Claypole on suicide watch.  Officer McGregor

19  contacted the on-duty Sergeant, Kaye.  An Intake Health Screening form completed shortly

20  thereafter shows the "no" box checked for "Does behavior suggest danger to self or others?"  A

21  Classification Inmate Intake Screening Questionnaire completed that same night indicates that

22  Claypole had not shown any bizarre behavior and that he had not been under psychiatric care.  It is

23  not clear whether medical personnel administered these screenings.  It does not appear that

24  Claypole was given any other mental health evaluation or treatment.  Nor was he placed on suicide

25  watch at that time despite his attorney's request.

26

27

28  [2] There are no allegations that CHOMP recognized Claypole as a former patient or that the MPD
    made contact with him when responding to CHOMP's calls.

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**May 2, 2013**

On May 2, 2013, Claypole's attorney visited him again.  Claypole asked if his mother could bring his medications to the jail.

**May 3, 2013**

On May 3, 2013, Claypole made his first court appearance.  He was mentally unstable, and he believed that others were speaking to him telepathically.  His attorney assumed (incorrectly) that Claypole had been placed on suicide watch.  Claypole finally was placed on suicide watch at 2:35 p.m. on May 3, at which time he was transferred to a safety cell.

**May 4, 2013**

Approximately sixteen hours later, at 6:30 a.m. on Saturday, May 4, 2013, Claypole was taken off suicide watch and moved from the safety cell to a cell in A Pod, an administrative segregation housing unit.  No mental health personnel work at the jail on weekends; it is unclear who ordered Claypole taken off suicide watch.  At 1:00 p.m. that afternoon, Plaintiff arrived to visit Claypole and deliver his medications.  Jail staff refused to allow her to see Claypole, stating that he had been moved to a new unit and that visitation hours for that unit had not begun.  Plaintiff gave the medications to a jail nurse.  The medications were not provided to Claypole.

Although jail policy required staff to check Claypole hourly, the Hourly Safety Check log indicates that staff did not check on him for more than six hours.  At approximately 2:30 p.m., non-party Deputy Sheriff Raymond Gordano ("Gordano") found Claypole in his cell, hanging from a noose made of torn bed sheets that had been attached to a metal brace on the wall.  Gordano did not immediately open the cell or cut Claypole down; instead, he requested and waited for backup.  After other staff arrived, Claypole was cut down and the noose was cut with a knife.  Claypole was transferred to the custody of emergency room personnel at Natividad Medical Center, and then he was transported via helicopter to San Jose Regional Medical Center.  He was pronounced dead on May 9, 2013.  A postmortem examination determined that he died from asphyxia due to hanging.

A handwritten note was found in Claypole's cell, reading:  "I love you mama.  I'm sorry for all the pain I have brought you mama.  I love you very much.  Maybe I will see you again.

1   Love, Joshua."  Compl. ¶ 80.

2          Plaintiff sues the County of San Mateo; San Mateo County Sheriff Greg Munks; the

3   County of Monterey; Miller; Kaye; the City of Monterey; Penko; Hall; California Forensic

4   Medical Group ("CFMG")[3]; Dr. Taylor Fithian[4]; and CHOMP.  Plaintiff asserts the following

5   claims:  (1) a § 1983 claim for deliberate indifference in violation of the Fourteenth Amendment;

6   (2) a § 1983 claim for deliberate indifference in violation of the Fourteenth Amendment[5]; (3) a §

7   1983 claim for deprivation of substantive due process in violation of the First and Fourteenth

8   Amendments (causing loss of parent/child relationship); (4) professional negligence/medical

9   malpractice claim under California law; (5) failure to furnish medical care under California law;

10  (6) negligent supervision, training, hiring, and retention under California law; and (7) wrongful

11  death under California Code of Civil Procedure § 377.60.

