Dan Stormer, Esq. [S.B. # 101967]
Josh Piovia-Scott, Esq. [S.B. #222364]
Mohammad Tajsar, Esq. [S.B. #280152]
HADSELL STORMER & RENICK LLP
128 N. Fair Oaks Avenue
Pasadena, California 91103
Telephone: (626) 585-9600/Facsimile:  (626) 577-7079
Email: dstormer@hadsellstormer.com, jps@hadsellstormer.com, and
mtajsar@hadsellstormer.com

Lori Rifkin, Esq. [S.B. # 244081]
RIFKIN LAW OFFICE
P.O. Box 19169
Oakland, California 94619
Telephone: (415) 685-3591
Email: lrifkin@rifkinlawoffice.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Estate of JOSHUA CLAYPOLE, deceased, by and through SILVIA GUERSENZVAIG, as Administrator; SILVIA GUERSENZVAIG,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF SAN MATEO; SHERIFF GREG MUNKS, in his individual and official capacity; COUNTY OF MONTEREY; SHERIFF SCOTT MILLER, in his individual and official capacity; SERGEANT E. KAYE, in his individual and official capacity; CITY OF MONTEREY; MONTEREY POLICE DEPARTMENT CHIEF PHILIP PENKO, in his individual and official capacity; BRENT HALL, in his individual and official capacity; CALIFORNIA FORENSIC MEDICAL GROUP; DR. TAYLOR FITHIAN, in his individual and official capacity; COMMUNITY HOSPITAL OF MONTEREY PENINSULA; and DOES 1 through 30,<br><br>Defendants. | Case No: CV 14-02730 BLF<br><br>[Assigned to the Honorable Beth Labson Freeman - Courtroom 3]<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES**<br><br>1. Failure to Provide Medical Care in Violation of Fourteenth Amendment;<br>2. Failure to Protect from Harm in Violation of Fourteenth Amendment;<br>3. Deprivation of Substantive Due Process in Violation of First and Fourteenth Amendments;<br>4. Medical Malpractice;<br>5. Failure to Furnish Medical Care;<br>6. Negligent Supervision, Training, Hiring, and Retention;<br>7. Wrongful Death;<br>8. Negligence.<br><br>**DEMAND FOR JURY TRIAL**<br><br>Complaint Filed:      June 12, 2014<br>Discovery Cut-Off:    By Code<br>Motion Cut-Off:       By Code<br>TRIAL DATE:           NONE SET |

FIRST AMENDED COMPLAINT

**INTRODUCTION**

1.     On May 4, 2013, 20-year-old Joshua Claypole committed suicide in a cell at Monterey County Jail by hanging himself from a bed sheet. Three days prior, Claypole had been arrested for the fatal stabbing of Daniel Garcia Huerta, a taxi driver, during a bipolar episode. These two tragic deaths should not have happened—and would not have happened—if Defendants in this case had fulfilled their duties as public safety agencies and followed policies and procedures that are standard in their fields and required by law.

2.     Defendants are California municipalities, Sheriffs' departments, health care providers, and their employees. Each Defendant entity had multiple contacts with Claypole in the days before his death. Had Defendants followed standard protocols and training, they would have identified Claypole's acute mental health crisis and risk factors, and intervened to protect him and the public. However, Defendants did not have the appropriate policies and procedures in place, and ignored the obvious warning signs.  As a result, two families lost their loved ones.

3.     The Estate of Joshua Claypole and Claypole's mother, Silvia Guersenzvaig, bring this action for damages against Defendants for violations arising out of Defendants' deliberate indifference and negligence that caused the needless suffering and death of Joshua Claypole.

**JURISDICTION**

4.     This Complaint seeks damages for violations of the civil rights, privileges, and immunities guaranteed by the First and Fourteenth Amendments of the United States Constitution, pursuant to 42 U.S.C. §§ 1983 and 1988, and for violations of California state law.

5.     This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. §§ 1331 and 1343.

6.     This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367, because the claims form part of the

same case or controversy arising under the United States Constitution and federal law.

## VENUE

7.      Plaintiffs' claims arose in the Counties of San Mateo and Monterey, California. Venue therefore lies in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2).

8.      Rule 3 of the Federal Rules of Civil Procedure and Local Rule 3-2(e) authorizes assignment to this division because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the counties served by this division.

## PARTIES

9.      Plaintiff Silvia Guersenzvaig, as Administrator of the Estate of Joshua Kannon Claypole, brings this action pursuant to California Code of Civil Procedure §§ 377.10 et seq. At the time of his death, Joshua Claypole was a 20-year-old citizen of the United States and resident of the County of Monterey in the State of California. The survival causes of action in this matter are based on violations of Joshua Claypole's rights under the First and Fourteenth Amendments, and on violations of California state law.

10.     Silvia Guersenzvaig is the mother of Joshua Claypole. She is suing individually for violations of civil rights under the First and Fourteenth Amendments and California state law.

11.     Defendant County of San Mateo is a public entity, duly organized and existing under the laws of the State of California. Under its authority, Defendant County of San Mateo operates and manages the Maguire Correctional Facility and is and was at all relevant times mentioned herein responsible for the actions and/or inactions and the policies, procedures, and practices/customs of the San Mateo County Sheriff's Department and the Maguire Correctional Facility, and each entity's respective employees and/or agents. San Mateo County Sheriff's

Department operates the Maguire Correctional Facility, and is and was responsible for ensuring the provision of emergency and medical and mental health care services to all Maguire Correctional Facility inmates.

12. Defendant Greg Munks is, and was at all relevant times mentioned herein, the Sheriff of the County of San Mateo, the highest position in the San Mateo County Sheriff's Department. As Sheriff, Defendant Munks is and was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all San Mateo Sheriff's Department custodial employees and/or agents and Does 1 through 10. Defendant Munks is and was charged by law with the administration of the Maguire Correctional Facility, with the assistance of a small group of executive officers. Defendant Munks also is and was responsible for the promulgation of the policies and procedures and allowance of the practices/customs pursuant to which the acts of the San Mateo County Sheriff's Department alleged herein were committed. Defendant Munks is being sued in his individual and official capacities.

13. Defendant County of Monterey is a public entity, duly organized and existing under the laws of the State of California. Under its authority, Defendant County of Monterey operates and manages Monterey County Jail and is and was at all relevant times mentioned herein responsible for the actions and/or inactions and the policies, procedures, and practices/customs of the Monterey County Sheriff's Department and Monterey County Jail, and each entity's respective employees and/or agents. Monterey County Sheriff's Department operates Monterey County Jail, and is and was responsible for ensuring the provision of emergency and medical and mental health care services to all Monterey County Jail inmates.

14. Defendant Scott Miller is, and was at all relevant times mentioned herein, the Sheriff of the County of Monterey, the highest position in the San Mateo County Sheriff's Department. As Sheriff, Defendant Miller is and was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and

FIRST AMENDED COMPLAINT -3-

control of all San Mateo Sheriff's Department custodial employees and/or agents and Does 11 through 20.  Defendant Miller is and was charged by law with the administration of the Monterey County Jail, with the assistance of a small group of executive officers.  Defendant Miller also is and was responsible for the promulgation of the policies and procedures and allowance of the practices/customs pursuant to which the acts of the Monterey County Sheriff's Department alleged herein were committed.  Defendant Miller is being sued in his individual and official capacities.

15.     Defendant E. Kaye is, and was at all relevant times mentioned herein, a Sergeant in the County of Monterey's Sheriff's Department. As a Sergeant, Defendant Kaye is a supervisor at the Monterey County Jail. On May 1, 2013, Defendant Kaye was the on-duty Sergeant at the Monterey County Jail who received notice from a subordinate deputy that Joshua Claypole was suicidal. She had direct control over the placement of Claypole in a safety cell, and for ensuring he was placed on suicide watch during his detention at Monterey County Jail. Her failure to ensure adequate protection and monitoring of Claypole led to his suicide. Defendant Kaye is being sued in her individual capacity.

16.     Defendant City of Monterey is a municipality duly organized and existing under the laws of the State of California. The Monterey Police Department is a duly formed agency of the City of Monterey. Under its authority, Defendant City of Monterey is and was at all relevant times mentioned herein responsible for the actions and/or inactions and the policies, procedures, and practices/customs of the Monterey Police Department and its respective employees and/or agents. City of Monterey police officers arrested and detained Joshua Claypole on May 1, 2013, and were privy to numerous suicidal statements made by Claypole while in their custody.

17.     Defendant Philip Penko is, and was at all relevant times mentioned herein, the Chief of the Monterey Police Department, the highest position in the

---

FIRST AMENDED COMPLAINT                    -4-

Department. As Chief, Defendant Penko is and was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all Monterey Police Department employees and/or agents and Does 21 through 30. Defendant Penko also is and was responsible for the promulgation of the policies and procedures and allowance of the practices/customs pursuant to which the acts of the Monterey Police Department alleged herein were committed.  Defendant Penko is being sued in his official capacity.

18.     Defendant Brent Hall is, and was at all relevant times mentioned herein, an Officer of the Monterey Police Department. According to police records, Defendant Hall responded to the crime scene in Monterey on May 1, 2013, and transported Joshua Claypole to the Monterey County Jail, where Claypole was booked into the facility. Defendant Hall is being sued in his individual and official capacities.

19.     Defendant California Forensic Medical Group ("CFMG") is a California corporation headquartered in Monterey, California. CFMG is a private correctional health care provider that services approximately 65 correctional facilities in 27 California counties. The County of Monterey contracts with CFMG to provide medical, mental health, and dental services for the Monterey County Jail. At all relevant times mentioned herein, CFMG was responsible for the health services provided to Joshua Claypole during his detention in the Monterey County Jail.

20.     Defendant Taylor Fithian is, and was at all relevant times mentioned herein, the co-founder, President, and Medical Director for Defendant CFMG. Defendant Fithian is a Board-certified psychiatrist and oversees the delivery of medical, mental health and dental care in all CFMG-served facilities, including standards of medical care and utilization review. Dr. Fithian is also listed on the website of the Community Hospital of Monterey Peninsula as an affiliated doctor. Defendant Fithian is and was responsible for the promulgation of the policies and

FIRST AMENDED COMPLAINT          -5-

1  procedures and allowance of the practices/customs pursuant to which the acts of

2  CFMG alleged herein were committed. In addition, Defendant Fithian personally

3  evaluated Joshua Claypole on at least one occasion while he was held at Monterey

4  County Jail, and was involved in the decision to remove Claypole from suicide

5  watch on May 4, 2013.  Defendant Fithian is sued in his individual capacity.

6      21.    Defendant Community Hospital of Monterey Peninsula ("CHOMP") is

7  a California non-profit health care provider based in Monterey, California. It

8  encompasses a main hospital, a mental health clinic, laboratories, and a short-term

9  nursing facility, among others, that provide services spanning a range of health care

10  needs, including primary care, cardiology, oncology, behavioral health, and

11  emergency care.  CHOMP provided outpatient mental health care to Joshua

12  Claypole from approximately March 2012 through August 2012. Medical records

13  indicate CHOMP-affiliated doctors were involved in prescribing medication to

14  Claypole as late as October 2012.

15      22.    The true names and identities of Defendants Does 1 through 10 are

16  presently unknown to Plaintiffs.  Plaintiffs allege that each of Defendants Does 1

17  through 10 was employed by the County of San Mateo and/or the San Mateo

18  County Sheriff's Department at the time of the conduct alleged herein. Plaintiffs

19  allege that each of Defendants Does 1 through 10 was deliberately indifferent to

20  Joshua Claypole's medical needs and safety, failed to provide necessary psychiatric

21  care to him or take other measures to prevent him from attempting suicide, violated

22  his civil rights, wrongfully caused his death, and/or encouraged, directed, enabled

23  and/or ordered other defendants to engage in such conduct.  Plaintiffs further allege

24  that Defendants Does 1 through 10 violated Plaintiffs' First and Fourteenth

25  Amendment rights and rights under California state law.  Plaintiffs further allege

26  that each of Defendants Does 1 through 10 was responsible for the hiring,

27  screening, training, retention, supervision, discipline, counseling, and control of

28  medical, mental health, and jail custody employees and/or agents involved in the

1   conduct alleged herein.

2       23.    The true names and identities of Defendants Does 11 through 20 are

3   presently unknown to Plaintiffs.  Plaintiffs allege that each of Defendants Does 11

4   through 20 was employed by County of Monterey, and/or the Monterey County

5   Sheriff's Department, and/or California Forensic Medical Group at the time of the

6   conduct alleged herein. Plaintiffs allege that each of Defendants Does 11 through

7   20 was deliberately indifferent to Joshua Claypole's medical needs and safety,

8   failed to provide necessary psychiatric care to him or take other measures to prevent

9   him from attempting suicide, violated his civil rights, wrongfully caused his death,

10  and/or encouraged, directed, enabled and/or ordered other defendants to engage in

11  such conduct.  Plaintiffs further allege that Defendants Does 11 through 20 violated

12  Plaintiffs' First and Fourteenth Amendment rights, and rights under California state

13  law.  Plaintiffs further allege that each of Defendants Does 11 through 20 was

14  responsible for the hiring, screening, training, retention, supervision, discipline,

15  counseling, and control of medical, mental health, and jail custody employees

16  and/or agents involved in the conduct alleged herein.

17      24.    The true names and identities of Defendants Does 21 through 30 are

18  presently unknown to Plaintiffs.  Plaintiffs allege that each of Defendants Does 21

19  through 30 was employed by the City of Monterey and/or the Monterey Police

20  Department at the time of the conduct alleged herein.  Plaintiffs allege that each of

21  Defendants Does 21 through 30 was deliberately indifferent to Joshua Claypole's

22  medical needs and safety, failed to provide necessary psychiatric care to him or take

23  other measures to prevent him from attempting suicide, violated his civil rights,

24  wrongfully caused his death, and/or encouraged, directed, enabled and/or ordered

25  other defendants to engage in such conduct.  Plaintiffs further allege that

26  Defendants Does 21 through 30 violated Plaintiffs' First and Fourteenth

27  Amendment rights, and rights under California state law.  Plaintiffs further allege

28  that each of Defendants Does 21 through 30 was responsible for the hiring,

FIRST AMENDED COMPLAINT            -7-

1  screening, training, retention, supervision, discipline, counseling, and control of

2  medical, mental health, and jail custody employees and/or agents involved in the

3  conduct alleged herein.

4      25.    Plaintiffs will seek to amend this Complaint as soon as the true names

5  and identities of Defendants Does 1 through 30 have been ascertained.

6      26.    Defendants Greg Munks, Scott Miller, E. Kaye, Philip Penko, Brent

7  Hall, Taylor Fithian, and Does 1 through 30 engaged in the acts or omissions

8  alleged herein under color of state law.

9      27.    Plaintiffs are informed and believe and thereon allege that at all times

10 mentioned in this Complaint, Defendants were the agents, employees, servants,

11 joint venturers, partners and/or co-conspirators of the other Defendants named in

12 this Complaint and that at all times, each of the Defendants was acting within the

13 course and scope of said relationship with Defendants.

14                **EXHUASTION OF PRE-LAWSUIT PROCEDURES**

15                      **FOR STATE LAW CLAIMS**

16     28.    Plaintiffs filed governmental tort claims with the State and Defendant

17 County of Monterey, including on behalf of the Estate of Joshua Claypole, on

18 October 28, 2013.  By correspondence dated December 13, 2013, the County of

19 Monterey rejected the governmental tort claims on behalf of Joshua Claypole.

20     29.    By correspondence dated March 10, 2014, Plaintiffs notified

21 Defendants County of Monterey, Sheriff Miller, CFMG, and Dr. Taylor Fithian of

22 their intention to file suit against them based on their negligence in providing

23 professional health care services, as required by Section 364 of the California Code

24 of Civil Procedure.

25 ///

26 ///

27

28

---

**FACTUAL ALLEGATIONS**

**I.     History of Inadequate Mental Health Care in Monterey County Jail**

30.     County of Monterey and CFMG have been on notice that their provision of mental health care to inmates at the Monterey County Jail is inadequate and results in needless harm since at least 2007, when the Monterey County Sheriff's Office and the Monterey County Board of Supervisors hired an outside consulting firm to perform a needs assessment for the Jail.

31.     The independent assessment was updated in 2011 and found County of Monterey and CFMG's policies and practices for screening, supervising, and treating prisoners at risk for suicide inadequate. (See Exhibit 1.) The 2011 Assessment identified structural and design flaws of cells and dormitories that do not minimize suicide hazards in the facilities and fail to prevent self-harm. (See Exhibit 1 at EX.3.)  The Assessment also found that Monterey County Jail's physical facilities lack sufficient treatment space and therefore prevent adequate delivery of medical and mental health care. (Exhibit 1 at EX.3, A.3.)

32.     In addition to the Jail's structural issues the Assessment found that chronic understaffing hinders County of Monterey's ability to provide medical care, classify and move inmates within the facility, maintain inmate safety and security, and transport inmates to and from outside agencies. (Exhibit 1 at G.1–G.3, J.2–J.3.) In addition, understaffing and overcrowding at the Jail creates what the Assessment called "an indirect supervision facility," which impairs the Jail's ability to "recognize, manage and treat" mental health issues among the inmate population (as opposed to direct supervision from experienced physicians and psychologists). (Id. at EX.3.)

33.     These deficiencies are even more troubling in light of the Assessment's finding that approximately 15–20% of the Jail's inmates suffer from mental health issues. (Exhibit 1 at A.3 n. 4.)

///

34.     The Assessment's findings were confirmed in a 2013 draft report by an expert hired by County of Monterey, Dr. Richard Hayward ("Hayward Report"). (See Exhibit 2.) The County tasked Dr. Hayward with evaluating mental health care at Monterey County Jail in response to a federal class action lawsuit challenging County of Monterey's provision of medical and mental health care at the Jail. See Hernandez v. Cnty. of Monterey, No. 13-cv-2354-PSG (N.D. Cal. filed May 23, 2013). The Hayward Report, dated December 6, 2013, affirmed that understaffing of mental health professionals led to inadequate mental health care for inmates (see Exhibit 2 at 5), compounding the 2011 Assessment's findings of problems associated with crowded and space-limited clinics at the Jail.

35.     In addition, the Hayward Report identified other serious deficiencies in the delivery of mental health care at the Monterey County Jail, including:

a.     Lack of a complete mental health screening process that leads to inadequate identification of arrestees with a potential for self-harm or a history of mental disorders. (Exhibit 2 at 2.)

b.     Lack of mental health questions on intake forms that could adequately log an inmate's symptoms and treatment history, prior providers, past diagnoses and medications, and history of self-harm. (Exhibit 2 at 4.)

c.     County of Monterey employs only a total of four mental health professionals, which the Hayward Report concluded was "insufficient to meet the mental health needs of the inmates." (Exhibit 2 at 5.)

d.     Lack of mental health care clinicians assigned to the jail on weekends "results in insufficient services to mentally ill inmates," relevant because Claypole committed suicide on a Saturday. (Exhibit 2 at 2.)

e.     Inadequate supervision of inmates placed on suicide watch in designated "Safety Cells," including delays of up to an hour or more between checks of designated inmates who should be monitored twice each thirty minutes. (Exhibit 2 at 12.)

FIRST AMENDED COMPLAINT                    -10-

36.     County of Monterey's failures to timely identify, adequately treat, or effectively monitor prisoners at risk for suicide have had tragic consequences. According to the allegations contained in the Hernandez v. County of Monterey complaint, there had been three completed and over a dozen attempted suicides in the four years prior to Claypole's suicide. According to that complaint, the rate of completed suicides at the Monterey County Jail is nearly twice the national average for jail facilities.

37.     Moreover, on April 15, 2013, prior to Joshua Claypole's death, County of Monterey was again specifically put on notice of the serious problems with mental health treatment in the jail, as well as its disproportionately high suicide rate, in a letter written by Hernandez class counsel. (See Exhibit 3.)

## II.     Joshua Claypole's Detentions and Suicide

### A.     Claypole's Mental Health History

38.     Joshua Claypole was born in Monterey, California, and was raised primarily in Big Sur, California, by his mother Silvia Guersenzvaig.

39.     Starting in or around his junior year in high school, Claypole began struggling with substance abuse and exhibiting symptoms of mental illness, including anxiety, panic disorders, and bipolar disorder. He eventually dropped out of high school in December of his senior year.

40.     Guersenzvaig sought help for Claypole from numerous mental health therapists and practitioners from approximately 2010 through 2013.

41.     During this period, Claypole was treated by at least one psychiatrist at CHOMP, Dr. Marshal Alan Blatt. Dr. Blatt worked with Claypole between March 2012 and August 2012, but abruptly terminated his relationship with Claypole with no follow up care or referral to another care provider.

42.     In this time, Claypole would fluctuate between normative behavior and his more agitated, disturbed periods. When on his prescribed medications, he was funny, loving, creative, and thoughtful, often talking openly about his growth as a

1   young adult and the lessons he learned from his past experience and from others.

2   During periods of instability, however, he struggled with anxiety, aggression, and

3   substance abuse. This behavior led to two arrests, one for a DUI and vandalism and

4   the other for minor possession of cocaine. As part of his sentences for these arrests,

5   Claypole successfully completed several rehabilitation programs.

6   **B.   First Detention in San Mateo County**

7   43.   Joshua Claypole's mental health issues came to a head in April 2013.

8   On April 24, Silvia Guersenzvaig scheduled Claypole to see his treating

9   psychiatrist, Dr. John R. Donaldson, on May 2. By approximately April 27,

10  Claypole stopped sleeping, believed he had telepathy, and thought that others were

11  communicating to him through their thoughts.

12  44.   Five days before the May 2 appointment with his psychiatrist, Joshua

13  Claypole experienced a psychotic episode.  On April 28, 2013, while at his

14  mother's home, Claypole began acting strangely, exhibited aggressive and paranoid

15  behavior, and left the home without telling Guersenzvaig where he was going.

16  45.   Claypole traveled to the home of friends that evening, but did not sleep

17  the entire night. During the night, he told them he thought the singer of the music

18  they were listening to was going to come out of the music to kill him.

19  46.   The next day, Claypole returned to his mother's home, collected his

20  belongings, and left without answering her questions about where he was going. He

21  appeared agitated and paranoid.

22  47.   Worrying about her son's health, Silvia Guersenzvaig called Joshua

23  Claypole's psychiatrist Dr. Donaldson on April 29 and spoke with his office staff

24  about Claypole's behavior. She asked Dr. Donaldson's staff to provide further

25  assistance to Claypole in his upcoming May 2 appointment.

26  48.   Guersenzvaig called Dr. Donaldson's office again on April 30, 2013,

27  to confirm that Claypole would be receiving assistance and treatment from Dr.

28  Donaldson at his appointment in two days.

49.    After leaving his mother's home on April 29, records reflect that Joshua Claypole was arrested on suspicion of driving under the influence at 1:00 a.m. on the morning of April 30, 2013, by California Highway Patrol officers in Redwood City, California. According to San Mateo Sheriff's Department records, he was booked and detained at the Maguire Correctional Facility operated by County of San Mateo at approximately 4:30 a.m., and his car was impounded. A jail property slip indicates that he was arrested with medication in his possession, among other items.

50.    California Highway Patrol records indicate that CHP officers performed a narcotics test on Claypole, but San Mateo records do not reflect any review by San Mateo personnel of the test or its results.

51.    Although the San Mateo Arrest Report/Booking Sheet for Claypole noted that he was under the influence and his speech was slow and slurred, and the San Mateo Correctional Health Services Intake Sheet notes that his arrest was primarily for drug intoxication, San Mateo staff's medical examination of Claypole checked "no" for "any signs of alcohol/drug intoxication and/or withdrawal" and failed to check the box noting slurred speech.

52.    San Mateo's medical records also indicate that Claypole reported his psychiatric history and prescriptions for medications including Adderall (prescribed primarily for attention deficit hyperactivity disorder) and Klonopin (prescribed to treat anxiety disorders, panic disorders, and psychosis) to the screening nurse at Maguire Correctional Facility. Adderall and Klonopin are known to have side effects including irritability and aggression, cognitive impairments and hallucinations, depression, suicidal thoughts, and mood swings.  According to San Mateo's medical records, staff then prescribed Claypole three psychotropic medications: Hydroxyzine, Quetiapine, and Lithium Carbonate. All three medications are used to treat bipolar disorder, schizophrenia, psychosis, and mania. However, no referral for further medical health monitoring or treatment appears to

1    have been made.

2        53.    Despite notice of Claypole's serious mental illness, erratic behavior,

3    and the dangerous mix of narcotics and psychotropic medication he was suspected

4    to have consumed, County of San Mateo released Joshua Claypole on April 30,

5    2013, at 11:24 a.m. on the condition that he promise to appear for his DUI

6    arraignment.

7        **C.    Claypole's Repeated Visits to the CHOMP Facility Where He Had**

8             **Previously Received Treatment**

9        54.    After his release from San Mateo, Joshua Claypole traveled south to

10   Monterey.

11       55.    At approximately 8:30 a.m. on May 1, 2013, Joshua Claypole arrived

12   at the Hartnell Professional Center, which houses CHOMP. He had been treated by

13   CHOMP between March and August 2012, and that morning went to the outpatient

14   behavioral health clinic on the second floor where he had previously been a patient.

15   Despite CHOMP's prior relationship with Claypole and his obvious symptoms of a

16   mental health crisis, CHOMP personnel did not provide medical or mental health

17   treatment to Claypole.  Rather, they directed Claypole to leave, and called the

18   Monterey Police Department. By the time police officers arrived, Claypole had

19   already left.

20       56.    Joshua Claypole returned to CHOMP later that same morning at

21   approximately 11:00 a.m. He again visited CHOMP's behavioral health clinic. This

22   time, CHOMP personnel responded by deploying their internal security officers to

23   escort him out of the building, again failing to examine or treat Claypole. Despite

24   their physical custody of Claypole, and awareness of his troubled mental state,

25   CHOMP personnel refused to treat him, examine him, detain him, or provide any

26   medical or mental health assistance to him. Instead, CHOMP security officers threw

27   Claypole out of the building and again called the Monterey Police Department.

28   ///

1    57.   Immediately after CHOMP security officers physically ejected him,

2    Claypole went to a local Wells Fargo bank branch in Monterey, presumably to

3    obtain money for a rental car so he could return to Redwood City for his

4    impounded car. Wells Fargo employees confirmed that his strange behavior was

5    clearly observable, later telling Monterey Police Department officers that Claypole

6    appeared to be "on a substance," "very unstable," "out of it," and "in and out of

7    consciousness." They stated that Claypole displayed mood changes and would at

8    times be unresponsive to conversation. At the register of the bank, he did not talk

9    and made strange movements with his head. After withdrawing money from a bank

10   account he shared with his mother, Claypole requested Wells Fargo staff hale him a

11   taxi cab.

12        **D.    Detention in Monterey County**

13        58.   According to Monterey Police Department reports, Claypole got into a

14   taxi shortly thereafter outside of the Wells Fargo branch, and, at approximately 1:10

15   p.m., fatally stabbed the taxi driver, Daniel Garcia Huerta, outside an Enterprise

16   Rent-A-Car Company location on Del Monte Avenue in Monterey, California.

17   Claypole was then detained by Seaside Police Department officers a short distance

18   away in a stolen pickup truck. Monterey Police Department officers arrived at the

19   scene thereafter and took custody of Claypole. After the owner of the pickup truck

20   identified Claypole, Monterey Police Department personnel arrested him.

21        59.   According to police reports, when Claypole was seated in the back of

22   Defendant MPD Officer Brent Hall's squad car, he spontaneously asked Defendant

23   Hall, "Can you ask for the [lethal] injection?" He also told Defendant Hall, "I had

24   to do it."

25        60.   During the booking process, Claypole asked Defendant Hall "Should I

26   go? I should just take the injection."

27        61.   While waiting to be interviewed by a detective, Joshua Claypole asked

28   Hall "Is my mom going to get my remains?" Claypole again told Hall that he

---

FIRST AMENDED COMPLAINT            -15-

1    wanted to die by lethal injection and that he wanted to have his body cremated.

2        62.    Despite these suicidal comments, neither Defendant Hall nor

3    Defendant Monterey Police Department informed the Monterey County Sheriff's

4    Department that Joshua Claypole was acting strangely or a suicide risk. Rather than

5    assessing his mental health issues adequately, or notifying the County of Monterey,

6    his subsequent custodian, Defendants Hall and City of Monterey failed to take any

7    appropriate or necessary action in the face of a clearly paranoid and suicidal

8    detainee.

9        63.    At approximately 8:30 p.m. on May 1, Joshua Claypole met with his

10   criminal defense lawyer, John Klopfenstein. During the meeting, Claypole appeared

11   paranoid and talked about killing himself. Klopfenstein then spoke to Officer Candi

12   McGregor at the jail at approximately 8:45 p.m. and requested that Claypole be

13   placed on suicide watch, per a memorandum drafted by McGregor. McGregor

14   noted that she immediately contacted Defendant Sergeant E. Kaye, the on-duty

15   Sergeant. Sergeant Kaye advised McGregor that she would follow up on the

16   situation.

17       64.    According to County of Monterey records, an "Intake Health

18   Screening" of Joshua Claypole was conducted at 9:05 p.m. on May 1, 2013. During

19   the screening, Claypole told the screening deputy that he was taking medication for

20   anxiety.  However, the screening form used to document the examination did not

21   indicate that any questions were asked regarding Claypole's history of mental

22   health diagnoses or prior mental health treatment. Despite Claypole's suicidal

23   statements to the transporting police officers and reports from Claypole's lawyer to

24   jail staff that Claypole was unstable and talked about killing himself, the Intake

25   Health Screening shows the "no" box checked for "Does behavior suggest a danger

26   to self or others?"  Similarly, despite Claypole's self-report that he took anxiety

27   medications, the Intake Health Screening does not reflect any referral of Claypole

28   to a psychiatrist or other mental health staff.

FIRST AMENDED COMPLAINT        -16-

65.     County of Monterey Sheriff's personnel also completed a form entitled "Classification Inmate Intake Screening Questionnaire," dated May 1, 2013, at 9:05 p.m. Notwithstanding the recent events, Claypole's statements to the police officers, Claypole's psychiatric history, and his attorney's report of suicidal symptoms and request to have him placed on suicide watch, the Questionnaire indicates that Claypole had not shown any bizarre behavior and that he was not now nor had he ever been under psychiatric care.

66.     Monterey County Jail staff failed to place Claypole on suicide watch on May 1, 2014, despite his attorney's direct report of suicidal symptoms and request for such precautions.

67.     On May 2, Klopfenstein visited Claypole at the Jail. During this second meeting, Claypole asked Mr. Klopfenstein to have his mother bring his medications to the jail.

68.     On May 3, Joshua Claypole made his first appearance in court regarding the criminal charges. That same day, Claypole exhibited severe mental instability, believing that others were speaking to him telepathically through his thoughts. Mr. Klopfenstein assumed that the Jail had responded appropriately to his request to place Claypole on suicide watch.

69.     However, the medical records from County of Monterey reflect that it was not until 2:35 p.m. on May 3, two days after Klopfenstein first requested suicide watch, that Defendants finally placed Claypole on suicide watch and transferred Claypole to a safety cell where he was supposed to be observed by Jail staff.

70.     Fewer than twenty-four hours later, at approximately 6:30 a.m. on May 4, Defendants inexplicably released Claypole from suicide watch without any further suicide risk precautions.

71.     At approximately 1 p.m. on May 4, 2013, Silvia Guersenzvaig arrived at Monterey County Jail to visit her son and to bring him his psychotropic

1   medications, per his request.  However, Jail staff refused to allow her to see her son,

2   telling her that Claypole had been moved to a different housing unit and visitation

3   hours for that unit had not begun. Guersenzvaig gave Claypole's medications to a

4   Jail nurse summoned by the on-duty officer. Denied the ability to visit her son,

5   Guersenzvaig said to the nurse, "Please tell Josh I love him regardless of what

6   happened."

7       72.    On information and belief, Jail staff did not provide the medications

8   brought by Silvia Guersenzvaig to Joshua Claypole.

9       73.    At a "welfare check" conducted at approximately 2:30 p.m. on May 4,

10  2013, Monterey County Deputy Sheriff Raymond Gordano found Joshua Claypole

11  hanging from a cloth noose made of torn bed sheets inside his cell.

12      74.    According to the declaration of Dr. Pablo Stewart, an expert whose

13  declaration was filed by plaintiffs in Hernandez v. County of Monterey, Jail staff

14  failed to appropriately and timely respond to Claypole's suicide. Rather than

15  immediately open the cell to cut down the ligature, Gordano requested back up by

16  custody and medical staff. (See Exhibit 4 at ¶ 96.) Staff did not open Claypole's

17  cell and begin to assist him until other staff arrived on the scene. (Id.) Jail personnel

18  eventually cut the ligature using a knife, with some difficulty. (Id.)

19      75.    At the time of his suicide, Claypole was housed in A Pod, an

20  administrative segregation housing unit. The cell included a set of sturdy metal

21  braces on the wall, which are suicide hazards in cells used for inmates in mental

22  health crisis. Claypole tied the sheet he used to hang himself to these metal braces.

23      76.    Jail records reflect the failure of jail staff to follow their own policies

24  and procedures during and after suicide watch.  During the period when Claypole

25  was placed in suicide watch, Jail personnel did not perform the required checks

26  twice every 30 minutes, instead checking on him only once in some one-hour

27  periods.  After removing him from suicide watch, Jail personnel did not check on

28  Claypole hourly, as required by Jail policies. County of Monterey's Hourly Safety

1  Check log indicates that at the time staff discovered him hanging, staff had not
2  performed a safety check for Claypole in over 6 hours.

3        77.    According to jail policies and procedures, as recounted by Dr.
4  Hayward, no mental health personnel are on site at the Jail on weekends.
5  Nevertheless, County of Monterey removed Claypole from suicide watch on
6  Saturday when, upon information or belief, no mental health care staff were on site
7  at the Jail. Once Claypole was removed from suicide watch and placed back in
8  general population, there were no mental health staff at the jail to monitor his
9  condition, and custody staff failed to perform the required hourly safety checks.

10        78.    Defendant's failure to appropriately staff its jail facility and monitor
11  Claypole despite known and foreseeable suicide risks resulted in Claypole hanging
12  himself just a few hours after his removal from suicide watch.

13        79.    After staff discovered him hanging, Joshua Claypole was transferred to
14  the care of emergency room personnel at Natividad Medical Center, then
15  transported to the Trauma Center at San Jose Regional Medical Center via
16  helicopter.

17        80.    Shortly after finding his body, Jail deputies found a handwritten
18  suicide letter written by Claypole in his cell. Addressing his mother, Claypole
19  wrote: "I love you mama. I'm sorry for all the pain I have brought you mama. I love
20  you very much. Maybe I will see you again. Love, Joshua."

21        81.    On May 9, 2013, Joshua Claypole was declared dead. A subsequent
22  County of Monterey postmortem examination conducted on May 13, 2013,
23  concluded that he died from asphyxia due to hanging.

24  ///
25  ///
26  ///
27
28

FIRST AMENDED COMPLAINT    -19-

## CLAIMS FOR RELIEF

### First Claim for Relief

**Deliberate Indifference to Serious Medical and Mental Health Needs in Violation of the Fourteenth Amendment to the Constitution of the United States (Survival Action – 42 U.S.C. § 1983)**

**(Against Defendants County of San Mateo, Greg Munks, County of Monterey, Scott Miller, E. Kaye, California Forensic Medical Group, Taylor Fithian, and Does 1 through 20)**

82.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 81 as though fully set forth herein.

83.    Defendants have inadequate policies, procedures, and practices for identifying inmates in need of medical and mental health treatment and providing appropriate medical and mental health treatment. Defendants also fail to appropriately train and supervise staff regarding the provision of treatment to inmates with medical and mental health issues.

84.    Defendants have consistently failed to meet their constitutional obligation to provide adequate mental health care to prisoners in their jails.  The mental health care provided by Defendants to prisoners in their jails is woefully inadequate and falls far short of all of the minimum elements of a constitutional mental health care system.  Defendants' failure to correct their policies, procedures, and practices, despite notice of significant and dangerous problems, evidences deliberate indifference in the provision of mental health treatment.

85.    Defendants knew or should have known that there was a strong likelihood that Joshua Claypole posed a threat to himself or others.

86.    Defendants failed to provide necessary medical and mental health evaluation and treatment to Joshua Claypole while he was held at the Maguire Correctional Facility and Monterey County Jail, despite his history of serious mental illness, obvious symptoms of mental health crisis, and information that he

1   was under the influence of narcotics.

2          87.     Defendants' acts and/or omissions as alleged herein, including but not

3   limited to their failure to provide Joshua Claypole with appropriate medical or

4   psychiatric care and to identify suicide risk, along with the acts and/or omissions of

5   the Defendants in failing to train, supervise and/or promulgate appropriate policies

6   and procedures in order to identify suicide risk and provide treatment, constituted

7   deliberate indifference to Joshua Claypole's serious medical needs, health and

8   safety.

9          88.     As a direct and proximate result of Defendants' conduct, Joshua

10  Claypole experienced physical pain, severe emotional distress, and mental anguish

11  over a period of five days, as well as loss of his life and other damages alleged

12  herein.

13         89.     The aforementioned acts of Defendants were conducted with

14  conscious disregard for the safety of Plaintiffs and others, and were therefore

15  malicious, wanton, and oppressive. As a result, Defendants' actions justify an

16  award of exemplary and punitive damages to punish the wrongful conduct alleged

17  herein and to deter such conduct in the future.

18                          **Second Claim for Relief**

19  **Failure to Protect from Harm in Violation of the Fourteenth Amendment to**

20        **the Constitution of the United States (Survival Action – 42 U.S.C. § 1983)**

21  **(Against Defendants County of San Mateo, Greg Munks, County of Monterey,**

22    **Scott Miller, E. Kaye, City of Monterey, Philip Penko, Brent Hall, California**

23         **Forensic Medical Group, Taylor Fithian, and Does 1 through 30)**

24         90.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through

25  89 as though fully set forth herein.

26         91.     Each Defendant could have taken action to prevent unnecessary harm

27  to Joshua Claypole, but refused or failed to do so.

28  ///

_____
FIRST AMENDED COMPLAINT          -21-

92.     Defendants failed to have minimally necessary policies and procedures concerning the adequate identification and housing of Claypole, whom they knew or should have known to be at risk of self-harm.

93.     City of Monterey, Philip Penko, and Brent Hall failed to take necessary precautions to ensure that Claypole would not harm himself or others after he communicated clearly suicidal thoughts to Monterey Police Department officers. They also failed to create minimally necessary policies and procedures for ensuring that other entities and municipalities were informed of suicide risks among Monterey Police Department arrestees who are transferred from their custody. Lastly, they failed to adequately train and supervise officers to protect arrestees from harm.

94.     County Defendants failed to implement minimally sufficient policies and procedures to protect inmates from harm. County Defendants failed to appropriately train and supervise staff regarding identification and handling of detainees at risk of harm. With respect to Joshua Claypole, County Defendants failed to follow even their own suicide prevention procedures to identify, house, and monitor detainees at risk of self-harm.

95.     Defendants' acts and/or omissions as alleged herein, including but not limited to their failure to take appropriate measures to protect Joshua Claypole from harm, along with the acts and/or omissions of the Defendants in failing to train, supervise and/or promulgate appropriate policies and procedures in order to protect Joshua Claypole from harm, constituted deliberate indifference to Joshua Claypole's serious medical needs, health, and safety.

96.     As a direct and proximate result of Defendants' conduct, Joshua Claypole experienced physical pain, severe emotional distress, and mental anguish over a period of five days, as well as loss of his life and other damages alleged herein.

///

1    97.    The aforementioned acts of Defendants were willful, wanton,

2   malicious, and oppressive, thereby justifying an award to Plaintiffs of exemplary

3   and punitive damages to punish the wrongful conduct alleged herein and to deter

4   such conduct in the future.

5                         **Third Claim for Relief**

6   **Deprivation of Substantive Due Process Rights in Violation of First and**

7   **Fourteenth Amendments to the Constitution of the United States – Loss of**

8                   **Parent/Child Relationship (42 U.S.C. § 1983)**

9   **(Against Defendants County of San Mateo, Greg Munks, County of Monterey,**

10  **Scott Miller, E. Kaye, City of Monterey, Philip Penko, Brent Hall, California**

11           **Forensic Medical Group, Taylor Fithian, and Does 1 through 30)**

12   98.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through

13  97 as though fully set forth herein.

14   99.    The aforementioned acts and/or omissions of Defendants in being

15  deliberatively indifferent to Joshua Claypole's serious medical needs, health and

16  safety, violating Joshua Claypole's constitutional rights, and their failure to train,

17  supervise, and/or take other appropriate measures to prevent the acts and/or

18  omissions that caused the untimely and wrongful death of Joshua Claypole

19  deprived Plaintiff Guersenzvaig of her liberty interest in the parent-child

20  relationship in violation of her substantive due process rights as defined by the First

21  and Fourteenth Amendments to the United States Constitution.

22   100.   As a direct and proximate result of the aforementioned acts and/or

23  omissions of Defendants, Plaintiffs suffered injuries and damages as alleged herein.

24   101.   The aforementioned acts and/or omissions of the individually named

25  Defendants were willful, wanton, malicious, and oppressive, thereby justifying an

26  award of exemplary and punitive damages to punish the wrongful conduct alleged

27  herein and to deter such conduct in the future.

28  ///

1

### Fourth Claim for Relief

2

### Medical Malpractice (Survival Actions – California State Law)

3

### (Against Defendants California Forensic Medical Group, Taylor Fithian, and

4

### Community Hospital of Monterey Peninsula)

5    102.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through

6    101 as though fully set forth herein.

7    103.   Defendants failed to comply with professional standards in the

8    treatment of Joshua Claypole's serious mental illness by failing to appropriately

9    assess and evaluate his mental health and suicide risk, failing to take appropriate

10   and timely suicide prevention measures, prematurely removing Claypole from

11   suicide watch and returning him to an unsafe cell, failing to provide appropriate

12   mental health treatment, and failing to prescribe or provide appropriate and

13   necessary psychiatric medications and ensure compliance with those medications.

14   104.   Defendants also failed to appropriately supervise, review, and ensure

15   the competence of medical staff's and custody staff's provision of treatment to

16   Claypole, and failed to enact appropriate standards and procedures that would have

17   prevented such harm to him.

18   105.   As a direct and proximate cause of this negligence and failure to meet

19   their professional standards of care, Joshua Claypole and Silvia Guersenzvaig

20   suffered injuries and damages as alleged herein.

21   106.   The negligent conduct of these Defendants was committed within the

22   course and scope of their employment.

23   107.   The aforementioned acts of Defendants were willful, wanton,

24   malicious, and oppressive, thereby justifying an award of exemplary and punitive

25   damages to punish the wrongful conduct alleged herein and to deter such conduct in

26   the future.

27   ///

28   ///

1

**Fifth Claim for Relief**

2

**Failure to Furnish / Summon Medical Care (Survival Action – California State**

3

**Law)**

4

**(Against Defendants County of Monterey, Scott Miller, E. Kaye, California**

5

**Forensic Medical Group, Community Hospital of Monterey Peninsula, Taylor**

6

**Fithian, and Does 11 through 20)**

7       108.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through

8   107 as though fully set forth herein.

9       109.   Defendants owed Joshua Claypole a duty of care to provide him

10  immediate medical and mental health care.

11      110.   The conduct of Defendants alleged herein, including but not limited to

12  the facts that Defendants knew or had reason to know that Joshua Claypole was in

13  need of immediate medical and mental health care and that Defendants failed to

14  take reasonable action to summon or provide that care, resulting in Joshua

15  Claypole's death as alleged herein, violated California state law, including Cal.

16  Govt. Code §§ 844.6 and 845.6.

17      111.   Defendants also failed to timely and appropriately respond to Joshua

18  Claypole's expressions of suicidal ideation, in which he requested that he be killed

19  and stated his desire to kill himself on numerous occasions before hanging himself

20  in his cell.

21      112.   The alleged conduct of Defendants was committed within the course

22  and scope of their employment.

23      113.   As a direct and proximate result of Defendants' breach, Joshua

24  Claypole and Silvia Guersenzvaig suffered injuries and damages causing great pain

25  and leading to his death, as alleged herein.

26      114.   The aforementioned acts of Defendants were willful, wanton,

27  malicious, and oppressive, thereby justifying an award of exemplary and punitive

28  damages to punish the wrongful conduct alleged herein and to deter such conduct in

FIRST AMENDED COMPLAINT          -25-

1    the future.

2    ### Sixth Claim for Relief

3    **Negligent Supervision, Training, Hiring, and Retention (Survival Action –**

4    **California State Law)**

5    **(Against Defendants County of Monterey, Scott Miller, E. Kaye, California**

6    **Forensic Medical Group, Community Hospital of Monterey Peninsula, Taylor**

7    **Fithian, and Does 11 through 20)**

8        115.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through

9    114, as though fully set forth herein.

10       116.   Defendants had a duty to hire, supervise, train, and retain employees

11   and/or agents so that employees and/or agents refrain from the conduct and/or

12   omissions alleged herein.

13       117.   Defendants breached this duty, causing the conduct alleged herein.

14   Such breach constituted negligent hiring, supervision, training, and retention under

15   the laws of the State of California.

16       118.   As a direct and proximate result of Defendants' failure, Joshua

17   Claypole and Plaintiff suffered injuries and damages as alleged herein.

18   ### Seventh Claim for Relief

19   **Wrongful Death – California Code Civ. Proc. § 377.60**

20   **(Against Defendants County of Monterey, Scott Miller, E. Kaye, California**

21   **Forensic Medical Group, Community Hospital of Monterey Peninsula, Taylor**

22   **Fithian, and Does 11 through 20)**

23       119.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through

24   118, as though fully set forth herein.

25       120.   Joshua Claypole's death was a direct and proximate result of the

26   aforementioned wrongful and/or negligent acts and/or omissions of Defendants.

27   Defendants' acts and/or omissions thus were also a direct and proximate cause of

28   Plaintiff' injuries and damages, as alleged herein.

FIRST AMENDED COMPLAINT                          -26-

121.   As a direct and proximate result of Defendants' wrongful and/or negligent acts and/or omissions, Plaintiff incurred expenses for funeral and burial expenses in an amount to be proved.

122.   As a direct and proximate result of Defendants' wrongful and/or negligent acts and/or omissions, Plaintiffs suffered the loss of the services, society, care, and protection of the decedent, as well as the loss of the present value of his future services to his mother.  Plaintiffs are further entitled to recover prejudgment interest.

123.   Plaintiff Estate of Joshua Claypole is entitled to recover punitive damages against individual Defendants who, with conscious disregard of Joshua Claypole's rights, failed to provide Joshua Claypole with mental health treatment services meeting the professional standard of practice and failed to adhere to the legal mandates of prisoner supervision.

124.   The aforementioned acts of Defendants were willful, wanton, malicious, and oppressive, thereby justifying an award to Plaintiff of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## Eighth Claim for Relief

### Negligence (Survival Actions – California State Law)

### (Against Defendants County of Monterey, Scott Miller, E. Kaye, and Does 11 through 20)

125.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 124, as though fully set forth herein.

126.   The Monterey County Defendants failed to comply with professional standards in the treatment of Joshua Claypole's serious mental illness by failing to appropriately assess and evaluate his mental health and suicide risk, failing to take appropriate and timely suicide prevention measures, prematurely removing Claypole from suicide watch and returning him to an unsafe cell, failing to provide

appropriate mental health treatment, and failing to prescribe or provide appropriate and necessary psychiatric medications and ensure compliance with those medications.

127.   These Defendants also failed to appropriately supervise, review, and ensure the competence of medical staff's and custody staff's provision of treatment to Claypole, and failed to enact appropriate standards and procedures that would have prevented such harm to him.

128.   Together, these Defendants acted negligently and improperly, breached their respective duties, and as a direct and proximate result, Joshua Claypole and Silvia Guersenzvaig suffered injuries and damages as alleged herein.

129.   The negligent conduct of Defendants was committed within the course and scope of their employment.

130.   The aforementioned acts of Defendants were conducted with conscious disregard for the safety of Plaintiffs and others, and were therefore malicious, wanton, and oppressive. As a result, Defendants' actions justify an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

1.     For compensatory, general and special damages against each Defendant, jointly and severally, in an amount to be proven at trial;

2.     For damages related to loss of familial relations as to Plaintiff Silvia Guersenzvaig;

3.     Funeral and burial expenses, and incidental expenses not yet fully ascertained;

4.     General damages, including damages for physical and emotional pain, emotional distress, hardship, suffering, shock, worry, anxiety, sleeplessness, illness and trauma and suffering, the loss of the services, society, care and protection of the

FIRST AMENDED COMPLAINT                          -28-

decedent, as well as the loss of financial support and contributions, loss of the present value of future services and contributions, and loss of economic security;

5. Prejudgment interest;

6. For punitive and exemplary damages against each individually named Defendant and CHOMP in an amount appropriate to punish Defendant(s) and deter others from engaging in similar misconduct;

7. For costs of suit and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and as otherwise authorized by statute or law;

8. For restitution as the court deems just and proper;

9. For such other relief, including injunctive and/or declaratory relief, as the Court may deem proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand trial by jury in this action.

Dated: October 28, 2014                    Respectfully Submitted,

RIFKIN LAW OFFICE

HADSELL STORMER & RENICK LLP


By:      /s/ Dan Stormer
         Dan Stormer
         Josh Piovia-Scott
         Mohammad Tajsar
         Attorneys for Plaintiffs

Complaint for Damages

# Exh. 1

# COUNTY OF MONTEREY
# OFFICE OF THE SHERIFF

## Jail Needs Assessment
### December 30, 2011



# Table of Contents

| Section | Page |
|---|---|
| Participants and Acknowledgements | 1 |
| Executive Summary | EX.1 |
| A. Elements of the System | EX.1 |
| B. Operational and Design Philosophy | EX.4 |
| C. Current Adult Population | EX.4 |
| D. Classification of Inmates | EX.5 |
| E. Programs | EX.5 |
| F. Analysis of Adult Detention Trends and Characteristics | EX.6 |
| G. Adequacy of Staffing Levels | EX.6 |
| H. Ability to Provide Visual Supervision | EX.8 |
| I. Adequacy of Record Keeping | EX.8 |
| J. Compliance with Standards | EX.8 |
| I. Unresolved Issues | EX.10 |

| A. Elements of the System | A.1 |
|---|---|
| Existing Monterey County Jail | A.1 |
| Total Beds Required | A.1 |
| Existing Jail Bed Capacity | A.1 |
| Shortfall Using the Average Projection | A.1 |
| Shortfall Using the High Projection | A.2 |
| Urgent Service Gap in Adult Criminal Justice System | A.2 |
| Identified Need | A.4 |
| Bed Need Remains Paramount | A.6 |

| B. Operational and Design Philosophy | B.1 |
|---|---|
| Introduction | B.1 |
| Purpose | B.1 |
| Goal | B.1 |
| Design Goals for the New Adult Detention Beds and Support | B.1 |
| Construction and Administrative Work Plan | B.2 |

| C. Current Inmate Population | C.1 |
|---|---|
| Introduction | C.1 |
| Felony Arrests and Dispositions | C.1 |
| Crime and Crime Rates | C.1 |
| Sentenced and Non-Sentenced Inmates | C.2 |

TRGConsulting

D.   Classification System ................................................................... D.1

Introduction ...................................................................................... D.1
Classification Training ........................................................................ D.1
Classification of Inmates .................................................................... D.1
"Need" to Properly Separate and Segregate Inmates ........................... D.5

E.   Programs ..................................................................................... E.1

Introduction ...................................................................................... E.1
Inmate Programs and Detention Alternatives ....................................... E.1
Prevention of Disproportionate Confinement of Minorities .................. E.34

F.   Analysis of Adult Trends and Characteristics ............................... F.1

Introduction ...................................................................................... F.1
Projection of Average Daily Population (ADP) ...................................... F.1

        Table F.1 - Admissions 1998 -2005 .......................................... F.1
        Table F.2 - Detention Days 1998 -2005 .................................... F.2
        Table F.3 - Monterey County Population 1940-2000 ................. F.2
        Table F.4 - Monterey County Population 1998 -2005 ................. F.3
        Table F.5 - Projected County Population 2010-2040 ................. F.3
        Figure F.1 - Projected County Population 2010-2040 ................. F.3

Forecasting Adult Detention Admissions .............................................. F.4

        Table F.6 - Ratios: Admissions/Population 1998 -2005 .............. F.4
        Table F.7 - Average of the Jail Ratios ........................................ F.4
        Table F.8 - Projected Admissions to Detention 2010-2040 ......... F.5
        Figure F.2 - Projected Admissions to Detention 2010-2040 ....... F.5

Forecasting Adult Detention Days ........................................................ F.6

        Table F.9 - Detention Ratios: Det. Days/Pop. 1998 -2005 .......... F.6
        Table F.10 - Average of the Detention Ratios ............................ F.6
        Table F.11 - Projected Detention Days 2010-2040 ..................... F.7
        Figure F.3 - Projected Detention Days 2010-2040 ..................... F.7

Average Daily Population (ADP) and Average Length of Stay (ALS) ... F.8

        Table F.12 - Baseline Average Daily Population 2010-2040 ....... F.8
        Figure F.4 - Baseline Average Daily Population 2010-2040 ....... F.8
        Table F.13 - Baseline Range of ADP 2010-2040 ....................... F.9

Unauthorized Migrants ....................................................................... F.9

        Table F.14 - Range of ADP 2010-2040/Unauthorized Migrants F.10
        Table F.15 - Range of ADP 2010-2040/Unauthorized Migrants F.10
        Figure F.5 - Range of ADP 2010-2040/Unauthorized Migrants  F.11

Peaking and Classification .................................................................. F.11

        Table F.16 - Peaking Factor 2008 - 2010 .................................. F.12
        Table F.17 - ADP Adjusted for Peaking and Classification ........ F.13
        Table F.18 - Projected ADP with Peaking and Classification .... F.13
        Table F.19 - Historic Detention Data 1996-2005 ...................... F.14

MONTEREY COUNTY ADULT DETENTION NEEDS ASSESSMENT

**G.   Adequacy of Staffing Levels** ........................................................... I.1

Introduction ....................................................................................G.1
Staffing Issues................................................................................G.1
Historic Factors ..............................................................................G.3

**H.   Ability to Provide Visual Supervision**............................................H.1

Introduction ....................................................................................H.1
Existing Facility Design ..................................................................H.1
New Facility Design.........................................................................H.1
Adequacy of Staff...........................................................................H.1

**I.    Adequacy of Record Keeping** ........................................................ I.1

Introduction ..................................................................................... I.1

**J.   Compliance with Standards** ...........................................................J.1

Introduction ....................................................................................J.1
Poor Facility Design .......................................................................J.1
Overcrowding .................................................................................J.1
Understaffing...................................................................................J.2

K.   Unresolved Issues ......................................................................... K.1

Unresolved Issues..................................................................................J.1
Direct Negotiations with CDCR ............................................................J.1
Public Safety and Offenders Rehabilitation Services Act of 2007..........J.1
Funding ................................................................................................J.2
Construction Phasing for 2030 Bed Need.............................................J.2
Expanding the Project to Include Juvenile Detention Beds...................J.2
Disposition of the Components of the Existing Jail ...............................J.2
Location................................................................................................J.3
Regional Adult Detention Facility/Leased Beds ....................................J.3
Implementation Strategy to Resolve Issues..........................................J.4

Appendix ........................................................................................AP.1

Stakeholders ...................................................................................AP1.1

## Acknowledgements

The preparation of this needs assessment would not have been possible without the assistance of a number of professionals from Monterey County.  While the following list by no means represents all of the people who participated in this effort, it is our attempt to recognize the primary contributors who helped make this planning effort a success

The efforts and participation of the following individuals are gratefully acknowledged.

### Monterey County Board of Supervisors

Fernando Armenta - Supervisor, District 1
Louis R. Calcagno - Supervisor, District 2
Simon Salinas - Supervisor, District 3
Jane Parker - Supervisor, District 4 (Chair CY 2011)
Dave Potter - Supervisor, District 5 (Chair CY 2012)

### Monterey County Administrative Office

Lew C. Bauman - CAO
DeWayne Woods - County Budget Director
John Guertin - Principal Administrative Analyst

### Monterey County Sheriff's Office

Scott Miller - Sheriff-Coroner-Marshal
Chief Jeffrey J. Budd - Custody Bureau Chief
Commander Jose L. Mendoza - Jail Commander
Commander Lisa A. Nash, Professional Standards Division

### Monterey County Resource Management Agency, Department of Public Works

Benny J. Young - Resource Management Agency Director
Richard P. Sauerwein - Architectural Services Manager
Shawne Ellerbee - Finance Manager
Patricia Lopez - Grant Manager

### HMC + Beverly Prior Architects

Beverly Prior - Practice Leader

TRGConsulting Project Team

William Harry Munyon - Project Manager and Lead Planner
Kay Mead - Project Administration, Senior Research Staff, Data Coordinator
Jim Marmack - Operations & Staffing
JoAnn Martinez - Planner
Alex Damon - IT Operations

## Executive Summary

### A.  Elements of the System

**Existing Monterey County Jail.**
The Monterey County Jail is located at 1410 Natividad Road, Salinas, California 93906.  The jail consists of three components:

1.  The Rehabilitation Facility.
2.  The Main Jail.
3.  The Woman's Jail.

**Existing Jail Bed Capacity.**  The rated jail capacity as calculated by the Corrections Standards Authority (CSA) is illustrated in Table EX.1.



*Monterey County Jail*

Table EX.1
CSA Rated Jail Bed Capacity

| Rated Beds | Total Beds |
|---|---|
| Main Jail/Woman's Jail | 575 Beds |
| Rehabilitation Facility | 250 Beds |
| **Total Beds** | **825 Beds** |

Source.  Corrections Standards Authority.  April 2010.

**Shortfall Using the High Projection.**   When the 825 existing beds are considered, the additional bed requirements for 2020 through 2040 *using the average projection* are illustrated in Table EX.2 below.

Table EX.2
Adult Detention Facility *Additional* Bed Need 2020 - 2040 (Average)

| Year | Additional Beds Needed |
|---|---|
| 2020 | 1,727 Beds |
| **2030** | **2,008 Beds** |
| 2040 | 2,307 Beds |

Source.  TRGConsulting.  December 2011.

The table above indicates that an additional 2,008 beds will be required in 2030 if the county elects to construct enough beds to meet their twenty-year needs using the average projections.

***Please note that it is recommended that Monterey County target the 2030 needs as an immediate requirement since the new adult detention facility will start to become overcrowded almost immediately upon opening should the first phase only consist of enough beds to meet the 2020 needs.  The existing severely overcrowded conditions have been exacerbated by the enactment of AB 109.[1]***

---

[1]   AB 109, Criminal Justice Alignment, has been modified by AB 117, Criminal Justice Realignment.

Urgent Service Gap in the Adult Criminal Justice System.  The most urgent service gap is the need for a new detention beds and additional staff.  The current combination of insufficient beds, an inadequate detention facility and understaffing has resulted in an almost untenable situation.  This service gap is illustrated by the following.

- There are not enough beds to meet the current adult detention needs, let alone the needs in the near future.  Worse, the county has the wrong type of beds for the population currently incarcerated.  As an example, over 75% of the beds are in dormitories; while over 80% of the inmates are felons. The facility was designed for minimum and low medium-security inmates while the bulk of the inmates currently held are medium and maximum-security inmates.  This situation is exacerbated by AB 109 as modified by AB 117, which requires counties to house selected inmates who previously were housed by the state.  If additional beds are not constructed, criminals who should be incarcerated will not be incarcerated since beds space will not be available. Criminals serving time will serve little or none of their time since the beds to which they are assigned will be needed for others who pose a greater danger to public safety.  An extensive and unpopular early release system (i.e. releasing inmates well before their full sentence is served) will be required to prevent even more severe overcrowding.[2]
- Overcrowding, the lack of adequate staff and an insufficient number of single and double cells has resulted in the necessity of classifying inmates primarily by gang affiliation.  While gang membership typically is one of the factors used in classifying inmates, it is not normally the primary consideration. Existing court decisions allow for segregation by race and gangs only as a "temporary measures" when classification by race is necessary to allow staff to get the facility under control.
- Officer safety is compromised by the severe lack of an adequate number of single and double cells.
- The jail is so overcrowded that no allowance can be made for peaking and classification or the routine or emergency maintenance required in inmate housing areas.
- Severe overcrowding has resulted in inmates being held in the intake area for up to forty-eight hours. This is not permitted by the California Code of Regulations.
- Severe overcrowding has forced the Sheriff to use areas for housing that were not designed or intended for that use (e.g. the rotunda area). This makes these areas much more difficult for officers to manage and control.
- Overcrowding has forced the Sheriff to operate the jail as an indirect supervision facility, while the jail was designed for direct supervision.  This creates significant command, control and management problems.
- Adequate separation and segregation resulting from the classification of inmates cannot occur because of the severe overcrowding and the lack of a sufficient number of single and double cells. Thus, while the staff has the ability to classify, they do not have the ability to physically segregate those inmates who should be separated because of their classification.  This creates an environment that is unsafe for officers, inmates and visitors.
- The design of the jail and the manner in which additions have been constructed results in a physical plant that is difficult to manage and control and unnecessarily expensive to operate.  Numerous blind spots and the labyrinth like design requires more staff than would be required in a state-of-the-art podular facility.  There is poor observation from most deputy stations.  Officers cannot observe inmate areas in Pods A through J.  The wing walls in the dormitories are approximately four feet high and provide a number of areas where inmates cannot be observed.
- The manner in which additions have been constructed has resulted in a facility that lacks any real central control or command post that would be used in the event of a major disturbance or disaster. The existence of multiple control stations is unnecessarily staff intensive in facility that is understaffed.
- The age of the building systems in the sections of the jail constructed prior to 1993 require extensive maintenance and, as a result, these systems are more expensive to operate.  Maintenance costs already are increasing and will continue to increase at a faster rate as the facility deteriorates.

---

[2]   The jail population regularly exceeds 1,000 inmates in a facility rated at 825.  Overcrowding already has reached a dangerous level.

- The older design of the cells and dormitories constructed prior to 1993 does not meet today's minimum standards for acceptable detention facilities.  Examples include:

  - Suicide hazard elimination is not as stringent as it should be to prevent self-harm and the attendant liability.
  - Medical/mental health treatment spaces are not adequate for the rated beds, let alone the actual number of inmates held.[3]
  - Design requirements to improve security and the management of inmates are not met (e.g. number of toilet fixtures and showers per inmate, number of safety and sobering cells needed for efficient operation, adequate intake and release facilities, sufficient storage, etc.).
  - There are insufficient spaces dedicated to programs.  Effective programs are necessary to manage the jail population and reduce recidivism.
  - Overcrowding forces the entire facility to operate as an indirect supervision jail.  Mental health issues are considerably more difficult to recognize, manage and treat in an indirect supervision facility.  A direct supervision, podular design in which staff is able to interact continuously with inmates makes it significantly easier to detect inmates with mental health problems.  Additionally a direct supervision model reduces conflict and allows better observation of those requiring treatment.

- Understaffing has resulted in insufficient staff coverage.  This all too frequently results in a four-hour gap in the middle of twelve-hour shifts.  At times the middle of a shift may be as many as three or four officers short.  This has been exacerbated by recent staff reductions.[4]  As a result there are not enough officers present in the jail to respond to a major crisis or natural disaster.[5]
- Understaffing has resulted in the extensive use of CCTV cameras to monitor inmate activities.  CCTV never can substitute for officer presence.
- The attrition rate of trained detention officers is quite high.[6]
- Because of understaffing, the Sheriff is forced to use pre-academy hires in the jail.
- Understaffing has increased the span of control for first line supervisors to an unacceptable level.
- Sergeants are sometimes forced to work line positions because of lack of staff.  This results in a lack of supervision of the staff in the jail.
- There are insufficient staff on some shifts to make the required safety checks.
- Reduced staffing makes it difficult for staff to supervise inmates in the kitchen and the laundry.
- Staff shortages have resulted in the excessive use of overtime.


Identified Need (Facility Type).  As discussed above, additional beds urgently need to be constructed at the Natividad site.  The Monterey County Jail will remain a Type II Facility (i.e. a local detention facility used for the detention of persons pending arraignment, during trial and upon sentence of commitment as defined in Title 24 of the *California Code of Regulations*).

---

[3]  For example, it is estimated that at least fifteen to twenty percent of the inmate population have mental health issues.

[4]  In January 2011 there were 220 personnel in the Custody Bureau (Sworn and Unsworn).  The recent budget cuts ($6.4 million in the Sheriff's Office) have reduced Custody Bureau staff to 183 people assigned, a reduction of thirty-seven positions in a facility that already was woefully understaffed.  All vacant positions were eliminated in the most recent budget cuts.  Finally, on December 13, 2011, the Board of Supervisors approved twelve new civilian (non-sworn) hires to replace deputies serving in unit control stations.  This will make those deputies serving in control available to work in the jail.  The twelve deputies now serving in control then will be available for other duties in the jail.  The civilian hires are expected to be trained and on duty in February 2012.  Thus the net loss of jail personnel since January 2011 is twenty-five positions.  Unfortunately the net loss includes a Captain's position and two Commander's positions.

[5]  Staff in the jail work twelve-hour shifts.  When insufficient staff is available for a particular shift for whatever reason, the Sheriff is forced to hold over staff from the previous shift for four hours and bring in staff from the following shift four hours early.  This results in a four-hour gap in the shift that is short of staff.  Worse, this results in some officers working sixteen-hour shifts.

[6]  The Custody Bureau has indicated that they continue to lose trained deputies for a variety of reasons including the desire of newer deputies to work in patrol, the opportunity to work nearer to home in another agency and the fact that there are other more desirable opportunities available in law enforcement.

## B.  Operational and Design Philosophy

Purpose.  The purpose of the Monterey County Adult Detention and Rehabilitation Facilities is the detention of persons charged with crimes and awaiting arraignment or trial.

1.  The detention of persons, in the Sheriff's custody, to ensure their attendance as witnesses in criminal cases.

2.  The confinement of persons sentenced to imprisonment in the County Facilities.[7]

Goal.  By means of the continuing process of education and training of the deputies and professional staff employed herein, to provide for the security, health and welfare of inmates in custody and to rehabilitate them whenever possible through programs designed for this purpose.[8]

Design Goals for the New Adult Detention Beds and Support Spaces.  The immediate design goal is to maximize the number of new detention beds in cells at the current site, using existing support infrastructure and administrative space as much as possible.  The specific design objectives for the new adult detention beds and support space are discussed in detail in the body of this assessment.

Construction and Administrative Work Plan.  Similarly, the construction and administrative work plan for the new adult detention facility is discussed in the body of this report.

## C.  Current Adult Population



*The Monterey County Main Jail.*

Current Adult Population.  The Corrections Standards Authority (CSA) provides summary data collected for the Jail Profile Survey.  Crime and arrest data for Monterey County also is available for 2006 through 2009 from the California Department of Justice (DOJ).  A "snapshot" from 2006 through 2009 (the last full data year of information from the California Department of Justice) is indicative of the current jail population.  This section provides statistical data on the jail population, including:

1.  Felony Sentenced Dispositions;
2.  Crime and Crime Rates; and
3.  Sentenced and Non-Sentenced Adult Detention Populations by Gender.

Conclusion.  Over the last decade, violent felony reports and arrests according to statistics maintained by the California Department of Justice have fluctuated; therefore a predictable upward or downward trend has not occurred.  Unfortunately the number of beds available for holding these offenders has been well below the number and type needed throughout that timeframe.  As a result, the classification and segregation of inmates is extremely difficult given the type of beds available to house them.  This places staff, visitors and inmates in the facility at risk of injury or death.  With an insufficient number of maximum and medium-security beds the staff must choose the "least violent" of the violent offenders to house in minimum-security dormitory beds since there are no medium-security double cells.  It is obvious that the system is dangerously out of balance in terms of the types of beds available and the classification of inmates held.

---

[7]  *Monterey County Sheriff's Manual*, Section 1101.03 A. *Purpose.*  Page 4.
[8]  *Monterey County Sheriff's Manual*, Section 1101.03 B. *Goal.*  Page 4.

## D.  Classification of Inmates

**Classification Issues.**  The proper classification of inmates is critical in the Monterey County Jail because of the age of the facility and the lack of enough single and double cells to properly separate and segregate inmates.  The number of violent gang members currently held at the existing adult detention facility further exacerbates the difficulty in classification.  Classification officers classify primarily by gang affiliation because of insufficient staff, inadequate facilities and severe overcrowding.

In Monterey County there is the possibility of misclassifying inmates based on space rather than security level.  Overcrowding reduces the ability to classify.  This is further compounded by the dormitory design. Normally, 10% - 15% of the beds should be empty and available for classification spikes and maintenance.

**"Need" Resulting from the Desire to Properly Separate and Segregate Inmates.**  Proper separation and segregation of inmates as envisioned in the Sheriff's classification plan is very difficult because of insufficient staff, an inadequate physical plant layout and the severe overcrowding that makes it necessary to unofficially add well over 300 beds above the CSA rated capacity.  These problems can be alleviated with the construction of new housing or a new facility properly sized to meet future needs. (One of the design goals for the new facility is to have a sufficient number of single and double cells for the proper separation of inmates of differing classification.)

## E.  Programs



*Severe overcrowding and lack of space make it extremely difficult to offer programs.*

**Programs Present and Future.**  The existing Monterey County Jail lacks adequate space to conduct any kind of meaningful programs to reduce recidivism.  Worse, the severe overcrowding and insufficient staff make it almost impossible for the Sheriff to conduct any but the most basic programs (e.g. religious services and counseling, basic mental health programs and counseling, visiting, commissary, counseling by health care providers, Alcoholics Anonymous and Narcotics Anonymous classes, etc.).

A new adult detention facility with adequate program space will allow for a wide variety of programs to reduce recidivism.  Not only will the Sheriff's Office be able to enhance existing programs, but staff also will be able to introduce a number of programs that have been successful in other jurisdictions.  Examples include:

- expanding mental health programs and therapy sessions;
- additional programs specifically designed for female inmates;
- developing an adult literacy program;
- providing tutoring for inmates seeking a GED;
- increasing the number of Bible study sessions and expanding religious programs;
- increasing the number of AA meetings and providing additional alcohol abuse counseling;
- enhancing the narcotics abuse program with additional meetings and therapy sessions; and
- providing health education on a wider variety of subjects.

Additional programs that are being considered for implementation in the new facility are discussed in the body of the report.

## F.  Analysis of Local Trends and Characteristics.

**Analysis and Projections.**  An analysis of local trends and characteristics resulted in the bed need projections illustrated in Table EX.3.  The high Average Daily Population (ADP) was used to determine bed needs for 2020 - 2050 for the reasons explained in the body of the report.

Table EX.3
•  Projected ADP with Peaking and Classification Factors 2020 – 2050 Summary

| Calendar Year | Revised Low ADP | Revised Median ADP | Revised Average ADP | Revised High ADP |
|---|---|---|---|---|
| 2020 | 2,385 | 2,563 | 2,552 | 2,708 |
| 2030 | 2,648 | 2,845 | 2,833 | 3,006 |
| 2040 | 2,927 | 3,145 | 3,132 | 3,323 |
| 2050 | 3,235 | 3,477 | 3,462 | 3,674 |

Source:  TRGConsulting.  November 2011.

The report includes a detailed description of the projection methodology along with the algorithms used. Anticipated Average Lengths of Stay (ALS) statistics also are included in this section of the report.

## G.  Adequacy of Staffing Levels



*Eighty percent of the beds at the Monterey County Jail are in dormitories while eighty percent of the inmates are felons.*

**Existing Conditions.** The Monterey County Jail is facing a number of staff related issues.  These issues affect the overall security of the facility and the morale of the staff.

**Staffing Issues.**  Detention facilities must be staffed 24 hours a day, 7 days a week (24/7) in order to fulfill their mandate to provide safe and secure housing for those inmates under their care.  Staff within the Monterey County Jail must be available to receive new bookings in the jail, provide medical care, classify and move inmates within the facility, maintain staff and inmate safety and security, provide recreation and exercise, ensure inmates are fed, transport inmates to court or outside agencies and lawfully release inmates.  Due to its nature, a jail cannot simply discontinue operation (e.g. refuse to accept prisoners) if there is not a person available to fill a position.  When detention facilities are not staffed adequately, overtime is necessary to cover an unfilled post.

The major staffing issues facing the Monterey County Jail are:

1.  It appears that the staffing provided by the County salary ordinance is based on the rated capacity of the facility, not on how many inmates are actually in custody.

2.  There has not been an updated relief factor calculated for quite some time.

3.  Baseline staffing should be above minimum staffing.  Due to vacancies and other factors, the Monterey County Jail constantly is using overtime to staff *up* to their self-imposed minimum staffing.  This level is *not* adequate to provide basic safety and security for staff and inmates.

4.  Vacancies, extended periods of leave, and normal staff attrition have resulted in a significant amount of vacant POST positions.  The jail has an increased reliance on overtime to meet minimum staffing.

5.  The extensive use of overtime can be dangerous since staff may have recently completed a 12-hour shift, when they are required to work additional overtime.  Efforts must be made to reduce the number of overtime hours.  To fill a vacancy in Monterey County, the practice has been to have an onsite employee work 4 hours over his normal shift and another employee called in early for 4 hours.  This practice required two employees to work 16-hour days.  Of additional importance is the 4-hour gap that is left uncovered in the middle of the shift.  In an emergency situation the facility would be dangerously understaffed.

6.  Supervision is a critical task in any detention facility.  Supervisors ensure that policy is followed, tasks are completed, critical decisions are made and exposure to liability from "failure to supervise" claims are limited.  In Monterey County, sergeants fill in for line positions when relief is unavailable.  This leaves a gap in first line supervision.  All vacant sergeant positions[9] should be filled and, except for an unusual situation, sergeants should supervise and not fill in for a line vacancy.  Even at full authorized staffing, it appears the span of control for sergeants is weak and additional positions for minimum supervision are necessary.

7.  Chronic understaffing lowers morale, employees are unable to take breaks (in violation of the Fair Labor Standards Act), employees get "burned out" with mandatory overtime, employees must take "shortcuts" to get the job done and employees are forced to assume collateral duties to allow the facility to function.

8.  The current authorized staffing for the Monterey County Jail is woefully inadequate.  Even if every vacancy were filled with a fully trained staff member, the facility would not have enough staff to meet the minimum staffing, let alone adequate staffing.

9.  A review of the current staffing  pattern as practiced by the Monterey County Jail and the best practices staffing plan included in the 2006 *Staffing Analysis*[10] indicates that the critical needs are for the extra staffing in the housing units and for facility-wide escort deputies.  These positions will ensure required safety checks are made, there is some level of supervision in the kitchen, laundry and medical areas and adequate staffing is available to respond to emergencies and unusual situations.  Recent cuts in staffing have made this situation much worse, thereby exposing the county to additional lawsuits.


Recruitment, Selection and Retention.  The Monterey County Sheriff's Department experiences difficulty in the recruitment, selection and retention of detention officers for the following reasons.

- Monterey County deputies' pay and benefits are less than those that are offered by several local, state and federal agencies for similar positions.
- The Custody Bureau estimates that 93% of the applicants for deputy positions in the Sheriff's Office fail the background investigation for a number of reasons including financial insolvency, drug use and psychological issues.

While the above difficulties are common in most county detention systems, the poor working conditions and antiquated design of the jail exacerbate Monterey County difficulties.  The feeling of draconian confinement and disorientation created by a maze-like layout are more than most potential applicants are willing to bear.

---

[9]  At the time of this assessment, one sergeant was out on long-term illness and one sergeant was scheduled to retire this month (December 2011).  This will leave two sergeants positions vacant.  Additionally the Custody Bureau lost one captain's position and two commander's positions in the budget cuts earlier this year (2011).

[10]  *Monterey County Sheriff's Office, Staffing Analysis.*  Voorhis Associates, Inc.  June 21, 2006.

Thus, the "need" for a new adult detention facility goes well beyond a simple "need" for additional beds that is, in itself, quite critical.  The additional "need" is for a facility that protects the safety of deputies and provides them with a professional environment in which to work.

### H.  Ability to Provide Visual Supervision



*Transportation van parked in front of the Monterey County Rehabilitation Facility.*

**Visual Supervision.**  While visual supervision is problematic in the existing jail, the new Monterey County housing units will be designed to enhance visual supervision as indicated in Section B *Operational and Design Philosophy* of this needs assessment.

**Existing Facility Design.**  A glaring example of the physical plant limitations in the existing jail is the design of the control or "guard" station, and the ability of staff to directly supervise inmates.   At best there is intermittent observation of the inmates.   In the Rehabilitation Facility, a Deputy Sheriff must walk into the inmate housing area to see the entire living and shower area.  It appears there is an attempt to remedy the problem with the use of cameras.   Unfortunately, this is not working.  Cameras should not be used in place of staff, but as a tool for staff in overall security.

**New Housing Design.**  It is envisioned that the new housing units will offer direct visual supervision from unit control into the housing pods and the attached outdoor recreation areas.  Similarly, roving officers will provide direct visual supervision of all areas in all pods including the toilet and shower areas.  Partitions providing modesty to inmates in the toilet area and the showers will be designed so that inmate's heads and feet always are visible.  There will be no blind corners in the housing pods when observed by the roving officers.

### I.  Adequacy of Record Keeping

**Record Keeping.**  Record keeping at the Monterey County Jail is quite detailed.  Not only does jail staff maintain all records required by Title 15, but they also keep additional records to effectively manage the inmate population.  Examples include the detailed records relating to overcrowding and early release, inmate management records, information on inmates with mental health needs and logs of those on psychotropic medications, statistics on gang affiliation, historic needs assessments and records relating to the effectiveness of programs (including records of the effectiveness of alternatives to incarceration).

### J.  Compliance with Standards

**Existing Conditions.**  The Monterey County Sheriff's Office operates a Type II adult detention facility. The facility is used for the detention of males and females pending arraignment, during trial, and upon a sentence of commitment. This facility has a unique physical plant design that complies with minimum standards for local adult detention facilities.  The facility's four main housing areas and reception area have a Corrections Standards Authority (CSA) rated capacity of 825 inmates.  On any given day,  there can be as many as 1,000 inmates in custody.  The existing Monterey County Jail faces three significant issues affecting the success of its overall mission and the ability of the Sheriff's Office to comply with Title 15 and Title 24 standards:

1. poor facility design;
2. severe overcrowding; and
3. understaffing.

Poor Facility Design.  The Monterey County Jail is located at 1414 Natividad Road, Salinas, California. The original rehabilitation facility was built in 1970 with additions to the jail complex occurring in 1977, 1988, 1993, and 1995. Adult male and female inmates are housed in the facility. The Corrections Standards Authority has given the facility a rated capacity of 825 inmates. This facility has some physical plant limitations that are causes for concern in terms of the safety and security of staff, visitors, volunteers and inmates.

A common thread through all of the four main housing units is the use of the dormitory design. Dormitories are much like military barracks, as opposed to single cell or four-man cellblocks. Dormitories are cheaper to build and theoretically are more cost effective to supervise.  Normally, dormitories are for the lowest level of classification.  In Monterey County, the jail facility has approximately 80% dormitory beds. The conflict occurs because the Monterey County regularly incarcerates approximately 80% felony sentenced and unsentenced inmates.  These are usually the highest level of inmate classification and require single and double cell housing.  Jail staff does not have the ability to classify or segregate problem inmates from other inmates or staff.

The type of inmate entering local county jails has changed dramatically since the Monterey County Jail opened in 1970.  Courts are releasing non-threatening felons prior to trial.  Judges are sentencing more misdemeanants to alternatives to custody.  The jail is left with serious felons awaiting trial and sentenced felons awaiting transportation to the state prison system.  In some ways, the local jail population is no different than those in state prisons.  Local jail populations will become even more similar to state prison populations as the full impact of AB 109 is felt.  The design of the housing units at the Monterey County Jail was never intended to house the type of felony inmates it now holds or the type of inmates that will be held as mandated recently by AB 109.

Overcrowding.  The Corrections Standards Authority (CSA) inspects and rates the Monterey County Jail. Rated capacity means the number of inmate occupants for which a facility's single and double occupancy cells or dormitories (except those dedicated for health care or disciplinary isolation housing) were planned and designed in conformity to the standards and requirements contained in the California Code of Regulations, Title 15 and Title 24.  The entire Monterey County Jail facility is rated at 825 inmates. As discussed earlier, there can be as many as 1,000 inmates in custody at any given time. There are approximately 13,500 inmates booked into the Monterey County Jail a year.

Overcrowding creates a number of issues that affect staff and inmates, and put the County at risk. Overcrowding causes stress both on inmates and staff. Inmates vs. inmate assaults typically occur more frequently, as do other disciplinary infractions.  Overcrowding affects inmates' mental and physical health by increasing the level of uncertainty with which they regularly cope.  There is less space per inmate.  In Monterey County there is the possibility of misclassifying inmates based on space rather than security level.  (Anecdotal information from staff indicates this occurs occasionally.)  Overcrowding reduces the ability to classify.  This is further compounded by the dormitory design.  Normally, 10% - 15% of the beds should be empty and available for classification spikes as well as routine and emergency maintenance.  With the severe overcrowding in the Monterey County Jail, programming is little, to nonexistent.

Understaffing.  The Monterey County Jail is facing many staff related issues.  These issues affect the overall security of the facility and the morale of the staff.

As discussed in detail in Section G, *Adequacy of Staffing Levels*, detention facilities must be staffed 24 hours a day, 7 days a week (24/7) in order to fulfill their mandate to provide safe and secure housing for those inmates under their care.  Staff within the Monterey County Jail must be available to receive new bookings in the jail, provide medical care, classify and move inmates within the facility, maintain staff and inmate safety and security, provide recreation and exercise, ensure inmates are fed, transport inmates to court or outside agencies, and lawfully release inmates.  Due to its nature, a jail cannot simply discontinue operation (e.g. refuse to accept prisoners) if there is not a person available to fill a position.  When detention facilities are not staffed adequately, overtime is necessary to cover an unfilled post.

## K.  Unresolved Issues

Unresolved Issues.  Six issues remain unresolved, mostly due to the uncertainty surrounding the final impact of AB 109 (Criminal Justice Alignment) as modified by AB 117 (Criminal Justice Realignment) on the Monterey County criminal justice system.  Unresolved issues include:

1.  The impact of Phase II of the *Public Safety and Offender Rehabilitation Services Act of 2007* on Monterey County.
2.  The final impact of AB 109 (as modified by AB 117) on the Monterey County criminal justice system.
3.  Sources of funding for the construction, project and operational costs that are associated with meeting the projected bed need for 2020 and 2030;
4.  The construction phasing of the 2030 need;
5.  The ultimate disposition of the three components[11] of the existing Monterey County Jail (e.g. continued use of one or more components for detention, demolition of one or more components, etc.); and
6.  The specific location of the new construction on the Natividad site.

These six issues are discussed in detail in the body of this report.

## Appendix

Stakeholders.  A list of stakeholders for the proposed construction project is included in the appendix.

---

[11]   The jail consists of three components (i.e. the Rehabilitation Facility, the Main Jail and the Woman's Jail).

## A.  Elements of the System

**Existing Monterey County Jail.** The Monterey County Jail is located at 1410 Natividad Road, Salinas, California 93906.  The jail consists of three components:



1.   The Rehabilitation Facility.
2.   The Main Jail.
3.   The Woman's Jail.

**Additional Beds Required.**  The additional beds required (including the existing 825 beds) *using the average and high projections*[1] are discussed below.

*Monterey County Jail*

**Existing Jail Bed Capacity.**  The rated jail capacity as calculated by the Corrections Standards Authority (CSA) is illustrated in Table A.1.

Table A.1
CSA Rated Jail Bed Capacity

| Rated Beds | Total Beds |
|---|---|
| Main Jail/Woman's Jail | 575 Beds |
| Rehabilitation Facility | 250 Beds |
| **Total Beds** | **825 Beds** |

Source.  Corrections Standards Authority.  April 2010.

**Shortfall Using the Average Projection.**  When the 825 existing beds are considered, the additional bed requirements for 2020 through 2040 *using the average projection* are illustrated in Table A.2 below.

Table A.2
Adult Detention Facility *Additional* Bed Need 2020 - 2040 (Average)

| Year | Additional Beds Needed |
|---|---|
| 2020 | 1,727 Beds |
| **2030** | **2,008 Beds** |
| 2040 | 2,307 Beds |

Source.  TRGConsulting.  December 2011.

The table above indicates that an additional 2,008 beds will be required in 2030 if the county elects to construct enough beds to meet their twenty-year needs using the average projections.

***Please note that it is recommended that Monterey County target the 2030 needs as an immediate requirement since the new adult detention facility will start to become overcrowded almost immediately upon opening should the first phase only consist of enough beds to meet the 2020 needs.  The existing severely overcrowded conditions have been exacerbated by the enactment of AB 109.***[2]

---

[1]   The projected bed need is calculated in *Section F: Analysis of Local Trends and Characteristics* of this report.  Please see Table F.17 on page F.9.
[2]   AB 109, Criminal Justice Alignment, has been modified by AB 117, Criminal Justice Realignment.

Shortfall Using the High Projection.  Alternatively, if *the high projection* is used, the current maximum capacity of only 825 beds requires that the county construct an additional 2,181 beds to meet the 2030 bed need.  The bed requirements for 2020 through 2040 using *the high projection* are illustrated in Table A.3.

Table A.3
Adult Detention Facility *Additional* Bed Need 2020 - 2040 (High)

| Year | Additional Beds Needed |
|------|------------------------|
| 2020 | 1,883 Beds |
| **2030** | **2,181 Beds** |
| 2040 | 2,498 Beds |

Source.  TRGConsulting.  December 2011.

*The table above indicates that to meet the 2030 need, an additional 2,181 beds will need to be constructed between now and 2030.*

Urgent Service Gap in the Adult Criminal Justice System.  The most urgent service gap is the need for a new detention beds and additional staff.  The current combination of insufficient beds, an inadequate detention facility and understaffing has resulted in an almost untenable situation.  This service gap is illustrated by the following.

- There are not enough beds to meet the current adult detention needs, let alone the needs in the near future.  Worse, the county has the wrong type of beds for the population currently incarcerated.  As an example, over 75% of the beds are in dormitories; while over 80% of the inmates are felons. The facility was designed for minimum and low medium-security inmates while the bulk of the inmates currently held are medium and maximum-security inmates.  This situation is exacerbated by AB 109 as modified by AB 117, which requires counties to house selected inmates who previously were housed by the state.  If additional beds are not constructed, criminals who should be incarcerated will not be incarcerated since beds space will not be available. Criminals serving time will serve little or none of their time since the beds to which they are assigned will be needed for others who pose a greater danger to public safety.  An extensive and unpopular early release system (i.e. releasing inmates well before their full sentence is served) will be required to prevent even more severe overcrowding.[3]
- Overcrowding, the lack of adequate staff and an insufficient number of single and double cells has resulted in the necessity of classifying inmates primarily by gang affiliation.  While gang membership typically is one of the factors used in classifying inmates, it is not normally the primary consideration. Existing court decisions allow for segregation by race and gangs only as a "temporary measures" when classification by race is necessary to allow staff to get the facility under control.
- Officer safety is compromised by the severe lack of an adequate number of single and double cells.
- The jail is so overcrowded that no allowance can be made for peaking and classification or the routine or emergency maintenance required in inmate housing areas.
- Severe overcrowding has resulted in inmates being held in the intake area for up to forty-eight hours. This is not permitted by the *California Code of Regulations*.
- Severe overcrowding has forced the Sheriff to use areas for housing that were not designed or intended for that use (e.g. the rotunda area). This makes these areas much more difficult for officers to manage and control.
- Overcrowding has forced the Sheriff to operate the jail as an indirect supervision facility, while the jail was designed for direct supervision.  This creates significant command, control and management problems.

---

[3]   The jail population regularly exceeds 1,000 inmates in a facility rated at 825.  Overcrowding already has reached a dangerous level.

- Adequate separation and segregation resulting from the classification of inmates cannot occur because of the severe overcrowding and the lack of a sufficient number of single and double cells. Thus, while the staff has the ability to classify, they do not have the ability to physically segregate those inmates who should be separated because of their classification. This creates an environment that is unsafe for officers, inmates and visitors.

- The design of the jail and the manner in which additions have been constructed results in a physical plant that is difficult to manage and control and unnecessarily expensive to operate. Numerous blind spots and the labyrinth like design requires more staff than would be required in a state-of-the-art podular facility. There is poor observation from most deputy stations. Officers cannot observe inmate areas in Pods A through J. The wing walls in the dormitories are approximately four feet high and provide a number of areas where inmates cannot be observed.

- The manner in which additions have been constructed has resulted in a facility that lacks any real central control or command post that would be used in the event of a major disturbance or disaster. The existence of multiple control stations is unnecessarily staff intensive in facility that is understaffed.

- The age of the building systems in the sections of the jail constructed prior to 1993 require extensive maintenance and, as a result, these systems are more expensive to operate. Maintenance costs already are increasing and will continue to increase at a faster rate as the facility deteriorates.

- The older design of the cells and dormitories constructed prior to 1993 does not meet today's standards for state-of-the-art detention facilities. Examples include:

  – Suicide hazard elimination is not as stringent as it should be to prevent self-harm and the attendant liability.
  – Medical/mental health treatment spaces are not adequate for the rated beds, let alone the actual number of inmates held.[4]
  – Preferred design requirements to improve security and the management of inmates are not met (e.g. number of toilet fixtures and showers per inmate, number of safety and sobering cells needed for efficient operation, adequate intake and release facilities, sufficient storage, etc.).
  – There are insufficient spaces dedicated to programs. Effective programs are necessary to manage the jail population and reduce recidivism.
  – Overcrowding forces the entire facility to operate as an indirect supervision jail. Mental health issues are considerably more difficult to recognize, manage and treat in an indirect supervision facility. A direct supervision, podular design in which staff is able to interact continuously with inmates makes it significantly easier to detect inmates with mental health problems. Additionally a direct supervision model reduces conflict and allows better observation of those requiring treatment.

- Understaffing has resulted in insufficient staff coverage. This all too frequently results in a four-hour gap in the middle of twelve-hour shifts. At times the middle of a shift may be as many as three or four officers short. This has been exacerbated by recent staff reductions.[5] As a result there are not enough officers present in the jail to respond to a major crisis or natural disaster.[6]

---

[4] For example, it is estimated that at least fifteen to twenty percent of the inmate population have mental health issues.

[5] In January 2011 there were 220 personnel in the Custody Bureau (Sworn and Unsworn). The recent budget cuts ($6.4 million in the Sheriff's Office) have reduced Custody Bureau staff to 183 people assigned, a reduction of thirty-seven positions in a facility that already was woefully understaffed. All vacant positions were eliminated in the most recent budget cuts. Finally, on December 13, 2011, the Board of Supervisors approved twelve new civilian (non-sworn) hires to replace deputies serving in unit control stations. This will make those deputies serving in control available to work in the jail. The twelve deputies now serving in control then will be available for other duties in the jail. The civilian hires are expected to be trained and on duty in February 2012. Thus the net loss of jail personnel since January 2011 is twenty-five positions. Unfortunately the net loss includes a Captain's position and two Commander's positions.

[6] Staff in the jail work twelve-hour shifts. When insufficient staff is available for a particular shift for whatever reason, the Sheriff is forced to hold over staff from the previous shift for four hours and bring in staff from the following shift four hours early. This results in a four-hour gap in the shift that is short of staff. Worse, this results in some officers working sixteen-hour shifts.

- Understaffing has resulted in the extensive use of CCTV cameras to monitor inmate activities.  CCTV never can substitute for officer presence.
- The attrition rate of trained detention officers is quite high.[7]
- Because of understaffing, the Sheriff is forced to use pre-academy hires in the jail.
- Understaffing has increased the span of control for first line supervisors to an unacceptable level.
- Sergeants are sometimes forced to work line positions because of lack of staff.  This results in a lack of supervision of the staff in the jail.
- There are insufficient staff on some shifts to make the required safety checks.
- Reduced staffing makes it difficult for staff to supervise inmates in the kitchen and the laundry.
- Staff shortages have resulted in the excessive use of overtime.

**Identified Need.**  As discussed above, additional beds urgently need to be constructed at the Natividad site.  The Monterey County Jail will remain a Type II Facility (i.e. a local detention facility used for the detention of persons pending arraignment, during trial and upon sentence of commitment as defined in Title 24 of the *California Code of Regulations*).

**Housing (Average Projections).**  To begin to meet 2030 needs using the *average* projections in Table A.2, 2,008 beds will need to be added to the existing 825 beds as described below. Housing will be designed as 192-bed units (each with two, 96-bed pods) to provide adequate control and to maximize staffing efficiency. The allocation of new beds using the *average* projections is summarized in Table A.4 below.

Table A.4
*Additional* Bed Allocation 2030 (Average)

| Bed Type | New Construction |
|---|---|
| Single Cells | 42 |
| Double Cells | 1,966 |
| Dormitory Beds | 0 |
| **Total Beds** | **2,008** |

Source.  TRGConsulting.  December 2011.

The allocation of beds by type of bed if the *average* projection is used is discussed below.[8]

**Single Occupancy Cells.**  A total of 42 new beds in single occupancy cells for maximum-security, disciplinary segregation, administrative segregation and protective custody inmates need to be added to the system. Stainless steel combination fixtures will be used.  All cell doors will be hung doors constructed of steel.  One bed and a desk will be wall mounted.[9]

**Double Occupancy Cells.**  A total of 1,966 new beds in 981 double occupancy cells will be added for medium-security inmates.  Adequate ADA cells will be provided.  Stainless steel combination fixtures will be used.  All cell doors will be hung doors constructed of steel.  Two beds and two desks will be wall mounted.

**Housing (High Projections).**  To meet 2030 needs using the *high* projections, 2,181 beds will need to be added to the existing 825 beds as described below.  Again, housing will be designed as 192-bed units (each

---

[7]  The Custody Bureau has indicated that they continue to lose trained deputies for a variety of reasons including the desire of newer deputies to work in patrol, the opportunity to work nearer to home in another agency and the fact that there are other more desirable opportunities available in law enforcement.

[8]  Note that the actual number of beds to be constructed will be adjusted for staff and construction efficiency during the architectural programming when actual projects are undertaken.  The number of beds to be constructed also will be adjusted based on available resources.

[9]  Please note that per Title 24, the only difference between single cells and double cells is the addition of a second bunk and desk in the double cell.  This size of the cell remains the same (70 net square feet).

with two, 96-bed pods) to provide adequate control and to maximize staffing efficiency.  The allocation of new beds using the *high* projections is summarized in Table A.5 on the following page.

Table A.5
*Additional* Bed Allocation 2030 (High)

| Bed Type | New Construction |
|---|---|
| Single Cells | 45 |
| Double Cells | 2,136 |
| Dormitory Beds | 0 |
| **Total Beds** | **2,181** |

Source.  TRGConsulting.  December 2011.

The allocation of beds by type of bed if the *high* projection is used is discussed below.

**Single Occupancy Cells.**  A total of 45 new beds in single occupancy cells for maximum-security, disciplinary segregation, administrative segregation and protective custody inmates will be added to the system.  All cells will be "wet."  Stainless steel combination fixtures will be used.  All cell doors will be hung doors constructed of steel.  One bed and a desk will be wall mounted.

**Double Occupancy Cells.**  A total of 2,136 new beds will be in 1,068 double occupancy cells for medium-security inmates.  Adequate ADA cells will be provided.  All cells will be "wet."  Stainless steel combination fixtures will be used.  All cell doors will be hung doors constructed of steel.  Two beds and two desks will be wall mounted.

**Dayrooms.**  Dayrooms will be provided at the rate of thirty-five square feet per inmate and will contain anchored tables and seating to accommodate the maximum number of inmates allowed access to the dayroom at any given time in each housing unit.  Access will be provided to toilets, washbasins, drinking fountains and showers from the dayroom.  Dining will occur in the dayroom of each housing unit.

**Visiting.**  Contact, non-contact and video visiting spaces will be provided.

**Program Space.**  Program rooms will be provided at each housing unit.  Activities that will occur in these spaces include adult education, religious services and counseling, Alcoholics Anonymous and Narcotics Anonymous classes, group counseling, mental health evaluations and classes along with other programs to reduce recidivism.  Additional program space will be provided for the existing rated beds.

**Medical and Mental Health Services.**  Medical examination rooms and secure pharmaceutical storage will continue to be provided for medical screening and routine medical care.  More advanced care will continue to be provided outside of the facility.  Mental health professionals will evaluate inmates and provide mental health programs as necessary.  Interview rooms and program space will be provided for this purpose.

**Outdoor Exercise.**  An enclosed, secure outdoor exercise area will be attached to each new housing unit.  This area will be observable from within the housing unit and from central control.  The area will be a secure area that is partially covered for use in inclement weather and have a clear height of at least fifteen feet.  The "open" area of the roof structure will be covered with high security mesh to prevent escape.  Access will be provided to a toilet, washbasin and drinking fountain.

There will be at least one completely fenced outdoor exercise area of not less than 600 square feet for use by those inmates who have earned this privilege.

Special care will be taken to eliminate opportunities for escape and the introduction of contraband.  All exercise areas will be observed by central control.

Recreation areas will accommodate inmates with disabilities.

**Attorney Interview Rooms.**  Selected non-contact visiting rooms will be configured with a secure and lockable paper pass to allow attorneys to consult confidentially with inmate clients.

**Confidential Interview Rooms.**  Confidential interview rooms will be provided near the new housing areas. The interview rooms will be used by custody, mental health and health care staff as well as by attorneys and religious advisors.  The interview rooms will be accessible to male and female inmates and they will not be monitored.

**Central Control.**  A new central control room will monitor and operate all security perimeter penetrations. Additionally central control will monitor each new and existing housing unit.

Central control will have visual supervision of the housing units, the attached outdoor exercise areas and the program spaces.  CCTV will be used to provide visual control and to assist in the control of the perimeter penetrations.  Central control will function as the Sheriff's command post during natural disasters or inmate disturbances.

**Unit Control.**  New unit control stations capable of visually controlling a unit and will be located between housing pods.

A new integrated control system will link all existing housing areas to the new construction.

**Staff Positions.**  A draft staffing plan will be prepared before the facility is designed.  Thus, care will be taken during the design to be certain that the facility does not generate additional staff positions not required by "best practice."  All staff stations will be ergonomically designed.

**Food Service.**  The existing food service operation will accommodate the additional beds.

Inmates will be fed in the dayrooms of their respective housing units.  Sack lunches will be provided for inmates who are away from the facility for the day (e.g. on work crews, inmates likely to be in court for the day, etc.).

**Storage.**  Institutional storage will be provided as required by Title 24.  Additionally, storage areas will be provided in the new housing units.  Inmate property storage will be provided.  The inmate property storage area will include secure storage for inmate valuables.

**Bed Need Remains Paramount.**  Although the Monterey County detention facilities have a CSA rated capacity of 825 beds, it must be remembered that all but 153 of the rated beds are dormitory beds.  Even at the 825 bed rated capacity the Sheriff regularly incarcerates over 1,000 inmates.  This results in an immediate shortage of 175 beds but, more importantly, a shortage of approximately 850 beds of the bed type needed to house the felons currently incarcerated as well as those that will be incarcerated as a result of AB 109 (i.e. beds in single and double cells).

There also is a need for additional and/or remodeled administration and support spaces to operate an efficient Custody Bureau.  Once the Sheriff is comfortable that enough of the available resources are devoted to beds, he should then address the administration and support needs.[10]

The county and their planner have determined that there also is an immediate need for a minimum of 5,000 sq. ft. of relocated administrative space to improve the flow of inmate induction and visitor control.  This relocation is required in Phase 1 to prepare for the construction of future housing units.

---

[10]  Please note that additional beds require specific support spaces (e.g. increased storage, recreation areas, etc.) as outlined in Title 24.  These mandatory support spaces must be included in any project that increases the rated bed capacity.



*Monterey County Rehabilitation Facility Entrance.*

## B.  Operational and Design Philosophy

**Introduction.**  The purposes and goals for the Monterey County Adult Detention and Rehabilitation Facilities are discussed in the *Monterey County Sheriff's Manual* in Section 1101.00 *Bureau Organization.*

**Purpose.**  The purpose of the Monterey County Adult Detention and Rehabilitation Facilities is the detention of persons charged with crimes and awaiting arraignment or trial.

1.  The detention of persons, in the Sheriff's custody, to ensure their attendance as witnesses in criminal cases.

2.  The confinement of persons sentenced to imprisonment in the County Facilities.[1]

**Goal.**  By means of the continuing process of education and training of the deputies and professional staff employed herein, to provide for the security, health and welfare of inmates in custody and to rehabilitate them whenever possible through programs designed for this purpose.[2]

**Long Range Design Goals for New Adult Detention Beds and Support Spaces.**  The immediate design goal is to maximize the number of new detention beds in cells at the current site, using existing support infrastructure and administrative space as much as possible.  The specific design objectives for the new adult detention beds and support space are discussed in detail in the body of this assessment.

*   be a state-of-the-art, new generation, direct visual supervision, podular, adult detention facility that meets all of the requirements of Title 24 of the *California Code of Regulations*;
*   provide a safe and secure environment for staff, visitors, volunteers and adults with a well defined secure perimeter that includes pedestrian and vehicular sally ports;
*   include a new central control station that controls the secure perimeter and has visual supervision of the housing units and recreation areas as well as other secure areas;
*   Include unit control stations to supervise the new housing pods;
*   consist of housing units with the flexibility to meet a wide variety of varying classification needs (e.g. mental health housing units, female housing units, special needs housing units, units of varying security levels, etc.);
*   meet Monterey County's adult detention requirements for twenty years after initial occupancy (with planned expansion);
*   provide spaces for a wide variety of programs to reduce recidivism and thus reduce county, state and federal criminal justice system costs;
*   provide a professional work environment and adequate space for custody staff, teachers, medical and mental health professionals, other professionals providing services and volunteers;
*   be cost efficient to build and operate;
*   be energy efficient and environmentally friendly to reduce operating costs;
*   be staff efficient to preserve county resources;
*   include intake/release/processing areas that are large enough to meet all booking needs and, simultaneously, provide an area for release and transportation staging (intake/release/ processing spaces often are undersized in detention facilities);
*   provide adequate medical, dental and mental health spaces to reduce the need for transportation outside the facility and to ensure that each inmate is evaluated, treated, monitored and assigned to appropriate programs;

---

[1]  *Monterey County Sheriff's Manual*, Section 1101.03 A. *Purpose.*  Page 4.
[2]  *Monterey County Sheriff's Manual*, Section 1101.03 B. *Goal.*  Page 4.

- meet the requirements of the Americans with Disabilities Act (ADA);
- provide adequate, easily supervised adult exercise and recreation spaces (including those required for large muscle group activities) to reduce tension and contribute to the success of programs;
- include expanded food service space and facilities as necessary to ensure that meals meet the nutritional requirements determined by the county and to provide vocational education opportunities;
- provide laundry services to clean inmate clothing, bedding and associated items related to the additional beds;
- include adequate storage (storage also often is undersized in detention facilities);
- provide secure spaces for contact, non-contact and video visiting; and
- include a court suite with all necessary support services to handle arraignments and other proceedings, thus reducing the need to transport inmates who are incarcerated in the jail.

Construction and Administrative Work Plan.  The construction and administrative work plan for the new adult detention facility is discussed below.

The delivery process is designed specifically to make the most efficient use of available resources while achieving the project scope (quality), budget and schedule.  This methodology has been used successfully on several adult detention facility projects throughout the United States including projects in California counties and projects under the aegis of state and federal grant managers.

This work plan includes proven project delivery methods to ensure successful completion of the proposed scope on time and within budget.  The plan also includes federally mandated requirements for grant funding. The plan consists of the following elements:

- Detailed conceptual level planning that includes:

  – information on and required by funding sources including the monitoring of matching funds;[3]
  – development of the preliminary program statement;[4]
  – development of the preliminary staffing plan;[5]
  – development of the preliminary architectural program;
  – refinement of the conceptual budget;
  – analysis of the construction costs and total project costs;
  – development of Monterey County Sheriff's Office operational and staffing costs that will be incurred once construction is complete;
  – development of maintenance costs that will be incurred once construction is complete;
  – refinement of the preliminary schedule; and
  – plans for continued compliance with state and/or federal pre-contractual requirements.

- Presentation to and approval by the Monterey County Board of Supervisors during planning, design, the development of construction documents and during construction (including the preparation of appropriate graphics for the presentation).

- Development of the architectural program including:

  – preliminary code analysis;
  – an analysis of the requirements of Titles 15, 19 and 24;
  – staffing and operational analysis which will include a refinement of the staffing plan and refinement of the Program Statement; and
  – any required refinement of the project timeline.

- Preparation of traditional schematic design and design development documents.

---

[3]  If the project receives federal funding it will include certain reporting, inspection and auditing requirements.
[4]  It is important to finalize the program statement early so that it forms the basis for the design effort.
[5]  Similarly, it is important to finalize the staffing plan at this stage to insure staffing efficiency and reduced operational costs.

- Transition planning that begins with the establishment of the transition team during schematic design and continues through move-in and post-occupancy activities.
- Continuous design/value engineering to make the most efficient use of available resources (i.e. provide a cost effective design) and preserve life cycle costs.

- Continuous user input from the Monterey County Sheriff's Office staff and others providing programs and services at the proposed adult detention facility.

- Continuous code analysis.

- Independent cost estimates during the design and construction document phases to remain within 5% of the conceptual budget.

- Continuous analysis of the requirements of the Titles 15, 19 and 24.

- Ongoing schedule review and analysis to be certain that the project is ready for occupancy as planned.

- The preparation of construction documents (drawings and specifications).

- Constructability reviews during design and during the preparation of construction documents to use the most effective construction means and methods in order to ensure competitive bidding and to reduce change orders.

- Peer review during the preparation of design and construction documents to provide the best possible and most cost effective solutions to design and construction issues.
- Continuous analysis of staffing, operations and life cycle costs in order to design and build the most cost effective facility possible.

- Marketing of the project to potential contractors and sub-contractors to increase the potential for competitive bids and to increase the number of bidders.[6]

- Bidding activities including the opening of the bids and the preparation and signing of the construction contract.

- Construction administration, coordination and observation.

- Preparation of the quarterly invoices and progress reports if required by grant funding procedures.

- Construction close-out activities including:

  – punch list development and monitoring of the completion of punch list items;
  – cost reconciliation and final audit;
  – final invoice and progress payment;
  – collection of warranties;
  – preparation of the final "as-built" drawings; and
  – collection of operation and maintenance manuals.

- Transition and move-in activities including:

  – equipment commissioning;
  – facility "shake-down;"

---

[6]   Particular attention should be paid to marketing the project to those sub-contractors responsible for detention hardware and security electronics.  This will help assure that competitive bids from these sub-contractors are provided to the general contractors bidding on the project.

- – operations and security "walk through;"
- – staff occupancy training; and
- – the phased move-in of inmates.[7]
- Periodic post-occupancy evaluations at one, two and five years after occupancy.

- Other services as desired by the Monterey County Sheriff's Office.

---

[7] Experience has shown that initial occupancy is an intense time for staff and inmates. A phased move-in allows staff and inmates to adjust with less tension. This results in the reduced risk of self-harm by inmates and reduced sick leave requests by staff.

## C.  Current Inmate Population

Current Inmate Population.  The California Department of Corrections and Rehabilitation (CDCR), Corrections Standards Authority (CSA) provides summary data collected for the Jail Profile Survey.  Crime and arrest data for Monterey County also is available for 2006 through 2009 from the California Department of Justice (DOJ).  A "snapshot" from 2006 through 2009 (the last full data year of information from the California Department of Justice) is indicative of the current jail population.   Included in this section is statistical data on the jail population, including:

1.  Felony Sentenced Dispositions;
2.  Crime and Crime Rates; and
3.  Sentenced and Non-Sentenced Adult Detention Populations by Gender.

Felony Arrests and Dispositions.  A "snapshot" of felony sentenced disposition data for 2006 through 2009 from the DOJ, is presented in Table C.1 below.

Table C.1
Monterey County Adult Felony Sentenced Dispositions, 2006 – 2009

| Sentence | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|
| Death | 0 | 0 | 0 | 0 |
| Prison | 71 | 6 | 195 | 86 |
| Probation | 18 | 13 | 44 | 21 |
| Probation with Jail | 699 | 111 | 1,109 | 430 |
| Jail | 61 | 7 | 53 | 13 |
| Fine | 19 | 4 | 18 | 20 |
| CRC (Civil Addict) | 0 | 0 | 0 | 0 |
| Other | 2 | 5 | 8 | 6 |
| Total | 870 | 146 | 1,427 | 576 |

Source:  California Department of Justice.  November 2011.

Crimes and Crime Rates.  As with felony sentenced dispositions, a "snapshot" of crimes and crime rate data for Monterey County (again, available from The California Department of Justice for 2006 through 2009) is illustrated in Table C.2 below.

Table C.2
Monterey County Adult Crimes and Crime Rates, 2006 – 2009

| Category/Crime | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|
| Violent Crimes | 2,014 | 2,191 | 1,973 | 2,118 |
| Homicide | 15 | 29 | 36 | 51 |
| Forcible Rape | 116 | 123 | 99 | 125 |
| Robbery | 599 | 638 | 587 | 657 |
| Aggravated Assault | 1,284 | 1,401 | 1,251 | 1,285 |
| Property Crimes | 7,289 | 8,934 | 7,006 | 6,885 |
| Burglary | 2,712 | 3,020 | 3,056 | 3,151 |
| Motor Vehicle Theft | 2,202 | 3,364 | 1,894 | 1,808 |
| Larceny - Theft $400+ | 2,375 | 2,550 | 2,056 | 1,926 |
| Total Larceny-Theft | 8,204 | 8,043 | 6,541 | 6,245 |
| Over $400 | 2,375 | 2,550 | 2,056 | 1,926 |
| $400 and Over | 5,829 | 5,493 | 4,485 | 4,319 |
| Arson | 81 | 79 | 78 | 90 |

Source:  California Department of Justice. November 2011.

**Sentenced and Non-Sentenced Inmates.**   Table C.4 illustrates the percentages of non-sentenced and sentenced inmates (by gender) held at the Monterey County Jail from January 2011 through March 2011 (the most recent data available from the Corrections Standards Authority).

Table C.3
Monterey Jail Population by Sentenced and
Non-Sentenced Inmates, January – March 2011

| Category | Number | Percent |
|---|---|---|
| Non-Sentenced | | |
| Male | 712 | 89% |
| Female | 85 | 11% |
| Total | 796 | 100% |
| Sentenced | | |
| Male | 257 | 89% |
| Female | 30 | 11% |
| Total | 288 | 100% |
| Grand Total | 1,084 | |

Corrections Standards Authority.  November 2011

**Conclusion.**   Over the last decade, violent felony reports and arrests according to statistics maintained by the California Department of Justice have fluctuated; therefore a predictable upward or downward trend has not occurred.   Unfortunately the number of beds available for holding these offenders has been well below the number and type needed throughout that timeframe.   As a result, the classification and segregation of inmates is extremely difficult given the type of beds available to house them.   This places staff, visitors and inmates in the facility at risk of injury or death.   With an insufficient number of maximum and medium-security beds the staff must choose the "least violent" of the violent offenders to house in minimum-security dormitory beds since there are no medium-security double cells.   It is obvious that the system is dangerously out of balance in terms of the types of beds available and the classification of inmates held.

## D.  Classification of Inmates



*The Monterey County Main Jail.*

**Introduction.**  The proper classification of inmates is critical in the Monterey County Jail because of the age of the facility and the lack of enough single and double cells to properly separate and segregate inmates.  The number of violent gang members currently held at the existing adult detention facility further exacerbates the difficulty in classification.  Classification officers classify primarily by gang affiliation because of insufficient staff, inadequate facilities and sever overcrowding.

In Monterey County there is the possibility of misclassifying inmates based on space rather than security level.  Overcrowding reduces the ability to classify.  This is further compounded by the dormitory design.  Normally, 10% - 15% of the beds should be empty and available for classification spikes and maintenance.

**Classification Training.**  A majority of the classification training for staff is performed in house.

**Classification of Inmates.**  The county's classification system is explained in the verbiage below from the *Monterey County Sheriff's Manual.*

**1110.00     INMATE CLASSIFICATION**

1110.01     Receiving Deputies are responsible for the initial classification and housing of inmates.  They shall use information in CJIS to assess the inmate's classification history.  This shall include inmate's current charges, past custody record, gang affiliation and criminal history.  Deputies shall use the following guidelines for assigning housing.  They may also use the on duty Classification Deputy as a resource in classifying inmates.

A.  The different levels of security and inmate classification categories shall be determined as follows.  These categories shall require maximum-security housing at initial housing.

1.  *Protective Custody* - Inmates that need to be housed separately because they are in danger of being assaulted by other inmates because of their charge, gang affiliation, sexual preference, occupation, or inmate informants.

2.  *Violently Assaultive or Predatory Behavior* - Inmates that are prone to assaultive or threatening behavior toward other inmates or staff.  Inmates that are found to be in possession of deadly weapons while in custody.  Inmates that have an extensive criminal history of violence and assaults on peace officers.

3.  *Escape Risk* - Inmates that have escaped or attempted to escape from custody to include participation in any escape or possession of escape tools.  Inmates that have been sentenced to or are pending sentence to death or life in prison shall be considered an escape risk.

4.  *Violent or Serious Criminal Charges* - Inmates that are charged with murder, attempted murder, kidnapping, aggravated assault and sex crimes.  This may include inmates that have a past history of these charges even if currently in custody on lesser charges.

5.  *Sophisticated Criminal History* - Inmates that have been found in possession of prison weapons or are sophisticated gang members.

6. *State/Federal Prison Inmates* - Inmates held locally for court proceedings that have holds from federal or state prisons.

7. *Uncooperative Attitude* - Inmates that display an anti-establishment and uncooperative behavior.

8. *Exhibiting Behavior that Fits the Criteria of 5150 W&I or Diagnosed Mental Illness* - Inmates that are a danger to themselves or others, unable to care for themselves or have been diagnosed with psychological problems.  Referral to medical staff for treatment and clearance for housing is required.

9. *Under the Influence of Psychedelic Drugs* - P.C.P., L.S.D., or other hallucinogenic drugs or mind-altering drugs.

B. The following categories may be housed in medium security general housing.

1. *Misdemeanor and General Felony Charges* - Inmates that are charged with misdemeanor and felony charges that are not violent and assaultive in nature.  Inmates that can adapt to the jail setting and adjust to the open housing setting.  This category includes inmates sentenced to county jail waiting classification clearance for minimum security.

C. The following categories of inmates shall be housed in minimum security.

1. Inmates sentenced to county jail.

2. Inmates who can adapt to an open housing environment.

3. Inmates that can participate in work details and correctional programs.

D. Processing and Housing Civil Prisoners.

1. Any person committed to jail on a civil charge (civil contempt of court, failure to abide by a court order, etc.) shall be housed in a single cell away from the general population. They shall be dressed out in a **WHITE** jumpsuit.

2. Priority shall be given to assigning all civil commitments to the Isolation Cells in the Men's Section and Holding Cells in the Women's Section.

3. The Receiving Deputy shall make the cell assignment with the assistance of Classification or the Watch Supervisor.  In the event that no isolation cell is available, a temporary assignment in Booking can be made.  The civil inmate shall be moved to an isolation cell at the earliest possible time.

4. A civil prisoner cannot be offered the option of being housed in general population.

1110.02   Facility Housing Levels

A. The different levels of security such as minimum, medium, and maximum are based on charge, past criminal history, and current and past conduct in custody.  The different housing units in the facility fall into the following security categories.

1. *Maximum* – Isolation Cells, A-Pod, B-Pod, C-Pod, D-Pod, G-Pod, H-Pod, I-Pod, J-Pod, Women's Holding Cells, R-Pod, and S-Pod.

2. *Medium* – E-Pod, F-Pod, Rotunda, K-Pod, Dorm-A, Dorm-B, Dorm-C, Dorm-D, B-Wing, C-Wing, T-Pod, and U-Pod.

  3. *Minimum* – Q-Pod, E Wing,  F-Wing, D-Wing, and Dorm-E.

B. The following classes of  inmates shall be kept separate (PC 4002(a)):

  1. Male prisoners shall be confined separately from female prisoners.

  2. Persons confined on civil charges shall be kept separate from those confined on criminal charges.

  3. Juvenile inmates shall be kept separate from adult inmates.

C. Following is a list of housing units and a description of the types of inmates housed in each unit.  Deputies shall use these categories to correctly house inmates.  Inmates shall not be housed directly into the dorms without review by the Classification Deputies or approval of the Team Commander.

Table D.1<br>Inmate Classification<br>Revised 09/06

| Main Jail | TYPE OF HOUSING | ARMBAND COLOR | CLOTHING COLOR |
|---|---|---|---|
| A-POD | Adm. segregation, 5150, incompatible sex crimes | GREEN | ORANGE |
| B-POD | Adm. segregation, 5150, incompatible sex crimes | GREEN | ORANGE |
| C-POD | Adm. segregation for heavy Surenos[1] and compatible inmates | ORANGE | ORANGE |
| D-POD | Adm. Segregation | WHITE | ORANGE |
| E-POD | General housing restricted to Norteno gang members and compatibles | WHITE | RED |
| F-POD | General housing restricted to Norteno gang members and compatibles | WHITE | RED |
| G-POD | Adm. segregation for Norteno/Sureno dropouts | WHITE | ORANGE |
| H-POD | Adm. segregation for Nortenos, Blacks, and Whites | WHITE | ORANGE |
| I-POD | Adm. segregation for Nortenos, Blacks, Whites and handicapped inmates | WHITE | ORANGE |
| J-POD | Adm. segregation for Nortenos, Blacks, and Whites | WHITE | ORANGE |
| ROTUNDA | General housing for misd./elderly/weak.  Housing by Classification ONLY! | WHITE | RED |
| K-4 | General housing.  B/C Wing overflow and immigration | WHITE | RED |
| K-5 | General housing restricted to gang dropouts | ORANGE | ORANGE |
| K-16 | General housing.  B/C Wing overflow and immigration | WHITE | RED |
| K-17 | General housing restricted to gang dropouts | ORANGE | ORANGE |
| A-DORM | General housing for inmates with light felony charges. No Nortenos | WHITE | RED |
| B-DORM | General housing for Sureno gang members | ORANGE | ORANGE |
| C-DORM | General housing for inmates with sex charges | GREEN | ORANGE |
| D-DORM | General housing for parolees and compatibles (No Nortenos) | WHITE | RED |
| E-DORM | General housing restricted to sentenced Surenos | ORANGE | BLACK |
| ISOLATION | Adm. segregation for extreme protective custody, high risk, civil, or juvenile inmates | BLUE | ORANGE |

---

[1] Heavy Surenos are gang leaders or "shot callers."

Table D.1 (Continued)
Inmate Classification

| Rehab Center | TYPE OF HOUSING | ARMBAND COLOR | CLOTHING COLOR |
|---|---|---|---|
| B-WING | General housing for felons. No black inmates | WHITE | RED |
| C-WING | General housing for light felons, misdemeanor or sentenced inmates | WHITE | RED |
| D-WING | General housing restricted to sentenced Nortenos | WHITE | BLACK |
| E-WING | General housing for sentenced inmates (non-workers) | WHITE | BLACK |
| F-WING | General housing for sentenced inmates assigned to work details | WHITE | BLACK OR KP GREEN |
| **Women's Jail** | **TYPE OF HOUSING** | **ARMBAND COLOR** | **CLOTHING COLOR** |
| Q-POD | General housing for sentenced females and work details | WHITE | BLUE |
| R-POD | Adm. segregation for 187 PC, 5150, or problem inmates | WHITE | ORANGE |
| S-POD | Adm. segregation for 187 PC, 5150, or problem inmates | WHITE | ORANGE |
| T-POD | General housing - felony charges | WHITE | RED |
| U-POD | General housing - misdemeanor charges, sentenced, or overflow felons | WHITE | RED OR BLUE |
| HOLDING | Adm. segregation - extreme protective custody, high risk, or civil inmates | WHITE | ORANGE |

1110.03    *Lockdown/Inmate Movement Forms* - A Lockdown/Inmate Movement Form documents the justification for an inmate's housing.  The Lockdown/Inmate Movement Form establishes a record of where an inmate has been housed and the circumstances of the housing change.   A Lockdown/Inmate Movement Form shall be completed in the following cases:

A.   Anytime an inmate is housed in maximum security.

B.   Anytime an inmate is moved to higher level of security.

C.   Whenever an inmate is moved from one location to another (except when moved per the Mainline Transfer List).

D.   Anytime an inmate is rolled up to the Receiving Area pending re-classification.

E.   The original copy of the *Lockdown/Inmate Movement Form* shall be placed in the Inmate File. Copies shall be distributed to the Bureau Captain, the Team Commander, and Classification.

1110.04    Classification Deputy Responsibilities.

A.   The primary responsibility of the Classification Unit is to classify and house inmates. Classification Deputies shall review the initial housing of inmates housed in lockdown.

B.   Secondary duties of the Classification Unit include incident investigation, assisting and sharing intelligence with other agencies, monitoring the inmate phone system, and gathering and disseminating gang intelligence.

1. The goal of the Custody Operations Bureau is to work cooperatively to assist other agencies in gathering and disseminating investigative information.

2. Routine requests shall be handled by the Classification Deputy receiving the request (e.g., recording of an inmate telephone call, reading a specific inmate's mail for investigative purposes).

3. Non-routine requests (such as searching an inmate's cell to remove contents) require necessary precautions. The following guidelines shall be followed when out of the ordinary requests are received:

   a. The Classification Deputy receiving the request shall contact the Classification Sergeant. The Classification Sergeant will determine if the Classification Unit can assist, in consultation with the appropriate Commander, if necessary.

   b. If the Classification Sergeant is not available, the Classification Deputy shall contact the on-duty sergeant. The Classification Deputy shall ensure the affected Commander is made aware of the planned activity. The Commander has the authority to approve or disapprove the agency's request.

   c. An incident report shall be distributed to the Classification Sergeant and the Classification Commander.

C. Classification Deputies are authorized to change the level of an inmate's classification in order to protect the security of the facility and the welfare of inmates and staff. All increases in classification shall be reported to the Bureau Captain via memorandum or *Lockdown/Inmate Movement Form*.

D. Classification Deputies shall conduct routine reviews of inmate classification levels to maintain an awareness of inmate activity so that housing assignments and space can be best utilized.

E. Classification Deputies shall screen and approve sentenced inmates for transfer to Mainline.

F. Classification Deputies shall receive copies of all disciplinaries, crime reports, and lockdown/inmate movement forms. They shall use these reports to update inmate custody histories and maintain facility statistics.

G. Inmates who have been sentenced to more than 60 days have the right to write to Classification for a review of their level of classification every 30 days. Classification shall respond in writing to the inmate with the result of their review.

H. Inmates have the right to appeal their housing classification to the Classification Sergeant. Inmates may further appeal to the Bureau Administrative Commander whose decision is final.

I. The Bureau Administrative Commander has the authority to change the classification level of an inmate as deemed appropriate.

J. Any time the Classification Unit has special security information on an inmate, they shall send a memo alerting the jail, Transportation and Court Security staff of the inmate's security risk.

"Need" Resulting from the Desire to Properly Separate and Segregate Inmates. Proper separation and segregation of inmates as envisioned in the Sheriff's classification plan is very difficult because of insufficient staff, an inadequate physical plant layout and the severe overcrowding that makes it necessary to unofficially add well over 300 beds above the CSA rated capacity. These problems can be alleviated with the construction of new housing or a new facility properly sized to meet future needs. (One of the design goals

for the new facility is to have a sufficient number of single and double cells for the proper separation of inmates of differing classification.)

## E.  Programs



*Dormitory housing in the Rehabilitation Facility at the Monterey County Jail.  Severe overcrowding and lack of adequate program space make it extremely difficult to offer meaningful programs.*

Introduction.  The existing Monterey County Jail lacks adequate space to conduct any kind of meaningful programs to reduce recidivism. Worse, the sever overcrowding and insufficient staff make it almost impossible for the Sheriff to conduct any but the most basic programs (e.g. religious services and counseling, basic mental health programs and counseling, visiting, commissary, counseling by health care providers, Alcoholics Anonymous and Narcotics Anonymous classes, etc.).

New detention housing with adequate program space will allow for a wide variety of programs to reduce recidivism.  Not only will the Sheriff's Office be able to enhance existing programs, but staff also will be able to introduce a number of successful programs in other jurisdictions.

Programs currently offered at the Monterey County Jail:

Alcoholics Anonymous is offered to both men and women.  This is a program designed for men and women to share their experiences, strength and hope with each other to work on solving their common problems and help others to recover from alcoholism.  *Offered in both English and Spanish.*

The B.I. Incorporated  program is offered to both men and women.  This program describes services that are offered to the inmates upon release.  The program provides cognitive and behavioral treatment programs for probationers and prepares them for employment in their community.  Clients receive additional employment assistance based on their needs as well as personalized help to overcome any obstacles, which may occur with productive employment.

Commissary is offered to both men and women.  This program provides inmates with a "taste from the outside" by providing snacks as well as personal hygiene items.  Inmates also can receive "iCare" packages from friends and family members when they go online and order packages, which range in price and seasonal specials.

The Financial Class is offered as part of the Nutritional Curriculum on the last day of incarceration.  This class teaches basic financial topics such as how to manage their money, how to balance a check book, etc.

Forklift training is offered to both men and women who are sentenced and are assigned to a work detail.  This is an interactive course where inmates receive classroom and hands on instruction on the safety, parts and operation.  Inmates must be able to pass a classroom test and the practical test in order to obtain a successful certificate of completion.  Once the inmate is released from custody they may go to C.E.T. (Center for Employment Training) to take their certification test in order to obtain a forklift license.  This test is offered free to only those individuals that completed the instructional part while in custody.  They must present their certificate of successfully completion.

G.E.D. Preparation and Testing is offered to both men and women who are sentenced and are housed in the inmate areas that are assigned to a work detail.  This program provides inmates with five subject tests which, when passed, certify that they have successfully completed the General Educational Development (G.E.D.) equivalent to a high school diploma.

H.I.V/John XXIII Awareness presentation and testing is offered to both men and women. The presentation offers awareness on the topic.  The test is done in a private setting and is confidential.

Janitorial Instruction is offered to both men and women who are sentenced and are housed in the inmate areas that are assigned to a work detail.  This program is designed to provide skills in addition to simple janitorial services.  Instruction topics include:

- Handling of Hazardous and Infectious Waste
- Basic Cleaning for Floor Surfaces
- Cleaning for Restrooms/Shower rooms

Kick Start will be offered to both men and women.  This program is designed to help inmates "between release and re-entry" with employment and employment-related services.  Inmates are assisted with completing applications, preparing résumés, preparing for interviews as well as providing opportunities for employment.

Kitchen Basics is offered to both men and women who are sentenced and are housed in the inmate areas that are assigned to a work detail.  The course objective is to prepare students for work in the food service industry.  Students will be able to apply the skills learned from this program in a food service job in the community. Topics covered are:

- Personal Hygiene
- Equipment
- Sanitation
- General Safety
- Food Safety
- Production
- Storage

Each student is given a workbook for pre-work, class work and homework.  A quiz is given at the end of each class with a final exam at the end of Kitchen Basics.  Students must maintain an average of 75% or they will be asked to leave the course and repeat.

Library Instruction is offered to women who are sentenced and are housed in the inmate areas that are assigned to a work detail.  Inmates essentially become the inmate library assistant.  This inmate(s) is assigned to keep the library organized, prepare the donated books for placement on the shelves, prepare bags with books for the library book exchange throughout the jail, return the library books to the shelves, fill the special book requests and provide cleaning services for the library and library office.

Microsoft Office training is offered to both men and women.  This program provides inmates with basic computer skills needed for future employment.  Courses will include instruction on Word, Excel, PowerPoint, etc.

Narcotics Anonymous is offered to both men and women.  N.A. is a twelve-step program.  This is a program designed for men and women to share their experiences, strength and hope with each other to work on solving their common problems and help others to recover from chemical dependency.  *Offered in both English and Spanish.*

The Nutritional Curriculum is offered only to female sentenced inmates in Q-pod and U-Pod.  This program is designed to help the inmates make healthier food/snack choices.

Papas in Rehab is offered to men only.  This program is designed to help incarcerated fathers continue to build a bond with their children by teaching the "6 Basics of Being a Great Dad:"

- Provide unconditional love and affection
- Spend T-I-M-E
- Communicate constantly and creatively
- Partner with Mom
- Instill moral and spiritual values
- Establish "My Fathering Legacy"  Offered only in Spanish.

Parenting currently is offered to both men and women under Pride and Choices to limited housing areas pending the identification of additional volunteers with the experience, training and certification.  This class provides inmates with skills in raising responsible and independent children.  Ways of rethinking the approach of teaching, discipline, etc. also are part of the curriculum.

Pride and Choices is offered to both men and women who are sentenced and are housed in the inmate areas that are assigned to a work detail.  This program is designed to help with recovery inside and out. "Choices" is a two-week self-assessment intervention group designed to give the client information about addiction and the tools necessary for change.   "Pride" is an eight-week intensive drug and alcohol recovery program.  Topics include:

- Anger Management
- Critical Thinking
- Aptitude and Interest
- Substance Abuse Subtle Screening Inventory and other subjects

S.O.A.R. (Starting Over Accessing Re-Entry)[1] is offered to both men and women.  This is a 6-week program whose goal is "re-entry oriented to break the cycle of recidivism."  Topics include:

- Transitioning into the Community
- Relapse Prevention
- Cognitive Skills and Communication
- Coping with Trauma
- Self Care
- Accessing Community Resources

Turning Point presentations are offered to both men and women.  This program offers presentations of services that are available to inmates upon release.  Adult employment programs that help those who have an arrest record match their skills and aspirations with employers in the community.  They offer:

- On-the-job training
- Résumé and interviewing techniques
- Employment workshops
- Computer access
- Career counseling
- Job placement and other core services.

---

[1]   This program currently is not offered, but hopefully it will soon be offered.  Behavioral Health Department staff was teaching the class.

Veteran Orientation Workshop is designed to help veterans find employment and/or get them connected to services.  Topics will include:

- CALVET Welcome Home Program
- Veteran Benefits G.I. Bill
- Résumé and Job Search Assistance
- Disability and Pension
- Priority Job Referrals.


Examples of enhancements to existing programs include:

- expanding mental health programs and therapy sessions;
- additional programs specifically designed for female inmates;
- developing an adult literacy program;
- providing tutoring for inmates seeking a GED;
- increasing the number of Bible study sessions and expanding religious programs;
- increasing the number of AA meetings and providing additional alcohol abuse counseling;
- enhancing the narcotics abuse program with additional meetings and therapy sessions; and
- providing health education on a wider variety of subjects.

Additional programs that are being considered for implementation include:

- life skills programs targeted by age, gender and need;
- a program to identify community resources and provide initial contact prior to release;
- family awareness and responsibilities;
- parenting programs;
- mentoring programs for young inmates;
- anger management classes and counseling;
- self-esteem enhancement;
- cultural awareness programs;
- developing communication skills and enhancing human relations;
- aptitude assessment and career planning;
- special education classes;
- classes offering high school credit;
- vocational education classes in conjunction with local labor unions modeled after programs that have been successful in other counties (e.g., computer skills, food service, laundry service, landscaping, printing, construction technologies, automobile maintenance and repair, automobile body work, etc.);
- academic and vocational education correspondence courses;
- college level courses by correspondence or through the local college system;
- English as a second language;
- arts and crafts;
- physical education classes; and
- other programs that will assist inmates in returning to the community as productive citizens.


Inmate Programs and Detention Alternatives.  Inmate programs, including alternatives to detention, are described in the verbiage below from the *Monterey County Sheriff's Manual*.

**1116.00    CUSTODY PROGRAMS**

1116.01    *Exercise and Recreation*

> A.  Inmates shall be allowed a minimum of three hours of exercise and/or outdoor recreation distributed over a seven-day period.

1. The day sergeant shall prepare and post yard schedules to meet the requirements of Title 15, Minimum Standards (Section 1065).  The on-duty sergeant shall approve any changes to the posted schedule.
2. Deputies shall notify the sergeant when inclement weather conditions exist.  The sergeant shall decide when to cancel the yard.  Cancellations shall be noted on the daily yard schedule.

3. The yard deputy shall place the daily yard schedule in the 24-file at the end of the day.

B. The yard deputy shall search the yard at the beginning and end of each day.  The yard deputy shall inspect the yard (including vents and perimeter fencing) for contraband, faulty equipment, and facility damage that presents a security risk.  Deficiencies shall be reported to the on-duty sergeant.  If defects are found, inmates shall not be taken to the yard unless approved by the on-duty sergeant.

C. The 135 door leading from the main jail to court holding shall be closed and locked when men's yard is being conducted.  This is essential for the security of the facility.

D. Inmate Yard Rules

1. Inmates shall not be taken to the yard without their armband.

2. Inmates shall only be allowed to wear jail issued clothing to the yard.  Sheets, towels, cup, spoon, food, writing paper, pencils, etc. are prohibited.

3. Inmates shall wear their jumpsuits to and from the exercise yard.

4. Inmates shall not cross the painted red lines on the exercise yard without permission from the yard deputy.  Violators shall be removed from the yard and a disciplinary written.

E. Men's Section Exercise Yard (Upper Yard)

1. The total number of inmates on the upper yard at one time shall not exceed 30.

2. The yard chain link fence gate shall be padlocked with the security chain whenever inmates are on the yard.

3. Inmate counts ensure proper security and accountability of inmates.  The yard deputy shall count the inmates as they walk onto the exercise yard, and make numerous counts during the exercise period.

4. The yard deputy shall immediately report suspicious activities and summons assistance to respond to the yard.

5. The yard deputy shall not open the gate to respond to an emergency on the yard until sufficient back-up is on the scene to safeguard the security of the yard.

6. The yard deputy is responsible for the security and supervision of inmates on the yard.  The exercise yard is a key point for escape.  The yard deputy shall maintain constant vigilance.

   a. The yard deputy position is non-stationary.  While there is a shed erected on the yard floor to provide shelter from the elements, deputies shall not remain inside for extended periods of time.

b. The yard deputy shall not leave the exercise yard unattended at any time while inmates are on the yard. If the yard deputy needs relief from his duties, he shall notify the floor deputies or on-duty sergeant.

c. The yard telephone shall only be used for official business.

d. Reading materials and any devices that distract from continual observation of inmates on the yard is prohibited.

e. The yard deputy shall not engage in conversation with inmates that detract from the primary function of ensuring the security of the yard.

F. Women's Section Exercise Yard. The same guidelines that apply to the men's yard apply to the women's yard except that the yard position is a stationary position and the yard deputy shall observe inmates from the yard booth. There is no red off-limit line, however, inmates shall not be allowed contact with the yard fencing.

G. Inmate Movement

1. Normally two deputies will be responsible for moving inmates to the yard. **One deputy shall remain on the floors at all times**. The Yard Deputy shall remain in the Deputy security area of the yard and shall not assist the floor deputies with the inmate movements.

2. The yard deputy shall provide housing deputies with a printed roster for each housing unit scheduled for yard. Deputies shall mark the yard roster as inmates file out of the pod and are identified by their armband. The roster printout will not reflect yard restrictions. The floor deputy is responsible for ensuring that only authorized inmates are permitted to go to the yard.

3. Inmates shall be searched randomly going to and from the yard.

4. The yard deputy shall be in the area that is secure from direct inmate contact before the inmates enter the yard.

5. The housing deputies shall escort the inmates to the yard. One housing deputy shall walk across the yard and give the yard deputy the yard roster. The yard deputy shall verify that the count is correct before the housing deputy leaves the yard.

6. Five minutes before the end of the exercise period, the yard deputy shall advise the housing deputies that the inmates are ready to return to their housing unit.

7. Two deputies shall escort inmates off of the yard. One deputy shall remain at the top of the stairwell and count inmates as they file down the stairs. One deputy shall remain at the bottom of the stairs to observe inmate movement.

8. Deputies shall conduct a final headcount as inmates file through the entrance door to their housing unit.

9. Deputies shall immediately notify the on-duty sergeant whenever a count is not correct. The on-duty sergeant shall secure the jail and initiate a search for the missing inmate.

H. Dorm Exercise Yards

1. The dorm-housing deputy shall conduct the security checks as described in Section 1116.01.B.

2.  Dorm yards will be opened after the 0800 hour head count and dorm clean-up is complete.  The yard will be closed no later than sundown.

3.  Dorm yards shall be closed on  Saturday and Sunday due to visiting.

I.  Isolation Exercise Yard

1.  The daytime sergeant shall schedule yard for inmates housed in the isolation cells.   The sergeant shall ensure that only compatible inmates are exercised together.

2.  The E-Dorm yard shall be used to exercise inmates in isolation.  Deputies shall secure the door to the E dorm-housing unit.

3.  Two deputies shall escort inmates housed in isolation to the yard.  One deputy shall observe yard activity from the interior of E-Dorm.

J.  Rehabilitation Center Exercise Yards

1.  The daytime Rehab. Sergeant shall schedule the exercise yard for inmates housed at the Rehabilitation Center.

2.  The exercise deputy shall conduct a security inspection as described in Section 1116.01.B.

3.  The exercise deputy shall collect volleyballs from the roof and surrounding at the beginning of the day before beginning yard.

4.  When conducting B/C wing yard, the yard deputy shall be stationed at the post outside the yard before the inmates enter the yard.

5.  The maximum number of inmates allowed on the B/C wing yard is 30.  The B & C Wing deputy shall count inmates going out to the yard and confirm his count with the yard deputy.   The B & C-Wing Deputy shall count inmates returning from the yard and ensure the yard door is secure after yard exercise is over.

1116.02    *Religious Programs*

A.  The Jail Chaplain provides for the religious needs of inmates in the Jail and Rehabilitation Center.

1.  The Chaplain is authorized to recruit assistance from local faith communities.   The Chaplain shall develop and provide appropriate volunteer training to ensure volunteers understand security concerns, limitations and scope of services to be rendered.

2.  Inmates may contact the Jail Chaplain by submitting a request in writing.   Inmate requests shall be placed in the Chaplain's mailbox.

3.  Persons interested in becoming a religious volunteer shall submit a Volunteer Referral application form to the Jail Chaplain.   The Jail Chaplain shall verify the volunteer's affiliation with a recognized church and determine the person's ability to conduct religious services.   Religious volunteers shall complete an orientation class provided by the Jail Chaplain.

B.  The Chaplain shall prepare a schedule of religious services for each housing section.  A Program Binder, located in the lobby and in Control 5, lists the day and time for religious service by housing unit.

1.  The Chaplain shall maintain and update the schedule of religious services in the Program Binder.

2.  The Program Binder shall contain a list of authorized volunteers.  The Chief's secretary shall maintain and update the list of authorized volunteers.

C.  Religious Clergy shall be ordained or licensed ministers.

1.  The Jail Chaplain shall approve all religious clergy who are eligible for contact visits.

2.  The Jail Chaplain shall list the authorized clergy's name and the name of the church in the Clergy Box located in the jail lobby and in Control #5.

3.  Clergy not listed in the clergy box shall not receive a contact visit unless a Facility Commander or the Captain has given prior approval.  Clergy not authorized contact visits may use the non-contact visiting room.

4.  Clergy who are not listed in the clergy box shall be advised they must contact the Chaplain to obtain a clearance.

5.  Contact visits shall be held in the attorney rooms of each facility.

6.  Clergy are prohibited from using clergy privileges to visit members of their own family.

7.  Clergy shall not bring other people with them for contact visits.

8.  Clergy shall not give Bibles or other articles to inmates during visits, nor shall they leave these materials for the Chaplain to pass on to the inmates.

9.  Religious volunteers shall not be admitted for individual inmate contact visits if they are not listed in the clergy box.  Religious volunteers who are not clergy may visit individual inmates as a visitor on visiting day.

1116.03   *Volunteers in the Custody Operations Bureau*

A.  The work of volunteers is a valued component of inmate programs offered in the Custody Operations Bureau.  Volunteers provide rehabilitative services and represent a significant savings to the Bureau by providing services on a voluntary basis.

B.  Only persons who have completed a background and have been placed on the Program Roster are authorized to enter the facility as a volunteer.

C.  Persons desiring to become a volunteer in the Custody Operations Bureau shall complete a personal history background check in accordance with Monterey County Sheriff's Manual Sections 316.03 (a) and 316.10 (d).  The Chief Deputy of Custody Operations, or his designee, shall review the volunteer's personal history investigation and approve all volunteer clearances.

1.  Volunteers shall complete the Monterey County Sheriff's Office Custody Operations Bureau Volunteer Referral form and obtain the written approval of the program coordinator (e.g., N.A., Chaplain, etc.).   Applications shall be forwarded to the Inmate Services Sergeant for review.  The Inmate Services Sergeant shall make an appointment

with the applicant for photo, prints and background interview.  The Support Services Commander shall review all volunteer backgrounds for final approval.

2.  Volunteers clearances shall not be issued to individuals who have been incarcerated in a county jail or penal institution or on probation or parole within the past two years, or who have a close association with a gang member or anyone involved in illegal activity.

3.  Volunteers shall possess a California Identification Card or California Driver's License.

4.  Volunteers shall read and sign a Hostage Policy and Search Informed Consent Release that shall be retained in the Background file.

5.  Only volunteers involved in programs that consist of academic or vocational courses, exercise and recreation, individual, family and/or social service programs and religious services shall be approved for clearance.

D.  Volunteers shall renew their clearance annually.  The Chief's secretary shall send out renewal notices to each Program Coordinator.  Program Coordinators shall be responsible for notifying program volunteers.   Volunteers who do not return the renewal form shall be removed from the active volunteer list.

E.  Volunteers shall obtain an access badge and sign the Building Access Log.  Volunteers shall present either a California Identification Card or California Driver's License in order to obtain building access and an access badge.  (Reference Sheriff's Manual Section 317).

F.  The Inmate Services Sergeant is in charge of inmate programs.  Problems with non-religious persons or groups shall be reported to the Inmate Services Sergeant.   Problems with individual clergy or religious volunteers shall be reported in writing to both the Inmate Services Sergeant and the Jail Chaplain.

1116.04   *Commissary.*

A.  Commissary items such as toiletries, stationary and snack foods may be ordered once per week.

1.  Inmates must have the funds on their account at the time the order is processed.

2.  Inmates must fill out the order form completely, including their full name, booking number, housing location, and signature.  Incomplete forms shall not be processed.

3.  Completed commissary forms shall be picked up by the housing deputies as scheduled, and placed in the commissary box in the lobby.

B.  Commissary is distributed on Monday, Tuesday and Wednesday depending on the housing unit.  Make-up commissary is delivered on Thursday.  Deputies shall distribute commissary order forms the day before the scheduled delivery.

C.  Deputies shall provide security to the commissary employees during commissary delivery.

D.  Commissary employees shall inventory each inmate order in the presence of the inmate.

1.  Commissary employees shall verify inmates by their identification wristband.  Inmates without a wristband shall not receive commissary.

2. Commissary employees shall verify the contents of the inmate commissary bag and have the inmate sign the commissary receipt.

3. The contract commissary provider shall handle shortages and apply credits, as appropriate.

E. Complaints regarding commissary shall be directed to the contract commissary provider or to the Custody Support Commander.

F. Inmates released from custody before commissary delivery shall be advised to contact the Jail on the following Tuesday to obtain a refund. Employees shall release the funds after verifying the identity of the former inmate entitled to the funds.

1. Inmates shall have one year within which to pick up money left in their account after release. After one year this money will be placed into the General Fund pursuant to Government Code 26642.

2. The second watch corrections specialist supervisor shall notify inmates of uncollected refunds at the end of each calendar year. The supervisor shall maintain an audit trail of all notifications and disbursements.

G. Indigent inmates ($1.00 or less on their account) may receive a free care package. The inmate must ask commissary staff for a care package at the time commissary is delivered in the housing unit. A computer-generated report identifies inmates who are eligible for a care package. A care packet consists of one toothbrush, one toothpaste, one comb, two bars of soap, a disposable razor (if permitted), fours sheets of writing paper, two envelopes and one pencil. Care packages are handed out with the inmate commissary.

H. Inmates on disciplinary restriction (DAR) may purchase a DAR package. Inmates on disciplinary restriction may mail two personal letters free of charge through the jail mailroom.

I. Inmates are responsible for keeping track of their account balance. This information is provided on their cash on books receipts, their last commissary receipt, or their booking sheet if no commissary has been ordered before.

1116.05  *Inmate Welfare Fund*

A. The Inmate Welfare Fund is comprised of all monies and property accrued through the profits from commissary and the pay phones. In accordance with Penal Code Sections 4025 and 4026, profits shall be deposited in the Inmate Welfare Fund and expended by the Sheriff, based on recommendations of the Inmate Welfare Fund Committee, for the benefit of education, welfare of the inmates confined within the facilities, and the maintenance of facilities.

B. The Inmate Welfare Fund Committee shall consist of the following:

1. Chief Deputy, Custody Operations Bureau – Chairman.

2. Captain.[2]

3. Support Services Commander.

4. Inmate Services Sergeant.

---

[2] The Captain's position at the jail has been eliminated in the last round of staff cuts.

     5.    Librarian, Custody Operations Bureau.

     6.    Rehabilitation Facility Educational Director.

     7.    Jail Chaplain.

     8.    Public member from the community.

C.  Rules of Order

     1.    The Inmate Welfare Fund Committee shall review and approve expenditures and examine accounting practices and procedures.

     2.    A quorum of four (4) voting Committee members is necessary to transact business.

     3.    The Chairman shall schedule Inmate Welfare Fund Committee meetings on a quarterly basis.  Special meetings may be called when deemed necessary by the Chairman.

     4.    The Chief's secretary shall take minutes of each meeting.  A copy shall be forwarded to the Fiscal Division and the Sheriff.

D.  Guidelines for Inmate Welfare Fund Expenditures.

     1.    Capital items ($500.00 or more in unit price with a useful life of three years or more) must be authorized by the Inmate Welfare Fund Committee and approved by the Inmate Welfare Fund Chairman.

     2.    Expenditures in excess of $1,000.00 shall be reviewed by the Inmate Welfare Fund Committee and approved by the Inmate Welfare Fund Chairman.

     3.    The Support Services Commander shall approve routine replacement and purchases of equipment and supplies.

     4.    The Inmate Welfare Fund is authorized to provide indigent inmates (those inmates defined as having $1.00 or less on their books) with a bus ticket for transportation back to the area of residence outside the county, and for clothing if the inmate does not have civilian clothing and has no means to have clothing brought in at the time of release.

     5.    Final approval of all Inmate Welfare Fund expenditures will be made by the Sheriff or Undersheriff.

E.  Revenue from the Inmate Welfare Fund shall be deposited with the Treasurer of Monterey County who shall deposit, invest, or re-invest any part of the Fund in excess of that deemed necessary for the day-to-day operation.  The interest accrued on such fund shall be deposited in the Inmate Welfare Fund.

F.  The Support Services Commander shall be responsible for Inmate Welfare Fund Property purchased by/for Custody Operations.

G.  The Inmate Welfare Fund shall be audited regularly to ensure compliance with standard accounting principals and practices.  A copy of this report shall be posted in each facility and be made available to the public and to inmates.

1116.06    *Sheriff's Passes*

   A.  Penal Code Section 4018.6 authorizes the Sheriff to grant a temporary release from custody. The following guidelines shall be considered in the granting of passes in the Monterey County Sheriff's Custody Operations Bureau.

      1.  The inmate must be sentenced to the County Jail and have no outstanding holds, Parole Holds, domestic violence charges, or disciplinaries.

      2.  Family emergencies may be considered as:  life-threatening illness or death of an immediate family member (i.e. father, mother, sister, brother, spouse by marriage, child by marriage).

      3.  An inmate needing medical or dental care that cannot be provided by the Jail Facility or Natividad Medical Center, with the review and recommendation of the jail physician, may be granted a pass to see their personal physician at their own expense (4011PC).  In the event that the inmate does not meet the criteria for a pass but requests to see their own doctor, the inmate shall agree to pay for the cost of transportation and place a sufficient amount of money on their books to cover the costs of the escort deputy and the transportation vehicle.  Doctor fees are the inmate's responsibility.

      4.  The Bureau Administrative Commander approves all passes up to eight hours.

      5.  Passes will not be granted for travel outside the county of Monterey absent exigent circumstances.

   B.  The procedure for requesting a Sheriff's Pass is as follows:

      1.  The pass request (SO Form 135) shall be completed by the inmate and given to the Control 5 deputy at the Rehab Facility or the Desk Deputy/Corrections Specialist at the Jail.  The Control Deputy or the Desk Deputy/Corrections Specialist shall verify that the inmate lists a reason for the pass.  The inmate's charges, sentence, disciplinary problems, and outdate shall be noted on the pass form and forwarded to the Bureau Administrative Commander.

      2.  If the pass request is for medical reasons, it shall be reviewed by the Jail Physician or his representative prior to being submitted to the Bureau Administrative Commander for review.

      3.  The Bureau Administrative Commander shall approve/disapprove the pass, and sign and distribute the pass form.

      4.  The releasing deputy/specialist shall advise the inmate of the pass conditions and require the inmate to sign the agreement.  A copy shall be given to the inmate.

      5.  The releasing deputy/specialist shall list the clothing that the inmate is wearing on the pass form.  The name and valid drivers license of the inmate's driver shall be written on the pass form.

      6.  When the inmate returns from pass, the clothing worn shall be compared with what was written down at release.  Any changes shall be noted on the pass form and the changes entered on the inmate's original booking sheet in the lobby and in CJIS.  The date and time that the inmate returned shall be written on the pass form.  The original of the completed pass form shall be filed in the inmate's file and a copy shall be sent to the Bureau Administrative Commander.

7. Medications the inmate brings back from pass shall be picked up by the medical staff in the lobby before the inmate is processed back in.

8. If an inmate fails to return, escape charges shall be filed.  If the pass is a court-ordered pass, a memorandum shall be sent to the judge who ordered the pass.  Copies of this memo shall be placed in the inmate's file and sent to the Bureau Captain.

1116.07  *Inmate Marriages*

A. Inmates wishing to be married while in jail must write the Jail Chaplain for a marriage package.  The package includes instructions and an Affidavit re Marriage.

1. The Affidavit re. Marriage shall be signed and dated by the inmate, licensed minister and the prospective spouse.

2. After the inmate is sentenced to state prison on the local charges, the inmate shall submit the marriage documents to the Administrative Commander for approval.  If approved, the affidavit must be picked up and presented to the County Clerk for a marriage license. (The County Clerk requires the presence of the minister listed on the affidavit.)

3. Once the required documentation is in order, the Administrative Commander will call the prospective spouse for the date, time, and location of the ceremony.  Only one person, a required witness, may attend.  Cameras and flowers are prohibited.  Potential spouses are advised that rings shall not be exchanged nor brought into the facility.

4. Same sex marriages shall not be authorized.

B. To qualify for a marriage while incarcerated, an inmate must be sentenced to state prison on his local charges and meet the following pre-requisites:

1. He/she must be financially responsible for all costs incurred due to marriage, i.e. filing fee, marriage license, minister, blood tests, etc.

2. The prospective spouse must be at least eighteen years of age.

3. He/she must establish a sound reason for the marriage.

4. He/she shall not have any spousal or child abuse charges.

5. He/she is disciplinary free.

6. Inmates returning to prison on parole charges shall not qualify.

C. The Jail Chaplain shall not officiate or participate in marriage ceremonies.

Monterey County Courthouse
240 Church Street
Salinas, CA  93901

Attorney for the Defendant:

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF MONTEREY

PEOPLE OF THE STATE OF CALIFORNIA,

Plaintiff)No. _____  vs. **AFFIDAVIT re MARRIAGE**)

Defendant, )

_____, under penalty of perjury declares:
(Minister)

1. That at all times herein mentioned he was, and now is a licensed minister of the _____ Church, authorized by law to perform marriages and to solemnize a marriage between unmarried persons living together as man and wife:

2. That _____ (inmate) is physically unable to appear in person before the County Clerk, the clerk of the court, or a judge in private chambers because he is incarcerated in the Monterey County Jail. I declare under penalty of perjury that the foregoing is true of my own knowledge, except as to those matters that are stated on information and belief, and as to those matters, I believe them to be true.

Executed at Salinas, California, on _____     _____ (Date)

X_____
(Licensed Minister Signature)

_____ (Church)

As the representative of Sheriff Michael Kanalakis, I do hereby approve this application for marriage.

Executed at Salinas, California, on _____ (Date)__
(Administrative Commander)

I, the undersigned, do HEREBY DECLARE UNDER PENALTY OF PERJURY that I have read the foregoing and know the contents thereof; that the same is true of my own knowledge except as to those matters therein stated on information and belief and as to those matters I do believe the same to be true and I desire to marry

_____
(Name of Inmate)
Executed at Salinas, California, on

_____ (Date)     .
X     _____
(Signature)     .

I, the undersigned, do HEREBY DECLARE UNDER PENALTY OF PERJURY that I have read the foregoing and know the contents thereof; that the same is true of my knowledge except as to those matters therein stated on information and belief and as to those matters I do believe the same to be true and I desire to marry

_____ (Prospective Spouse)     .
X     _____
(Signature of Inmate)     .

1116 – Custody Programs
11

TRGConsulting

1116.08    *News Media Interviews with Inmates*

    A.  News media representatives may be allowed to interview or photograph inmates subject to the following conditions:

        1.  No interviews shall be permitted with inmates randomly encountered in the course of an institutional activity or visit.  No inmates shall be selected at random for interviews.

        2.  Sentenced inmates, who have no other charges pending may be interviewed; however, it is recommended the media visit during regular visiting hours under the usual visiting rules.

        3.  Pre-trial detainees and sentenced inmates with pending charges may be interviewed and photographed subject to the following conditions:

            a.  The news media representative shall make a request to the Administrative Commander at least three business days prior to the actual interview.

            b.  After receiving the request, the Administrative Commander shall contact the inmate to determine if he or she wishes to voluntarily agree to the interview.  If so, the inmate shall complete INMATE-MEDIA CONSENT/RELEASE Form (SO Form 162).  The original shall be maintained by the Sheriff's Office and a copy given to the news media representative.

            c.  The inmate shall sign a separate SO Form 162 for each interview.

            d.  The news media representative shall obtain and submit to the Sheriff's Office or their representative, a written consent from the inmate's attorney of record.  The inmate's attorney shall be given an opportunity to be present at the interview to ensure that their client's case is not prejudiced.  The attorney's written consent shall indicate whether or not he intends to be present.  If the inmate is a co-defendant, a copy of the attorney's written consent shall be sent to the other defendant(s) and their attorney of record.

            e.  If the court has issued a gag order, written authorization and consent must be obtained from the court.

    B.  All interviews shall be conducted under such conditions as the Facility Commander may deem appropriate, including restrictions as to time, place and length of interview, size of film crew, and any other factors related to the interview.  News media may be required to reimburse the County for costs of supervision, or any security arrangements deemed necessary.

    C.  Interviews with inmates shall be prohibited when the Sheriff believes the interview would jeopardize the safety and peaceful order of the jail, or when such interviews would be detrimental to the welfare and best interest of the inmate.  Interviews with inmates who are psychiatrically diagnosed as psychotic are prohibited.  Interviews and photographs of inmates in physical restraint are prohibited without specific approval of the Sheriff.

### NEWS MEDIA REPRESENTATIVE REQUEST FOR INTERVIEW AND RELEASE FORM

I request an interview with _____, who is now in the
custody of the                                    (Inmate's Name)
MONTEREY COUNTY SHERIFF. In consideration for the issuance of a Sheriff's Office press pass and the
authorization to enter the premises of the Monterey County Adult Detention and Rehabilitation Facilities and
there to take still or motion pictures, video tapings, sound recordings, interview inmates, or any of the
foregoing, the undersigned, for themselves and for the news media they represents, their heirs, executors,
administrators and assigns, hereby agrees as follows:

1. To release and hold harmless the County of Monterey, the Sheriff of Monterey County, and the Monterey
County Sheriff's Office, and each and all of their deputies, employees, or agents from any and all liability,
claims, or damages from death, harm, or injury, to person or property, incurred in or in any way resulting
from the aforesaid entry or activities, or any of them.

2. To reimburse for property damage, and for the cost of any litigation, or either of them, the County of
Monterey, the Sheriff of Monterey County, and the Monterey County Sheriff's Office, and each and all of
their deputies, employees, or agents, from or resulting or arising out of the aforesaid entry to activities, or
any of them.

3. To abide by the rules and regulations established for news media access to Monterey County Adult
Detention and Rehabilitation Facilities, a copy of which has been read by the undersigned.

4. To a search of his person and equipment before, during, and after the aforesaid entry or activities, or any of
them.

5. To give the Sheriff of Monterey County, the Sheriff's Office, or any of their deputies, employees, or agents
against whom allegations are made by an inmate interviewed, a reasonable opportunity to respond.

6. To provide no compensation, either direct or indirect, to the inmate or his or her family for any interview or
correspondence; and to respect the rights of privacy of all inmates.

The undersigned acknowledges that:

1. The Monterey County Sheriff's Office may limit, restrict, terminate or forbid touring, filming, taping,
or recording at the Monterey County Adult Detention and Rehabilitation Facilities, as provided in
news media access rules.

2. The Monterey County Sheriff's Office does not permit inmates or others to use hostages to escape
from custody or otherwise interfere with orderly institutional operations. The Sheriff's Office does not
recognize hostages for bargaining purposes.

NEWS MEDIA AGENCY:                              APPROVED BY:

_____              _____
                                               (Sheriff's Representative)
REPRESENTATIVE:

_____              DATE: _____

1116 – Custody Programs
13

### INMATE-MEDIA CONSENT / RELEASE FORM

I, _____ , have been informed that still or motion pictures, video tapings, voice
   *(Inmate's Name)*

recordings, and/or interviews have been requested of me by

_____ who represents _____
   *(News Media Representative)*                                          *(News Media Agency)*

I understand that said still or motion pictures films, video tapings, voice recordings, and/or interviews may be for
commercial or non-commercial distribution and transmission to the general public, and I hereby fully and forever
release, acquit, and discharge to County of Monterey, the Sheriff of Monterey County, the Monterey County
Sheriff's Office, and all of their deputies, employees, or agents from any and all liability which may accrue on
account of any and all claims or causes of action which in any way arise from my participation in said still or motion
pictures, video tapings, voice recordings, and/or interviews are concerned.

I further declare that I fully understand the terms of this release and that I have voluntarily and without duress
entered into and signed the same. I have been advised that I do not have to consent to or participate in any way in
said films, video tapings, voice recordings, and/or interviews.

My attorney of record is _____
                                    *(Attorney's Name)*

_____          _____
   *(Attorney's Business Address)*                        *(Attorney's Telephone Number)*

The court having jurisdiction of my case is:

_____

Date: _____          _____
                                                  *(Inmate Signature)*

WITNESSED BY:

_____
   *(Sheriff's Office Representative)*

SO 162

1116 – Custody Programs
14

1116.09    *Visiting Procedures*

    A.   *Visitor Requirements*

        1.   Visitors must provide proper valid identification (i.e., driver's license, identification card, Military ID, passport, Matricula Consular ID Card, or any other identification with a photograph attached). This identification may vary widely and deputies shall be reasonable in interpreting what may constitute "valid" identification. The purpose of this requirement is not to prevent visits but to ensure security. Unacceptable IDs are Social Security cards, bank cashing cards, student ID cards, or other unofficial identification.

        2.   Visiting Form (SO Form 155) shall be completed by the visitor for each inmate visited.

        3.   The visitor information from the visiting cards shall be entered into CJIS by the visiting deputy either during visiting or immediately after visiting at the jail. At Rehab, entries shall be completed by the hallway deputy on the same evening as visiting occurred. The visiting card shall then be disposed of.
          a.   Deputies assigned to outside visiting posts shall be armed.

        4.   Each inmate is allowed a minimum of one hour of visiting per week. This time may be divided among different visitors. One child and one adult are allowed in the secured visiting rooms at one time. A total of four visitors are allowed during contact visits at one time. This includes adults and/or children. It is the responsibility of the visitors to monitor their time in allowing all visitors an opportunity to visit with the inmate.

        5.   Cameras, tape recorders, cellular phones and other electronic devices are prohibited and may be confiscated. A memo and property receipt (SO 59) of confiscated items shall be forwarded to the Facility Commander.

    B.   Visiting schedules change to accommodate the needs of the facility. For current visiting schedules, see the schedules posted throughout the facility. The day of the week and time of visiting for each housing unit will be posted within each respective housing area.

    C.   Visiting Procedures for Inmates Housed in the Infirmary (during scheduled visiting time):

        1.   If the inmate can leave the Infirmary, visits shall be in the non-contact visiting room.

        2.   If the inmate cannot leave the Infirmary (and there is no medical reason for not receiving visitors (i.e. contagious diseases or security risk), the Team Commander will review the possibility of having the family visit in the infirmary. If approved, the following restrictions apply:
          a.   Adults only.
          b.   Must be members of the immediate family.
          c.   Must meet visitor requirements as listed in Sections 1116.09 A.
          d.   Visitors shall be limited to one person at a time and shall not be authorized to take extra items (e.g. purses or coats) with them.

D.   *Visiting Procedures for Inmates Housed in the Hospital*

1.   Inmates housed at the hospital not under the security of a deputy or contract security guard shall be allowed visitation under the policy of regular patient visiting at the hospital.

2.   Inmates housed at the hospital under security of a deputy or contract security guard shall be allowed visiting under the jail regulations and guidelines set forth in Procedures for Guards at Hospitals (Section 1119.07).

E.   *Rules for Visiting*

1.   Main Jail inmates shall be allowed one sixty minute visit per week.  Rehab Mainline sentenced inmates, E Dorm, D-Wing and sentenced women inmates shall be allowed a minimum of one hour contact visit per week.  (Sentenced women inmates are housed in U-Pod and Q-Pod.)

2.   An inmate may refuse to see a visitor.

3.   A visitor may only visit one inmate at a time except when visitors are visiting inmates who are immediate family members and housed in an area that has outside visiting.

4.   All visitors shall wear appropriate attire.  Visitors shall wear shoes or sandals. Visitors shall be fully clothed.  Shorts or skirts shall not expose more than mid-thigh.  This includes slits in the garments.  Buttons and zippers shall remain fastened.  Persons attempting to visit with the following types of clothing will be prohibited from visiting:

a.   Transparent clothing, tank tops or short shorts.
b.   Strapless, halter, spaghetti straps or bare midriff clothing.
c.   Attire displaying obscene or offensive language or drawings.
d.   Skin tight clothing.
e.   Articles of clothing that could be deemed gang colors, including but not limited to ball caps, belts, bandanas, shoes, etc.).

5.   Any person under 18 years of age (unless married to an inmate) must be accompanied by a parent or legal guardian.  It is the responsibility of the visitors to provide proof of their relationship to the satisfaction of the jail staff.  Persons under the age of 18 that are married to an inmate must provide proof of emancipation in order to secure a visit without being accompanied by an adult.

6.   Bringing firearms, explosives, alcoholic beverages, narcotics or any controlled substances including marijuana into the facility or on facility grounds is a crime and cause for arrest.

7.   Visitors under the influence of alcohol or drugs shall be denied visiting and subject to arrest.

8.   Persons who are unwilling or unable to control their minor children while in the facility shall not be allowed to visit or if visiting, will be requested to leave.

9.   Visitors who are causing a disturbance shall be required to leave the facility and shall be denied access for that day.

10. Visitors shall not give anything to or take anything from an inmate without prior approval of the Watch Supervisor.

11. After visits, inmates shall be subject to search as deemed appropriate.

12. Violation of visiting rules and regulations by an inmate shall be dealt with in accordance with policy.

13. Violation of visiting rules, regulations, and procedures by a visitor shall result in the termination of the visit and removal from the facility.  For severe violations, the Facility Captain shall be notified for review of visiting eligibility in the future.

14. Inmates of both facilities who are allowed contact visits shall only be allowed to make body contact by a short embrace at the beginning and at the end of visit. Holding of hands during visiting is permitted.  Any other type of behavior shall result in termination of the visit and a disciplinary.   Inmates shall sit on one side of the table while their visitors sit on the other side.

15. Any criminal conduct by a visitor or active warrant may result in arrest.

16. If a visitor leaves the visiting area, they shall not be allowed to return and continue the visit.

17. Smoking, chewing tobacco and gum are prohibited during visiting.

18. The drinking fountain and public bathrooms may only be used by visitors, and are off limits to inmates.

19. Visiting is a right guaranteed by Minimum Standards.  Outside contact visiting is a privilege and not a right.  Visits may be terminated for violations of any visiting rule, and  may result in a Disciplinary Action Report.  The DAR may result in the loss of one or all of the following:

    a.  Temporary or permanent loss of outside contact visits.
    b.   Loss of good time/work time credits.

F.  *Search of Visitors*

1. When there is a reasonable suspicion that a visitor may be concealing contraband, probable cause to justify a search shall be submitted in writing to the Facility Captain or Team Commander.  Upon approval of the strip search, the following steps shall be taken:

    a.  The Deputy shall advise the visitor that they shall not be allowed to enter the facility or grounds for a visit without submitting to an unclothed search.

    b.  The deputy shall advise the visitor of their right to refuse an unclothed search.

    c.  In the event the visitor refuses the search, the visitor shall be allowed to leave the facility, losing the visiting privilege on that date only.

    d.  In the event the visitor agrees to the unclothed search, the visitor shall be required to sign a Consent to Search form.

2. A memorandum shall be written by the deputy conducting the search of the visitor indicating not only the reason for the search, but what, if anything, is found.  The Consent to Search form shall be attached with the incident report and forwarded to the Team Commander.

G.  *Special Visits*

1. The Watch Supervisor MAY approve a special visit for persons who have traveled from out of county and arrive before or after regular scheduled visiting hours.  This is a one-time authorization.  The visitor shall be informed that any future visits shall be at the prescribed times.

2. The Facility Captain may approve a special visit for any unforeseen circumstances that arise which preclude a person from visiting during regular hours or using regular visiting facilities.

3. A cursory pat search may be conducted with the permission of the visitor.

4. All visitors are required to satisfactorily clear the metal detector prior to being authorized to visit.

H.  *Intra-Jail Visiting*

1. Intra-jail visiting is granted to inmates who meet the following requirements.
   a. Inmates must be legally married to each other.  It is the responsibility of the inmates to provide proof of their marriage.  This policy does not include common law marriages.
   b. Both inmates must have been in custody over 30 consecutive days in the Monterey County Jail.
   c. To be eligible, inmates shall not have any in-custody incidents, disciplinary action reports, or crime reports during the previous 30-day period.

2. Rules for intra-jail visiting:

   a. Request must be in writing to the Administrative Commander.
   b. A maximum of one intra-jail visit shall be authorized during any four week period.
   c. The visit shall not exceed thirty minutes.
   d. Intra-jail visiting shall be held on Wednesday evening between 6:00 p.m. and 7:00 p.m.  (NOTE:  contact visits are not authorized.)
   e. Inmates who have been denied an intra-jail visit may re-apply if they later become eligible.
   f. Any incident/crime report/D.A.R. on either inmate after an intra-jail visit has been approved shall cause the intra-jail visit to be canceled.

1116.10    *Procedures for Use of the Attorney Visiting Rooms*

A. Attorney rooms are available for official visits with inmates by attorneys, probation officers, social workers, investigators, etc., at any time

B. Official visitors shall sign the Inmate Visitor Log located in the lobby.  The Correction Specialist assigned to the lobby shall enter all official visits into CJIS as a permanent record.  The Inmate Visitor Log shall be retained by the Corrections Supervisor assigned to First Watch for 30 days, after which time it shall be  given to the Support Services Commander for filing.

C. The employee assigned to the Lobby shall verify the identity of the official visitor prior to admittance into the attorney rooms.  Official visitors shall be prepared to show identification to validate their official status if they are not known.  If an attorney does not have the necessary identification in their possession, every attempt shall be made to establish proper identification by phone or other methods available so as not to hinder an authorized visit.

D. If the official visit is for a female inmate, the visitor shall wait between N103 and N104 until a deputy can escort them into the Women's Section.  Control 3 shall advise the floor deputy of the visit.  The deputy shall ensure that the inmate is secured in the attorney visiting room.

E. If the official visit is for an inmate in the Men's Section, the lobby employee shall advise Control 1 to admit the official visitor into the Men's attorney rooms.

F. Lobby personnel shall notify Control 8 of the inmate's name and location.  Control 8 shall notify the appropriate housing deputy to have the inmate brought to the attorney room.

G. Interviews shall take place in the attorney visiting rooms on a first come/first serve basis.  If the attorney visiting rooms are full, visitors may be offered the use of the regular visiting area (on a non-contact basis) or wait until an attorney visiting room is available.

H. Security Assessment Precautions:  Attorneys or other official visitors may request the inmate be restrained during the visit.  Justification for the request shall be based upon their knowledge of the inmate's history, conduct, or potential for violence.

   1. No inmate shall be unnecessarily restrained.

   2. Restraints shall be selectively applied only to inmates who have a history of violence/acting out, or whom the attorney has a reasonable belief may become violent or act out in a harmful manner during the visit.

   3. Deputies shall brief the attorney or other official visitor when they know the inmate is exhibiting signs of violence or there are potential risks to the visitor's personal safety.

   4. Attorneys or other official visitors shall complete a Request for Restraint form, stating the reasons for restraining the inmate.  The form shall be signed by the requestor and filed in the inmate file.

   5. Restraint options:

      a. *Unrestrained* - The inmate is brought to the attorney visiting room without restraints and will be locked in the room with the attorney.

      b. *Restrained* - The inmate is locked in the attorney room in restraints.  Restraints may include wall shackle, handcuffs, leg irons, belly-chain, or a combination thereof.  The least amount of restraint possible should be used based on the circumstances of each visit.

      c. *Non-contact* - Conversations are through the telephone.  A pass-through is available for paperwork the inmate needs to sign.

      d. *Deputy presence* - Upon special arrangements, a deputy will be present inside the room.  This is only for extremely violent persons and when

confidentiality has been waived.  The attorney and the inmate shall first provide a signed waiver.

I.   Communication Equipment

1.   *Telephone* - Attorney rooms are equipped with a wall-mounted telephone.  When the phone receiver is picked up, it automatically rings into control 1 or control 3, depending on the location of the attorney room.  The deputy will answer the telephone as soon as possible.  If control does not pick up the phone within seven rings, and there is not an emergency, the official visitor should hang up the receiver and try again.

   a.   The telephone is not considered a part of the emergency equipment.  However, if the receiver is knocked off of the phone, and no voice contact is made, the appropriate Control will radio for deputies to respond to the attorney room to investigate.

   b.   Phone extension #5550 in Control #8 is reserved for calls from the attorney rooms.  This phone shall not be used for routine calls.

2.   *Silver push button* - (located by the door frame).  This is an emergency alarm.  It rings directly into Control #1.  When depressed, a light flashes above the attorney room door.  When depressed, deputies shall respond to the attorney room immediately.  This feature is not available in the Women's Section.

3.   *Duress alarm (red button)* - This is the primary emergency alarm.  A red button is located on the wall beside the table, and on the back wall.  It rings directly into Control.  Deputies shall respond immediately on an emergency status.

J.   Security and Safety Issues

1.   In the Men's Section, the official visitor shall sit on the door side of the table, and the inmate on the far side of the table.  The visitor is to be next to the duress alarm mounted on the wall next to the table.

2.   In the Women's Section, the attorney shall sit against the far wall, with the inmate closest to the door as the duress alarm is located on the far wall.  All chairs in the interview rooms shall be made of plastic.

3.   The door to the attorney visiting room shall be locked when in use to prevent escapes.

4.   Visitors must remain alert to signs of potential violence.  They are encouraged to initiate emergency procedures when they feel uncomfortable.

5.   Officials should request assistance if they become concerned for their safety.  Rapid speech, an increase in voice volume, agitation, gesturing, clenching of hands, threats, etc. are signs of potential violence

6.   The visitors should remain calm and try to diffuse the situation until deputies arrive.

7.   The visitor should keep as much distance as possible from the inmate.  Do not block the doorway of the room, as deputies will enter to take control.

8.  When deputies arrive, the visitor needs to remain out of the way so that deputies may control the situation.

9.  Injuries shall be reported to the Watch Supervisor and to the employer.

10. The Monterey County Sheriff's Office has a no hostage policy.

K.  Emergency Response

1.  Control 1 shall notify deputies of an emergency situation whenever the alarms are depressed (refer to Communication Equipment - Section 1116.10 (J) above)

2.  First responders to the Men's Section/Attorney Visiting Rooms shall include the K-Pod housing deputy, one dorm deputy, and one receiving deputy.  Emergency responders to the Women's Section Attorney Visiting Rooms shall include the two Women's Section deputies and the K-Pod housing deputy.  Emergency responders shall obtain control, secure and remove the inmate from the area if necessary and advise status via the radio.

3.  Secondary responders include other available personnel until such time as a Code 4 is received.  The responsibility of second responders is as follows:
    a.  Secure the scene pending further investigation.
    b.  Ascertain the status of the visitor and respond to any medical needs.
    c.  Obtain a list of all witnesses.
    d.  Other duties as directed by the watch supervisor.

L.  Incident Investigation and Follow-up

1.  The Receiving Sergeant shall respond to the attorney visiting room and take charge of the investigation.  He/she shall determine whether or not to call the Investigations Division.  The supervisor shall make notifications of the incident to include:
    a.  Victim's employer (if applicable)
    b.  Victim's family (upon request)
    c.  On-duty Commander
    d.  Captain
    e.  Chief of the Custody Operations Bureau

2.  The receiving sergeant shall ensure that all crime reports and other internal reports are completed.

3.  The receiving sergeant shall complete an Injury Investigation Report (SO 100 ADM) in accordance with the Department's Injury and Illness Prevention Program.  Worker's Compensation documents are the responsibility of the victim's employer.

1116.11  *Rules for Attorneys, Investigators, and Legal Assistants.*

A.  Attorneys, law firms, and legal assistance agencies shall be responsible for the actions of their investigators, law students, and legal assistants.

B.  Investigators shall be authorized to visit inmates.  Investigators include:

1.  Law enforcement officers.

    2.   Investigators for the District Attorney and Public Defender's Office.

    3.   Private Investigators who are licensed pursuant to provisions of the California Business and Professions Code.

C.   Legal Assistants - A law firm or legal assistance agency may designate other individuals to aid them in the legal representation of inmates. The category of "Legal Assistant" includes those persons called "Legal Worker" or "Paralegals" and includes non-certified law students and non-licensed investigators.

D.   An attorney may appoint two persons as Legal Assistants. The firm or agency shall notify the Custody Operations Bureau in writing of designated individuals.

E.   Persons not designated in the foregoing classifications shall only be permitted to visit with the inmate during normal visiting hours in the visiting area used for regular visits in accordance with the rules relating to public visits with inmates.

F.   Interviews shall be for a bona fide purpose and are limited to the following:

    1.   Interviews with clients represented by the attorneys.

    2.   Interviews with the prospective client who has requested an interview with the attorney or his agent or which has been requested by the family of the inmate.

    3.   Interviewing a witness relating to a case that an attorney is handling for another client.

G.   The following are rules violations:

    1.   Communication with inmates other than the inmate indicated at the time of registration. Should another interview be necessary, the party shall notify the control deputy via telephone of the inmate's name. A deputy will respond to the interview room with the inmate requested.

    2.   Unnecessary physical contact.

    3.   Entrance into an unauthorized area.

    4.   Failure to follow the instructions of the deputy.

    5.   Disrespect to jail staff.

    6.   Bringing contraband into the jail (4573.5, 4573.6, 4574 PC).

    7.   Altering identification to gain entrance to the jail or allowing another person to utilize identification other than their own in order to gain access to the jail (4570.5 PC).

    8.   Theft or damage to property  (484, 4600 PC).

    9.   Instituting or aiding in a disturbance in jail or a violation of jail rules (404.6 PC).

   10.  Extorting money or favors from jail personnel or inmates (519 PC).

   11.  Aiding in the escape or attempted escape of any inmate (4532 PC).

12. Providing weapons or information on weapons to any inmate (4574 PC).

13. Committing any act or aiding or abetting another in the commission of any act, which is in violation of law or jail regulations.

14. Attorneys or their representatives shall not solicit or advertise in the jail except as provided by the Business and Professions Code.

15. If an employee has reasonable suspicion that an attorney, investigator, or legal assistant has violated a rule of the institution, he/she shall bring the matter to the immediate attention of the on-duty sergeant.  If justified, the on-duty sergeant shall meet with the employee and the accused party against whom the charge is lodged in an attempt to determine whether the allegation of a rule violation has occurred.   The on-duty sergeant shall also seek information from other individuals who may have information relevant to the allegations.

   a. Should the sergeant find probable cause to sustain the allegation of the rule violations, the party against whom the charges were lodged will be immediately barred from access to the jail.

   b. The sergeant shall prepare a written report of the allegations, the investigation, and findings.  The report shall immediately be forwarded to the on-duty Commander.

   c. Upon receipt, the Commander shall send a copy of the report to the Captain. The Captain may conduct an independent investigation.

   d. The Captain shall forward all documentation, along with his recommendations, to the Chief of the Custody Operations Bureau.

16. Use of cameras by attorneys, investigators, or legal assistants may be allowed with approval of the on-duty Commander. Tape recorders and cameras shall be inspected before being allowed into the Attorney Visiting Room.

17. All persons are subject to inspection of their persons and possessions (including but not limited to purses, brief cases, etc.) prior to entry into the attorney visiting room.  "Strip" or "body" searches of the person may only be authorized when there is a reasonable suspicion that contraband may be present.   Facts supporting the suspicion shall be in writing and approved by the on-duty sergeant prior to initiating a strip search.  If an attorney refuses to submit to the strip search, he/she shall be allowed a non-contact visit.  All documents shall be forwarded to the Facility Commander.

18. Attorneys shall not leave such items as pens, magazines, books, any metal objects, etc., with the inmate except by approval of the on-duty sergeant. Transcripts, copies of legal pleadings, police reports, or other legal paperwork regarding the inmate's case may be left with the inmate upon termination of the interview, but shall not contain paper clips or metal fasteners and shall be approved by the on-duty sergeant.

19. Deputies may inspect written material to be left with the inmate.  Inspections shall be sufficient to meet the security needs of the facility and may include, but are not limited to, careful searches for metal or plastic objects and for signs of possible impregnation of paper with contraband substances.  Deputies inspecting such written or printed material shall not read the contents thereof.  Should the

material be read inadvertently, the information therein shall not be revealed, except upon order of the Superior Court.

20. If the deputy conducting the examination believes, upon reasonable suspicion, that the written or printed material is not regarding the inmates' case, or presents a threat to the security of the facility, he/she shall notify the attorney. The material shall be presented to the on-duty sergeant for full inspection, including reading. The attorney may withdraw the material from submission to the on-duty sergeant or accede to the review. If the examination by the sergeant is accomplished, the material shall only be read to the extent necessary to make a proper determination. Contents shall be kept in strict confidence unless release is ordered by the Superior Court.

21. Employees shall make every effort to handle visits as expeditiously as possible. Disputes or complaints regarding the procedures and policies outlined herein, shall be brought to the attention of the on-duty sergeant.

1116.12   *Voting Registration for Inmates*

A. A person entitled to vote shall be a United States citizen, a resident of California, not in prison or on parole for the conviction of a felony, and at least 18 years of age at the time of the next election (2101 Elections Code).

B. Persons not eligible to vote include:

1. Parolees (C.D.C. and C.Y.A.)

2. Persons certified mentally incompetent by the court

C. An inmate who is eligible to vote and wishes an absentee voter registration may request the Bureau librarian to call the County Elections Department) for the necessary forms.

D. Absentee voter registration forms shall be filled out by the inmate and returned to the librarian as soon as possible.

1116.13   *Supervised Home Confinement*

A. Supervised Home Confinement is administered by the Monterey County Probation Department under the provisions of Section 1203.016 of the Penal Code.

B. Inmates may apply for Supervised Home Confinement through the Probation Department or ask deputies for a blank form. Forms are available in Control 5 and the forms room. Completed forms shall be forwarded to the Home Confinement office of the Probation Department.

C. Rule violators will be returned to custody to serve the remainder of their sentence and may lose credit for the good time served on the Program.

1116.14   *Sheriff's Parole*

A. Sheriff's Parole may be used for the purpose of emergency situations where inmates need extended medical care in the community and Home Confinement is not available. Sheriff's Parole shall comply with Penal Code Sections 3074 through 3089.

B. The Sheriff's Parole Board shall consist of:

1. The Sheriff, or a designee;

2. A probation officer, or his/her designee;

3. A member from the public, selected by the presiding judge. The public member's term shall not exceed three years (PC 3075(b)).

C. The contract medical provider shall make a request for parole to the Facility Captain. The Captain shall review the urgency of the request, and notify the sentencing judge of the request.

D. The Sheriff's Parole Board shall approve or deny the request for parole.

E. The Chief Deputy of the Custody Operations Bureau has the authority to grant parole in emergency situations (PC 3079 (a)).

1116.15   *Work Alternative Program*

A. The Work Alternative Program (WAP) is available to non-violent offenders with sentences of 30 days or less. The Program allows offenders to complete their sentence by working for public or non-profit agencies instead of serving the sentence in jail. The Program is administered by Sheriff's Work Alternative Coordinators under the direction of the Court Services Commander.

B. Defendants may apply for the Program prior to their surrender date. Work assignments will be assigned to the defendants.

C. Violators of the program will be removed from the Program and the judge will be notified.

D. Violators will serve out the remainder of their sentence in jail.

1116.16   *Library Service*

A. Library services are provided to inmates in all housing areas. The library is staffed from 0730 to 1530 hours on weekdays.

B. Paperback books for general reading are distributed to the housing units every three weeks. Inmates are expected to turn in old books before new ones are issued. Inmates are allowed a total of four (4) books or three (3) magazines in their cell or in their possession (excluding legal books and materials). Inmates shall be held responsible for each book that they check out.

C. Legal reference materials are available to inmates who wish to gather legal information. Inmates shall submit a written request to the librarian for specific legal material or request access to the law library.

D. Pro Per inmates shall have first priority for use of the library law books. Requests from other inmates shall be considered on a first-come, first serve basis.

E. Copying services are available to inmates at their own expense. Inmates are charged 10 cents per page. Revenues shall be placed into the Inmate Welfare Fund Trust Account.

F.  The library may provide inmates with some legal forms such as modification papers or divorce papers.

1116.17    *Inmate Telephones*

G.  Arrestees shall be authorized booking telephone calls as required by Penal Code Section 851.5.  Phones in the receiving area are available throughout the day except from 0600 hours through 0730 hours when court is being transported out.

H.  Telephones are available in all housing units throughout the facility.  The computer system automatically turns the telephones in the Main Jail on between 0730 and 2300 hours.  On Mainline, telephones are turned on between 0900 and 2300 hours. Telephones may be turned off by phone switches located in the control areas, as necessary.

I.  The computer system, located in the Classification Office, records all inmate calls. Inmate abuse, harassment or threats may be investigated through the system.

J.  Deputies shall report broken phones to the on-duty sergeant.  The on-duty sergeant shall place a service call to Securus at  866-558-2323 or 800-947-0899.  The Site number 03712.   Sergeants shall notify the Support Services Commander of service problems with the contractor.

K.  Public inquires and complaints about the inmates phones and/or phone blocks and payments shall be referred to Securus.  The public shall be given Securus' customer service number  (800- 844-6591).

L.  Requests from the public to block phone numbers shall be referred to the on-duty sergeant or the Classification Unit.

1116.18    *Inmate Correspondence*

A.  All legitimate mail sent to and from persons incarcerated in the Monterey County Custody Operations Bureau shall be delivered to the addressee without undue delay.

B.  Incoming Mail

1.  Mail shall be received through regular channels only.  No deputy, employee, or volunteer shall accept incoming or outgoing mail for an inmate

2.  Mail shall be distributed to inmates on weekdays (excluding holidays).

3.  The mail clerk shall determine whether the mail is for an inmate who is not in custody.   Mail for an inmate who is not in custody shall be returned to the sender without being opened or the stamps removed.  Mail that has no return address and the inmate is not in custody shall be shredded.

4.  If the inmate is in custody, the mail clerk shall remove the stamps, write the housing location on the envelope, and sort the various mail by housing sections.

5.  All non-privileged incoming mail shall be opened and inspected for contraband.

C.   Restrictions on Incoming Mail

1.   Mail that contains unauthorized items shall be returned to the sender.  Prohibited items include:
    a.   Blank paper, drawing paper or blank cards sent in to be mailed out.
    b.   Postage stamps.
    c.   Stickers on the envelope or inside the envelope/letters.
    d.   Photographs larger than 5 x 7 inches.
    e.   Photographs containing violent, sexually suggestive or unclothed women/men, or gang symbols.
    f.   Items that are pasted, glued, laminated, or contain glitter.
    g.   Polaroid pictures.
    h.   Plastic greeting cards or phone cards.
    i.   Musical cards designed to chime when opened
    j.   Mail order catalogs.

2.   Personal packages SHALL NOT be accepted.

3.   Multiple letters, newspapers, magazines, etc., that have been mailed to another address and have been packaged in a larger envelope and forwarded shall not be accepted.

4.   Only newspapers, magazines, or books mailed directly from the publisher or Internet publisher (Amazon.com, Barnes&Noble.com, etc.) shall be accepted.  Materials sent from a bookstore shall not be accepted.  Only paperback books shall be permitted.

D.   *Returning Inmate Mail to the Sender*

1.   Unauthorized mail shall be stamped  "Return to Sender" and the reason for rejection indicated on the envelope.

2.   If the envelope has been opened, or the stamp removed, the mail clerk shall place the contents in a Departmental envelope along with an explanation for rejection.  The envelope shall be sealed and mailed to the sender.

3.   Inmates shall be notified, in writing, when mail is rejected and why.

4.   Unauthorized mail shall not be placed in the inmate property room pending their release.

E.   *Money Received in the Mail*

1.   The mail clerk shall list all money orders received through the jail on the Money Order Log Form and stamp the back of the money order with the endorsement stamp.  At the end of the day the mail clerk shall total the Money Order Log Form.  The form and money orders shall  be given to the receiving cashier for posting.

2.   When the inmate's name and/or booking number is not noted on the money order, the mail person processing the check shall write the information on the check to ensure that the money is posted to the correct inmate's account..

3.   Personal checks, payroll checks, tax refund checks, child welfare checks, unemployment checks, etc. shall be returned to the sender whenever possible.  If

unable to return, the check shall be placed in the inmate's property, the inmate notified, and a notation made on the inmate's booking sheet.

F. *Legal Mail*

1. Legal mail is defined as correspondence from or to state and federal courts, any member of the State Bar or holder of public office, and the State Board of Corrections (reference Minimum Standards 1063). Legal mail is determined by the return address on the outside of the envelope. Questions as to whether or not a letter is legal mail shall be referred to the Inmate Services Sergeant

2. Legal mail shall only be opened in the presence of the inmate.

3. Deputies shall not read legal mail; however, it may be handled to search for contraband, cash, checks, or money orders.

4. A report shall be prepared whenever legal mail is opened in error. The report shall state the circumstances surrounding the opening of the correspondence. Copies of the report shall be distributed to the inmate, Inmate Services Sergeant, and Support Services Commander.

G. *Mail Delivery to Housing Units*

1. The housing unit deputy is responsible for picking up the mail in the lobby.

2. Housing deputies shall distribute mail to inmates in a timely manner.

3. The housing deputy shall deliver mail only to the addressee as identified by their wristband.

H. *Outgoing Inmate Mail*

1. Deputies shall collect inmate outgoing mail daily by 2300 hours. Outgoing mail shall be placed in the mail slot in the lobby. Deputies shall ensure that letters have the proper return address during collection. Inmate mail shall include the inmate's name and booking number and the Jail return address.

> Monterey County Jail
> P.O. Box 809
> Salinas, CA 93902-0809

2. Mail without a completed return address shall be opened to determine to whom the correspondence belongs. If unable to make this determination, the mail shall be shredded.

3. Deputies shall not pass mail from one inmate to another. All letters shall be stamped and sent through the U.S. Mail.

4. There shall be no pictures or drawings on outgoing mail. Envelopes with drawings shall be returned to the inmate.

I. *No Fund Mail.*

1. Inmates with less than $1.00, or inmates restricted from ordering commissary, are authorized to send out two free letters per week to family or friends. Inmates

with less than $1.00 on their books may send an unlimited number of legal mail at no cost.

2. The mail clerk shall process "no fund" mail Monday through Friday (holidays excluded). The mail clerk shall maintain a log of "no fund" mail to prevent inmates from fraudulently gaining this privilege. The log shall be kept from Saturday to Friday. If it is determined that an inmate has sent out the quota for the week, the additional mail shall be returned to the inmate with a note stating that the inmate has exceed the authorized limit for the week.

3. If an inmate has funds to buy stamps, the mail clerk shall return the mail to the inmate, advising him/her to buy stamps.

J. *Contraband Received in the Mail*

1. Mail shall be closely inspected to prevent illegal drugs and contraband from entering the facility. Drugs may be concealed under the stamp, sealed in the envelope flap, in the seam of the envelope, or in greeting cards glued together.

2. The mail clerk shall notify the on-duty watch sergeant when illegal contraband is found in the mail. The on-duty sergeant shall assign a deputy to test the drugs and investigate the case. The on-duty sergeant shall decide whether to call in Investigations. The assigned deputy shall write a crime report.

1116.19  *Inmate Grievance Procedure*

A. It is the policy of the Monterey County Sheriff's Office Custody Operations Bureau that the inmate grievance process shall be utilized in order to provide an expedient and appropriate resolution to a complaint at the lowest possible level, and also allow for appeal to the next level of review.

1. All inmate grievances shall start as a written Grievance by the inmate.

2. Grievances that allege staff misconduct shall not be directly responded to by the grieved employee. The employee's supervisor shall investigate the complaint and respond to the inmate.

3. If upon review of the Grievance the sergeant feels the Grievance alleges serious misconduct by an employee, the Grievance shall be forwarded to the Bureau Captain for proper assignment. The Captain can elevate the Grievance to the level of a Citizen's Complaint or an internal affairs investigation if appropriate.

4. The inmate grievance process is an avenue for an inmate to grieve and resolve issues of confinement. The goal is to resolve complaints at the lowest level. Issues of complaints against employees can be at the level of a citizen's complaint. An inmate may request and receive a citizen's complaint form if so requested. All complaints will be reviewed and appropriately investigated.

B. It is the policy of the Monterey County Sheriff's Office Custody Operations Bureau that an inmate may file and have resolved, within a reasonable amount of time, a grievance relating to any act, policy or condition of confinement.

C.  Grievance Process:

1.  Inmates who wish to grieve a condition of confinement may submit an Inmate Grievance Form within ten days from the date of the incident relating to the grievance.

    a.  Response to the grievance will be to the author of the grievance.
    b.  Anonymous or "group" grievances without an author will receive no response.
    c.  All grievance responses shall be in writing.

2.  Inmate Grievance Forms shall be made available upon request. A blank form is provided in the Inmate Information Handbook.

    a.  Grievances shall be handled at the lowest level possible.
    b.  The deputy requested to provide the Grievance Form shall determine if the inmate's grievance can be resolved at that time by taking the appropriate action.
    c.  If the grievance cannot be resolved at line staff level, the inmate shall be provided an Inmate Grievance Form. The deputy shall provide the necessary information or instructions for the proper completion of the form.

3.  The inmate shall sign and date the completed grievance form and place the form into the housing unit's Grievance Box.

4.  The sergeant responsible for each housing unit will inspect the Grievance Box at least twice per shift and will remove any grievance.
    a.  The sergeant shall log the grievance onto the Grievance log form.
    b.  Sergeants shall review and assign investigation of the grievance to the appropriate level or team for resolution.

5.  The designated investigating deputy shall make a recommendation that the grievance is either resolved or unresolved.

    a.  If the grievance is resolved, an explanation of the resolution shall be provided.
    b.  Should the grievance be unresolved, the steps taken to resolve the grievance shall be documented on the grievance and forwarded to the next level for resolution.

6.  All resolved grievances shall be forwarded to the responsible team sergeant who shall review and sign them prior to distributing copies to the appropriate parties.

7.  A formal written reply to the grievance shall be forwarded to the grieving inmate within ten calendar days of the original complaint.

8.  If the grievance has not been resolved within ten calendar days, the Team Commander having jurisdiction over the grievance shall be responsible to investigate and determine the reason why the grievance has not been completed in a timely manner and shall ensure its completion.

9.  An inmate may file a complaint with the County's Equal Opportunity Office, the California Department of Fair Employment & Housing, and/or the U.S. Equal Employment Opportunity Commission. County ordinance prohibits any retaliation for filing a discrimination complaint with the EOO, DFEH and /or EEOC Offices.

D.  The original grievance and copy of the written complaint shall be placed in the inmate file, a copy to the inmate and a copy to both the Team Commander and the Facility Captain.

E.  If the grievance is the result of an act or omission by an allied agency, i.e. medical complaint, or commissary complaint, or discrimination/sexual harassment complaint, the Facility Commander or his designee shall coordinate the investigation with the involved parties.

F.  All grievances shall be processed according to policy. Failure to respond to a grievance or destroying a grievance is an act of negligence of duty and subject to disciplinary action.

G.  Right of Appeal – If an inmate is dissatisfied with the grievance resolution, an appeal may be made to the next highest level by way of a letter of appeal. This letter shall be directed to the appropriate person in the chain of command. The final appeal is the Chief Deputy of the Custody Operations Bureau.

H.  Special Information:

   1.  This policy and procedure does not preclude the right of any inmate to communicate confidentially with a Commander, Captain, Chief Deputy of the Custody Operations Bureau and/or the Sheriff.

   2.  A copy of any grievance involving complaints of discrimination or harassment shall be forwarded to the Team Commander. This copy shall not include any findings/recommendations or reviews and dispositions. The Captain or the Chief will make the determination as to whether a grievance will be forwarded to the EOO.  The Team Commander or the Captain will complete the redacting and copying of the grievance.  The grievance will then be forwarded to the County's Equal Opportunity Office. The original copy of the grievance shall be investigated and responded to in the same manner as other grievances.

I.  Misuse of the Grievance Procedure:

   1.  Inmates who file excessive, unfounded or frivolous grievances may have their right to file further grievances limited to one grievance per week.

   2.  Replies to grievances determined to be unfounded or frivolous shall show documentation stating why it was so determined.

   3.  Due to health and safety issues associated with medical grievances, inmates who file repetitive medical grievances claiming "absent medical concern" shall continue to be considered, despite their repetitious nature. They can, however be limited to one grievance per week.

   4.  Inmates may not grieve the decision on a previous grievance, regarding the same matter, once all levels of resolution have been exhausted.

Additional Additional/Changes Since Last Revision of the *Monterey County Sheriff's Manual.*   The following changes have occurred since the last revision of the manual:

•  Another early release program has been provided related to PC Section 4018 (3-day) release.  The Sheriff's Office meets with the Presiding Judge at the end of each month to obtain a 5-day early release (or 10% of sentence, ten days through fifty days release) under PC Section 4024.1.

- Since October 2011, the Sheriff's Office has revamped the Release on Own Recognizance (OR) program to include first time felons for 10851 VC, 11350 H.S., Penal Code Section 487 and few other non-violent/non-serious crimes.  This results in a savings of an average of 200 days per month during which a person waiting for arraignment normally would occupy a bed.  *This is to compensate somewhat for the influx of AB 109 inmates.*

Prevention of the Disproportionate Confinement of Minority Populations.  The Monterey County Sheriff's Office formally monitors the entire continuum of services to be certain that minority populations are not treated differently in any respect.  Specifically, proactive steps have been taken for the last ten years to be certain that there is not a disproportionate confinement of minorities.  This is accomplished by assuring that minority populations receive the maximum possible benefits from all of the services in the continuum.  Monitoring occurs during quarterly meetings of senior staff at which time statistics relating to the confinement of minorities are reviewed in great detail.  Adjustments are made when necessary.

## F.  Analysis of Local Trends and Characteristics.

**Introduction.**  This section is an analysis of local trends and characteristics that influence planning assumptions about future detention system growth.  Different factors that influence change, including projected population increases (including those associated with AB 109), current and projected inmate populations and program costs based on continuation of current policies are measured.  Projections of alternative policies or programs on inmate population growth and program costs, as well as observed factors that could affect the level of criminal activity in the jurisdiction including trends in felony and misdemeanor arrests and trends in average daily populations of detention facilities.

These population indicators will assist in determining the design, security level (i.e. minimum-security, medium-security, maximum-security, disciplinary segregation, administration segregation and protective custody) and type of detention beds required in a new or expanded facility.  Discussions of the impact of alternative policies or programs on inmate population growth and program costs point toward exploring alternative methods to control and manage offender populations.[1]

**Projection of Average Daily Population (ADP).**  The purpose of these projections is to forecast the average daily population (ADP) for Monterey County adult detention for calendar years 2020, 2030, 2040 and 2050.  This will allow the determination of future adult detention facility beds needs.

A.  The following information is available from Monterey County Jail records for calendar years 2008 through 2010:

   1.)  Detention days per calendar year;
   2.)  Average Daily Population (ADP); and
   3.)  Average Length of Stay (ALS).

B.  The following summaries were prepared from the available data:

   1.)  Annual number of admissions to the Monterey County Jail from 2008 through 2010 are shown on the following table.

Table F.1<br>Admissions 2008 – 2010

| Year | Admissions |
|------|------------|
| 2008 | 14,155 |
| 2009 | 13,515 |
| 2010 | 13,266 |
|      |        |

Source:  Monterey County Sheriff's Office, Custody Operations Bureau.  November 2011.

   2.)  Number of detention days (person-days)[2] served in the Monterey County Jail (pre-sentenced and sentenced) from 2008 to 2010 (illustrated in Table F.2 on the next page).

---

[1]  Please see Section E. Programs.

[2]  Annual detention days equal the total number of days served in detention by all of the inmates detained during that year.  If inmate #1 serves four days in the detention facility, inmate #2 serves six days and inmate #3 serves five days, then the inmates combined served a total of fifteen detention days.  The number of days served by any inmate during the calendar year is equal to the number of days that elapsed between his or her date of admission and their date of release.  If an inmate was received before the start of the year, the annual number of days that they serve is measured from the beginning of the year to the date of release.  If an inmate is received, but not released by the end of the year, the annual number of days that they serve is measured from the date of admission to the end of the year.  AB 109 admissions were estimated using court records.

Table F.2
Detention Days 2008 - 2010

| Year | Detention Days |
|------|----------------|
| 2008 | 593,095 |
| 2009 | 633,923 |
| 2010 | 564,642 |

Source:  Monterey County Sheriff's Office, Custody Operations Bureau. Calculations by TRG Consulting.  November 2011.

C.  Projections of the Monterey County Jail population were determined by comparing ratios of admissions and detention day data to the County population for 2008 through 2010.  The ratios then were multiplied by the projected county population for calendar years 2020, 2030, 2040 and 2050.  The following population figures were used.

Figures from the U.S. Bureau of the Census, *U.S. Census of Population* are depicted in the following table.

Table F.3
Monterey County Population 1950 – 2010

| Calendar Year | County Population |
|---------------|-------------------|
| 1950 | 130,498 |
| 1960 | 198,351 |
| 1970 | 250,071 |
| 1980 | 292,100 |
| 1990 | 356,800 |
| 2000 | 403,946 |
| 2010 | 415,057 |

Source:  U.S. Bureau of the Census.  November 2011.

The California Department of Finance has provided intercensal estimated population data for calendar years 2008 through 2010.

Table F.4
Monterey County Intercensal Population Estimates 2008 - 2010

| Calendar Year | County Population |
|---------------|-------------------|
| 2008 | 405,660 |
| 2009 | 410,370 |
| 2010 | 415,057 |

Source:  California Department of Finance, Demographic Research Unit.  November 2011.

The projection of Monterey County's population growth from 2020-2050 is presented in Table F.5 on the following page.

Table F.5
Projected Monterey County Population 2020 - 2050

| Calendar Year | County Population |
|---|---|
| 2020 | 476,642 |
| 2030 | 529,145 |
| 2040 | 584,878 |
| 2050 | 646,590 |

Source:  California Department of Finance, Demographic Research Unit. November 2011.

Forecasting Adult Detention Facility Admissions.  Projections of the Monterey County Adult Detention Facility population required finding the ratio between annual jail data and the Monterey County population for 2008 through 2010.

A.  These ratios were found by obtaining the ratio between the annual number of inmates admitted to the jail and the Monterey County population in the same year.  The ratio for each year is:

Number of Adult Admissions
County Population

Table F.6
Ratios: Adult Admissions/County Population 2008 - 2010

| Calendar Year | = | Table F.1 Admissions | / | Table F.4 County Population | = | Ratio |
|---|---|---|---|---|---|---|
| 2008 | = | 14,155 | / | 405,660 | = | 0.0348938 |
| 2009 | = | 13,515 | / | 410,370 | = | 0.0329337 |
| 2010 | = | 13,266 | / | 415,057 | = | 0.0319619 |

Source:  TRGConsulting.  November 2011.

B.  The data indicates that it is necessary to identify the low, median and high ratios in the series and then calculate the arithmetic average of all of the ratios.

| | |
|---|---|
| Low | 0.0319619 |
| Median | 0.0329337 |
| Average | 0.0332631 |
| High | 0.0348938 |

The average was determined as follows:

Table F.7
Determination of the Average Jail Ratio

| Calendar Year | Ratio | = | Average |
|---|---|---|---|
| 2008 | 0.0348938 | | |
| 2009 | 0.0329337 | | |
| 2010 | 0.0319619 | | |
| | 0.0997893 | = | 0.0332631 |
| | 3 | | |

Source:  TRGConsulting.  November 2011.

This procedure is one of examining historic inmate data for an estimate of the low, median, average and high rate of probable admissions per unit of population that occurred during the data years. Once this range in the rate of probable admissions per unit of population has been estimated, then the number of future admissions can be estimated by multiplying these ratios (low, median, average and high) by the projected population of the service area (Monterey County) as determined from data provided by the Demographic Research Unit of the California Department of Finance.

C.  The projected number of adult offender admissions in the future to the Monterey County Adult Detention Facility (assuming a continuation of present practices in the law enforcement and judicial systems) was determined by multiplying the forecasted Monterey County population by the low, median, average and high ratios (number of adult offenders divided by the County population) as calculated from the adult offender data above.

1.)  Projected number of adult admissions to the Monterey County Adult Detention Facility (assuming continuation of present practices):

Table F.8
Projected High, Average, Median and Low Admissions to Adult Detention Facility 2020 - 2050

| Year | Projected County Population | x | Low 0.0319619 | Median 0.0329337 | Average 0.0332631 | High 0.0348938 |
|------|------------------------------|---|------|--------|---------|------|
| 2020 | 476,642 | x | 15,234 | 15,698 | 15,855 | 16,632 |
| 2030 | 529,145 | x | 16,912 | 17,427 | 17,601 | 18,464 |
| 2040 | 584,878 | x | 18,694 | 19,262 | 19,455 | 20,409 |
| 2050 | 646,590 | x | 20,666 | 21,295 | 21,508 | 22,562 |

Source: TRGConsulting. November 2011.

Forecasting Adult Detention Days.

A.  The potential number of detention days that would be served by adult offenders per year in a future adult detention facility was projected by the same procedures used to project adult offender admissions. First it was necessary to obtain the ratio between the number of detention days served per year from 2008 through 2010 and the Monterey County population during the same years. The formula is:

Detention Days Served
County Population

Table F.9
Ratios:  Detention Days/County Population 2008 – 2010

| Calendar Year | = | Table F.2 Detention Days | / | Table F.4 County Population | = | Percentage |
|---------------|---|--------------------------|---|------------------------------|---|------------|
| 2008 | = | 593,095 | / | 405,660 | = | 1.4620495 |
| 2009 | = | 633,923 | / | 410,370 | = | 1.5447596 |
| 2010 | = | 564,642 | / | 415,057 | = | 1.3603963 |

Source: TRGConsulting. November 2011.

B. An examination of this series of ratios indicates that, again, it is useful to identify the lowest and highest ratios and then calculate the arithmetic median and average of the ratios.

| | |
|---|---|
| **Low** | 1.3603963 |
| **Median** | 1.4620495 |
| **Average** | 1.4557351 |
| **High** | 1.5447596 |

The average was determined as shown in Table F.10 below.

Table F.10
Determination of the Average of Detention Day Ratios

| Calendar Year | Ratio | = | Average |
|---|---|---|---|
| **2008** | 1.4620495 | | |
| **2009** | 1.5447596 | | |
| **2010** | 1.3603963 | | |
| | 4.3672054 | = | **1.4557351** |
| | 8 | | |

Source: TRGConsulting.  November 2011.

C. To obtain the projected number of detention days served by adult offenders in the future Monterey County Adult Detention Facility (again, assuming the continuation of present practices) multiply the forecasted Monterey County population by the low, median, average and high ratios (potential detention days divided by the county population) as calculated from Monterey County Jail data.

Table F.11
Projected Low, Median, Average and High Detention Days
for Adult Detention Facility 2020 – 2050

| Year | Projected County Population | Low | Median | Average | High |
|---|---|---|---|---|---|
| | | 1.3603963 | 1.4620495 | 1.4557351 | 1.5447596 |
| **2020** | 476,642 | 648,422 | 696,874 | 693,865 | 736,297 |
| **2030** | 529,145 | 719,847 | 773,636 | 770,295 | 817,402 |
| **2040** | 584,878 | 795,666 | 855,121 | 851,427 | 903,496 |
| **2050** | 646,590 | 879,619 | 945,347 | 941,264 | 998,826 |

Source: TRGConsulting.  November 2011.

Average Daily Population (ADP) and Average Length of Stay (ALS).

A. Using the number of adult offender admissions and detention days served per year it is possible to calculate:

Average Daily Population  =  Total Detention Days Served per Year
                                              365 Days

Average Length of Stay  =  Total Detention Days Served per Year
                                            Number of Admissions per Year

1.) Since the projected number of detention days served per year was provided in the previous section, the projected average daily population can be obtained using the first formula listed above.  The results are illustrated in Table F.12 and Figure F.4.

Table F.12
Projected Average Daily Population 2020 – 2050

| Year | Projected County Population | Low | Low Daily Population | Median | Median Daily Population | Average | Average Daily Population | High | High Daily Population |
|------|------|------|------|------|------|------|------|------|------|
| | | 1.360396 | 365 | 0.915262 | 365 | 1.455735 | 365 | 1.544760 | 365 |
| 2020 | 476,642 | 648,422 | 1,776 | 696,874 | 1,909 | 693,865 | 1,901 | 736,297 | 2,017 |
| 2030 | 529,145 | 719,847 | 1,972 | 773,636 | 2,120 | 770,295 | 2,110 | 817,402 | 2,239 |
| 2040 | 584,878 | 795,666 | 2,180 | 855,121 | 2,343 | 851,427 | 2,333 | 903,496 | 2,475 |
| 2050 | 646,590 | 879,619 | 2,410 | 945,347 | 2,590 | 941,264 | 2,579 | 998,826 | 2,737 |

Source:  TRGConsulting.  November 2011.

Table F.13
Projected Range of Average Daily Population (ADP) 2020 – 2050

| Year | Projected Low ADP | Projected Median ADP | Projected Average ADP | Projected High ADP |
|------|------|------|------|------|
| 2020 | 1,776 | 1,909 | 1,901 | 2,017 |
| 2030 | 1,972 | 2,120 | 2,110 | 2,239 |
| 2040 | 2,180 | 2,343 | 2,333 | 2,475 |
| 2050 | 2,410 | 2,590 | 2,579 | 2,737 |

Source:  TRGConsulting.  November 2011.

Unauthorized Migrants.  The data presented in Table F.13 above provides the baseline projection of average daily population that would occur absent other factors that influence these projections.  In the case of Monterey County, an additional influential factor must be considered.  Population figures used in the baseline projections are based on U.S. Census data that does not include unauthorized migrants and an adjustment is required to account for this additional population.[3]

B.  Population figures used in the baseline projections are based on U.S. Census data that does not include unauthorized migrants.  A percentage of increase factor is required to account for this unauthorized population particularly since a large part of the unauthorized population resides in California.  The algorithm to estimate the percentage of increase compares the unauthorized migrants in California to the state population.  The formula is illustrated on the following page.

---

[3]  This needs assessment uses Jeffrey Passel's term and definition of "unauthorized migrant" to describe an individual who resides in the United States, but is not a U.S. citizen, has not been admitted for permanent residence and is not in a set of specific authorized temporary statuses permitting longer-term residence and work.  (See Passel, Van Hook and Bean 2004 for further discussion.)  Various labels have been applied to this group of unauthorized migrants including "undocumented immigrants," "illegals," "illegal aliens" and "illegal immigrants."  The term "unauthorized migrant" best encompasses this population because many migrants now enter the country of work using counterfeit documents and thus really are not "undocumented" because they have documents, but not legal documents.  While many will stay permanently in the United States, unauthorized migrants are more likely to leave the country than other groups (Van Hook, Passel, Zhang and Bean 2004).  "Migrant" rather than "immigrant" is used to highlight this distinction.

2005 Unauthorized Migrant Population (California) / 2005 Estimated California Population

2,750,000/37,172,015 = X

X = 7.4%

This percentage of increase factor of 7.4% for unauthorized migrants should be added to the baseline projections in Table F.13 above.  The results are shown in Tables F.14 and F.15

Table F.14
Projected Range of Average Daily Population (ADP)
With Unauthorized Migrants Percentage of Increase Factor 2020 - 2050

| Year | Low Projected ADP | Unauthorized Migrants 7.4% | Revised Low ADP |
|------|------|------|------|
| 2020 | 1,776 | 131.5 | 1,908 |
| 2030 | 1,972 | 145.9 | 2,118 |
| 2040 | 2,180 | 161.3 | 2,341 |
| 2050 | 2,410 | 178.3 | 2,588 |

| Year | Median Projected ADP | Unauthorized Migrants 7.4% | Revised Median ADP |
|------|------|------|------|
| 2020 | 1,909 | 141.3 | 2,051 |
| 2030 | 2,120 | 156.8 | 2,276 |
| 2040 | 2,343 | 173.4 | 2,516 |
| 2050 | 2,590 | 191.7 | 2,782 |

| Year | Average Projected ADP | Unauthorized Migrants 7.4% | Revised Average ADP |
|------|------|------|------|
| 2020 | 1,901 | 140.7 | 2,042 |
| 2030 | 2,110 | 156.2 | 2,267 |
| 2040 | 2,333 | 172.6 | 2,505 |
| 2050 | 2,579 | 190.8 | 2,770 |

| Year | High Projected ADP | Unauthorized Migrants 7.4% | Revised High ADP |
|------|------|------|------|
| 2020 | 2,017 | 149.3 | 2,167 |
| 2030 | 2,239 | 165.7 | 2,405 |
| 2040 | 2,475 | 183.2 | 2,659 |
| 2050 | 2,737 | 202.5 | 2,939 |

Source:  TRGConsulting.  November 2011.

Table F.15

Projected Range of Average Daily Population (ADP) with Unauthorized Migrant
Percentage of Increase Factor 2020 – 2050

| Calendar Year | Revised Low ADP | Revised Median ADP | Revised Average ADP | Revised High ADP |
|---|---|---|---|---|
| 2020 | 1,908 | 2,051 | 2,042 | 2,167 |
| 2030 | 2,118 | 2,276 | 2,267 | 2,405 |
| 2040 | 2,341 | 2,516 | 2,505 | 2,659 |
| 2050 | 2,588 | 2,782 | 2,770 | 2,939 |

Source: TRGConsulting. November 2011.

Thus it can be predicted that the average daily population will range from a low population of 1,908 in 2020 (if the facility is not artificially "capped") to a high of 2,939 in 2050.

Peaking and Classification. Finally, a peaking and classification factor is used to accommodate the higher "peaks" in adult detention facility population and the classification of incarcerated adults.

Peaks occur when bookings temporarily increase because of such occurrences as increased criminal or gang activity, an increase in crime after parties when adults are chemically impaired, etc. Typically peaking ranges from 10% to 20% depending on the jurisdiction. This report uses the average of 15% for estimating the probable future peaking of the adult detention population.

Proper classification procedures require separation of inmates based on such factors as the inmate's potential for violence, gender differences, status, gang affiliation, predatory tendencies, etc. Criminal justice planners typically use a classification factor of between 8% and 15%. This report uses the more conservative classification factor of 10%.

If a peaking and classification factor of 25% is added to the previous calculations, it is predicted that the *high* projected ADP will range from 2,708 in 2020 to 3,006 beds in 2030; 3,323 beds in 2040; and 3,674 beds in 2050.[4] These results are illustrated in Tables F.16 below and Table F.17 on the following page. The projected high ADP is highlighted in yellow on those tables.[5]

Table F.16

Projected ADP with Peaking and Classification Factors 2020 – 2050 Summary

| Calendar Year | Revised Low ADP | Revised Median ADP | Revised Average ADP | Revised High ADP |
|---|---|---|---|---|
| 2020 | 2,385 | 2,563 | 2,552 | 2,708 |
| 2030 | 2,648 | 2,845 | 2,833 | 3,006 |
| 2040 | 2,927 | 3,145 | 3,132 | 3,323 |
| 2050 | 3,235 | 3,477 | 3,462 | 3,674 |

Source: TRGConsulting. November 2011.

---

[4] This statement assumes using the high projections within the range. High projections are used because of the uncertainty brought about by overcrowding in the state prison system and the demands of AB 109. The concern is that state prison inmates will continue to "backup" into county jail systems.

[5] The projection methodology used throughout this section originally was developed by The Law Enforcement Assistance Administration (LEAA) and has been an accepted projection method use throughout the United States for the last three decades.

Table F.17
Projected ADP with Peaking and Classification Factors
Total Beds Required 2020 – 2050

| Year | Low Projected ADP | Peaking & Classification Factor 25.00% | Revised Low ADP |
|---|---|---|---|
| 2020 | 1,908 | 477 | 2,385 |
| 2030 | 2,118 | 530 | 2,648 |
| 2040 | 2,341 | 585 | 2,927 |
| 2050 | 2,588 | 647 | 3,235 |

| Year | Median Projected ADP | Peaking & Classification Factor 25.00% | Revised Median ADP |
|---|---|---|---|
| 2020 | 2,051 | 513 | 2,563 |
| 2030 | 2,276 | 569 | 2,845 |
| 2040 | 2,516 | 629 | 3,145 |
| 2050 | 2,782 | 695 | 3,477 |

| Year | Average Projected ADP | Peaking & Classification Factor 25.00% | Revised Average ADP |
|---|---|---|---|
| 2020 | 2,042 | 510 | 2,552 |
| 2030 | 2,267 | 567 | 2,833 |
| 2040 | 2,505 | 626 | 3,132 |
| 2050 | 2,770 | 692 | 3,462 |

| Year | High Projected ADP | Peaking & Classification Factor 25.00% | Revised High ADP |
|---|---|---|---|
| 2020 | 2,167 | 542 | 2,708 |
| 2030 | 2,405 | 601 | 3,006 |
| 2040 | 2,659 | 665 | 3,323 |
| 2050 | 2,939 | 735 | 3,674 |

Source: TRGConsulting. November 2011.

C. Based on the projected number of detention days served per year in the future Monterey County Adult Detention Facility as calculated in the previous section, the average length of stay has AB 109 been in place can be obtained using the second formula identified previously. Given the previous projections of adult offender admissions and total adult offender detention days, the best single estimate of the average length of stay can be obtained by using the average range of projections of adult offender admissions and detention days.

Average Length of Stay  =  Total Detention Days Served per Year
                              Number of Admissions per Year

The average length of stay during these data years provides the best estimate of the average length of stay during the forecast period.

The range of departure from a low of 41.90 days in 2008 to a high of 46.91 days 2009 can be found in the following table:

Table F.18
Historical Detention Data 2008 – 2010 (with AB 109)

| Year | Detention Days Table F.2 | Admissions Table F.1 | Average Daily Population | Average Length of Stay |
|------|-------------------------|----------------------|-------------------------|------------------------|
| 2008 | 593,095 | 14,155 | 1,625 | 41.90 |
| 2009 | 633,923 | 13,515 | 1,737 | 46.91 |
| 2010 | 564,642 | 13,266 | 1,547 | 42.56 |

Source:  Monterey County Sheriff's Office, Custody Operations Bureau.  Aggregate:  TRGConsulting.  November 2011.

This table summarizes the original offender data from which projections have been made.  In this table the original admissions and detention days data have been converted to average length of stay using the formula above.  The average length of stay ranges from 41.90 days (2008) to 46.91 days (2009).  Since it was shown previously that the admissions and days in detention data display no apparent trend in relation to the population of Monterey County during the data years, it can be assumed that any combination of the admissions and detention days data might have occurred during this period.  Accordingly, the operating upper limits of the length of stay can be found by pairing the highest number of detention days during the data period (2009) with the lowest number of jail admissions (2010).  Similarly, the lowest number of detention days (2010) should be paired with the highest number of jail admissions (2008).  Substituting these paired extremes into formula an ALS algorithm results in the following:

| 2010 / | 2008 | = ALS Days |
|--------|------|------------|
| Lowest Average Length of Stay | 564,642 / 14,155 | = 39.89 |

| 2009 / | 2008 | = ALS Days |
|--------|------|------------|
| Highest Average Length of Stay | 633,923 / 14,155 | = 44.78 |

If past practices continue and calculations include the impact of AB 109, the average length of stay in the Monterey County Adult Detention Facility will fall between 39.89 and 44.78 days during the projected period.  This suggests the importance of an effective and intense aftercare component if programs are to have any long term, lasting impact that results in reduced recidivism.

Shortfall Using the Average Projection.  When the 825 existing beds are considered, the additional bed requirements for 2020 through 2040 *using the average projection* are illustrated in Table F.19 below.

Table F.19
Adult Detention Facility *Additional* Bed Need 2020 - 2040 (Average)

| Year | Additional Beds Needed |
|------|------------------------|
| 2020 | 1,727 Beds |
| **2030** | **2,008 Beds** |
| 2040 | 2,307 Beds |

Source.  TRGConsulting.  December 2011.

The previous table indicates that an additional 2,008 beds will be required in 2030 if the county elects to construct enough beds to meet their twenty-year needs using the average projections.

***Please note that it is recommended that Monterey County target the 2030 needs as an immediate requirement since the new adult detention facility will start to become overcrowded almost immediately upon opening should the first phase only consist of enough beds to meet the 2020 needs. The existing severely overcrowded conditions have been exacerbated by the enactment of AB 109.[6]***

Shortfall Using the High Projection.  Alternatively, if *the high projection* is used, the current maximum capacity of only 825 beds requires that the county construct an additional 2,181 beds to meet the 2030 bed need.  The bed requirements for 2020 through 2040 using *the high projection* are illustrated in Table F.20.

Table F.20
Adult Detention Facility *Additional* Bed Need 2020 - 2040 (High)

| Year | Additional Beds Needed |
|------|------------------------|
| 2020 | 1,883 Beds |
| **2030** | **2,181 Beds** |
| 2040 | 2,498 Beds |

Source.  TRGConsulting.  December 2011.

***The table above indicates that to meet the 2030 need, an additional 2,181 beds will need to be constructed between now and 2030.***

---

[6]  AB 109, Criminal Justice Alignment, has been modified by AB 117, Criminal Justice Realignment.

## G. Adequacy of Staffing Levels



*Eighty percent of the beds at the Monterey County Jail are in dormitories while eighty percent of the inmates are felons.*

**Introduction.** The Monterey County Jail is facing a number of staff related issues. These issues affect the overall security of the facility and the morale of the staff.

**Staffing Issues.** Detention facilities must be staffed 24 hours a day, 7 days a week (24/7) in order to fulfill their mandate to provide safe and secure housing for those inmates under their care. Staff within the Monterey County Jail must be available to receive new bookings in the jail, provide medical care, classify and move inmates within the facility, maintain staff and inmate safety and security, provide recreation and exercise, ensure inmates are fed, transport inmates to court or outside agencies and lawfully release inmates. Due to its nature, a jail cannot simply discontinue operation (e.g. refuse to accept prisoners) if there is not a person available to fill a position. When detention facilities are not staffed adequately, overtime is necessary to cover an unfilled post.

The major staffing issues facing the Monterey County Jail are:

1. While the 2010 inspection report appears to indicate that the jail is staffed adequately, a closer examination of the report reveals that CSA staff only was commenting on the fact that required safety checks were being made.[1] CSA staff did not examine the staffing required to safely operate the jail in any detail. As in 2006, it still appears that the staffing provided by the County salary ordinance is based on the rated capacity of the facility, not on how many inmates are actually in custody. There has been no adjustment for the increase in number of inmates or the criminal sophistication of the inmate now in custody.

2. There has not been an updated relief factor calculated for quite some time. For example, employees are due two 15-minute breaks away from their workstation per shift and have to be replaced by another staff member. The position cannot be left vacant. Also, in recent years family medical leave and other factors come into play that should be factored in to provide a realistic relief factor.

3. Minimum staffing is the level of staff required to operate a detention facility in a manner that will provide basic safety and security for the public, staff, and inmates. Minimum staffing levels establish a baseline by which detention facilities may operate, yet often times do not take into consideration the span of control between assigned duties and the actual ability to supervise and manage inmate populations. When a system's minimum staffing is precariously low, the county is exposed to potential liability because this implies that basic safety and security are no longer protected. Minimum staffing levels are influenced and affected by various factors including facility design and inmate capacity, adequate staffing of necessary POST positions, adequate shift relief factor, inmate profile/classification level and budget constraints. It is important to reiterate that minimum staffing is just that (i.e. minimum staffing to provide basic functions). The baseline staffing should be above minimum staffing. Due to vacancies and other factors, the Monterey County Jail is constantly using overtime to staff *up* to their self-imposed minimum

---

[1] For example, in the inspection report dated June 10, 2010, the following comments also relate. "Crowding continues to plague the Custody Operations Bureau, which inherently raises unit tensions leading to potential increases in inmate assaults on other inmates and staff. Increased exposure to litigation results in costly lawsuits." The report goes on to document the overcrowding (i.e. a total of 146 inmates over rated capacity at the time of the inspection).

staffing.  This level is *not* adequate to provide basic safety and security for staff and inmates.  This situation will be exacerbated by the influx of AB 109 inmates.

4.  Vacancies,[2] extended periods of leave, and normal staff attrition underscore the importance of maintaining a minimum number of staff.  Staff at the Monterey County Jail are leaving for employment at local and surrounding police departments that offer higher pay and enhanced benefits and a variety or other reasons.  This has caused a lower than normal experience level of staff and the use of pre-academy hires.  The workforce needs to level out.  With a significant amount of vacant POST positions, the jail has an increased reliance on overtime to meet minimum staffing.

5.  Sheriff's Offices often utilize overtime to cover an unfilled post.  This practice can be dangerous since staff may have recently completed a 12-hour shift, when they are required to work additional overtime.  There is no way for detention facilities to eliminate all use of overtime; it is a necessary component of staffing a 24-hour a day, 7-day a week operation.  However, to save the Custody Bureau money and remove the potential for staff burnout, efforts must be made to reduce the number of overtime hours.  To fill a vacancy in Monterey County, the practice has been to have an onsite employee work 4 hours over his normal shift and another employee called in early for 4 hours.  This practice required two employees to work 16-hour days.  Of additional importance is the 4-hour gap that is left uncovered in the middle of the shift.[3]  In an emergency situation the facility would be dangerously understaffed.  An alternative would be to call or order someone on regular days off to fill the entire shift on overtime whenever possible; however, this is difficult to accomplish because of the severe staff shortage.

6.  Supervision is a critical task in any detention facility.  Supervisors ensure that policy is followed, tasks are completed, critical decisions are made and exposure to liability from "failure to supervise" claims are limited.  In Monterey County, sergeants fill in for line positions when relief is unavailable.  This leaves a gap in first line supervision.  All vacant sergeant positions[4] should be filled and, except for an unusual situation, sergeants should supervise and not fill in for a line vacancy.  Even at full authorized staffing, it appears the span of control for sergeants is weak and additional positions for minimum supervision are necessary.

7.  Chronic understaffing causes a host of other issues detrimental to the mission of the jail.  It lowers morale, employees are unable to take breaks (in violation of the Fair Labor Standards Act), employees get "burned out" with mandatory overtime, employees must take "shortcuts" to get the job done and employees are forced to assume collateral duties to allow the facility to function.

8.  The current authorized staffing for the Monterey Jail is woefully inadequate.  Even if every vacancy were filled with a fully trained staff member, the facility would not have enough staff to meet the minimum staffing, let alone adequate staffing.  The current roster carries vacancies, employees on medical leave, employees on light duty, employees on family leave and other assorted reasons for not filling a POST position.  Monterey County should aggressively recruit and fill all vacant positions.  They should also "over hire" Deputy Sheriffs above the authorized staffing to fill in when a vacancy occurs.  Some counties refer to this as "pipeline" hiring.  There are always people in the "system" or pipeline from background processing to attending the academy.  Rarely does over hiring have a cost associated with it, but there is always cost avoidance for overtime when a vacancy occurs and a new employee is already trained.

9.  A review of the current staffing pattern as practiced by the Monterey County Jail and the best practices staffing plan included in the 2006 *Staffing Analysis*[5] indicates that the critical needs are for the extra

---

[2]  There were twelve vacancies when this assessment was made.  Additionally, the Custody Bureau lost thirty-seven positions (sworn and unsworn) between January 2011 and December 2011.

[3]  The Custody Bureau "sometimes uses on-duty classification deputies to fill the middle four hours, but most of the time [the post is not filled]."

[4]  At the time of this assessment, one sergeant was out on long-term illness and one sergeant was scheduled to retire this month (December 2011).  This will leave two sergeants positions vacant.  Additionally the Custody Bureau lost one captain's position and two commander's positions in the budget cuts earlier this year (2011).

[5]  *Monterey County Sheriff's Office, Staffing Analysis.*  Voorhis Associates, Inc.  June 21, 2006.

staffing in the housing units and for facility-wide escort deputies.  These positions will ensure required safety checks are made, there is some level of supervision in the kitchen, laundry and medical areas and adequate staffing is available to respond to emergencies and unusual situations.  Recent cuts in staffing have made this situation much worse, thereby exposing the county to additional lawsuits.

Recruitment, Selection and Retention.  The Monterey County Sheriff's Department experiences difficulty in the recruitment, selection and retention of detention officers for the following reasons.

- Monterey County deputies' pay and benefits are less than those that are offered by several local, state and federal agencies for similar positions.
- The Custody Bureau estimates that 93% of the applicants for deputy positions in the Sheriff's Office fail the background investigation for a number of reasons including financial insolvency, drug use and psychological issues.

While the above difficulties are common in most county detention systems, the poor working conditions and antiquated design of the jail exacerbate Monterey County difficulties.  The feeling of draconian confinement and disorientation created by a maze-like layout are more than most potential applicants are willing to bear.  Thus, the "need" for a new adult detention facility goes well beyond a simple "need" for additional beds that is, in itself, quite critical.  The additional "need" is for a facility that protects the safety of deputies and provides them with a professional environment in which to work.  (This is one of the design goals for the new facility and is addressed in Section B, *Operational and Design Philosophy*.)

Historic Factors.  The issues addressed in the section above historically have been a concern.  As a result, the Sheriff's command staff has been required to devote a disproportionate amount of time to recruiting, testing, investigating, selecting, mentoring and retaining detention officers.  A new facility will go a long way toward easing the recruiting and retention burden placed on senior officers and will allow them to devote more of their energies to law enforcement and inmate rehabilitation issues.

## H.  Ability to Provide Visual Supervision



*Transportation van parked in front of the Monterey County Rehabilitation Facility.*

Introduction.   While visual supervision is problematic in the existing jail, the new Monterey County housing units will be designed to enhance visual supervision as indicated in Section B *Operational and Design Philosophy* of this needs assessment.

Existing Facility Design.   A glaring example of the physical plant limitations in the existing jail is the design of the control or "guard" station, and the ability of staff to directly supervise inmates.  At best there is intermittent observation of the inmates.  In the Rehabilitation Facility, a Deputy Sheriff must walk into the inmate housing area to see the entire living and shower area.  It appears there is an attempt to remedy the problem with the use of cameras.  Unfortunately, this is not working well.  Cameras should not be used in place of staff, but as a tool for staff in overall security.  Unfortunately, staff is not observing the cameras that are in place, because they are overtaxed with other obligations.

New Housing Design.  It is envisioned that the new housing units will offer direct visual supervision from unit control into the housing pods and the attached outdoor recreation areas.  Similarly, roving officers will provide direct visual supervision of all areas in all pods including the toilet and shower areas.  Partitions providing modesty to inmates in the toilet area and the showers will be designed so that inmate's heads and feet always are visible.  There will be no blind corners in the housing pods when observed by the roving officers.

Video, contact and non-contact visiting will be visually observed at all times by officers circulating through the spaces.  Again an "open" design will be used to ensure ease of observation in contact visiting.  Video and non-contact visiting cubicles will be observed easily by roving officers supplemented by CCTV.

Program spaces including the medical examination room will be observed by those providing the programs and services as well as by roving officers.  Again, spaces will be "open" for ease of observation.

Finally, the exterior of the building will be laid out such that visual observation is enhanced.  Adequate night lighting and CCTV will aid the direct visual observation of all outside areas including the parking lots.

Adequacy of Staff.  As discussed above the design will permit complete visual observation of all interior and exterior spaces in the new Monterey County Adult Detention Facility.  Staffing efficiency will be improved by the improved visibility in the new housing units and support spaces.  Thus, the staffing mandated by Title 15 will be more than adequate to observe all inmates regardless of the activity in which they are involved.  The Board of Supervisors, the County Administrative Officer and the Sheriff and his staff are committed to staffing the new facility as required by Title 15.

## I. Adequacy of Record Keeping

*Introduction.*  Record keeping at the Monterey County Jail is quite detailed.  Not only does jail staff maintain all records required by Title 15, but they also keep additional records to effectively manage the inmate population.  Examples include the detailed records relating to overcrowding and early release, inmate management records, information on inmates with mental health needs and logs of those on psychotropic medications, statistics on gang affiliation, historic needs assessments and records relating to the effectiveness of programs (including records of the effectiveness of alternatives to incarceration).

In addition to the above, the Custody Bureau maintains a series of notebooks that include a variety of jail statistics and copies of media coverage related to the Monterey County Jail.  These include:

- *Monterey County Department of Health; Detention and Rehabilitation; Annual Health, Medical and Nutritional Inspections*

- *Monterey County Sheriff's Office; Board of Corrections Biennial Inspections:*

- *Office of the State Fire Marshal; Fire/Life Safety Inspection Report Adult/Juvenile Detention Facilities*

- *Monterey County Sheriff's Office; Custody Operations Bureau; Historical Newspaper Articles; February 1978 through December 1990*

- *Monterey County Sheriff's Office; Custody Operations Bureau; Historical Newspaper Articles; January 1991 through December 2001*

- *Monterey County Sheriff's Office; Custody Operations Bureau; Historical Newspaper Articles; January 2002 through June 2005*

- *Monterey County Sheriff's Office; Custody Operations Bureau; Statistics of Jail Data*

- *Additional Correctional Facilities Requirements Analysis; Monterey County, California Omni Group; September 1985*

- *Major Corrections Needs Assessment Study Update; Monterey County October 1987; Omni-Group, Inc.*

- *Monterey County Jail Needs Assessment and Facilities Master Plan; September 1988*

- *Monterey County Facilities Master Plan; Prepared by ROMA Design Group; June 1989*

- *Monterey County Sheriff's Office Staffing Analysis; Prepared by Voorhis Associates, Inc.; June 21 2006*

- *County of Monterey Recommended Budgets*

Required records maintained by the Custody Bureau include:

- *Monterey County Sheriff's Manual*
- fiscal records
- booking/arrest records
- admittance procedures
- intake screening records
- criminal history records
- classification records
- classification reviews
- release procedures
- incident reports
- disciplinary records
- grievances
- population accounting
- counseling and casework services plan

- health care records (including mental health and dental)
- psychotropic medication logs
- employee files containing health care staff credentials
- Corrections Standards Authority (CSA) inspections (including documentation of the resolution of non-compliance issues)
- fire inspections
- health inspections
- environmental health inspections
- building inspections
- food service plan
- diet menus (including therapeutic diets when ordered)
- food preparation temperature logs (to verify food is served at the correct temperatures)
- emergency procedures
- evacuation plans
- construction documents (as available; including "as built" drawings)
- historic records and chronology of additions, renovations and modifications to the Monterey County Jail
- room check logs (safety checks)
- population accounting to CSA
- employee files and records
- staff training records
- staff assignments (current and historical)
- employee records of hours worked including overtime hours
- employee records of sick leave
- reports of legal actions
- annual security review
- transportation logs
- Title 24 needs assessments (current and historical)

## J.  Compliance with Standards

**Introduction.**  The Monterey County Sheriff's Office operates a Type II adult detention facility. The facility is used for the detention of males and females pending arraignment, during trial, and upon a sentence of commitment. This facility has a unique physical plant design that complies with minimum standards for local adult detention facilities.[1]  The facility's four main housing areas and reception area have a Corrections Standards Authority (CSA) rated capacity of 825 inmates. On any given day, there can be as many as 1,000 inmates in custody. The existing Monterey County Jail faces three significant issues affecting the success of its overall mission and the ability of the Sheriff's Office to comply with Title 15 and Title 24 standards:

1. poor facility design;
2. severe overcrowding; and
3. understaffing.

**Poor Facility Design.**  The Monterey County Jail is located at 1414 Natividad Road, Salinas, California. The original rehabilitation facility was built in 1970 with additions to the jail complex occurring in 1977, 1988, 1993, and 1995. Adult male and female inmates are housed in the facility. The Corrections Standards Authority has given the facility a rated capacity of 825 inmates. This facility has some physical plant limitations that are causes for concern in terms of the safety and security of staff, visitors, volunteers and inmates.

A common thread through all of the four main housing units is the use of the dormitory design. Dormitories are much like military barracks, as opposed to single cell or four-man cellblocks. Dormitories are cheaper to build and theoretically are more cost effective to supervise.  Normally, dormitories are for the lowest level of classification.  In Monterey County, the jail facility has approximately 80% dormitory beds. The conflict occurs because the Monterey County regularly incarcerates approximately 80% felony sentenced and unsentenced inmates.  These are usually the highest level of inmate classification and require single and double cell housing.  Jail staff does not have the ability to classify or segregate problem inmates from other inmates or staff.

The type of inmate entering local county jails has changed dramatically since the Monterey County Jail opened in 1970.  Courts are releasing non-threatening felons prior to trial.  Judges are sentencing more misdemeanants to alternatives to custody.  The jail is left with serious felons awaiting trial and sentenced felons awaiting transportation to the state prison system.  In some ways, the local jail population is no different than those in state prisons.  Local jail populations will become even more similar to state prison populations as the full impact of AB 109 is felt.  The design of the housing units at the Monterey County Jail was never intended to house the type of felony inmates it now holds or the type of inmates that will be held as mandated recently by AB 109.

Normally in local detention facilities, there is an area designed as a central or main control.  This area does not have the responsibility for inmate supervision.  All staff alarms, fire alarms, and perimeter alarms terminate in this area.  This area also controls all external doors and gates into the facility, and accounts for all keys.  Depending on the design of the facility, other facility-wide responsibilities could be assigned to this position.  In the case of a major facility emergency or inmate disturbance, this position would function as a command post.  The Monterey County Jail does not have a central control area designed in this manner.

**Overcrowding.**  The Corrections Standards Authority (CSA) inspects and rates the Monterey County Jail. Rated capacity means the number of inmate occupants for which a facility's single and double occupancy cells or dormitories (except those dedicated for health care or disciplinary isolation housing) were planned and designed in conformity to the standards and requirements contained in the California Code of Regulations, Title 15 and Title 24.  The entire Monterey County Jail facility is rated at 825 inmates.  As

---

[1]   This detention facility is "grandfathered" and therefore only needs to comply with the standards in place at the time each section of the facility was constructed (i.e. the standards in place in 1973 and 1988).  There was one minor issue of non-compliance in that the multiple occupancy cells in the female housing unit were rated for four beds but held eight bunks; however, on the day of the inspection the cells were not overcrowded.  (Corrections Standards Authority inspection report of June 8, 2010.)  The facility would not necessarily comply with today's more restrictive standards.

discussed earlier, there can be as many as 1,000 inmates in custody at any given time. There are approximately 13,500 inmates booked into the Monterey County Jail a year.

Overcrowding creates a number of issues that affect staff and inmates, and put the County at risk. Overcrowding causes stress both on inmates and staff. Inmates vs. inmate assaults typically occur more frequently, as do other disciplinary infractions. Overcrowding affects inmates' mental and physical health by increasing the level of uncertainty with which they regularly cope. There is less space per inmate. In Monterey County there is the possibility of misclassifying inmates based on space rather than security level. (Anecdotal information from staff indicates this occurs occasionally.) Overcrowding reduces the ability to classify. This is further compounded by the dormitory design. Normally, 10% - 15% of the beds should be empty and available for classification spikes as well as routine and emergency maintenance. With the severe overcrowding in the Monterey County Jail, programming is little, to nonexistent.

A review of the Monterey County Jail admissions and daily housing population indicates that, absent a court order, there are few inmates being booked who could be cited and released in lieu of booking. With 80% of the population having some type of felony charge, there is little that can be done to reduce this group. It appears parole violators are not staying an inordinate amount of time in custody, and sentenced felons are moving on to state prison within an acceptable time frame.

Understaffing. The Monterey County Jail is facing many staff related issues. These issues affect the overall security of the facility and the morale of the staff.

As discussed in detail in Section G, *Adequacy of Staffing Levels*, detention facilities must be staffed 24 hours a day, 7 days a week (24/7) in order to fulfill their mandate to provide safe and secure housing for those inmates under their care. Staff within the Monterey County Jail must be available to receive new bookings in the jail, provide medical care, classify and move inmates within the facility, maintain staff and inmate safety and security, provide recreation and exercise, ensure inmates are fed, transport inmates to court or outside agencies, and lawfully release inmates. Due to its nature, a jail cannot simply discontinue operation (e.g. refuse to accept prisoners) if there is not a person available to fill a position. When detention facilities are not staffed adequately, overtime is necessary to cover an unfilled post.

The major staffing issues facing the Monterey County Jail are:

1.  It appears that the staffing provided by the County salary ordinance is based on the rated capacity of the facility, not on how many inmates are actually in custody.

2.  It appears there has not been an updated relief factor calculated for some time.

3.  Baseline staffing should be above minimum staffing. Due to vacancies and other factors, the Monterey County Jail is constantly using overtime to staff *up* to their self-imposed minimum staffing. This level is *not* adequate to provide basic safety and security for staff and inmates.

4.  Vacancies, extended periods of leave, and normal staff attrition have resulted in a significant amount of vacant POST positions. The jail has an increased reliance on overtime to meet minimum staffing.

5.  The extensive use of overtime can be dangerous since staff may have recently completed a shift, when they are required to work additional overtime. Efforts should be made to reduce the number of overtime hours.

6.  Supervision is a critical task in any detention facility. Supervisors ensure that policy is followed, tasks are completed, critical decisions are made and exposure to liability from "failure to supervise" claims are limited. In Monterey County, sergeants fill in for line positions when relief is unavailable. This leaves a gap in first line supervision. Even at full authorized staffing, it appears the span of control for sergeants is weak and additional positions for minimum supervision are necessary.

7. Chronic understaffing lowers morale, employees are unable to take breaks (in violation of the Fair Labor Standards Act), employees get "burned out" with mandatory overtime, employees must take "shortcuts" to get the job done and employees are forced to assume collateral duties to allow the facility to function.

8. The current authorized staffing for the Monterey Jail is woefully inadequate.  Even if every vacancy were filled with a fully trained staff member, the facility would not have enough staff to meet the minimum staffing, let alone adequate staffing.

9. A review of the current staffing pattern as practiced by the Monterey County Jail and the best practices staffing plan included in the recent Staffing Analysis[2] indicates that the critical needs are for the extra staffing in the housing units and for facility-wide escort deputies.  These positions will ensure required safety checks are made, there is some level of supervision in the kitchen, laundry and medical areas and adequate staffing is available to respond to emergencies and unusual situations.  Additionally there should be two additional positions assigned to classification that are not included in the Staffing Analysis.

---

[2]   *Monterey County Sheriff's Office, Staffing Analysis.*  Voorhis Associates, Inc.  June 21, 2006.

## K.  Unresolved Issues

Unresolved Issues.  Six issues remain unresolved, mostly due to the uncertainty surrounding the final impact of AB 109 (Criminal Justice Alignment) as modified by AB 117 (Criminal Justice Realignment) on the Monterey County criminal justice system.  Unresolved issues include:

1.  The impact of Phase II of the *Public Safety and Offender Rehabilitation Services Act of 2007* on Monterey County.
2.  The final impact of AB 109 (as modified by AB 117) on the Monterey County criminal justice system.
3.  Sources of funding for the construction, project and operational costs that are associated with meeting the projected bed need for 2020 and 2030;
4.  The construction phasing of the 2030 need;
5.  The ultimate disposition of the three components[1] of the existing Monterey County Jail (e.g. continued use of one or more components for detention, demolition of one or more components, etc.); and
6.  The specific location of the new construction on the Natividad site.


1.  The *Public Safety and Offender Rehabilitation Services Act of 2007*.[2]  This act includes provisions for CDCR and county detention facilities.  The provisions in the act that relate to local detention facilities include:

$1.2 billion will be provided for local jail bed construction in two phases:

– Phase I will provide $750,000,000 (plus an additional local match of 25%) for 8,000 beds.

– Phase II will provide $602,881,000[3] (plus an additional local match of 10%)[4] for 5,000 beds.

• Compliance with the California Environmental Quality Act is the responsibility of the county.

• The Corrections Standards Authority (CSA) will consider "cost effectiveness" in evaluating projects.

• Funding will be provided for "the cost of the local jail facility project and ongoing maintenance and staffing responsibilities for the term of the financing."

• CSA requirements will include, but are not limited to:

– Control of the project site;

– Documentation of need;

– Written project proposal;

– Submittal of a staffing plan (the new construction must be staffed and operating within ninety days of the completion of construction);

– Submittal of approved architectural drawings;

– Final determination of economic impact; and

– Provisions intended to maintain tax-exempt status.

• Matching funds will be a minimum of 10% of total project costs; and

---

[1]  The jail consists of three components (i.e. the Rehabilitation Facility, the Main Jail and the Woman's Jail).
[2]  The *Public Safety and Offender Rehabilitation Services Act of 2007* also is referred to as Assembly Bill 900 (AB 900).
[3]  The Phase II funding was increased from the original $470,000,000 to $602,881,000 of which $200,000,000 is available as medium-sized county set-asides.  Monterey County is classified as a medium-sized county.
[4]  The local match requirement for Phase II was reduced from 25% to 10% by AB 94 and AB 111 amendments.  Any combination of cash and in-kind contributions are allowed, subject to certain limitations.

TRGConsulting

The Corrections Standards Authority has issued grant application instructions for Phase II funding associated with the *Public Safety and Offender Rehabilitation Services Act of 2007*. Monterey County and the Sheriff's Office have elected to pursue the maximum state funding available for medium-sized counties of $80,000,000 to begin to address the shortage of adult detention beds in the county.

2.   AB 109, Criminal Justice Alignment as modified by AB 117 (Criminal Justice Realignment).   The key provisions of these two pieces of legislation are:

Main components:

- Defines local custody for non-violent, non-serious, non-sex offenders
- Makes changes to state parole and creates local "post-release community supervision"

Local planning process:

- Expands role and purpose of the Community Corrections Partnership (CCP), which was previously established in Penal Code §1230
- Requires CCP to develop and recommend to the Board of Supervisors an implementation plan for 2011 public safety realignment
- Creates an Executive Committee from the CCP members comprised of:
    - Chief Probation Officer (chair)
    - Chief of police
    - Sheriff
    - District Attorney
    - Public Defender
    - Presiding Judge of the Superior Court (or his or her designee)
    - A representative from either the County Department of Social Services, Mental Health, or Alcohol and Substance Abuse Programs, as appointed by the County Board of Supervisors
- The implementation plan is deemed accepted by the County Board of Supervisors unless the Board rejects the plan by a four-fifths vote.

Timeframe:

- All provisions are prospective and applied on October 1, 2011
- AB 117 provides the statutory framework, allocation methodology and revenue to implement public safety realignment

Local custody:

- Revises the definition of felony to include specified lower-level crimes that would be punishable in jail or another local sentencing option for more than one year.
- Maintains length of sentences.
- Time served in jails instead of prisons:
    - Non-violent offenders
    - Non-serious offenders
    - Non-sex offenders

- Enhanced local custody and supervision tools
    - Alternative custody tools for county jails
    - Home detention for low-level offenders
    - Local jail credits mirror current prison credits (day-for-day)
    - Broaden maximum allowable hospital costs for jail inmates and remove sunset date.

State custody:

- Convictions/priors for following offenses require state prison term:
    - Prior or current serious or violent felony as described in PC 1192.7 (c) or 667.5 (c)
    - The defendant is required to register as a sex offender pursuant to PC 290
- Other specified crimes (approximately 60 additional exclusions from "low-level" definition) will still require term in state prison

Contracting back:

- Counties permitted to contract back with the state to send local offenders to state prison.
- Authorize counties to contract with public community correctional facilities (CCFs).
- Contracting back does not extend to parole revocations.

Post-release (county-level) community supervision:

- Prospectively, county-level supervision for offenders upon release from prison will include:
    - Current non-violent offenders (irrespective of priors)
    - Current non-serious offenders (irrespective of priors)
    - Sex offenders
- County-level supervision will not include:
    - 3rd strikers
    - Individuals with a serious commitment offense
    - Individuals with a violent commitment offense
    - High-risk sex offenders as defined by CDCR
- Board of Supervisors designates a county agency to be responsible for Post Release Supervision and provide that information to the California Department of Corrections and Rehabilitation (CDCR) by August 1, 2011.
- CDCR must notify counties as to who is being released on post-release supervision at least one month prior to their release.
- CDCR has no jurisdiction over any person who is under post-release community supervision
- No person shall be returned to prison except for persons previously sentenced to a term of life (and only after a court order).

Post-release community supervision revocations:

- Revocations are capped at 180 days with day-for-day credit earning.
- Authorizes discharging individuals on post-release community supervision who have no violations for six months.

Ongoing state parole:

- CDCR continues to have jurisdiction over all offenders on state parole prior to October 1, 2011 implementation

- State parole will continue for the following:

  – The offender's committing offense is a serious or violent felony as described in PC §§1192.7(c) or 667.5(c);

  – The offender has been convicted of a third strike;

  – The person is classified as a high risk sex offender; or

  – The person is classified as a Mentally Disordered Offender (MDO).


Parole revocations:

- Prospectively, the parole revocation process continues under Board of Parole Hearings (BPH) until July 1, 2013.

- Parole revocations will be served in county jail and not to exceed 180 days.

- Contracting back to the state for revocations is not an option.

- Only persons previously sentenced to a term of life can be revoked to prison.

- For the remaining low-level offenders on parole after implementation of realignment, parole has the authority to discharge after six months if no violations have occurred.

Juvenile Justice

- AB 109 limited the future juvenile court commitments to state juvenile detention (Division of Juvenile Justice or DJJ); this provision was removed in AB 117. Consequently, there are no changes to the state juvenile justice system in realignment.

The Monterey County criminal justice system is just beginning to feel the impact of AB 109 and AB 117.  It will take at least a year to understand and adjust to these pieces of legislation.  Even if the county is successful in obtaining grant funding to construct additional beds, these beds will not come on line for several years.  In the meantime the Custody Bureau of the Sheriff's Office must accommodate the new influx of inmates brought about by this legislation and accommodate these inmates in the existing detention facilities.  This is difficult because the Custody Bureau only has 825 Corrections Standards Authority rated detention beds[5] and regularly incarcerates over 1,000 inmates.  The Monterey County Jail obviously already is overcrowded.  The Sheriff will be faced with difficult decisions regarding which inmates will be housed and which inmates will be placed in alternative programs or released.


3. Funding.  Potential funding sources include federal, state, county and/or private funds.  The preference is to pursue grant funding that will require minimal matching dollars from Monterey County because of the county's limited resources.  Grant funding will augment local resources that will be needed to construct beds to meet the projected need for 2020 and 2030.

The county will consider potential funding sources after the estimates of probable construction, project and operational costs have been developed and refined in the process described later in this section.

---

[5]   Only 153 of these beds are located in single cells (there are no CSA rated double cells), which would be the most appropriate type of housing for most AB 109 inmates.

4. Construction Phasing for 2030 Bed Need.  Recommended construction phasing cannot be determined until the 2030 bed need is finalized.  This will occur once the Sheriff's Office and/or the Board of Supervisors:

- understand the impact of Phase II of the *Public Safety and Offender Rehabilitation Services Act of 2007;*
- fully understand the impact of AB 109 as modified by AB 117 on the Monterey County criminal justice system; and
- the funding sources for construction, operations and staffing are determined.

5. Disposition of the Components of the Existing Monterey County Jail.  The Monterey County Jail consists of three components:

1. The Rehabilitation Facility.
2. The Main Jail.
3. The Woman's Jail.

The near term and ultimate disposition of these three components will depend upon:

- how rapidly the county can "catch up" with the needed number of beds so that consideration can be given to replacing any or all of the three components (particularly the Rehabilitation Facility, which has outlived it's useful life);
- the useful life of all three components when considering the cost of replacing antiquated and worn out building systems and components;
- the adequacy of the housing and support spaces in terms of the type of inmates held;
- the need for the site on which any of the three components is located for a higher and better purpose (e.g. replacing the Rehabilitation Facility with housing that is more appropriate for the inmates being held, etc.).

6. Location.  At this stage of the planning process it appears as though any new construction will occur in the parking area northwest of the existing jail between the jail and the juvenile hall; this area is bordered on the northeast by the Sheriff's Public Safety Building and on the southwest by county property (including the County Hospital);

The total number of beds and the associated support space requirements may need to be increased because of the remaining uncertainty associated with the *Public Safety and Offender Rehabilitation Services Act of 2007* and the impact of AB 109 as modified by AB 117.  If a large number of additional beds are added to the county needs already identified, then it may be necessary to expand into the area occupied by county structures associated with the old hospital (to the southwest of the existing jail).  An alternative would be to construct a new juvenile hall and Probation Department offices on another site and take over the area currently occupied by the Probation Department between Natividad Road and the existing jail parking lot.

The actual construction site(s) for the new adult detention facility will be chosen after the total bed need is determined for each new construction project.  At that point a detailed architectural program will be written to further define the project.  The architectural program will identify the building gross square footages of the new housing pods and any associated program and support buildings.  The required site amenities including mandated recreation space, parking, etc. also will be identified.  Future long-term expansion of the new adult detention facility will be addressed as well.

Implementation Strategy to Resolve Issues.  The remaining activities required to resolve these issues are discussed below.  Monterey County is committed to continuing this implementation strategy until all issues are

resolved and new adult detention beds and support spaces are constructed and occupied.[6]   The implementation schedule will be reviewed periodically and accelerated as appropriate.  The six unresolved issues identified above will be resolved as part of this strategy.

Conceptual Schedule and Budget.  A conceptual schedule and budget will be developed based on this needs assessment in order to determine the feasibility of the next project.

The conceptual schedule will contain all major milestones from the refinement of the needs assessment as more is learned about the impact of AB 109 and AB 117 to the occupancy of the new adult detention beds and support spaces.  Included will be the milestone dates on which decisions to continue the project must be made if the projected occupancy date is to be met.

Three conceptual budgets will be developed.  The first will present the estimate of probable construction costs for the new adult detention construction.[7]  Secondly the estimate of probable project costs will be developed based on the estimate of construction costs.[8]  Finally, the estimate of probable operational costs will be prepared.[9]  The combination of the three estimates will provide the leadership of Monterey County with the anticipated costs to design, bid and construct the new adult detention beds and support spaces as well as the costs to operate the facility once it is occupied.  All three estimates will be refined as more information becomes available during each step of the process.

The conceptual schedule and budget will establish baselines that will be adjusted appropriately throughout the process leading to new detention beds and support spaces.  Project participants and county leadership continuously will be updated with information concerning the timeline and projected costs for the new construction.  The feasibility of the project will be assessed at each stage of the implementation strategy.

Operational Program Statement.  Section 13-102(c) 3 of Title 24, Part 1 requires the operational program statement to be submitted to the Corrections Standards Authority (CSA) with the schematic design architectural documents.[10]  Monterey County has elected to prepare the program statement early in the conceptual process to be certain that the architectural program and any design work are driven by program requirements.

The operational program statement will include a description of the following:

    A.  Intended capacity of facility.
    B.  Security and classification of inmates to be housed.
    C.  Inmate movement within the facility and entry and exit from security areas.
    D.  Food preparation and serving.
    E.  Staffing.
    F.  Intake/release/processing.
    G.  Visiting and attorney interviews.
    H.  Exercise.
    I.  Programs.
    J.  Medical services, including the management of communicable diseases.
    K.  Cleaning and/or laundering.

---

[6]   Monterey County has limited resources (as is the case with a number of California counties).  Nonetheless county leaders intend to move forward as rapidly as scarce resources permit.

[7]   "Construction costs" are the costs associated with "bricks and mortar" and construction labor.

[8]   "Project costs" include such things as architectural and engineering design fees, construction management and environmental consulting fees, testing and inspection fees, project management costs, etc.

[9]   Operational costs cover such things as staffing, utilities, maintenance, operational supplies, janitorial services, move-in costs, etc.

[10]  The major divisions in architectural services typically are planning (e.g. architectural programming, master planning, operational programming, staffing planning, conceptual design including floor plans, elevations and a rendering, etc.), schematic design, design development, construction documents, bidding and negotiation, construction administration, move-in/project closeout and post-occupancy services.

L.  Inmate segregation as specified in Penal Code Sections 4001 and 4002 and Article 5 of Title 15, CCR.
M.  Court holding and inmate movement.
N.  Mental health services.
O.  Facilities for jail administration and operations staff.
P.  Staff to staff communications system.
Q.  Management of disruptive inmates.
R.  Management and placement of persons with disabilities with provisions for wheelchairs, gurney access, and for evacuation during emergencies.
S.  Architectural treatment of space relative to preventing suicides by inmates.
T.  Method of implementing Penal Code Section 4030 relating to the holding of misdemeanant arrestees without the necessity of unjustified strip searches.
U.  Intended type of facility.
V.  Sobering cells(s) as referenced by Title 15, Section 1056, with the ability to segregate.
W.  Safety cell(s) as referenced by Title 15, Section 1055.

The construction, project and operational estimates of probable costs along with the milestone schedule will be adjusted as necessary based on the program statement.

**Staffing Plan.**  Similarly Monterey County has elected to prepare the staffing plan early in the conceptual process to be certain that staffing requirements "drive" the architectural program and any design work.  This will ensure a staff efficient design and reduce operating expenses.[11]

The staffing plan will include:

- the number of FTE staff required to fill post positions;
- staff requirements during construction;
- relief factors for each post position;
- selection of new staff (by post position);
- new staff hiring and training schedules; and
- program/operational requirements.

The operational estimate of probable costs and the project schedule will be adjusted as necessary based on the staffing plan.

**Architectural Program.**  An architectural program will be developed to determine the detailed requirements for each space, area and component of the new detention beds and support spaces.  Activities and operations for each component will be described so that the architectural design will reflect the requirements of Titles 15 and 24 as well as the programs and staffing desired by Monterey County.  Building gross square footages of all housing, program and support spaces will be determined.  The architectural program will identify the building systems to be used and the site area required along with all site amenities (e.g. outdoor recreation areas, security perimeters, vehicular and pedestrian sally ports, secure and non-secure parking, security and site lighting, loading docks/delivery areas, etc.).

The project schedule and the construction and project estimates of probable costs will be adjusted as necessary based on the architectural program.
The specific location of the components of the new adult detention facilities on the Natividad site will be confirmed based on the site requirements developed in the architectural program.

---

[11]  Previous grants administered by CSA included a requirement that a detailed staffing plan be submitted with the architectural design development documents.  The *Public Safety and Offender Rehabilitation Services Act of 2007* requires that all funded detention facilities be staffed and operational within ninety days of the completion of construction.

Conceptual Design.   At this point a conceptual design consisting of a site plan, floor plans, elevations and an architectural rendering will be developed to further refine the construction and project estimates and to provide the architectural design concepts necessary for most grant applications and other funding initiatives.

Identification of Funding Sources.   The county will research traditional and non-traditional potential funding sources such as:

– Federal, state and private grants
– Impact fees
– Lease/purchase financing (lease payments with purchase option)
– California Infrastructure and Economic Development Bank Loans
– Industrial Revenue Bonds
– Local option sales tax
– General obligation bonds
– Certificates of Participation (COPs)

More creative funding sources such as the following also may be considered:

– Agreements with other counties to participate in a regional detention facility
– Homeland Security funds
– United States Department of Agriculture Rural Development ($100,000 to $2,000,000 to finance essential community facilities)
– California Energy Commission loans (loans up to $2,500,000 for financing energy conservation measures as part of new detention facilities)
– Environmental Protection Agency grants (e.g. by proving a new facility will reduce transportation emissions through such initiatives as providing on-site court facilities to eliminate the need to transport inmates to distant court facilities).

The project budget will be adjusted based on funding sources available and the timeline in which those funds will become available.  The milestone schedule will be modified as necessary based on the funding timeline.

Resolution.   Once the funding sources are identified all unresolved items will be satisfied since, by this time, the impact of the *Public Safety and Offender Rehabilitation Services Act of 2007* and the final impact of AB 109 as modified by AB 117 will be known. The architectural program and master plan will identify the parts of the existing jail that are to be retained or demolished for new construction.  The specific location of the new detention beds and support spaces on the jail site will have been determined.

When these issues are resolved Monterey County will be in a position to obtain the necessary funding, move forward with the architectural design and construction documents and advertise the project for competitive bid.[12]  Selection of the contractor, construction, transition and phased occupancy then will follow in the normal course of events.

---

[12]   Monterey County staff also may consider using the design build project delivery methodology.

## Appendix

The Appendix includes a list of stakeholders for the project.

## Stakeholders

Revision 03; December 12, 2011

Introduction.  Below is a list of potential stakeholders.

1.  Monterey County Board of Supervisors

    A.  Monterey County Board of Supervisors Capital Subcommittee

2.  Adult Detention Facility Needs Assessment Executive Steering Committee

3.  Law Enforcement

    A.  Monterey County Sheriff's Office
    B.  Sheriff's Commission on Budget and Finance
    C.  Monterey County Probation Department
    D.  Monterey County Chief Law Enforcement Officers' Association
    E.  Corrections Standards Authority
    F.  California State Parole Office
    G.  California Department of Corrections and Rehabilitation (CDCR)

4.  Courts/Legal

    A.  Monterey County Superior Court/California State Administrative Office of the Courts
    B.  Monterey County District Attorney
    C.  Public Defender
    D.  Monterey County Bar Association

5.  Monterey County Departments (particularly those providing services to the jail)

6.  Services

    A.  Monterey County Fire
    B.  Fire Departments in Monterey County
    D.  Utility Providers (e.g. gas, water, sewer, telephone, irrigation, etc.)
    E.  County Hospital
    F.  Ambulance Services

7.  Cities in Monterey County

    A.  Mayor of Salinas

8.  Media

    A.  Print Media (e.g. newspapers, magazines, etc.)
    B.  Radio
    C.  Television
    D.  Foreign Language Media

9.  Community Interests

    A.  Neighbors Adjacent to Selected Site
    B.  Service Clubs
    C.  Churches and Religious Organizations
    D.  Civil Rights Coalition (CRC)
    E.  Prisoners Rights Groups or Advocates (only those active in Monterey County)
    F.  Community Advocacy Groups (e.g. for mental health, substance abuse, literacy, etc.)

10. Monterey County Office of Education

Complaint for Damages

# Exh. 2

# Exhibit M

**DRAFT**   Review of Mental Health Services at the Monterey County Jail

December 6, 2013

Based on my review and analysis of the materials identified in this report and my review of the Monterey County correctional facilities, I have prepared the following summary of my findings regarding the mental health services at the Monterey County Jails. I would like to thank everyone that assisted by providing access to the documents needed for the review in addition to access to the jails. I also would like to thank Monterey County Sheriff Scott Miller and all of his staff for being exceptionally accommodating during my three days of visiting the jails. Additionally, Dr. Taylor Fithian, Correctional Health Services (CHS) Manager Dave Harness and the mental health clinicians provided extensive information regarding the mental health services.

**Collection of data for the report:**

I reviewed the Monterey County Correctional Facilities including the Main Jail and the Rehabilitation Center located on the campus in Salinas, California. My site visits were completed on September 25, October 4 and October 25, 2013. I interviewed Commander Jim Bass and Classification Sgt. Durham who work collaboratively with mental health staff at the jail. I additionally interviewed Deputies Pritchett and DiMaggio who routinely supervise inmates in the jail. I also interviewed Taylor Fithian, M.D., the primary psychiatrist; Elaine Finnberg, the primary psychologist; Kim Spano, Licensed Marriage and Family Therapist (L.M.F.T.) and Charlotte Gage, Licensed Psychiatric Nurse. I reviewed 23 mental health records including records of inmate-patients that were treated with antipsychotic medication, inmate-patients that refused mental health treatment, inmates evaluated for competency to stand trial, inmates that attempted or completed suicide, inmates that were placed in a Safety Cell or in the restraint chair, and inmate-patients that required housing in administrative segregation areas. I conducted six interviews with inmate-patients including four that were accepting mental health treatment and two that were refusing treatment. I additionally reviewed incident reports on suicides, suicide attempts, placement in the Safety Cells and the use of the restraint chair. I also reviewed the policies and procedures regarding Mental Health Services, Developmental Disabilities, and the use Safety Cells and the Restraint chair. I reviewed the Complaint, records of community treatment of mentally ill inmates, and deputy training programs for suicide prevention and management of inmates having problems with serious mental illness, developmental disabilities and substance use disorders.

1. Review of Intake and Receiving Screening:

- All arrestees that are accepted into the custody of the Sheriff complete an intake screening provided by Sheriff's deputies at the Main Jail. The screening officers receive specific training regarding the identification of arrestees that may present

a risk of self-harm or may require mental health evaluation or treatment. Arrestees that are determined to have a possible risk of self-harm or to require additional mental health evaluation are referred to medical staff. A registered nurse (R.N.) then evaluates the inmate and completes a form requesting mental health evaluation.

- All inmates identified as requiring a mental health evaluation are seen by a mental health clinician, usually within 24 hours on Monday through Fridays. The clinicians include Taylor Fithian, M.D., Elaine Finnberg, Ph.D., Kim Spano, L.M.F.T. and Charlotte Gage, R.N. Dr. Fithian typically sees only the inmates that are referred for additional psychiatric evaluation following an intake assessment by Charlotte Gage, R.N. However, all of the clinicians respond to urgent requests for mental health assessments of inmates.

- The mental health clinicians at the jail are available to provide urgent mental health evaluations within a brief period of time on Monday through Fridays. There are no mental health clinicians assigned to the jail on weekends although Dr. Fithian or Dr. Finnberg always would be available on call. The medical nurses respond to inmates that need mental health services on the weekend and telephone the on-call doctor for consultation. Any inmate that requires urgent services may be placed on a W&I 5150 hold and transported by deputies to Natividad Medical Center which is a short distance from the jail campus. The lack of mental health staff in the facility on weekends results in insufficient services to mentally ill inmates and is further discussed below.

- The intake screening process would be improved by several additional questions designed to increase the identification of arrestees with a potential for self-harm or a history of mental disorder.

**Recommendation:** add the following (or similar) questions to the Intake Health Screening form:
a. Have you been admitted to a hospital during the past five years? Were you ever admitted on a (W&I) 5150?
b. Have you ever had problems with depression? Are you feeling depressed now?
c. Have you ever had mental health counseling or treatment?

- Inmates are able to access mental health services through multiple routes. As noted above, many inmates are identified as possible mental health clients based on positive responses to the initial health screening questions. Healthcare staff and deputies also refer inmates based on their observations of emotions or behaviors that suggest the inmate may be able to benefit from a mental health evaluation or that suggest a risk of self-harm.

- Inmates request mental health services by completing a Health Request form or by verbally making a request to any deputy or healthcare staff. Inmates are advised how to complete a Health Request form during the booking process and

[1035449-1]

bilingual staff provide intake screening in Spanish or other languages as needed. Translation services for all languages are available from facility staff and through a telephone service.

- Health Request forms are available from nursing staff and once completed the forms are handed to any medical staff or deposited in locked boxes. These boxes also are used for grievance forms and only selected Sheriff's officers have keys to open the boxes and collect the grievances and Health Request forms. This practice requires modification since current correctional healthcare standards require that inmates have privacy of their healthcare requests. The simple solution would be to provide keys to the locked boxes to healthcare staff who would collect the Health Request forms and the grievances daily. This may require some additional time of the health care staff to separate the grievances and give them to the deputies. An alternate solution would be to add an additional locked box for Health Request forms in each pod, which also would be collected by healthcare staff. The Health Request forms are triaged daily by a registered nurse and requests for mental health services are provided to the mental health clinicians.

**Recommendation:** modify the current practice of retrieving Health Request forms from inmates to ensure that they are collected and reviewed only by healthcare staff.

- The medical nurses accept health requests that are written on anything including blank paper or scrap paper. This is a commendable practice since it facilitates the inmates' access to health services. Review of the charts indicated that written responses usually are provided to inmates within an appropriate period of time. However, several inmates complained during interviews that they did not receive responses to some of their written health requests. The current procedures lack a systematic method of auditing receipt of and responses to all inmate requests for health services. It is recommended that Correctional Health Services modify the Health Request form as follows:

**Recommendation:** It is recommended that Correctional Health Services develop a triplicate NCR form for health requests. The inmate completes the triplicate form and retains one copy before forwarding the form to nursing staff. The nurse provides a written response on the form and returns it to the inmate while retaining a copy for the health record. This system would enable the Quality Management program to audit the processing of inmate health requests and ensure timely responses to all requests.

- Mental health referrals and inmate requests for mental health services frequently are forwarded to the psychiatric nurse for a mental health intake evaluation. The psychiatric nurse dictates a note briefly summarizing the inmate's symptoms and history and formulating an initial treatment plan that may include referral to the psychiatrist or the LMFT. Review of the records confirms that the psychiatric

nurse has access to the Monterey County Behavioral Health Services system and routinely obtains relevant information by telephone and fax.

**Recommendation:** It is recommended that Correctional Mental Health Services develop a mental health intake form with a checklist to summarize the inmate-patient's symptom and treatment history, community provider(s), prior diagnoses and medications, co-occurring disorders, substance use, and history of self-harm or suicidal ideation and attempts. The intake form would ensure that all relevant information is obtained at the time of the initial contact.

- The psychiatric nurse inquires of each new inmate-patient if he or she has any recent history of taking psychiatric medications and also asks where the inmate-patient obtained the medications. The nurse then contacts the pharmacy to verify the prescription and telephones Dr. Fithian to obtain a voice order to start the medications. Review of the records indicates that this procedure is effective and inmate-patients often are started on psychiatric medications within 72 hours and sometimes within 24 hours during the week. Continuity of mental health care would be improved by modifying the current system to have nursing staff initiate psychiatric medication verification when the nurse completes the first health evaluation. Once the medications are verified the psychiatric nurse can obtain a telephone order from Dr. Fithian during the week and the medical nurse would obtain the order on weekends.

**Recommendation:** modify the current practice to have nursing staff initiate psychiatric medication verification at the time that the nurse completes the first health evaluation. This would apply to any inmate-patient that offers information regarding the pharmacy that supplies the psychiatric medication. Once a current or recent prescription is verified the psychiatric nurse can obtain a telephone order from Dr. Fithian during the week and the medical nurse would obtain the order on weekends.

- Once the psychiatric medications are ordered by Dr. Fithian the inmate-patient can begin receiving the medication. There is an onsite stock supply of the frequently used psychiatric medications and most of them are on the formulary for the facility. Non-formulary medications also can be requested by Dr. Fithian. Review of the health records indicate that inmate-patients usually begin receiving the medication on the same day it is ordered or by the following day.

- Timeliness of continuing psychiatric medications should be routinely reviewed by the Quality Management program. Overall, the current system of screening arrestees for possible mental disorders and risk of self-harm is effective and meets minimal standards for the identification of arrestees with mental disorders. However, the above recommendations are needed to ensure that mental health evaluation and treatment begins within a short period following acceptance to the jail and that psychiatric medications are verified and initiated on weekends as quickly as during the week whenever possible.

4

2.    Review of mental health treatment services:

- Mental health evaluation and treatment services are provided by a total of four mental health professionals including Taylor Fithian, M.D., Elaine Finnberg, Ph.D., Kim Spano, L.M.F.T. and Charlotte Gage, R.N. The number of mental health professionals is insufficient to meet the mental health needs of the inmates in the Monterey County Jails.

- Once an inmate has demonstrated a stable clinical status, he or she is eligible for housing in almost any of the various correctional pods or at the Rehabilitation Center. The LMFT and psychiatric nurse provide on-site outpatient therapeutic and supportive services. Dr. Fithian primarily provides psychiatric evaluation and medications and Dr. Finberg primarily provides psychological evaluations and crisis intervention.

- Inmates that display signs of an acute mental illness may be maintained in Intake until evaluated by a mental health clinician. As noted above, the mental health clinicians are not in the facility on weekends although either the psychiatrist or a psychologist is always on call. Inmates that require mental health services on weekends are evaluated by a medical nurse who then consults with the on-call psychiatrist or psychologist. The facility has the capability of transporting an inmate to Natividad Medical Center for acute psychiatric services on weekends. However, review of the records indicates that this rarely occurs and most inmate-patients remain in the jail until the mental health clinicians arrive on Monday. They may be placed in a safety cell on suicide precautions for observation until they can be evaluated by a mental health clinician. The safety cells are used excessively for this purpose and inmates may remain in the safety cell over the weekend until a clinician provides evaluation and release on Mondays. Weekend mental health coverage is insufficient to meet the multiple needs of mentally ill inmate-patients, which include timely assessments, continuation of psychiatric medications and early release from the safety cells. It is recommended that Correctional Health Services hire part-time licensed mental health clinicians to provide weekend services.

**Recommendation:** hire part-time licensed mental health clinicians to provide six to eight hours of mental health services on each Saturday, Sunday and holiday. These clinicians would provide mental health intake assessments, crisis intervention services, evaluations of inmates in the safety cells or the restraint chair and supportive counseling to seriously mentally ill inmate-patients housed in the administrative segregation pods. A total of 20 hours of additional clinician services would be sufficient to meet minimal standards for correctional mental health care. This would include 12 to 16 hours of weekend services and four to eight additional hours during the week as described below.

- Inmates identified as having impaired intellectual functioning (a developmental disability) also are screened initially by a nurse and then by a mental health

5

[1035449-1]

clinician. The classification deputy is notified of the inmate-patient's disability and provides appropriate housing to ensure safety. The regional developmental disability center is notified so that a case manager can plan to assist the inmate-patient upon return to the community.

- Inmates with psychotic symptoms that are secondary to the ingestion of a substance may be housed in a safety cell for observation and stabilization because they present an increased risk of self-harm or assault. Dr. Fithian evaluates these inmates and provides treatment with psychiatric medications as needed to stabilize their symptoms. Inmate-patients with substance-induced psychotic symptoms frequently stabilize within several days and then are housed by the classification deputy. Correctional Health Services also provides a withdrawal protocol for inmate-patients with acute alcohol or benzodiazepine withdrawal.

- The mental health clinicians collaborate with community providers of alcohol and other drug (AOD) services to ensure that inmate-patients are able to access chemical dependency treatment. Two of the AOD providers with Monterey County Behavioral Health Services are available for referrals of inmates including those with co-occurring disorders of mental illness and substance abuse. The jail also provides group AOD counseling services at the Rehabilitation Center. These services exemplify the commitment of Monterey County to provide integrated treatment for co-occurring disorders that include substance abuse and mental illness.

- Acutely mentally ill inmates are evaluated by Dr. Fithian and offered medication to stabilize their symptoms. The most commonly used psychiatric medications are available on the formulary and non-formulary medications can be ordered. Acute inmate-patients are evaluated frequently by the mental health clinicians.

- Mental health treatment is voluntary in the absence of a court order and inmate-patients that accept treatment frequently stabilize and may be housed in a general housing pod as determined by Classification. Inmate-patients that have not stabilized are usually housed in administrative segregation pods including the A and B pods for males and the R and S units for females. The psychiatric nurse provides socialization/support groups to the inmate-patients on these units when they are sufficiently stable to safely participate in a group. She provides groups in the A and B male pods during one week and to the women in the R and S units during the following week. Deputies that are familiar with the pods determine which inmate-patients are able to safely participate in the socialization groups. These groups are important to support and maintain stabilization of inmate-patients with serious mental illnesses and additional opportunities to participate would be beneficial. The Sheriff could facilitate participation by enhancing security procedures on the units. Other correctional facilities have accomplished this by welding links to the tables on the unit so that inmate-patients can be safely secured to the table with belly chains while they participate in the group. These

6

groups are voluntary and inmate-patients must be educated regarding the safety procedures before they begin participating in the groups.

**Recommendation:** it is recommended that the Sheriff collaborate with Dr. Fithian and the Correctional Health Services Manager to facilitate additional participation of inmate-patients in the socialization groups provided by the psychiatric nurse. Sheriff's administration can explore chaining the inmate-patients to a table on the unit and other methods of increasing security to facilitate additional participation. Any new construction at the jail may provide an opportunity to design a secure room for socialization groups. Some facilities have built group rooms with six individual locked cages that allow inmate-patients to safely participate in socialization groups.

- The socialization groups provide valuable opportunities for inmate-patients to receive support in addition to education about mental health treatment. The psychiatric nurse does not have sufficient time to provide weekly groups to both male and female inmate-patients in the facility. An additional total of 20 hours of licensed mental health clinician time is needed to provide sufficient services to seriously mentally ill inmate-patients as noted above. Most of these clinical hours are needed on Saturdays and Sundays when no mental health clinicians are available in the facility.

**Recommendation:** as described above, add part-time licensed mental health clinicians to provide a total of 20 additional hours of mental health services weekly, primarily on weekends. This would include six to eight hours of clinical services on each Saturday, Sunday and holiday. The additional staff would assume some of the current duties of the psychiatric nurse and allow her to provide weekly socialization/support groups for both male and female inmate-patients.

- Review of the records indicates that Dr. Fithian consistently sees inmate-patients within seven days of starting them on a psychiatric medication. The second face-to-face visit occurs within 30 days for stable inmate-patients and more frequently for those that have not stabilized. Subsequent face-to-face psychiatric evaluations occur at a minimum of every 90 days for stable inmate-patients and those who are not stable are seen more frequently. All inmate-patients are seen by a mental health clinician at least once every 30 days even if they refuse mental health treatment. Dr. Fithian's scheduling of face-to-face psychiatric evaluations meets nationally accepted minimal standards for the provision of psychiatric services to correctional inmate-patients.

- Inmates with acute mental illness may have difficulties as they attempt to communicate with an attorney during the process of developing a defense and they may be referred for evaluation of their competency to continue with legal procedures. Competency evaluations are requested by the Court and the Court often appoints Dr. Fithian and Dr. Finnberg to complete evaluations. There is a panel of psychiatrists and psychologists qualified to provide competency evaluations and the court has the option to select other examiners from the panel.

[1035449-1]

The Court frequently prefers the services of Dr. Fithian and Dr. Finnberg for these evaluations because they often are familiar with the defendants after providing them with mental health services in the jail. However, this practice fails to meet community standards for independent evaluations that avoid compromising the defendant's ability to make decisions about accepting mental health treatment in the jail. Defendants may believe that their decisions regarding accepting mental health treatment at the jail present a risk of significant consequences since a finding of incompetence by Dr. Fithian or Dr. Finnberg could result in a commitment to the state hospital. Although this practice may be favored by the Court in Monterey County it compromises the provision of impartial mental health services to inmate-patients.

**Recommendation:** it is recommended that Behavioral Health Services Manager Robert Jackson communicate to the Court that the practice of appointing Dr. Fithian and Dr. Finberg to complete competency evaluations pursuant to Penal Code 1368 is improper due to the conflict with their roles as treating mental health clinicians in the jail. Other members of the panel should be appointed to complete the competency evaluations.

- When inmates-patients are found not competent to stand trial on felony cases they are committed by the Court to a state hospital. Male inmate-patients often are committed to Atascadero State Hospital and females usually are committed to Patton State Hospital. The court commitments include orders for involuntary treatment with psychiatric medication and most inmate-patients return as competent to stand trial after they stabilize on the medications. Review of the records indicates that Dr. Fithian frequently continues the same psychiatric medications that are prescribed at the state hospital. Inmate-patients remain on a status of having court ordered treatment when they are discharged from the state hospital and they are involuntarily medicated by injection in the jail if they refuse the oral medications. The Mental Health Services program at the Monterey County Jails offers voluntary treatment to inmate-patients as they are processed through trial competency procedures and continues to provide treatment for those inmate-patients having a court order for involuntary treatment.

- Planning for continuity of care at the time of release from the jail into the community begins when the inmate is initially evaluated by the mental health clinicians. Inmates that are designated as having a Serious Mental Illness (SMI) in the community may already have a case manager at Behavioral Health Services. The psychiatric nurse contacts the case manager to advise that the client is incarcerated and to begin the process of planning for housing and continuing care at the time of the inmate-patient's release. Case managers may visit the inmate at the jail. The case manager is responsible for continuity of care at the time of release from the jail including transportation to housing and obtaining continuing psychiatric medications from the community providers. Inmates that have not stabilized at the jail may be placed on a W&I 5150 and transported to Natividad Medical Center for further evaluation and treatment. Behavioral Health Services

8

Manager Robert Jackson meets monthly with Dr. Fithian, Commander Bass and the jail mental health clinicians to review inmate-patients that have not stabilized and require additional efforts to ensure continuity of care into the community. Review of the records indicates that the current system meets minimal standards for continuity of care from the jail into the community.

- Individual supportive counseling and psychotherapy services are provided by Kim Spano, L.M.F.T., based primarily on the acuity of the inmate-patient. She uses a brief intervention model with a focus on supporting the inmate-patient's coping skills. She provides crisis intervention services in the jail as needed and she assists inmate-patients that are suffering from insomnia, anxiety, depression or stress. The inmate interviews and the record review indicated that inmate-patients consistently find her therapeutic services very helpful as they manage the multiple stresses of incarceration. It was noted that most of her therapeutic interventions are brief, which allows her to respond to a substantial number of inmates that are requesting mental health services.

- Although the inmate-patients housed in the administrative segregation units have insufficient socialization opportunities with other inmates the availability of contact with mental health clinicians meets the nationally accepted minimal standards of mental health care for inmates housed in administrative segregation units.

**Recommendation:** it is recommended that the Sheriff adopt a policy of having Classification review the status of mentally ill inmates housed in administrative segregation at least once monthly to determine if the inmate can be moved to less restrictive housing.

- The Monterey County Case Management Team meets monthly to review inmate-patients who require additional supportive services. The committee includes the Jail Commander, the Behavioral Health Services Manager (Robert Jackson), Dr. Fithian, two chemical dependency case managers and the jail mental health clinicians. The meetings focus on behavior management, treatment and continuity of care problems and the Team develops strategies to assist the inmate-patients with improving their impulse control and to encourage acceptance of mental health treatment. The Commander provides briefings regarding the behavior management plans to the lieutenants, sergeants and deputies responsible for supervising inmate-patients in the jail. The functioning of this committee evidences a collaborative relationship between the Sheriff's staff, Correctional Mental Health Services and the community Behavioral Health Services program.

- The Mental Health Services team provides medically necessary evaluation and treatment services to inmate-patients with acute mental illnesses. As inmate-patients stabilize with treatment they become eligible for housing in less restrictive environments where they continue to receive mental health services. The treatment system is effective, and the addition of 20 hours of mental health

9

clinician time primarily on weekends will ensure that it meets nationally accepted minimum standards of correctional mental health care. All of the mental health clinicians that were interviewed displayed substantial enthusiasm for providing high quality care to the inmate-patients. Review of the records and interviews with the inmate-patients indicate that they mostly feel respected by the mental health staff and usually are satisfied with the mental health services provided.

3.   Review of the Suicide Prevention Program:

- CHS and the Sheriff's staff deserve commendation for many positive aspects of the current Suicide Prevention Plan. Any inmate that mentions suicidal ideation or displays overt signs of possible suicide risk is placed in a safe area until he or she is evaluated by a nurse or by mental health staff. Review of the records indicates a reasonably rapid response by nurses and mental health clinicians to any inmate requiring an assessment for risk of suicide. The nurses and the clinicians often recommend that the inmate be placed in a safety cell on suicide precautions and the Sheriff's deputies invariably comply with the recommendations.

- Review of the suicide prevention training materials and logs of deputy training indicates that the Sheriff maintains a commitment to ensuring that the officers receive appropriate training to help them identify and refer inmates that may present a risk of self-harm or suicide, in addition to training to help them understand and manage mentally disordered inmates. It was noted that suicide prevention training to deputies has been somewhat repetitive over the past few years and a novel training program would be beneficial by providing additional information and skills.

**Recommendation:** it is recommended that the Sheriff collaborate with Dr. Fithian and the other mental health clinicians to add the "On Your Watch" training package to the annual STC training for deputies. The package is available from the California Institute for Mental Health (CIMH) in Sacramento at a cost of less than $50. The contact person at CIMH is Gloria Hurd at 916-379-5326. The training package includes videos of suicidal inmates that can be used to promote discussion and role-playing regarding how to identify and talk to potentially suicidal inmates.

- Identification of inmates that may be at risk of self-harm begins at Intake when the booking deputy questions the arrestee and refers those with possible risk signs to the medical nurse. The screening questionnaire contains two questions designed to identify arrestees with thoughts of self-harm or a history of suicidal behavior. Three additional questions are recommended as noted above. Any arrestee with a positive response to the self-harm questions is evaluated by a medical nurse who subsequently makes a referral to the licensed mental health clinicians. The nurses also receive annual training to help them identify signs of potential self-harm and they consistently referred inmate-patients to the mental health clinicians for further evaluation. There is no formal plan for encouraging

10

[1035449-1]

inmates to report observations of other inmates in their housing area that may suggest potential self-harm or suicide risk.

**Recommendation:** it is recommended that the Sheriff collaborate with Dr. Fithian and the other mental health clinicians to develop a plan to encourage all inmates to report observations of other inmates that suggest a possible risk self-harm. The plan may include an information sheet that describes risk signs and suggests ways to report observations to the deputies.

- Any deputies or Correctional Health Services licensed staff can initiate placement of an inmate displaying signs of potential self-harm in a Safety Cell at the Main Jail. There are five Safety Cells in the Intake area. One additional Safety Cell located in the female section of the jail was not available for use at the time of the site visit. The Safety Cells are padded and contain only a hole in the floor to be used as a toilet. Flushing is controlled externally. The Safety Cells that were inspected at the time of the site visit were sufficiently clean to meet minimal acceptable standards. However, review of the records indicates recurrent complaints by inmates that they were placed in safety cells that were filthy and smelled of feces. Since Correctional Health Services assumes significant responsibility for placing, monitoring and evaluating inmate-patients in the Safety Cells, it is recommended that the Quality Management Team develop a plan for routine audits of safety cell hygiene and complaints, and collaborate with Sheriff's staff to ensure complete decontamination of the cells following each use.

**Recommendation:** it is recommended that the CHS Quality Management Team monitor problems with the Safety Cells and collaborate with Sheriff's administration to ensure that sufficient cleaning and decontamination occurs following each use.

- Inmates in the Safety Cells are provided Safety garments by policy. Inmate interviews and review of the records indicated that there were recurrent complaints that some inmates were naked in the safety cell for many hours prior to receiving the safety gown. One inmate complained that he was naked for 16 hours before receiving the safety garment. Even if the claim was exaggerated there is no justification for an inmate to be placed in a safety cell without a safety garment. Inmates in safety cells also require a safety blanket that can be folded to provide padding for sleep and a second safety blanket as needed for warmth. Failure to provide these basic necessities may increase the inmate's feelings of despondency and suicidal intent.

**Recommendation:** it is recommended that the Sheriff modify the Safety Cell Log to add a section for required documentation of the time at which a safety gown is provided to the inmate and also the times at which one or two safety blankets are provided as needed. Safety sleeping bags can be utilized in lieu of the safety blankets.

11

- Inmates in Safety Cells are checked every 15 minutes by deputies. The checks are documented on logs. Review of the Safety Cell logs indicated that many deputy checks were out of compliance with the required frequency of two every 30 minutes. Some logs document delays of an hour or more between checks. This presents an increased risk of inmate self-harm in addition to a potential liability for the Sheriff.

**Recommendation:** it is recommended that the Sheriffs Administration develop a corrective action plan to ensure that safety cell checks occur twice every 30 minutes as required by the Sheriff's policy.

- Inmates in Safety Cells also are evaluated by CHS staff and mental health clinicians and their observations are noted in the health record in addition to documentation of their checks on the Safety Cell Log. Review of the logs indicated that nursing and mental health evaluations occurred within the time frames required by policy. Continued suicide watch in the Safety Cell beyond 24 hours must be approved by Dr. Fithian or Dr. Finnberg. Review of the logs indicated that most inmates were removed from suicide watch and from the safety cell within 72 hours.

- The use of safety cells for suicide watch at the Monterey County Jail is excessive. In most other correctional facilities, safety cells are used only for inmates that are acutely suicidal. Review of the records indicates that many of the inmates placed on suicide watch in a safety cell reported suicidal ideation but were not acutely suicidal. It is recommended that Correctional Health Services and the Sheriff's Administration collaborate to develop a suicide prevention plan that minimizes use of the safety cells for suicide watch.

- Recommended modifications of the Suicide Prevention Plan: the current plan provides a comprehensive response to inmates that verbally express suicidal ideation or display self-harm behavior. However, the most lethal suicidal inmates usually say nothing about their suicidal thinking and are cautious to avoid any verbalizations that might suggest to others that they are planning to suicide. These inmates often can be assessed for risk of suicide by using a comprehensive suicide risk assessment form. An example is provided in Appendix A. The suicide risk assessment form ensures that relevant factors have been considered and allows the mental health clinician to determine that the inmate presents a minimal, moderate or high risk of suicide. High risk inmates can be placed in a safety cell if there are indications of acute suicide risk such as statements that the inmate plans to hang or cut himself. High risk inmates that are not determined to be acutely suicidal by the mental health clinicians can be placed in an administrative segregation cell that is stripped of any items that might be used for self-harm such as bedding, clothing, shaving or writing instruments. The inmate must be provided with a safety gown and two safety blankets to provide sufficient padding for sleep in addition to adequate warmth. Safety sleeping bags that are remarkably tear

12

resistant also are made specifically for this purpose and they provide sufficient warmth and padding in addition to being washable. Hourly checks of high risk inmates can be logged by the deputies and evaluations of the inmate by nursing and mental health clinicians can be documented at least once on their respective shifts. The mental health clinicians would reduce the inmate from high risk to moderate risk based on their evaluations and clinical judgment in addition to consultation with Dr. Fithian or Dr. Finnberg if indicated. The addition of weekend mental health clinicians as recommended above will allow assessment of inmate-patients on Saturdays and Sundays and a capability of reducing their risk level and enabling early release from the safety cell.

- CHS and the Sheriff's Administration can collaborate to develop additional protocols for housing and monitoring inmates that are determined by the mental health clinicians to present a low or moderate risk of suicide. Minimal risk inmates may require no more than monthly mental health checks and housing with other inmates, or housing where they can be monitored if they are not able to share a cell. Moderate risk inmates would require weekly mental health checks and housing that allows increased monitoring by deputies or at least increased communication with deputies on a regular basis.

**Recommendation:** it is recommended that the Sheriff and CHS collaborate to develop protocols for housing and monitoring inmates that present a minimal, moderate or high risk of suicide as described above. It is also recommended that the mental health clinicians complete a suicide risk assessment form for each inmate at the time of the initial evaluation and at subsequent evaluations if there are indications of any modification of risk factors. It is recommended that Correctional Health Services develop a program for training deputies and CHS staff on the use of the updated suicide prevention protocols.

- Inmates that have been on a moderate or high level of suicide precautions while incarcerated require an additional evaluation by a mental health clinician prior to being released to the community. Suicide risk levels are ideally identified in the Sheriff's computer, which facilitates appropriate housing of these inmates and also alerts the release officer that the inmate requires a mental health screening prior to being released. An alternative would be to identify the risk level with color-coded jackets that are used to contain hard copies of required custody documentation. The mental health clinicians can reassess the inmate for suicide risk at the time of release and make appropriate referrals to resources as indicated by the needs of the inmate. Any inmate that presents a high risk of suicide at the time of release may be placed on a W&I 5150 for further evaluation and treatment at Natividad Medical Center.

- Inmate-patients that display self-harm or assaultive behavior may be placed in the restraint chair, which requires approval by a facility Sergeant. The restraint chair is authorized for continued restraint up to two hours and additional approval is required to continue beyond two hours with documentation of the reason for

continued restraint. The Sheriff appropriately limits use of the restraint chair to a maximum of six hours and there was no indication in the records that the chair was used longer than six hours. The records also document infrequent use of the restraint chair and no indication of any other type of restraints other than routine cuffs and belly chains. The nurse and any on-site mental health clinicians are notified as soon as inmate is placed in the chair and nurses provide a medical check within a brief period of time. Mental health assessment is provided as needed. The deputies are required to monitor the inmate-patients while in restraints and document their observations twice every 30 minutes. Review of the records indicated that inmates frequently are removed from the restraint chair by the end of the initial two-hour time frame or prior to the end of the second two hours if the restraint approval is renewed.

4.   Review of the Health Records:

- A total of 23 mental health records were reviewed. The records were selected for review based on the following categories: inmate-patients with a serious mental illness that refuse treatment, inmate-patients with a serious mental illness that accept treatment, inmate-patients that attempted or completed suicide within the past three years, inmate-patients that have been involuntarily medicated via court ordered treatment pursuant to P.C. 1370, inmate-patients that were involuntarily medicated due to emergency conditions, inmate-patients that were placed in Safety Cells and inmate-patients that were placed in the restraint chair. The health records were sufficiently thorough to meet minimal standards of documentation of correctional mental health services. Documentation of the reasons for continued retention in the safety cell was marginally adequate. There was sufficient CHS documentation of required nursing and mental health checks of inmate-patients placed in Safety Cells, and the restraint chair.

- The records contained signed consents for mental health treatment for inmates that were accepting voluntary treatment. The records contained sufficient problem lists to assist with the coordination of services for co-occurring medical, chemical dependency and mental health disorders. Progress notes consistently were signed and there were individualized treatment plans for inmate-patients receiving mental health services. There is evidence that the mental health clinicians obtain prior treatment records when appropriate and also coordinate continuity of care with community mental health providers. The health records meet nationally accepted minimal standards for documentation of mental health services.

- A strong quality improvement program is critical to the development of effective correctional mental health services. Correctional Health Services maintains a Quality Management (QM) program that includes evaluations of several aspects of mental health services. The QM program has completed audits of important indicators of successful functioning of the mental health program including the response time for inmate-patients to receive mental health evaluations and to start

14

their psychiatric medications following intake. There is evidence that action plans resulting from chart audits and system reviews are improving the quality of mental health services and it can be anticipated that additional QM activities will continue to advance the quality of care.

- The QM plan also includes a peer review component with an annual review of the psychiatrist services by an independent psychiatrist that is not associated with Monterey County services. The QM program meets nationally accepted minimal standards for quality improvement review of mental health services.

Summary

The Mental Health Services program at the Monterey County correctional facilities has mental health clinicians who demonstrate substantial expertise and a commitment to provide quality mental health care. As noted above, the mental health service suffers from understaffing and would benefit by the addition of part-time clinicians to provide an additional 20 hours of mental health services primarily on weekends. Inmate-patients in need of mental services are identified through multiple resources and most receive timely services from professional mental health clinicians that are providing high quality care. The administrative and line staff of Monterey County Sheriff Scott Miller deserve commendation for providing substantial support of the mental health services in addition to maintaining a professional level of communication that ensures effective problem solving. There is evidence of extensive collaboration between Correctional Health Services and Sheriff's deputies to provide sufficient services despite limited staffing as noted above. This report contains multiple recommendations for improving the quality of the mental health services and CHS will need to provide training for updated protocols in addition to monitoring the effectiveness of the modifications through the Quality Management program. It is my opinion that implementation of the recommendations in this report will ensure that the mental health services at the Monterey County correctional facilities meet all nationally accepted standards of care for correctional mental health programs.

Respectfully submitted,

Richard Hayward, Ph.D.
Clinical and Forensic Psychology
California License #PSY 4972

15

# Appendix A

## Suicide Prevention Assessment Form

Name_____        DOB_____

AKA_____        ID#_____

| QUESTIONS | YES | NO |
|---|---|---|
| 1.  Do you have serious problems that worry you? | | |
|      Serious health or money problems? | 1 | 0 |
|      Family or relationship problems (children, parents, significant other)? | 1 | 0 |
|      Problems in the jail? Other serious problems (drugs/alcohol) | 1 | 0 |
| 2.  Have you experienced any of the following in the past year? | | |
|      Loss of relationship? | 1 | 0 |
|      Loss of job or income? | 1 | 0 |
|      Loss of housing? | 1 | 0 |
|      Death in the family? | 1 | 0 |
| 3.  Have you ever seriously considered suicide? | 1 | 0 |
|      Are you thinking of killing/harming yourself now? | 1 | 0 |
|      What do you think you might do? | | |
|      Lethal plan or refuses to answer _____ | 2 | 0 |
| 4.  Have you ever tried to kill yourself? | 2 | 0 |
|      Were you hospitalized? | 1 | 0 |
|      Has anyone in your family committed suicide? | 1 | 0 |
| 5.  Do you have communication with friends? Family? | 0 | 1 |
|      Will anyone visit you in jail? | 0 | 1 |
|      Will family/friends put money in your account? | 0 | 1 |
| 6.  What are your plans for the future? (Prison or no plans = 1) | 0 | 1 |
|      Will you have employment, school or financial resources? | 0 | 1 |
|      Do you have a place to live?  Chemical dependency program? | 0 | 1 |
| 7.  Signs of depression: | | |
|      Withdrawn, sad, tearful, psychomotor retardation, other _____ | 1 | 0 |
|      Does not want to talk; halting or slowed speech | 1 | 0 |
|      Feels hopeless | 3 | 0 |
| 8.  Signs of psychosis or impaired reality contact: | | |
|      Agitated, responds to internal stimuli or is pressured | 1 | 0 |
|      Delusional or paranoid thoughts or bizarre thoughts/behavior | 1 | 0 |
| 9.  Charges are serious | 1 | 0 |
|      Charges include murder, attempted murder, rape, kidnapping, mayhem, | | |
|      child molest, domestic violence or other serious offenses | 2 | 0 |
|      Charges involve a child/minor or family member | 1 | 0 |

| QUESTIONS | YES | NO |
|---|---|---|
| 10. What will (or has) happen to you if convicted? | | |
| Expect sentence of at least 90 days? | 1 | 0 |
| Expect to be sent to prison? | 1 | 0 |
| Expect more than 3 years? | 1 | 0 |
| 11. Arresting/transporting officer reports that: | | |
| Arrestee may be at risk of self-harm/suicide | 1 | 0 |
| Arrestee made suicide threat | 1 | 0 |
| 12. Inmate is under the influence of alcohol and/or drugs | 2 | 0 |
| 13. Inmate anticipates problems with withdrawal | 2 | 0 |
| 14. Inmate is dependent on alcohol and/or drugs | 2 | 0 |
| 15. Inmate has a position of respect in the community | 1 | 0 |
| 16. Inmate feels embarrassed, ashamed or humiliated | 2 | 0 |
| 17. Inmate is anxious, afraid or angry | 1 | 0 |
| 18. Inmate is impulsive or unable to cope with jail (e.g. first arrest) | 1 | 0 |
| 19. Inmate has significant health problems | 1 | 0 |
| 20. Prior records suggest suicide risk | 1 | 0 |
| 21. Inmate has history of mental health treatment or counseling | 2 | 0 |
| 22. Inmate has a serious mental disorder | 2 | 0 |
| 23. Inmate is male = 2    female = 0 | 2 | 0 |
| Total Points | | |

Suicide risk level is determined by clinical evaluation of the inmate. A higher number of points suggests a higher risk level. Protective factors such as supportive relationships and positive future plans may reduce the risk level. Assign a higher risk level if you are unable to obtain sufficient information to complete the assessment. The risk level can be reduced when you acquire additional information that indicates a lower risk.

No Precautions          Minimal Risk          Moderate Risk          High risk          Acute risk

Comments:

Clinician: _____   Date: _____

17

[1035449-1]

Complaint for Damages

Exh. 3



**ROSEN BIEN
GALVAN & GRUNFELD LLP**

315 Montgomery Street, Tenth Floor
San Francisco, California 94104-1823
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Gay Crosthwait Grunfeld
Email: ggrunfeld@rbgg.com

April 15, 2013

<u>VIA FEDEX</u>

| | |
|---|---|
| The Honorable Scott Miller<br>Sheriff<br>County of Monterey<br>1414 Natividad Road<br>Salinas, California 93906 | The Honorable Fernando Armenta<br>Monterey County District 1 Supervisor<br>168 West Alisal, 2nd Floor<br>Salinas, California 93901 |
| The Honorable Louis R. Calcagno<br>Monterey County District 2 Supervisor<br>Castro Plaza<br>11140 Speegle Street<br>P.O. Box 787<br>Castroville, California 95012 | The Honorable Simon Salinas<br>Monterey County District 3 Supervisor<br>168 West Alisal, 3rd Floor<br>Salinas, California 93901 |
| The Honorable Jane Parker<br>Monterey County District 4 Supervisor<br>2616 1st Avenue<br>Marina, California 93933 | The Honorable Dave Potter<br>Monterey County District 5 Supervisor<br>Monterey Courthouse<br>1200 Aguajito Road, Suite 1<br>Monterey, California 93940 |

Re:   Remedying the Illegal Conditions in the Monterey County Jail
      <u>Our File No. 1187-6</u>

Dear Sheriff Miller and Monterey County Supervisors:

We write on behalf of prisoners housed in Monterey County Jail ("the Jail").
Rosen Bien Galvan & Grunfeld LLP and the Monterey County Public Defender's Office
have been investigating the conditions in the Jail for some time. Though our
investigation is still ongoing, we have already identified serious violations of federal and
California law.

The County of Monterey ("the County") and the Monterey County Sheriff's
Office (the "Sheriff's Office"), through their operation of the Jail, violate the civil rights

685239-9

The Honorable Scott Miller
Monterey County Supervisors
April 15, 2013
Page 2

of prisoners by failing to provide reasonable accommodations to prisoners with
disabilities, by failing to operate an adequate medical and mental health care system, and
by failing to protect prisoners from violence and injury at the hands of other prisoners.
The illegal conditions prevailing at the Jail are the direct result of the County's
inadequate policies and practices. In particular, the County refuses to take common
sense, cost-effective, safety enhancing steps to ameliorate the overcrowding in the Jail,
which is a root cause of many of the violations of federal and state law we have
identified.

The conditions in the Jail cause very real harm to the more than 1100 prisoners in
the Jail. From a deaf signer who has been repeatedly denied sign language interpretation
in medical and due process settings to mentally ill prisoners forced to spend time in
revolting rubber rooms covered with feces to an extremely ill prisoner whose
colonoscopy has been poorly handled to a mobility impaired prisoner who has failed to
receive adequate medical care and accommodations for the nerve injury he sustained
when he was attacked by another prisoner, to a prisoner with serious mental health and
medical issues (including diabetes, bone cancer, and fibromyalgia) who has not once
been evaluated by a doctor in the six weeks she has been at the Jail, the conditions of the
Jail and the harm they cause shock the conscience.

At the conclusion of this letter, we propose a framework for remedying the
conditions in the Jail and avoiding the expense and delay of protracted litigation. If,
however, the County does not agree by May 16, 2013 to a framework for resolving the
grave problems described below, we will have no choice but to file a lawsuit to protect
the rights of prisoners in the Jail.

## I.      The Jail Fails to Provide Adequate Accommodations to Prisoners with
Disabilities Under Federal and State Law

Our investigation has uncovered widespread violations of Title II of the
Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act, the
California Disabled Persons Act, California Government Code § 11135, and relevant
regulations interpreting those laws. *See* 42 U.S.C. § 12131 *et seq.*; 29 U.S.C. § 794; 28
C.F.R. § 35.101 *et seq.*; Cal. Civ. Code § 54 *et seq.*; Cal. Gov't Code § 11135. The ADA
and similar laws apply with full force to all correctional facilities, including the Jail. *See,
e.g., Pierce v. County of Orange*, 526 F.3d 1190, 1214 (9th Cir. 2008) (citing *Pa. Dep't
of Corr. v. Yeskey*, 524 U.S. 206, 209-10 (1998)). Put simply, the County lacks policies
and practices necessary to ensure the accommodation of prisoners with disabilities, and,
as a result, routinely discriminates against prisoners with disabilities in violation of state
and federal law.

The Honorable Scott Miller
Monterey County Supervisors
April 15, 2013
Page 3

To begin with, the Jail does not adequately screen incoming prisoners to determine whether they have disabilities that require accommodations. In addition, the Jail does not maintain a central list, electronic or otherwise, of prisoners with disabilities and the accommodations they require. *See Armstrong v. Davis*, 275 F.3d 849, 876 (9th Cir. 2001) (prison system's lack of disability tracking system violates the ADA). The Jail's failure to identify and track prisoners with disabilities contributes to pervasive violations of prisoners' rights under federal and state disability laws.

The Jail has no mechanism for providing notice to prisoners of their rights under the ADA, as required by federal regulation. *See* 28 C.F.R. § 35.106. The Jail also lacks an adequate grievance procedure for prisoners to request accommodations while incarcerated, as required by 28 C.F.R. § 35.107(b). Prisoners have reported problems obtaining grievance forms, which are controlled by staff. Our interviews with prisoners and review of custody files indicate that even when prisoners are able to submit a grievance about disability-related issues, they frequently receive delayed or incomplete responses or no response at all.

The Jail routinely fails to provide accommodations to prisoners with hearing, vision, speech, and other impairments that affect communication. *See* 28 C.F.R. § 35.160. Specifically, the Jail rarely, if ever, provides prisoners with sign language interpreters, hearing aids, or other auxiliary aids to ensure that prisoners with disabilities can effectively communicate with custody and medical staff. This failure to ensure effective communication affects access to nearly every program and service offered by the Jail, including the booking process, telephones, disciplinary proceedings, religious services, recreational programs, medical and mental health care, and educational and vocational programs. For example, at a medical appointment for a hearing impaired prisoner who primarily communicates using American Sign Language, medical staff not only refused his request for a sign language interpreter, but also refused the prisoner's alternative request to communicate using written notes. Instead, the staff member forced the prisoner to read lips, which the prisoner is unable to do, leaving him unable to understand most of what the staff member conveyed during the medical visit and placing the prisoner at a significant risk of misdiagnosis and harm. This same prisoner was also found guilty of a disciplinary infraction and sanctioned at a hearing in which he was unable to effectively participate because he was denied a sign language interpreter.

In the course of the investigation, we learned that the Jail, in violation of 28 C.F.R. § 35.152, frequently fails to provide prisoners with disabilities with safe and accessible housing. Only a few areas of the Jail have accessible showers and toilets. The Jail lacks adequate policies and practices to ensure that prisoners who require such facilities are placed and retained in these accessible housing units. For example, a wheelchair-bound

The Honorable Scott Miller
Monterey County Supervisors
April 15, 2013
Page 4

prisoner who was assigned to a housing unit that lacked toilets and showers with grab
bars fell repeatedly trying to take care of his basic needs and hygiene. Moreover, the
exercise yard for the Rotunda, all of the Pods, the clinic, and the Women's Section of the
Jail can only be accessed by traveling up one long flight and then down a shorter flight of
stairs. The Jail routinely houses prisoners with mobility impairments in these units even
though these architectural barriers deny such prisoners access to the yard.

The Jail often refuses to provide assistive devices—including but not limited to
wheelchairs, walkers, crutches, canes, braces, tapping canes, hearing aids, and pocket
talkers—to prisoners with disabilities. Without such accommodations, prisoners are
unable to move around the Jail and access the Jail's programs and services, in violation of
the ADA. *See* 28 C.F.R. § 35.130. As an example, one prisoner, who required, but was
denied, a wheelchair, was forced to have other prisoners carry him to and from the toilet
and shower.

The Jail's woefully inadequate program for accommodating prisoners with
disabilities not only denies prisoners access to programs and services, it threatens their
safety and well-being. Prisoners with unidentified and unaccommodated disabilities are
at greater risk of harm in the case of emergencies, including fires, alarms, and
earthquakes. Such prisoners are also at increased risk of exploitation by other prisoners
as a result of their need to rely upon other prisoners for assistance to access basic
services.

## II.     The Jail Fails to Provide Adequate Health Care to Prisoners

The Eight and Fourteenth Amendments to the United States Constitution and
Article I, Sections 7 and 17 to the California Constitution, require the County to provide
adequate health care to all prisoners in the Jail. *Estelle v. Gamble,* 429 U.S. 97, 104
(1976); *see also In re Alva*, 33 Cal. 4th 254, 291 (2004). Our investigation has uncovered
distressing evidence of a manifestly unconstitutional health care system, in which the
County is deliberately indifferent to the medical and mental health care needs of its
prisoners.[1]

---

[1] It is our understanding that the County contracts with California Forensic
Medical Group ("CFMG") to provide medical and mental health care to prisoners in the
Jail. The County is nonetheless liable for all constitutional violations suffered by
prisoners, whether those violations were caused by County personnel or employees of
CFMG. *West v. Atkins*, 487 U.S. 42, 56 (1988).

The Honorable Scott Miller
Monterey County Supervisors
April 15, 2013
Page 5

"A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society." *Brown v. Plata*, 131 S. Ct. 1910, 1928 (2011).

### A.    Inadequate Mental Health Care

The County violates prisoners' rights under the federal and state constitutions by failing to provide adequate mental health care. The minimum elements of a constitutional mental health system are:

> (1) a systematic program for screening and evaluating inmates to identify those in need of mental health care; (2) a treatment program that involves more than segregation and close supervision of mentally ill inmates; (3) employment of a sufficient number of trained mental health professionals; (4) maintenance of accurate, complete and confidential mental health treatment records; (5) administration of psychotropic medication only with appropriate supervision and periodic evaluation; and (6) a basic program to identify, treat, and supervise inmates at risk for suicide.

*Coleman v. Brown*, S-90-520 LKK/JFM, 2013 U.S. Dist. LEXIS 50900, at *55-56 (E.D. Cal. Apr. 5, 2013) (quoting *Coleman v. Wilson*, 912 F. Supp. 1282, 198 n.10 (E.D. Cal. 1995), *citing Balla v. Idaho*, 595 F. Supp. 1558 (D. Idaho 1984)).

The mental health care system in Monterey County Jail falls far short of these minimum standards. The Jail's screening and evaluation processes fail to identify numerous prisoners with serious mental illness. From our interviews and review of custody and medical files, it appears that mental health care treatment in the Jail consists almost entirely of medication. Therapy, on either a group or individual basis, is nearly non-existent. Contrary to law, prisoners with mental illness are segregated from the general population and placed in the A and B Pods for men and the R and S Pods for women. Prisoners in these Pods are frequently denied access to programs and services—including day room access and yard—from which other prisoners benefit. Though medication constitutes the primary mechanism of treatment in the Jail, all medications, including psychotropic medications, are provided to prisoners in an inconsistent manner; medications are frequently changed or discontinued without medical justification.

Most troublingly, the Jail's program for supervising prisoners at risk of suicide is patently deficient. Among the most shocking discoveries is the Jail's regular placement of prisoners in mental health care crisis (and for that matter, prisoners who are simply

The Honorable Scott Miller
Monterey County Supervisors
April 15, 2013
Page 6

misbehaving) in "rubber rooms." These "rubber rooms," which lack any furniture or features save for a grate in the floor which serves as the toilet, are punitive, anti-therapeutic, disgusting, and inhumane. The floors (on which prisoners sleep, urinate, and defecate) and walls of the "rubber rooms" are frequently covered in feces.

The shortcomings in the Jail's mental health care system have had tragic consequences. Over the past three years, there have been two completed and more than a dozen attempted suicides. The rate of completed suicides at the Jail significantly exceeds the national average for local jails.

In addition, many prisoners in the Jail suffer from obvious, untreated psychiatric problems. One prisoner, who had been found incompetent to stand trial because of his mental illness, did not receive any medications for his first 10 days in the Jail; as a result, he became depressed and began to hear voices. Another prisoner simply asked to see a mental health clinician, and was placed naked in a rubber room for a significant period of time. Other prisoners we interviewed were floridly psychotic during our meetings and clearly were not receiving adequate mental health care treatment.

## B.   Inadequate Medical Care

The County routinely and systemically violates the federal and state constitutional rights of prisoners by failing to provide minimally adequate medical care.

The Jail's screening process is inadequate for identifying prisoners with serious and chronic medical issues; as a result, many prisoners receive no treatment for serious conditions for significant periods of time (if ever) after being booked into the jail. Even when the Jail identifies a new prisoner with chronic or serious medical concerns, the Jail frequently refuses to continue the prescribed treatment the prisoner was receiving. In particular, the Jail employs a remarkably punitive "detox protocol" for prisoners who arrive at the Jail, refusing to provide prisoners with pain medication prescribed by their outside doctors. *See Hamilton v. Endell*, 981 F.2d 1062, 1066-67 (9th Cir. 1992), *abrogated in part on other grounds by Ford v. Ramirez-Palmer (Estate of Ford)*, 301 F.3d 1043, 1045 (9th Cir. 2002) (deliberate indifference to ignore outside doctors without medical justification). Prisoners placed on the "detox protocol" suffer from intense, untreated pain as well as powerful, dangerous, and unnecessary withdrawal symptoms.

The Jail also has a systemic practice of delaying necessary treatments until prisoners are released in order to avoid the expense of treatment. This is particularly true when the care required by a prisoner involves referral to an outside medical provider.

The Honorable Scott Miller
Monterey County Supervisors
April 15, 2013
Page 7

These and other practices violate established precedent governing adequate medical care. *See LeMarbe v. Wisneski*, 266 F.3d 429, 440 (6th Cir. 2001).

Prisoners have difficulty requesting assistance through the sick call procedure, and often experience substantial delays before being seen by an appropriate medical provider. *See Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982) (medical care is deficient when prisoners are unable to make their needs known to medical and mental health care staff). As a result, medical issues often go untreated for weeks or months. *See Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (deliberate indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment") (quotation marks and citations omitted). It is our understanding that the inability of patients to be seen in a timely manner is both a product of the Jail's overcrowding (discussed below) as well as the County's refusal to hire sufficient health care workers. *See Anderson v. Atlanta*, 778 F.2d 678, 685-89 (11th Cir. 1985) (deliberate indifference where insufficient number of medical professionals employed to provide care).

When prisoners are able to meet with medical staff, staff routinely fail to address the prisoners' concerns or fail to provide care when care is medically indicated. *See Jett*, 439 F.3d at 1098 (deliberate indifference where correctional facility refused to provide medically indicated treatment).

These policies and practices have resulted in significant harm to numerous prisoners. We are aware that the Jail has been prone to several outbreaks of infectious disease, including scabies, measles, and staph infections. At least three prisoners with colostomies did not receive appropriate supplies or follow-up treatment, including reversal procedures, while at the Jail. Prisoners who arrive at the Jail with serious chronic medical issues, including ulcerative colitis, a rare stomach fungus, and high blood pressure, consistently reported delays or lack of appropriate treatment. Other prisoners reported that the Jail was refusing to provide them with prescribed medications, some of which the prisoners had been taking for years to manage chronic issues. Many prisoners described patently insufficient treatment for traumatic injuries; for example, one prisoner, who had his collar bone fractured by a Jail deputy, received no treatment for his injury other than an ice pack for four days. Another prisoner received no treatment for vaginal bleeding that occurred for two months. A number of prisoners received grossly inadequate treatment after being released from the hospital back to the Jail.

685239-9

The Honorable Scott Miller
Monterey County Supervisors
April 15, 2013
Page 8

### III.     The Jail Fails to Protect Prisoners from Harm

Pursuant to the Eighth and Fourteenth Amendments of the U.S. Constitution and Article I, Sections 7 and 17 of the California Constitution, the County must "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1970). The County violates the constitutional rights of inmates because it "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847.

Prisoners housed in Monterey County Jail face a constitutionally unacceptable risk of violence from other prisoners. Our review of Monterey County Jail Incident Reports for January 2011 to September 2012 indicates that scores of prisoners are attacked and injured by other prisoners. Most of the incidents require medical attention for at least one of the participants, either at the Jail or the local hospital. These incidents occur in almost every area of the Jail, including housing units, the kitchen, infirmary, and visiting area. Violent incidents take place among male prisoners and female prisoners at approximately the same rate. Jail staff almost never intervene to stop incidents of prisoner violence before they are complete. Moreover, in many cases, Jail staff never identify the assailants.

Rather than take steps to mitigate the risk of violence, Jail officials, through their deliberate policy choices, create the environment in which violence flourishes. The County has elected to operate the Jail with an insufficient number of officers, accepting the risk that its staff will not be able to monitor and protect all prisoners. As is discussed in more detail below, the Jail is extraordinarily overcrowded, which makes it considerably more difficult for the County to protect prisoners from violence. The Jail itself is a patchwork of makeshift spaces, thrown together to keep up with Monterey's fast-growing Jail populations. Consequently, throughout the housing units and other spaces, there are numerous blind spots where staff cannot safely monitor prisoners. And finally, the Jail does not adequately classify and assign prisoners to housing locations in the Jail where they will be safe from injury and violence. Prisoners who are incompatible, including because of rival gang memberships and/or histories of assaultive behaviors, are regularly housed together in the Jail.

### IV.     The County Refuses to Utilize Available Solutions to Reduce Overcrowding in the Jail

Each of the constitutional and statutory violations discussed above are caused, at least in part, by the severely overcrowded conditions in the Jail. As the United States Supreme Court has explained:

685239-9

The Honorable Scott Miller
Monterey County Supervisors
April 15, 2013
Page 9

> Crowding ... creates unsafe and unsanitary living conditions that hamper
> effective delivery of medical and mental health care.... Cramped
> conditions promote unrest and violence, making it difficult for prison
> officials to monitor and control the prison population.... [O]vercrowding
> may prevent immediate medical attention necessary to avoid suffering,
> death, or spread of disease.... Living in crowded, unsafe, and unsanitary
> conditions can cause prisoners with latent mental illnesses to worsen and
> develop overt symptoms. Crowding may also impede efforts to improve
> delivery of care.

*Plata*, 131 S. Ct. at 1933-34 (citations omitted).

These conditions prevail in the Jail; as Monterey County Civil Grand Jury concluded, "[t]he County Jail is suffering a condition of gross overcrowding." The Jail has a rated capacity for 829 prisoners, but has in the recent past housed as many as 1200 prisoners, nearly 150 percent of capacity. Some areas of the Jail are considerably more overcrowded than the Jail as a whole, especially in the Women's Section.

County officials have repeatedly acknowledged the severity of the Jail's overcrowding problem. For many years now, Monterey County has applied on a monthly basis to the Superior Court for the County of Monterey for an order to release prisoners on an accelerated basis pursuant to California Penal Code section 4024.1. To support the applications, the former Chief Deputy Sheriff for the County has sworn on multiple occasions that unless the Jail is able to release some inmates, the overcrowding in the Jail would "compromise[] the inmate classification plan as well as the safety and security of the detention facilities." In support of the applications, Dr. Taylor Fithian, Director of CFMG, "advised that the excessive number of inmates housed in the Jail compromises the health of the inmates and the staff working at the facility." As recently as late 2012, Sheriff Miller stated that "[o]vercrowding has been a serious problem at the jail for many years, creating a dangerous situation for inmates, jail staff and the community."

Despite the profound and persistent overcrowding, the County has not availed itself of all opportunities to reduce the Jail population. In particular, the County fails to utilize any form of pre-trial risk assessment for all but a handful of detained defendants, refuses to expand capacity for its existing work release program for sentenced individuals, and has failed to investigate opportunities for collaboration between agencies to expand its capacity to supervise individuals on mandatory community supervision as part of a split sentence. If the County used these policies and programs to reduce the Jail's census, the population in the Jail would quickly fall below the Jail's rated capacity without harm to public safety.

685239-9

The Honorable Scott Miller
Monterey County Supervisors
April 15, 2013
Page 10

Instead, the County has unwisely decided to try building its way out of its
overcrowding problem. In the fall, the County announced plans to expand the Jail at a
cost of more than $40 million; this project will not be completed until 2017 at the earliest.
And most recently, Sheriff Miller announced that the County was planning to send as
many as 50 prisoners to be housed in Alameda County Jail because the Monterey County
Jail is too overcrowded; this program will cost a minimum of $1.5 million annually.
These proposed expenditures amount to a needless waste of public funds. Moreover,
they will do little to alleviate the illegal conditions in the existing Jail facilities.

**V.      Framework for Ameliorating the Illegal Conditions in the Jail**

The violations of state and federal law we have identified must be remedied, and
the unnecessary suffering of prisoners in the Jail must come to an end. To achieve that
end without the need for costly and protracted litigation, we propose entering into an
enforceable agreement with certain minimum criteria.

First and most importantly, the agreement would provide for a process of retaining
mutually agreeable neutral experts to review the Jail's practices with respect to
accommodations for prisoners with disabilities, medical and mental healthcare,
overcrowding, and violence. Within 120 days of the appointment of the experts, they
would issue reports proposing standards and remediation for conditions found to be
below the minimum federal and state standards.

Second, at the same time that the experts are reviewing Jail policies and practices,
county officials must agree to engage in serious efforts consistent with law and public
safety to reduce crowding at the jail, including implementing pre-trial services and
alternatives to incarceration for the individuals who present the lowest risk and stand to
benefit significantly from accessing employment, education, substance abuse treatment,
and other services only available in the community. The county should also investigate
the possibility of utilizing split sentencing to a greater extent. These and other measures
would be expected to reduce the jail population significantly over the next six to nine
months.

Third, the settlement process must ultimately result in a settlement agreement filed
with the court and over which the court retains continuing jurisdiction. The agreement
would require that the County, where necessary to comply with state and federal law,
revise policies and procedures, implement a system for quality control, and permit
outside monitoring of conditions.

The Honorable Scott Miller
Monterey County Supervisors
April 15, 2013
Page 11

      Please let us know as soon as possible whether the County is open to pre-litigation discussions consistent with this letter. If we do not agree on a framework for resolution by May 16, 2013, we will have no choice but to file a complaint seeking declaratory and injunctive relief to ameliorate the illegal conditions in the Jail.

Very truly yours,

ROSEN BIEN                          MONTEREY COUNTY OFFICE OF
GALVAN & GRUNFELD LLP               THE PUBLIC DEFENDER

/s/ Gay Crosthwait Grunfeld         /s/ James Egar

By: Gay Crosthwait Grunfeld         By: James Egar

GCG:amc
cc:    (by Federal Express)
        Charles J. McKee, County Counsel
        Manuel Real, Chief Probation Officer

685238-9

Complaint for Damages

# Exh. 4

1  MICHAEL W. BIEN – 096891
   GAY C. GRUNFELD – 121944
2  VAN SWEARINGEN – 259809
   MICHAEL FREEDMAN – 262850
3  SARAH P. ALEXANDER – 291080
   ROSEN BIEN
4  GALVAN & GRUNFELD LLP
   315 Montgomery Street, Tenth Floor
5  San Francisco, California  94104-1823
   Telephone:   (415) 433-6830
6  Facsimile:   (415) 433-7104
   Email:       mbien@rbgg.com
7                ggrunfeld@rbgg.com
                 vswearingen@rbgg.com
8                mfreedman@rbgg.com
                 spalexander@rbgg.com
9
10 JAMES EGAR – 065702
   Public Defender
11 DONALD E. LANDIS, JR. – 149006
   Assistant Public Defender
   OFFICE OF THE PUBLIC DEFENDER
12 COUNTY OF MONTEREY
   111 West Alisal Street
13 Salinas, California  93901-2644
   Telephone:   (831) 755-5806
14 Facsimile:   (831) 755-5873
   Email:       EgarJS@co.monterey.ca.us
15                LandisDE@co.monterey.ca.us

   ALAN SCHLOSSER – 049957
   MICAELA DAVIS – 282195
   AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION OF NORTHERN
   CALIFORNIA, INC.
   39 Drumm Street
   San Francisco, California  94111-4805
   Telephone:   (415) 621-2493
   Facsimile:   (415) 255-8437
   Email:       aschlosser@aclunc.org
                mdavis@aclunc.org

   ERIC BALABAN*
   CARL TAKEI*
   ACLU NATIONAL PRISON PROJECT
   915 15th Street N.W., 7th Floor
   Washington, D.C.  20005-2302
   Telephone:   (202) 393-4930
   Facsimile:   (202) 393-4931
   Email:       ebalaban@npp-aclu.org
                ctakei@npp-aclu.org

   *Admitted Pro Hac Vice

16  Attorneys for Plaintiffs

17

18              UNITED STATES DISTRICT COURT

19            NORTHERN DISTRICT OF CALIFORNIA

20

21  JESSE HERNANDEZ et al., on behalf of       Case No. CV 13 2354 PSG
    themselves and all others similarly situated,
22                                              **DECLARATION OF PABLO
                 Plaintiffs,                    STEWART IN SUPPORT OF
23                                              PLAINTIFFS' MOTION FOR
         v.                                     CLASS CERTIFICATION**
24
    COUNTY OF MONTEREY; MONTEREY                Judge:   Hon. Paul S. Grewal
25  COUNTY SHERIFF'S OFFICE;                    Date:    June 3, 2014
    CALIFORNIA FORENSIC MEDICAL                 Time:    10:00 A.M.
26  GROUP, INCORPORATED, a California           Crtrm.:  5, 4th Floor
    corporation; and DOES 1 to 20, inclusive,
27                                              Trial Date:    None Set
                 Defendants.
28

[1140784-7]

1    I, Pablo Stewart, declare:

2       1.    I am a board-certified psychiatrist and Clinical Professor in the Department

3   of Psychiatry at the University of California, San Francisco.  My curriculum vitae is

4   attached hereto as **Exhibit A**.  I have more than 25 years of experience in correctional

5   mental health care, including serving as the court's expert in class action cases challenging

6   the provision of mental health care to prisoners.

7       2.    I have been asked to provide my opinion regarding the policies and practices

8   of the County of Monterey, the Monterey County Sheriff's Office, California Forensic

9   Medical Group ("CFMG"), and their agents as they relate to the provision of mental health

10  care to prisoners in Monterey County Jail (the "Jail").

11      3.    In order to prepare this report, I have reviewed the following materials:

12          a.    Plaintiffs' Second Amended Complaint

13          b.    Draft Review of Mental Health Services at the Monterey County Jail,

14  Dr. Richard Hayward, Ph.D., Dec. 6, 2013

15          c.    Monterey County Jail Health Care Evaluation, Dr. Mike Puisis, D.O.,

16  Nov. 29, 2013

17          d.    Rule 26 Report, Michael Hackett, Dec. 9, 2013

18          e.    The CFMG Staffing Plan for Monterey County

19          f.    All declarations submitted by named plaintiffs in support of Plaintiffs'

20  Motion for Class Certification

21          g.    Inmate Daily Count Sheets from January 1, 2013 to March 13, 2013

22          h.    California Forensic Medical Group, Inc., Policy and Procedure

23  Manual, Monterey County Adult Detention Facility

24          i.    Monterey County Sheriff's Office, Custody Operations, Policies and

25  Procedures

26          j.    Minutes, Quality Assurance/Peer Review Committee Meeting,

27  Monterey County Jail & Juvenile Hall Medical Services, Oct. 28, 2010

28

[1140784-7]

1    k.  Minutes, Quality Assurance/Peer Review Committee Meeting,

2 Monterey County Jail & Juvenile Hall Medical Services, Jan. 27, 2011

3    l.  Letter from Gay Grunfeld, Plaintiffs' counsel, to Dr. Hayward, Dec.

4 20, 2013

5    m.  Initial Response to Feedback to Draft of Review of Mental Health

6 Services at the Monterey County Jail, Dr. Hayward, Jan. 17, 2014

7    n.  Letter from Michael Philippi, Deputy County Counsel, Monterey

8 County, to Dr. Hayward, Jan. 13, 2014

9    o.  Letter from Gay Grunfeld to Dr. Hayward, Feb. 11, 2014

10    p.  Email from Susan Blitch, Senior Deputy County Counsel, Monterey

11 County, to Dr. Hayward, Feb. 11, 2014

12    q.  Applications by the Monterey County Sheriff's Office pursuant to

13 California Penal Code § 4024.1

14    r.  ADA Assessment & Review, Monterey County Jail, SZS Consulting,

15 Nov. 30, 2013, Appendix

16    s.  Redacted documents related to the suicide of Daniel Lariviere,

17 including the Coroner Report, July 25, 2011; Monterey County Postmortem Examination,

18 July 11, 2011; Toxicology Report, July 19, 2011; Monterey County, Office of the Sheriff,

19 Crime/Incident Reports and Supplements, July 8, 2011; Safety Cell Log, July 5, 2011;

20 Classification Inmate Intake Screening Questionnaire, July 5, 2011; Intake Health

21 Screening form, July 5, 2011; and Pre-Booking Sheet, July 5, 2011

22    t.  Documents (some redacted) related to the suicide of Jessie Crow,

23 including the Coroner Report, August 30, 2010; Monterey County Postmortem

24 Examination, August 11, 2010; Toxicology Report, August 13, 2010; and documents from

25 Mr. Crow's medical file

26    u.  Redacted incident reports related to the suicide of Joshua Claypole

27    v.  Incident reports from September 1, 2012 to March 2014 involving

28 suicide attempts

1       4.      My opinions set forth below are based upon the documents and other

2   evidence listed above and on my professional knowledge and my experiences working in

3   correctional settings.

4       5.      This case is still in a very early stage.  I am informed that the parties have not

5   yet exchanged any formal discovery.  For example, I have not conducted any inspection of

6   the Jail facilities, I have not interviewed any staff or prisoners, and I have only reviewed a

7   small number of records for the named plaintiffs.  As a result, I have not been able to form

8   opinions regarding certain elements of the mental health care system at the Jail.  For

9   example, at the present time, I do not have access to the information necessary to form

10   opinions regarding whether Defendants maintain appropriate medical records.  I would

11   expect to consider this and other issues not addressed in this report in the future once

12   Plaintiffs propound discovery.  Based upon the documents and information I have

13   reviewed, however, I am able to offer the following preliminary opinions.  I reserve the

14   right to supplement or modify these opinions as more information becomes available.

15       6.      From my preliminary review, it is my opinion that the mental health care

16   program at the Jail is not sufficient to meet prisoners' serious mental health needs and

17   needlessly places prisoners in the Jail at a substantial risk of serious harm.  The serious,

18   system-wide problems with the mental health care system at the Jail include the following:

19       •   Defendants fail to staff the Jail with sufficient mental health, medical, and

20           custody staff to deliver timely and appropriate mental health care to

21           prisoners with serious mental illness.

22       •   Defendants' intake processes are inadequate, in that they fail to adequately

23           identify prisoners with mental illness booked into the Jail and also fail to

24           appropriately continue care that prisoners were receiving in the community.

25       •   Defendants lack an effective and timely mechanism for prisoners to request

26           mental health care services.

27       •   Defendants fail to appropriately and safely manage and monitor the

28           administration of psychotropic medication.

[1140784-7]

3

- Defendants do not offer adequate group and individual therapy to prisoners with serious mental illness.

- Defendants lack adequate policies and practices for transferring prisoners who require higher level inpatient or crisis care to facilities that can meet prisoners' serious mental health needs.

- Defendants, pursuant to policy, house prisoners with the most serious mental illness in restrictive administrative segregation units that aggravate prisoners' mental health and deny prisoners access to programs and services in the Jail.

- Defendants lack an adequately functioning suicide prevention program; expose acutely suicidal prisoners to unnecessarily harsh conditions in safety cells that exacerbate prisoners' suicidality and inhibit prisoners from coming forward with suicidal feelings; fail to adequately observe prisoners placed on suicide watch; and have a higher than average suicide rate.

- Defendants' quality improvement program is inadequate to ensure Defendants identify and fix systemic problems.

- Additionally, the Jail is overcrowded, which magnifies the negative effects of each of the problems listed above.

7.    As I discuss below, it is my opinion that, collectively and individually, these problems place all prisoners at a substantial risk of serious harm. Any prisoner, whether they enter the Jail with a diagnosed mental illness or not, may develop symptoms of mental illness while in the Jail. This is especially true given the harsh, overcrowded conditions in the Jail. And any prisoner with mental illness in the Jail is endangered by Defendants' problematic policies and practices, which do not ensure that prisoners receive timely, appropriate, and effective mental health care. Consequently, all prisoners, not just prisoners with diagnosed mental illness, are placed at great risk of serious harm by Defendants' deficient mental health care system.

**Defendants' Insufficient Staffing of Mental Health Care Clinicians, Medical Clinicians, and Custody Staff Affects All Prisoners With Serious Mental Illness.**

8.      From the information I have reviewed, it is my opinion that the County and CFMG do not employ sufficient mental health care, medical, and custody staff to ensure prisoners receive mental health care in a timely and appropriate manner. Defendants' understaffing affects all prisoners in the Jail, especially those who have serious mental illness.

9.      The number of mental health care clinicians employed at the Jail is not adequate to deliver mental health care to prisoners in the Jail. As part of the contract for CFMG to provide medical, mental health, and dental services to prisoners at the Jail, Defendants developed a staffing plan for the Jail. Pursuant to the staffing plan, CFMG employs three staff members who provide mental health services to prisoners: a Psychiatrist who works 15 hours a week, a Licensed Clinical Social Worker/Psychologist/Marriage and Family Therapist who works 20 hours a week, and a psychiatric registered nurse who works 40 hours per week. *See* Grunfeld Decl., Ex. H. According to the staffing plan, collectively there are 1.88 Full-time Equivalent ("FTE") positions for mental health care staff at the Jail.

10.      Dr. Richard Hayward, Ph.D., was jointly retained by the parties to conduct an evaluation of the mental health care system at the Jail. In his draft report summarizing his findings, Dr. Hayward indicated that he was informed that CFMG employs four employees to provide mental health treatment to prisoners: Dr. Taylor Fithian, a psychiatrist who works about 25 hours a week in the Jail, Dr. Elaine Finnberg, Ph.D., a psychologist who works 20 hours per week in the Jail, Charlotte Gage, R.N., a registered nurse who works 40 hours per week at the Jail, and Kim Spano, L.M.F.T., a licensed marriage and family therapist who works 40 hours per week. *See* Grunfeld Decl., Ex. O, at 4. According to Dr. Hayward, collectively there are 3.125 FTE positions for mental health care staff at the Jail.

11.      Regardless of whether the Defendants staff the Jail at the level indicated in

DECL. OF PABLO STEWART ISO PLS.' MOTION FOR CLASS CERTIFICATION

[1140784-7]

1   the staffing plan agreed to by CFMG and the County or at the level indicated in

2   Dr. Hayward's report, the number and type of clinical staff in the Jail are not sufficient for

3   a jail the size of Monterey County Jail. In his draft report, Dr. Hayward described a

4   shortage of mental health care clinicians and the risks the shortage poses to prisoners. He

5   found that CFMG needed to add an additional 0.5 FTE staffing for a mental health

6   clinician in addition to the psychiatrist and psychologist "to provide a minimally adequate

7   level of mental health services …" at the Jail. *See id.* Dr. Hayward found that the

8   additional staff is necessary for Defendants to "provide mental health intake assessments,

9   crisis intervention services, evaluations of inmates in the safety cells or the restraint chair

10  and supportive counseling to seriously mentally ill inmate-patients housed in the

11  administrative segregation pods." *See* Grunfeld Decl., Ex. M, at 5.

12          12.     Dr. Hayward also identifies as a problem that there are *no* mental health

13  care clinicians on site at the Jail on weekends and holidays. *See id.* at 2, 5. One

14  consequence of this staffing deficiency is that prisoners who require acute psychiatric

15  services on weekends remain in the Jail, largely untreated, until the mental health

16  clinicians arrive on Monday. My review of the declaration for Plaintiff Brandon Mefford,

17  a prisoner who Defendants knew suffered from serious mental illness, indicates that this is

18  exactly what happened to him. He was identified as being in mental health crisis on a

19  Friday afternoon at about 3:00 P.M. Over the weekend, Plaintiff Mefford was not seen by

20  any mental health care staff and was housed in a safety cell (sometimes being placed in a

21  restraint chair with belly chains and a helmet) or a booking cell. He was not seen by a

22  mental health clinician until Monday. This lack of qualified mental health staff on-site on

23  weekends poses a serious risk to prisoners who are suicidal. Any prisoners, newly booked

24  or otherwise, who present with any mental health needs on a Friday, Saturday, or Sunday

25  will be at risk for deterioration of his or her condition and needless suffering over the

26  weekend without mental health care staffing. Accordingly, I agree with Dr. Hayward that

27  the understaffing of mental health clinicians at the Jail results in inadequate mental health

28  care services for prisoners in the Jail.

1    13.    In order to provide minimally adequate mental health care to prisoners in the

2  Jail, Defendants will, for the following reasons, need to add significantly more than 0.5

3  FTE mental health clinicians to the staff.

4    14.    To begin with, Dr. Hayward's recommendation for additional staffing did

5  not include a relief factor.  *See* Grunfeld Decl., Ex. O, at 4.   A relief factor indicates how

6  many FTEs it takes to fill a position, taking into account the inevitable absences of

7  employees for vacation, sickness, leave, and training.  Any evaluation of staffing that does

8  not include a relief factor necessarily underestimates the minimum amount of necessary

9  staff.

10    15.    More importantly, Dr. Hayward's recommendation appears to be based upon

11  an under-estimation of the needs of prisoners for mental health care services.  Dr. Hayward

12  explained that Defendants house prisoners with the most serious mental illness in

13  administrative segregation: A and B Pods for men, and R and S Pods for women.  *See*

14  Grunfeld Decl., Ex. M, at 6.  He also explained that his staffing recommendation was

15  based on the Jail needing to provide socialization groups to those prisoners once per week

16  for one hour.  *See* Grunfeld Decl., Ex. M, at 7.  It is my opinion that one hour of structured

17  out-of-cell time once per week for prisoners who are "not stabilized" falls far below the

18  standard of care and is insufficient to provide adequate psychiatric therapy to prisoners

19  who have serious mental illness.  Dr. Hayward's estimate for additional needed staff does

20  not take into account the need for significantly greater group therapy offerings necessary to

21  meet the standard of care.

22    16.    It is my opinion that Defendants also do not staff the Jail with sufficient

23  medical staff, placing all prisoners, including prisoners with serious mental illness, at risk

24  of significant harm.  Dr. Mike Puisis, who evaluated the quality of medical care provided

25  in the Jail as a joint expert for the parties, found that the staffing pattern for providing

26  medical care in the Jail "is not capable of accomplishing all assigned duties …."  Grunfeld

27  Decl., Ex. J, at 7; *see id.* at 3 ("Staffing is inadequate.").  According to Dr. Hayward, the

28  mental health care staff at the Jail relies heavily on medical staff for a number of critical

1  tasks, including, but not limited to, screening of prisoners with mental illness during the

2  intake process, distributing psychiatric medications, verifying prescriptions for psychiatric

3  medications, attending to prisoners in acute psychiatric distress on weekends and holidays,

4  and processing and routing requests for mental health care treatment.  *See* Grunfeld Decl.,

5  Ex. M, at 1-4.  The shortages of medical providers identified by Dr. Puisis would

6  necessarily have an impact on the ability of prisoners to receive timely, adequate mental

7  health care in the Jail.

8        17.     It is my opinion that Defendants also do not staff the Jail with sufficient

9  custody staff to ensure the timely delivery of appropriate mental health care, which affects

10  all prisoners in the Jail.  Each of the experts who reviewed staffing found that custody

11  staffing was insufficient to complete all necessary tasks.  Dr. Hayward found that custody

12  staff frequently failed to make required safety checks of prisoners in safety cells twice

13  every thirty minutes, as required by Sheriff's Office and CFMG policies, a deficiency

14  possibly caused by lack of sufficient staff.  *See id.* at 12.  Dr. Puisis concluded that custody

15  staffing in the Jail was insufficient to adequately facilitate the provision of medical care to

16  prisoners.  *See* Grunfeld Decl., Ex. J, at 3 ("Because there are limitations with respect to

17  officers transporting inmates for their scheduled appointments, officer staffing should be

18  evaluated along with medical staffing.").  Michael Hackett, who evaluated the safety in the

19  Jail as a joint expert for the parties, also concluded that custody staffing at the Jail was

20  inadequate in a number of respects.  *See generally* Grunfeld Decl., Ex. I, at ¶¶ 3.1-.14.  In

21  addition, TRG Consulting, who produced a Jail Needs Assessment for the County and

22  Sheriff's Office in December 2011, also found that the Jail employed nowhere near enough

23  custody staff to, among other things, "provide medical care … and move inmates within

24  the facility."  Second Am. Compl., Ex. B (Dkt. No. 41), at EX. 6.

25        18.     These custody staffing shortages create serious problems for all prisoners.

26  For example, many of the named plaintiffs were unable, at some point during their time in

27  the Jail, to receive needed medical treatment because of the unavailability of custody staff.

28        19.     In my experience, mental health care staff members in correctional settings

1   rely upon custody staff to assist in the provision of mental health care to prisoners. Among

2   other critical tasks, custody staff members escort prisoners to and from mental health care

3   treatment and monitor prisoners with mental illness in administrative segregation and in

4   safety cells. Custody staff is also responsible for supervising prisoners on the exercise

5   yard, in the day room, and for other programs and activities. The shortages of custody

6   staff identified by Drs. Puisis and Hayward and by Mr. Hackett and TRG Consulting

7   necessarily impede the delivery of mental health care and the provision of other activities.

8   It is thus my opinion that the Jail's failure to employ sufficient custody staff to ensure that

9   prisoners with mental illness receive the care that they require affects all prisoners at the

10   Jail.

11       20.     Without more information regarding the incidence and acuity of mental

12   illness in the Jail population, I cannot provide a recommendation regarding the quantity of

13   additional mental health care and medical clinicians and custody staff necessary to provide

14   adequate mental health care to prisoners in the Jail. I am, however, confident that, as

15   found by Dr. Hayward, Defendants currently do not staff the Jail with sufficient mental

16   health clinicians to ensure that prisoners receive the mental health treatment they require. I

17   am also confident that Dr. Hayward's estimate—that an additional 0.5 FTE for mental

18   health clinicians would result in minimally adequate mental health care staff—is too low,

19   likely by a significant amount.

20       21.     Lack of sufficient mental health, medical, and custody staff inevitably has a

21   negative impact on the quality and quantity of the mental health care delivered to

22   prisoners. An understaffed facility, and particularly one that appears to be as understaffed

23   as the Jail, is simply not capable of providing all of the mental health care services that

24   prisoners require. The problems caused by understaffing are exacerbated by the

25   overcrowding in the Jail, which I discuss below. As a result of the lack of sufficient

26   mental health, medical, and custody staff at the Jail, all prisoners with, or who may

27   develop, mental illness, are placed at serious risk of substantial harm.

28

**Defendants Fail to Adequately Identify Prisoners with Mental Illness During the Intake and Booking Process, and Thereby Fail to Continue Providing the Care Prisoners Were Receiving in the Community and/or Fail to Provide Care Prisoners Require When They Arrive at the Jail.**

22.     One of the most important functions of a jail mental health care system is to ensure that newly booked prisoners quickly receive the mental health care services they require.  For prisoners who were receiving mental health treatment up to the time of their arrest, a jail must identify the nature of the person's mental illness, the types of treatments they were receiving in the community, and ensure such treatment is continued unless a provider makes a reasonable clinical determination to discontinue or change treatment following a face-to-face assessment of the patient.  For prisoners who were not receiving treatment in the community, a jail must determine whether the person suffers from mental illness and devise an appropriate treatment plan.  The Jail's intake process fails to ensure that necessary mental health treatment is continued or initiated.

23.     Any failure to quickly diagnose new prisoners' mental illnesses, identify their community mental health treatment (if any), and devise an appropriate treatment plan for their time in the Jail, can have devastating consequences.  As is discussed more fully below, prisoners with mental illness who are introduced to a Jail environment are, for a number of reasons, at a heightened risk of suicide; any delay in identifying such prisoners and mitigating that risk can result in self-harm and attempted or completed suicide.  In addition, and as is also discussed more fully below, for those prisoners who were taking psychotropic medications in the community, any interruption of medication can cause a prisoner to mentally decompensate, may result in a permanent worsening of their underlying mental illness, and may make future treatment more difficult and potentially less efficacious.

24.     The intake process is also important for ensuring that prisoners are placed in appropriate jail housing.  Prisoners with unstable mental illness should be placed into housing units capable of addressing their mental health needs.  And prisoners who are at risk of suicide must be placed in suicide-safe housing, in which suicide hazards have been

1   eliminated and where there is increased observation.  The Jail's intake process fails to

2   ensure that mentally ill prisoners are appropriately housed after intake.

3         25.    The policies and practices at the Jail for identifying newly-booked prisoners

4   with mental illness and ensuring they receive appropriate treatment and housing are

5   inadequate in a number of respects.  Pursuant to Sheriff's Office and CFMG policy, the

6   process of identifying prisoners with mental illness and their mental health needs occurs in

7   three steps.  First, during the booking process, custody staff completes an Intake Health

8   Screening form for all prisoners.  Second, for prisoners identified as receiving psychiatric

9   medications, medical staff is supposed to conduct an Intake Triage Assessment

10   immediately.  And third, if medical staff refers a patient for a psychiatric evaluation, a

11   psychiatrist is supposed to assess the prisoner within five to seven days.  Each of these

12   steps is deficient in ways that expose prisoners to substantial risk of serious harm.

13         26.    Both the Intake Health Screening form and the custody officers who

14   complete it are inadequate for the task.  Though the form does include some questions

15   about prisoners' mental health, Dr. Hayward found it was insufficient to capture adequate

16   information regarding prisoners with mental illness. As Dr. Hayward explains, the form

17   should, but does not, include questions regarding whether the prisoner has ever been

18   hospitalized at a psychiatric facility in the past five years, whether the prisoner ever has

19   been or is currently depressed, or has ever had mental health counseling or treatment. *See*

20   Grunfeld Decl., Ex. M, at 2.  I agree with Dr. Hayward's recommendations.

21         27.    Dr. Puisis, in his report, concluded that the Intake Health Screening process

22   "does not provide for accurate or appropriate medical intake screening and therefore does

23   not protect incoming detainees from harm."  Grunfeld Decl., Ex. J, at 15.  He found that

24   the "responsibilities placed upon correctional officers … are well beyond their ability to

25   perform" and that the officers were not properly trained for the function. *Id.*  He

26   recommended that, for a jail the size of Monterey County Jail, all screening be conducted

27   by nurses. *See id.*  I agree with Dr. Puisis.  Having custody staff conduct initial health care

28   screenings is ineffective and dangerous.  Prisoners with mental illness, many of whom also

1   have co-occurring substance abuse problems, are frequently reluctant to provide truthful

2   information to correctional officers, especially before the charges against them have been

3   resolved.  Having non-medical, poorly-trained staff conduct initial healthcare evaluations

4   places all prisoners, especially those with mental illness, at risk of harm.

5        28.    At this first stage of the intake process, Dr. Puisis also observed that custody

6   staff members make decisions regarding whether to place prisoners in sobering or safety

7   cells. *See* Grunfeld Decl., Ex. J, at 19-20.  Dr. Puisis found that the officers making these

8   decisions "are not trained to identify persons at risk for withdrawal, to evaluate persons

9   who appear to be intoxicated, or to make medical decisions with respect to isolation for

10  this purpose.…  The altered mental status of alcoholism or drug withdrawal can mask

11  serious injury or other medical conditions." *Id.* at 20.  Dr. Puisis recommended that these

12  decisions should be made "by medical professionals not custody officers." *Id.*  And he

13  concluded that the current practice "places detainees at risk for harm." *Id.*

14       29.    I agree with Dr. Puisis.  As he correctly states, substance intoxication and/or

15  withdrawal can mask serious injury or other medical conditions.  These conditions also

16  heighten the risk of suicide.  It is particularly difficult to identify prisoners with mental

17  illness in the context of substance intoxication and withdrawal.  For that reason, medical

18  and mental health screening should be conducted by properly trained medical or mental

19  health care staff.

20       30.    At the first step, Dr. Puisis also found that Defendants lack any policy to

21  govern the housing of prisoners with mental illness. *See* Grunfeld Decl., Ex. J, at 13.  This

22  systematic deficiency places all prisoners at risk by increasing the likelihood (1) that a

23  prisoner with mental illness is housed in an inappropriate setting that increases the

24  prisoner's risk of suicide or decompensation or (2) that the prisoner with mental illness is

25  involved in a conflict with other prisoners or staff while experiencing a behavioral

26  disturbance secondary to his or her inadequately treated mental illness.

27       31.    The second step of the intake process, the Intake Triage Assessment, is

28  conducted by medical staff at the Jail.  Dr. Puisis found that during the Intake Triage

1   Assessment, medical staff significantly under-identifies chronic diseases, including

2   tuberculosis, hypertension, diabetes, and asthma, among newly-booked prisoners. *See*

3   Grunfeld Decl., Ex. J, at 17-19. If medical staff similarly under-identifies prisoners with

4   mental illness, and therefore fail to refer them to mental health care staff, it would also

5   place prisoners at risk of harm. Dr. Hayward indicated that this does occur in the Jail. *See*

6   Grunfeld Decl., Ex. N, at 5 (asking Dr. Hayward if there were "any prisoners who suffered

7   from mental illness at the time of intake but who were not identified as having mental

8   illness"); Grunfeld Decl., Ex. O, at 2 (responding that "some inmates were not identified as

9   having a mental illness until sometime following their intake").

10       32.    In order to reach the third step of the mental illness identification process,

11  prisoners must be referred by medical staff to see mental health care staff. According to

12  Dr. Hayward, mental health care staff is available for urgent mental health care referrals

13  during the week, but are not available over the weekends or on holidays. *See* Grunfeld

14  Decl., Ex. M, at 2. This staffing deficiency, discussed above, places all prisoners at risk.

15  It also appears, at least with respect to the suicide of Daniel Lariviere, discussed below,

16  that mental health evaluations do not always occur in a timely manner during the week.

17       33.    According to Dr. Hayward, even when prisoners get to see mental health

18  care staff for an initial evaluation, clinicians do not use any standardized mental health

19  intake form to summarize a prisoner's "symptom and treatment history, community

20  provider(s), prior diagnoses and medications, co-occurring disorders, substance use, [or]

21  history of self-harm or suicidal ideation and attempts." *Id.* at 4. As I discuss further

22  below, mental health care staff also does not utilize any comprehensive suicide risk

23  assessment tool to evaluate prisoners' risk of suicide. These lack of standardized practices

24  place prisoners at risk.

25       34.    It also appears that Defendants do not identify and continue needed mental

26  health care treatment for prisoners who were receiving care in the community. Any

27  disruption of psychiatric medications can be dangerous for a number of reasons. First,

28  individuals who take prescribed medication to control their mental illness often

1   decompensate if their medication is interrupted. This can lead to increased symptoms and

2   risk of suicide. Second, a disruption of prescribed psychiatric medication can actually

3   exacerbate the underlying mental illness by altering brain physiology and causing an

4   expansion of foci in the brain of the condition at issue. This is called the "kindling

5   phenomenon." Finally, because disruption of medication can cause a worsening of the

6   underlying condition, it can also make it more difficult to treat the metal illness.

7        35.    For all of these reasons, it is important that Defendants minimize the

8   disruption in receipt of prescribed psychotropic medications. One of the most important

9   means for accomplishing this task is to quickly obtain outside pharmacy records for

10  prisoners to confirm their prescriptions and dosages. This process does not appear to

11  function properly, especially on weekends. Dr. Hayward found that only mental health

12  care staff members, not medical staff, initiate requests for pharmacy records for prisoners

13  with mental illness. *See id.* at 4. Because of the lack of mental health care staff on site

14  during the weekends, Defendants do not even begin the process of obtaining mental health

15  care records for prisoners booked on Fridays and weekends until the following Monday.

16  *See id.* This can result in significant disruptions in the receipt of prescribed psychotropic

17  medications, which creates the risks I describe above.

18       36.    Dr. Puisis found that Defendants' policies and practices for continuing

19  medications begun prior to incarceration are fundamentally flawed. Troublingly, he found

20  that "if a detainee does not remember the name of his medication or if the health staff can

21  not verify a prescription of medication at a local pharmacy, no medication is provided even

22  when medication is medically necessary." Grunfeld Decl., Ex. J, at 23. Dr. Puisis also

23  found that Defendants lack an adequate process for physician intervention for when staff

24  cannot verify outside medical records. *See id.* at 13. He concluded that "[b]ased on chart

25  reviews, it appears that MCJ is systematically denying necessary medication to patients

26  with chronic disease." *Id.* at 23. Similar failures with respect to continuing psychiatric

27  treatment for prisoners newly-booked into the Jail would place prisoners at serious risk of

28  harm.

37.     The problems identified by Dr. Puisis are likely caused by serious deficiencies and lack of clarity in the policies regarding continuation of medications prescribed prior to incarceration.  There appear to be two policies that might govern the provision of psychotropic medications to prisoners newly arrived at the Jail.  First, CFMG policy includes a list of medications that can be continued prior to being seen by a mid-level provider or a physician in the sick call process.  *See* Grunfeld Decl., Ex. G, at 371.  Psychotropic medications are not on this list of medications.  This means it is critically important that a process exist to ensure prisoners on psychotropic medications have immediate access to a prescribing provider.  This is not, however, the case.  CFMG has a second, more specific policy, entitled "Psychotropic Medications," which sets forth the procedure for continuing psychotropic medications.  *See id.* at 361.  It states that "[n]o psychotropic medications shall be unilaterally discontinued without consultation with the facility physician or psychiatrist."  *Id.*  But it then explains that no prisoner will receive psychotropic medications until staff requests their outside psychiatric records and they are seen by a psychiatrist at the Jail.  The policy only requires that the prisoner be seen by the psychiatrist within 5-7 days of booking.  As I read the policy, this means that, at best, even a prisoner who brings his medication to the Jail and for whom the Jail immediately verifies his prescriptions, will suffer, at a minimum, a five day interruption in medication.  As I discuss above, a five day interruption of medication can cause very serious problems.  This policy for continuing prescriptions for psychotropic medications begun prior to incarceration places prisoners at a substantial risk of serious harm.

38.     Defendants also appear to engage in a very dangerous detoxification process for prisoners who arrive at the Jail intoxicated or with a history of drug or alcohol abuse.  Individuals suffering alcohol or benzodiazepine withdrawal are at increased risk of seizures.  Most antipsychotic medications lower the seizure threshold.  Consequently, it is clinically appropriate to remove a person experiencing alcohol or benzodiazepine withdrawal from antipsychotic medications they are taking for up to 72 to 96 hours for alcohol withdrawal and up to a week depending on the type of benzodiazepine.  After that

1   time, it is safe and appropriate to restart the antipsychotic medications.  As far as I am

2   aware, alcohol and benzodiazepine withdrawal present the only circumstances where, as

3   part of a detoxification process, it is clinically appropriate to temporarily remove a prisoner

4   from antipsychotic medications.  There is no medical reason to remove people from

5   psychotropic medications as part of the detoxification process from opiates or

6   psychostimulants.

7          39.     From my limited review, however, it appears that Defendants utilize a

8   punitive, medically contraindicated detoxification process for some prisoners that involves

9   removing them from all psychotropic medications for 90 days or longer.  For example, my

10  review of the declaration for Plaintiff Gist shows that she was booked into the Jail on

11  March 15, 2012.  She informed medical and custody staff that she was taking a number of

12  psychotropic medications, including Risperidone, Fluoxetine, Benztropine, and Trazodone.

13  Four days later, on March 19, 2012, her relatives brought those psychotropic medications

14  to the Jail for her.  That same day, the Jail obtained pharmacy records that confirmed that

15  she was prescribed the same medications.  On March 20, 2012, a psychologist at the Jail

16  consulted with Dr. Fithian about whether Plaintiff Gist should be provided with her

17  prescription medication.  Dr. Fithian instructed that "due to history of alcoholism, … we

18  should hold off medicating her for now to allow her to detox from alcohol while in

19  custody."  On March 27, Plaintiff Gist was again seen by the psychologist.  In a progress

20  note, the psychologist wrote that "[p]rior to seeing inmate, writer conferred with

21  Dr. Fithian.  It was agreed that she is to remain medication free and clean and sober for 90

22  days."  It appears that mental health care staff at the Jail also refused to provide Plaintiff

23  Greim with psychiatric medications for 90 days on the basis that he suffered from alcohol

24  dependence.

25         40.     There was no clinical justification for denying Plaintiffs Gist and Greim

26  psychotropic medications for 90 days because of a history of alcohol abuse.  In fact, such a

27  process is medically contraindicated for the reasons I described above regarding the risks

28  of interrupting psychotropic medications.  This 90-day detoxification "protocol" places

1   prisoners with mental illness at a substantial risk of serious harm.

2       41.     Plaintiff Gist's experience also included examples of other problems with the

3   intake process. Defendants did not even consider continuing her previously prescribed

4   medications for at least five days after booking. As I discuss above, a five-day delay to

5   determine whether to continue prescribed medications does not meet the standard of care.

6   In addition, Plaintiff Gist did not receive a face-to-face evaluation from Dr. Fithian, the

7   only mental health care staff with prescribing authority at the Jail, prior to discontinuing

8   Plaintiff Gist's psychotropic medications. The standard of care for starting or stopping

9   medication is for the prescriber to conduct a face-to-face evaluation.

10      42.     As evidenced by the circumstances surrounding the suicide of Daniel

11  Lariviere, which occurred in July 2011, problems with the intake process can have fatal

12  consequences. I discuss additional problems with Mr. Lariviere's suicide below, but his

13  tragic experience with the intake process is revealing. In short, Mr. Lariviere committed

14  suicide approximately 72 hours after he arrived at the Jail. Upon his arrest, which took

15  place on a Tuesday, Mr. Lariviere was placed in a safety cell in restraints without any prior

16  consultation with mental health care staff. He remained in the safety cell for

17  approximately 2.5 hours, and was released without approval from any mental health care

18  staff. About 12 hours later, Mr. Lariviere was finally interviewed by custody staff for the

19  Intake Health Screening assessment. Mr. Lariviere informed custody staff that he was

20  under the care of a doctor for psychiatric reasons, had a history of alcohol abuse, and had

21  recently been discharged from a psychiatric hospital. Despite this information, custody

22  staff recommended that he be placed in the general population. Mr. Lariviere was then

23  evaluated by medical staff, who confirmed the information Mr. Lariviere provided to

24  custody staff and learned that Mr. Lariviere was having auditory hallucinations and had

25  been discharged from the psychiatric hospital only four days earlier. The medical staff

26  conducting the Intake Triage Assessment set a medical appointment for Mr. Lariviere the

27  next day, but did not request an urgent psychiatric consultation, and instead, made an

28  appointment with mental health staff for Friday, three days later. It is not clear whether

1  staff initiated the process for obtaining Mr. Lariviere's outside mental health care records,

2  including records of any prescribed medications. For reasons unclear, Mr. Lariviere was

3  then single-celled in an administrative segregation housing unit in a cell that contained

4  suicide hazards. It appears that the medical appointment did not occur as scheduled. And

5  before Mr. Lariviere's scheduled psychiatric evaluation, he committed suicide by hanging

6  in his cell. When Mr. Lariviere committed suicide early on Friday morning, he had

7  received no psychiatric medications and had not been evaluated by either mental health or

8  medical staff. It is my opinion, based on the records I have reviewed, that this suicide was

9  completely preventable. If any one of a number of things that should have happened did

10  take place—mental health care consultations before and upon release from placement in

11  safety cell, a mental health suicide risk evaluation prior to being placed in housing, a

12  timely request for and review of outside medical treatment and prescription medication

13  records, the continuation of previously prescribed medications, and a safe housing

14  placement for a seriously mentally ill and suicidal prisoner—his suicide would have been

15  prevented.

16      43.    The intake process is more difficult to conduct adequately in overcrowded,

17  understaffed facilities, like the Jail, than in jails that have adequate staff and are not

18  overcrowded.

19      44.    For all of the above-stated reasons, it is my opinion that the Jail's intake

20  process for identifying and treating prisoners with mental illness is broken and places all

21  prisoners at risk of harm.

**Defendants Lack an Adequate Method for Prisoners to Request
Mental Health Care Services.**

24      45.    Another important element of an adequate correctional mental health care

25  system is a functioning, effective process for prisoners to request mental health care

26  services and be timely seen by appropriate staff for treatment. An inadequate and

27  unreliable health care request process places all prisoners and staff at risk. Those with

28  mental illness are denied access to timely care and others may be harmed if prisoners with

1   mental illness have behavioral disturbances secondary to their untreated mental illness.  In

2   my experience, many prisoners with mental illness will underreport their mental health

3   conditions during the intake process.  As a result, it is critical to have a means for them to

4   confidentially communicate their mental health needs at a later time.  This system is also

5   vital in suicide prevention in that prisoners will often use the system to seek help for

6   suicidality.

7         46.     Health requests should be collected and triaged at least twice in any 24 hours

8   period.  The system must also have in place mechanisms for the most acute patients to be

9   seen immediately by appropriate staff after the request is triaged.

10        47.     The current health care request process at the Jail does not provide prisoners

11  with a reliable and effective means for requesting mental health care services and being

12  timely seen and assessed.  Pursuant to policy, the primary method prisoners have for

13  requesting either medical or mental health care services is to fill out and submit what is

14  called a "sick call slip."  *See* Grunfeld Decl., Ex. G, at 230.  According to Dr. Puisis, there

15  are a variety of problems with the current policy and practices for triaging sick slips.  The

16  policy itself is very brief:  It does not address how nurses are to evaluate health requests; it

17  does not include a timeframe for evaluating sick call slips; it does not require vital signs

18  for all symptomatic complains; and it does not require that sick call slips and/or the

19  response to sick call slips be tracked.  *See* Grunfeld Decl., Ex. J, at 11, 22.

20        48.     Two additional problems identified by Dr. Puisis are particularly relevant to

21  the delivery of mental health care.  First, even though there are as many as 200 prisoners

22  housed in segregation at any time, including two male (A and B) and two female (R and S)

23  pods of prisoners with serious mental illness, there is no policy for how such prisoners are

24  to obtain and submit sick call slips.  *See id.* at 22.  Second, though all sick call slips are

25  evaluated by medical nurses, there is no policy regarding what is to be done with requests

26  that raise psychiatric issues.  *See id.* at 11.  I have reviewed the policy and agree with

27  Dr. Puisis' conclusions.

28        49.     The sick call process appears to be even more dysfunctional in practice.

[1140784-7]

19

CV 13 2354 PSG

DECL. OF PABLO STEWART ISO PLS.' MOTION FOR CLASS CERTIFICATION

1   Dr. Puisis concluded from his review that the "follow up of care of health requests was not

2   consistently timely …."  Grunfeld Decl., Ex. J, at 22.  Moreover, according to Dr. Puisis,

3   Defendants do not track "how many people place requests, how many are seen, or whether

4   their care was timely," and thus are "unable to evaluate [their] own performance with

5   respect to detainee access to care."  *Id.*  Dr. Hayward reached a similar conclusion.  *See*

6   Grunfeld Decl., Ex. M, at 3 ("The current procedures lack a systematic method of auditing

7   receipt and responses to all inmate requests for health services.").

8         50.     I have reviewed the declarations of all of the named plaintiffs in this action.

9   Most of these declarations describe serious problems using the sick call process to access

10   appropriate care.

11         51.     In addition, Defendants do not provide a confidential place for prisoners to

12   submit sick call slips.  Instead, as found by both Dr. Puisis and Dr. Hayward, prisoners

13   submit sick call slips in the same boxes into which prisoners also submit grievances

14   regarding non-medical issues.  Only custody officers have keys to access the boxes and

15   collect the sick slips and grievances.  As Dr. Hayward wrote, "[t]his practice requires

16   modification since current correctional healthcare standards require that inmates have

17   privacy of their healthcare requests."  *Id.* at 3; *see also* Grunfeld Decl., Ex. J at 21 (Dr.

18   Puisis recommending that medical requests should be secure, confidential, and only

19   reviewed by medical staff).  I agree with both Dr. Hayward and Dr. Puisis that it is

20   problematic if Defendants do not have a confidential means for prisoners to request mental

21   health care services.

22         52.     These problems with the sick call process at the Jail, which deny prisoners

23   timely access to needed care, affect all prisoners, especially those with mental illness, and

24   place them at risk of serious harm.

25   **The Medication Administration and Prescription Drug Renewal Processes at the Jail**
     **Place All Prisoners at Risk of Serious Harm.**

26

27         53.     The proper administration of psychotropic medications prescribed for

28   prisoners with mental health issues is another critical element of an adequate mental health

1   care program in a correctional facility.  Many psychotropic medications can cause

2   significant and adverse side effects, including, but not limited to, extrapyramidal and

3   metabolic syndromes and cardiac complications, which can cause unnecessary pain and be

4   life threatening.  As a result, medical and custody staff in the Jail play a very important

5   role monitoring drug side effects, efficacy, and compliance.  Staff administering

6   medication must record their clinical impression of prisoners taking psychotropic

7   medication, any reports of side effects, and any instances of non-compliance.  It appears

8   that Defendants do not adequately utilize the medication administration process to monitor

9   prisoners on psychotropic medications.  Dr. Puisis found that "[m]edication administration

10  records are not used to record administration of medication at the time medication is

11  administered.  Instead, … [r]ecording medication administration is performed at a later

12  time by virtue of evaluating the envelopes [in which the medications were packaged for

13  prisoners] after return to the medication room which may be a few hours after starting

14  medication administration.  The nurse records an empty envelope as a successful

15  medication administration.  Envelopes which still contain medication are recorded as not

16  given.  The reason for not administering medication is recollected from memory.  This is

17  not good nursing practice.  Medication administration should be documented at the time it

18  is performed."  Grunfeld Decl., Ex. J at 24-25.  I agree with Dr. Puisis.  The process

19  currently in place for documenting medication distribution places prisoners at risk because

20  it is not adequate for monitoring the side effects, efficacy, and compliance for prisoners

21  taking psychotropic medications.

22       54.    In addition, a number of the plaintiffs' declarations indicate significant

23  problems renewing expiring prescriptions for medication.  From these declarations, it

24  appears that rather than scheduling prisoners for medical appointments prior to the

25  expiration of a prescription, Jail staff, before taking any action, waits for prisoners to file

26  sick call slips for renewal.  For many of the plaintiffs, this frequently resulted in

27  disruptions in medications.  As I discussed above, any disruption in the receipt of

28  psychotropic medications can cause serious harm to prisoners.

DECL. OF PABLO STEWART ISO PLS.' MOTION FOR CLASS CERTIFICATION

**The Group and Individual Therapy Offered to Prisoners with Serious Mental Illness Is Not Sufficient to Adequately Treat the Mentally Ill Population in the Jail.**

55.     Mental health therapy is an essential component of any mental health care system.  As important as it is to have an adequate psychiatric medication system, mental illness requires additional treatments besides medication.

56.     Defendants offer very few opportunities for prisoners to receive mental health therapies.  It appears from Dr. Hayward's draft report that the only therapy available to prisoners is individual supportive counseling and psychotherapy offered by the L.M.F.T. and group socialization/support groups run by the psychiatric nurse.  Dr. Hayward does not specify how many hours of therapy the L.M.F.T. offers on weekly basis.  He does indicate that prisoners who are cleared by custody staff are eligible to receive one hour of group therapy every two weeks.

57.     As I discussed above, the quantity of group therapy offered at the Jail—once every other week for one hour—falls well below the standard of care for seriously mentally ill prisoners housed in restricted housing units.  Individual therapy should be provided as often as clinically indicated.  Because I do not know how often individual therapy is offered, I cannot draw any opinion regarding its adequacy for all mentally ill prisoners.

58.     Pursuant to Defendants' policies and according to Dr. Hayward, it appears that the prisoners with the most severe mental illness may be denied access to group therapy.  Dr. Hayward explained in his draft report that only prisoners who "are sufficiently stable to participate in group" therapy are permitted to participate.  Grunfeld Decl., Ex. M, at 6.  Plaintiffs' counsel requested clarification from Dr. Hayward regarding who determines whether a prisoner is "sufficiently stable."  Dr. Hayward explained that "deputies have the responsibility to determine which inmate-patients can participate safely in groups.  The deputies consider only safety issues not clinical issues."  Grunfeld Decl., Ex. O, at 5.  If I understand Dr. Hayward correctly, because only "stable" prisoners can participate in group therapy, the prisoners with the most severe mental illness, who are the

1   least stable but also the most in need of socialization and therapy, are more likely to be

2   denied access to therapy.  Moreover, custody staff, not clinical staff, makes the decisions

3   regarding who can participate in socialization groups.  This is very problematic.  Custody

4   staff members lack clinical training to determine what treatment a prisoner with serious

5   mental illness requires.  As far as I could determine from my review of the Jail and CFMG

6   policies, there is no policy governing which prisoners custody staff should permit to

7   participate in group therapy.  Though I have not had an opportunity to observe group

8   therapy offered at the Jail, I have serious concerns that the most seriously ill and difficult

9   prisoners will be denied access to therapy.

10       59.     It is considerably more difficult to offer adequate mental health therapy to

11   prisoners in overcrowded facilities.  In order to offer individual and group therapy, the

12   facility must have sufficient staff to transport prisoners to and from the location of the

13   therapy and confidential and adequately-sized locations that are conducive to therapy.  In

14   overcrowded facilities, like the Jail, both adequate transportation staff and adequate space

15   to offer therapy are frequently lacking.  It appears that both areas are problems at the Jail.

16   **Defendants Lack Adequate Policies and Practices for Transferring Prisoners Who
     Require Higher Levels of Psychiatric Care to Facilities Licensed to Provide That
17   Level of Care.**

18       60.     Another critical element of any adequate correctional mental health system is

19   the ability to provide inpatient mental health care services to prisoners who require higher

20   levels of care.  Prisoners must have access to inpatient units with appropriately trained

21   mental health care staff.  Prisoners must also have access to units licensed to provide care

22   to prisoners in acute psychiatric crisis.

23       61.     From my review, the Jail is not licensed to provide any higher levels of care

24   to prisoners with serious mental illness.  Accordingly, Defendants must have in place

25   adequate policies and practices for transferring prisoners to a licensed facility that can

26   provide such care.  I have not fully evaluated the processes in place at the Jail, but it

27   appears that, in theory, Defendants utilize a mental health care unit at Natividad Medical

28   Center ("NMC") when prisoners require higher levels of care.  According to Dr. Hayward,

1  however, transfers to NMC do not always take place when necessary.  Dr. Hayward writes

2  that:

> 3  The [Jail] has the capability of transporting an inmate to Natividad Medical
> Center for acute psychiatric services on weekends. However, review of the
> 4  records indicates that this rarely occurs and most inmate-patients remain in
> the jail until the mental health clinicians arrive on Monday. They may be
> 5  placed in a safety cell on suicide precautions for observation until they can
> be evaluated by a mental health clinician. The safety cells are used
> 6  excessively for this purpose and inmates may remain in the safety cell over
> the weekend until a clinician provides evaluation and release on Mondays.

7

8  Grunfeld Decl., Ex. M at 5.  I agree with Dr. Hayward that Defendants' failures to timely

9  transfer prisoners to inpatient mental health care units when necessary is a significant

10  problem and places prisoners with mental illness at risk of serious harm.

11  **By Housing Prisoners With Serious Mental Illness in Administrative Segregation,
Defendants Place Prisoners' Mental Health In Serious Jeopardy.**

12

13       62.      As discussed above, Defendants have a policy of housing the prisoners with

14  the most serious mental illness in administrative segregation units— A and B Pods for

15  men, R and S Pods for women.  *See* Grunfeld Decl., Ex. M, at 6.[1]  According to policy,

16  prisoners in these units are locked in their cells for 23 hours per day.  Grunfeld Dec.,

17  Ex. G, at 217.  This policy is confirmed by named Plaintiffs who have been housed in

18  administrative segregation in the Jail, who describe how they and other prisoners in such

19  pods are only permitted one hour outside of their cells per day.  The hour that prisoners are

20  permitted outside of their cell is the only opportunity they have to exercise, shower, and

21  use the telephone.

22       63.      Prisoners with mental illness are likely to deteriorate and decompensate in

23  segregation units under isolated conditions.  This deterioration and decompensation often

24  takes the form of acting out and other actions that may violate the rules of the correctional

25

---

26  [1] C, D, G, H, I, and J-Pods also are administrative segregations units.  It is my
understanding that Defendants house prisoners with mental illness in these units as well.
27  However, according to Dr. Hayward, A, B, R, and S-Pods are the only administrative
segregation units in which Defendants house prisoners *because of* their mental illness.

28

1  facility.  In these cases, the prisoners' "bad" conduct is the direct product of their mental

2  illness.  Their illness exacerbates the psychological and behavioral reactions they have to

3  the pain and stress of isolated confinement.

4          64.     Scientific literature establishes the risk of harm posed to seriously mentally

5  ill persons who are placed in solitary confinement or segregation.  The recognition of this

6  risk has led professional mental health organizations to prohibit the placement of the

7  seriously mentally ill in such units or, if it is absolutely necessary (and only as a last resort)

8  to confine them there, but under strict limits and with significant amounts of out-of-cell

9  time and enhanced access to care.  For example, the American Psychiatric Association

10  ("APA") has issued a Position Statement on Segregation of Prisoners with Mental Illness

11  stating:

12          Prolonged segregation of adult inmates with serious mental illness, with rare
          exceptions, should be avoided due to the potential for harm to such inmates.
13          If an inmate with serious mental illness is placed in segregation, out-of-cell
          structured therapeutic activities (i.e., mental health/psychiatric treatment) in
14          appropriate programming space and adequate unstructured out-of-cell time
          should be permitted.   Correctional mental health authorities should work
15          closely with administrative custody staff to maximize access to clinically
          indicated programming and recreation for the individuals.[2]
16

17  The APA's position on this issue reflects the accepted fact that mentally ill prisoners are

18  especially vulnerable to isolation- and stress-related regression, deterioration, and

19  decompensating that worsen their psychiatric conditions and intensify their mental health-

20  related symptoms and maladies (including depression, psychosis, and self-harm).  I share

21  this view.

22          65.     Correctional professionals likewise have recognized the risk of placing

23  mentally ill prisoners in isolated confinement.  Mental health staff in a well-functioning

24  prison or jail system is required by policy and practice to screen prisoners in advance of

25  their possible placement in isolation to identify those who are mentally ill and to exclude

26

27  [2]Am. Psych. Assoc., Position Statements:  Segregation of Prisoners with Mental Illness
   (2012), *available at* http://www.psychiatry.org/advocacy--newsroom/position-statements.

28

1  them from such confinement if indicated.  Moreover, they are charged with regularly

2  monitoring isolated prisoners to identify any who may be manifesting the signs and

3  symptoms of emerging mental illness and to remove them from these harmful

4  environments if indicated.

5        66.      The concerns about placing prisoners with serious mental illness in isolated

6  conditions generally emanate from the conundrum faced by correctional staff when a

7  prisoner with serious mental illness violates the rules of a facility.  Standard correctional

8  practice is to place prisoners who break facility rules in the isolated conditions of

9  administrative segregation as a punishment.  A consensus has been reached in mental

10  health care and correctional communities, however, that when a prisoner who breaks the

11  rules suffers from serious mental illness, the facility must take into account the prisoner's

12  mental illness when devising an appropriate response to his or her rule breaking.  This

13  break from ordinary practice is necessitated by the risks that a prisoner with mental illness

14  faces in administrative segregation.

15        67.      Defendants' use of administrative segregation as a place to house prisoners

16  with mental illness who have not violated any Jail rules is an extremely dangerous

17  practice.  Instead of trying to avoid placing prisoners with serious mental illness in

18  administrative segregation unless absolutely necessary, Defendants place such prisoners in

19  administrative segregation *because of* their serious mental illness.  Thus, as a matter of

20  policy and practice, Defendants intentionally expose prisoners with serious mental illness

21  to the dangerous conditions of administrative segregation.  This practice is far outside the

22  accepted norms in the correctional or mental health care communities, and places prisoners

23  at risk of grave harm.

24        68.      Not only do Defendants place prisoners in administrative segregation

25  because of their mental illness, Defendants have no policy governing how and when

26  prisoners placed in administrative segregation should be transferred to less restrictive

27  housing environments.  Dr. Hayward recommended in his draft report that "the Sheriff

28  adopt a policy of having Classification review the status of mentally ill inmates housed in

26

CV 13 2354 PSG

DECL. OF PABLO STEWART ISO PLS.' MOTION FOR CLASS CERTIFICATION

1  administrative segregation at least once monthly to determine if the inmate can be moved

2  to less restrictive housing." Grunfeld Decl., Ex. M, at 9. I infer from Dr. Hayward's

3  recommendation that such reviews do not occur monthly and may not occur at all. Failing

4  to reevaluate prisoners with serious mental illness to transfer them out of administrative

5  segregation as soon as possible further contributes to the risks of harm faced by such

6  prisoners.

7      69.    Approximately half of all suicides committed in correctional facilities take

8  place in administrative segregation units. In fact, all three suicides since 2010 in the Jail

9  have occurred in administrative segregation. One of the suicides occurred in A Pod, one of

10 the housing units in which Defendants specifically place prisoners with serious,

11 unstabilized mental illness.

12     70.    In recognition of the risks posed to prisoners with mental illness in

13 administrative segregation, it is the correctional standard that security checks occur twice

14 every hour at intervals no longer than 30 minutes at unpredictable and intermittent times.

15 Pursuant to policy, custody staff only conducts health and welfare checks of prisoners in

16 administrative segregation once every hour. The policy also does not mandate that the

17 security checks be conducted at intermittent and unpredictable times or that staff log their

18 observations of prisoners. *See* Grunfeld Decl., Ex. E, at § 1106.04. It is my opinion that

19 the inadequacies in the Defendants' policies for conducting safety checks on prisoners in

20 administrative segregation place all prisoners, especially those with serious mental illness,

21 at risk of serious harm.

22     71.    It is my opinion that Defendants overuse administrative segregation units to

23 house prisoners with mental illness. Overuse of administrative segregation is a common

24 problem in overcrowded facilities like the Jail.

25 **Defendants' Suicide Prevention Program Is Deficient in a Number of Respects that**
   **Significantly Increase the Likelihood of Self-Harm and Suicide For All Prisoners,**
26 **Especially Those With Mental Illness.**

27     72.    The suicide rate in the Monterey County Jail is nearly twice the average

28 suicide rate for jails throughout the country. According to the most recent data available

1    from the Department of Justice's Bureau of Justice Statistics, the average suicide rate in

2    jails throughout the country was 43 suicides per 100,000 inmates in 2011.[3]  From 2010

3    through 2013, three prisoners committed suicide in Monterey County Jail.   Assuming the

4    Jail maintained an average daily population of 1000 prisoners throughout that time period,

5    the suicide rate for the Jail for those four years is 75 suicides per 100,000 prisoners.  That

6    rate is 74 percent above the national average for jail populations.

7         73.     Having reviewed the Jail's suicide prevention policies, a number of

8    documents related to completed and attempted suicides, and the declarations for the named

9    Plaintiffs, it is not surprising that the rate of suicide in the Jail is above the national

10    average.  The suicide prevention program at the Jail has a number of serious problems that

11    place all prisoners at risk.

12         74.     As is discussed above, Defendants' policies and practices during the intake

13    process for identifying prisoners with serious mental illness, including those who are at

14    risk of suicide, are woefully inadequate.  Prisoners newly booked into the Jail have a

15    higher risk of suicide than prisoners who have been in the Jail for a longer time.

16    Incarceration is one of the most stressful experiences people can encounter.  The stress

17    associated with arrest incarceration increases the likelihood of suicide.  People often are

18    booked into the Jail while intoxicated on drugs and alcohol; individuals experiencing acute

19    withdrawal are at an extremely high risk for suicide.  Finally, the mentally ill are

20    overrepresented in the Jail population.  As a result, Defendants' failures of suicide

21    prevention during the intake process place prisoners at great risk of harm.

22         75.     According to Dr. Hayward, Defendants do not utilize *any* comprehensive

23    suicide risk assessment tool.  *See* Grunfeld Decl., Ex. M, at 12.  The only means by which

24    Defendants become aware of prisoners who are at risk of suicide is when prisoners express

25    suicidal ideation to staff or display self-harm behavior.  *See id.*  Dr. Hayward, as an

---

26

[3] *See* U.S. Dep't of Justice, Bureau of Justice Statistics, *Mortality in Local Jails and State*

27   *Prisons, 2000-2011*, at 8, Table 3 (Aug. 2013), *available at*
http://www.bjs.gov/content/pub/pdf/mljsp0011.pdf.

28

[1140784-7]

CV 13 2354 PSG

DECL. OF PABLO STEWART ISO PLS.' MOTION FOR CLASS CERTIFICATION

1  appendix to his report, included an example of one such form. *See id.* at Appendix A.

2  Without a suicide assessment tool, Defendants are unable to employ suicide prevention

3  efforts with respect to a subpopulation of prisoners at high risk of suicide—those who have

4  any of a variety of indicia of suicidality, but who have not yet engaged in self-harm or

5  reported their suicidal feelings to any staff members. A suicide risk assessment tool is a

6  basic element of an adequate suicide prevention program.

7         76.     When Jail staff members determine that a prisoner is at risk of harming him

8  or herself, staff members place prisoners in one of the six safety cells in the Jail. The

9  conditions in the safety cells are extraordinarily punitive. According to Plaintiffs'

10  declarations, the safety cells, which are often referred to as "rubber rooms," are empty

11  rooms with padded walls and floors. The safety cells have no features other than a

12  window and a tray slot in the door and a grate in the floor through which prisoners must

13  urinate and defecate. The safety cells have no beds, sinks, toilets (other than the grate in

14  the floor), chairs, tables, or windows for natural light. Prisoners must sit, sleep, and eat on

15  the same floor on which the toilet grate is located. In addition, according to Dr. Hayward,

16  the safety cells are not sufficiently maintained and cleaned. *See id.* at 11. As a result, they

17  frequently smell of and are sometimes covered in feces.

18         77.     Prisoners placed in the safety cells are denied nearly all privileges and

19  human contact. From my review of safety cell logs attached to Plaintiffs' declarations,

20  prisoners are not provided with showers, any out of cell time, exercise, or property while in

21  the safety cells, regardless of how long they are retained in those cells. Pursuant to policy,

22  Defendants are supposed to provide prisoners with meals and water; from my review of

23  Plaintiffs' declarations, it appears that this does not always happen. In addition, Jail policy

24  explicitly permits staff to handcuff and shackle prisoners while they are in the safety cells.

25  *See* Grunfeld Decl., Ex. E, at § 1104.06 (section improperly numbered in exhibit as

26  11104.06). From my review of some of the Plaintiffs' declarations, it appears that staff

27  frequently engages in this practice.

28         78.     As if the conditions discussed above were not sufficiently punitive,

[1140784-7]

1  Defendants frequently strip prisoners and place them naked in the safety cells. Jail policy

2  requires that prisoners placed in the safety cells "shall be allowed to retain sufficient

3  clothing or be provided with a safety smock to provide for their personal privacy unless

4  specific identified risks to the inmate's safety or to the security of the facility are

5  documented." *Id.* at § 1104.05(I) (section improperly numbered in exhibit as 1114.05).

6  However, according to Dr. Hayward, Jail staff frequently deprives prisoners of clothing or

7  a safety smock gown for many hours. *See* Grunfeld Decl., Ex. M, at 11.

8      79.    It is my opinion that these conditions are overly restrictive and punitive.

9  Confining a suicidal prisoner to their cell for 24 hours a day only enhances isolation and is

10 anti-therapeutic. Under these circumstances, it is also difficult, if not impossible, to

11 accurately gauge the source of the prisoner's suicidal ideation. The punitive nature of the

12 safety cells also increases the risk of suicide in two very dangerous ways. First, the

13 conditions increase prisoners' suicidality, also increasing the risk that prisoners will follow

14 through on their suicidal feelings. Second, punitive conditions in the safety cells increase

15 the likelihood that a suicidal individual will not report feelings of suicidality in order to

16 avoid being placed in a safety cell.

17     80.    These effects are very real, not hypothetical. For example, according to his

18 declaration, when Plaintiff Mefford was experiencing suicidal thoughts in January 2014,

19 he explicitly represented to mental health care staff that he was unsure whether he should

20 report his true level of suicidality because he was afraid he would be placed in a safety

21 cell. Once he was placed in the safety cell, his suicidality increased markedly and he

22 engaged in repeated acts of self-harm.

23     81.    Defendants' policies and practices for observing prisoners in safety cells are

24 wholly inadequate and place prisoners at risk. Sheriff's Office policy requires that custody

25 staff members conduct and log a safety check at least twice every thirty minutes when a

26 prisoner is in a safety cell. *See* Grunfeld Decl., Ex. E, at § 1104.05(B) & (C) (section

27 improperly numbered in exhibit as 1114.05). CFMG policy requires that medical staff be

28 notified within one hour of a prisoner's placement in a safety cell, that medical staff

1   members check in on the prisoner at least once every six hours, and that mental health staff

2   members evaluate a prisoner within 24 hours of placement.  Grunfeld Decl., Ex. G, at 289.

3          82.    The policies, even if followed perfectly, are problematic in a number of ways

4   that place prisoners at risk.  First, Defendants lack any policy for suicide watch.  Suicide

5   watch—where staff constantly observes an acutely suicidal prisoner—is necessary to

6   ensure that certain, acutely suicidal prisoners do not engage in self-harm.  To address this

7   danger, some correctional systems, for example the Federal Bureau of Prisons, place all

8   suicidal prisoners under constant observation until such time that mental health care staff

9   determines the prisoner is no longer at risk of self-harm.  The complete lack of a suicide

10  watch policy at the Jail places prisoners at risk of serious harm.

11         83.    Second, the custody policy for conducting safety checks of suicidal prisoners

12  placed in safety cells does not require that the twice-every-half-hour safety checks be

13  conducted at unpredictable and non-repeating times.  Safety checks at unpredictable times

14  are necessary to ensure that the patient cannot anticipate the amount of time they will not

15  be observed and engage in suicidal acts.

16         84.    Third, CFMG's policy permits a suicidal prisoner to be kept in a safety cell

17  for up to 24 hours without any evaluation by mental health care staff.  A suicidal patient

18  should be seen prior to being placed in a safety cell to determine if they require such

19  placement.  In cases where that is not possible, the patient should be seen as soon as

20  possible after placement in a safety cell; 24 hours is far too long for a suicidal prisoner to

21  spend in a safety cell without being seen by mental health care staff.  The lack of an

22  adequate policy has, according to Dr. Hayward, resulted an "excessive" use of safety cells

23  at the Jail.  Grunfeld Decl., Ex. M, at 12.  Dr. Hayward wrote that "[r]eview of the records

24  indicates that many of the inmates placed on suicide watch in a safety cell reported suicidal

25  ideation but were not acutely suicidal."  Id.

26         85.    Fourth, the policy does not specify what level provider is authorized to

27  evaluate and remove a suicidal prisoner from a safety cell, nor does it specify whether

28  evaluations must be in in-person.  By potentially permitting low-level providers to admit,

1    evaluate, and discharge suicidal prisoners from safety cells, the policy places suicidal

2    prisoners at risk of serious harm.

3        86.    Dr. Hayward found that Defendants do not even follow their flawed safety

4    cell policies.  In his review of safety cell logs, he found "that many deputy checks were out

5    of compliance with the required frequency of two every 30 minutes.  Some logs document

6    delays of an hour or more between checks."  *Id.* at 12.  My review of the declaration for

7    Plaintiff Mefford confirms Dr. Hayward's findings, as there were numerous times where

8    Plaintiff Mefford was in a safety cell and was not observed by staff twice every half hour.

9        87.    Dr. Hayward concluded that staff's failures to perform safety checks

10   "presents an increased risk of inmate self-harm ...."  *Id.*  I agree with his conclusion.  The

11   failure to conduct safety checks on a timely basis is a hallmark of overcrowded facilities

12   like the Jail.

13       88.    Dr. Hayward also found that Defendants overuse the safety cells as holding

14   cells for prisoners displaying acute mental illness while staff waits for a mental health

15   clinician to arrive.  As he explains, prisoners "may be placed in a safety cell on suicide

16   precautions for observation until they can be evaluated by a mental health clinician....

17   [I]nmates may remain in the safety cell over the weekend until a clinician provides

18   evaluation and release on Mondays."  Grunfeld Decl., Ex. M, at 5.  Keeping prisoners in a

19   safety cell for a prolonged period of time, such as an entire weekend, without any attention

20   from mental health clinicians, can seriously harm a prisoner's mental health.

21       89.    Defendants' use of restraint chairs also places prisoners at risk of serious

22   harm.  Restraint chairs should only be used when a prisoner is so out of control that the

23   only means for preventing harm to self or others is to place them in a restraint chair.  That

24   said, prisoners placed in restraint chairs are at significant risk of physical harm from being

25   restrained.  As a result, prisoners who have been placed in a restraint chair must be

26   constantly observed.  Jail policy provides that prisoners in restraint chairs must be

27   observed twice every thirty minutes, the same frequency as for prisoners in safety cells.

28       90.    Though I have not yet had an opportunity to fully review Defendants' use of

1    restraint chairs, Defendants do not always follow their stated policy. For example,

2    Plaintiff Mefford was placed in restraint chairs for approximately four hours and twenty

3    minutes on December 15 and 16, 2013. Staff should have conducted a minimum of 18

4    checks during that time period. Instead, staff only conducted 13 checks. Moreover, during

5    the time he was in the chair, periods of 39 and 50 minutes passed without any checks.

6    During such long periods without observation, it was possible that Plaintiff Mefford could

7    have suffered grave injury or even death.

8         91.    It also appears that the physical structure of the Jail does adequately protect

9    prisoners with mental illness from suicide. TRG Consulting found in its December 2011

10   assessment of the Jail that "suicide hazard elimination is not as stringent as it should be to

11   prevent self-harm …." Second Am. Compl., Ex. B (Dkt. No. 41), at A.3. I have not yet

12   been able to inspect the facilities at the Jail. Nonetheless, a correctional facility should

13   have a sufficient number of cells without suicide hazards in booking and in all places

14   where mentally ill prisoners are housed. If Defendants have not sufficiently eliminated

15   suicide hazards at the Jail, it would increase the risk of harm to which prisoners with

16   mental illness are exposed.

17        92.    I have reviewed some[4] documents related to the three completed suicides

18   since 2010. In each case, problems with the Jail's mental health and suicide prevention

19   programs appear to have contributed to the suicides.

20        93.    *Daniel Lariviere:* Daniel Lariviere committed suicide on July 8, 2011.

21   Multiple failures in Defendants' mental health and suicide prevention programs preceded

22   Mr. Lariviere's suicide. The problems with Mr. Lariviere's intake, diagnosis, and

23   intervention, discussed above in Paragraph 42, speak to deficiencies in Defendants' suicide

24   prevention program. Defendants' actions in the hours immediately preceding and

25   following Mr. Lariviere's death reflect additional inadequacies that place prisoners at risk.

26

27   _____

[4] I should note that I have only been able to review the medical file for Jessie Crow, and
not for the other two prisoners who committed suicide.

28

1   Mr. Lariviere was ultimately housed in a single cell in I-Pod, an administrative segregation

2   housing unit. Early in the morning, sometime between 2:05 and 3:06 a.m., Mr. Lariviere

3   tied a ligature onto part of the window and hanged himself. He was found with either a t-

4   shirt or a sheet around his neck (Defendants' records are unclear) at 3:06 a.m. during an

5   hourly safety check. A deputy cut Mr. Lariviere down using a knife, began shaking him to

6   try to get a response, and then began to implement CPR. Medical staff was called, and,

7   when Mr. Lariviere did not respond, he was pronounced dead.

8       94.    Defendants' supervision of Mr. Lariviere and response to his suicide were

9   problematic in a number of respects. The safety checks in administrative segregation were

10  conducted hourly, as opposed to every half hour. Moreover, the checks were not staggered

11  and unpredictable, but rather, occurred almost exactly one hour apart (at 12:10, 1:10, 2:05,

12  and 3:06 a.m.). Though Defendants maintained a log of the time at which they conducted

13  safety checks for Mr. Lariviere's unit (and presumably other units), they kept no log of

14  their observations of individual prisoners (i.e., whether the prisoner was awake or asleep,

15  standing or lying down, etc.). And rather, than start CPR immediately, the deputy shook

16  Mr. Lariviere, and only when he did not respond, did staff begin CPR. This series of

17  events highlight Defendants' inadequate policies and practices for monitoring prisoners in

18  administrative segregation, inadequate training of officers regarding how to respond to

19  medical and suicide emergencies, and lack of suicide-safe housing. Better policies,

20  practices, and training and safer housing may have been able to save Mr. Lariviere's life.

21      95.    *Jesse Crow:* Jesse Crow committed suicide on August 7, 2011, by hanging

22  in his cell in D-Pod, one of the administrative segregation pods. According to the

23  Coroner's Report, Mr. Crow used a rope that he manufactured himself while in Jail that he

24  threaded through the air vent in the ceiling. He also used another rope he made in the Jail

25  to tie his cell door closed so securely that it took two deputies to pry open the door. A

26  number of elements of Mr. Crow's suicide are problematic. First, that Mr. Crow was able

27  to construct two substantial ropes, and position one of them to hang himself and the other

28  to prevent staff from opening his door, all without staff noticing indicates that staff was not

1   conducting effective checks of prisoners in an administrative segregation unit.  In addition,

2   Mr. Crow's ability to access the air vent in his cell demonstrates that Defendants did not

3   adequately eliminate suicide hazards in administrative segregation; suicide resistant air

4   vents are generally available for jails and prisons.  Finally, Mr. Crow submitted one sick

5   call slip on June 22, 2010 stating that he was depressed, and another on June 23, 2010

6   complaining of trouble sleeping.  Mr. Crow was not seen by any mental health care staff

7   between his complaints and the date of his suicide.

8         96.   *Joshua Claypole:*  Joshua Claypole attempted suicide on May 4, 2013 by

9   hanging, and died a few days later at a hospital in San Jose from complications from his

10   suicide attempt.  As with the other two suicides, elements of Mr. Claypole's suicide

11   demonstrate problems with the Jail's suicide prevention program.  At the time he

12   attempted suicide, Mr. Claypole was housed in A Pod, one of the administrative

13   segregation housing units utilized by Defendants to house prisoners with serious mental

14   illness.  Mr. Claypole was found in his second-tier cell and had used his sheet as a noose.

15   The cell included a set of sturdy metal braces on that wall to which the sheet had been tied,

16   which are serious suicide hazards.  When an officer initially found Mr. Claypole, rather

17   than immediately open the cell to cut down the ligature, the officer requested back up by

18   custody and medical staff.  Staff did not open the cell and begin to assist Mr. Claypole

19   until other custody staff arrived on the scene.  Staff cut Mr. Claypole's ligature using a

20   knife and appeared to have some difficulty doing so; this indicates that they lacked access

21   to a cut-down tool, a much more efficient tool for such a purpose.

22         97.   My review of incident reports involving attempted suicides also identified a

23   number of problems with Defendants' suicide prevention program.  For example, an

24   incident report from September 2012 indicates that prisoners in the booking area have

25   access to material (a sheet) they can use to harm themselves.  An incident report from

26   November 2012 involved a prisoner who engaged in self-harm (using fingernails and part

27   of a prisoner ID wristband to open a self-inflicted wound) and was placed in a safety cell;

28   that prisoner was transferred directly from the safety cell to a general population holding

1   cell, where the prisoner proceeded to assault another prisoner.  An incident report from

2   April 2013, in which a female prisoner ingested one ounce of Combat germicide solution,

3   indicates that Defendants have poor control over items that can be used for self-harm.

4   Finally, an incident report from September 2013—where a deputy, without consulting with

5   mental health care staff or calling for backup, tased a mentally ill detainee who had

6   threatened suicide after the prisoner refused to surrender her spork and leave her cell—

7   demonstrates that Defendants improperly use force against prisoners who are suicidal and

8   who have mental illness.

9   **Defendants appear to lack an adequate quality improvement plan for identifying and
    fixing problems with the delivery of mental health care and especially for responding**

10  **to completed and attempted suicides.**

11        98.      All adequately functioning correctional mental health systems must have a

12  robust quality improvement process in place.  A quality improvement program provides an

13  essential forum for custody and medical staff to review performance, identify problems,

14  and devise, implement, and evaluate solutions.  A quality improvement process is

15  particularly critical for ensuring the adequacy of a suicide prevention program.  Close

16  review of prisoners' attempted and completed suicides is necessary to understand where

17  the suicide prevention program may have failed and to ensure such failures do not occur

18  again.

19        99.      According to policy, Defendants have a quality management program.

20  Pursuant to this policy, Defendants must conduct a medical review of all in-custody

21  deaths, including suicides, and produce written findings that must note deficiencies and

22  include corrective action plans.  *See* Grunfeld Decl., Ex. G, at 31-32.  The medical reviews

23  of in-custody deaths are then supposed to be reviewed by the Quality Management/Peer

24  Review Committee, which consists of key members of the custody and medical staff.  *See*

25  *id.* at 13.  According to policy, "[t]he Committee shall be responsible for identifying

26  inappropriateness, deficiencies, and/or problems in health services delivery; developing a

27  corrective action plan and scheduled follow-up evaluation and reporting."  *Id.*

28        100.     I have reviewed the CFMG Quality Assurance/Peer Review Committee

[1140784-7]

1   Meeting Minutes related to Jesse Crow's suicide. Mr. Crow's suicide was discussed at two

2   Quality Assurance meetings. During the first meeting, on October 28, 2010, the discussion

3   in the minutes sets forth a chronology of Mr. Crow's time at the Jail and identified two

4   problems with the care provided to Mr. Crow. First, a psychologist had dictated a note

5   about an interaction with Mr. Crow, but the note was never placed in his medical file.

6   Second, Mr. Crow complained of trouble sleeping a month and a half before he committed

7   suicide, but he was not referred for a psychiatric consultation. According to the

8   chronology, Mr. Crow was not seen by mental health care staff between the date of his

9   complaint about sleeping and the date of his suicide. There is no recommendation for

10  corrective action in the minutes.

11      101.    The Quality Assurance Committee's second discussion of Mr. Crow's

12  suicide took place on January 27, 2011. This discussion was considerably shorter, and

13  only indicated that the autopsy had been reviewed and the missing transcribed progress

14  note had been posthumously placed in Mr. Crow's records. Again, there is no

15  recommendation for corrective action.

16      102.    If the quality improvement program's response to Mr. Crow's suicide is

17  indicative of Defendants' current quality improvement practices, they fall far short of an

18  adequate. The Quality Improvement Committee should have examined Mr. Crow's

19  suicide more closely to determine if any areas of the Jail's suicide prevention program

20  needed to be addressed. In fact, the Committee identified two serious systematic problems

21  that may have contributed to Mr. Crow's suicide: the failure to refer him for psychiatric

22  care when he requested it shortly before his death and the improper maintenance of his

23  medical records. Nevertheless, the Committee did not propose any corrective action.

24      103.    It should also be noted that, pursuant to policy, Defendants are only required

25  to review in-custody completed suicides in the Quality Assurance Committee. There is no

26  policy for reviewing suicide attempts. In my opinion, for a jail the size of Monterey

27  County Jail, the quality improvement program should review both completed and

28  attempted suicides. Though the suicide rate in the Jail is very high, there will likely not be

1   enough suicides in the Jail during any given time period for Defendants to remedy the

2   problems with their suicide prevention program by only reviewing completed suicides.

3   Attempted suicides, which generally occur at a much higher rate than completed suicides,

4   provide another critical source of information regarding the holes in Defendants' suicide

5   prevention program.

6          104.   The lack of a properly functioning quality improvement program places all

7   prisoners at risk of serious harm by decreasing the likelihood that serious deficiencies in

8   the delivery of health care will be identified and remedied.

9   **The Jail Is Overcrowded, Which Magnifies the Negative Effects of the Problems
    Discussed Above.**

10

11         105.   I have significant experience evaluating overcrowded correctional systems.

12  In 2008, I was one of the testifying experts in the *Coleman v. Schwarzenegger* trial before

13  a federal three-judge district court; the question for the court was whether overcrowding

14  was the primary cause of deficiencies in the medical and mental health care provided to

15  prisoners in  the California Department of Corrections and Rehabilitation.  I have also

16  evaluated, testified about, and helped to manage psychiatric care in other overcrowded

17  correctional systems, including the San Francisco County Jail, the Georgia youth

18  corrections system, and the California Youth Authority.

19         106.   Overcrowded facilities suffer from a number of problems: staffing shortages,

20  insufficient treatment space, the unnecessary placement of prisoners in administrative

21  segregation and other locked units, a marked increase in the number of prisoners

22  experiencing psychiatric crisis, medical problems, and/or psychiatric decompensation, a

23  reduction in programs, and overcrowded, dangerous, and chaotic housing environments.

24  These problems work as a feedback loop.  A problem in one area tends to reinforce and

25  heighten problems in the other areas.

26         107.   Monterey County Jail has been and continues to be an overcrowded facility.

27  Mr. Hackett, in his report regarding the security at the Jail, wrote that "[b]y any definition,

28  the jail population is such that the jail is overcrowded."  Grunfeld Decl., Ex. I, at ¶ 1.4.  As

1  evidence of overcrowding, Mr. Hackett relied not just on the fact that the Jail houses more

2  prisoners than its Board Rated Capacity—which it does, *see id.* at ¶ 1.9—but also on the

3  fact that prisoners "are housed in living areas not designed for inmate housing, inmates

4  who should by most standards be housed in medium or maximum security housing are

5  housed in les secure housing, and there are insufficient types of housing available to meet

6  classification needs," *id.* at ¶ 1.4.

7       108.   Both Dr. Puisis and TRG Consulting, in their reports about the problems

8  with the Jail, highlighted the gross insufficiency of available, confidential treatment space.

9  Dr. Puisis found that none of the treatment spaces in the Jail were originally designed for

10  clinical purposes. *See* Grunfeld Decl., Ex. J, at 8.  He also found that nurses frequently

11  evaluated prisoners in non-clinical, non-confidential spaces. *See id.* at 21.  TRG

12  Consulting, in their December 2011 report, wrote that "[m]edical/mental health treatment

13  spaces are not adequate for the rated beds, let alone the actual number of inmates held."

14  Second Am. Compl., Ex. B (Dkt. No. 41), at EX. 3.  A number of the Plaintiffs describe

15  situations in which medical and mental health staff examined them in non-clinical, non-

16  confidential settings.  Examinations conducted in such circumstances, especially mental

17  health evaluations in which prisoners communicate sensitive and personal information to

18  the mental health care clinicians, are highly prone to error because of prisoners'

19  understandable reluctance to speak earnestly.  The lack of sufficient confidential treatment

20  space in the Jail places prisoners at a substantial risk of serious harm by hindering their

21  ability to request and receive adequate treatment.

22       109.   TRG Consulting also highlighted how the overcrowding in the facility

23  "forces the entire facility to operate as an indirect supervision jail.  Mental health issues are

24  considerably more difficult to recognize, manage and treat in an indirect supervision

25  facility." *Id.*  I agree with TRG Consulting's conclusion.

26       110.   The Defendants in this case have acknowledged that the overcrowding in the

27  Jail compromises their ability to deliver effective health care.  For most of the last six

28  years, the County has applied to the Superior Court for the County of Monterey for an

1   order to release prisoners on an accelerated basis pursuant to California Penal Code

2   § 4024.1.  In many of these applications, including one from as recently as October 2012,

3   Dr. Fithian "advised that the excessive number of inmates housed in the Jail compromises

4   the health of the inmates and the staff working at the facility."  Grunfeld Decl., Ex. Z, at 2.

5        111.     In my more than 25 years evaluating and working with correctional facilities,

6   I have come across very few, if any, overcrowded facilities in which the overcrowding did

7   not negatively affect the delivery of mental health care.  In light of the problems discussed

8   above, it is my opinion that overcrowding negatively affects the quality of mental health

9   care in the Jail and places all prisoners, especially those with serious mental illness, at risk

10   of serious harm.

11        I declare under penalty of perjury under the laws of the United States and the State

12   of California that the foregoing is true and correct, and that this declaration is executed at

13   San Francisco, California this 24th day of April, 2014.

14

15                                                    Pablo Stewart

16                                        Pablo Stewart

17

18

19

20

21

22

23

24

25

26

27

28

DECL. OF PABLO STEWART ISO PLS.' MOTION FOR CLASS CERTIFICATION

# Exhibit A

CURRICULUM VITAE

***PABLO STEWART, M.D.***
**824 Ashbury Street**
**San Francisco, California 94117**
**(415) 753-0321; fax (415) 753-5479; e-mail: pab4emi@aol.com**
**(Updated November 2013)**

EDUCATION:                 University of California School of Medicine, San Francisco, California, M.D., 1982

United States Naval Academy, Annapolis, MD, B.S. 1973, Major: Chemistry

LICENSURE:                 California Medical License #GO50899
Hawai'i Medical License #MD-11784
Federal Drug Enforcement Administration #BS0546981
Diplomate in Psychiatry, American Board of
Psychiatry and Neurology, Certificate #32564

ACADEMIC APPOINTMENTS:

September 2006-            Academic Appointment: Clinical Professor, Department of
Present                   Psychiatry, University of California, San Francisco,
School of Medicine.

July 1995 -               Academic Appointment:  Associate Clinical Professor,
August 2006               Department of Psychiatry, University of California, San Francisco,
School of Medicine.

August 1989 -             Academic Appointment:  Assistant Clinical Professor,
June 1995                 Department of Psychiatry, University of California, San Francisco,
School of Medicine.

August 1986 -             Academic Appointment:  Clinical Instructor, Department of
July 1989                 Psychiatry, University of California, San Francisco, School of
Medicine.

EMPLOYMENT:

December 1996-            Psychiatric Consultant
Present                   Provide consultation to governmental and private agencies on a
variety of psychiatric, forensic, substance abuse and organizational
issues; extensive experience in all phases of capital litigation and
correctional psychiatry.

1

| | |
|---|---|
| January 1997-<br>September 1998 | <u>Director of Clinical Services, San Francisco Target Cities</u><br><u>Project.</u>  Overall responsibility for ensuring the quality of the clinical services provided by the various departments of the project including the Central Intake Unit, the ACCESS Project and the San Francisco Drug Court   Also responsible for providing clinical in-service trainings for the staff of the Project and community agencies that requested technical assistance. |
| February 1996 -<br>November 1996 | <u>Medical Director, Comprehensive Homeless Center,</u><br><u>Department of Veterans Affairs Medical Center, San Francisco.</u><br>Overall responsibility for the medical and psychiatric services at the Homeless Center. |
| March 1995 -<br>January 1996 | <u>Chief, Intensive Psychiatric Community Care Program,</u><br><u>(IPCC) Department of Veterans Affairs Medical Center, San</u><br><u>Francisco.</u>  Overall clinical/administrative responsibility for the IPCC, a community based case management program.  Duties also include medical/psychiatric consultation to Veteran Comprehensive Homeless Center.  This is a social work managed program that provides comprehensive social services to homeless veterans. |
| April 1991 -<br>February 1995 | <u>Chief, Substance Abuse Inpatient Unit, (SAIU), Department</u><br><u>of Veterans Affairs Medical Center, San Francisco.</u><br>Overall clinical/administrative responsibility for SAIU. |
| September 1990 -<br>March 1991 | <u>Psychiatrist, Substance Abuse Inpatient Unit, Veterans</u><br><u>Affairs Medical Center, San Francisco.</u>  Clinical responsibility for patients admitted to SAIU.  Provide consultation to the Medical/Surgical Units regarding patients with substance abuse issues. |
| August 1988 -<br>December 1989 | <u>Director, Forensic Psychiatric Services, City and County of</u><br><u>San Francisco.</u>  Administrative and clinical responsibility for psychiatric services provided to the inmate population of San Francisco.  Duties included direct clinical and administrative responsibility for the Jail Psychiatric Services and the Forensic Unit at San Francisco General Hospital. |
| July 1986 -<br>August 1990 | <u>Senior Attending Psychiatrist, Forensic Unit, University of</u><br><u>California, San Francisco General Hospital.</u>  Administrative and clinical responsibility for a 12-bed, maximum-security psychiatric ward.  Clinical supervision for psychiatric residents, postdoctoral psychology fellows and medical students assigned to the ward.  Liaison with Jail Psychiatric Services, City and County of San Francisco.  Advise San Francisco City Attorney on issues pertaining to forensic psychiatry. |

| | |
|---|---|
| July 1985<br>June 1986 | <u>Chief Resident, Department of Psychiatry, University of</u><br><u>California San Francisco General Hospital.</u>  Team leader of the Latino-focus inpatient treatment team (involving 10-12 patients with bicultural/bilingual issues); direct clinical supervision of 7 psychiatric residents and 3-6 medical students; organized weekly departmental Grand Rounds; administered and supervised departmental residents' call schedule; psychiatric consultant to hospital general medical clinic; assistant coordinator of medical student education; group seminar leader for introduction to clinical psychiatry course for UCSF second-year medical students. |
| July 1984 -<br>March 1987 | <u>Physician Specialist, Westside Crisis Center, San Francisco,</u><br><u>CA.</u>  Responsibility for Crisis Center operations during assigned shifts; admitting privileges at Mount Zion Hospital.  Provided psychiatric consultation for the patients admitted to Mount Zion Hospital when requested. |
| April 1984 -<br>July 1985 | <u>Psychiatric Consultant, Marin Alternative Treatment, (ACT).</u><br>Provided medical and psychiatric evaluation and treatment of residential drug and alcohol clients; consultant to staff concerning medical/psychiatric issues. |
| August 1983 -<br>November 1984 | <u>Physician Specialist, Mission Mental Health Crisis Center,</u><br><u>San Francisco, CA.</u>   Clinical responsibility for Crisis Center clients; consultant to staff concerning medical/psychiatric issues. |
| July 1982-<br>July 1985 | <u>Psychiatric Resident, University of California, San Francisco.</u><br>Primary Therapist and Medical Consultant for the adult inpatient units at San Francisco General Hospital and San Francisco Veterans Affairs Medical Center; Medical Coordinator/Primary Therapist - Alcohol Inpatient Unit and Substance Abuse Clinic at San Francisco Veterans Affairs Medical Center; Outpatient Adult/Child Psychotherapist; Psychiatric Consultant - Adult Day Treatment Center - San Francisco Veterans Affairs Medical Center; Primary Therapist and Medial Consultant - San Francisco General Hospital Psychiatric Emergency Services; Psychiatric Consultant, Inpatient Medical/Surgical Units - San Francisco General Hospital. |
| June 1973 -<br>July 1978 | <u>Infantry Officer - United States Marine Corps.</u><br>Rifle Platoon Commander; Anti-tank Platoon Commander; 81mm Mortar Platoon Commander; Rifle Company Executive Officer; Rifle Company Commander; Assistant Battalion Operations Officer; Embarkation Officer; Recruitment Officer; Drug, Alcohol and Human Relations Counselor; Parachutist and Scuba Diver; Commander of a Vietnamese Refugee Camp.  Received an Honorable Discharge.  Highest rank attained was Captain. |

<u>HONORS AND AWARDS:</u>

| | |
|---|---|
| June 1995 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1994/1995. |
| June 1993 | Selected by the class of 1996, University of California, San Francisco, School of Medicine as outstanding lecturer, academic year 1992/1993. |
| May 1993 | Elected to Membership of Medical Honor Society, AOA, by the AOA Member of the 1993 Graduating Class of the University of California, San Francisco, School of Medicine. |
| May 1991 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1990-1991. |
| May 1990 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1989-1990. |
| May 1989 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1988-1989. |
| May 1987 | Selected by the faculty and students of the University of California, San Francisco, School of Medicine as the recipient of the Henry J. Kaiser Award For Excellence in Teaching. |
| May 1987 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident. The award covered the period of 1 July 1985 to 30 June 1986, during which time I served as Chief Psychiatric resident, San Francisco General Hospital. |
| May 1985 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident. |
| 1985 | Mead-Johnson American Psychiatric Association Fellowship. One of sixteen nationwide psychiatric residents selected because of a demonstrated commitment to public sector psychiatry. Made presentation at Annual Hospital and Community Psychiatry Meeting in Montreal, Canada, in October 1985, on the "Psychiatric Aspects of the Acquired Immunodeficiency Syndrome." |

MEMBERSHIPS:

| | |
|---|---|
| June 2000-<br>May 2008 | California Association of Drug Court Professionals. |
| July 1997-<br>June 1998 | President, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1996 -<br>June 1997 | President-Elect, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1995 -<br>June 1996 | Vice President, Northern California Area, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| April 1995 -<br>April 2002 | Associate Clinical Member, American Group Psychotherapy Association. |
| July 1992 -<br>June 1995 | Secretary-Treasurer, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1990 -<br>June 1992 | Councilor-at-large, Alumni-Faculty Association, University of California, San Francisco, School of Medicine |

PUBLIC SERVICE:

| | |
|---|---|
| June 1992 | Examiner, American Board of Psychiatry and Neurology, Inc. |
| November 1992 -<br>January 1994 | California Tuberculosis Elimination Task Force, Institutional Control Subcommittee. |
| September 2000-<br>April 2005 | Editorial Advisory Board, *Juvenile Correctional Mental Health Report.* |
| May 2001-<br>Present | Psychiatric and Substance Abuse Consultant, San Francisco Police Officers' Association. |
| January 2002-<br>June 2003 | Psychiatric Consultant, San Francisco Sheriff's Department Peer Support Program. |
| February 2003-<br>April 2004 | Proposition "N" (Care Not Cash) Service Providers' Advisory Committee, Department of Human Services, City and County of San Francisco. |
| December 2003-<br>January 2004 | Member of San Francisco Mayor-Elect Gavin Newsom's Transition Team. |
| February 2004-<br>June 2004 | Mayor's Homeless Coalition, San Francisco, CA. |
| April 2004-<br>January 2006 | Member of Human Services Commission, City and County of San Francisco. |

| February 2006-<br>January 2007;<br>April 2013-<br>present | Vice President, Human Services Commission, City and County of San Francisco. |
|---|---|
| February 2007-<br>March 2013 | President, Human Services Commission, City and County of San Francisco. |

UNIVERSITY SERVICE:

| October 1999-<br>October 2001 | Lecturer, University of California, San Francisco, School of Medicine Post Baccalaureate Reapplicant Program. |
|---|---|
| July 1999-<br>July 2001 | Seminar Leader, National Youth Leadership Forum On Medicine. |
| November 1998-<br>November 2001 | Lecturer, University of California, San Francisco, School of Nursing, Department of Family Health Care Nursing.  Lecture to the Advanced Practice Nurse Practitioner Students on Alcohol, Tobacco and Other Drug Dependencies. |
| January 1994 -<br>January 2001 | Preceptor/Lecturer, UCSF Homeless Clinic Project. |
| June 1990 -<br>November 1996 | Curriculum Advisor, University of California, San Francisco, School of Medicine. |
| June 1987 -<br>June 1992 | Facilitate weekly Support Groups for interns in the Department of Medicine.  Also, provide crisis intervention and psychiatric referral for Department of Medicine housestaff. |
| January 1987 –<br>June 1988 | Student Impairment Committee, University of California San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to identify, treat and prevent student impairment. |
| January 1986 –<br>June 1996 | Recruitment/Retention Subcommittee of the Admissions Committee, University of California, San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to attract and retain minority students and faculty. |
| October 1986 -<br>September 1987 | Member Steering Committee for the Hispanic Medical Education Resource Committee.<br>Plan and present educational programs to increase awareness of the special health needs of Hispanics in the United States. |
| September 1983 -<br>June 1989 | Admissions Committee, University of California, School of Medicine.  Duties included screening applications and interviewing candidates for medical school. |

| | |
|---|---|
| October 1978 - December 1980 | Co-Founder and Director of the University of California, San Francisco Running Clinic. Provided free instruction to the public on proper methods of exercise and preventative health measures. |

TEACHING RESPONSIBILITIES:

| | |
|---|---|
| July 2003- Present | Facilitate weekly psychotherapy training group for residents in the Department of Psychiatry. |
| January 2002- January 2004 | Course Coordinator of Elective Course University of California, San Francisco, School of Medicine, "Prisoner Health." This is a 1-unit course, which covers the unique health needs of prisoners. |
| September 2001- June 2003 | Supervisor, San Mateo County Psychiatric Residency Program. |
| April 1999- April 2001 | Lecturer, UCSF School of Pharmacy, Committee for Drug Awareness Community Outreach Project. |
| February 1998- June 2000 | Lecturer, UCSF Student Enrichment Program. |
| January 1996 - November 1996 | Supervisor, Psychiatry 110 students, Veterans Comprehensive Homeless Center. |
| March 1995- Present | Supervisor, UCSF School of Medicine, Department of Psychiatry, Substance Abuse Fellowship Program. |
| September 1994 - June 1999 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine. Designed, planned and taught course, Psychiatry 170.02, "Drug and Alcohol Abuse." This is a 1-unit course, which covers the major aspects of drug and alcohol abuse. |
| August 1994 - February 2006 | Supervisor, Psychiatric Continuity Clinic, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. Supervise 4th Year medical students in the care of dual diagnostic patients. |
| February 1994 - February 2006 | Consultant, Napa State Hospital Chemical Dependency Program Monthly Conference. |
| July 1992 - June 1994 | Facilitate weekly psychiatric intern seminar, "Psychiatric Aspects of Medicine," University of California, San Francisco, School of Medicine. |
| July 1991- Present | Group and individual psychotherapy supervisor, Outpatient Clinic, Department of Psychiatry, University of California, San Francisco, School of Medicine. |

7

| | |
|---|---|
| January 1991 | Lecturer, University of California, San Francisco, School of Pharmacy course, "Addictionology and Substance Abuse Prevention." |
| September 1990 - February 1995 | Clinical supervisor, substance abuse fellows, and psychiatric residents, Substance Abuse Inpatient Unit, San Francisco Veterans Affairs Medical Center. |
| September 1990 - November 1996 | Off ward supervisor, PGY II psychiatric residents, Psychiatric Inpatient Unit, San Francisco Veterans Affairs Medical Center. |
| September 1990 - June 1991 | Group therapy supervisor, Psychiatric Inpatient Unit, (PIU), San Francisco Veterans Affairs Medical Center. |
| September 1990 - June 1994 | Course coordinator, Psychiatry 110, San Francisco Veterans Affairs Medical Center. |
| September 1989 - November 1996 | Seminar leader/lecturer, Psychiatry 100 A/B. |
| July 1988 - June 1992 | Clinical supervisor, PGY III psychiatric residents, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. |
| September 1987 - Present | Tavistock Organizational Consultant. Extensive experience as a consultant in numerous Tavistock conferences. |
| September 1987 - December 1993 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine. Designed, planned and taught course, Psychiatry 170.02, "Alcoholism". This is a 1-unit course offered to medical students, which covers alcoholism with special emphasis on the health professional. This course is offered fall quarter each academic year. |
| July 1987- June 1994 | Clinical supervisor/lecturer FCM 110, San Francisco General Hospital and Veterans Affairs Medical Center. |
| July 1986 - June 1996 | Seminar leader/lecturer Psychiatry 131 A/B. |
| July 1986 - August 1990 | Clinical supervisor, Psychology interns/fellows, San Francisco General Hospital. |
| July 1986 - August 1990 | Clinical supervisor PGY I psychiatric residents, San Francisco General Hospital |
| July 1986 - August 1990 | Coordinator of Medical Student Education, University of California, San Francisco General Hospital,  Department of Psychiatry.  Teach seminars and supervise clerkships to medical students including: Psychological Core of Medicine 100 A/B; Introduction to Clinical Psychiatry 131 A/B; Core Psychiatric Clerkship 110 and Advanced Clinical Clerkship in Psychiatry 141.01. |

| | |
|---|---|
| July 1985 –<br>August 1990 | Psychiatric Consultant to the General Medical Clinic, University of California, San Francisco General Hospital.  Teach and supervise medical residents in interviewing and communication skills.  Provide instruction to the clinic on the psychiatric aspects of ambulatory medical care. |

COMMUNITY SERVICE AND PRISON CONDITIONS EXPERT WORK:

| | |
|---|---|
| October 2007<br>-Present | Plaintiffs' expert in 2007-2010 overcrowding litigation and in opposing current efforts by defendants to terminate the injunctive relief in *Coleman v. Brown,* United States District Court, Eastern District of California, Case No. 2:90-cv-00520-LKK-JFM. The litigation involves plaintiffs' claim that overcrowding is causing unconstitutional medical and mental health care in the California state prison system. Plaintiffs won an order requiring the state to reduce its population by approximately 45,000 state prisoners.  My expert opinion was cited several times in the landmark United States Supreme Court decision upholding the prison population reduction order. *See Brown v. Plata,* __ U.S. ___, 131 S. Ct. 1910, 1933 n.6, 1935, 179 L.Ed.2d 969, 992 n.6, 994 (2011). |
| July/August 2008 | Plaintiff psychiatric expert in the case of Fred Graves, et al., plaintiffs v. Joseph Arpaio, et al., defendants (District Court, Phoenix, Arizona.)  This case involved Federal oversight of the mental health treatment provided to pre-trial detainees in the Maricopa County Jails. |
| February 2006-<br>December 2009 | Board of Directors, Physician Foundation at California Pacific Medical Center. |
| June 2004-<br>September 2012 | Psychiatric Consultant, Hawaii Drug Court. |
| November 2003-<br>June 2008 | Organizational/Psychiatric Consultant, State of Hawaii, Department of Human Services. |
| June 2003-<br>December 2004 | Monitor of the psychiatric sections of the "Ayers Agreement," New Mexico Corrections Department (NMCD).  This is a settlement arrived at between plaintiffs and the NMCD regarding the provision of constitutionally mandated psychiatric services for inmates placed within the Department's "Supermax" unit. |
| October 2002-<br>August 2006 | Juvenile Mental Health and Medical Consultant, United States Department of Justice, Civil Rights Division, Special Litigation Section. |

| | |
|---|---|
| July 1998-<br>June 2000 | Psychiatric Consultant to the Pacific Research and Training Alliance's Alcohol and Drug Disability Technical Assistance Project. This Project provides assistance to programs and communities that will have long lasting impact and permanently improve the quality of alcohol and other drug services available to individuals with disabilities. |
| July 1998-<br>February 2004 | Psychiatric Consultant to the National Council on Crime and Delinquency (NCCD) in its monitoring of the State of Georgia's secure juvenile detention and treatment facilities. NCCD is acting as the monitor of the agreement between the United States and Georgia to improve the quality of the juvenile justice facilities, critical mental health, medical and educational services, and treatment programs. NCCD ceased to be the monitoring agency for this project in June 1999. At that time, the Institute of Crime, Justice and Corrections at the George Washington University became the monitoring agency. The work remained unchanged. |
| July 1998-<br>July 2001 | Psychiatric Consultant to the San Francisco Campaign Against Drug Abuse (SF CADA). |
| March 1997-<br>Present | Technical Assistance Consultant, Center for Substance Abuse Treatment, Substance Abuse and Mental Health Services Administration, Department of Health and Human Services. |
| January 1996-<br>June 2003 | Psychiatric Consultant to the San Francisco Drug Court. |
| November 1993-<br>June 2001 | Executive Committee, Addiction Technology Transfer Center (ATTC), University of California, San Diego. |
| December 1992 -<br>December 1994 | Institutional Review Board, Haight Ashbury Free Clinics, Inc. Review all research protocols for the clinic per Department of Health and Human Services guidelines. |
| June 1991-<br>February 2006 | Chief of Psychiatric Services, Haight Ashbury Free Clinic. Overall responsibility for psychiatric services at the clinic. |
| December 1990 -<br>June 1991 | Medical Director, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. Responsible for directing all medical and psychiatric care at the clinic. |
| October 1996-July 1997 | Psychiatric Expert for the U.S. District Court, Northern District of California, in the case of Madrid v. Gomez, No. C90-3094-TEH. Report directly to the Special Master regarding the implementation of constitutionally mandated psychiatric care to the inmates at Pelican Bay State Prison. |
| April 1990 –January 2000 | Psychiatric Expert for the U.S. District Court, Eastern District of California, in the case of Gates v. Deukmejian, No. C1V S-87-1636 LKK-JFM. Report directly to the court regarding implementation and monitoring of the consent decree in this case. (This case involves the provision of adequate psychiatric care to the inmates at the California Medical Facility, Vacaville). |

| | |
|---|---|
| January 1984 -<br>December 1990 | Chief of Psychiatric Services, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. Direct medical/psychiatric management of project clients; consultant to staff on substance abuse issues. Special emphasis on dual diagnostic patients. |
| July 1981-<br>December 1981 | Medical/Psychiatric Consultant, Youth Services, Hospitality House, San Francisco, CA. Advised youth services staff on client management. Provided training on various topics related to adolescents. Facilitated weekly client support groups. |

SERVICE TO ELEMENTARY AND SECONDARY EDUCATION:

| | |
|---|---|
| January 1996 -<br>June 2002 | Baseball, Basketball and Volleyball Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |
| September 1994 -<br>Present | Soccer Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |
| June 1991-<br>June 1994 | Board of Directors, Pacific Primary School, San Francisco, CA. |
| April 1989 -<br>July 1996 | Umpire, Rincon Valley Little League, Santa Rosa, CA. |
| September 1988 -<br>May 1995 | Numerous presentations on Mental Health/Substance Abuse issues to the student body, Hidden Valley Elementary School and Santa Rosa Jr. High School, Santa Rosa, CA. |

PRESENTATIONS:

1.    San Francisco Treatment Research Unit, University of California, San Francisco, Colloquium #1.   (10/12/1990).   "The Use of Anti-Depressant Medications with Substance-Abusing Clients."

2.    Grand Rounds.   Department of Psychiatry, University of California, San Francisco, School of Medicine.  (12/5/1990).  "Advances in the Field of Dual Diagnosis."

3.    Associates Council, American College of Physicians, Northern California Region, Program for Leadership Conference, Napa, California.   (3/3/1991).   "Planning a Satisfying Life in Medicine."

4.    24th Annual Medical Symposium on Renal Disease, sponsored by the Medical Advisory Board of the National Kidney Foundation of Northern California, San Mateo, California. (9/11/1991).  "The Chronically Ill Substance Abuser."

5.    Mentoring Skills Conference, University of California, San Francisco, School of Medicine, Department of Pediatrics. (11/26/91). "Mentoring as an Art."

6.    Continuing Medical Education Conference, Sponsored by the Department of Psychiatry, University of California, San Francisco, School of Medicine. (4/25/1992). "Clinical & Research Advances in the Treatment of Alcoholism and Drug Abuse."

7.    First International Conference of Mental Health and Leisure. University of Utah. (7/9/1992). "The Use of Commonly Abused Street Drugs in the Treatment of Mental Illness."

8.    American Group Psychotherapy Association Annual Meeting, San Francisco, California. (2/20/1993). "Inpatient Groups in Initial-Stage Addiction Treatment."

9.    Grand Rounds. Department of Child Psychiatry, Stanford University School of Medicine. (3/17/93, 9/11/96). "Issues in Adolescent Substance Abuse."

10.   University of California, Extension. Alcohol and Drug Abuse Studies Program. (5/14/93), (6/24/94), (9/22/95), (2/28/97). "Dual Diagnosis."

11.   American Psychiatric Association Annual Meeting. (5/26/1993). "Issues in the Treatment of the Dual Diagnosis Patient."

12.   Long Beach Regional Medical Education Center and Social Work Service, San Francisco Veterans Affairs Medical Center Conference on Dual Diagnosis. (6/23/1993). "Dual Diagnosis Treatment Issues."

13.   Utah Medical Association Annual Meeting, Salt Lake City, Utah. (10/7/93). "Prescription Drug Abuse Helping your Patient, Protecting Yourself."

14.   Saint Francis Memorial Hospital, San Francisco, Medical Staff Conference. (11/30/1993). "Management of Patients with Dual Diagnosis and Alcohol Withdrawal."

15.   Haight Ashbury Free Clinic's 27th Anniversary Conference. (6/10/94). "Attention Deficit Disorder, Substance Abuse, Psychiatric Disorders and Related Issues."

16.   University of California, San Diego. Addiction Technology Transfer Center Annual Summer Clinical Institute: (8/30/94), (8/29/95), (8/5/96), (8/4/97), (8/3/98). "Treating Multiple Disorders."

17.   National Resource Center on Homelessness and Mental Illness, A Training Institute for Psychiatrists. (9/10/94). "Psychiatry, Homelessness, and Serious Mental Illness."

18.   Value Behavioral Health/American Psychiatry Management Seminar. (12/1/1994). "Substance Abuse/Dual Diagnosis in the Work Setting."

19.   Grand Rounds. Department of Oral and Maxillofacial Surgery, University of California, San Francisco, School of Dentistry. (1/24/1995). "Models of Addiction."

20.   San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project. (1/25/95, 1/24/96, 1/13/97, 1/21/98, 1/13/99, 1/24/00, 1/12/01). "Demystifying Dual Diagnosis."

21.   First Annual Conference on the Dually Disordered.   (3/10/1995).   "Assessment of Substance Abuse."   Sponsored by the Division of Mental Health and Substance Abuse Services and Target Cities Project, Department of Public Health, City and County of San Francisco.

22.   Delta Memorial Hospital, Antioch, California, Medical Staff Conference.   (3/28/1995). "Dealing with the Alcohol and Drug Dependent Patient."   Sponsored by University of California, San Francisco, School of Medicine, Office of Continuing Medical Education.

23.   Centre Hospitalier Robert-Giffaard, Beoupont (Quebec), Canada.   (11/23/95). "Reconfiguration of Psychiatric Services in Quebec Based on the San Francisco Experience."

24.   The Labor and Employment Section of the State Bar of California.   (1/19/96). "Understanding Alcoholism and its Impact on the Legal Profession."   MCCE Conference, San Francisco, CA.

25.   American Group Psychotherapy Association, Annual Training Institute.   (2/13-2/14/96), National Instructor - Designate training group.

26.   American Group Psychotherapy Association, Annual Meeting.   (2/10/96).   "The Process Group at Work."

27.   Medical Staff Conference, Kaiser Foundation Hospital, Pleasanton, California, "The Management of Prescription Drug Addiction". (4/24/96)

28.   International European Drug Abuse Treatment Training Project, Ankaran, Slovenia, "The Management of the Dually Diagnosed Patient in Former Soviet Block Europe". (10/5-10/11/96)

29.   Contra Costa County Dual Diagnosis Conference, Pleasant Hill, California, "Two Philosophies, Two Approaches: One Client".  (11/14/96)

30.   Faith Initiative Conference, San Francisco, California, "Spirituality: The Forgotten Dimension of Recovery".  (11/22/96)

31.   Alameda County Dual Diagnosis Conference, Alameda, California, "Medical Management of the Dually Diagnosed Patient". (2/4/97, 3/4/97)

32.   Haight Ashbury Free Clinic's 30th Anniversary Conference, San Francisco, California, "Indicators for the Use of the New Antipsychotics". (6/4/97)

33.   DPH/Community Substance Abuse Services/San Francisco Target Cities Project sponsored conference, "Intake, Assessment and Service Linkages in the Substance Abuse System of Care", San Francisco, California.  (7/31/97)

34.   The Institute of Addictions Studies and Lewis and Clark College sponsored conference, 1997 Northwest Regional Summer Institute, "Addictions Treatment: What We Know Today, How We'll Practice Tomorrow; Assessment and Treatment of the High-Risk Offender".  Wilsonville, Oregon. (8/1/97)

35.   The California Council of Community Mental Health Agencies Winter Conference, Key Note Presentation, "Combining funding sources and integrating treatment for addiction problems for children, adolescents and adults, as well as coordination of addiction

treatment for parents with mental health services to severely emotionally disturbed children."  Newport Beach, California.  (2/12/98)

36.    American Group Psychotherapy Association, Annual Training Institute, Chicago, Illinois. (2/16-2/28/1998), Intermediate Level Process Group Leader.

37.    "Multimodal Psychoanalytic Treatment of Psychotic Disorders: Learning from the Quebec Experience."  The Haight Ashbury Free Clinics Inc., sponsored this seminar in conjunction with the San Francisco Society for Lacanian Studies and the Lacanian School of Psychoanalysis.  San Francisco, California.  (3/6-3/8/1998)

38.    "AIDS Update for Primary Care: Substance Use & HIV: Problem Solving at the Intersection."  The East Bay AIDS Education & Training Center and the East Bay AIDS Center, Alta Bates Medical Center, Berkeley, California sponsored this conference. (6/4/1998)

39.    Haight Ashbury Free Clinic's 31st Anniversary Conference, San Francisco, California, "Commonly Encountered Psychiatric Problems in Women."  (6/11/1998)

40.    Community Networking Breakfast sponsored by San Mateo County Alcohol & Drug Services and Youth Empowering Systems, Belmont, California, "Dual Diagnosis, Two Approaches, Two Philosophies, One Patient."  (6/17/1998)

41.    Grand Rounds, Department of Medicine, Alameda County Medical Center-Highland Campus, Oakland, California, "Medical/Psychiatric Presentation of the Patient with both Psychiatric and Substance Abuse Problems."  (6/19/1998)

42.    "Rehabilitation, Recovery, and Reality: Community Treatment of the Dually Diagnosed Consumer."  The Occupational Therapy Association of California, Dominican College of San Rafael and the Psychiatric Occupational Therapy Action Coalition sponsored this conference.  San Rafael, California.  (6/20/1998)

43.    "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Los Angeles County Department of Mental Health sponsored conference, Los Angeles, CA. (6/29/98)

44.    Grand Rounds, Wai'anae Coast Comprehensive Health Center, Wai'anae, Hawaii, "Assessment and Treatment of the Patient who presents with concurrent Depression and Substance Abuse."  (7/15/1998)

45.    "Dual Diagnostic Aspects of Methamphetamine Abuse", Hawaii Department of Health, Alcohol and Drug Abuse Division sponsored conference, Honolulu, Hawaii.  (9/2/98)

46.    9th Annual Advanced Pain and Symptom Management, the Art of Pain Management Conference, sponsored by Visiting Nurses and Hospice of San Francisco.  "Care Issues and Pain Management for Chemically Dependent Patients."   San Francisco, CA. (9/10/98)

47.    Latino Behavioral Health Institute Annual Conference, "Margin to Mainstream III: Latino Health Care 2000."  "Mental Illness and Substance Abuse Assessment: Diagnosis and Treatment Planning for the Dually Diagnosed", Los Angeles, CA.  (9/18/98)

48.    Chemical Dependency Conference, Department of Mental Health, Napa State Hospital, "Substance Abuse and Major Depressive Disorder."  Napa, CA.  (9/23/98)

49.   "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", San Mateo County Drug and Alcohol Services, Belmont, CA.  (9/30/98)

50.   "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Sacramento County Department of Mental Health, Sacramento, CA.  (10/13/98)

51.   California Department of Health, Office of AIDS, 1998 Annual AIDS Case Management Program/Medi-Cal Waiver Program (CMP/MCWP) Conference, "Triple Diagnosis: What's Really Happening with your Patient."  Concord, CA.  (10/15/98)

52.   California Mental Health Director's Association Meeting: Dual Diagnosis, Effective Models of Collaboration; "Multiple Problem Patients: Designing a System to Meet Their Unique Needs", San Francisco Park Plaza Hotel.  (10/15/98)

53.   Northwest GTA Health Corporation, Peel Memorial Hospital, Annual Mental Health Conference, "Recognition and Assessment of Substance Abuse in Mental Illness." Brampton, Ontario, Canada.  (10/23/98)

54.   1998 California Drug Court Symposium, "Mental Health Issues and Drug Involved Offenders."  Sacramento, CA.  (12/11/98)

55.   "Assessment, Diagnosis and Treatment Planning for the Dually Diagnosed", Mono County Alcohol and Drug Programs, Mammoth Lakes, CA.  (1/7/99)

56.   Medical Staff Conference, Kaiser Foundation Hospital, Walnut Creek, CA, "Substance Abuse and Major Depressive Disorder."  (1/19/99)

57.   "Issues and Strategies in the Treatment of Substance Abusers", Alameda County Consolidated Drug Courts, Oakland, CA.  (1/22/99 & 2/5/99)

58.   Compass Health Care's 12th Annual Winter Conference on Addiction, Tucson, AZ: "Dual Systems, Dual Philosophies, One Patient", "Substance Abuse and Developmental Disabilities" & "Assessment and Treatment of the High Risk Offender."  (2/17/99)

59.   American Group Psychotherapy Association, Annual Training Institute, Houston, Texas. (2/22-2/24/1999).  Entry Level Process Group Leader.

60.   "Exploring A New Framework: New Technologies For Addiction And Recovery", Maui County Department of Housing and Human Concerns, Malama Family Recovery Center, Maui, Hawaii.  (3/5 & 3/6/99)

61.   "Assessment, Diagnosis and Treatment of the Dual Diagnostic Patient", San Bernardino County Office of Alcohol & Drug Treatment Services, San Bernardino, CA.  (3/10/99)

62.   "Smoking Cessation in the Chronically Mentally Ill, Part 1", California Department of Mental Health, Napa State Hospital, Napa, CA.  (3/11/99)

63.   "Dual Diagnosis and Effective Methods of Collaboration", County of Tulare Health & Human Services Agency, Visalia, CA.  (3/17/99)

64.   Pfizer Pharmaceuticals sponsored lecture tour of Hawai'i.  Lectures included: Major Depressive Disorder and Substance Abuse, Treatment Strategies for Depression and Anxiety with the Substance Abusing Patient, Advances in the Field of Dual Diagnosis &

Addressing the Needs of the Patient with Multiple Substance Dependencies. Lecture sites included: Straub Hospital, Honolulu; Maui County Community Mental Health; Veterans Administration Hospital, Honolulu; Hawai'i (Big Island) County Community Mental Health; Mililani (Oahu) Physicians Center; Kahi Mohala (Oahu) Psychiatric Hospital; Hale ola Ka'u (Big Island) Residential Treatment Facility.  (4/2-4/9/99)

65.    "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Mendocino County Department of Public Health, Division of Alcohol & Other Drug Programs, Ukiah, CA.  (4/14/99)

66.    "Assessment of the Substance Abusing & Mentally Ill Female Patient in Early Recovery", Ujima Family Services Agency, Richmond, CA.  (4/21/99)

67.    California Institute for Mental Health, Adult System of Care Conference, "Partners in Excellence", Riverside, California.  (4/29/99)

68.    "Advances in the Field of Dual Diagnosis", University of Hawai'i School of Medicine, Department of Psychiatry Grand Rounds, Queens Hospital, Honolulu, Hawai'i.  (4/30/99)

69.    State of Hawai'i Department of Health, Mental Health Division, "Strategic Planning to Address the Concerns of the United States Department of Justice for the Alleged Civil Rights Abuses in the Kaneohe State Hospital."  Honolulu, Hawai'i.  (4/30/99)

70.    "Assessment, Diagnosis and Treatment Planning for the Patient with Dual/Triple Diagnosis", State of Hawai'i, Department of Health, Drug and Alcohol Abuse Division, Dole Cannery, Honolulu, Hawai'i.  (4/30/99)

71.    11th Annual Early Intervention Program Conference, State of California Department of Health Services, Office of Aids, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient."  Concord, California.  (5/6/99)

72.    The HIV Challenge Medical Conference, Sponsored by the North County (San Diego) AIDS Coalition, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient."  Escondido, California.  (5/7/99)

73.    "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Sonoma County Community Mental Health's Monthly Grand Rounds, Community Hospital, Santa Rosa, California.  (5/13/99)

74.    "Developing & Providing Effective Services for Dually Diagnosed or High Service Utilizing Consumers", third annual conference presented by the Southern California Mental Health Directors Association.  Anaheim, California.  (5/21/99)

75.    15th Annual Idaho Conference on Alcohol and Drug Dependency, lectures included "Dual Diagnostic Issues", "Impulse Control Disorders" and "Major Depressive Disorder."  Boise State University, Boise, Idaho.  (5/25/99)

76.    "Smoking Cessation in the Chronically Mentally Ill, Part 2", California Department of Mental Health, Napa State Hospital, Napa, California.  (6/3/99)

77.    "Alcohol and Drug Abuse: Systems of Care and Treatment in the United States", Ando Hospital, Kyoto, Japan.  (6/14/99)

78.    "Alcoholism: Practical Approaches to Diagnosis and Treatment", National Institute On Alcoholism, Kurihama National Hospital, Yokosuka, Japan.  (6/17/99)

79.    "Adolescent Drug and Alcohol Abuse", Kusatsu Kinrofukushi Center, Kusatsu, Japan. (6/22/99)

80.    "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Osaka Drug Addiction Rehabilitation Center Support Network, Kobe, Japan.  (6/26/99)

81.    "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Santa Barbara County Department of Alcohol, Drug, & Mental Health Services, Buellton, California.  (7/13/99)

82.    "Drug and Alcohol Issues in the Primary Care Setting", County of Tulare Health & Human Services Agency, Edison Ag Tac Center, Tulare, California.  (7/15/99)

83.    "Working with the Substance Abuser in the Criminal Justice System", San Mateo County Alcohol and Drug Services and Adult Probation Department, Redwood City, California. (7/22/99)

84.    1999 Summer Clinical Institute In Addiction Studies, University of California, San Diego School of Medicine, Department of Psychiatry.  Lectures included: "Triple Diagnosis: HIV, Substance Abuse and Mental Illness.  What's Really Happening to your Patient?" "Psychiatric Assessment in the Criminal Justice Setting, Learning to Detect Malingering." La Jolla, California.  (8/3/99)

85.    "Assessment, Diagnosis and Treatment Planning for the Patient with Dual and Triple Diagnoses", Maui County Department of Housing and Human Concerns, Maui Memorial Medical Center. Kahului, Maui.  (8/23/99)

86.    "Proper Assessment of the Asian/Pacific Islander Dual Diagnostic Patient", Asian American Recovery Services, Inc., San Francisco, California.  (9/13/99)

87.    "Assessment and Treatment of the Dual Diagnostic Patient in a Health Maintenance Organization", Alcohol and Drug Abuse Program, the Permanente Medical Group, Inc., Santa Rosa, California.  (9/14/99)

88.    "Dual Diagnosis", Residential Care Providers of Adult Residential Facilities and Facilities for the Elderly, City and County of San Francisco, Department of Public Health, Public Health Division, San Francisco, California.  (9/16/99)

89.    "Medical and Psychiatric Aspects of Methamphetamine Abuse", Fifth Annual Latino Behavioral Health Institute Conference, Universal City, California.  (9/23/99)

90.    "Criminal Justice & Substance Abuse", University of California, San Diego & Arizona Department of Corrections, Phoenix, Arizona.  (9/28/99)

91.    "Creating Balance in the Ohana: Assessment and Treatment Planning", Hale O Ka'u Center, Pahala, Hawai'i.  (10/8-10/10/99)

92.    "Substance Abuse Issues of Runaway and Homeless Youth", Homeless Youth 101, Oakland Asian Cultural Center, Oakland, California.  (10/12/99)

93.   "Mental Illness & Drug Abuse - Part II", Sonoma County Department of Mental Health Grand Rounds, Santa Rosa, California.  (10/14/99)

94.   "Dual Diagnosis/Co-Existing Disorders Training", Yolo County Department of Alcohol, Drug and Mental Health Services, Davis, California.  (10/21/99)

95.   "Mental Health/Substance Abuse Assessment Skills for the Frontline Staff", Los Angeles County Department of Mental Health, Los Angeles, California.  (1/27/00)

96.   "Spirituality in Substance Abuse Treatment", Asian American Recovery Services, Inc., San Francisco, California.  (3/6/00)

97.   "What Every Probation Officer Needs to Know about Alcohol Abuse", San Mateo County Probation Department, San Mateo, California.  (3/16/00)

98.   "Empathy at its Finest", Plenary Presentation to the California Forensic Mental Health Association's Annual Conference, Asilomar, California.  (3/17/00)

99.   "Model for Health Appraisal for Minors Entering Detention", Juvenile Justice Health Care Committee's Annual Conference, Asilomar, California.  (4/3/00)

100.  "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Humboldt County Department of Mental Health and Substance Abuse Services, Eureka, California.  (4/4-4/5/00)

101.  "The Dual Diagnosed Client", Imperial County Children's System of Care Spring Training, Holtville, California.  (5/15/00)

102.  National Association of Drug Court Professionals 6th Annual Training Conference, San Francisco, California.  "Managing People of Different Pathologies in Mental Health Courts", (5/31 & 6/1/00); "Assessment and Management of Co-Occurring Disorders" (6/2/00).

103.  "Culture, Age and Gender Specific Perspectives on Dual Diagnosis", University of California Berkeley Extension Course, San Francisco, California.  (6/9/00)

104.  "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Thunder Road Adolescent Treatment Centers, Inc., Oakland, California.   (6/29 & 7/27/00)

105.  "Assessing the Needs of the Entire Patient: Empathy at its Finest", NAMI California Annual Conference, Burlingame, California.  (9/8/00)

106.   "The Effects of Drugs and Alcohol on the Brain and Behavior", The Second National Seminar on Mental Health and the Criminal Law, San Francisco, California.  (9/9/00)

107.  Annual Conference of the Associated Treatment Providers of New Jersey, Atlantic City, New Jersey.   "Advances in Psychopharmacological Treatment with the Chemically Dependent Person" & "Treatment of the Adolescent Substance Abuser" (10/25/00).

108.  "Psychiatric Crises In The Primary Care Setting", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service.   (11/1/00, 3/13/01)

109. "Co-Occurring Disorders: Substance Abuse and Mental Health", California Continuing Judicial Studies Program, Center For Judicial Education and Research, Long Beach, California. (11/12-11/17/00)

110. "Adolescent Substance Abuse Treatment", Alameda County Behavioral Health Care Services, Oakland, California. (12/5/00)

111. "Wasn't One Problem Enough?" Mental Health and Substance Abuse Issues. 2001 California Drug Court Symposium, "Taking Drug Courts into the New Millennium." Costa Mesa, California. (3/2/01)

112. "The Impact of Alcohol/Drug Abuse and Mental Health Disorders on the Developmental Process." County of Sonoma Department of Health Services, Alcohol and Other Drug Services Division. Santa Rosa, California. (3/8 & 4/5/01)

113. "Assessment of the Patient with Substance Abuse and Mental Health Issues." San Mateo County General Hospital Grand Rounds. San Mateo, California. (3/13/01)

114. "Dual Diagnosis-Assessment and Treatment Issues." Ventura County Behavioral Health Department Alcohol and Drug Programs Training Institute, Ventura, California. (5/8/01)

115. Alameda County District Attorney's Office 4th Annual 3R Conference, "Strategies for Dealing with Teen Substance Abuse." Berkeley, California. (5/10/01)

116. National Association of Drug Court Professionals 7th Annual Training Conference, "Changing the Face of Criminal Justice." I presented three separate lectures on the following topics: Marijuana, Opiates and Alcohol. New Orleans, LA. (6/1-6/2/01)

117. Santa Clara County Drug Court Training Institute, "The Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders." San Jose, California. (6/15/01)

118. Washington Association of Prosecuting Attorneys Annual Conference, "Psychiatric Complications of the Methamphetamine Abuser." Olympia, Washington. (11/15/01)

119. San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis." (1/14/02)

120. First Annual Bi-National Conference sponsored by the Imperial County Behavioral Health Services, "Models of Family Interventions in Border Areas." El Centro, California. (1/28/02)

121. The California Association for Alcohol and Drug Educators 16th Annual Conference, "Assessment, Diagnosis and Treatment of Patients with Multiple Diagnoses." Burlingame, California. (4/25/02)

122. Marin County Department of Health and Human Services, Dual Diagnosis and Cultural Competence Conference, "Cultural Considerations in Working with the Latino Patient." (5/21/02)

123. 3rd Annual Los Angeles County Law Enforcement and Mental Health Conference, "The Impact of Mental Illness and Substance Abuse on the Criminal Justice System." (6/5/02)

124. New Mexico Department of Corrections, "Group Psychotherapy Training." Santa Fe, New Mexico. (8/5/02)

125.   Judicial Council of California, Administrative Office of the Courts, "Juvenile Delinquency and the Courts: 2002." Berkeley, California. (8/15/02)

126.   California Department of Alcohol and Drug Programs, "Adolescent Development and Dual Diagnosis." Sacramento, California. (8/22/02)

127.   Haight Ashbury Free Clinic's 36th Anniversary Conference, San Francisco, California, "Psychiatric Approaches to Treating the Multiple Diagnostic Patient." (6/6/03)

128.   Motivational Speaker for Regional Co-Occurring Disorders Training sponsored by the California State Department of Alcohol and Drug Programs and Mental Health and the Substance Abuse Mental Health Services Administration-Center for Substance Abuse Treatment, Samuel Merritt College, Health Education Center, Oakland, California. (9/4/03)

129.   "Recreational Drugs, Parts I and II", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service. (10/1/03), (12/3/03)

130.   "Detecting Substance Abuse in our Clients", California Attorneys for Criminal Justice Annual Conference, Berkeley, California. (10/18/03)

131.   "Alcohol, Alcoholism and the Labor Relations Professional", 10th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section. Pasadena, California. (4/2/04)

132.   Lecture tour of Japan (4/8-4/18/04). "Best Practices for Drug and Alcohol Treatment." Lectures were presented in Osaka, Tokyo and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

133.   San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis." (9/9/04)

134.   "Substance Abuse and the Labor Relations Professional", 11th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section. Sacramento, California. (4/8/05)

135.   "Substance Abuse Treatment in the United States", Clinical Masters Japan Program, Alliant International University. San Francisco, California. (8/13/05)

136.   Habeas Corpus Resource Center, Mental Health Update, "Understanding Substance Abuse." San Francisco, California. (10/24/05)

137.   Yolo County Department of Behavioral Health, "Psychiatric Aspects of Drug and Alcohol Abuse." Woodland, California. (1/25/06), (6/23/06)

138.   "Methamphetamine-Induced Dual Diagnostic Issues", Medical Grand Rounds, Wilcox Memorial Hospital, Lihue, Kauai. (2/13/06)

139.   Lecture tour of Japan (4/13-4/23/06). "Assessment and Treatment of the Patient with Substance Abuse and Mental Illness." Lectures were presented in Hiroshima and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

140.   "Co-Occurring Disorders: Isn't It Time We Finally Got It Right?" California Association of Drug Court Professionals, 2006 Annual Conference.   Sacramento, California. (4/25/06)

141.   "Proper Assessment of Drug Court Clients", Hawaii Drug Court, Honolulu. (6/29/06)

142.   "Understanding Normal Adolescent Development," California Association of Drug Court Professionals, 2007 Annual Conference.  Sacramento, California. (4/27/07)

143.   "Dual Diagnosis in the United States," Conference sponsored by the Genesis Substance Abuse Treatment Network.  Medford, Oregon. (5/10/07)

144.   "Substance Abuse and Mental Illness: One Plus One Equals Trouble," National Association of Criminal Defense Lawyers 2007 Annual Meeting & Seminar.   San Francisco, California.  (8/2/07)

145.   "Capital Punishment," Human Writes 2007 Conference.  London, England.  (10/6/07)

146.   "Co-Occurring Disorders for the New Millennium," California Hispanic Commission on Alcohol and Drug Abuse, Montebello, California.  (10/30/07)

147.   "Methamphetamine-Induced Dual Diagnostic Issues for the Child Welfare Professional," Beyond the Bench Conference.  San Diego, California. (12/13/07)

148.   "Working with Mentally Ill Clients and Effectively Using Your Expert(s)," 2008 National Defender Investigator Association (NDIA), National Conference, Las Vegas, Nevada. (4/10/08)

149.   "Mental Health Aspects of Diminished Capacity and Competency," Washington Courts District/Municipal Court Judges' Spring Program.  Chelan, Washington.  (6/3/08)

150.   "Reflection on a Career in Substance Abuse Treatment, Progress not Perfection," California Department of Alcohol and Drug Programs 2008 Conference.  Burlingame, California.  (6/19/08)

151.   Mental Health and Substance Abuse Training, Wyoming Department of Health, "Diagnosis and Treatment of Co-occurring Mental Health and Substance Abuse." Buffalo, Wyoming. (10/6/09)

152.   2010 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th & 5th, 2010)

153.   Facilitating Offender Re-entry to Reduce Recidivism: A Workshop for Teams, Menlo Park, CA.  This conference was designed to assist Federal Courts to reduce recidivism. "The Mentally-Ill Offender in Reentry Courts," (9/15/2010)

154.   Juvenile Delinquency Orientation, "Adolescent Substance Abuse." This was part of the "Primary Assignment Orientations" for newly appointed Juvenile Court Judges presented by The Center for Judicial Education and Research of the Administrative Office of the Court.  San Francisco, California. (1/12/2011, 1/25/12, 2/27/13 & 1/8/14)

155.   2011 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th, 2011)

156. 2012 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 2nd, 2012)

157. Mexican Capital Legal Assistance Program Meeting, "Issues Related to Mental Illness in Mexican Nationals." Santa Fe, New Mexico (10/12/12); Houston, Texas (4/23/13)

158. Los Angeles County Public Defender's Capital Case Seminar, "Mental Illness and Substance Abuse." Los Angeles, California. (9/27/13)


PUBLICATIONS:

1) Kanas, N., Stewart, P. and Haney, K. (1988). *Content and Outcome in a Short-Term Therapy Group for Schizophrenic Outpatients*. Hospital and Community Psychiatry, 39, 437-439.

2) Kanas, N., Stewart, P. (1989*). Group Process in Short-Term Outpatient Therapy Groups for Schizophrenics.* Group, Volume 13, Number 2, Summer 1989, 67-73.

3) Zweben, J.E., Smith, D.E. and Stewart, P. (1991). *Psychotic Conditions and Substance Use: Prescribing Guidelines and Other Treatment Issues.* Journal of Psychoactive Drugs, Vol. 23(4), Oct.-Dec. 1991, 387-395.

4) Banys, P., Clark, H.W., Tusel, D.J., Sees, K., Stewart, P., Mongan, L., Delucchi, K., and Callaway, E. (1994). *An Open Trial of Low Dose Buprenorphine in Treating Methadone Withdrawal*. Journal of Substance Abuse Treatment, Vol. 11(1), 9-15.

5) Hall, S.M., Tunis, S., Triffleman, E., Banys, P., Clark, H.W., Tusel, D., Stewart, P., and Presti, D. (1994). *Continuity of Care and Desipramine in Primary Cocaine Abusers.* The Journal of Nervous and Mental Disease, Vol. 182(10), 570-575.

6) Galloway, G.P., Frederick, S.L., Thomas, S., Hayner, G., Staggers, F.E., Wiehl, W.O., Sajo, E., Amodia, D., and Stewart, P. (1996). *A Historically Controlled Trial Of Tyrosine for Cocaine Dependence.* Journal of Psychoactive Drugs, Vol. 28(3), pages 305-309, July-September 1996.

7) Stewart, P. (1999). *Alcoholism: Practical Approaches To Diagnosis And Treatment.* Prevention, (Newsletter for the National Institute On Alcoholism, Kurihama Hospital, Yokosuka, Japan) No. 82, 1999.

8) Stewart, P. (1999). *New Approaches and Future Strategies Toward Understanding Substance Abuse.* Published by the Osaka DARC (Drug Abuse Rehabilitation Center) Support Center, Osaka, Japan, November 11, 1999.

9) Stewart, P. (2002). *Treatment Is A Right, Not A Privilege.* Chapter in the book, *Understanding Addictions-From Illness to Recovery and Rebirth,* ed. by Hiroyuki Imamichi and Naoko Takiguchi, Academia Press (Akademia Syuppankai): Kyoto, Japan, 2002.

10) Stewart, P., Inaba, D.S., and Cohen, W.E. (2004). *Mental Health & Drugs.* Chapter in the book, *Uppers, Downers, All Arounders, Fifth Edition*, CNS Publications, Inc., Ashland, Oregon.

11)   James Austin, Ph.D., Kenneth McGinnis, Karl K. Becker, Kathy Dennehy, Michael V. Fair, Patricia L. Hardyman, Ph.D. and Pablo Stewart, M.D. (2004) *Classification of High Risk and Special Management Prisoners, A National Assessment of Current Practices.* National Institute of Corrections, Accession Number 019468.

12)   Stanley L. Brodsky, Ph.D., Keith R. Curry, Ph.D., Karen Froming, Ph.D., Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D. and Hans Toch, Ph.D. (2005) *Brief of Professors and Practitioners of Psychology and Psychiatry as AMICUS CURIAE in Support of Respondent: Charles E. Austin, et al. (Respondents) v. Reginald S. Wilkinson, et al. (Petitioners), In The Supreme Court of the United States, No. 04-495.*

13)   Stewart, P., Inaba, D.S., and Cohen, W.E.   (2007).  *Mental Health & Drugs.*  Chapter in the book,  *Uppers, Downers, All Arounders, Sixth Edition*, CNS Publications, Inc., Ashland, Oregon.

14)   Stewart, P., Inaba, D.S. and Cohen, W.E. (2011). *Mental Health & Drugs.* Chapter 10 in the book,  *Uppers, Downers, All Arounders, Seventh Edition,* CNS Publications, Inc., Ashland, Oregon.