Dan Stormer, Esq. [S.B. # 101967]
Josh Piovia-Scott, Esq. [S.B. #222364]
Mohammad Tajsar, Esq. [S.B. #280152]
HADSELL STORMER & RENICK LLP
128 N. Fair Oaks Avenue
Pasadena, California 91103
Telephone: (626) 585-9600/Facsimile:  (626) 577-7079
Emails: dstormer@hadsellstormer.com
          jps@hadsellstormer.com, and
          mtajsar@hadsellstormer.com

Lori Rifkin, Esq. [S.B. # 244081]
RIFKIN LAW OFFICE
P.O. Box 19169
Oakland, California 94619
Telephone: (415) 685-3591
Email: lrifkin@rifkinlawoffice.com

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Estate of JOSHUA CLAYPOLE, deceased, by and through SILVIA GUERSENZVAIG, as Administrator; SILVIA GUERSENZVAIG,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF SAN MATEO; SHERIFF GREG MUNKS, in his individual and official capacity; COUNTY OF MONTEREY; SHERIFF SCOTT MILLER, in his individual and official capacity; SERGEANT E. KAYE, in his individual and official capacity; CITY OF MONTEREY; MONTEREY POLICE DEPARTMENT CHIEF PHILIP PENKO, in his individual and official capacity; BRENT HALL, in his individual and official capacity; CALIFORNIA FORENSIC MEDICAL GROUP; DR. TAYLOR FITHIAN, in his individual and official capacity; COMMUNITY HOSPITAL OF MONTEREY PENINSULA; and DOES 1 through 30,<br><br>Defendants. | Case No: CV 14-02730 BLF<br><br>[Assigned to the Honorable Beth Labson Freeman - Courtroom 3]<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SANCTIONS AND TO COMPEL DISCOVERY**<br><br>DATE:        December 15, 2015<br>TIME:        10:00 a.m.<br>CRTRM:        5<br>JUDGE:        Hon. Paul Grewal<br><br>Complaint Filed:        June 12, 2014<br>FAC Filed:        October 28, 2014<br>Discovery Cut-Off:        August 31, 2015<br>Motion Cut-Off:        January 14, 2016<br>Trial Date:        April 11, 2016 |

1   **TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:**

2       **PLEASE TAKE NOTICE** that on December 15, 2015, at 10:00 a.m. in

3   Courtroom 5 of the above-entitled court, or as soon thereafter as this matter may be heard,

4   Plaintiffs will and hereby do move this Court pursuant to Federal Rule of Civil Procedure

5   37 and Northern District Local Rule 37 for orders compelling further discovery with

6   respect to Plaintiffs' request for production of documents during expert discovery and for

7   discovery sanctions for improper conduct of Defendants CFMG's and Fithian's counsel

8   during discovery.  Plaintiffs will also move for costs and attorney's fees associated with

9   bringing this motion in accordance with Federal Rule of Civil Procedure 37(a)(5).

10      Good cause exists to hear and grant this motion to compel despite the expert

11  discovery cut-off of October 23, 2015, pursuant to Local Rule 37-3.   The discovery

12  dispute regarding production of documents relied upon by Defendants' expert arose on

13  October 16, 2015 during Dr. Hayward's deposition, and the dispute ripened only after

14  Plaintiffs' attempts to resolve this dispute with Defendants during the following weeks

15  were unproductive.  Plaintiff has brought this motion as soon as practicable after receiving

16  the expert deposition transcripts on October 30, 2015.  Further, Defendants' counsel has

17  engaged in an extensive pattern of improper behavior throughout discovery that, without

18  intervention of this Court, will have the effect of obstructing Plaintiffs from discovery to

19  which they are fairly entitled, thereby prejudicing Plaintiffs and rewarding Defendants'

20  counsel's improper discovery tactics.  A motion to compel and to grant sanctions is

21  therefore Plaintiffs' only means of relief.

22  / / /

23  / / /

24  / / /

25

26

27

28

1    This motion is based on this Notice of Motion and Motion, the memorandum of

2    points and authorities filed herewith, the Declaration of Lori Rifkin and attached exhibits,

3    and all pleadings and files on record in this action, as well as any oral argument and

4    evidence that may be presented at any hearing on this motion.

5

6    Dated: November 10, 2015                    Respectfully Submitted,

7                                                RIFKIN LAW OFFICE

8                                                HADSELL STORMER & RENICK LLP

9
                                                 By: _/s/ Dan Stormer_____
10                                                       Dan Stormer
11                                                       Josh Piovia-Scott
                                                         Mohammad Tajsar
12                                               Attorneys for Plaintiffs

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

Page(s)

3     INTRODUCTION ................................................................................................ 1

4     PROCEDURAL AND FACTUAL BACKGROUND ......................................... 1

5
6     I.     Hayward Request for Production of Documents.................................... 1

7     II.    Mr. Bertling's Improper Discovery Conduct ........................................ 4

8            A.     Mr. Bertling's sexist attack on Plaintiffs' counsel........................ 4

9
10           B.     Improper instructions not to answer deposition questions ........... 5

11           C.     Mr. Bertling's extensive objections, inappropriate comments,
                    and witness coaching ..................................................................... 6

12
13                  1.     Examples of Extensive Speaking Objections, Editorial
                           Comments, and Coaching and Suggesting of Testimony to
14                         Witnesses ............................................................................. 6

15                  2.     Examples of Physically Pointing Deponent to Specific
                           Pages and Documents to Coach Deposition Testimony ................ 10
16

17                  3.     Examples of Mr. Bertling Answering for Deponent ....................... 12

18                  4.     Whispering to Deponent During Testimony .................................. 15

19                  5.     Examples of Cutting Deponents Off in the Middle of Answers ...... 15
20

21    ARGUMENT.................................................................................................... 16

22    I.     Defendants Failed to Respond to Plaintiffs' Requests for Production
             to Hayward and Should Be Compelled to Produce Responsive Documents
23           and Recall Hayward for Deposition at Defendants' Expense ................ 16

24    II.    Mr. Bertling's Improper Conduct Throughout the Course of Discovery
             Interfered with Plaintiffs' Ability to Fairly Examine Witnesses and Obtain
25           Relevant Evidence, Wasted Plaintiffs' and the Court's Resources, and
26           Warrants the Imposition of Sanctions .................................................. 17

27    CONCLUSION ................................................................................................ 21

28

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

## FEDERAL CASES

4

*BNSF Ry. Co. v. San Joaquin Valley R. Co.*

5
    2009 WL 3872043 (E.D. Cal. Nov. 17, 2009) ....................................................... 18

6

*Cordova v. United States*

7
    2006 WL 4109659 (D.N.M. July 30, 2006) .......................................................... 18

8

*Craig v. St. Anthony's Med. Ctr.*

9
    2009 WL 690210 (E.D. Mo. Mar. 12, 2009).......................................................... 18

10

*Cruz-Aponte v. Caribbean Petroleum Corp.*
    2015 WL 5006213 (D.P.R. Aug. 1, 2015) ............................................................ 19

11

*Funk v. Town of Paradise*

12
    2011 U.S.Dist. LEXIS 69434 (E.D. Cal. June 28, 2011) ...................................... 17

13

 *In re Cathode Ray Tube (CRT) Antitrust Litig.,*

14
    No. 3:07-cv-5944SC, 2015 U.S. Dist. LEXIS 147409, at *167

15
    (N.D. Cal. Aug. 6, 2015) ........................................................................................ 17