12  **II.    LEGAL STANDARD**

13         "A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a

14  claim upon which relief can be granted 'tests the legal sufficiency of a claim.'"  *Conservation*

15  *Force v. Salazar*, 646 F.3d 1240, 1241-42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d

16  729, 732 (9th Cir. 2001)).  When determining whether a claim has been stated, the Court accepts

17  as true all well-pled factual allegations and construes them in the light most favorable to the

18  plaintiff.  *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011).  However, the

19  Court need not "accept as true allegations that contradict matters properly subject to judicial

20  notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or

21  unreasonable inferences."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008)

22  (internal quotation marks and citations omitted).  While a complaint need not contain detailed

United States District Court
Northern District of California

---

[3] CFMG is a private health care provider that services approximately sixty-five correctional facilities in California, including the Monterey County Jail.

[4] Taylor Fithian is the co-founder, President, and Medial Director of CFMG.

[5] Although Claim 1 is labeled "Deliberate Indifference to Serious Medical and Mental Health Needs" and Claim 2 is labeled "Failure to Protect from Harm," both clearly are deliberate indifference claims.  The claims contain the identical allegation that Defendants' conduct "constituted deliberate indifference to Joshua Claypole's serious medical needs, health, and safety."  Compl. ¶¶ 87 (Claim 1) and 95 (Claim 2).

factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## III. CITY DEFENDANTS' MOTION TO DISMISS

The City, Penko, and Hall are named as defendants in only two of the seven claims asserted in this lawsuit: Claim 2 for deliberate indifference in violation of the Fourteenth Amendment; and Claim 3 for deprivation of substantive due process in violation of the First and Fourteenth Amendments. They seek dismissal of both claims with prejudice.

### A. Claim 2 – Deliberate Indifference

Claim 2 asserts a § 1983 claim against the City Defendants and others based upon their alleged deliberate indifference to Claypole's serious medical needs, health, and safety in violation of the Fourteenth Amendment. Read liberally, the claim alleges that Hall knew that Claypole was suicidal and failed to respond appropriately; and that Penko and the City failed to maintain policies and procedures, or provide adequate training and supervision, to ensure that MPD officers informed other agencies of known suicide risks when transferring custody of an arrestee. *See* Compl. ¶ 93. The City Defendants argue that they did not owe any duty to Claypole at the time of his death; the actions of the County Defendants were a superseding cause that precludes any liability against the City Defendants; and Penko did not have any contact with Claypole or take any action that could render him individually liable to Plaintiff.

"To succeed on a § 1983 claim, a plaintiff must show that (1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct deprived the plaintiff of a federal constitutional or statutory right." *Patel v. Kent School Dist.*, 648 F.3d 965, 971 (9th Cir. 2011). Here, the City, Penko, and Hall do not challenge their status as state actors for § 1983 purposes. They contend that Plaintiff has not alleged facts showing that they deprived Claypole of Fourteenth Amendment rights.

"[T]he Fourteenth Amendment Due Process Clause generally does not confer any affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty,

United States District Court
Northern District of California

1  or property interests." *Id.* "There are two exceptions to this rule: (1) when a 'special relationship'

2  exists between the plaintiff and the state (the special-relationship exception); and (2) when the

3  state affirmatively places the plaintiff in danger by acting with 'deliberate indifference' to a

4  'known or obvious danger' (the state-created danger exception)." *Id.* at 971-72 (internal citations

5  omitted). "If either exception applies, a state's omission or failure to protect may give rise to a §

6  1983 claim." *Id.* at 972.

7  In the context of arrest or pretrial detention, the Fourteenth Amendment confers a right to

8  be free from cruel and unusual punishment, which encompasses a right to have serious medical

9  needs addressed. *Simmons v. Navajo Cnty.*, 609 F.3d 1011, 1017 (9th Cir. 2010); *Gibson v. Cnty*

10  *of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002). "[A] heightened suicide risk can present a

11  serious medical need." *Simmons*, 609 F.3d at 1018. An officer effects a deprivation of Fourteenth

12  Amendment rights if he or she is deliberately indifferent to a detainee's serious medical needs. *Id.*

13  at 1017; *see also Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1241 (9th Cir. 2010) ("We

14  have long analyzed claims that correction facility officials violated pretrial detainees'

15  constitutional rights by failing to address their medical needs (including suicide prevention) under

16  a 'deliberate indifference' standard.").