16

*In re Plaza Hotel Corp.*

17
    111 B.R. 882 (Bankr. E.D. Cal. 1990) ............................................................ 19, 20

18

*JSR Micro, Inc. v. QBE Ins. Corp.*

19
    2010 WL 1338152 (N.D. Cal. Apr. 5, 2010).......................................................... 20

20

*Lund v. Matthews*
    2014 WL 517569 (D. Neb. Feb. 7, 2014).............................................................. 18

21

*Matter of Yagman*

22
    796 F.2d 1165 (9th Cir. 1986) ............................................................................... 20

23

*Sec. National Bank of Sioux City, IA v. Day*

24
    800 F.3d 936 (8th Cir. 2015) ................................................................................. 17

25

## FEDERAL STATUTES

26

Federal Rules of Civil Procedure

27
    Rule 30(c)(2) ......................................................................................................... 17
    Rule 30(d)(2) ......................................................................................................... 18

28
    Rule 37.......................................................................................... 1, 16, 17

1

**INTRODUCTION**

2

Defendants CFMG's and Fithian's lead counsel, Peter Bertling, has engaged in an

3

extensive pattern of improper behavior throughout discovery that, without intervention of

4

this Court, will have the effect of obstructing Plaintiffs from discovery to which they are

5

fairly entitled, thereby prejudicing Plaintiffs and rewarding Defendants' counsel's

6

improper discovery tactics.  This behavior includes not only the production of a literally

7

broken DVD as the response to request for production of documents at an expert

8

deposition and subsequent refusal to produce responsive documents, but, also, substantial

9

deposition misconduct including extensive coaching, suggestive speaking objections,

10

answering questions for deponents and otherwise interfering with deponents' answers, and

11

gender-based statements to Plaintiffs' counsel.  A motion to compel and to grant sanctions

12

is Plaintiffs' only means of relief and is necessary to deter further such conduct.

13

Moreover, as set forth in the background section below, good cause exists to hear

14

and grant this motion despite the expert discovery cut-off of October 23, 2015, pursuant to

15

Local Rule 37-3.   The discovery dispute regarding production of documents relied upon

16

by Defendants' expert arose on October 16, 2015 during Dr. Hayward's deposition, and

17

the dispute ripened only after Plaintiffs' attempts to resolve this dispute with Defendants

18

during the following weeks were unproductive.  Declaration of Lori Rifkin ("Rifkin

19

Decl.") ¶ 7.  Plaintiffs have brought this motion as soon as practicable after receiving the

20

expert deposition transcripts on October 30, 2015. Rifkin Decl. ¶ 8.

21

**PROCEDURAL AND FACTUAL BACKGROUND**

22

**I.    Hayward Request for Production of Documents**

23

On October 2, 2015, following the September 28, 2015 disclosure of experts in this

24

matter, and after meeting and conferring with Defendants about date and location,

25

Plaintiffs served Plaintiffs' Notice of the Deposition of Defendant California Forensic

26

Medical Group's Retained Expert Richard Hayward, Ph.D. and Request for Production of

27

Documents.  Rifkin Decl. ¶ 2; Exhibit ("Ex.") A.  Plaintiffs noticed Dr. Hayward's

28

deposition for October 16, 2015 and requested production of documents related to Dr.

1    Hayward's expert report by that date.  These requests included, *inter alia*, requests for

2    production of specific documents listed in Dr. Hayward's report that he relied upon and/or

3    reviewed, Dr. Hayward's notes from his inspections of Monterey County Jail and

4    assessments of suicides including Claypole's, and communications from Dr. Hayward in

5    both *Hernandez* and *Claypole* relating to provision of mental health treatment and suicide

6    prevention at Monterey County Jail.[1]  Rifkin Decl. ¶ 2; Ex. A.  Defendants asserted only

7    general objections in response to these requests for production and did not state that they

8    were refusing to produce any responsive documents.  Rifkin Decl. ¶ 3; Ex. B.

9         On October 16, 2015, at the beginning of Dr. Hayward's deposition, Defendants'

10   counsel, Peter Bertling, presented Plaintiffs' counsel with a DVD that he represented as

11   Dr. Hayward's production of documents, along with a paper production of email

12   communications between Dr. Hayward and Defendants' counsel.  Rifkin Decl. ¶ 4.  The

13   DVD was physically cracked, rendering the disc useless.  Rifkin Decl. ¶ 4; Ex. C.  Mr.

14   Bertling represented that he would have his office send the documents on the DVD

15   electronically to Plaintiffs' counsel during the deposition.  Rifkin Decl. ¶ 5; Ex. D at 8:1-

16   18.  Plaintiffs' counsel checked in with Mr. Bertling mid-way through the deposition and

17   Mr. Bertling again agreed to ensure that this happened.  Rifkin Decl. ¶ 5.  However, this

18   did not occur, and Plaintiffs reserved their right on the record to hold the deposition of Dr.

19   Hayward open pending production of those documents.  Rifkin Decl. ¶ 5; Ex. D at

20   188:18-189:1.  Plaintiffs' counsel confirmed with Dr. Hayward that he had produced

21   documents responsive to Plaintiffs' requests for production and he believed that those

22   were on the broken DVD, but counsel was unable to probe Dr. Hayward further regarding

23   the information because it was not accessible via the broken DVD.  Rifkin Decl. ¶ 6; Ex.

24   D at 7:2-8:18.

25        By October 21, 2015, Defendants still had not produced the documents responsive

26   ────────────────

27   [1] Because Defendants failed to respond to almost all of Plaintiffs' Requests to Dr.
     Hayward for Production of Documents, with the exception of certain email
28   communications between Dr. Hayward and Defendants' counsel, all outstanding requests
     for production are reproduced as Appendix A to this motion.

1   to the Hayward Requests for Production.  Rifkin Decl. ¶ 7.  Following inquiry from

2   Plaintiffs' counsel on October 21, 2015, Defendants' counsel produced four documents to

3   Plaintiffs that it represented as Dr. Hayward's production.  Rifkin Decl. ¶ 7; Ex. C.

4   However, these documents were in no way sufficient responses to Plaintiffs' Requests for

5   Production, given that they consisted solely of a duplicate production of Dr. Hayward's

6   expert report, Plaintiffs' expert disclosure, Plaintiff's expert's report, and the emails

7   between Dr. Hayward and Defendants' counsel that were already produced on paper.  *Id.*

8   Plaintiffs' counsel attempted to meet and confer on October 26 and October 27 with Mr.

9   Bertling regarding apparent discrepancies between the documents requested, documents

10  produced, and Dr. Hayward's testimony on this issue (which was limited because

11  Plaintiffs' counsel did not know what was on the DVD and Mr. Bertling represented the

12  documents would be produced during the course of the deposition).  *Id.* Mr. Bertling's

13  meet and confer response on October 26, 2015 failed to respond to the issue beyond

14  asking Plaintiffs' counsel, "What do you believe we should be producing that has not

15  already been produced?  You already have many of the documents referred to by Dr.