17  "A prison official cannot be liable for deliberate indifference unless he or she 'knows of

18  and disregards an excessive risk to inmate health or safety; the official must both be aware of facts

19  from which the inference could be drawn that a substantial risk of serious harm exists, and he must

20  also draw the inference.'" *Simmons*, 609 F.3d at 1017 (quoting *Farmer v. Brennan*, 511 U.S. 825,

21  837 (1994)). "In other words, a plaintiff must show that the official was (a) subjectively aware of

22  the serious medical need and (b) failed adequately to respond." *Id.* at 1017-18 (internal quotation

23  marks and citation omitted).

24  **1.    Duty**

25  The City Defendants argue that they did not owe Claypole any duty at the time of his death

26  because the special relationship created by the MPD's custody of Claypole ended when custody

27  was transferred to the County, and the MPD did not place Claypole in danger prior to the transfer.

28  A special relationship clearly existed during the period in which the MPD had custody of

United States District Court
Northern District of California

7

1    Claypole.  *See DeShaney v.Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989)

2    ("when the State takes a person into its custody and holds him there against his will, the

3    Constitution imposes upon it a corresponding duty to assume some responsibility for his safety

4    and general well-being").  The City Defendants do not suggest otherwise.  While that special

5    relationship existed, and before it terminated as a result of transfer of custody to the County, the

6    City Defendants are charged with failing to take required actions consistent with their duty of care.

7    It is alleged that while in City custody, Claypole made a number of statements to Hall that could

8    be viewed as suicidal.  Moreover, while Plaintiff does not allege any specific facts regarding

9    Claypole's general behavior when he was with Hall, her allegations regarding his bizarre conduct

10   both before and after Hall had custody of him give rise to an inference that he behaved bizarrely

11   with Hall as well.[6]

12          Viewing the complaint in the light most favorable to Plaintiff, it is plausibly alleged that

13   Hall was subjectively aware that Claypole was suicidal and nonetheless failed to request a mental

14   health assessment or even inform Claypole's next custodian, the County, of that critical fact.

15   Those allegations are sufficient to make out a deliberate indifference claim.  Plaintiff plausibly

16   alleges that the harm to Claypole – his suicide three days later – was caused, at least in part, by the

17   City Defendants' failure to provide medical care and failure to advise the Monterey County Jail

18   staff of Claypole's suicidal statements and bizarre behavior while in City custody.  *Cf. Lum v.*

19   *Cnty. of San Joaquin*, 756 F. Supp. 2d 1243, 1254-58 (E.D. Cal. 2010) (finding viable a wrongful

20   death claim based in part upon jail staff's failure to assess the decedent's medical status or provide

21   medical care while he was in custody, where decedent was found floating in a nearby river three

22   days after his release from jail).

23          Plaintiff does not assert any pleading deficiencies with respect to the official capacity

24   claims against Penko or the *Monell*[7] claims against the City; they rely solely upon their contention

25

26   _____

27   [6] Taking Plaintiff's allegations as true, it is highly unlikely that Claypole behaved strangely at
     CHOMP, at Wells Fargo, and at the jail with his attorney, but had a moment of clarity while with
     Hall.

28   [7] *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

United States District Court
Northern District of California

United States District Court
Northern District of California

1  that Plaintiff has failed to allege an underlying violation of Claypole's rights.  Consequently, the

2  City Defendants have failed to demonstrate that they are entitled to dismissal of Plaintiffs' claims.

3                    **2.      Superseding Cause**

4          The City Defendants contend that their conduct could not have been the proximate cause of

5  Claypole's death.  *See Clouthier*, 591 F.3d at 1245 n.3 ("to prevail on a § 1983 claim under a

6  deliberate indifference theory, plaintiff must prove that the official's actions were both the actual

7  and proximate cause of plaintiff's injuries") (citing *White v. Roper*, 901 F.2d 1501, 1505 (9th Cir.

8  1990)).  Specifically, the City Defendants contend that the actions of the County in first imposing,

9  and then removing, a suicide watch constituted a superseding cause that precludes any liability

10  against them.