16  Hayward in his report."  *Id.*  At no time did Mr. Bertling clarify what documents were

17  actually on the broken DVD or explain how Defendants could possibly contend that no

18  responsive documents existed beyond Dr. Hayward's report and Plaintiff's expert

19  disclosures.  *Id.*

20          Plaintiffs' counsel responded to Mr. Bertling's questions on October 27, 2015,

21  explaining that the requests for production "included, inter alia, requests for all materials

22  relied upon by Dr. Hayward in his two reports offered as a disclosure in this case, notes

23  from his jail visits, incident reports reviewed, as well as specific documents that he

24  referenced that had not previously been produced to Plaintiffs."  Plaintiffs' counsel

25  requested that Mr. Bertling clarify whether the four documents constituted the full extent

26  of the production in response to the Hayward request for documents so that the issue

27  could be brought before the Court.  *Id.* Mr. Bertling did not respond to Plaintiffs'

28  counsel's emails nor did Defendants produce any additional documents.  *Id.*  Plaintiff's

1   counsel received the transcript of Dr. Hayward's deposition on October 30, 2015.  Rifkin

2   Decl. ¶ 8.  Plaintiff therefore now moves to compel production of documents and recall

3   Dr. Hayward for further deposition at cost to Defendants so that Plaintiffs can obtain

4   necessary information about the bases of Dr. Hayward's expert opinions.

5   **II.      Mr. Bertling's Improper Discovery Conduct**

6          The production of a broken DVD and failure to subsequently produce responsive

7   documents is typical of Mr. Bertling's improper conduct throughout the discovery

8   process, best typified by a blatant sexist attack on Plaintiffs' counsel. Even before the

9   depositions, when Mr. Bertling's discovery misconduct was most severe, Mr. Bertling's

10  lack of cooperation in deposition scheduling required unreasonable and prolonged

11  negotiation about deposition dates and agreements to produce deponents for deposition.

12  For example, as detailed in the attached Declaration of Lori Rifkin, Mr. Bertling's

13  obstructive discovery tactics forced Plaintiffs' counsel to spend almost the entirety of

14  three days in late July 2015 re-negotiating dates and deposition agreements with Mr.

15  Bertling that had previously been agreed to in writing by an associate at his firm. Rifkin

16  Decl. ¶¶ 9-10; Ex. F. Because the totality of Mr. Bertling's conduct frustrated the

17  purposes of discovery and unduly obstructed the discovery process, Plaintiffs seek

18  discovery sanctions against Mr. Bertling.

19         **A.      Mr. Bertling's sexist attack on Plaintiffs' counsel**

20         Along with the numerous other examples of inappropriate discovery conduct

21  itemized below, Mr. Bertling's obstreperous behavior is best exemplified by a blatant

22  gender-based attack on Plaintiffs' counsel during the deposition of Dr. Fithian on August

23  31, 2015. While Plaintiff's counsel was moving to strike an answer as non-responsive,

24  Mr. Bertling interrupted her. When she requested that he not interrupt her, Mr. Bertling

25  told her, "Move on with your next question and don't raise your voice at me.  It's not

26  becoming of a woman or an attorney who is acting professionally under the rules of

27  professional responsibility."  Rifkin Decl. ¶ 12; Ex. G at 28:5-21.

28  / / /

1

### B.     Improper instructions not to answer deposition questions

2     Beyond personal attacks, Mr. Bertling's unprofessional and prejudicial behavior

3  persisted during each of Plaintiffs' depositions of Dr. Fithian, most notably the Rule

4  30(b)(6) deposition of Dr. Fithian conducted on July 31, 2015.  Throughout this

5  deposition, despite Defendants' failure to object to any of the topics noticed for

6  deposition, Mr. Bertling repeatedly and improperly instructed Dr. Fithian not to answer

7  questions squarely within those topics.  *See* Suppl. Brief in Support of Mot. to Compel

8  Defendant CFMG's Further Response to Production of Documents (Dkt. No. 89-1, Ex. A)

9  at 7:11-9:4.[2]

10     Plaintiffs were forced to move to compel additional testimony by Dr. Fithian

11  regarding the 30(b)(6) topics, and although the Court substantially granted this motion, it

12  did not award costs or fees for that motion, and the additional day of deposition was at

13  Plaintiffs' expense.  Dkt. No. 92.  During Dr. Fithian's second 30(b)(6) deposition,

14  ordered by the Court, Mr. Bertling continued to provide lengthy instructions not to answer

15  on topics specifically designated by the Court for the second deposition.  Ex. H at 6:5-

16  8:18.  When Plaintiffs' counsel advised Mr. Bertling, "if you continue to engage in

17  elaborate speaking objections, and waste the three hours allotted to us, we will go back to

18  the judge."  Mr. Bertling replied "That's fine." Ex. H at 8:24-9:3.

19     During Dr. Fithian's individual deposition on August 31, 2015, which followed the

20  Court's August 18, 2015 decision substantially granting Plaintiff's motion to compel, Mr.

21  Bertling again instructed Dr. Fithian not to answer various questions, including those

22  about his salary, income and personal finances, and the positions he holds with CFMG-

23

---

[2] Furthermore, Defendants' counsel had repeatedly insisted that Plaintiffs' counsel begin
24  Dr. Fithian's individual deposition that same day if the 30(b)(6) portion were concluded,
and Plaintiffs' counsel had agreed to do so in an effort to accommodate Dr. Fithian's
25  schedule.  Rifkin Decl. ¶ 10; Ex. F. As would reasonably be expected, this required
Plaintiffs' counsel to prepare for both Dr. Fithian's 30(b)(6) and individual depositions in
26  advance of July 31, 2015.  Rifkin Decl. ¶ 10.  However, on the day of the deposition, Mr.
Bertling maintained that no portion of Dr. Fithian's individual deposition could go
27  forward, in direct contradiction of all prior communications by Defendants' counsel.
Rifkin Decl. ¶ 10; Ex. D. at 118:15-120:25.
28

1  related business entities.  Rifkin Decl. ¶ 11; Ex. G at 17:13-19:20, 99:14-100:25, 102:1-

2  20, 106:9-107:16, and 111:10- 12.  Plaintiffs' counsel requested a same-day telephonic

3  hearing with Magistrate Judge Grewal.  Rifkin Decl. ¶ 11; *see also* Dkt. No. 95.  The

4  Court accommodated this request and ruled that Dr. Fithian must answer questions on his

5  finances and positions he held with CFMG-related business entities as of the time of Mr.

6  Claypole's death.  Dkt. No. 96.

7       **C.      Mr. Bertling's extensive objections, inappropriate comments, and**

8              **witness coaching**

9       Following his sexist attempt to silence Plaintiffs' counsel, Mr. Bertling then

10  proceeded to engage in extensive speaking objections, editorial comments, coaching and

11  suggesting of testimony to witnesses, physically pointing witnesses to specific pages and

12  parts of documents, interrupting deponents and speaking to them during answers, and

13  even answering questions himself in this and subsequent depositions of Dr. Fithian and

14  Defendants' experts.  When Plaintiffs' counsel attempted to meet and confer with him

15  regarding these improper tactics, a typical response from Mr. Bertling was:  "Do what you

16  need to do, Lori.  Ask your next question." Rifkin Decl. ¶ 13; Ex. I at 102:3-17.

17          *1.      Examples of Extensive Speaking Objections, Editorial Comments,*

18                *and Coaching and Suggesting of Testimony to Witnesses*

19  Q:  Are you familiar with the September 28th, 2014, suicide of Mikol
    Stewart in Sonoma County Jail?

20  A:  What jail?

21  Q:  Sonoma County Jail

    Mr. Bertling:  So we are not going to go through any other suicides.  We are

22  here today for the treatment and care that he provided to Mr. Claypole.
    That's what this deposition was for.  The Court has allowed you to have a

23  second—another deposition where that information was covered.  We are
    not going to go over that today.  You've asked nothing about Mr. Claypole,

24  and it's about time you did.