11          In § 1983 actions, "[t]raditional tort law defines intervening causes that break the chain of

12  proximate causation."  *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996) (citation

13  omitted).  A defendant's conduct is not the proximate cause of the plaintiff's injury "if another

14  cause intervenes and supersedes his liability for the subsequent events."  *White*, 901 F.2d at 1506.

15  However, "[t]he courts are quite generally agreed that [foreseeable] intervening causes . . . will not

16  supersede the defendant's responsibility."  *Id.* (internal quotation marks and citation omitted)

17  (alteration in original).  If reasonable persons could differ on the question of foreseeability, the

18  question should be left to a jury.  *Id.*

19          The gist of the City Defendants' argument is that they were entitled to expect the County

20  to undertake any necessary precautions or treatment with respect to Claypole's mental health; the

21  County did take such precautions; and the City could not have foreseen – and cannot be held

22  responsible for – the County's decisions to place Claypole on and then remove him from suicide

23  watch.  However, Plaintiff alleges that when Claypole arrived at the jail he was given only a

24  cursory mental health screening, which resulted in check-box determinations that he was not a

25  danger to himself and had no history of psychiatric treatment.  The County did not place Claypole

26  on suicide watch until he had been at the jail for two days.  Had Hall informed the County that

27  Claypole was suicidal, the County may well have performed a more thorough mental health

28  evaluation upon intake, medicated Claypole, and/or maintained the suicide watch for a longer

9

1   period of time.  Accordingly, the Court cannot conclude as a matter of law that the County's

2   conduct constituted a superseding cause that cuts off any potential liability on the part of the City

3   Defendants.

4               3.      **Penko**

5         "A defendant may be held liable as a supervisor under § 1983 if there exists either (1) his

6   or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection

7   between the supervisor's wrongful conduct and the constitutional violation."  *Starr v. Baca*, 652

8   F.3d 1202, 1207 (9th Cir. 2011) (internal quotation marks and citation omitted).  "The requisite

9   causal connection can be established . . . by setting in motion a series of acts by others, . . . or by

10  knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or

11  reasonably should have known would cause others to inflict a constitutional injury."  *Id.* (internal

12  quotation marks and citation omitted) (alterations in original).  "A supervisor can be liable in his

13  individual capacity for his own culpable action or inaction in the training, supervision, or control

14  of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that

15  showed a reckless or callous indifference to the rights of others."  *Id.* (internal quotation marks and

16  citation omitted).

17        The Complaint alleges generally that "Penko is and was responsible for the hiring,

18  screening, training, retention, supervision, discipline, counseling, and control of all Monterey

19  Police Department employees and/or agents," and that "Penko also is and was responsible for the

20  promulgation of the policies and procedures and allowance of the practices/customs pursuant to

21  which the acts of the Monterey Police Department alleged herein were committed."  Compl. ¶ 17.

22  Bare allegations of this nature are insufficient; some specific facts regarding Penko's knowledge

23  or conduct must be pled to make out a plausible claim against him in his individual capacity.  *See,*

24  *e.g., Starr*, 652 F.3d at 1208-12 (reciting the plaintiff's detailed allegations regarding the

25  defendant sheriff's knowledge of misconduct by his subordinate jail officials).

26        Accordingly, the motion to dismiss Claim 2 is GRANTED with leave to amend as to the

27  claim against Penko in his individual capacity and otherwise is DENIED.

28

United States District Court
Northern District of California

10

United States District Court
Northern District of California

### B.      Claim 3 – Substantive Due Process

Claim 3 asserts a substantive due process claim against the City Defendants and others. "The substantive due process right to family integrity or to familial association is well established." *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1079 (9th Cir. 2011). "A parent has a 'fundamental liberty interest' in companionship with his or her child." *Id.* (citing *Kelson v. City of Springfield*, 767 F.2d 651, 654-55 (9th Cir. 1985)). In order to make out a violation of substantive due process, the harmful conduct must shock the conscience or offend notions of fair play and decency. *Id.*

The City Defendants argue that Plaintiff cannot make out a claim against them because she has failed to allege facts showing that they violated Claypole's constitutional rights or caused his death. However, as discussed above, Plaintiff has alleged facts sufficient to state a claim for deliberate indifference as to all City Defendants except for Penko in his individual capacity. Because the conduct alleged, if true, would shock the conscience, the Court concludes that Plaintiff has stated a substantive due process claim as well.