    Ms. Rifkin:   Peter, Dr. Fithian is here as an individual defendant.  It's not a

25  30(b)(6).  We are not required to notice topics.  You can object on
    relevance.  And the time to take that up with the Court is before trial.  That

26  is not grounds to instruct your client not to answer here.

27  Mr. Bertling:  Well, he has not reviewed the documentation that you're
    referring to, so you're probably not going to get answers.  If you want to

28

waste time—you got seven hours on this deposition.  He is not going to be made available for additional time.  So do whatever you need to do.

Ms. Rifkin:  Why are you testifying about what documentation or what your client is familiar with?  Please stop advising your client on how to answer.  You know that the federal rules prohibit speaking objections.  They prohibit statements, for example, such as, "If you can understand the question, go ahead."  I have allowed you to keep saying them because I didn't want to disrupt the deposition, but you know those comments are not allowed.

Mr. Bertling:  I'm not doing anything that's inappropriate.  Please move forward with your questions.

Ex. G at 79:19-81:4.

Coaching with respect to one of the fundamental issues of the case, which is the sufficiency of suicide risk assessments performed at Monterey County Jail, and whether any were conducted for Joshua Claypole:

Q:  Have there been any changes made to the suicide risk assessment form used by Monterey County—or used at Monterey County Jail since May 2013?

Mr. Bertling:  Are you talking about the nursing assessment or the intake triage?

Ms. Rifkin:  I'm talking about the suicide risk assessment.

Mr. Bertling:  Well, the intake triage is a suicide risk assessment, that's why it's vague and ambiguous.

Ms. Rifkin:  I'm asking Dr. Fithian.

Ex. H at 115:6-17.

Example of speaking objections improperly coaching and providing information to the witness during the deposition of Defendants' expert Dr. Hayward:

Q:  And I just want to clarify, because DR. Fithian's note says that he states he's stable now, right, or patient states?

A:  Yes.

Q:  So in your opinion, is Dr. Fithian reporting what Mr. Claypole was stating, or is DR. Fithian making a clinical judgment that Mr. Claypole was stable?

Mr. Bertling:  Lacks foundation.  Calls for speculation.  Dr. Fithian could have been asking a number of questions that caused him to come to that conclusion.

Ex. D at 119:11-21.

/ / /

Q:  On the top of that page, under the very top provision:  "The addition to scope of work provides a policy that a ward shall be seen no later than the first scheduled sick call after his/her request is received by medical staff. Psychiatric complaints shall be screened daily."  Do you know how, either specifically for this contract or in general, CFMG would come to the determination of putting in a specific time frame like that in a specific county?

Mr. Bertling:  Well, let me just object that it's vague and ambiguous.  Calls for speculation.  This is also a juvenile facility as opposed to an adult facility with different titles and statutes that may be involved.  But if you understand the question and can answer, please do, Dr. Fithian."

Ex. H at 62:15-63:8.

Q:  And did anybody on May 3rd, when Josh was placed back on suicide watch, did anybody complete a suicide risk assessment for him at that time?

Mr. Bertling:  Lacks foundation that that's part of the policies and procedures.

Ex. G at 148:17-21.

Q:  And what evaluation did any medical or mental health staff do of Josh at the time that he was placed back on suicide watch on May 3rd?

Mr. Bertling:  Other than what you just went over with Ms. Spano's note?

Ms. Rifkin:  Again, I would ask counsel not to testify.

Mr. Bertling:  I'm not testifying.

Ex. G at 150:18-25.

Q:  Was there a written corrective action plan developed relating to anything with Josh Claypole's death?

Mr. Bertling:  That lacks foundation that one was necessary.

Ex. G at 175:17-21.

Q:  Are you aware that the court found that conducting health and safety checks of inmates in segregation or lockdown units only once per hour violated correctional standards?

Mr. Bertling:  Objection.  Lacks foundation, calls for speculation.  That had nothing to do with CFMG.  If you know.

The Witness:  I think, again, I think Mr. Bertling is correct.

Ex. G at 182:3-11.

Q:  When you said that you added some additional questions to the intake screening, I know there is—we have talked about various screenings.  Is there one in particular that you're referring to?

Mr. Bertling:  Well, lacks foundation that CFMG did it as opposed to the county.  But go ahead and answer the question if you can."

Ex. G at 187:11-17.

> Q:  You listed under your responsibilities as a psychiatrist at Monterey County Jail, some of the things you listed were to review health records, to talk to other doctors in the community, family members, defense attorneys—I'm sorry—attorneys, including defense attorneys and review medical files, correct?
> A: Yes, ma'am.
> Q:  Did you do any of that in Joshua Claypole' case?
> A:  I don't believe I did, ma'am.
> Mr. Bertling:  Lacks foundation that there was time to do that before committing suicide.
> Q:  And why didn't you do that?
> A:  Again, Counselor, Mr. Claypole was in custody, I think, for about 48 hours.

Ex. G at 220:19-221:9.

> Q:  And given those stark conditions, prior to May 1st, 2013, did you ever recommend to the County of Monterey that they modify their safety cells?
> Mr. Bertling:  Lacks foundation that there was any way to modify.  But go ahead and answer her question.

Ex. G at 226:16-21.

> Q:  Are you aware of whether CFMG or Dr. Fithian through the QA process at Monterey County Jail identified any errors or areas of improvement as a result of Mr. Claypole's suicide?
> Mr. Bertling: Lacks foundation that there was a need for that.
> The Witness:  I don't recall.  I vaguely recall seeing that there was a quality assurance review of the suicide, but I don't recall any details about it.
> By Ms. Rifkin: Q: Are you aware of whether any corrective action plan was identified or followed?
> Mr. Bertling:  Lacks foundation that there was a need for any such corrective action plan to be identified or followed following the peer review of this case.

Ex. D at 173:16-174:7.

> Q:  Okay.  So if we can turn to page 11 of 40, you list as opinion number 1—or you list opinion number 1 on this page, that the suicide prevention plan developed by CFMG at the Monterey County Adult Detention Facility met the minimal standards of the Title 15 regulations prior to and at the time of the suicide of Joshua Claypole on May 4th, 2014.  Is that an accurate description of your opinion?
> A: Yes.
> Q:  And what is the basis for that opinion, Dr. Hayward?

1   Mr. Bertling:  Other than what's set forth in his report?
    By Ms. Rifkin: Q:  Do you understand my question, Doctor?

2   Mr. Bertling:  Well, my question is whether it's other than what's set forth
    in his report?

3   By Ms. Rifkin:  Q: What is the basis for your—whether set forth in your
    report or not, what are the bases for your—

4   Mr. Bertling:  Well, the report speaks for itself.  Are you asking for whether

5   there's anything above and beyond your report?

6   Ms. Rifkin:  No.  I'm asking Dr. Hayward what the bases for his opinion
    that he's prepared to express are.

7   Mr. Bertling:  Other than what's set forth in his report?  I mean he has
    numerous opinions and bases.  Are you asking him for something above and

8   beyond that?

9   Ex. D at 41:12 - 42:18.

10              *2.*      *Examples of Physically Pointing Deponent to Specific Pages*

11                       *and Documents to Coach Deposition Testimony*

12   Q:  Okay.  After you saw Josh on the morning of May 2nd, as reflected in
     your progress notes that we have been discussing, when was the next time

13   you saw him or learned any information about him?
     A:  I did not see Joshua again until—I did not see Joshua again personally.