Accordingly, the motion to dismiss Claim 3 is GRANTED with leave to amend as to the claim against Penko in his individual capacity and otherwise is DENIED.

## IV.   COUNTY DEFENDANTS' MOTION TO DISMISS AND TO STRIKE

The County Defendants are named as defendants in all seven claims asserted in the Complaint. However, they move to dismiss only four: Claim 4 for professional negligence; Claim 5 for failure to furnish medical care; Claim 6 for negligent supervision, training, hiring, and retention; and Claim 7 for wrongful death. They also move to strike Plaintiff's punitive damages request.

### A.      Claim 4 - Professional Negligence

Claim 4 asserts that the County Defendants and others committed professional negligence by failing to provide appropriate evaluation and treatment of Claypole. Based upon a careful review of the allegations of the Complaint and the colloquy between the Court and Plaintiff's counsel at the hearing, it appears clear that Claim 4 is a claim for medical malpractice. Because none of the County Defendants is a medical professional, a claim of medical malpractice does not

United States District Court
Northern District of California

1   lie against them.  *See Silverbrand v. Woodford*, No. CV 06-3253-R (CW), 2010 WL 3635780, at

2   *8 (Aug. 18, 2010) (dismissing medical malpractice claims against corrections officers who were

3   not medical professionals).

4           Plaintiff's reliance on *Lum*, 756 F. Supp. 2d 1243, is misplaced.  In *Lum*, parents asserted

5   claims against public entities and officials arising out of the detention and subsequent death of

6   their son.  The decedent had been arrested for public intoxication at approximately 1:00 a.m. and

7   booked on a "kickout" charge, meaning he would be released from jail six hours later.  At the time

8   of his arrest, the decedent had a cut on his foot, vomit on his shirt, and was behaving strangely.  A

9   blood test showed no alcohol in his system; he stated that he was bipolar and took medication; and

10  he had hallucinations and a seizure in his holding cell.  However, the jail staff did not order a

11  medical or psychiatric evaluation.  Instead, they released the decedent at 7:30 a.m. "without

12  successful family notification, transportation, money, phone, or shoes."  *Id.* at 1247.  His body was

13  found in the nearby San Joaquin River a few days later.  The Court of Appeals concluded that

14  under those circumstances the parents could make out negligence claims against the arresting

15  officers and jail personnel that would not be barred by governmental immunities.  *Id.* at 1256.  The

16  court did not, however, find that the parents could make out *professional* negligence claims.

17          Accordingly, the motion to dismiss Claim 4 is GRANTED without leave to amend the

18  claim of professional negligence against the County Defendants but with leave to amend to add a

19  garden-variety negligence claim against the County Defendants, if appropriate.

20          **B.      Claim 5 - Failure to Furnish Medical Care**

21          Claim 5 seeks to impose liability upon the County Defendants and others for failure to

22  furnish or summon medical care while Claypole was held at the jail.  The claim alleges that

23  although "Defendants owed Joshua Claypole a duty of care to provide him immediate medical and

24  mental health care," "Defendants failed to take reasonable action to summon or provide that care,

25  resulting in Joshua Claypole's death."  Compl. ¶¶ 109-10.  The Monterey County Defendants

26  contend that the County is immune from suit under California Government Code § 844.6 and that

27  Plaintiff has not pled facts sufficient to come within the exception to immunity set forth in

28  California Government Code § 845.6.

1

2   Section 844.6 provides that, with certain enumerated exceptions, "a public entity is not

3   liable for . . . an injury to any prisoner." Cal. Gov't Code § 844.6(a). One of the enumerated

4   exceptions is California Government Code § 845.6, which provides in relevant part that "a public

5   employee, and the public entity where the employee is acting within the scope of his employment,

6   *is liable if the employee knows or has reason to know that the prisoner is in need of immediate*

7   *medical care and he fails to take reasonable action to summon such medical care*." Cal. Gov't

    Code § 845.6 (emphasis added).