14   Q:  When was the next time, if any, that you learned any information about

15   Josh?
     Mr. Bertling:  I don't---

16   Ms. Rifkin:  And I would just like the record to reflect that Dr. Fithian's
     attorney has pointed him and directed him to a certain page in the records.

17   And I would like to ask counsel to let his client answer, and I'm going to
     continue to note these on the record and will seek sanctions if you continue

18   to do this.  You know it's improper behavior.[3]

19   Mr. Bertling:  There is nothing that I'm doing improper.  I'm handing him
     his medical records.  What I actually showed him was CFMG-JC0091.  You

20   were asking him when he next heard information about him.  I'm just

21   showing him records so he can refresh his recollection.

22   Ms. Rifkin:  Is it your contention, Counsel, that the records you just gave
     him are not part of the packet, the exhibit packet that is currently front of

23   him?
     Mr. Bertling:  They are part of the exhibit package.

24   Ms. Rifkin:  And you handed him a document that was outside of that

25   exhibit packet, didn't you?  You handed him your version of it.  I want the
     record to reflect what you did.

26   Mr. Bertling:  No, I handed him what you handed me.

27

28   [3] Earlier in the same deposition, Mr. Bertling had similarly used physical gestures to
     coach the witness to look at certain documents during answers. Ex. G at 123:4-19.

1

2

3

Ms. Rifkin:  That's right.  And Dr. Fithian had his own copy of the exhibit in front of him.  I handed you that as a courtesy, not so that you can—

Mr. Bertling:  I appreciate it.

Ms. Rifkin:--not so that you could point out and direct Dr. Fithian to testify in a certain way.

4

5

6

Mr. Bertling:  Don't you want fair and accurate testimony from him?  I'm showing him a record that he can testify from.  I didn't tell him to say anything.  I'm showing him records.  You asked him what is the next time you had some information about the patient.  So I handed him a record.  You can ask him about it.  That's it.

7

8

9

Ms. Rifkin:  The purpose of the testimony in a deposition is to elicit Dr. Fithian's testimony.  If he answers that he doesn't recall, we can follow that up, as appropriate.  But you are obstructing and interfering with my ability to elicit honest and best recollection of my client—or not my client—of your client.

10

Mr. Bertling:  Ask him the question.

11

Ms. Rifkin:  Dr. Bertling, I've noted several times on the record.  If you do it again, I will seek sanctions.

12

13

14

Mr. Bertling:  Just move forward.  I haven't had him testify about anything. I've shown him documents that will help him to respond to your questions. Is there something that prohibits me from doing that?  Please move forward with your questions.

Ms. Rifkin:  There is.  It's called the Federal Rules of Civil Procedure.

15

16

17

Ex. G at 139:9-141:22.  The ensuing testimony by Dr. Fithian made clear that he answered the subsequent questions based on Mr. Bertling's coaching, not based on his own knowledge or recollection.  Ex. G at 141:24-142:9.

18

19

Mr. Bertling again repeatedly engaged in similar behavior with one of Defendants' experts, Dr. Hayward:

20

21

Q:  Okay.  Did Dr. Fithian complete a suicide risk assessment on the morning of May 2nd for Mr. Claypole?

A:  Yes.

22

Q:  And what do you base that opinion on?

A:  On his chart note.

23

24

Q:  And I just want the report to reflect that Mr. Bertling has taken the records from in front of you, so—

Mr. Bertling:  I want to show him the chart note so he can see the chart note. Do you have a problem with that?

25

26

The Witness:  I would like to see the chart note to provide any details regarding his assessment.

27

By Ms. Rifkin:  Q:  Dr. Hayward, you've looked through medical files before, haven't you?

28

A:  Yes, many.

1

Q:  Do you consider yourself capable of identifying a chart note?
A:  I probably have achieved that level of competency.

2

Ex. D at 116:3-23; *see also* Ex. D at 88.

3

### 3.    *Examples of Mr. Bertling Answering for Deponent*

4

Q:  Do you know if Dr. Fithian asked about any prior suicidal statements during his meeting with Mr. Claypole on the morning of May 2nd?

5

Mr. Bertling:  You mean other than what's in his record where he said it denied it?

6

Ex. D at 129:1-5.

7

8

Q:  In conducting a suicide risk assessment of Mr. Claypole, subsequent to those statements that he made to Ms. Spano, in your opinion, should a suicide risk assessment have involved asking Mr. Claypole about the statements that he's made indicating suicidality?

9

10

Mr. Bertling:  Well, he did.

11

Ex. D at 133:3-8.

12

Q:  So in your opinion, given that Mr. Claypole was suicidal on the 1st, not suicidal, as you said, or reporting that he wasn't suicidal on the 2nd, suicidal on the 3rd, and reporting that he wasn't going to commit suicide on the 4th,w as it a realistic possibility that he might once again become suicidal later that day or the next day?

13

14

15

A:  Yes.

16

Q:  What measures, if any, did CFMG or Dr. Fithian take to address that possibility?

17

18

Mr. Bertling:  You mean other than the fact that he was in a lock down cell being monitored by custody?

Ms. Rifkin:  Well, you are not testifying, Peter, so I—

19

Mr. Bertling:  Well, I know I'm not testifying, I'm just asking him other than that, I mean

20

Ms. Rifkin:  Well, you don't ask me questions, Peter.

21

Mr. Bertling:  You are excluding—you don't tell me what to do.  You are excluding everything else that is part of the plan, the suicide prevention plan at the Jail—

22

23

Ms. Rifkin:  Peter, I'm going to ask you to stop testifying and coaching the witness.

24

Mr. Bertling:  I'm not testifying or coaching the witness. I'm just saying you in your questioning are excluding everything that's part and parcel—

25

Ms. Rifkin:  And make an objection, Peter.

26

Mr. Bertling:  --of the suicide prevention plan at the Monterey County Jail.

Ms. Rifkin:  Peter, you can make objections—you haven't even made a recognizable objection at this point.  If you continue to coach the witness, I have told you think in previous depositions repeatedly, I will seek sanctions.

27

28

1       Mr. Bertling:  Do what you need to do, Lori.  Ask your next question."

2  Ex. I at 101:4-102:17.

3       Q:  In your opinion, should a suicide risk assessment completed after that
time have included questions to Mr. Claypole about those various suicidal
4     statements he'd made to Ms. Spano?

5     Mr. Bertling:  Well, it lacks foundation that that didn't happen with Ms.
Shene where she specifically noted he denied he was suicidal.

6     Ms. Rifkin:  Thank you for your testimony, Mr. Bertling.

7     Q:  Dr. Hayward, can you provide your expert answer, please.

Mr. Bertling:  So what's the question?

8     By Ms. Rifkin:  Do you know the question, Dr. Hayward?

9     A:  Well clarify it for me, please.

Q:  Yes.

10    Mr. Bertling:  Because he's already testified that he thought Ms. Shene did
an appropriate and adequate suicide risk assessment on the morning of the
11    4th.  Are you asking him if there were any others?

12    By Ms. Rifkin: Q:  In your expert opinion, Dr. Hayward, should a suicide
risk assessment completed subsequent to Mr. Claypole's placement on
13    suicide watch the second time, so on May 3rd, would any suicide risk
assessment completed after that point have included questions to Mr.
14    Claypole about the suicidal statements he made to Ms. Spano?

15    A:  Yes.

Q:  Did that occur?

16    A:  it may have.

17    Q:  From the treatment records, are you able to tell whether anyone ever
asked Mr. Claypole about those statements between the time he was placed
18    on suicide watch on May 3rd and the time he was released on May 4th?