8          The County Defendants argue that Claim 5 does not fall within this exception because the

9   Complaint reveals that medical care in fact was furnished. To the extent that the County

10  Defendants rely on allegations regarding medical screening administered to Claypole after Kaye

11  was informed of Claypole's suicidal ideation, it is unclear from the record whether that screening

12  was given by medical personnel or whether initiating the screening constituted "reasonable action

13  to summon" medical care. *See* Compl. ¶¶ 63-65. To the extent that the County Defendants rely

14  on allegations regarding the care given after Claypole was discovered hanging in his cell, it is

15  unclear from the record whether Gordano's decision to wait for backup before cutting Claypole

16  down constituted "reasonable" action. *See* Compl. ¶ 74. While the County Defendants ultimately

17  may be able to prove that they are not subject to liability under Section 845.6, it would be

18  inappropriate to make that factual determination at the pleading stage.

19         Accordingly, the motion to dismiss Claim 5 is DENIED.

20  **C.     Claim 6 – Negligent Supervision, Training, Hiring, and Retention and**

21              **Claim 7 – Wrongful Death**

22         Claim 6 asserts that the County Defendants are liable for negligent supervision, training,

23  hiring, and retention, while Claim 7 asserts that they are liable for negligent or wrongful acts that

24  caused Claypole's death. The County argues that it is immune from these claims, relying on

25  California Government Code § 815, which provides that a public entity is not liable for any injury

26  except as otherwise provided by statute. Cal. Gov't Code § 815(a). As discussed above, Section

27  845.6 permits claims against a public entity based upon its employees' failure to furnish medical

28  care. Thus the Court concludes that Plaintiff's claims are viable to the extent they are based upon

United States District Court
Northern District of California

13

1   the County's negligence in supervising and training its employees regarding the furnishing of

2   mental health care. *See Bock v. Cnty. of Sutter*, No. 2:11-cv-00536-MCE-GGH, 2012 WL

3   3778953, at *18-19 (E.D. Cal. Aug. 31, 2012) (denying motion to dismiss claims for negligent

4   supervision and wrongful death that were based upon jail personnel's failure to furnish medical

5   care).

6           Accordingly, the motion to dismiss Claim 6 and Claim 7 is DENIED.

7           **D.      Punitive Damages**

8           The County Defendants move to strike Plaintiff's request for punitive damages under Rule

9   12(f).  The Ninth Circuit has held that Rule 12(f) is not the appropriate vehicle for a challenge to

10   punitive damages at the pleading stage, and has directed that such a challenge should be brought

11   under Rule 12(b)(6). *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974 (9th Cir. 2010).

12   Even if the motion had been brought under Rule 12(b)(6), however, the Court would not be

13   inclined to entertain it at this stage in the proceedings.  If and when appropriate after summary

14   judgment or trial, the Court will take up the issue of whether punitive damages are available in this

15   action.

16           Accordingly, the County Defendants' motion to strike is DENIED.

17   **V.    ORDER**

18           For the foregoing reasons, IT IS HEREBY ORDERED that:

19           (1)     The City of Monterey Defendants' motion to dismiss is GRANTED as to Plaintiff's

20                   claims against Penko in his individual capacity, with leave to amend, and otherwise

21                   is DENIED.  If Plaintiff is unable to allege additional facts against Penko in his

22                   individual capacity by the deadline for amendment but discovers such facts at a

23                   later date, she may seek leave to amend her pleading to reallege claims against

24                   Penko in his individual capacity.

25           (2)     The County of Monterey Defendants' motion to dismiss is GRANTED as to Claim

26                   4 without leave to amend the claim of professional negligence but with leave to

27                   amend to add a garden-variety negligence claim, if appropriate.  The County of

28                   Monterey Defendants' motion to dismiss otherwise is DENIED, and their motion to

United States District Court
Northern District of California

1    strike is DENIED.

2    (3)    Leave to amend is limited to the pleading deficiencies identified herein.  Plaintiff

3          may not add any other claims or other parties without express leave of court.

4    (4)    Any amended complaint shall be filed on or before October 28, 2014.

5

6    Dated:  October 9, 2014

7    _____

8    BETH LABSON FREEMAN
     United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28