19    Mr. Bertling:   Are you referring to about whether or not he was still
suicidal?

20    By Ms. Rifkin: Q: Do you understand the question Dr. Hayward?

21    A:  Yes, I believe I understand the question.

Ex. D at 133:21-135:11.

22

23    Q:  Do you—in your opinion, is that an adequate treatment plan when
releasing somebody from—well, in your opinion, was that an adequate
24    treatment plan for Mr. Claypole when he was discharged from suicide
watch?

25    Mr. Bertling:  Well, it lacks foundation that that's all the treatment is.  He
was obviously set to see Dr. Fithian on Monday as well.  So it's an
26    incomplete hypothetical.

27    By Ms. Rifkin:  Q: Dr. Hayward, is there any part of the treatment plan—is
there any additional part of the treatment plan that you can identify other
28    than what you just stated as discontinue suicide watch and begin trazodone

1    for 30 days?  Is there any other part of the treatment—a treatment plan that
     you can identify for Joshua Claypole on May 4th?

2    Mr. Bertling:  Are you referring to things that would be happening to him
3    after he was released from the suicide cell?  Your question is vague and
     ambiguous.

4    Ms. Rifkin:   I'm asking Dr. Hayward what his understanding of the
5    treatment plan for Joshua Claypole was when he was released from suicide
     watch.  Peter, please stop testifying.

6    Mr. Bertling:  And are you incorporating things that had already been put
     into place before he was released on May 4th?

7    Ms. Rifkin:  I'm not incorporating anything.  I am asking Dr.—

8    Mr. Bertling:  So that's why your question is vague and ambiguous.  I ask
     that you clarify it.  Your question is vague and ambiguous as to are you
9    talking about solely things that were ordered on May 4th or things that were
     included as part of the treatment to go forward after May 4th?

10   By Ms. Rifkin: Q:  Dr. Hayward, I'll ask you again.  In your expert opinion,
11   what was the treatment plan for Joshua Claypole when he was released from
     suicide watch on June—on May 4th as you, as an expert, understand
12   treatment plan?

13   Mr. Bertling:  Vague and ambiguous as to what you mean by the term
     "treatment plan" under these circumstances and whether you're including
14   things that had been part of the treatment plan before the release or that were
     just included as further treatment plan after the release.

15   Ms. Rifkin:  And Peter, I'll note for the record that if you continue to testify,
16   we will not pay Dr. Hayward for the time that you spent testifying.

17   Mr. Bertling:  I am not testifying.  I'm stating legitimate objections because
     I'm trying to get a clear understanding of what time period you're referring
     to when you say "the treatment plan."  You're aware that there were
18   treatment plans already in place before May 4th.  There were things added
19   to it.  You're aware Dr. Fithian was scheduled to see the inmate on Monday
     and that that had been a change in the treatment plan.  So I'm just trying to
20   get clarification regarding what you're referring to.

21   By Ms. Rifkin: Q:  Dr. Hayward, as an expert evaluating all the different
     jails we've gone through and patients, do you have an understanding what
22   the phrase "treatment plan" means to you?

     A:  Yes.

23   Q:  And it's what we've talked about, what you described already, right?

24   A:  Yes.

     Q:   Okay.   So do you understand the question when I ask you in your
25   opinion, as an expert, based on your understanding of a treatment plan, what
     the treatment plan was for Joshua Claypole on May 4th?  Do you understand
26   what I'm asking?

27   A:  Yes.

     Q:  Can you answer the question, please.
28   A:  Yes.  I already covered the medication part of the treatment plan.  There

1    was a follow-up that I believe was scheduled with Dr. Fithian.

2    Ex. D at 69:25-73:7.

3         *4.*  <u>*Whispering to Deponent During Testimony*</u>

4      Mr. Bertling at one point whispered something to his deponent during his answer to

5    a question:

6      Q:  Okay.  Did you ask Josh about his family during your meeting with him
  on May 2nd?

7      A:  I don't remember.
  Q:  Did you ask him about –

8      Mr. Bertling:  Just go ahead.

9      Ms. Rifkin:  I'm sorry, Counsel, can you just state whatever it was on the
  record that you told your—

10     Mr. Bertling:  No. Ask your question.

11   Ex. G at 137:19-138:1.

12        *5.*  <u>*Examples of Cutting Deponents Off in the Middle of Answers*</u>

13     Q:  Okay.  You did refer, a few minutes ago, that you were part of a
  discussion about staffing, I believe mental health staff on weekends at

14     Monterey County Jail; is that right?
  A:  Yes.

15     Q:  And to the best that you recall, when did that discussion begin?

16     A:  Again, Counselor, I don't know when it began.  I really don't know
  when it began.

17     Q:  Do you know if it began prior to May 1st, 2013?

18     A:  No, I – again, I don't know with any certainty that it began before 2013.
  Staffing –

19     Mr. Bertling:  You have answered the question.

20     Ms. Rifkin:  And I'll just make a note for the record of Counsel cutting off
  his client.

21     M. Bertling:  I didn't cut off the client.  He had answered your question.
  The record speaks for itself.

22   Ex. H at 40:14 – 41:8.

23
  Q:  And do you know whose decision it was as between CFMG and the

24     County of Monterey that custody officers do the initial health screening
  when an inmate comes into the jail?

25     A:  You know, Counselor, that has been a pattern of practice since 1981.  I
  think the intake health screening prior to coming on board was done by

26     custody administration, custody staff.  I think we continued that through the

27     years.

28     Mr. Bertling:  You've answered the question.

The witness:  Did I answer the question?

Ms. Rifkin:  Yes. Counsel, thank you for cutting off your client.

Mr. Bertling:  Well, he has answered the question.  I don't think you want him to ramble.

Ms. Rifkin:  I don't think I would like you to advise your client on how to answer in the middle of him answering a question.

Mr. Bertling:  I'm his attorney here to do what I think is appropriate to represent the best interests of my client.  I'll continue to do that.  Please move to your next question."

Ex. J at 64:22-65:18.

It would have been inefficient and burdensome for Plaintiffs' counsel to contact the Court during each CFMG-related deposition where Mr. Bertling improperly obstructed discovery.  Rather, Plaintiffs' counsel focused on making the best use of the deposition time possible.  Moreover, especially during the short course of expert discovery, Plaintiffs' counsel necessarily needed to focus their resources on preparing for and taking depositions.  However, Mr. Bertling's conduct was improper and prevented Plaintiffs from fairly obtaining accurate and full testimony from deponents.  Mr. Bertling's obstructions wasted the time of all parties during discovery, and now requires yet additional resources to be expended by Plaintiffs and the Court.  Therefore, Plaintiffs request discovery sanctions in addition to attorneys' fees and costs, as supported by the facts and circumstances set forth in the accompanying declaration, pursuant to Local Rule 37-4.

## ARGUMENT

**I.     Defendants Failed to Respond to Plaintiffs' Requests for Production to Hayward and Should Be Compelled to Produce Responsive Documents and Recall Hayward for Deposition at Defendants' Expense**

Plaintiffs are entitled to probe the bases of Defendants' expert opinions, which is the point of expert discovery after the disclosure of expert reports.  However, Defendants have prevented Plaintiffs from fully exploring Dr. Hayward's opinions by completely failing to produce underlying documents relating to his knowledge and opinions in this matter, and by failing to produce these documents in a timely manner so that Plaintiffs

1   could question Dr. Hayward about them during deposition.  Mr. Bertling's statement in

2   his October 26, 2015 email, sent ten days *after* Dr. Hayward's deposition, that "You

3   already have many of the documents referred to by Dr. Hayward in his report" does not

4   meet Defendants' obligation to respond to requests for production.

5        Plaintiffs filed this Motion only after providing sufficient time for Defendants'

6   counsel to respond to their repeated requests for production of responsive documents.

7   "Under the Federal Rules of Civil Procedure and the Northern District of California Local

8   Rule 37-3, an untimely motion to compel may be excused for good cause shown." *In re*

9   *Cathode Ray Tube (CRT) Antitrust Litig.*, No. 3:07-cv-5944SC, 2015 U.S. Dist. LEXIS

10  147409, at *167 (N.D. Cal. Aug. 6, 2015) (excusing failure to file motion to compel

11  before deadline when movant was attempting to resolve discovery dispute "without resort

12  to a motion to compel"). Having heard no response from Defendants' counsel, and

13  without any alternative resort beyond court intervention, Plaintiffs bring this motion as

14  soon as was reasonable under the circumstances.

15  **II.   Mr. Bertling's Improper Conduct Throughout the Course of Discovery**

16  **Interfered with Plaintiffs' Ability to Fairly Examine Witnesses and Obtain**

17  **Relevant Evidence, Wasted Plaintiffs' and the Court's Resources, and**

18  **Warrants the Imposition of Sanctions**

19       The Federal Rules of Civil Procedure require that objections at depositions be

20  "stated concisely in a nonargumentative and nonsuggestive manner."  F.R.Civ.P. 30(c)(2).

21  "[A]rgumentative objections, suggestive objections, and directions to a deponent not to

22  answer, improperly disrupt, prolong, and frustrate deposition testimony." *Sec. Nat. Bank*

23  *of Sioux City, IA v. Day*, 800 F.3d 936, 942 (8th Cir. 2015).  During a deposition, it is

24  improper for counsel defending the deposition to interrupt questions and answers, interject

25  editorial comments, and coach or suggest information to witnesses.  *See Funk v. Town of*

26  *Paradise*, 2011 U.S. Dist. LEXIS 69434, *2-6 (E.D. Cal. June 28, 2011) (finding defense

27  counsel's behavior to be "appalling" and ordering sanctions where counsel "repeatedly

28  interrupted the proceedings, interjected editorial comments, and coached or suggested

1  information to the witnesses").   "[C]ounsel for the witness being deposed is prohibited

2  from acting as an intermediary, interpreting questions, assisting the deponent with

3  formulation of the answers, or deciding which questions should be answered.  *BNSF Ry.*

4  *Co. v. San Joaquin Valley R. Co.*, 2009 WL 3872043 at *4 (E.D. Cal. Nov. 17, 2009).

5  "[I]f a witness is confused about a question, or if the question seems awkward or vague,

6  the witness may ask deposing counsel to clarify the question; securing clarification is not

7  the job of the witness' counsel."  *Cordova v. United States*, No. CIV.05 563 JB/LFG, 2006

8  WL 4109659, at *2 (D.N.M. July 30, 2006).

9      Federal Rule of Civil Procedure 30(d)(2) allows the Court to impose sanctions,

10  including the reasonable expenses incurred by any party, on a person who "impedes,

11  delays, or frustrates the fair examination of a deponent." *See, e.g., Lund v. Matthews,* 2014

12  WL 517569, at *5-6 (D. Neb. Feb. 7, 2014) (awarding sanctions where counsel's

13  objections with commentary and whispering in deponent's ear during question frustrated

14  receipt of complete answers and disrupted orderly flow of deposition); *Craig v. St.*

15  *Anthony's Med. Ctr.*, 2009 WL 690210, at *2 (E.D. Mo. Mar. 12, 2009)(awarding

16  sanctions where counsel made argumentative and suggestive objections, conducted private

17  conversations with his client, instructed client not to answer questions without asserting a

18  privilege, and answered questions on behalf of his client); *Cordova v. United States*, 2006

19  WL 4109659, at *2 (D.N.M. July 30, 2006) (sanctioning attorney who "frustrated the fair

20  examination" of a deponent by making suggestive or coaching speaking objections

21  throughout the deposition, engaging in off-the-record conferences with the witness during

22  pending questions, and instructing the witness not to answer when the rules did not all

23  such an instruction).

24      The Guidelines for Professional Conduct of the Northern District of California

25  state that "All lawyers who practice in the US District Court for the Northern District of

26  California . . . owe a duty of professionalism to their clients, opposing parties and their

27  counsel, the courts, and the public as a whole.  Those duties include, among others:

28  civility, professional integrity, personal dignity, candor, diligence, respect, courtesy,

1  cooperation, and competence."  Northern District Local Rule 11-4(b) requires that "[t]he

2  practice of law before this Court must be free from prejudice and bias.  Treatment free of

3  bias must be accorded all other attorneys, litigants, judicial officers, jurors and support

4  personnel."  The Northern District of California also adopted General Order 40 "to govern

5  the conduct of attorneys" and "to ensur[e] that all forms of bias and prejudice [were]

6  eliminated from the practice of law."  General Order 40 establishes that the "duty to

7  exercise nonbiased behavior includes the responsibility to avoid comment or behavior

8  manifesting prejudice or bias toward another."

9       As set forth *supra*, Mr. Bertling engaged in every one of the deposition behaviors

10  described in the above cases, and impeded Plaintiffs' opportunity to take fair and

11  complete depositions in this matter.  Mr. Bertling also engaged in impermissible bait-and-

12  switch tactics regarding production of Dr. Fithian for 30(b)(6) versus individual

13  depositions, which resulted in Plaintiffs' counsel expending considerable time preparing

14  to depose Dr. Fithian on topics Mr. Bertling apparently never intended to allow Dr.

15  Fithian to testify regarding on the dates designated.  Mr. Bertling engaged in this course of

16  conduct consistently and repeatedly throughout discovery, but took his obstruction to yet

17  another level in expert discovery by withholding the production of responsive documents

18  and answering deposition questions outright.

19       Furthermore, Mr. Bertling's statement to Plaintiffs' counsel Ms. Rifkin in the

20  beginning of Dr. Fithian's August 31, 2015 deposition regarding behavior "becoming of a

21  woman" violated the rules, orders, and professional standards of this Court.  As another

22  California District Court held, "Gender-biased remarks are unworthy of counsel who

23  appear in federal court, interfere with the orderly conduct of federal litigation in an

24  atmosphere of equal justice, and are as sanctionable as the casting of racial or ethnic

25  epithets and slurs among counsel."  *In re Plaza Hotel Corp.*, 111 B.R. 882, 892 (Bankr.

26  E.D. Cal. 1990); *see also Cruz-Aponte v. Caribbean Petroleum Corp.*, 2015 WL 5006213

27  (D.P.R. Aug. 1, 2015) (male attorney's comment to female attorney that "You're not

28  getting menopause, I hope," in response to her statement "It's hot in here," constituted

1  professional misconduct and warranted sanctions). Moreover, given that Ms. Rifkin was

2  the attorney conducting all of the subsequent depositions from which the other extensive

3  examples of improper conduct provided *supra* are drawn, it is plausible that gender bias

4  motivated and/or contributed to the rest of Mr. Bertling's unprofessional conduct.  *See In*

5  *re Plaza Hotel Corp.* at 892 (condescending attitude towards female lawyer evinced

6  during hearing gave gender-biased content and context to remarks dismissive of female

7  attorney and refusal to respond to her request for additional information); *see also JSR*

8  *Micro, Inc. v. QBE Ins. Corp.*, 2010 WL 1338152 at *7-11(N.D. Cal. Apr. 5, 2010)

9  (defendant's counsel engaged in inappropriate behavior during deposition and discovery

10  when counsel answered questions for the deponent and made demeaning comments to

11  opposing counsel).

12       Regardless of the precise impetus for each aspect of Mr. Bertling's improper

13  course of conduct, this type of repeated behavior by counsel is unacceptable.  The Ninth

14  Circuit has described "the primary purpose of sanctions" as "to deter subsequent abuses"

15  and emphasized that "[a] proper sanction assessed at the time of a transgression will

16  ordinarily have some measure of deterrent effect on subsequent abuses."  *Matter of*

17  *Yagman*, 796 F.2d 1165, 1183 (9th Cir. 1986).  Plaintiffs previously requested the

18  imposition of sanctions in response to Mr. Bertling's many improper instructions not to

19  answer during the course of Dr. Fithian's first 30(b)(6) deposition, but the Court declined

20  to grant them at that time.  Given substantial evidence of Mr. Bertling's escalating course

21  of conduct, and the facts that the parties still have substantial proceedings in this case,

22  including dispositive motions and trial, and that Mr. Bertling is the retained attorney on

23  numerous other cases in this Court, Plaintiffs request that this Court send the clear

24  message that this conduct will not be tolerated.

25  / / /

26  / / /

27  / / /

28

**CONCLUSION**

For the reasons stated above, Plaintiffs request that this Court compel production of responses to Plaintiffs' Request for Production to Dr. Hayward, order Defendants' to produce Dr. Hayward for further deposition, and sanction Mr. Bertling for his improper discovery conduct.


Dated: November 10, 2015              Respectfully Submitted,

                                      RIFKIN LAW OFFICE

                                      HADSELL STORMER & RENICK LLP

                                      By:  /s/ Dan Stormer
                                           Dan Stormer
                                           Josh Piovia-Scott
                                           Mohammad Tajsar
                                      Attorneys for Plaintiffs

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Appendix A**

Below is (1) a verbatim reproduction of Requests for Production Nos. 1–12, 14–16, and 20–21, the Requests at issue in this Motion; and (2) Defendants CFMG and Taylor Fithian's entire response to Plaintiffs' requests. Defendants' responses were global, and were not specific to any particular requests. *See* Ex. B.

**OUTSTANDING REQUESTS FOR PRODUCTION OF DOCUMENTS**

1.      Any and all DOCUMENTS YOU reviewed RELATING TO YOUR assessment of the provision of mental health treatment and/or suicide prevention at Monterey County Jail offered in YOUR May 30, 2014 Report (submitted as pages 17-21 of YOUR Report in this action), and which have not been previously produced in this action.

2.      Any and all documents YOU reviewed RELATING TO YOUR assessment of the provision of mental health treatment and/or suicide prevention at Monterey County Jail offered in YOUR September 27, 2015 Report (submitted as pages 8-16 of YOUR Report in this action), and which have not been previously produced in this action.

3.      Any and all DOCUMENTS including but not limited to notes, dictations, e-mails or other communications, summaries, and/or reports, YOU made in connection with YOUR surveys and/or visits of Monterey County correctional facilities in September 2013, October 2013, and May 2014, as referenced in YOUR Report submitted in this action.

4.      Any and all DOCUMENTS reflecting YOUR notes, observations, opinions, questions, conclusions, recommendations, and/or communications RELATING TO any suicides or suicide attempts occurring at Monterey County Jail prior to January 1, 2014.

5.      Any and all DOCUMENTS reflecting YOUR communications with Defendants, or their employees, agents, and/or attorneys RELATING TO YOUR recommendations for changes or improvements to the Monterey County Jail Suicide Prevention Program as referenced on pages 15-16 of YOUR Report submitted in this action.

6.      Any and all DOCUMENTS reflecting YOUR communications with Plaintiffs in the Hernandez litigation, or their agents and/or attorneys RELATING TO YOUR

recommendations for changes or improvements to the Monterey County Jail Suicide Prevention Program as referenced on pages 15-16 of YOUR Report submitted in this action.

7.      Any and all DOCUMENTS reflecting YOUR communications with Defendants, or their employees, agents, and/or attorneys RELATING TO YOUR recommendations for changes or improvements to the mental health services at Monterey County Jail as referenced on pages 19-35 of YOUR Report submitted in this action.

8.      Any and all DOCUMENTS reflecting YOUR communications with Plaintiffs in the Hernandez litigation, or their agents and/or attorneys RELATING TO YOUR recommendations for changes or improvements to the mental health services at Monterey County Jail as referenced on pages 19-35 of YOUR Report submitted in this action.

9.      All "Incident Reports on suicides, suicide attempts and placement in the Safety Cells at the Monterey County Correctional Facilities from 2010 through October 25, 2013" as referenced on page 8 of YOUR Report in this action.

10.     "The report of the inspection of the Monterey County Main Jail by the Corrections Standards Authority (now the Board of State and Community Corrections) dated May 10, 2010," as referenced on page 9 of YOUR Report in this action.

11.     Any and all DOCUMENTS YOU reviewed in connection with YOUR role as a consultant for the Hernandez litigation that YOU relied on and/or form the basis for any of the opinions YOU offered in pages 8-21 of YOUR Report in this action, and which have not been previously produced in this action.

12.     Any and all DOCUMENTS reflecting YOUR communications RELATING TO provision of mental health treatment and/or suicide prevention at Monterey County Jail, including but not limited to YOUR communications with other consultants, retained experts, non-retained experts, CFMG personnel, Monterey County personnel, and/or attorneys representing any party in the Hernandez litigation, except those which are specifically exempt under the trial preparation protection pursuant to Fed R. Civ. P. 26(b)(4)(C).

14.     Any WRITING provided to YOU by defendants' counsel at any time since YOU have been retained as an expert witness in this case.

15.     Any WRITING YOU have relied upon in formulating the opinions and recommendations which are set forth in YOUR September 27, 2015 report which was served with defendants' Expert Witness Disclosure.

16.     Any WRITING which reflects the facts and data considered in formation of YOUR opinions and recommendations as set forth in YOUR September 27, 2015 report which was served with defendants' Expert Witness Disclosure.

20.     Any WRITING which reflects the amount of time and billings YOU have generated as an expert witness in this case.

21.     Any articles which YOU have read, reviewed, or relied upon that support any of the opinions or recommendations set forth in YOUR September 27, 2015 report which was served with defendants' Expert Witness Disclosure.


**DEFENDANTS CALIFORNIA FORENSIC MEDICAL GROUP, INC. AND TAYLOR FITHIAN, M.D.'S OBJECTIONS TO THE REQUEST FOR PRODUCTION OF DOCUMENTS ASSOCIATED WITH THE DEPOSITION NOTICE OF RICHARD HAYWARD, PH.D.:**

Defendants object to each and every request for production to the extent it seeks documents in violation of Federal Rule of Civil Procedure Rule 26(b)(4)(B) and (C) and Federal Rule of Civil Procedure Rule 26(b)(3)(A).

Defendants further object to each and every request for production to the extent it seeks confidential and private third-party information and hereby designate any and all information produced containing such information as CONFIDENTIAL INFORMATION pursuant to this matter's entered protective order.