1  Dan Stormer, Esq. [S.B. # 101967]
2  Josh Piovia-Scott, Esq. [S.B. #222364]
   Mohammad Tajsar, Esq. [S.B. #280152]
3  HADSELL STORMER & RENICK LLP
   128 N. Fair Oaks Avenue
4  Pasadena, California 91103
   Telephone: (626) 585-9600/Facsimile:  (626) 577-7079
5  Emails: dstormer@hadsellstormer.com
            jps@hadsellstormer.com, and
6           mtajsar@hadsellstormer.com

7  Lori Rifkin, Esq. [S.B. # 244081]
8  RIFKIN LAW OFFICE
   P.O. Box 19169
9  Oakland, California 94619
   Telephone: (415) 685-3591
10 Email: lrifkin@rifkinlawoffice.com

11 Attorneys for Plaintiffs

12            UNITED STATES DISTRICT COURT
13           NORTHERN DISTRICT OF CALIFORNIA

14 Estate of JOSHUA CLAYPOLE,            Case No: CV 14-02730 BLF
   deceased, by and through SILVIA
15 GUERSENZVAIG, as Administrator;       [Assigned to the Honorable Beth Labson
   SILVIA GUERSENZVAIG,                  Freeman - Courtroom 3]
16
              Plaintiff,                 DECLARATION OF LORI RIFKIN
17                                       AND EXHIBITS IN SUPPORT OF
       vs.                               PLAINTIFFS' MOTION FOR
18                                       SANCTIONS AND TO COMPEL
   COUNTY OF SAN MATEO;                  DISCOVERY
19 SHERIFF GREG MUNKS, in his
   individual and official capacity;     DATE:       December 15, 2015
20 COUNTY OF MONTEREY;                   TIME:       10:00 a.m.
   SHERIFF SCOTT MILLER, in his          CRTRM:      5
21 individual and official capacity;     JUDGE:      Hon. Paul Grewal
   SERGEANT E. KAYE, in his
22 individual and official capacity; CITY
   OF MONTEREY; MONTEREY                 Complaint Filed:      June 12, 2014
23 POLICE DEPARTMENT CHIEF               FAC Filed:            October 28, 2014
   PHILIP PENKO, in his individual and   Discovery Cut-Off:    August 31, 2015
24 official capacity; BRENT HALL, in his Motion Cut-Off:       January 14, 2016
   individual and official capacity;     Trial Date:           April 11, 2016
25 CALIFORNIA FORENSIC MEDICAL
   GROUP; DR. TAYLOR FITHIAN, in
26 his individual and official capacity;
   COMMUNITY HOSPITAL OF
27 MONTEREY PENINSULA; and
   DOES 1 through 30,
28
              Defendants.

   _____

## DECLARATION OF LORI E. RIFKIN

I, Lori E. Rifkin, declare:

1.       I am an attorney admitted to practice law in California, a member of the bar of this Court, and counsel of record for Plaintiff.  I have personal knowledge of the matters set forth herein, and if called as a witness I could competently so testify.  I make this declaration in support of Plaintiffs' Notice of Motion and Motion for Sanctions and to Compel Discovery.

2.       The Court-ordered deadline for expert disclosures in this case was September 28, 2015.  Defendants CFMG and Fithian disclosed Dr. Richard Hayward as one of their experts and produced his expert report on September 28, 2015.  After meeting and conferring with Defendants about date and location, on October 2, 2015, Plaintiffs noticed Dr. Hayward's deposition for October 16, 2015.  Plaintiff served Plaintiffs' Notice of the Deposition of Defendant CFMG'S Retained Expert Richard Hayward, Ph.D. and Request for Production of Documents, a true and correct copy of which is attached hereto as **Exhibit A**.

3.       On October 14, 2015 Plaintiffs were served with Defendants' Objections to the Request for Production of Documents to Hayward, a true and correct copy of which is attached hereto as **Exhibit B**.  Defendants asserted only general objections to the extent the requests sought documents in violation of the Federal Rules of Civil Procedure and confidential and private third-party information, and did not state that they were refusing to produce any responsive documents.

4.       On October 16, 2015, at the beginning of Dr. Hayward's deposition, Defendants' counsel, Peter Bertling, presented me with a DVD that he represented as Dr. Hayward's production of documents, along with a paper production of email communications between Dr. Hayward and Defendants' counsel.  The DVD was physically cracked, rendering the disc useless. A true and correct photograph of the DVD as it was produced to me by Mr. Bertling is attached hereto as **Exhibit C**.

/ / /

5.      A true and correct copy of excerpts from Dr. Hayward's October 16, 2015 deposition is attached hereto as **Exhibit D**.  Mr. Bertling represented that he would have his office send the documents on the DVD electronically to me during the deposition. Ex. D at 8:1-18.   I checked in with Mr. Bertling mid-way through the deposition because I had not received the production of documents and Mr. Bertling again agreed to ensure that this happened.  However, this did not occur. Plaintiffs reserved their right on the record to hold the deposition of Dr. Hayward open pending production of those documents. Ex. D at 188:18-189:1.

6.      I confirmed with Dr. Hayward that he had produced documents responsive to Plaintiffs' requests for production and he believed that those were on the broken DVD, but was unable to probe Dr. Hayward further regarding the information because it was not accessible via the broken DVD. Ex. D at 7:2-8:18.

7.      By October 21, 2015, Defendants still had not produced the documents responsive to the Hayward Requests for Production.  I contacted Mr. Bertling by email on October 21, 2015 regarding the missing production, and, Defendants' counsel then produced four documents to Plaintiffs that it represented as Dr. Hayward's production. These documents consisted solely of a duplicate production of Dr. Hayward's expert report, Plaintiffs' expert disclosure, Plaintiff's expert's report, and the emails between Dr. Hayward and Defendants' counsel that were already produced on paper.  I attempted to meet and confer with Mr. Bertling on October 26 regarding the apparent discrepancies between the documents requested, documents produced, and Dr. Hayward's testimony on this issue. Mr. Bertling responded on October 26 by asking Plaintiffs' counsel, "What do you believe we should be producing that has not already been produced?  You already have many of the documents referred to by Dr. Hayward in his report." I responded by email to Mr. Bertling on October 27 explaining the issues in dispute.  Mr. Bertling declined to further meet and confer.  At no time did Mr. Bertling clarify what documents were actually on the broken DVD or whether he was actually representing that no responsive documents existed beyond Dr. Hayward's report and Plaintiff's expert

1  disclosures. A true and correct copy of the e-mail exchange between myself and

2  Defendants' counsel on October 21, 26, and 27 is attached hereto as **Exhibit E**. No

3  additional documents have been produced by Defendants in response to Plaintiffs'

4  Requests for Production to Dr. Hayward.

5         8.      Plaintiff's counsel received the transcript of Dr. Hayward's deposition on

6  October 30, 2015.

7         9.      Mr. Bertling's conduct through the discovery period has required me to

8  spend unreasonable amounts of time negotiating and re-negotiating deposition dates for

9  Dr. Fithian and whether CFMG would produce certain witnesses for noticed depositions.

10  For example, after extensively meeting and conferring in June and early July with Mr.

11  Bertling's associate, Jemma Saunders, and arriving at agreements about the date of Dr.

12  Fithian's first deposition, and the process for deposing CFMG former employees

13  (reflected in a letter from Ms. Saunders on July 6, 2015), on July 21, 2015, Mr. Bertling

14  notified me that date would no longer work for Dr. Fithian and reversed CFMG's position

15  on produce the former CFMG employees.  I then had to spend almost the entirety of three

16  days from July 21, 2015 through July 24, 2015 speaking with Mr. Bertling by phone and

17  emailing him—during which he demanded "proof" that anyone from his office had agreed

18  to this despite it being in clear letter and e-mail communications with Ms. Saunders—and

19  working with my co-counsel to prepare the witness subpoenas Mr. Bertling demanded,

20  and then reversed himself again, before Mr. Bertling would agree to set dates for the

21  depositions.  A true and correct copy of Ms. Saunders' July 6, 2015 letter setting forth the

22  date for Dr. Fithian's deposition, and subsequent late July email exchanges with Mr.

23  Bertling is attached hereto as **Exhibit F**.

24        10.    Ms. Saunders' letter also clearly lays out Defendants' demand that Dr.

25  Fithian's individual deposition be started on the same day as his 30(b)(6) deposition, and

26  Mr. Bertling repeated this demand in his July 24, 2015 7:46 a.m. email.  However, Mr.

27  Bertling then reversed his position mid-way through the 30(b)(6) deposition without prior

28  notice to Plaintiffs' counsel.  Based on Defendants' counsels' demand—to which

---

RIFKIN DECL. IN SUPP PLTFS' MTN FOR
SANCTIONS & TO COMPEL DISC.    -3-

1    Plaintiffs agreed—I spent considerable time preparing to take Dr. Fithian's individual

2    deposition prior on July 31, 2015.

3          11.     During Dr. Fithian's individual deposition on August 31, 2015, which

4    followed the Court's decision substantially granting Plaintiff's motion to compel, Mr.

5    Bertling again instructed Dr. Fithian not to answer various questions, including those

6    about his salary, income and personal finances, and the positions he holds with CFMG-

7    related business entities.  A true and correct copy of excerpts of the August 31, 2015

8    deposition transcript for Dr. Fithian are attached hereto as **Exhibit G**. Plaintiffs' counsel

9    requested a same-day telephonic hearing with Magistrate Judge Grewal.

10          12.     Toward the beginning of Dr. Fithian's individual deposition, while I was

11   moving to strike an answer as non-responsive, Mr. Bertling interrupted me and when I

12   requested that he not interrupt me, Mr. Bertling told me, "Move on with your next

13   question and don't raise your voice at me.  It's not becoming of a woman or an attorney

14   who is acting professionally under the rules of professional responsibility." Ex. G at 28:5-

15   21.

16          13.     Throughout the rest of Dr. Fithian's individual deposition, his second

17   30(b)(6) deposition, and the depositions of CFMG's experts, Mr. Bertling engaged in

18   extensive speaking objections, editorial comments, coaching and suggesting of testimony

19   to witnesses, physically pointing witnesses to specific pages and parts of documents,

20   interrupting deponents and speaking to them during answers, and even answering

21   questions himself in this and subsequent depositions.  As evidenced in the transcripts, all

22   of my efforts to meet and confer with Mr. Bertling regarding this improper behavior were

23   met with "instructions" to me from Mr. Bertling to the effect of "move on" or "ask [my]

24   next question."

25          14.     A true and correct copy of excerpts of the deposition transcript of Dr.

26   Fithian's second 30(b)(6) deposition on September 7, 2015 are attached hereto as **Exhibit**

27   **H**.

28   / / /

RIFKIN DECL. IN SUPP PLTFS' MTN FOR        -4-
SANCTIONS & TO COMPEL DISC.

1    15.    A true and correct copy of excerpts of the deposition transcript of Dr. Roof

2  on October 13, 2015 are attached hereto as **Exhibit I**.

3    16.    A true and correct copy of excerpts of the deposition transcript of Dr.

4  Fithian's 30(b)(6) deposition on July 31, 2015 are attached hereto as **Exhibit J**.

5    17.    It would have been inefficient and burdensome for Plaintiffs' counsel to

6  contact the Court during each CFMG-related deposition conducted where Mr. Bertling

7  improperly obstructed discovery.  Rather, I focused on making the best use of the

8  deposition time possible.  Especially during the short course of expert discovery,

9  Plaintiffs' counsel necessarily needed to focus our resources on preparing for and taking

10  depositions.  However, this does not render Mr. Bertling's behavior nonprejudicial or

11  harmful.

12    18.    It will be necessary to wait for the completion of proceedings on the instant

13  motion to provide the Court a comprehensive itemized list of otherwise unnecessary

14  expenses including attorney fees and costs resulting from Mr. Bertling's improper

15  behavior because the entirety of this motion and briefing is included in that amount.

16  However, prior to this motion, I spent approximately 21.4 hours in discovery negotiations

17  and consultation with co-counsel during July 21-24, 2015 required only because of Mr.

18  Bertling's unreasonable and unjustified reversal of his firm's prior positions, and working

19  with support staff to prepare subpoenas for witnesses CFMG previously had agreed to

20  produce without subpoenas, and then later again agreed to produce without subpoenas.

21  Hadsell Stormer & Renick support staff spent approximately 3.4 hours working on these

22  matters. The rate for Hadsell Stormer & Renick support staff is $175/hour.  I spent

23  approximately 14.9 hours preparing for and taking Dr. Fithian's second 30(b)(6)

24  deposition on September 7, which was rendered necessary because of Mr. Bertling's

25  improper instructions not to answer.  Plaintiffs' counsel Hadsell Stormer & Renick

26  incurred $1,624.50 in additional costs for this second day of 30(b)(6) deposition.  I spent

27  approximately 4 hours preparing to take a portion of Dr. Fithian's individual deposition on

28  July 31, 2015, as Defendants' counsel had demanded but then disallowed.  Finally,

RIFKIN DECL. IN SUPP PLTFS' MTN FOR    -5-
SANCTIONS & TO COMPEL DISC.

considerable amounts of time during each of the depositions referenced in this motion were taken up by Mr. Bertling's improper and unprofessional conduct.

19.     My 2015 hourly fee rate is $550/hour.  This is a reasonable fee for civil rights litigation by an attorney of my expertise and experience in the San Francisco Bay Area.

20.     I am a 2004 graduate of New York University School of Law.  Since graduation, I have practiced civil rights litigation as a staff attorney at the American Civil Liberties Unions of Connecticut and Southern California, an associate at the public interest law firm of Rosen, Bien, Galvan & Grunfeld, an attorney at the Legal Aid Society-Employment Law Center, and as a senior trial attorney in the Special Litigation Section of the Civil Rights Division of the United States Department of Justice.  I have extensive experience litigating unconstitutional prison and jail conditions, including, among others, *Coleman v. Brown*, E.D. Cal. Case No. 2:90-cv-00520-KJM-DAD.  I am admitted to the California, New York (inactive), and Connecticut (inactive) State Bars; the Eastern, Northern, and Central Federal District Courts in California; and the Ninth Circuit Court of Appeals.

21.     In late 2013, I founded my own civil rights practice, Rifkin Law Office, in which I handle complex civil rights matters.  In addition to representing clients directly in federal civil rights litigation, I am often consulted by other attorneys working on civil rights matters, including jail and prison litigation.  A copy of my resume is attached hereto as **Exhibit K.**

22.     Civil rights actions against law enforcement agencies are inherently difficult and complex.  Such cases require a law firm to make significant investments of attorney time and in discovery and expert witness fees.  There are relatively few lawyers and law firm that are willing to handle such cases.  My firm is regularly approached by victims and family members of law enforcement misconduct seeking representation for matters throughout the State of California.

/ / /

23.     I am familiar with the rates charged by other civil rights lawyers in the San Francisco Bay Area from my own work with Rosen, Bien, Galvan & Grunfeld, my work with co-counsel during my current Rifkin Law Office practice, my discussions of attorneys' fees and billing practices with other members of the bar who practice in the area of civil rights, and by reviewing articles, surveys, and published opinions regarding prevailing attorneys' rates and fees.  My fees are commensurate with the market rates of other attorneys with comparable experience, expertise, and practice in this region.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, and that this declaration is executed at Oakland, California on November 9, 2015.

_____
Lori E. Rifkin

Rifkin Decl. in Supp of Mtn to Compel
Discovery & for Sanctions

Exh. A

1    Dan Stormer, Esq. [S.B. # 101967]
     Josh Piovia-Scott, Esq. [S.B. #222364]
2    Mohammad Tajsar, Esq. [S.B. #280152]
     HADSELL STORMER & RENICK LLP
3    128 N. Fair Oaks Avenue
     Pasadena, California 91103
4    Telephone: (626) 585-9600/Facsimile:  (626) 577-7079
     Emails: dstormer@hadsellstormer.com
5           jps@hadsellstormer.com
           mtajsar@hadsellstormer.com
6

7    Lori Rifkin, Esq. [S.B. # 244081]
     RIFKIN LAW OFFICE
8    P.O. Box 19169
     Oakland, California 94619
9    Telephone: (415) 685-3591
     Email: lrifkin@rifkinlawoffice.com
10

11    Attorneys for Plaintiff

12

              **UNITED STATES DISTRICT COURT**
13         **NORTHERN DISTRICT OF CALIFORNIA**

14    Estate of JOSHUA CLAYPOLE,
     deceased, by and through SILVIA
15    GUERSENZVAIG, as Administrator;
     SILVIA GUERSENZVAIG,
16

17             Plaintiff,

18    vs.

19    COUNTY OF SAN MATEO; SHERIFF
     GREG MUNKS, in his individual and
20    official capacity; COUNTY OF
     MONTEREY; SHERIFF SCOTT
21    MILLER, in his individual and official
     capacity; SERGEANT E. KAYE, in her
22    individual capacity; CITY OF
     MONTEREY; MONTEREY POLICE
23    DEPARTMENT CHIEF PHILIP
     PENKO, in his official capacity;
24    BRENT HALL, in his individual and
     official capacity; CALIFORNIA
25    FORENSIC MEDICAL GROUP; DR.
     TAYLOR FITHIAN, in his individual
26    capacity; COMMUNITY HOSPITAL
     OF MONTEREY PENINSULA; and
27    DOES 1 through 30,

28           Defendants.

Case No: CV 14-02730 BLF

[Assigned to the Honorable Beth Labson Freeman - Courtroom 3]

**PLAINTIFFS' NOTICE OF THE DEPOSITION OF DEFENDANT CALIFORNIA FORENSIC MEDICAL GROUP'S RETAINED EXPERT RICHARD HAYWARD, PH.D. AND REQUEST FOR PRODUCTION OF DOCUMENTS**

DATE:      October 16, 2015
TIME:      9:30 a.m.
PLACE:     Regus – San Mateo
              951 Mariners Island Blvd.,
              Suite 300
              San Mateo, CA 94404

Complaint Filed:         June 12, 2014
FAC Filed:           October 28, 2014
Discovery Cut-Off:     August 31, 2015
Motion Cut-Off:       January 14, 2016
Trial Date:           April 11, 2016

PLTFS' NTC OF DEPO OF DEFT'S
EXPERT RICHARD HAYWARD & RFPS

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that pursuant to Rule 30 of the Federal Rules of Civil Procedure, plaintiffs will take the deposition of Defendant California Forensic Medical Group's Retained Expert RICHARD HAYWARD, Ph.D. on October 16, 2015.  Said deposition shall commence at 9:30 a.m. at offices of Rugus – San Mateo, 951 Mariners Island Boulevard, Suite 300, San Mateo, CA 94404.

**PLEASE TAKE FURTHER NOTICE** that said deposition will be taken upon oral examination by stenographic means before a notary public, or some other officer authorized by law to administer oaths.  Plaintiffs reserve the right to record said deposition by videotape.  If the deposition is not completed on October 16, 2015, it will be continued day to day thereafter, until completed, or at some mutually agreeable date within a reasonable period of time.

## I. DEFINITIONS

1.     The terms "YOU" or "YOUR" refer to, without limitation, Richard Hayward and all representatives, employees, agents, consultants, and any other person(s) acting or purporting to act on the Richard Hayward's behalf.

2.     The terms "WRITING" or "DOCUMENTS" refer to the meaning prescribed in Rule 34 of the Federal Rules of Civil Procedure, and includes the original and every non-identical copy or reproduction in YOUR possession, custody, or control, and further is used in a broad sense to refer to any tangible object or electronic image or file that contains, conveys, or records information. WRITING or DOCUMENTS includes, but is not limited to, all of the following: papers, correspondence, emails, MS Excel files, MS Word files, MS PowerPoint files, text files, instant messages, postings on internet websites or blogs including Twitter and Facebook, training manuals, employee manuals, policy statements, trade letters, envelopes, memoranda, telegrams, cables, notes, messages, reports, studies, press releases, comparisons, books, accounts, checks, audio and video recordings and transcriptions thereof, pleadings, testimony, articles, bulletins,

1  pamphlets, brochures, magazines, questionnaires, surveys, charts, maps, plans,

2  graphs, computer programs, photographs, newspapers, calendars, desk calendars,

3  pocket calendars, lists, logs, publications, notices, diagrams, instructions, diaries,

4  minutes of meetings, orders, resolutions, agendas, memorials or notes of oral

5  communications (whether by telephone or face-to-face), contracts, agreements,

6  memoranda of understanding, and letters of intent.  WRITING or DOCUMENTS

7  includes any writings recorded or stored in any medium or location, including

8  desktop computers, laptops, PDAs, cell phones, home computers used for work,

9  calendars, computer tapes, computer drives or memories, computer diskettes or

10  disks, email, CD-ROMs, DVDs, BlackBerrys, iPhones, or other similar handheld

11  devices used to send and receive electronic mail, instant messaging ("IM"), blog or

12  other internet or intranet posting, text messages, Twitter postings, Facebook

13  postings, or any other tangible thing on which any handwriting, typing, printing,

14  photostatic, electronic or other form of communication or information is recorded

15  or reproduced.  WRITING or DOCUMENTS also includes all notations on any of

16  the foregoing; all originals, file copies or other unique copies of the foregoing; all

17  versions or drafts of the foregoing, whether used or not; and all metadata.

18      3.      "RELATING" or "RELATING TO" means referring, regarding,

19  describing, referencing, or pertaining, in any manner whatsoever, in whole or in

20  part, directly or indirectly, implicitly or explicitly.

21          **II.      REQUEST FOR PRODUCTION OF DOCUMENTS**

22      PLEASE TAKE FURTHER NOTICE that the deponent named above is

23  required to produce the following documents, writings, papers, and items which are

24  in the possession, custody, or control of the deponent, the defendants, the

25  defendants' attorneys, or the defendants' agents retaining the deponent:

26      1.      Any and all DOCUMENTS YOU reviewed RELATING TO YOUR

27  assessment of the provision of mental health treatment and/or suicide prevention at

28  Monterey County Jail offered in YOUR May 30, 2014 Report (submitted as pages

17-21 of YOUR Report in this action), and which have not been previously produced in this action.

2.      Any and all documents YOU reviewed RELATING TO YOUR assessment of the provision of mental health treatment and/or suicide prevention at Monterey County Jail offered in YOUR September 27, 2015 Report (submitted as pages 8-16 of YOUR Report in this action), and which have not been previously produced in this action.

3.      Any and all DOCUMENTS including but not limited to notes, dictations, e-mails or other communications, summaries, and/or reports, YOU made in connection with YOUR surveys and/or visits of Monterey County correctional facilities in September 2013, October 2013, and May 2014, as referenced in YOUR Report submitted in this action.

4.      Any and all DOCUMENTS reflecting YOUR notes, observations, opinions, questions, conclusions, recommendations, and/or communications RELATING TO any suicides or suicide attempts occurring at Monterey County Jail prior to January 1, 2014.

5.      Any and all DOCUMENTS reflecting YOUR communications with Defendants, or their employees, agents, and/or attorneys RELATING TO YOUR recommendations for changes or improvements to the Monterey County Jail Suicide Prevention Program as referenced on pages 15-16 of YOUR Report submitted in this action.

6.      Any and all DOCUMENTS reflecting YOUR communications with Plaintiffs in the Hernandez litigation, or their agents and/or attorneys RELATING TO YOUR recommendations for changes or improvements to the Monterey County Jail Suicide Prevention Program as referenced on pages 15-16 of YOUR Report submitted in this action.

7.      Any and all DOCUMENTS reflecting YOUR communications with Defendants, or their employees, agents, and/or attorneys RELATING TO YOUR

1  recommendations for changes or improvements to the mental health services at

2  Monterey County Jail as referenced on pages 19-35 of YOUR Report submitted in

3  this action.

4         8.     Any and all DOCUMENTS reflecting YOUR communications with

5  Plaintiffs in the Hernandez litigation, or their agents and/or attorneys RELATING

6  TO YOUR recommendations for changes or improvements to the mental health

7  services at Monterey County Jail as referenced on pages 19-35 of YOUR Report

8  submitted in this action.

9         9.     All "Incident Reports on suicides, suicide attempts and placement in

10  the Safety Cells at the Monterey County Correctional Facilities from 2010 through

11  October 25, 2013" as referenced on page 8 of YOUR Report in this action.

12        10.    "The report of the inspection of the Monterey County Main Jail by the

13  Corrections Standards Authority (now the Board of State and Community

14  Corrections) dated May 10, 2010," as referenced on page 9 of YOUR Report in this

15  action.

16        11.    Any and all DOCUMENTS YOU reviewed in connection with YOUR

17  role as a consultant for the Hernandez litigation that YOU relied on and/or form the

18  basis for any of the opinions YOU offered in pages 8-21 of YOUR Report in this

19  action, and which have not been previously produced in this action.

20        12.    Any and all DOCUMENTS reflecting YOUR communications

21  RELATING TO provision of mental health treatment and/or suicide prevention at

22  Monterey County Jail, including but not limited to YOUR communications with

23  other consultants, retained experts, non-retained experts, CFMG personnel,

24  Monterey County personnel, and/or attorneys representing any party in the

25  Hernandez litigation, except those which are specifically exempt under the trial

26  preparation protection pursuant to Fed R. Civ. P. 26(b)(4)(C).

27        13.    Any and all DOCUMENTS, including but not limited to written or

28  electronic communications, RELATING TO YOUR retention as an expert in this

1  action.

2      14.    Any WRITING provided to YOU by defendants' counsel at any time

3  since YOU have been retained as an expert witness in this case.

4      15.    Any WRITING YOU have relied upon in formulating the opinions and

5  recommendations which are set forth in YOUR September 27, 2015 report which

6  was served with defendants' Expert Witness Disclosure.

7      16.    Any WRITING which reflects the facts and data considered in

8  formation of YOUR opinions and recommendations as set forth in YOUR

9  September 27, 2015 report which was served with defendants' Expert Witness

10  Disclosure.

11      17.    Any WRITING which YOU have sent to defendants' counsel

12  regarding this case.

13      18.    Any WRITING which has been exchanged between YOU and

14  defendants' counsel regarding this case.

15      19.    Any WRITING prepared by YOU in connection with YOUR services

16  as an expert witness in this case. This request includes, but is not limited to, any

17  preliminary drafts, revised drafts or final reports which YOU have authored.

18      20.    Any WRITING which reflects the amount of time and billings YOU

19  have generated as an expert witness in this case.

20      21.    Any articles which YOU have read, reviewed, or relied upon that

21  support any of the opinions or recommendations set forth in YOUR September 27,

22  2015 report which was served with defendants' Expert Witness Disclosure.

23      22.    Any WRITING which was prepared by anyone assisting YOU in

24  YOUR services as an expert witness in this case.

25      23.    A copy of YOUR current curriculum vitae.

26  / / /

27  / / /

28  / / /

1      24.   A copy of YOUR testimonial history as described by FRCP Rule

2  26(a)(2)(B)(v).

3

4  Dated: October 2, 2015           Respectfully Submitted,

5                                 RIFKIN LAW OFFICE

6

7                                 HADSELL STORMER & RENICK LLP

8                                 By: _____

9                                      Dan Stormer

                                       Joshua Piovia-Scott

10                                 Mohammad Tajsar

                                       Attorneys for Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLTFS' NTC OF DEPO OF DEFT'S      -6-
EXPERT RICHARD HAYWARD & RFPS

**PROOF OF SERVICE**

I am employed in the county of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 128 N. Fair Oaks Avenue, Pasadena, California 91103.

On October 2, 2015, I served the foregoing document described as: **PLAINTIFFS' NOTICE OF THE DEPOSITION OF DEFENDANT CALIFORNIA FORENSIC MEDICAL GROUP'S RETAINED EXPERT RICHARD HAYWARD, PH.D. AND REQUEST FOR PRODUCTION OF DOCUMENTS** on the interested parties in this cause as follows:

**SEE ATTACHED SERVICE LIST**

<u>XX</u>   **BY E-MAIL**

<u>XX</u>   I served the above-mentioned document electronically on the parties listed at the e-mail addresses below and, to the best of my knowledge, the transmission was complete and without error in that I did not receive an electronic notification to the contrary.

Executed on October 2, 2015, at Pasadena, California.

<u>XX</u>   (Federal)   I declare that I am employed in the office of a member of the bar of this Court at whose direction the serve was made.


_____
Jessica Valdenegro
Declarant

1

**SERVICE LIST**

| | |
|---|---|
| 2<br>3<br>4<br>5<br>6<br>7<br>8 | Charles J. McKee, SBN 152458<br>County Counsel<br>Susan K. Blitch, SBN 187761<br>Senior Deputy County Counsel<br>Irv Grant, SB 68950<br>Deputy County Counsel<br>County of Monterey<br>168 West Alisal Street, Third Floor<br>Salinas, CA 93901-2653<br>Email: blitchsk@co.monterey.ca.us<br>    granti@co.monterey.ca.us<br>    ZinmanK@co.monterey.ca.us (assistant) | **Attorneys for Defendants,**<br>**COUNTY OF MONTEREY, SHERIFF**<br>**SCOTT MILLER, and SERGEANT E.**<br>**KAYE** |
| 9<br>10<br>11<br>12<br>13<br>14<br>15 | Vincent P. Hurley #111215<br>Amanda Cohen #243946<br>Rachel Ostrander #291890<br>Ryan Thompson #292281<br>LAW OFFICES OF VINCENT P.<br>HURLEY<br>A Professional Corporation<br>38 Seascape Village<br>Aptos, California 95003<br>Email: vphurley@hurleylaw.com<br>    acohen@hurleylaw.com<br>    rostrander@hurleylaw.com<br>    rthompson@hurleylaw.com | **Attorneys for Defendants,**<br>**CITY OF MONTEREY, CHIEF**<br>**PHILIP PENKO, and OFFICER**<br>**BRENT HALL** |
| 16<br>17<br>18<br>19 | Peter G. Bertling - 131602<br>Jemma Parker Saunders - 227962<br>BERTLING & CLAUSEN, LLP<br>15 West Carrillo Street, Suite 100<br>Santa Barbara, CA 93101<br>Email: pgb@bertling-clausen.com<br>    jps@bertling-clausen.com<br>    jam@bertling-clausen.com (assistant) | **Attorneys for Defendants,**<br>**CALIFORNIA FORENSIC MEDICAL**<br>**GROUP, INC. and TAYLOR**<br>**FITHIAN, M.D.** |

20

21

22

23

24

25

26

27

28

2

Rifkin Decl. in Supp of Mtn to Compel
Discovery & for Sanctions

# Exh. B

Peter G. Bertling  # 131602
Jemma Parker Saunders #227962
BERTLING & CLAUSEN L.L.P.
15 West Carrillo Street, Suite 100
Santa Barbara, California  93101
Telephone:  (805) 892-2100
Facsimile:   (805) 963-6044

Attorneys for Defendants
CALIFORNIA FORENSIC MEDICAL GROUP, INC.;
TAYLOR FITHIAN, M.D.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Estate of JOSHUA CLAYPOLE, deceased, by and through SILVIA GUERSENZVAIG, as Administrator; SILVIA GUERSENZVAIG,<br><br>               Plaintiff,<br><br>v.<br><br>COUNTY OF SAN MATEO; SHERIFF GREG MUNKS, in his individual and official capacity; COUNTY OF MONTEREY; SHERIFF SCOTT MILLER, in his individual and official capacity; SERGEANT E. KAYE, in his individual and official capacity; CITY OF MONTEREY; MONTEREY POLICE DEPARTMENT CHIEF PHILIP PENKO, in his individual and official capacity; BRENT HALL in his individual and official capacity; CALIFORNIA FORENSIC MEDICAL GROUP; DR. TAYLOR FITHIAN, in his individual and official capacity; COMMUNITY HOSPITAL OF MONTEREY PENINSULA; and DOES 1 through 30.<br><br>               Defendants. | Case No. 5:14-cv 02730 BLF<br><br>**OBJECTIONS TO THE REQUEST FOR PRODUCTION OF DOCUMENTS ASSOCIATED WITH THE DEPOSITION NOTICE OF RICHARD HAYWARD, PH.D.**<br><br><br>Action Filed:  June 12, 2014<br>Trial Date:    April 11, 2016<br>PTR Conf:    March 31, 2016<br>Judge:         Hon. Beth Labson Freeman |

Defendants California Forensic Medical Group, Inc. and Taylor Fithian, M.D.

hereby object to the deposition notice with demand for production of documents issued

to Richard Hayward, Ph.D. by plaintiffs as follows:

1                                    **5:14cv02730 BLF**

OBJECTIONS TO THE REQUEST FOR PRODUCTION OF DOCUMENTS ASSOCIATED WITH
THE DEPOSITION NOTICE OF RICHARD HAYWARD, PH.D.

1    Defendants object to each and every request for production to the extent it seeks

2 documents in violation of Federal Rule of Civil Procedure Rule 26(b)(4)(B) and (C) and

3 Federal Rule of Civil Procedure Rule 26(b)(3)(A).

4    Defendants further object to each and every request for production to the extent it

5 seeks confidential and private third-party information and hereby designate any and all

6 information produced containing such information as CONFIDENTIAL INFORMATION

7 pursuant to this matter's entered protective order.

8 DATED:  October 13, 2015.                        BERTLING & CLAUSEN, L.L.P.

9

10

11                                    By:   */s/  Jemma Parker Saunders*
                                            Peter G. Bertling
12                                          Jemma Parker Saunders
                                            Attorneys for Defendants
13                                          CALIFORNIA FORENSIC
                                            MEDICAL GROUP, INC. and
14                                          TAYLOR FITHIAN, M.D.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OBJECTIONS TO THE REQUEST FOR PRODUCTION OF DOCUMENTS ASSOCIATED WITH
THE DEPOSITION NOTICE OF RICHARD HAYWARD, PH.D.

1  Peter G. Bertling  # 131602
   Jemma Parker Saunders #227962
2  BERTLING & CLAUSEN L.L.P.
   15 West Carrillo Street, Suite 100
3  Santa Barbara, California  93101
   Telephone:  (805) 892-2100
4  Facsimile:   (805) 963-6044

5  Attorneys for Defendants
   CALIFORNIA FORENSIC MEDICAL GROUP, INC.;
6  DR. TAYLOR FITHIAN

7

8

9                     UNITED STATES DISTRICT COURT

10           FOR THE NORTHERN DISTRICT OF CALIFORNIA

11  Estate of JOSHUA CLAYPOLE,          ) Case No. CV 5:14 02730 BLF
    deceased, by and through SILVIA     )
12  GUERSENZVAIG, as Administrator;     ) **CERTIFICATE OF SERVICE**
    SILVIA GUERSENZVAIG,                )
13                                      )
                                        )
14             Plaintiff,               )
        v.                              )
15                                      )
    COUNTY OF SAN MATEO;                )
16  SHERIFF GREG MUNKS, in his          )
    individual and official capacity;   )
17  COUNTY OF MONTEREY;                 )
    SHERIFF SCOTT MILLER, in his        )
18  individual and official capacity;   ) Action Filed: June 12, 2014
    SERGEANT E. KAYE, in his            ) Trial Date:    April 11, 2016
19  individual and official capacity; CITY OF ) PTR Conf:    March 31, 2016
    MONTEREY; MONTEREY POLICE           ) Judge:         Hon. Beth Labson
20  DEPARTMENT CHIEF PHILIP PENKO, in   )                Freeman
    his individual and official capacity; BRENT )
21  HALL in his individual and official capacity; )
    CALIFORNIA FORENSIC MEDICAL         )
22  GROUP; DR. TAYLOR FITHIAN, in his   )
    individual and official capacity;   )
23  COMMUNITY HOSPITAL OF               )
    MONTEREY PENINSULA; and DOES 1      )
24  through 30.                         )
               Defendants.             )
25  ─────────────────────────────────  )

26      I am employed in the County of Santa Barbara, State of California.  I am over the

27  age of 18 years and not a party to the within action.  My business address is 15 West

28  Carrillo Street, Suite 100, Santa Barbara, California 93101.  My email address is

─────────────────────────────────────────────────────────────
                         1                      **5:14cv02730 BLF**
─────────────────────────────────────────────────────────────
                    **CERTIFICATE OF SERVICE**

jam@bertling-clausen.com.

On **October 14, 2015,** I served a true copy of the following document:

- **OBJECTIONS TO THE REQUEST FOR PRODUCTION OF DOCUMENTS ASSOCIATED WITH THE DEPOSITION NOTICE OF RICHARD HAYWARD, PH.D.**

☒ BY ELECTRONIC SERVICE (E-Mail)

By electronically transmitting the document listed above to the email addresses on the attached Service List.

☒ FEDERAL   I declare under penalty of perjury under the laws of the United States of America that the above is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on **October 14, 2015,** at Santa Barbara, California.

/s/ _____
Joan McMaster

**I hereby attest that I have on file all holograph signatures for any signatures indicated by a "conformed" signature (/s/) within this e-filed document.**

1

# SERVICE LIST

2

*Joshua Claypole et al. v. County of San Mateo, et al.*
U.S.D.C. - Northern District of California, Case No. 5:14-cv-02730 BLF

3

4   **Attorney for Plaintiffs**:
Dan Stormer, Esq.

5   Josh Piovia-Scott, Esq.
Mohammad Tajsar, Esq.

6   Hadsell Stormer & Renick, LLP
128 N. Fair Oaks Avenue

7   Pasadena, CA 91103
(626) 585-9600 - Phone

8   (626) 577-7079 - Fax
Email: dstormer@hadsellstormer.com

9   Email: jps@hadsellstormer.com
Email: mtajsar@hadsellstormer.com

10

11   Lori Rifkin, Esq.
Rifkin Law Office

12   P.O. Box 19169
Oakland, CA 94619

13   (415) 685-3591 - Phone
Email: lrifkin@rifkinlawoffice.com

14

15

16

17

18

**Attorneys for Defendants COUNTY OF MONTEREY; SHERIFF SCOTT MILLER, AND SERGEANT E. KAYE**
Susan K. Blitch, Esq.
Michael Philippi, Esq.
Office of the County Counsel,
County of Monterey
168 West Alisal Street, 3rd Floor
Salinas, CA  93901-2439
(831) 755-5045 - Phone
(831) 755-5283 - Fax
Email: BlitchSK@co.monterey.ca.us
Email: PhilippiMR@co.monterey.ca.us
moores@co.monterey.ca.us;
zinmank@co.monterey.ca.us

**Defendant City of Monterey**
Ryan Thompson, Esq.
Law Offices of Vincent P. Hurley
A Professional Corporation
28 Seascape Village
Aptos, CA 95003
831-661-4800
Fax: 831-661-4804
Email: rthompson@hurleylaw.com

19

20

21

22

23

24

25

26

27

28

3                                         **5:14cv02730 BLF**

**CERTIFICATE OF SERVICE**

Rifkin Decl. in Supp of Mtn to Compel
Discovery & for Sanctions

Exh. C



Rifkin Decl. in Supp of Mtn to Compel
Discovery & for Sanctions

Exh. D

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

Estate of JOSHUA CLAYPOLE,    )
deceased, by and through      )
SILVIA GUERSENZVAIG, as       )
Administrator; SILVIA         )
GUERSENZVAIG,                 )
                              )
              Plaintiff,      )
                              )
    vs.                       )    Case No. CV 14-02730 BLF
                              )
COUNTY OF SAN MATEO;          )
et al.,                       )
                              )
              Defendants.     )
_____)

--oOo--

Friday, October 16, 2015

--oOo--

DEPOSITION OF

RICHARD HAYWARD, Ph.D.

--oOo--

Reported by:   CARI VALLO
               California CSR No. 6484
               Registered Professional Reporter

KARYN ABBOTT
& ASSOCIATES
COURT REPORTERS
70 S. Lake Avenue, 10th Floor
Pasadena, California 91101
Phone 213.749.1234 | 213.749.0644

1    BY MS. RIFKIN:

2        Q.  Dr. Hayward, what's been marked as Exhibit 119

3    and handed to you is Plaintiff's notice of your

4    deposition.  Have you seen this document before?

5        A.  Yes, I believe I have.

6        Q.  And part of this document is a request for

7    production of various documents.  Did you review those

8    requests?

9        A.  Yes.

10       Q.  And did you provide any documents to be

11   produced in response to those requests?

12       A.  The broken DVD or CD contains those documents,

13   yes.

14       Q.  And you're referencing, Mr. Bertling handed me

15   a DVD before we started with some of the document

16   production, and it is broken.  So it will not be able

17   to be accessed by me.

18           MR. BERTLING:  We've also produced emails

19   exchanged between Dr. Hayward, myself, and I think

20   other people in my office.

21   BY MS. RIFKIN:

22       Q.  And is it your understanding, Dr. Hayward,

23   that all of the documents that you provided to Counsel

24   were going to be on this CD in addition to the emails?

25       A.  Yes, between the two.

1          MS. RIFKIN:  And Mr. Bertling, are you able to

2    provide either another DVD to me today or to send them

3    to me via email or Dropbox prior to the end of this

4    deposition?

5          MR. BERTLING:  I'm sure I can have them do

6    that.

7          MS. RIFKIN:  Okay.  Thank you.

8          MR. BERTLING:  If you have a Dropbox or

9    wherever you want them sent, I can send my assistant an

10   email right now and ask her to send you everything on

11   the disc.

12         MS. RIFKIN:  I assume it's too big for email.

13   That's just why.

14         MR. BERTLING:  Do you have a Dropbox?  If you

15   want to forward that to me, I'll be glad to have her

16   send it there.

17         MS. RIFKIN:  Okay.  It's my email address.

18         MR. BERTLING:  Okay.

19   BY MS. RIFKIN:

20      Q.  Dr. Hayward, did you review the emails that

21   were produced?  That's the stack of emails that were

22   produced this morning.

23      A.  I have not reviewed them recently.  I -- let

24   me clarify.  I have not reviewed all of them recently.

25   I have reviewed probably the last dozen emails

1      A.   Bryce?   I'm not -- that's not --

2      Q.   So you don't think you did?

3      A.   I don't recall seeing that.

4      Q.   Other than -- so we talked about documents

5  you've received since you wrote this report.   Do you

6  believe that this list offered in number 1 on page 8 to

7  9 contains all of the materials that you relied on or

8  referenced in forming your opinions in this case?

9      A.   I believe so, yes.

10      Q.   Ah, and now I see the hours of review.

11      A.   On the same page, yes.

12      Q.   Okay.   So if we can turn to page 11 of 40, you

13  list as opinion number 1 -- or you list opinion number

14  1 on this page, that the suicide prevention plan

15  developed by CFMG at the Monterey County Adult

16  Detention Facility met the minimal standards of the

17  Title 15 regulations prior to and at the time of the

18  suicide of Joshua Claypole on May 4th, 2014.

19           Is that an accurate description of your

20  opinion?

21      A.   Yes.

22      Q.   And what is the basis for that opinion,

23  Dr. Hayward?

24           MR. BERTLING:   Other than what's set forth in

25  his report?

```
 1   BY MS. RIFKIN:
 2       Q.  Do you understand my question, Doctor?
 3           MR. BERTLING:  Well, my question is whether
 4   it's other than what's set forth in his report?
 5   BY MS. RIFKIN:
 6       Q.  What is the basis for your -- whether set
 7   forth in your report or not, what are the bases for
 8   your --
 9           MR. BERTLING:  Well, the report speaks for
10   itself.  Are you asking for whether there's anything
11   above and beyond that report?
12           MS. RIFKIN:  No.  I'm asking Dr. Hayward what
13   the bases for his opinion that he's prepared to express
14   are.
15           MR. BERTLING:  Other than what's set forth in
16   his report?  I mean, he has numerous opinions and
17   bases.  Are you asking him for something above and
18   beyond that?
19   BY MS. RIFKIN:
20       Q.  On what information did you base your
21   opinion -- or interviews or inspections or documents or
22   other information did you base your opinion that the
23   suicide prevention plan developed by CFMG at Monterey
24   County met the minimal standards of Title 15
25   regulations at the time we're talking about?
```

1    A.   I just have what you gave me.

2         So looking at May 4, 2013, when he was

3    released from suicide watch, I see in the record "DC

4    suicide watch," which stands for discontinue suicide

5    watch.   This was at 0620 on the morning of May 4, 2013.

6         Telephone order from Dr. Fithian.   That was

7    with and recorded by Nurse Shene.   I believe it's

8    pronounced "sheen."

9         And the treatment plan then was -- treatment

10   plan was discontinue suicide watch, begin trazodone,

11   100 milligrams at HS, for 30 days.

12        And then it says that that was set up at 0630

13   on May 4, and there's the nurse that set it up.

14        When I say set up, that would be -- that would

15   be set up the trazodone, I'm sure the nurse is

16   referring to there.

17   Q.   Okay.   And just for the record, you're looking

18   at the page that says "Doctor Orders?"

19   A.   "Doctors Orders," yes.

20   Q.   I think it -- I can't read the Bates stamp

21   from here, but it's CMFG-JC --

22   A.   Four zero 25.

23   Q.   Okay.   000025?

24   A.   Four zeroes and 25, yes.

25   Q.   Do you -- in your opinion, is that an adequate

```
1   treatment plan when releasing somebody from -- well, in
2   your opinion, was that an adequate treatment plan for
3   Mr. Claypole when he was discharged from suicide watch?
4           MR. BERTLING:  Well, it lacks foundation that
5   that's all the treatment is.  He was obviously set to
6   see Dr. Fithian on Monday as well.  So it's an
7   incomplete hypothetical.
8   BY MS. RIFKIN:
9       Q.  Dr. Hayward, is there any part of the
10  treatment plan -- is there any additional part of the
11  treatment plan that you can identify other than what
12  you just stated as discontinue suicide watch and begin
13  trazodone for 30 days?
14          Is there any other part of the treatment -- a
15  treatment plan that you can identify for Joshua
16  Claypole on May 4th?
17          MR. BERTLING:  Are you referring to things
18  that would be happening to him after he was released
19  from the suicide cell?
20          Your question is vague and ambiguous.
21          MS. RIFKIN:  I'm asking Dr. Hayward what his
22  understanding of the treatment plan for Joshua Claypole
23  was when he was released from suicide watch.
24          Peter, please stop testifying.
25          MR. BERTLING:  And are you incorporating
```

```
 1   things that had already been put into place before he
 2   was released on May 4th?
 3           MS. RIFKIN:  I'm not incorporating anything.
 4   I am asking Dr. --
 5           MR. BERTLING:  So that's why your question is
 6   vague and ambiguous.  I ask that you clarify it.
 7           Your question is vague and ambiguous as to are
 8   you talking about solely things that were ordered on
 9   May 4th or things that were included as part of the
10   treatment to go forward after May 4th?
11   BY MS. RIFKIN:
12       Q.  Dr. Hayward, I'll ask you again.
13           In your expert opinion, what was the treatment
14   plan for Joshua Claypole when he was released from
15   suicide watch on June -- on May 4th as you, as an
16   expert, understand treatment plan?
17           MR. BERTLING:  Vague and ambiguous as to what
18   you mean by the term "treatment plan" under these
19   circumstances and whether you're including things that
20   had been part of the treatment plan before the release
21   or that were just included as further treatment plan
22   after the release.
23           MS. RIFKIN:  And Peter, I'll note for the
24   record that if you continue to testify, we will not pay
25   Dr. Hayward for the time that you spent testifying.
```

1          MR. BERTLING:  I am not testifying.  I'm

2     stating legitimate objections because I'm trying to get

3     a clear understanding of what time period you're

4     referring to when you say "the treatment plan."

5          You're aware that there were treatment plans

6     already in place before May 4th.  There were things

7     added to it.

8          You're aware Dr. Fithian was scheduled to see

9     the inmate on Monday and that that had been a change in

10    the treatment plan.

11         So I'm just trying to get clarification

12    regarding what you're referring to.

13    BY MS. RIFKIN:

14         Q.  Dr. Hayward, as an expert evaluating all the

15    different jails we've gone through and patients, do you

16    have an understanding what the phrase "treatment plan"

17    means to you?

18         A.  Yes.

19         Q.  And it's what we've talked about, what you

20    described already, right?

21         A.  Yes.

22         Q.  Okay.  So do you understand the question when

23    I ask you in your opinion, as an expert, based on your

24    understanding of a treatment plan, what the treatment

25    plan was for Joshua Claypole on May 4th?  Do you

1  understand what I'm asking?

2       A.  Yes.

3       Q.  Can you answer the question, please.

4       A.  Yes.

5           I already covered the medication part of the

6  treatment plan.  There was a follow-up that I believe

7  was scheduled with Dr. Fithian.

8       Q.  On what do you base that belief, that there

9  was a follow-up scheduled with Dr. Fithian?

10      A.  On two things.  One was that was a routine --

11 that was the routine practice.  When anybody was in the

12 safety cell for suicide watch, the routine practice was

13 they would be scheduled for the next available -- what

14 they called the psychiatrist call, which was being seen

15 by Dr. Fithian.

16          The next available would have been Monday when

17 he -- he normally would come in Monday morning.  So I

18 believe he was scheduled to see Dr. Fithian on Monday.

19      Q.  Monday, May 6th?

20      A.  Yes, Monday, May 6th, yes.

21          And I also know that it was routine for the

22 mental health clinicians to do a follow-up assessment.

23 So he would be seen again either by Kim Spano or by

24 Charlotte Gage, who was, at the time, the psychiatric

25 nurse.

1    the documentation.  It's right here.

2            THE WITNESS:  That's a good point.  We do have

3    what she put in her -- in her log, in her assessment.

4    I have to find out which one it is here, though.

5            MR. BERTLING:  It's right here (indicating).

6            THE WITNESS:  Okay.  Her --

7            MS. RIFKIN:  I just want the record to show

8    Mr. Bertling pointing to a specific place on the page.

9            MR. BERTLING:  Sure.  I'm pointing to the --

10           MS. RIFKIN:  I'm talking.

11           MR. BERTLING:  -- 5/4 entry by Ms. Shene.

12           MS. RIFKIN:  I ask that you don't interrupt me

13   again, Mr. Bertling.

14           MR. BERTLING:  Go ahead.  Say what you need to

15   say.

16           I just wanted to clarify what I was pointing

17   to.  It was her last entry.  It helps to have the

18   record clear.

19           THE WITNESS:  So in the entry by Nurse

20   Shene -- and this was dated 5/4/2013 at 0515 -- she

21   writes:  Denies suicidal ideation -- which is

22   abbreviated as SI -- contracts for safety.  Wants to be

23   removed from SF cell.  Requests meds to help him sleep.

24   Calm, clear speech.

25           So yes, so that's -- so she has addressed

1   of this assessment?

2        A.   Yes.

3        Q.   Okay.  Did Dr. Fithian complete a suicide risk

4   assessment on the morning of May 2nd for Mr. Claypole?

5        A.   Yes.

6        Q.   And what do you base that opinion on?

7        A.   On his chart note.

8        Q.   And I just want the report to reflect that

9   Mr. Bertling has taken the records from in front of

10  you, so --

11          MR. BERTLING:  I want to show him the chart

12  note so he can see the chart note.  Do you have a

13  problem with that?

14          THE WITNESS:  I would like to see the chart

15  note to provide any details regarding his assessment.

16  BY MS. RIFKIN:

17       Q.   Dr. Hayward, you've looked through medical

18  files before, haven't you?

19       A.   Yes, many.

20       Q.   Do you consider yourself capable of

21  identifying a chart note?

22       A.   I probably have achieved that level of

23  competency.

24       Q.   So on what do you base your conclusion that

25  Dr. Fithian completed a suicide risk assessment on the

1   open-ended questions about his current factors that we

2   discussed a few moments ago?

3       A.   He concluded that "Patient states he is stable

4   now," and that indicates to me that he sufficiently and

5   adequately covered Mr. Claypole's emotional state at

6   the time of this assessment.

7       Q.   And on what basis does that note indicate that

8   to you?

9       A.   He states that "He is stable now.  He voiced

10  no suicidal ideation or intent" --

11      Q.   And I just want to clarify, because

12  Dr. Fithian's note says that he states he's stable now,

13  right, or patient states?

14      A.   Yes.

15      Q.   So in your opinion, is Dr. Fithian reporting

16  what Mr. Claypole was stating, or is Dr. Fithian making

17  a clinical judgment that Mr. Claypole was stable?

18          MR. BERTLING:   Lacks foundation.  Calls for

19  speculation.  Dr. Fithian could have been asking a

20  number of questions that caused him to come to that

21  conclusion.

22  BY MS. RIFKIN:

23      Q.   How do you read that note?

24      A.   So I read that note as saying that

25  Mr. Claypole -- sorry -- Claypole stated that he's

1      Q.   Do you know if Dr. Fithian asked about any

2   prior suicidal statements during his meeting with

3   Mr. Claypole on the morning of May 2nd?

4           MR. BERTLING:   You mean other than what's in

5   his record where he said he denied it?

6           THE WITNESS:   Do I know if he asked about

7   prior suicidal statements?  I know his note indicates

8   that he asked about current suicidal ideation or

9   intent.

10          In terms of prior suicidal statements, that

11   was -- that was on the nurse's assessment, that he

12   denied that.

13          Dr. Fithian may have asked about it again, and

14   that's something -- I'm going to say I reviewed his

15   deposition.  So that level of detail I'm not able to

16   carry in my mind.

17   BY MS. RIFKIN:

18      Q.   If you can turn to page 14 of 40 in your

19   report.

20      A.   Okay.

21      Q.   So I'm looking at the -- well, both of your

22   paragraphs that have your own statements in them.  I'll

23   start with, "The records" -- so it's the paragraph that

24   starts with "The records again document."  Do you see

25   that?

```
1   person on the morning of May 2nd; is that right?

2       A.  Yes.

3       Q.  In conducting a suicide risk assessment of

4   Mr. Claypole, subsequent to those statements that he

5   made to Ms. Spano, in your opinion, should a suicide

6   risk assessment have involved asking Mr. Claypole about

7   the statements that he's made indicating suicidality?

8           MR. BERTLING:  Well, he did.

9           THE WITNESS:  I'm not sure what point of time

10  you're talking about there.

11  BY MS. RIFKIN:

12      Q.  So after Mr. Claypole was placed on suicide

13  watch following those statements to Ms. Spano --

14      A.  Yes.

15      Q.  -- a suicide risk assessment conducted after

16  any -- after that point at which he was placed on

17  suicide watch.

18      A.  This was the second time he was on --

19      Q.  The second time he was on suicide watch.

20      A.  -- suicide watch you're referring to?

21      Q.  In your opinion, should a suicide risk

22  assessment completed after that time have included

23  questions to Mr. Claypole about those various suicidal

24  statements he'd made to Ms. Spano?

25          MR. BERTLING:  Well, it lacks foundation that
```

1   that didn't happen with Ms. Shene where she

2   specifically noted he denied he was suicidal.

3        MS. RIFKIN:  Thank you for your testimony,

4   Mr. Bertling.

5        Q.  Dr. Hayward, can you provide your expert

6   answer, please.

7        MR. BERTLING:  So what's the question?

8   BY MS. RIFKIN:

9        Q.  Do you know the question, Dr. Hayward?

10       A.  Well, clarify it for me, please.

11       Q.  Yes.

12       MR. BERTLING:  Because he's already testified

13  that he thought Ms. Shene did an appropriate and

14  adequate suicide risk assessment on the morning of the

15  4th.  Are you asking him if there were any others?

16  BY MS. RIFKIN:

17       Q.  In your expert opinion, Dr. Hayward, should a

18  suicide risk assessment completed subsequent to

19  Mr. Claypole's placement on suicide watch the second

20  time, so on May 3rd, should any suicide risk assessment

21  completed after that point have included questions to

22  Mr. Claypole about the suicidal statements he made to

23  Ms. Spano?

24       A.  Yes.

25       Q.  Did that occur?

1        A.   It may have.

2        Q.   From the treatment records, are you able to

3    tell whether anyone ever asked Mr. Claypole about those

4    statements between the time he was placed on suicide

5    watch on May 3rd and the time he was released on

6    May 4th?

7            MR. BERTLING:   Are you referring to about

8    whether or not he was still suicidal?

9    BY MS. RIFKIN:

10       Q.   Do you understand the question, Dr. Hayward?

11       A.   Yes, I believe I understand the question.

12            So what I would expect is the next -- again,

13   the nurse at the jail is -- does not have the expertise

14   as a mental health clinician.   So she's doing a very

15   basic -- more of a preliminary suicide risk assessment,

16   and she, I believe, covered that very well.

17            He was scheduled to see Dr. Fithian at the

18   next available psychiatric sick call, which would have

19   been Monday.

20            And so the next mental health clinician that

21   evaluated Mr. Claypole, yes, should have asked him

22   about these statements that he made to Ms. Spano.

23            She probably asked about these statements.   We

24   don't know how much time she spent with him, but there

25   may have -- you know, clinicians put a summary in their

1    or her patients, to make a mistake?

2        A.  Yes.  I think we're all human in this

3    business.

4        Q.  Do you think, in your opinion, that part of a

5    functional quality improvement program or quality

6    assessment program is acknowledging when a mistake has

7    been made in clinical practice or judgment?

8        A.  Yes.  Acknowledge -- you know, part of the

9    quality improvement is that you look at incidents where

10   there was some adverse outcome, and you try to -- you

11   try to find any mistakes, any errors in judgment.

12          Then you set up a corrective action plan to

13   reduce the likelihood that a similar mistake -- or I

14   want to say error in judgment -- might occur in the

15   future.

16       Q.  Are you aware of whether CFMG or Dr. Fithian

17   through the QA process at Monterey County jail

18   identified any errors or areas of improvement as a

19   result of Mr. Claypole's suicide?

20          MR. BERTLING:  Lacks foundation that there was

21   a need for that.

22          THE WITNESS:  I don't recall.  I vaguely

23   recall seeing that there was a quality assurance review

24   of the suicide, but I don't recall any details about

25   it.

1   BY MS. RIFKIN:

2       Q.  Are you aware of whether any corrective action

3   plan was identified or followed?

4           MR. BERTLING:  Lacks foundation that there was

5   a need for any such corrective action plan to be

6   identified or followed following the peer review of

7   this case.

8           THE WITNESS:  I am not aware of what might

9   have occurred.

10  BY MS. RIFKIN:

11      Q.  Is it your opinion that placement of

12  inmate-patients in the type of safety cells that exist

13  at Monterey County jail, in other words, padded cells

14  with a grate in floor, may increase an inmate's

15  feelings of despondency and suicidal intent?

16          MR. BERTLING:  Objection.  Incomplete

17  hypothetical.  Vague and ambiguous.

18          But go ahead and answer the question if you

19  can, Doctor.

20          THE WITNESS:  So do you want my opinion if it

21  could increase despondency?  I'm not sure what you're

22  asking.

23  BY MS. RIFKIN:

24      Q.  Yes, if you have one.  I'm asking is that your

25  opinion.

```
 1              (Witness reviews document.)
 2              THE WITNESS:  I don't recall seeing this
 3    particular memo.  I may have, but it --
 4              MR. BERTLING:  And just so the record is
 5    clear, this is a May 7, 2013, memorandum from C.
 6    MacGregor regarding inmate Claypole, Joshua.
 7              Is there a question pending?  He says he
 8    doesn't recall seeing the document.
 9    BY MS. RIFKIN:
10        Q.  Oh, I wasn't sure if you were done with your
11    answer, Doctor.
12        A.  So I don't recall seeing this prior to today.
13              MS. RIFKIN:  Okay.  I don't have any more
14    questions for you, Doctor.  I don't want to go off the
15    record because there's other matters to talk about, but
16    I wanted to check to see if Counsel has any questions.
17              MR. BERTLING:  No.
18              MS. RIFKIN:  So I have not received any
19    email -- an email with any of the documents that were
20    to be produced today that were handed to me on the
21    broken disc.
22              So I am reserving the right to hold
23    Dr. Hayward's deposition open for the purpose of asking
24    questions that may come up as a result of reviewing
25    these documents and reserving the right to do so at
```

```
 1   cost to the defendants.
 2           MR. BERTLING:  Are we done?
 3           MS. RIFKIN:  Thank you, Doctor.
 4           THE COURT REPORTER:  Before we go off the
 5   record, can I have Counsel state whether you are
 6   ordering a copy of the transcript.
 7           MR. BERTLING:  I am ordering a copy.  I'd like
 8   to get the condensed version, the E transcript,
 9   whatever that package is.
10           MR. GRANT:  I'll take the same thing on behalf
11   of the County.
12           MS. RIFKIN:  Yes, we are ordering a copy of
13   the transcript, as well, including a rough.
14           (Off the record.)
15   BY MS. RIFKIN:
16       Q.  Can you let me know how much time we spent to
17   the record?
18           THE COURT REPORTER:  Can we go off the record
19   so I can add up the time?
20           MS. RIFKIN:  Yes.
21           (Off the record.)
22           MS. RIFKIN:  So the Court Reporter has stated
23   that we spent five hours and six minutes on the record.
24   Are you requesting payment for the six minutes?
25           MR. BERTLING:  Sure.
```

```
 1                  CERTIFICATE OF REPORTER

 2          I, CARI VALLO, a Certified Shorthand Reporter

 3   of the State of California, duly authorized to

 4   administer oaths, do hereby certify:

 5          That the foregoing proceedings were taken

 6   before me at the time and place herein set forth; that

 7   any witnesses in the foregoing proceedings, prior to

 8   testifying, were duly sworn; that a record of the

 9   proceedings was made by me using machine shorthand,

10   which was thereafter transcribed under my direction;

11   that the foregoing transcript is a true record of the

12   testimony given.

13          Further, that if the foregoing pertains to the

14   original transcript of a deposition in a Federal case,

15   before completion of the proceedings, review of the

16   transcript [ ] was [x] was not requested.

17          I further certify I am neither financially

18   interested in the action nor a relative or employee of

19   any attorney or party to this action.

20          IN WITNESS WHEREOF, I have this date

21   subscribed my name:

22          Dated:  October 29, 2015

23

24

25          CARI VALLO, RPR, CSR NO. 6484
```

**KARYN ABBOTT & ASSOCIATES**                                    193

Rifkin Decl. in Supp of Mtn to Compel
Discovery & for Sanctions

Exh. E

Lori Rifkin <lrifkin@rifkinlawoffice.com>

---

## Claypole v. CFMG et al; production of Hayward documents

**Lori Rifkin** <lrifkin@rifkinlawoffice.com>                                    Wed, Oct 21, 2015 at 1:02 PM
To: "Peter Bertling (pgb@bertling-clausen.com)" <pgb@bertling-clausen.com>, "jps@bertling-clausen.com"
<jps@bertling-clausen.com>
Cc: Josh Piovia-Scott <jps@hadsellstormer.com>, Dan Stormer <dstormer@hadsellstormer.com>, Mohammad Tajsar
<mtajsar@hadsellstormer.com>

Dear Peter,

I am writing to follow up regarding your failure to produce documents in response to the request for production of
documents and notice of deposition for Dr. Hayward.  The deposition took place on Friday, October 16, 2015, and
you produced some hard copies of e-mails and a broken disc.  You represented that you would direct that the files
on the disc be produced electronically during the deposition, but neither I nor my co-counsel received them on
that day, and I noted on the record that we were holding Dr. Hayward's deposition open pending production of
those documents.

Neither I nor my co-counsel have received an updated production to date.  Please produce the documents
responsive to the requests that were to have been produced on the broken disc, and any additional responsive
documents.  If we have not received them by the morning of Friday, October 23, the close of expert discovery, we
will have no choice but to file a motion to compel and seek costs and fees for such motion.

Lori Rifkin, Esq.

Rifkin Law Office
www.rifkinlawoffice.com
lrifkin@rifkinlawoffice.com
415-685-3591


CONFIDENTIALITY NOTICE

The information contained in this e-mail message may be privileged, confidential and protected from
disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited.
If you think that you have received this e-mail message in error, please e-mail the sender at
lrifkin@rifkinlawoffice.com.

Lori Rifkin <lrifkin@rifkinlawoffice.com>

## Claypole v. CFMG et al; production of Hayward documents

**Joan McMaster** <jam@bertling-clausen.com>                    Wed, Oct 21, 2015 at 1:46 PM
To: "lrifkin@rifkinlawoffice.com" <lrifkin@rifkinlawoffice.com>
Cc: "jps@hadsellstormer.com" <jps@hadsellstormer.com>, "dstormer@hadsellstormer.com"
<dstormer@hadsellstormer.com>, "mtajsar@hadsellstormer.com" <mtajsar@hadsellstormer.com>, Peter Bertling
<pgb@bertling-clausen.com>, Jemma Saunders <jps@bertling-clausen.com>

Dear Ms. Rifkin:

Attached are the requested documents pertaining to the deposition of Dr. Hayward.

Sincerely,

Joan McMaster

Paralegal/Legal Assistant

Bertling & Clausen, LLP

15 West Carrillo Street, Suite 100

Santa Barbara, CA  93101

Phone: (805) 892-2100 **Fax:** (805) 963-6044; jam@bertling-clausen.com

-------------------------------------------------------------------------------

This message and any attached documents contain information from the law firm of Bertling & Clausen, LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

**4 attachments**

 **CFMG's expert witness disclosure.pdf**
4725K

**Dr. Patterson's Report & CV.pdf**
7510K

 **Emails.PDF**
1202K

**Pls Expert Witness Disclosure 9-28-15.pdf**
7806K

Lori Rifkin <lrifkin@rifkinlawoffice.com>

---

# Claypole v. CFMG et al; production of Hayward documents

**Lori Rifkin** <lrifkin@rifkinlawoffice.com>                                    Mon, Oct 26, 2015 at 9:46 AM
To: Joan McMaster <jam@bertling-clausen.com>
Cc: "jps@hadsellstormer.com" <jps@hadsellstormer.com>, "dstormer@hadsellstormer.com"
<dstormer@hadsellstormer.com>, "mtajsar@hadsellstormer.com" <mtajsar@hadsellstormer.com>, Peter Bertling
<pgb@bertling-clausen.com>, Jemma Saunders <jps@bertling-clausen.com>

Counsel:

My understanding is that the documents to be produced on the disc for the Hayward deposition included the
documents responsive to the requests for production included with the deposition notice.  The documents
attached to Ms. McMaster's email include only CFMG's expert witness disclosure, Plaintiffs' expert witness
disclosure, and the emails Peter produced in paper.

Please clarify by the close of business today which documents Defendants intended to produce in response to the
document requests to Dr. Hayward. If this is the extent of the production, which would appear to conflict with Dr.
Hayward's testimony at his deposition, it is not responsive to Plaintiffs' request for production and we will need to
bring this issue before the Court, and recall Dr. Hayward for further deposition.

Lori Rifkin, Esq.

Rifkin Law Office
www.rifkinlawoffice.com
lrifkin@rifkinlawoffice.com
415-685-3591


CONFIDENTIALITY NOTICE

The information contained in this e-mail message may be privileged, confidential and protected from
disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited.
If you think that you have received this e-mail message in error, please e-mail the sender at
lrifkin@rifkinlawoffice.com.



On Wed, Oct 21, 2015 at 1:46 PM, Joan McMaster <jam@bertling-clausen.com> wrote:

> Dear Ms. Rifkin:
>
>
> Attached are the requested documents pertaining to the deposition of Dr. Hayward.
>
>
> Sincerely,
>
>
>
> Joan McMaster

Paralegal/Legal Assistant

Bertling & Clausen, LLP

15 West Carrillo Street, Suite 100

Santa Barbara, CA  93101

Phone: (805) 892-2100 Fax: (805) 963-6044; jam@bertling-clausen.com

--------------------------------------------------------------------------------

This message and any attached documents contain information from the law firm of Bertling & Clausen, LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

Lori Rifkin <lrifkin@rifkinlawoffice.com>

---

## Claypole v. CFMG et al; production of Hayward documents

**Peter Bertling** <pgb@bertling-clausen.com>                    Mon, Oct 26, 2015 at 10:24 AM
To: Lori Rifkin <lrifkin@rifkinlawoffice.com>, Joan McMaster <jam@bertling-clausen.com>
Cc: "jps@hadsellstormer.com" <jps@hadsellstormer.com>, "dstormer@hadsellstormer.com"
<dstormer@hadsellstormer.com>, "mtajsar@hadsellstormer.com" <mtajsar@hadsellstormer.com>, Jemma Saunders
<jps@bertling-clausen.com>, "BlitchSK@co.monterey.ca.us" <BlitchSK@co.monterey.ca.us>,
"granti@co.monterey.ca.us" <granti@co.monterey.ca.us>, "Philippi, Michael R. x5361
(PhilippiMR@co.monterey.ca.us)" <PhilippiMR@co.monterey.ca.us>

Hi Lori:


Please clarify what you believe is inconsistent with our production and Dr. Hayward's deposition testimony.
What do you believe we should be producing that has not already been produced?  You already have many of
the documents referred to by Dr. Hayward in his report.


Regards,


Peter Bertling

Bertling & Clausen, L.L.P.

15 West Carrillo, Suite 100

Santa Barbara, Calif. 93101

(805) 892-2100 ext. 100

(805) 963-6044: Fax


WARNING: This message and any attachments hereto may contain confidential and privileged communications or
information and/or attorney-client communications or work-product protected by law. The information contained herein
is transmitted for the sole use of the intended recipient(s). If you are not the intended recipient or designated agent of
the recipient of such information, you are hereby notified that any use, dissemination, copying or retention of this e-
mail of the information contained herein is strictly prohibited and may subject you to penalties under federal and/or
state law. If you received this e-mail in error, please notify the sender immediately and permanently delete this e-mail.


**From:** Lori Rifkin [mailto:lrifkin@rifkinlawoffice.com]
**Sent:** Monday, October 26, 2015 9:47 AM
**To:** Joan McMaster
**Cc:** jps@hadsellstormer.com; dstormer@hadsellstormer.com; mtajsar@hadsellstormer.com; Peter Bertling;
Jemma Saunders

**Subject:** Re: Claypole v. CFMG et al; production of Hayward documents

[Quoted text hidden]

Lori Rifkin <lrifkin@rifkinlawoffice.com>

---

# Claypole v. CFMG et al; production of Hayward documents

**Lori Rifkin** <lrifkin@rifkinlawoffice.com>                                    Tue, Oct 27, 2015 at 11:03 AM
To: Peter Bertling <pgb@bertling-clausen.com>
Cc: Joan McMaster <jam@bertling-clausen.com>, "jps@hadsellstormer.com" <jps@hadsellstormer.com>,
"dstormer@hadsellstormer.com" <dstormer@hadsellstormer.com>, "mtajsar@hadsellstormer.com"
<mtajsar@hadsellstormer.com>, Jemma Saunders <jps@bertling-clausen.com>, "BlitchSK@co.monterey.ca.us"
<BlitchSK@co.monterey.ca.us>, "granti@co.monterey.ca.us" <granti@co.monterey.ca.us>, "Philippi, Michael R.
x5361 (PhilippiMR@co.monterey.ca.us)" <PhilippiMR@co.monterey.ca.us>

    Peter,

    Dr. Hayward testified that he provided documents to be produced in response to the requests for production that
he believed were on the broken DVD.  The request for production included, inter alia, requests for all materials
relied upon by Dr. Hayward in his two reports offered as a disclosure in this case, notes from his jail visits, incident
reports reviewed, as well as specific documents he referenced that had not previously been produced to
Plaintiffs.  My understanding from his testimony was that he had provided those documents to be produced on
that DVD.  I did not have the opportunity to ask him further questions about what was or was not included
because the DVD you provided me was broken and your office did not provide the documents electronically
during the deposition, as you had represented you would do.  The documents your office has now produced are
not a sufficient response to Plaintiffs' requests for production to Dr. Hayward.  Please clarify whether the
documents attached to Ms. McMaster's email constitute the full extent of the production in response to the request
for documents to Dr. Hayward.  As my previous email states, if this is the extent of the production, we will bring
this issue before the Court and seek to recall Dr. Hayward for further deposition.

    Lori Rifkin, Esq.

    Rifkin Law Office
    www.rifkinlawoffice.com
    lrifkin@rifkinlawoffice.com
    415-685-3591


    CONFIDENTIALITY NOTICE

    The information contained in this e-mail message may be privileged, confidential and protected from
disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited.
If you think that you have received this e-mail message in error, please e-mail the sender at
lrifkin@rifkinlawoffice.com.


    On Mon, Oct 26, 2015 at 10:24 AM, Peter Bertling <pgb@bertling-clausen.com> wrote:

      Hi Lori:


      Please clarify what you believe is inconsistent with our production and Dr. Hayward's deposition
      testimony.  What do you believe we should be producing that has not already been produced?  You already
      have many of the documents referred to by Dr. Hayward in his report.

Regards,


Peter Bertling

Bertling & Clausen, L.L.P.

15 West Carrillo, Suite 100

Santa Barbara, Calif. 93101

(805) 892-2100 ext. 100

(805) 963-6044: Fax


WARNING: This message and any attachments hereto may contain confidential and privileged communications or information and/or attorney-client communications or work-product protected by law. The information contained herein is transmitted for the sole use of the intended recipient(s). If you are not the intended recipient or designated agent of the recipient of such information, you are hereby notified that any use, dissemination, copying or retention of this e-mail of the information contained herein is strictly prohibited and may subject you to penalties under federal and/or state law. If you received this e-mail in error, please notify the sender immediately and permanently delete this e-mail.



**From:** Lori Rifkin [mailto:lrifkin@rifkinlawoffice.com]
**Sent:** Monday, October 26, 2015 9:47 AM
**To:** Joan McMaster
**Cc:** jps@hadsellstormer.com; dstormer@hadsellstormer.com; mtajsar@hadsellstormer.com; Peter Bertling; Jemma Saunders
**Subject:** Re: Claypole v. CFMG et al; production of Hayward documents


Counsel:


My understanding is that the documents to be produced on the disc for the Hayward deposition included the documents responsive to the requests for production included with the deposition notice.  The documents attached to Ms. McMaster's email include only CFMG's expert witness disclosure, Plaintiffs' expert witness disclosure, and the emails Peter produced in paper.


Please clarify by the close of business today which documents Defendants intended to produce in response to the document requests to Dr. Hayward. If this is the extent of the production, which would appear to conflict with Dr. Hayward's testimony at his deposition, it is not responsive to Plaintiffs' request for production and we will need to bring this issue before the Court, and recall Dr. Hayward for further deposition.


Lori Rifkin, Esq.


Rifkin Law Office

www.rifkinlawoffice.com

lrifkin@rifkinlawoffice.com

415-685-3591

CONFIDENTIALITY NOTICE

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at lrifkin@rifkinlawoffice.com.

On Wed, Oct 21, 2015 at 1:46 PM, Joan McMaster <jam@bertling-clausen.com> wrote:

Dear Ms. Rifkin:

Attached are the requested documents pertaining to the deposition of Dr. Hayward.

Sincerely,

Joan McMaster

Paralegal/Legal Assistant

Bertling & Clausen, LLP

15 West Carrillo Street, Suite 100

Santa Barbara, CA  93101

Phone: (805) 892-2100 Fax: (805) 963-6044; jam@bertling-clausen.com

--------------------------------------------------------------------------------

This message and any attached documents contain information from the law firm of Bertling & Clausen, LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

Rifkin Decl. in Supp of Mtn to Compel
Discovery & for Sanctions

Exh. F

# BERTLING & CLAUSEN L.L.P.
## ATTORNEYS AT LAW

15 West Carrillo Street • Suite 100 • Santa Barbara, CA 93101

TELEPHONE 805.892.2100
FACSIMILE 805.963.6044

**Jemma Parker Saunders**
jps @bertling-clausen.com

July 6, 2015

*Via Electronic Mail*

Joshua Piovia-Scott
Mohammad K. Tajsar
Dan Lewis Stormer
Hadsell Stormer & Renick, LLP
128 N. Fair Oaks Avenue
Pasadena, CA 91103
jps@hadsellstormer.com, mtajsar@hadsellstormer.com

Re:     *Joshua Claypole, deceased v. CFMG, et al.*

Dear Counsel:

This correspondence is in reply to Mr. Piovia-Scott and Mr. Tajsar's correspondences of June 29, 2015 and June 23, 2015. I apologize for the delay, however as previously notified I was out of the country until last weekend.

We have reserved July 30, 2015 for Dr. Fithian's deposition. He will also be designated as the CFMG Person Most Knowledgeable pursuant to Rule 30(b). We request plaintiffs take his deposition as an individual defendant and the PMK concurrently. Should additional time beyond the seven hours be necessary to complete the deposition on July 30, 2015, we would be agreeable to an extended day.

Joshua Piovia-Scott
Mohammad K. Tajsar
Dan Lewis Stormer
July 6, 2015
Page 2

Regarding the depositions of Ms. Shene and Ms. Spano, please be advised that both individuals are no longer employees or staff members of CFMG. Nevertheless, we will make every effort to coordinate their production. I have been advised by my client that Ms. Shene's employment separation with CFMG was due to her relocation to the East Coast as her husband is in the military. Logistically, this may hinder her production. I currently have no information on Ms. Spano's whereabouts. I will endeavor to provide you with an update on these witnesses status within the next few days.

Finally, CFMG will agree to produce the two additional deponents you have requested.

Please do not hesitate to contact Mr. Bertling or myself to further discuss these issues.

Very truly yours,

BERTLING & CLAUSEN L.L.P.

Jemma Parker Saunders

cc:    All Counsel, by electronic mail

Lori Rifkin <lrifkin@rifkinlawoffice.com>

---

## Claypole v County of San Mateo et al; depositions

**Lori Rifkin** <lrifkin@rifkinlawoffice.com>                                      Tue, Jul 21, 2015 at 4:43 PM
To: "Peter Bertling (pgb@bertling-clausen.com)" <pgb@bertling-clausen.com>
Cc: Josh Piovia-Scott <jps@hadsellstormer.com>, Mohammad Tajsar <mtajsar@hadsellstormer.com>, Jessica
Valdenegro <jessicav@hadsellstormer.com>, "jps@bertling-clausen.com" <jps@bertling-clausen.com>

Dear Peter,

I am writing to confirm and follow up on our telephone conversation earlier today concerning deposition
scheduling and discovery.

You notified me during our call today that Dr. Fithian is unavailable on July 30, 2015, the date previous scheduled
and confirmed for his deposition.  We agreed that Dr. Fithian will be deposed as CFMG's PMK and, to the extent
possible, in his capacity as an individual Defendant, next Friday, July 31, rather than Thursday, July 30.  Dr.
Fithian will appear at the same start time and location previously noticed.  An amended deposition notice will go
out to all counsel shortly.  We confirmed August 27 as the second date for Dr. Fithian's deposition, should it be
necessary.

We agreed that Ms. Shene's deposition will take place August 28, 2015.  During our call you referred to Ms.
Shene's location as West Virginia.  I was previously informed by counsel that Ms. Shene is in Virginia, close to
Norfolk.  Please confirm Ms. Shene's location, so that we can prepare and send out the deposition notice.  During
our call you mentioned that CFMG may reverse its earlier position of agreeing to produce Ms. Shene and that
Plaintiff may need to subpoena her.  Please clarify whether you will accept service of an amended deposition
notice for Ms. Shene for a location in Norfolk, VA on August 28.

You stated that Ms. Spano is unavailable for deposition on the date noticed, August 10.  I requested that you
provide alternate dates for Ms. Spano's deposition, and you said you would follow up with me shortly.  Again,
during our call you mentioned that CFMG may reverse its earlier position of agreeing to produce Ms. Spano and
that Plaintiff may need to subpoena her.  Please clarify whether you will accept service of an amended deposition
notice for Ms. Spano on a date mutually agreeable to the parties prior to the August 31, 2015 discovery cut-off.

If any of the above does not reflect your understanding of our conversation, please clarify CFMG's position.

Sincerely,

Lori Rifkin, Esq.

Rifkin Law Office
www.rifkinlawoffice.com
lrifkin@rifkinlawoffice.com
415-685-3591


CONFIDENTIALITY NOTICE

The information contained in this e-mail message may be privileged, confidential and protected from
disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited.
If you think that you have received this e-mail message in error, please e-mail the sender at
lrifkin@rifkinlawoffice.com.

Lori Rifkin <lrifkin@rifkinlawoffice.com>

---

## Claypole v County of San Mateo et al; depositions

**Peter Bertling** <pgb@bertling-clausen.com>                                  Tue, Jul 21, 2015 at 5:20 PM
To: Lori Rifkin <lrifkin@rifkinlawoffice.com>
Cc: Josh Piovia-Scott <jps@hadsellstormer.com>, Mohammad Tajsar <mtajsar@hadsellstormer.com>, Jessica
Valdenegro <jessicav@hadsellstormer.com>, Jemma Saunders <jps@bertling-clausen.com>

Hi Lori:

Please see my response in red below. I assume you have cleared these proposed depositions with all other
counsel.

Regards,

Peter Bertling

Bertling & Clausen, L.L.P.

15 West Carrillo, Suite 100

Santa Barbara, Calif. 93101

(805) 892-2100 ext. 100

(805) 963-6044: Fax

WARNING: This message and any attachments hereto may contain confidential and privileged communications or
information and/or attorney-client communications or work-product protected by law. The information contained herein
is transmitted for the sole use of the intended recipient(s). If you are not the intended recipient or designated agent of
the recipient of such information, you are hereby notified that any use, dissemination, copying or retention of this e-
mail of the information contained herein is strictly prohibited and may subject you to penalties under federal and/or
state law. If you received this e-mail in error, please notify the sender immediately and permanently delete this e-mail.

**From:** Lori Rifkin [mailto:lrifkin@rifkinlawoffice.com]
**Sent:** Tuesday, July 21, 2015 4:43 PM
**To:** Peter Bertling
**Cc:** Josh Piovia-Scott; Mohammad Tajsar; Jessica Valdenegro; Jemma Saunders
**Subject:** Claypole v County of San Mateo et al; depositions

Dear Peter,

I am writing to confirm and follow up on our telephone conversation earlier today concerning deposition scheduling and discovery.

You notified me during our call today that Dr. Fithian is unavailable on July 30, 2015, the date previous scheduled and confirmed for his deposition.  We agreed that Dr. Fithian will be deposed as CFMG's PMK and, to the extent possible, in his capacity as an individual Defendant, next Friday, July 31, rather than Thursday, July 30.  Dr. Fithian will appear at the same start time and location previously noticed.  An amended deposition notice will go out to all counsel shortly.  We confirmed August 27 as the second date for Dr. Fithian's deposition, should it be necessary.

I appreciate your professional courtesy with respect to rescheduling the deposition of Dr. Fithian for July 31.  I regret you are not willing to take the deposition of Dr. Fithian in Salinas or Monterey.  He will be made available on July 31 at the location of your choosing.  Please confirm that all other counsel have agreed to this deposition date.

Dr. Fithian is also available for a second deposition, if necessary, on August 27th.  This may present a major logistical problem if we are going to be taking the deposition of Ms. Sheen on August 28th in Norfolk, Virginia.

We agreed that Ms. Shene's deposition will take place August 28, 2015.  During our call you referred to Ms. Shene's location as West Virginia.  I was previously informed by counsel that Ms. Shene is in Virginia, close to Norfolk.  Please confirm Ms. Shene's location, so that we can prepare and send out the deposition notice.  During our call you mentioned that CFMG may reverse its earlier position of agreeing to produce Ms. Shene and that Plaintiff may need to subpoena her.  Please clarify whether you will accept service of an amended deposition notice for Ms. Shene for a location in Norfolk, VA on August 28.

Ms. Shene is available for deposition on August 28.  Please locate a court reporting service in Norfolk, Virginia.  I will be flying to Norfolk to represent Ms. Shene at the deposition.  It is my understanding Norfolk is 3 hours ahead of California time.  I am not aware of anyone from my office agreeing to produce Ms. Shene without a subpoena but I have not had an opportunity to speak with Jemma about this issue.  However,  I am now agreeing to make her available for her deposition on August 28 without the need for a subpoena.

You stated that Ms. Spano is unavailable for deposition on the date noticed, August 10.  I requested that you provide alternate dates for Ms. Spano's deposition, and you said you would follow up with me shortly.  Again, during our call you mentioned that CFMG may reverse its earlier position of agreeing to produce Ms. Spano and that Plaintiff may need to subpoena her.  Please clarify whether you will accept service of an amended deposition notice for Ms. Spano on a date mutually agreeable to the parties prior to the August 31, 2015 discovery cut-off.

Please provide me with any written correspondence which confirms anyone from my office agreed to make Ms. Spano available for deposition without a subpoena.  I cannot confirm we are able to make Ms. Spano available for deposition without a subpoena because she does not currently work for CFMG.  However, I will try and facilitate making her available and have tried to contact her to discuss her availability for deposition.  Please provide me with dates when you and all other counsel have agreed to be available for her deposition.

I am not sure Ms. Spano will agree to travel to San Jose for her deposition and I anticipate this nonparty witness will expect her deposition to take place in Monterey or Salinas.

If any of the above does not reflect your understanding of our conversation, please clarify CFMG's position.

Sincerely,

Lori Rifkin, Esq.

Rifkin Law Office

www.rifkinlawoffice.com

lrifkin@rifkinlawoffice.com

415-685-3591

CONFIDENTIALITY NOTICE

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at lrifkin@rifkinlawoffice.com.

Lori Rifkin <lrifkin@rifkinlawoffice.com>

---

# Claypole v County of San Mateo et al; depositions

**Peter Bertling** <pgb@bertling-clausen.com>                  Tue, Jul 21, 2015 at 5:36 PM
To: Lori Rifkin <lrifkin@rifkinlawoffice.com>
Cc: Josh Piovia-Scott <jps@hadsellstormer.com>, Mohammad Tajsar <mtajsar@hadsellstormer.com>, Jessica Valdenegro <jessicav@hadsellstormer.com>, Jemma Saunders <jps@bertling-clausen.com>

Hi Lori:


I spoke with Jemma and she informed me she did agree to make Ms. Spano available for deposition without the need for a subpoena.  However, she told you her deposition would need to take place in Monterey.


Jemma also told me you agreed to be "flexible" with the location for Dr. Fithian's deposition.  Jemma confirmed you two discussed a midway point between San Jose and Monterey but no location was ever identified.  I renew my request that you agree to take the deposition of Dr. Fithian in Salinas.


Regards,


Peter Bertling

Bertling & Clausen, L.L.P.

15 West Carrillo, Suite 100

Santa Barbara, Calif. 93101

(805) 892-2100 ext. 100

(805) 963-6044: Fax


WARNING: This message and any attachments hereto may contain confidential and privileged communications or information and/or attorney-client communications or work-product protected by law. The information contained herein is transmitted for the sole use of the intended recipient(s). If you are not the intended recipient or designated agent of the recipient of such information, you are hereby notified that any use, dissemination, copying or retention of this e-mail of the information contained herein is strictly prohibited and may subject you to penalties under federal and/or state law. If you received this e-mail in error, please notify the sender immediately and permanently delete this e-mail.

---

**From:** Peter Bertling
**Sent:** Tuesday, July 21, 2015 5:20 PM

**To:** 'Lori Rifkin'
**Cc:** Josh Piovia-Scott; Mohammad Tajsar; Jessica Valdenegro; Jemma Saunders
**Subject:** RE: Claypole v County of San Mateo et al; depositions

Hi Lori:

Please see my response in red below. I assume you have cleared these proposed depositions with all other counsel.

Regards,

Peter Bertling

Bertling & Clausen, L.L.P.

15 West Carrillo, Suite 100

Santa Barbara, Calif. 93101

(805) 892-2100 ext. 100

(805) 963-6044: Fax

WARNING: This message and any attachments hereto may contain confidential and privileged communications or information and/or attorney-client communications or work-product protected by law. The information contained herein is transmitted for the sole use of the intended recipient(s). If you are not the intended recipient or designated agent of the recipient of such information, you are hereby notified that any use, dissemination, copying or retention of this e-mail of the information contained herein is strictly prohibited and may subject you to penalties under federal and/or state law. If you received this e-mail in error, please notify the sender immediately and permanently delete this e-mail.

**From:** Lori Rifkin [mailto:lrifkin@rifkinlawoffice.com]
**Sent:** Tuesday, July 21, 2015 4:43 PM
**To:** Peter Bertling
**Cc:** Josh Piovia-Scott; Mohammad Tajsar; Jessica Valdenegro; Jemma Saunders
**Subject:** Claypole v County of San Mateo et al; depositions

Dear Peter,

I am writing to confirm and follow up on our telephone conversation earlier today concerning deposition scheduling and discovery.

You notified me during our call today that Dr. Fithian is unavailable on July 30, 2015, the date previous scheduled

and confirmed for his deposition.  We agreed that Dr. Fithian will be deposed as CFMG's PMK and, to the extent possible, in his capacity as an individual Defendant, next Friday, July 31, rather than Thursday, July 30.  Dr. Fithian will appear at the same start time and location previously noticed.  An amended deposition notice will go out to all counsel shortly.  We confirmed August 27 as the second date for Dr. Fithian's deposition, should it be necessary.

I appreciate your professional courtesy with respect to rescheduling the deposition of Dr. Fithian for July 31.  I regret you are not willing to take the deposition of Dr. Fithian in Salinas or Monterey.  He will be made available on July 31 at the location of your choosing.  Please confirm that all other counsel have agreed to this deposition date.

Dr. Fithian is also available for a second deposition, if necessary, on August 27th.  This may present a major logistical problem if we are going to be taking the deposition of Ms. Sheen on August 28th in Norfolk, Virginia.

We agreed that Ms. Shene's deposition will take place August 28, 2015.  During our call you referred to Ms. Shene's location as West Virginia.  I was previously informed by counsel that Ms. Shene is in Virginia, close to Norfolk.  Please confirm Ms. Shene's location, so that we can prepare and send out the deposition notice.  During our call you mentioned that CFMG may reverse its earlier position of agreeing to produce Ms. Shene and that Plaintiff may need to subpoena her.  Please clarify whether you will accept service of an amended deposition notice for Ms. Shene for a location in Norfolk, VA on August 28.

Ms. Shene is available for deposition on August 28.  Please locate a court reporting service in Norfolk, Virginia.  I will be flying to Norfolk to represent Ms. Shene at the deposition.  It is my understanding Norfolk is 3 hours ahead of California time.  I am not aware of anyone from my office agreeing to produce Ms. Shene without a subpoena but I have not had an opportunity to speak with Jemma about this issue.  However,  I am now agreeing to make her available for her deposition on August 28 without the need for a subpoena.

You stated that Ms. Spano is unavailable for deposition on the date noticed, August 10.  I requested that you provide alternate dates for Ms. Spano's deposition, and you said you would follow up with me shortly.  Again, during our call you mentioned that CFMG may reverse its earlier position of agreeing to produce Ms. Spano and that Plaintiff may need to subpoena her.  Please clarify whether you will accept service of an amended deposition notice for Ms. Spano on a date mutually agreeable to the parties prior to the August 31, 2015 discovery cut-off.

Please provide me with any written correspondence which confirms anyone from my office agreed to make Ms. Spano available for deposition without a subpoena.  I cannot confirm we are able to make Ms. Spano available for deposition without a subpoena because she does not currently work for CFMG.  However, I will try and facilitate making her available and have tried to contact her to discuss her availability for deposition.  Please provide me with dates when you and all other counsel have agreed to be available for her deposition.  I am not sure Ms. Spano will agree to travel to San Jose for her deposition and I anticipate this nonparty witness will expect her deposition to take place in Monterey or Salinas.

If any of the above does not reflect your understanding of our conversation, please clarify CFMG's position.

Sincerely,


Lori Rifkin, Esq.


Rifkin Law Office

www.rifkinlawoffice.com

lrifkin@rifkinlawoffice.com

415-685-3591



CONFIDENTIALITY NOTICE

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at lrifkin@rifkinlawoffice.com.

Lori Rifkin <lrifkin@rifkinlawoffice.com>

---

## Claypole v County of San Mateo et al; depositions

**Lori Rifkin** <lrifkin@rifkinlawoffice.com>                           Tue, Jul 21, 2015 at 5:42 PM
To: Peter Bertling <pgb@bertling-clausen.com>
Cc: Josh Piovia-Scott <jps@hadsellstormer.com>, Mohammad Tajsar <mtajsar@hadsellstormer.com>, Jessica
Valdenegro <jessicav@hadsellstormer.com>, Jemma Saunders <jps@bertling-clausen.com>

Peter,

We have followed the same protocol as with all the other depositions noticed and scheduled to date, which is to
confirm availability of the deponent and counsel for the deponent, and to provide notice to all other counsel.

During our conversation, I specifically asked you if you thought it was feasible to do Ms. Shene's deposition in
Virginia on August 28th and Dr. Fithian's deposition on August 27th and you repeated to me that you would
produce them on those dates.  If CFMG will not be able to do both depositions, please provide me with other
dates that Ms. Shene is available for deposition.

Regarding Ms. Spano and Ms. Shene, counsel previously stated in writing that your firm was representing them
and would coordinate producing them for depositions.  I am attaching both the letter and e-mail exchange that
state this.  In addition, I had numerous conversations with Jemma about her attempts to contact Ms. Spano and
whether a subpoena would be necessary, which we agreed to try to avoid if possible, and serve only if counsel
was unable to successfully contact her.  I suggest that in the future, in keeping with professional courtesy, before
requesting written correspondence as "proof" of opposing counsel's statements you first review the
correspondence from your office.

Lori Rifkin, Esq.

Rifkin Law Office
www.rifkinlawoffice.com
lrifkin@rifkinlawoffice.com
415-685-3591


CONFIDENTIALITY NOTICE

The information contained in this e-mail message may be privileged, confidential and protected from
disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited.
If you think that you have received this e-mail message in error, please e-mail the sender at
lrifkin@rifkinlawoffice.com.


[Quoted text hidden]

---

**2 attachments**

Claypole v CFMG et al; follow-up from call.pdf
162K

l-cr03 07-06-15 re CFMG depos.pdf
82K

Lori Rifkin <lrifkin@rifkinlawoffice.com>

---

## Claypole v County of San Mateo et al; depositions

**Lori Rifkin** <lrifkin@rifkinlawoffice.com>                                    Tue, Jul 21, 2015 at 5:51 PM
To: Peter Bertling <pgb@bertling-clausen.com>
Cc: Josh Piovia-Scott <jps@hadsellstormer.com>, Mohammad Tajsar <mtajsar@hadsellstormer.com>, Jessica
Valdenegro <jessicav@hadsellstormer.com>, Jemma Saunders <jps@bertling-clausen.com>

Peter,

Jemma and I spoke about a location midway between Oakland, which is where my office is located, and
Monterey.  Jemma mentioned Morgan Hill, and said she would confirm if a location other than San Jose was
necessary.  Despite repeated requests, I have not heard anything more about location until now.

We will not agree to do the deposition in Salinas.  We will, however, agree to Morgan Hill if that is preferable for
Dr. Fithian, and our court reporter has space available on that date.  Please let me know as soon as possible if
you would prefer the Morgan Hiill location so that we can make the location arrangements while we are also
rescheduling the previously confirmed PMK deposition.

Lori Rifkin, Esq.

Rifkin Law Office
www.rifkinlawoffice.com
lrifkin@rifkinlawoffice.com
415-685-3591


CONFIDENTIALITY NOTICE

The information contained in this e-mail message may be privileged, confidential and protected from
disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited.
If you think that you have received this e-mail message in error, please e-mail the sender at
lrifkin@rifkinlawoffice.com.


[Quoted text hidden]

Lori Rifkin <lrifkin@rifkinlawoffice.com>

---

## Claypole v County of San Mateo et al; depositions

Peter Bertling <pgb@bertling-clausen.com>                    Tue, Jul 21, 2015 at 11:24 PM
To: Lori Rifkin <lrifkin@rifkinlawoffice.com>
Cc: Josh Piovia-Scott <jps@hadsellstormer.com>, Mohammad Tajsar <mtajsar@hadsellstormer.com>, Jessica
Valdenegro <jessicav@hadsellstormer.com>, Jemma Saunders <jps@bertling-clausen.com>

Lori:

During our conversation you asked me if Dr. Fithian would also be available on August 31, 2015, if necessary for his 2nd deposition.  I have confirmed he is available on that date as well as August 27.  However, because I intend to fly to Norfolk, Virginia to represent Ms. Shene at her deposition on August 28  I would prefer to proceed with the deposition of Dr. Fithian.

The deposition schedule will be as follows:

Dr. Fithian will be deposed on July 31, 2015 in either San Jose or Morgan Hill.  I will try to confirm the actual location tomorrow.

Ms. Shene will be deposed on August 28, 2015 in Norfolk, Virginia.  I will be travelling to Norfolk to represent Ms. Shene at this deposition.

The 2nd session of Dr. Fithian's deposition, if necessary, will take place on August 31, 2015.  The location will either be in San Jose or Morgan Hill.

I am still waiting to hear back from Ms. Spano regarding her deposition availability and will provide you with dates asap.  However, as I previously informed you, she is not a CFMG employee and, while I will do what I can to secure a deposition date,  I cannot guarantee her cooperation on a date that is not convenient for her schedule.  In addition, it is my understanding she will only agree to have her deposition taken in Monterey.

Please do not hesitate to contact me if you have any questions regarding this matter.

Regards,

Peter Bertling

Bertling & Clausen, L.L.P.

15 West Carrillo, Suite 100

Santa Barbara, Calif. 93101

(805) 892-2100 ext. 100

(805) 963-6044: Fax


WARNING: This message and any attachments hereto may contain confidential and privileged communications or information and/or attorney-client communications or work-product protected by law. The information contained herein is transmitted for the sole use of the intended recipient(s). If you are not the intended recipient or designated agent of the recipient of such information, you are hereby notified that any use, dissemination, copying or retention of this e-mail of the information contained herein is strictly prohibited and may subject you to penalties under federal and/or state law. If you received this e-mail in error, please notify the sender immediately and permanently delete this e-mail.


**From:** Lori Rifkin [mailto:lrifkin@rifkinlawoffice.com]
**Sent:** Tuesday, July 21, 2015 5:42 PM
**To:** Peter Bertling
**Cc:** Josh Piovia-Scott; Mohammad Tajsar; Jessica Valdenegro; Jemma Saunders
**Subject:** Re: Claypole v County of San Mateo et al; depositions

[Quoted text hidden]

Lori Rifkin <lrifkin@rifkinlawoffice.com>

---

## Claypole; your voicemail

**Lori Rifkin** <lrifkin@rifkinlawoffice.com>                                                          Wed, Jul 22, 2015 at 12:50 PM
To: "Peter Bertling (pgb@bertling-clausen.com)" <pgb@bertling-clausen.com>
Cc: Josh Piovia-Scott <jps@hadsellstormer.com>, Mohammad Tajsar <mtajsar@hadsellstormer.com>, Jessica
Valdenegro <jessicav@hadsellstormer.com>

Pete,

I received your voicemail.  The reason that I sent that email was to clarify to all counsel the PMK and potential 2nd
day, and the current date noticed for Dr. Fithian's second depo is August 27.  Because we are trying to work out
scheduling and that might change, I included a note that said that's what we are doing and we would send out an
update as soon as possible.

I am currently checking on availability of August 31 for Dr. Fithian's potential 2nd day, and will let you know if we
are able to make that work.  If we can make that work, we will.

We are now checking on availability for Morgan Hill for next week.  We will not be able to begin at 7 am, but I will
let you know the time and location as soon as I am able.

Lori Rifkin, Esq.

Rifkin Law Office
www.rifkinlawoffice.com
lrifkin@rifkinlawoffice.com
415-685-3591

CONFIDENTIALITY NOTICE

The information contained in this e-mail message may be privileged, confidential and protected from
disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited.
If you think that you have received this e-mail message in error, please e-mail the sender at
lrifkin@rifkinlawoffice.com.

Lori Rifkin <lrifkin@rifkinlawoffice.com>

---

# Claypole; your voicemail

**Lori Rifkin** <lrifkin@rifkinlawoffice.com>                         Wed, Jul 22, 2015 at 6:06 PM
To: "Peter Bertling (pgb@bertling-clausen.com)" <pgb@bertling-clausen.com>
Cc: Josh Piovia-Scott <jps@hadsellstormer.com>, Mohammad Tajsar <mtajsar@hadsellstormer.com>, Jessica
Valdenegro <jessicav@hadsellstormer.com>

Pete,

We are able to switch the second Fithian date to 8/31.

As soon as we get a Morgan Hill location, we'll send out amended notices.

Lori Rifkin, Esq.

Rifkin Law Office
www.rifkinlawoffice.com
lrifkin@rifkinlawoffice.com
415-685-3591

CONFIDENTIALITY NOTICE

The information contained in this e-mail message may be privileged, confidential and protected from
disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited.
If you think that you have received this e-mail message in error, please e-mail the sender at
lrifkin@rifkinlawoffice.com.

[Quoted text hidden]

Lori Rifkin <lrifkin@rifkinlawoffice.com>

---

# Claypole; your voicemail

**Peter Bertling** <pgb@bertling-clausen.com>                                    Wed, Jul 22, 2015 at 6:22 PM
To: Lori Rifkin <lrifkin@rifkinlawoffice.com>

Hi Lori:

I just spoke with Ms.Spano.  She is available for deposition on 8/31 in Monterey.  I suggest we confirm her
deposition for that date and find another date to take the second deposition of Dr. Fithian if it is actually needed.
As I already informed you I cannot attend the deposition of Dr. Fithian on 8/27 because I need to fly to Norfolk for
the depo  scheduled  on 8/28.  Please confirm the time you want that deposition to begin.

Dr. Fithian will be deposed in Morgan Hill on 8/31.  What time? I suggest we start as early as possible.  Dr. Fithian
is willing to stay until 7:00 p.m in order to get his individual and PMK completed.

Regards,

Pete

On Jul 22, 2015, at 6:06 PM, Lori Rifkin <lrifkin@rifkinlawoffice.com> wrote:

> Pete,
>
> We are able to switch the second Fithian date to 8/31.
>
> As soon as we get a Morgan Hill location, we'll send out amended notices.
>
> Lori Rifkin, Esq.
>
> Rifkin Law Office
> www.rifkinlawoffice.com
> lrifkin@rifkinlawoffice.com
> 415-685-3591
>
>
> CONFIDENTIALITY NOTICE
>
> The information contained in this e-mail message may be privileged, confidential and protected
> from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is
> strictly prohibited. If you think that you have received this e-mail message in error, please e-mail
> the sender at lrifkin@rifkinlawoffice.com.
>
>
>
> On Wed, Jul 22, 2015 at 12:50 PM, Lori Rifkin <lrifkin@rifkinlawoffice.com> wrote:
>> Pete,
>>
>> I received your voicemail.  The reason that I sent that email was to clarify to all counsel the PMK
>> and potential 2nd day, and the current date noticed for Dr. Fithian's second depo is August 27.
>> Because we are trying to work out scheduling and that might change, I included a note that said
>> that's what we are doing and we would send out an update as soon as possible.
>>
>> I am currently checking on availability of August 31 for Dr. Fithian's potential 2nd day, and will let

you know if we are able to make that work.  If we can make that work, we will.

We are now checking on availability for Morgan Hill for next week.  We will not be able to begin at 7 am, but I will let you know the time and location as soon as I am able.

Lori Rifkin, Esq.

Rifkin Law Office
www.rifkinlawoffice.com
lrifkin@rifkinlawoffice.com
415-685-3591

CONFIDENTIALITY NOTICE

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at lrifkin@rifkinlawoffice.com.

Lori Rifkin <lrifkin@rifkinlawoffice.com>

---

# Claypole; your voicemail

**Lori Rifkin** <lrifkin@rifkinlawoffice.com>                              Wed, Jul 22, 2015 at 7:51 PM
To: Peter Bertling <pgb@bertling-clausen.com>
Cc: Josh Piovia-Scott <jps@hadsellstormer.com>, Mohammad Tajsar <mtajsar@hadsellstormer.com>

Dear Peter,

At your request, yesterday we rescheduled the PMK deposition for CFMG for 7/31 instead of 7/30 with barely one week's notice, despite having had that date confirmed in writing by your office for over a month, and having scheduled multiple other depositions around that date.  At your request, we rescheduled the date for Dr. Fithian's individual deposition, to which we are entitled, from 8/27 to 8/31.  At your request, we scheduled the date for Ms. Shene's deposition for 8/28 to accommodate your schedule, in which you have stated that you are unavailable for 3 out of the 4 weeks of August.  Yet we could not schedule depositions sooner because CFMG has not provided any dates for any deponents' availability other than the PMK until this week.  Now you are attempting to obstruct Plaintiff's ability to depose named Defendants and witnesses identified by CFMG in its initial disclosures by attempting to force Plaintiff to choose between scheduling Ms. Spano's deposition and Dr. Fithian's deposition.

It is absurd to take the position that you cannot find another half-day in August to schedule Ms. Spano's deposition other than the day we rescheduled Dr. Fithian's deposition *at your request*.

I have told you that we will cover as much ground as we are able with Dr. Fithian on 7/31, but we have not yet received CFMG's electronic discovery, and we have an outstanding motion to compel CFMG to produce documents it has refused to produce in response to our discovery requests.  You have named Dr. Fithian as the PMK for CFMG on all topics noticed, and he is a named Defendant in this case and one of the main witnesses.  It is unlikely that we will be able to finish Dr. Fithian in one day and it is perfectly reasonable for us to have noticed his separate deposition.  If you would like to defend your position in Court of offering only 2 days of availability for the entire month of August, despite having multiple attorneys assigned to this case and more than one month of notice on these dates, we will not hesitate to take appropriate action. Please provide additional dates for Ms. Spano's half-day deposition. If we are not able to resolve this matter and schedule Ms. Spano's deposition by Friday, we will move forward in Court, and seek attorney's fees and costs for having to do so.


Lori Rifkin, Esq.

Rifkin Law Office
www.rifkinlawoffice.com
lrifkin@rifkinlawoffice.com
415-685-3591


CONFIDENTIALITY NOTICE

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at lrifkin@rifkinlawoffice.com.


[Quoted text hidden]

Lori Rifkin <lrifkin@rifkinlawoffice.com>

---

## Claypole; your voicemail

---

**Peter Bertling** <pgb@bertling-clausen.com>                    Wed, Jul 22, 2015 at 9:05 PM
To: Lori Rifkin <lrifkin@rifkinlawoffice.com>
Cc: Josh Piovia-Scott <jps@hadsellstormer.com>, Mohammad Tajsar <mtajsar@hadsellstormer.com>

Hi Lori:

Yesterday, I told you I would contact Ms. Spano, a nonparty witness who was not properly subpoenaed, and try to get a date for her deposition. I called her yesterday and heard from her late this afternoon. She said she was available for deposition on August 24 and 31 in Monterey. I previously notified you I was in trial on August 24 and would not be able to attend any depositions on this date. As Ms. Spano is a former employee of CFMG, I am the only attorney authorized to represent her at deposition. Today, promptly notified you Ms. Spano's deposition could go forward on August 31 in Monterey. Will you be noticing her deposition for that date or not? I am trying to make your job easier by making Ms. Spano available for a deposition without requiring you to subpoena her. I cannot force her to do anything because she is no longer employed by CFMG.

I am sure we can find an alternate date when the 2nd session of Dr. Fithian's deposition can go forward if necessary. I am not trying to "obstruct" your efforts to depose him. For example, I can check with Dr. Fithian to see if he would be available on August 21? I have confirmed with the Court Clerk where I will be in trial that the Court is dark for trial purposes on this day. We have no other depositions set i on August 21. Are you available to take Dr. Fithian's deposition on August 21? If so, I will contact him to confirm his availability.

I am the only attorney authorized to represent former or current CFMG employees whether or not they are actually named as defendants. My associate, Jemma Saunders, is authorized to attend other depositions as she has already been doing in this case.

Please advise.

Kind regards,

Peter Bertling

Bertling & Clausen, L.L.P.

15 West Carrillo, Suite 100

Santa Barbara, Calif. 93101

(805) 892-2100 ext. 100

(805) 963-6044: Fax

WARNING: This message and any attachments hereto may contain confidential and privileged communications or information and/or attorney-client communications or work-product protected by law. The information contained herein is transmitted for the sole use of the intended recipient(s). If you are not the intended recipient or designated agent of the recipient of such information, you are hereby notified that any use, dissemination, copying or retention of this e-mail of the information contained herein is strictly prohibited and may subject you to penalties under federal and/or state law. If you received this e-mail in error, please notify the sender immediately and permanently delete this e-mail.

**From:** Lori Rifkin [mailto:lrifkin@rifkinlawoffice.com]
**Sent:** Wednesday, July 22, 2015 7:52 PM
**To:** Peter Bertling
**Cc:** Josh Piovia-Scott; Mohammad Tajsar
**Subject:** Re: Claypole; your voicemail

Dear Peter,

[Quoted text hidden]
[Quoted text hidden]

Lori Rifkin <lrifkin@rifkinlawoffice.com>

---

## Claypole; your voicemail

---

**Peter Bertling** <pgb@bertling-clausen.com>                    Wed, Jul 22, 2015 at 9:27 PM
To: Lori Rifkin <lrifkin@rifkinlawoffice.com>
Cc: Josh Piovia-Scott <jps@hadsellstormer.com>, Mohammad Tajsar <mtajsar@hadsellstormer.com>

Hi Lori:

I have just been able to confirm with Dr. Fithian that he would be available for a second deposition on August 21, 2015. Is there any reason the deposition can't go forward on that date. We would then proceed with the following deposition schedule:

July 31, 2015: deposition of Dr. Fithian as PMK in Morgan Hill. Please confirm starting time and location.

August 21, 2015: second session of Dr. Fithian as a defendant if necessary. I would request that the deposition take place again in Morgan Hill. Please confirm time and location.

August 28, 2015: deposition of Ms. Shene in Norfolk, Virginia. Please confirm EST time and location of deposition.

August 31, 2015: deposition of nonparty witness, Kim Spano, in Monterey, California. Please confirm time and location.

Kind regards,

Pete
[Quoted text hidden]

Lori Rifkin <lrifkin@rifkinlawoffice.com>

---

## Claypole; your voicemail

---

**Lori Rifkin** <lrifkin@rifkinlawoffice.com>                    Thu, Jul 23, 2015 at 8:31 AM
To: Peter Bertling <pgb@bertling-clausen.com>
Cc: Josh Piovia-Scott <jps@hadsellstormer.com>, Mohammad Tajsar <mtajsar@hadsellstormer.com>

Peter,

Please confirm whether CFMG will accept a subpoena on Ms. Spano's behalf, or immediately provide Ms. Spano's address and telephone number, as required by FRCP 26.

Lori Rifkin, Esq.

Rifkin Law Office
www.rifkinlawoffice.com
lrifkin@rifkinlawoffice.com
415-685-3591


CONFIDENTIALITY NOTICE

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at lrifkin@rifkinlawoffice.com.


[Quoted text hidden]

Lori Rifkin <lrifkin@rifkinlawoffice.com>

---

## Claypole; your voicemail

---

**Peter Bertling** <pgb@bertling-clausen.com>                              Thu, Jul 23, 2015 at 8:34 AM
To: Lori Rifkin <lrifkin@rifkinlawoffice.com>
Cc: Josh Piovia-Scott <jps@hadsellstormer.com>, Mohammad Tajsar <mtajsar@hadsellstormer.com>

What will be the date, time and location of her deposition?
[Quoted text hidden]

Lori Rifkin <lrifkin@rifkinlawoffice.com>

---

## Claypole; your voicemail

---

**Lori Rifkin** <lrifkin@rifkinlawoffice.com>                                    Thu, Jul 23, 2015 at 8:44 AM
To: Peter Bertling <pgb@bertling-clausen.com>
Cc: Josh Piovia-Scott <jps@hadsellstormer.com>, Mohammad Tajsar <mtajsar@hadsellstormer.com>

> You have indicated that you have switched CFMG's position so that you are now taking the position that Ms. Spano was improperly served, despite your office's prior acceptance of her deposition notice, and indicated that she is a non-party witness you have no control over.  Therefore, we will subpoena her.

> Please confirm whether CFMG will accept a subpoena on Ms. Spano's behalf or provide her contact information as required by FRCP 26.

Lori Rifkin, Esq.

Rifkin Law Office
www.rifkinlawoffice.com
lrifkin@rifkinlawoffice.com
415-685-3591


CONFIDENTIALITY NOTICE

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at lrifkin@rifkinlawoffice.com.


[Quoted text hidden]

Lori Rifkin <lrifkin@rifkinlawoffice.com>

---

# Claypole; your voicemail

**Peter Bertling** <pgb@bertling-clausen.com>                    Thu, Jul 23, 2015 at 9:04 AM
To: Lori Rifkin <lrifkin@rifkinlawoffice.com>

Hi Lori:

I have provided you with dates when Ms. Spano told me she was available for deposition. When do you intend to notice her deposition? Do you intend to notice it for a date other than August 31, 2015? You previously told me you were available on this date for depositions.

Please let me know your intentions regarding scheduling the second session of Dr. Fithian's deposition for August 21, 2015.

Please confirm the time and location for the deposition of Dr. Fithian that is scheduled to take place on July 31, 2015 in Morgan Hill as previously agreed.

Please confirm the time and location of Ms. Shene's deposition on August 28, 2015 as previously agreed. Our office worked with you in good faith to schedule this deposition when we had no obligation to do so.

I believe you have an obligation to try and arrange Ms. Spano's deposition on a date that is acceptable to the parties and not unilaterally schedule it without conferring with counsel about the date.

I continue to take the position I am willing to try and coordinate a date for Ms. Spano's deposition that is acceptable to the witness and counsel. It would be unprofessional for you to set her deposition on a date when I have already told you she is not available. Again, she is a nonparty witness and has not been named as a defendant in this litigation.

Regards,

Pete
[Quoted text hidden]

Lori Rifkin <lrifkin@rifkinlawoffice.com>

---

## Claypole; your voicemail

**Lori Rifkin** <lrifkin@rifkinlawoffice.com>                                    Thu, Jul 23, 2015 at 1:56 PM
To: Peter Bertling <pgb@bertling-clausen.com>
Cc: Josh Piovia-Scott <jps@hadsellstormer.com>, Mohammad Tajsar <mtajsar@hadsellstormer.com>

Peter,

Your claim of "prompt" communication and notification of availability is undermined by the fact that we served these deposition notices on June 29, 2015, and have been attempting to confirm dates with your office since then (see, e.g., the communications I attached to prior emails).  Yet you did notify us of these changes in availability (or availability of Ms. Shene or Ms. Spano at all) until I reached out to your office again this week.  In the interim, we moved forward with scheduling the rest of the depositions in this case, which involves coordinating among five entities.

We repeatedly asked your office for dates the week of August 24 for Dr. Fithian's individual deposition, which was noticed for August 27.  At your request this week, we re-scheduled that to August 31st, despite that being outside the date range we requested.  This week, you provided a single day of availability in the entire month of August for Ms. Shene, which we accommodated.  Now you have provided effectively a single day of availability for Ms. Spano because you provided only one date on which you are willing to agree to have her deposition taken, and that is the same date as the date now scheduled for Dr. Fithian's deposition.  We are unavailable to take Dr. Fithian's deposition on August 21, and, in any case, that would not provide enough time for production and review of any documents CFMG is compelled to produce in response to plaintiff's motion, unless CFMG wants to produce Dr. Fithian for a third date of deposition.

Your office accepted service of a deposition notice on Ms. Spano's behalf, and explicitly stated plaintiff did not have to serve a subpoena.  You now take the position that plaintiff was required to serve a subpoena and that Ms. Spano is a non-party witness whom CFMG does not control.  Yet you are refusing to provide contact information for Ms. Spano so that plaintiff can effect service of this subpoena.  This constitutes obstruction of the discovery process and is sanctionable.  We will file with the Court tomorrow if you continue to refuse to provide contact information for Ms. Spano as required by FRCP 26.

As I have previously and repeatedly stated, we will provide a time and location for Dr. Fithian's deposition next week as soon as we have it.  As a reminder, we rescheduled both the date and location of this deposition this week, at your request.

Sincerely,

Lori Rifkin, Esq.

Rifkin Law Office
www.rifkinlawoffice.com
lrifkin@rifkinlawoffice.com
415-685-3591


CONFIDENTIALITY NOTICE

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at lrifkin@rifkinlawoffice.com.

Lori Rifkin <lrifkin@rifkinlawoffice.com>

---

## Claypole; your voicemail

**Peter Bertling** <pgb@bertling-clausen.com>                    Thu, Jul 23, 2015 at 2:22 PM
To: Lori Rifkin <lrifkin@rifkinlawoffice.com>
Cc: Josh Piovia-Scott <jps@hadsellstormer.com>, Mohammad Tajsar <mtajsar@hadsellstormer.com>

Hi Lori:

Are you willing to proceed with Ms. Spano's deposition on August 31 in Monterey or not? If not, please explain why not.

Regards,

Pete
[Quoted text hidden]

Lori Rifkin <lrifkin@rifkinlawoffice.com>

---

# Claypole; your voicemail

**Lori Rifkin** <lrifkin@rifkinlawoffice.com>                                Thu, Jul 23, 2015 at 2:28 PM
To: Peter Bertling <pgb@bertling-clausen.com>
Cc: Josh Piovia-Scott <jps@hadsellstormer.com>, Mohammad Tajsar <mtajsar@hadsellstormer.com>

We will be sending an amended notice for Dr. Fithian's deposition for August 31.  I have repeatedly explained this in my prior emails.  It is unreasonable that you have offered the 31st as the only possible day during July or August for Ms. Spano's half-day deposition in Monterey, given that it was noticed for August 10 on June 29, one and a half months prior.

Lori Rifkin, Esq.

Rifkin Law Office
www.rifkinlawoffice.com
lrifkin@rifkinlawoffice.com
415-685-3591


CONFIDENTIALITY NOTICE

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at lrifkin@rifkinlawoffice.com.


[Quoted text hidden]

Lori Rifkin <lrifkin@rifkinlawoffice.com>

---

# Claypole; your voicemail

**Peter Bertling** <pgb@bertling-clausen.com>                                    Fri, Jul 24, 2015 at 7:46 AM
To: Lori Rifkin <lrifkin@rifkinlawoffice.com>
Cc: Josh Piovia-Scott <jps@hadsellstormer.com>, Mohammad Tajsar <mtajsar@hadsellstormer.com>

Hi Lori:

I spoke with Ms. Spano last night and she is "absolutely not" available on August 10, 2015. She can be deposed on August 31 or the following Monday. I know that may be beyond the discovery cut off date but I would stipulate to extend the discovery cut off in order to take her deposition. Please remember that I am dealing with a nonparty witness who is making herself available on dates that she is not treating mental health care patients.  She has limited availability. The fact you essentially waited until the 11th hour to start scheduling these depositions should not justify your uncooperative nature regarding scheduling the deposition of Ms. Spano. She is available on August 31 in Monterey and I suggest you schedule her deposition for that date.

We already have the deposition of Dr. Fithian set for July 31.  It is speculation whether we will even need to have a second deposition. You have assured me you will do everything you can to complete his deposition on July 31 in his capacity as both a PMK and defendant in this litigation. I see no reason why that cannot be accomplished particularly when I've already told you that Dr. Fithian is available until 7:00 PM that evening and can start the deposition as early as 7:00 AM. If his deposition cannot be completed on the 31st then we will know whether a second deposition is even necessary. One of the major reasons there are limited dates for depositions is because you waited until the 11th hour to start scheduling them and you have scheduled numerous depositions which limit the number of days to depose other individuals. In addition, I am not available for several days during the last two weeks of August because of a trial commitment. My schedule has opened up during the first week in August and I could also potentially be available for Dr. Fithian's deposition on August 2, 3 or 4.  I will need to see if Dr. Fithian is available on one of these days. Are you?

You previously noticed Dr. Fithian's to start at 10:00 AM. I will notify him that is the time his deposition will be starting in Morgan Hill on July 31, 2015. If you want to schedule it earlier so we can avoid the need for a second deposition we are certainly willing to do so. Please confirm the location.

Have you been able to set up a court reporter in Norfolk, Virginia where Ms. Shene can be deposed on August 28, 2015? What time will her deposition commence? She needs to know ASAP.

Regards,

Pete
[Quoted text hidden]

Lori Rifkin <lrifkin@rifkinlawoffice.com>

---

## Claypole; your voicemail

---

**Lori Rifkin** <lrifkin@rifkinlawoffice.com>                              Fri, Jul 24, 2015 at 10:10 AM
To: Peter Bertling <pgb@bertling-clausen.com>
Cc: Josh Piovia-Scott <jps@hadsellstormer.com>, Mohammad Tajsar <mtajsar@hadsellstormer.com>

Peter,

If Ms. Spano is available August 2, 3, or 4, we can take her deposition then.  Otherwise, we will agree to your proposal to depose her after the discovery cut-off on the Monday following August 31, which is September 7 (Labor Day).  However, if we do depose her September 7, we will need to file a stipulation from all parties & proposed order with the Court.  Can you check with the other Defendants' counsel to see if they will stipulate to this, given Ms. Spano's limited availability resulting from her non-party and non-party employee status?

We will provide amended deposition notices with location and time today for Dr. Fithian and Ms. Shene.  Dr. Fithian's deposition will be noticed for 9:30 a.m. in Morgan Hill.

Lori Rifkin, Esq.

Rifkin Law Office
www.rifkinlawoffice.com
lrifkin@rifkinlawoffice.com
415-685-3591


CONFIDENTIALITY NOTICE

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at lrifkin@rifkinlawoffice.com.


[Quoted text hidden]

Lori Rifkin <lrifkin@rifkinlawoffice.com>

---

# Claypole; your voicemail

**Peter Bertling** <pgb@bertling-clausen.com>                    Fri, Jul 24, 2015 at 11:59 AM
To: Lori Rifkin <lrifkin@rifkinlawoffice.com>

Hi Lori:

No.  She is available on August 31 in Monterey.  I fail to see why you are so unwilling to schedule her deposition on this date to accommodate her schedule.  She had also offered August 24 but as I told you I am not available because I will be in trial.

Are you available on August 3, 4, 5 or 7 for a second deposition of Dr. Fithian if necessary?  I have asked him if he is available on one of these days and am waiting for a response.  He is also available on August 21.

I need to know the time you intend to start the deposition of Ms. Shene on August 28.  I also need you to confirm the time of Dr. Fithian's deposition on July 31.

Regards,

Pete
[Quoted text hidden]
[Quoted text hidden]

Lori Rifkin <lrifkin@rifkinlawoffice.com>

---

# Claypole; your voicemail

**Lori Rifkin** <lrifkin@rifkinlawoffice.com>                                    Fri, Jul 24, 2015 at 2:49 PM
To: Peter Bertling <pgb@bertling-clausen.com>, Josh Piovia-Scott <jps@hadsellstormer.com>, Mohammad Tajsar <mtajsar@hadsellstormer.com>, Jessica Valdenegro <jessicav@hadsellstormer.com>

Peter,

You just wrote this morning at 7:46 a.m. that Ms. Spano is available for deposition on September 7 and offered to stipulate to do her deposition after the cut-off date:  "I spoke with Ms. Spano last night and she is "absolutely not" available on August 10, 2015. She can be deposed onAugust 31 or the following Monday. I know that may be beyond the discovery cut off date but I would stipulate to extend the discovery cut off in order to take her deposition."

**I wrote you an email at 10:10 a.m. agreeing to this, as long as the other defense counsel are willing to so stipulate.  Are you now taking the position that Ms. Spano is not available on September 7?**

As I have repeatedly written, Dr. Fithian's second deposition date must be scheduled after the production of ESI documents and after the hearing on the motion to compel and allow time for production of any documents, unless you are willing to stipulate to Dr. Fithian coming back for a 3rd day if there is additional production of documents.

Regarding your other questions, amended deposition notices were already sent out with times and locations.

Please respond by email or voicemail within the next hour regarding Ms. Spano's deposition so that we can file with the Court today if it is still necessary.

Lori Rifkin, Esq.

Rifkin Law Office
www.rifkinlawoffice.com
lrifkin@rifkinlawoffice.com
415-685-3591

CONFIDENTIALITY NOTICE

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at lrifkin@rifkinlawoffice.com.

[Quoted text hidden]

Lori Rifkin <lrifkin@rifkinlawoffice.com>

---

## Claypole; your voicemail

---

**Peter Bertling** <pgb@bertling-clausen.com>                    Fri, Jul 24, 2015 at 2:53 PM
To: Lori Rifkin <lrifkin@rifkinlawoffice.com>
Cc: Josh Piovia-Scott <jps@hadsellstormer.com>, Mohammad Tajsar <mtajsar@hadsellstormer.com>, Jessica
Valdenegro <jessicav@hadsellstormer.com>

I did not see the email accepting September 7, 2015 as the deposition date for Ms. Spano. We will agree to that
date.

[Quoted text hidden]

Rifkin Decl. in Supp of Mtn to Compel
Discovery & for Sanctions

Exh. G

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Estate of JOSHUA CLAYPOLE, )
deceased, by and through SILVIA )
GUERSENZVAIG, as Administrator; )
SILVIA GUERSENZVAIG, )
 )
       Plaintiff, )   No. CV 14-02730 BLF
 )
   -vs- )
 )
COUNTY OF SAN MATEO; SHERIFF )
GREG MUNKS, in his individual )
and official capacity; COUNTY OF)
MONTEREY; SHERIFF SCOTT MILLER, )
in his individual and official )
capacity; SERGEANT E. KAYE, in )
her individual capacity; CITY OF)
MONTEREY; MONTEREY POLICE )
DEPARTMENT CHIEF PHILIP PENKO, )
in his official capacity; BRENT )
HALL, in his individual and )
official capacity; CALIFORNIA )
FORENSIC MEDICAL GROUP; DR. )
TAYLOR FITHIAN, in his )
individual capacity; COMMUNITY )
HOSPITAL OF MONTEREY PENINSULA; )
and DOES 1 through 30, )
 )
       Defendants. )
_____)


DEPOSITION OF

WILLIAM TAYLOR FITHIAN, III, M.D.

MORGAN HILL, CALIFORNIA

AUGUST 31, 2015


Reported By:
MARTHA RUBLE
CSR-5145
NO. 15-36243


KARYN ABBOTT
& ASSOCIATES
COURT REPORTERS
70 S. Lake Avenue, 10th Floor
Pasadena, California 91101
Phone 213.749.1234 | 213.749.0644

```
1        Q.   Beginning of 2014?

2        A.   I believe so.

3        Q.   Okay.  And what is your role in Correctional

4   Medical Group Companies' provision of health services in

5   these other states?

6        A.   I'm a doctor.  I'm a doctor.

7        Q.   Are you the medical director?

8        A.   No.

9             MS. RIFKIN:   Can we mark this as 90.

10           (Whereupon Plaintiff's Exhibit 90 was marked

11                    for identification.)

12   BY MS. RIFKIN:

13       Q.   So you've been handed what's been marked

14   Exhibit 90, and this is printout from the website for

15   Southwest Correctional Medical Group Incorporated.  That

16   is one of the names that Correctional Medical Group

17   Companies operates under, right?

18       A.   Yes, ma'am.

19       Q.   And this web page has lists and pictures of the

20   executive team for Southwest Correctional Medical Group,

21   and you are listed as medical director for Correctional

22   Medical Group Companies; is that accurate?

23       A.   It is not.

24       Q.   Was it ever accurate?

25       A.   No.
```

**KARYN ABBOTT & ASSOCIATES**                                    17

1      Q.   You should probably correct the website.

2           What position do you hold with Correctional

3    Medical Group Companies?

4           MR. BERTLING:  I have been allowing you to ask

5    some of these questions.  I'm not going to let you ask

6    any more.  It's totally irrelevant.

7           Correctional Medical Group Companies, Southwest

8    Correctional Medical Group is not a defendant in this

9    lawsuit.  This organization was formed after the death of

10   Mr. Claypole.  And so you've been able to ask a few

11   ground questions.  I'm not going to let you ask any more,

12   and I will instruct the witness not to answer.

13          MS. RIFKIN:  Well, relevancy is not an

14   appropriate grounds for a direction not to answer.

15   Relevancy is a motion later before a court.  As you know,

16   Dr. Fithian is an individual defendant.  I'm asking about

17   Dr. Fithian's role in providing these services.  If you

18   are going to instruct him not to answer, I'm going to try

19   the get the Court on the phone.

20          MR. BERTLING:  Okay.  Why don't you do that,

21   because you're asking questions about an organization

22   that didn't exist.  That's irrelevant in this lawsuit.

23   And if you want to get the Court on the phone, that

24   probably would be a good idea.

25          MS. RIFKIN:  Can you give me a cite to where

1   relevancy is a grounds under the Federal Rules of Civil

2   Procedure not to answer?  Can you give me a cite, Peter?

3        MR. BERTLING:  I'm instructing the witness not

4   to answer.  I'm not going to be here giving you any kind

5   of legal advice.

6   BY MS. RIFKIN:

7        Q.  Dr. Fithian, I want you to know that if you

8   follow your counsel's direction not to answer, and we

9   have to bring you back here to a fourth day of testimony,

10  we will move for sanctions.  We will move for the costs

11  and fees for that deposition.

12       Are you going to follow your counsel's

13  instruction not to answer?

14       A.  What would you recommend, ma'am?  Of course, I

15  am.

16       MR. BERTLING:  Okay.  This is just a fishing

17  expedition.  There is no relevancy whatsoever, and so

18  please move on.

19       MS. RIFKIN:  All right.  Let's go off the

20  record.

21            (Discussion off the record.)

22       MS. RIFKIN:  All right.  So my co-counsel is

23  currently contacting the judge's chambers.  And as soon

24  as we are able to find out a time for a call, we will do

25  that.  In the meantime, I will continue in a different

1     you know, always have to look retrospectively at their

2     own pattern of practice to see if they could have done

3     something different.  So I mean, have I ever been

4     self-critical?  Of course, I have.

5          Q.  I'm going to move to strike that as

6     nonresponsive and ask the question again.

7               Have you ever --

8               MR. BERTLING:  I think the question was

9     actually --

10              MS. RIFKIN:  Please don't interrupt me.

11              MR. BERTLING:  I think the question was --

12              MS. RIFKIN:  Counsel, please do not interrupt me

13    for the record, so that I can finish my statement before

14    you do.  This is not acceptable behavior, Mr. Bertling.

15              MR. BERTLING:  The fact that you don't like his

16    answer doesn't mean you have a reason to strike it.  I

17    think it was a perfectly responsive answer.  Move on with

18    your next question and don't raise your voice at me.

19    It's not becoming of a woman or an attorney who is acting

20    professionally under the rules of professional

21    responsibility.

22              MS. RIFKIN:  Interrupting counsel when they are

23    making an objection is not becoming to a professional.

24    It's not becoming to you.  And making sex- and

25    gender-based remarks about opposing counsel on the record

```
 1   call two days following the incident was appropriate?
 2       A.  Again, I --
 3           MR. BERTLING:  First of all, let me just object
 4   that it lacks foundation.  It calls for speculation.  We
 5   have provided him very limited information regarding the
 6   patient.  We have not provided the complete medical
 7   records.  It calls for an expert opinion.
 8           But go ahead and answer the question to the
 9   extent you can with this limited information.
10           THE WITNESS:  I think from -- again, from what
11   Mr. Bertling pointed out, he provided me Monterey County
12   Sheriff's Crime Incident Report.  It's not a medical
13   record.  And from what is described here -- and again,
14   from my statement that people that remain in receiving
15   are seen typically every shift by medical staff, not just
16   every two days.  So, again, I think from what is
17   reflected in this document, I don't think I would have
18   changed anything.
19   BY MS. RIFKIN:
20       Q.  Are you familiar with the September 28th, 2014,
21   suicide of Mikol Stewart in Sonoma County Jail?
22       A.  What jail?
23       Q.  Sonoma County Jail.
24           MR. BERTLING:  So we are not going to go through
25   any other suicides.  We are here today for the treatment
```

1    and care that he provided to Mr. Claypole.  That's what

2    this deposition was for.  The Court has allowed you to

3    have a second -- another deposition where that

4    information was covered.  We are not going to go over

5    that today.  You've asked nothing about Mr. Claypole, and

6    it's about time that you did.

7         MS. RIFKIN:  Peter, Dr. Fithian is here as an

8    individual defendant.  It's not a 30(b)(6).  We are not

9    required to notice topics.  You can object on relevance.

10   And the time to take that up with the Court is before

11   trial.  That is not grounds to instruct your client not

12   to answer here.

13        MR. BERTLING:  Well, he has not reviewed the

14   documentation that you're referring to, so you're

15   probably not going to get answers.  If you want to waste

16   time -- you got seven hours on this deposition.  He is

17   not going to be made available for additional time.  So

18   do whatever you need to do.

19        MS. RIFKIN:  Why are you testifying about what

20   documentation or what your client is familiar with?

21   Please stop advising your client on how to answer.  You

22   know that the federal rules prohibit speaking objections.

23   They prohibit statements, for example, such as, "If you

24   can understand the question, go ahead."  I have allowed

25   you to keep saying them because I didn't want to disrupt

1    the deposition, but you know those comments are not
2    allowed.
3           MR. BERTLING:   I'm not doing anything that's
4    inappropriate.   Please move forward with your questions.
5    BY MS. RIFKIN:
6      Q.  Dr. Fithian, are you familiar with the
7    September 28th, 2014, suicide of Mikol Stewart at Sonoma
8    County Jail?
9      A.  Not independently, Counselor.
10     Q.  Do you remember that he hung himself in his
11   cell?
12     A.  I don't remember independently, Counselor.
13     Q.  Do you remember if you were involved with the
14   quality assurance assessment following Mikol Stewart's
15   death?
16     A.  Again, I don't -- if you have the document to
17   show me, I would be more than happy to view it.
18     Q.  Are you familiar with the March 24th, 2015,
19   suicide of Sandra Vela in Monterey County Jail?
20     A.  Who?
21     Q.  Sandra Vela in Monterey County Jail.
22     A.  I think so.  Again, if you have the document for
23   me to review, that would be helpful.
24     Q.  This is a suicide that happened about five
25   months ago in Monterey County Jail.

```
 1          THE WITNESS:  I'm out of the state, Peter.
 2   BY MS. RIFKIN:
 3      Q.  All right.  Well, then, in that case I'm sorry,
 4   Dr. Fithian.
 5      A.  Let's just go ahead, Counselor.
 6      Q.  Okay.
 7          MR. BERTLING:  We can just raise it with the
 8   judge.
 9          THE WITNESS:  I'm leaving on the 9th.  I think I
10   get back the 17th, actually.
11          MR. BERTLING:  All right.  We will just bring it
12   up with the judge, then.
13   BY MS. RIFKIN:
14      Q.  Dr. Fithian, how are you paid by CFMG?  Is it a
15   salary basis?
16      A.  Is what?
17      Q.  Are you paid by CFMG on a salary basis?
18      A.  Yes, I am.
19      Q.  And are you paid separately for your services as
20   a psychiatrist at Monterey County Jail than from your
21   other roles at CFMG?
22          MR. BERTLING:  I'm going to instruct you not to
23   answer.  This is relevance, his pay structure.
24          MS. RIFKIN:  Can you repeat?  I'm sorry.  What
25   are the grounds that you're instructing him not to answer
```

```
 1    how he is paid?
 2             MR. BERTLING:  That's not calculated to lead to
 3    the discovery of admissible evidence.
 4             MS. RIFKIN:  Do you have any legal grounds for
 5    that, Peter?  I'm asking about his pay structure at his
 6    employer.
 7             MR. BERTLING:  It's irrelevant.  It doesn't lead
 8    to the -- it's not reasonably calculated to lead to the
 9    discovery of admissible evidence.  Why are you asking the
10    question?
11             MS. RIFKIN:  Dr. Fithian's interest in the
12    financial services that he provides is directly relevant
13    to this case.
14             MR. BERTLING:  Well, you learned that he is paid
15    on a salary.  You're not going to learn anything about
16    how much he makes, so please move on.
17             MS. RIFKIN:  Can you read back the question that
18    was instructed not to answer, please.
19             (The record was read back as follows:
20             "And are you paid separately for your
21              services as a psychiatrist at Monterey
22              County Jail than from your other roles
23              at CFMG?")
24             MR. BERTLING:  You can answer that question.
25             THE WITNESS:  Yes.
```

1      Q.   How much are you paid per hour for your services

2   as a staff psychiatrist at Monterey County Jail?

3          MR. BERTLING:   Don't answer that.   That violates

4   his financial right to privacy under the constitution.

5   It's not calculated to lead to the discovery of

6   admissible evidence.   And please move on.

7          MS. RIFKIN:   Our contention is that it's

8   relevant, especially to the area of punitive damages.

9   Does your instruction still remain?

10         MR. BERTLING:   It is.   In fact, in this case,

11  you're required under California State law to file a

12  motion which allows you to include a claim for punitive

13  damages against a health care provider under CCP 425.13.

14  You haven't done that.   So he is not going to answer

15  questions about how much money he makes.

16         MS. RIFKIN:   Well, that's not actually true in

17  federal court, and you didn't raise that in a motion to

18  dismiss.   We have moved for punitive damages.   So it

19  stands.   We will bring this up with the Court on our call

20  that is coming up.

21  BY MS. RIFKIN:

22     Q.   Dr. Fithian, how -- are you paid just -- in

23  addition to your wages as a psychiatrist at Monterey

24  County Jail, what other streams of income do you have

25  from CFMG?

1    Q.   Were those a percentage of the net profits?

2    A.   I'm sorry?

3    Q.   Were those a percentage of the net profits?

4    A.   You know, I don't know honestly how it was based

5    on.  I'm a doctor, not a financial person.

6    Q.   When CFMG acquires an additional contract with

7    the jail, do you get any additional payment?

8    A.   No, ma'am.

9    Q.   And how are you paid?  On what basis are you

10   paid for your position with CHOMP as a staff

11   psychiatrist?

12        MR. BERTLING:  Well, that's irrelevant; and

13   again, I'm going to be instruct him not to answer that

14   question.

15        MS. RIFKIN:  I'm entitled to explore the scope

16   of Dr. Fithian's employment.

17        MR. BERTLING:  You've already asked him where he

18   has been employed, where he works.  You're not entitled

19   to know what he makes from every different organization

20   he might be involved with.

21        MS. RIFKIN:  That question asked about the type

22   of -- the type of payments he received, in other words,

23   salary or hours.

24        MR. BERTLING:  Objection.  Vague and ambiguous

25   as to time.

1    BY MS. RIFKIN:

2        Q.   Okay.   Are you paid on -- how are you paid from

3    CHOMP; in other words, on a salary basis or an hourly

4    basis or something else?

5            MR. BERTLING:   Well, vague and ambiguous as to

6    time.   If it's now, it's not calculated to lead to the

7    discovery of admissible evidence.

8    BY MS. RIFKIN:

9        Q.   As of 2013.

10       A.   I think I made about $200 a month from CHOMP.

11       Q.   Was that hourly or a salary?

12       A.   I was not employed.   I was an independent

13   contractor.

14                   (Reporter clarification.)

15           THE WITNESS:   $250 month is what I make from

16   Community Hospital of Monterey Peninsula.

17   BY MS. RIFKIN:

18       Q.   Through the services that you provide to jails

19   in Oregon, are you also an independent contractor?

20       A.   I don't provide direct services to the contract

21   in Oregon.

22       Q.   Okay.   What do you provide in Oregon?

23       A.   Administrative overview, peer review,

24   consultation, training.

25       Q.   In your 30(b)(6) testimony, you had said that

1    ma'am.

2         Q.   And is that under your salary for CFMG?

3         A.   Yes, ma'am.

4         Q.   Do you have -- do you know the value of all

5    properties and other assets owned by you, Dr. Fithian?

6         A.   Do I know the value of what?

7         Q.   All properties and other assets owned by you.

8         A.   Do I know the value and assets owned by myself?

9    No, ma'am, I don't know the exact number.

10        Q.   Do you have an estimate of your net worth?

11             MR. BERTLING:   I'm going to instruct him not to

12   answer that question.

13   BY MS. RIFKIN:

14        Q.   Do you have ownership in any business entities

15   other than CFMG, Dr. Fithian?

16        A.   I have a retail store.  I'm a partner up in

17   Medford, Oregon.

18        Q.   What kind of --

19        A.   Not even -- not a part of the retail.  I own a

20   commercial building in partnership with somebody else

21   that I get rent from in Oregon.

22        Q.   Anything else?

23        A.   That's it.

24        Q.   Are you -- do you have any ownership interest in

25   any horse stables or equestrian centers?

1      A.   I don't remember if I had his whole chart or

2   not.  He had been in custody twice before, in April and

3   July of 2012.  I don't remember.

4      Q.   Would it have been your practice to look at

5   those charts?

6      A.   It would have been my practice to look at those

7   records, yes, ma'am.

8      Q.   And you don't remember if you did that or not?

9      A.   No, I don't.

10      Q.   If you had, would you have stated that on your

11   progress notes?

12      A.   Not necessarily.

13           MR. BERTLING:   (Indicating.)

14           THE WITNESS:   On my progress note dated 5-12,

15   which is dated -- time of dictation at 10:00 o'clock, I

16   put down that patient has been in jail before.  And I

17   don't know if that is a reflection of my having reviewed

18   his medical records or a statement that Mr. Claypole made

19   to me.

20   BY MS. RIFKIN:

21      Q.   Okay.  When you made the statement in your

22   progress notes, "Obviously, he is upset about his current

23   situation," what did you mean by that?

24      A.   Well, Mr. Claypole was a young man.  Although he

25   had been in jail before, this was a different set of

```
 1        A.   I don't believe I did.

 2        Q.   Did you direct anybody else to request Josh's

 3   records from CHOMP?

 4        A.   I don't believe I did.

 5        Q.   If you can turn to the nursing assessment of the

 6   psychiatrist and suicidal inmate that was on May 2nd.

 7   This is at the beginning of the packet Bates stamped with

 8   a 00005.

 9        A.   Yes, ma'am.

10        Q.   Would you have reviewed -- actually, I think you

11   already testified that you would have reviewed this

12   assessment prior to or during your meeting with Josh,

13   correct?

14        A.   Yes, ma'am.

15        Q.   And in the middle of this page under medical and

16   psychiatric history, it's written that patient, Josh,

17   states that mom is bringing meds in; is that right?

18        A.   Yes, ma'am.

19        Q.   Okay.  Did you ask Josh about his family during

20   your meeting with him on May 2nd?

21        A.   I don't remember.

22        Q.   Did you ask him about --

23             MR. BERTLING:  Just go ahead.

24             MS. RIFKIN:  I'm sorry, Counsel, can you just

25   state whatever it was on the record that you told your --
```

1        MR. BERTLING:  No.  Ask your question.

2    BY MS. RIFKIN:

3        Q.  Well, did you discuss Josh's mother, Silvia

4    Guersenzvaig, with him during your meeting with him on

5    May 2nd, 2013?

6        A.  I don't remember, Counselor.  I don't remember

7    if I did or not.  I know that I signed off on the record,

8    but I don't know if I asked him directly about his mom.

9        Q.  Is one of the factors to consider during a

10   suicide risk assessment whether a patient has support

11   from family?

12       A.  Yes.

13       Q.  And your progress note doesn't discuss any

14   mention of any conversation with Josh about whether or

15   not he has family support, right?

16       A.  Only that his mother was bringing his

17   medication.

18       Q.  That's not your progress note, right?  That's

19   the nursing assessment?

20       A.  Yes, that is correct.

21       Q.  But your progress note doesn't contain any

22   records of a conversation with Josh about his family or

23   his mother?

24       A.  That's correct.

25       Q.  Did you contact Josh's mom?

```
1       A.  I did not.

2       Q.  Did you direct anyone else to contact Josh's

3   mom?

4       A.  Not to my recollection.

5       Q.  Did you contact Josh's attorney, the one who had

6   apparently reported to Ms. McGregor that he was suicidal?

7       A.  I don't even think I knew who his attorney was

8   at that time.

9       Q.  Okay.  After you saw Josh on the morning of

10  May 2nd, as reflected in your progress notes that we have

11  been discussing, when was the next time you saw him or

12  learned any information about him?

13      A.  I did not see Joshua again until -- I did not

14  see Joshua again personally.

15      Q.  When was the next time, if any, that you learned

16  any information about Josh?

17          MR. BERTLING:  I don't --

18          MS. RIFKIN:  And I would just like the record to

19  reflect that Dr. Fithian's attorney has pointed him and

20  directed him to a certain page in the records.  And I

21  would like to ask counsel to let his client answer, and

22  I'm going to continue to note these on the record and

23  will seek sanctions if you continue to do this.  You know

24  it's improper behavior.

25          MR. BERTLING:  There is nothing that I'm doing
```

1    improper.  I'm handing him his medical records.  What I
2    actually showed him was CFMG-JC 0091.  You were asking
3    him when he next heard information about him.  I'm just
4    trying to show him records so he can refresh his
5    recollection.
6        MS. RIFKIN:  Is it your contention, Counsel,
7    that the records you just gave him are not part of the
8    packet, the exhibit packet that is currently in front of
9    him?
10       MR. BERTLING:  They are part of the exhibit
11   package.
12       MS. RIFKIN:  And you handed him a document that
13   was outside of that exhibit packet, didn't you?  You
14   handed him your version of it.  I want the record to
15   reflect what you did.
16       MR. BERTLING:  No, I handed him what you handed
17   me.
18       MS. RIFKIN:  That's right.  And Dr. Fithian had
19   his own copy of the exhibit in front of him.  I handed
20   you that as a courtesy, not so that you can --
21       MR. BERTLING:  I appreciate it.
22       MS. RIFKIN:  -- not so that you could point out
23   and direct Dr. Fithian to testify in a certain way.
24       MR. BERTLING:  Don't you want fair and accurate
25   testimony from him?  I'm showing him a record that he can

```
 1    testify from.  I didn't tell him to say anything.  I'm
 2    showing him records.  You asked him what is the next time
 3    you had some information about the patient.  So I handed
 4    him a record.  You can ask him about it.  That's it.
 5         MS. RIFKIN:  The purpose of the testimony in a
 6    deposition is to elicit Dr. Fithian's testimony.  If he
 7    answers that he doesn't recall, we can follow that up, as
 8    appropriate.  But you are obstructing and interfering
 9    with my ability to elicit honest and the best
10    recollection of my client -- or not my client -- of your
11    client.
12         MR. BERTLING:  Ask him the question.
13         MS. RIFKIN:  Dr. Bertling, I've noted several
14    times on the record.  If you do it again, I will seek
15    sanctions.
16         MR. BERTLING:  Just move forward.  I haven't had
17    him testify about anything.  I've shown him documents
18    that will help him to respond to your questions.  Is
19    there something that prohibits me from doing that?
20    Please move forward with your questions.
21         MS. RIFKIN:  There is.  It's called the Federal
22    Rules of Civil Procedure.
23    BY MS. RIFKIN:
24       Q.  Now, Dr. Fithian, when was the next time after
25    you met with Josh the morning of May 2nd when you learned
```

1   any information about him, if any?

2       A.   It appears that Kim Spano, a marriage and family

3   therapist, contacted me after she saw Mr. Claypole on

4   5-3-2013 at about 7:00 o'clock in the evening.

5       Q.   And from what -- first of all, do you have

6   any -- you're looking at the document your counsel

7   directed you to, 000091; is that correct?

8       A.   That's a progress note by Ms. Spano.   Yes,

9   ma'am.

10      Q.   And do you have any independent recollection of

11  Ms. Spano contacting you at that time?

12      A.   No, I don't, Counselor.

13      Q.   And from what do you infer that she contacted

14  you in this record?

15      A.   About her assessment and interview with

16  Mr. Claypole.

17      Q.   Yes.   And how are you -- you do not have an

18  independent recollection that she called you, how -- on

19  what are you basing your testimony that she contacted

20  you?

21      A.   I think -- if you let me read through it, I'll

22  be glad to try to respond to that.

23      Q.   You already gave me an answer, Dr. Fithian.

24      A.   What?

25          MR. BERTLING:   Don't argue with the witness.

1    A.   You know, we have policies and procedures and

2    professional people that are trained to assess people in

3    safety cells, and then they pass that information on to

4    me, whoever the on-call provider is.   And we make a joint

5    determination if it's appropriate to release someone from

6    the safety cell.   So it's not like Joshua was placed in a

7    safety cell.

8         And even though Ms. Spano said he would be

9    followed up on Monday, he obviously was followed up much

10   more acutely by a professional with consultation.   So I

11   think our policies and procedures were followed.

12   Q.   And the professional that you're referring to

13   that followed up with Josh, are you referring to the RN

14   who saw him on a -- for the suicide assessments to take

15   place every six hours?

16   A.   Yes, that's correct, ma'am.

17   Q.   And did anybody on May 3rd, when Josh was placed

18   back on suicide watch, did anybody complete a suicide

19   risk assessment for him at that time?

20        MR. BERTLING:   Lacks foundation that that's part

21   of the policies and procedures.

22        THE WITNESS:   I can find the nursing assessment

23   done when he was placed back in the safety cell.   It

24   looks like a safety cell assessment was done on -- when

25   he was placed back in the safety cell on 5-3, I believe

1    Q.   Was there a suicide risk assessment completed?

2    A.   No, there was not.

3    Q.   Why didn't you go into the county jail to see

4  Josh after you were notified by Ms. Spano that he was

5  placed on suicide watch for the second time in 24 hours?

6    A.   What was the question, ma'am?

7    Q.   Why didn't you go into the Monterey County Jail

8  to see him when Ms. Spano notified you that he had been

9  placed on suicide watch again?

10    A.   Because I relied upon the evaluations done by

11  our psych -- our mental health staff and our medical

12  staff to help make that decision.  If I felt that

13  Mr. Claypole was in imminent danger to himself, he was

14  beyond the management that could have been safely

15  provided, I would have gone back.  There wasn't anything

16  that led me to believe that that was necessary, that I

17  personally go back on-site.

18    Q.   And what evaluation did any medical or mental

19  health staff do of Josh at the time that he was placed

20  back on suicide watch on May 3rd?

21         MR. BERTLING:  Other than what you just went

22  over with Ms. Spano's note?

23         MS. RIFKIN:  Again, I would ask counsel not to

24  testify.

25         MR. BERTLING:  I'm not testifying.

1    A.  I don't know if Dr. Dale Bucke reviewed it.  He

2   has access to any record in the jail.  Our expectation is

3   that when we have a bad outcome, that those are cases we

4   would like our external peer review consultant to do.  I

5   don't know if Dr. Bucke did that or not, Counselor.

6    Q.  Who at CFMG for Monterey County is responsible

7   for requesting that Dr. Bucke review certain files in his

8   audit?

9    A.  Well, I think I'm partly responsible for that.

10   You know, when you set up an external peer review

11   consultant, you ask them, you know, to do random chart

12   reviews, to do focused reviews.  And our pattern of

13   practice has been to have the external peer review

14   consultant, whether it's Dr. Bucke or someone else in one

15   of our counties, to review in-custody deaths.  I don't

16   know if Dr. Bucke did that or not.

17    Q.  Was there a written corrective action plan

18   developed relating to anything with Josh Claypole's

19   death?

20    MR. BERTLING:  That lacks foundation that one

21   was necessary.

22    Go ahead.

23    THE WITNESS:  Again, I think just what's

24   reflected in the quality assurance.  I don't

25   remember believing that any additional action plan needed

1    Q.  Yes.

2    A.  Yes, I'm aware of them.

3    Q.  Are you aware that the court found that

4  conducting health and safety checks of inmates in

5  segregation or lockdown units only once per hour violated

6  correctional standards?

7         MR. BERTLING:  Objection.  Lacks foundation,

8  calls for speculation.  That had nothing to do with CFMG.

9         If you know.

10         THE WITNESS:  I think, again, I think

11  Mr. Bertling is correct.  I think, my recollection, there

12  have been some recommendations by the court and some

13  suggestions by the plaintiff's attorney that welfare

14  checks be done differently, yes.

15  BY MS. RIFKIN:

16    Q.  You testified in your PMK deposition that you

17  believed that the welfare checks done by custody officers

18  in lockdown units are part of the overall suicide

19  prevention plan for Monterey County?

20    A.  Yes, ma'am.

21    Q.  And do you agree that health and safety checks

22  of inmates in segregation or lockdown units only one per

23  hour is insufficient?

24         MR. BERTLING:  Objection.  Incomplete

25  hypothetical.  Vague and ambiguous.  Exceeds the scope of

1    lockdown pod but try to make some other arrangement per

2    classification.

3         I think we are doing welfare checks much more

4    routinely.  I think we have looked at our policies and

5    procedures, looked at what plaintiffs had to say, and I

6    think it has been a learning experience.  And I think we

7    are all working together right now in a good spirit of

8    cooperation to address concerns that have been brought up

9    by the courts and by plaintiff's attorneys.

10   BY MS. RIFKIN:

11        Q.  When you said that you added some additional

12   questions to the intake screening, I know there is -- we

13   have talked about various screenings.  Is there one in

14   particular that you're referring to?

15        MR. BERTLING:  Well, lacks foundation that CFMG

16   did it as opposed to the County.

17        But go ahead and answer the question if you can.

18        THE WITNESS:  I think it was actually -- I think

19   Dr. Hayward, who was an independent expert, made some

20   recommendations.  I think the sheriff's department took

21   those recommendations under consideration.  And I think a

22   series of five additional questions were added to our

23   intake health screening process.

24   BY MS. RIFKIN:

25        Q.  And is that the -- if we can go back to

1   in your capacity as medical director for CFMG?

2       A.   I think most of these war stories were in my

3   capacity as being the medical director.

4       Q.   And if you can look at the slide just before

5   that one, it's CFMG-JC 001076, which lists predisposing

6   factors in jail suicides.

7            To the best of your knowledge, as of May 2013

8   was this list accurate?

9       A.   I think so, yes, ma'am.

10      Q.   I just have a couple more questions,

11  Dr. Fithian, and then I think I'll be done.

12      A.   Okay.

13      Q.   When you saw Josh Claypole on the morning of

14  May 2nd, 2013, did you contact anybody at the Monterey

15  Police Department to ask them if they had made -- what

16  observations, if any, they had made about Josh Claypole's

17  behavior during the arrest process?

18      A.   I did not.

19      Q.   You listed under your responsibilities as a

20  psychiatrist at Monterey County Jail, some of the things

21  you listed were to review health records, to talk to

22  other doctors in the community, family members, defense

23  attorneys -- I'm sorry -- attorneys, including defense

24  attorneys and review medical files, correct?

25      A.   Yes, ma'am.

1   Q.  Did you do any of that in Joshua Claypole's

2   case?

3   A.  I don't believe I did, ma'am.

4       MR. BERTLING:  Lacks foundation that there was

5   time to do that before committing suicide.

6   BY MS. RIFKIN:

7   Q.  And why didn't you do that?

8   A.  Again, Counselor, Mr. Claypole was in custody, I

9   think, for about 48 hours.  My interaction and my

10  decision-making process were based on assessments done by

11  others, by my own independent evaluation.  And I thought

12  the care and treatment provided at the time was

13  appropriate.

14      If Mr. Claypole had remained in custody, had

15  been a significant management problem, I would have

16  reached out.  And that's been my pattern of practice and

17  continues to be my pattern of practice.  And I could

18  probably give you a 100 different scenarios where that

19  continues to take place and has taken place, took place

20  today and yesterday.  So --

21  Q.  How long would Mr. Claypole have had to be in

22  jail in order for you to seek out information from other

23  care providers or his family or other people in the

24  community?

25  A.  I wished I could honestly give you an exact time

**KARYN ABBOTT & ASSOCIATES**                                    221

```
1    average number of people that I cleared from a safety
2    cell, and I think it's -- I would imagine, Mr. Bertling,
3    an average would be maybe two a day, 14 a week.  Multiply
4    that out to four times, you know, that would be 60 times
5    a month, 7 or 800 times a year times 30 years.  That's a
6    lot of people cleared from safety cells.
7        Q.  Thank you.  I have no further questions.
8            MS. RIFKIN:  I do have a couple of follow-up
9    questions.
10                   EXAMINATION BY MS. RIFKIN
11       Q.  Dr. Fithian, you just described the safety cell
12   as a rubber room with a Turkish toilet and said that it
13   would be inhumane to keep someone in there longer than
14   they had to be; is that right?
15       A.  Correct.
16       Q.  And given those stark conditions, prior to
17   May 1st, 2013, did you ever recommend to the County of
18   Monterey that they modify their safety cells?
19           MR. BERTLING:  Lacks foundation that there was
20   any way to modify.
21           But go ahead and answer her question.
22           THE WITNESS:  Did I ever recommend that they
23   modify their safety cells?  I don't think I ever made a
24   recommendation to modify a safety cell.  I think I made a
25   recommendations consistently because we all work together
```

1                  DEPOSITION OFFICER'S CERTIFICATE

2

3    State of California   )

4    County of Santa Clara )

5

6         I, Martha Ruble, hereby certify:

7         I am a duly qualified Certified Shorthand

8    Reporter in the State of California, holder of

9    certificate number 5145, issued by the Court Reporters

10   Board of California and which is in full force and

11   effect.  (Bus. & Prof.  Section 8016)

12        I am not financially interested in this action

13   and am not a relative or employee of any attorney of the

14   parties, or any of the parties.

15   (Civ. Proc Section 2025.320 (a))

16        I am authorized to administer oaths or

17   affirmations pursuant to California Code of Civil

18   Procedure, Section 2093 (b), and prior to being examined,

19   the witness was first duly sworn by me.

20   (Civ. Proc, Section 2025.320, 2025.5400 (a))

21        I am the deposition officer that

22   stenographically recorded the testimony in the foregoing

23   deposition, and the foregoing transcript is a true record

24   of the testimony given by the witness.

25   (Civ. Proc. Section 2025.540 (a))

```
 1          I have not, and shall not, offer or provide any
 2    services or products to any party's attorney or third
 3    party who is financing all or part of the action without
 4    first offering same to all parties or their attorneys
 5    attending the deposition and making same available at the
 6    same time to all parties or their attorneys.
 7    (Civ. Proc. Section 2025.320 (b))
 8          I shall not provide any service or product
 9    consisting of the deposition officer's notations or
10    comments regarding the demeanor of any witness, attorney,
11    or party present at the deposition to any party or
12    party's attorney or third party who is financing all or
13    part of the action, nor shall I collect any personal
14    identifying information about the witness as a service or
15    product to be provided to any party or third party who is
16    financing all or part of the action.
17    (Civ. Proc. Section 2025.320 (b))
18
19    Dated:  September 17, 2015
20
21    Martha Ruble
22    _____
23    Martha Ruble
24    CSR License No. 5145
25                        *  *  *
```

Rifkin Decl. in Supp of Mtn to Compel
Discovery & for Sanctions

# Exh. H

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


Estate of JOSHUA CLAYPOLE,  )
deceased, by and through    )
SILVIA GUERSENZVAIG, as     )
Administrator, et. al.,     )
                         )
          Plaintiffs,  )
                         )
        vs.            )  CASE NO. CV 14-02730 BLF
                         )
COUNTY OF SAN MATEO;       )
SHERIFF GREG MUNKS, in his )
individual and official    )
Capacity; COUNTY OF         )
MONTEREY, et al.,         )
                         )
         Defendants.  )
_____)


DEPOSITION OF

DR. TAYLOR FITHIAN

MONTEREY, CALIFORNIA

SEPTEMBER 7, 2015


Reported by:
KELLI A. RINAUDO
CSR Lic. 6411 RMR, CRR, CCRR
No. 15-36305B

KARYN ABBOTT
& ASSOCIATES
COURT REPORTERS
70 S. Lake Avenue, 10th Floor
Pasadena, California 91101
Phone 213.749.1234 | 213.749.0644

1    we first talked you said you were the President of

2    CFMG and, up until, I believe, the beginning of this

3    year, the Medical Director; is that right?

4        A.   That is correct.

5        Q.   Okay.  What were your -- as of 2013, what          02:33

6    were your responsibilities as President of CFMG?

7        A.   It was an administrative function.

8    Involved in working with our executive team, Elaine

9    Hustedt and Dan Hustedt, our new CEO, to help

10   formulate plans to help give direction to how we          02:33

11   were going to proceed in our contracts in

12   California; to work in conjunction with Elaine, who

13   was Vice President of Operations, and with Dan

14   Hustedt, Vice President of Finance; to continue to

15   try to grow in California; to provide input, follow       02:34

16   up with our various contracts.

17            MR BERTLING:  Okay.  And let me just say

18   that, for the purpose of this record, I want to be

19   clear from here on out regarding what the purpose of

20   this deposition is.                                        02:34

21            The court has given you some additional

22   time to ask about specific documents that we had

23   produced that were ordered by the court.  That's

24   what's going to happen during this deposition.

25   While I just gave you some leeway in allowing him to      02:34

```
 1    answer that question, the rest of this deposition
 2    needs to focus on what the judge said the purpose of
 3    this deposition was.
 4           MS. RIFKIN:  For the record, the court gave
 5    us an additional three hours to talk about other          02:35
 6    counties, the core policies and administration, how
 7    CFMG is essentially run, the practices of staff at
 8    the Monterey County Jail, and changes to policies
 9    and procedures at Monterey County Jail since Joshua
10    Claypole's death.                                          02:35
11           You are welcome to instruct Dr. Fithian not
12    to answer on any of those topics, Peter, and we will
13    seek to bring him back.
14           MR BERTLING:  That's fine.
15           MS. RIFKIN:  We will seek costs and fees.           02:35
16           MR BERTLING:  Go ahead.  Because I think
17    the judge made it clear that what he was allowing is
18    you had talked about a training that was given, and
19    he allowed there to be further questioning about
20    that training.  We were required to produce records       02:35
21    regarding some of the contracts in the counties.
22    You can ask Dr. Fithian about that.
23           But I'm just saying that I thought the
24    judge made it very specific about what the purpose
25    of this deposition was, and so let's just move            02:36
```

1    forward.

2    BY MS. RIFKIN:

3        Q.   Okay.  So when you said that part of your

4    role as President is to formulate plans and give

5    direction about how to proceed in California, can          02:36

6    you be more specific about what "formulate plans"

7    means?

8              MR BERTLING:  Okay.  I'm going to instruct

9    him not to answer those questions.  The judge also

10   made it clear that this deposition was only limited        02:36

11   to things that happened at the time Dr. Fithian was

12   seeing Joshua Claypole.  You had specifically

13   requested about being able to ask about information

14   beyond that point, and the judge did not grant your

15   request.                                                   02:36

16             So if you would like to focus it as to the

17   time period the judge said, I'll let him answer

18   those questions.

19             MS. RIFKIN:  Well, Peter, you're wasting

20   time.  And I already asked Dr. Fithian:  As of 2013        02:37

21   what were your functions as President?  I'm asking

22   him a more specific question within that to define

23   things.  I'm just going to give you notice now that

24   if you continue to engage in elaborate speaking

25   objections, and waste the three hours allotted to          02:37

```
 1   us, we will go back to the judge.
 2            MR BERTLING:   That's fine.   Just go ahead
 3   and answer the question.
 4            (Telephone interruption.)
 5            MR. GRANT:   This is Irv Grant.                      02:37
 6            MR BERTLING:   It was the time as of
 7   Mr. Claypole's suicide which was in May of 2013.
 8   BY MS. RIFKIN:
 9      Q.   So, Dr. Fithian, in your description of
10   your roles as President as of 2013, one of the --           02:37
11   some of the descriptions that you gave were to help
12   formulate plans and to give direction about how to
13   proceed in California.   Can you be more specific
14   about what that means as far as your role?
15      A.   As you know, Counselor, California Forensic        02:37
16   Medical Group is a corporation that focused on
17   correctional health care, and so part of my role as
18   the President was to help put together missions and
19   visions regarding how we did that; to reinforce and
20   establish our relationships with our customers, our        02:38
21   clients; as President, to work with our providers in
22   the spirit of cooperation and to provide input,
23   supervision, whenever it was indicated or asked for;
24   to work hand in hand with the other two executive
25   officers, Dan Hustedt, Vice President of Finance,          02:38
```

```
 1            MR BERTLING:  The question is vague and
 2   ambiguous.  Overbroad.  Incomplete hypothetical.
 3            But please answer the question, if you can.
 4            THE WITNESS:  Counselor, I'm not -- I don't
 5   think -- and, again, I may be wrong, but I don't        03:28
 6   think we have a policy that mandates we have 24-hour
 7   mental health coverage just solely based on the
 8   population of a jail.
 9   BY MS. RIFKIN:
10       Q.  Okay.  And just to be clear, I'm not asking     03:28
11   about 24-hour coverage, I'm asking about a mental
12   health person being at the jail on weekends.
13       A.  And my response would be the same.
14       Q.  Okay.  You did refer, a few minutes ago,
15   that you were part of a discussion about staffing, I    03:28
16   believe mental health staff on weekends at Monterey
17   County Jail; is that right?
18       A.  Yes.
19       Q.  And to the best that you recall, when did
20   that discussion begin?                                  03:29
21       A.  Again, Counselor, I don't know when it
22   began.  I really don't know when it began.
23       Q.  Do you know if it began prior to May 1st,
24   2013?
25       A.  No, I -- again, I don't know with any           03:29
```

1    certainty that it began before 2013.  Staffing --

2         MR BERTLING:  You have answered the

3    question.

4         MS. RIFKIN:  And I'll just make a note for

5    the record of Counsel cutting off his client.          03:29

6         MR BERTLING:  I didn't cut off the client.

7    He had answered your question.  The record speaks

8    for itself.

9    BY MS. RIFKIN:

10        Q.  Do you -- again, Dr. Fithian, I'll remind    03:29

11   you I am entitled to your best estimate.

12        You have testified that you were a part of

13   the discussions about whether or not to have mental

14   health staff at Monterey County Jail on weekends.

15   To the best of your recollection, did that           03:29

16   discussion begin prior to May 1st, 2013?

17        A.  You know, Counselor, again, I don't know

18   when, in all honesty, those discussions began.

19        Q.  Do you know -- well, was a change ever made

20   at Monterey County Jail to have mental health staff   03:30

21   there on weekends?

22        A.  Yes.

23        Q.  When was that change made?

24        A.  Again, I can't answer that with any

25   certainty when we began to have weekend coverage on   03:30

1   Behavioral Health, Public Health, et cetera.

2           MS. RIFKIN:  Mark this as the next exhibit.

3           (Deposition Exhibit 112

4           was marked for identification.)

5   BY MS. RIFKIN:                                              04:07

6       Q.  So you've been handed what's been marked

7   Exhibit 112, which is Bates-stamped CFMG-JC 014027

8   and 28.  This is a portion of documents that were

9   provided for the package for Butte County.

10      A.  Yes, ma'am.                                         04:07

11      Q.  And this is specifically in addition to

12  scope of work for Butte County Juvenile Hall, I

13  think.  That's what it says anyway.

14      A.  That's what it says, yes, ma'am.

15      Q.  On the top of that page, under the very top   04:07

16  provision:

17          "The addition to scope of work provides

18          a policy that a ward shall be seen no later

19          than the first scheduled sick call after

20          his/her request is received by medical          04:07

21          staff.  Psychiatric complaints shall be

22          screened daily."

23          Do you know how, either specifically for

24  this contract or in general, CFMG would come to the

25  determination of putting in a specific time frame     04:08

1    like that in a specific county?

2         MR BERTLING:  Well, let me just object that

3    it's vague and ambiguous.  Calls for speculation.

4    This is also a juvenile facility as opposed to an

5    adult facility with different titles and statutes          04:08

6    that may be involved.

7         But if you understand the question and can

8    answer, please do, Dr. Fithian.

9         THE WITNESS:  Sure.  You know, I think,

10   Counselor, what you see for Butte County Juvenile          04:08

11   Hall is what we try to do everywhere, is that if

12   someone has a psychiatric complaint, that we try to

13   see them in a timely fashion.  And we try to do that

14   on the next scheduled sick call day provided by

15   Mental Health by a psychiatrist.  So although this         04:08

16   is reflected in Butte County, I think that's a

17   pattern of practice we try to do everywhere.

18   BY MS. RIFKIN:

19        Q.  My understanding from our previous

20   sessions, Dr. Fithian, is that there is no policy in        04:09

21   Monterey County Jail about a time frame in which an

22   inmate patient must be seen following a referral for

23   mental health; is that accurate?

24        MR BERTLING:  I think that misstates the

25   doctor's testimony.                                         04:09

```
1    form used for suicide risk assessment at Monterey
2    County Jail since May 1st, 2013?
3         A.   I think we --
4              MR BERTLING:   So what's the question?
5    BY MS. RIFKIN:                                          05:38
6         Q.   Have there been any changes made to the
7    suicide risk assessment form used by Monterey
8    County -- or used at Monterey County Jail since May
9    2013?
10             MR BERTLING:   Are you talking about the    05:38
11   nursing assessment or the intake triage?
12             MS. RIFKIN:   I'm talking about the suicide
13   risk assessment.
14             MR BERTLING:   Well, the intake triage is a
15   suicide risk assessment, that's why it's vague and   05:38
16   ambiguous.
17             MS. RIFKIN:   I'm asking Dr. Fithian.
18             THE WITNESS:   There was, I think, a series
19   of five questions that have been added to the intake
20   triage form that have augmented the suicide risk      05:38
21   factor, so I think that's been done.
22             And we have now R.N.s at the intake process
23   24/7 to assist in the intake screening.  And we have
24   mental health staff on weekends.
25   BY MS. RIFKIN:                                          05:39
```

```
1   STATE OF CALIFORNIA          )
2                                )  ss.
3   COUNTY OF MONTEREY.          )
4
5          I, KELLI A. RINAUDO, do hereby certify:
6          That I am a duly qualified Certified
7   Shorthand Reporter, in and for the State of
8   California, holder of certificate number 6411, RMR,
9   CRR, CCRR and CLR, which is in full force and
10  effect, and that I am authorized to administer oaths
11  and affirmations;
12         That the foregoing deposition testimony of
13  the witness,
14
15                DR. TAYLOR FITHIAN,
16
17  was taken before me at the time and place herein set
18  forth.
19         That prior to being examined, the witness
20  named in the foregoing deposition was duly sworn or
21  affirmed by me, to testify the truth, the whole
22  truth, and nothing but the truth;
23         That the testimony of the witness and all
24  objections made at the time of the examination were
25  recorded stenographically by me, and were thereafter
```

1  transcribed under my direction and supervision;

2         That prior to the completion of the

3  foregoing deposition, review of the transcript

4  _____ was requested;

5         X     was not requested;

6         I further certify that I am not a relative

7  or employee or attorney or counsel of any of the

8  parties, nor am I a relative or employee of such

9  attorney or counsel, nor am I financially interested

10  in the outcome of this action.

11         IN WITNESS WHEREOF, I have hereunto

12  subscribed my name this 17th day of September, 2015.

13

14

15

16  _____

17  KELLI A. RINAUDO
    California CSR No. 6411
    Washington CSR No. 3372
18  RMR / CRR / CCRR / CLR

19

20

21

22

23

24

25

Rifkin Decl. in Supp of Mtn to Compel
Discovery & for Sanctions

Exh. I

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

--oOo--

Estate of JOSHUA CLAYPOLE,          )
deceased, by and through SILVIA     )
GUERSENZVAIG, as Administrator;     )
SILVIA GUERSENZVAIG,                )
                                    )
        Plaintiff,                  )
                                    )
Vs.                                 ) No. CV 14-02730 BLF
                                    )
COUNTY OF SAN MATEO; SHERIFF        )
GREG MUNKS, in his individual       )
and official capacity; COUNTY       )
OF MONTEREY; SHERIFF SCOTT          )
MILLER, in his individual and       )
official capacity; SERGEANT E.      )
KAYE, in her individual capacity;   )
CITY OF MONTEREY; MONTEREY POLICE   )
DEPARTMENT CHIEF PHILIP PENKO, in   )
his official capacity; BRENT HALL,  )
in his individual and official      )
capacity; CALIFORNIA FORENSIC       )
MEDICAL GROUP; DR. TAYLOR FITHIAN,  )
in his individual capacity;         )
COMMUNITY HOSPITAL OF MONTEREY      )
PENINSULA; and DOES 1 through 30,   )
                                    )
        Defendants.                 )
_____    )

DEPOSITION OF

JASON GLEN ROOF, M.D.

SACRAMENTO, CALIFORNIA

OCTOBER 13, 2015

Reported by:
SHARON CABELLO,
CSR NO. 3080, Registered Professional Reporter
JOB: 15-37266



KARYN ABBOTT
& ASSOCIATES
COURT REPORTERS
70 S. Lake Avenue, 10th Floor
Pasadena, California 91101
Phone 213.749.1234 | 213.749.0644

```
1   weekends in 2015?
2        A    Yes, he would have been aware that they were
3   not present.
4        Q    So in your opinion, given that Mr. Claypole
5   was suicidal on the 1st, not suicidal, as you said, or
6   reporting that he wasn't suicidal on the 2nd, suicidal
7   on the 3rd, and reporting that he wasn't going to
8   commit suicide on the 4th, was it a realistic
9   possibility that he might once again become suicidal
10  later that day or the next day?
11       A    Yes.
12       Q    What measures, if any, did CFMG or Dr. Fithian
13  take to address that possibility?
14            MR. BERTLING:  You mean other than the fact
15  that he was in a lock down cell being monitored by
16  custody?
17            MS. RIFKIN:  Well, you are not testifying,
18  Peter, so I --
19            MR. BERTLING:  Well, I know I'm not
20  testifying, I'm just asking him other than that, I
21  mean --
22            MS. RIFKIN:  Well, you don't ask me questions,
23  Peter.
24            MR. BERTLING:  You are excluding -- you don't
25  tell me what to do.  You are excluding everything else
```

```
1    that is part of the plan, the suicide prevention plan
2    at the Jail --
3            MS. RIFKIN:  Peter, I'm going to ask you to
4    stop testifying and coaching you witness.
5            MR. BERTLING:  I'm not testifying or coaching
6    the witness.  I am just saying you in your questioning
7    are excluding everything that's part and parcel --
8            MS. RIFKIN:  And make an objection, Peter.
9            MR. BERTLING:  -- of the suicide prevention
10   plan at the Monterey County Jail.
11           MS. RIFKIN:  Peter, you can make objections --
12   you haven't even made a recognizable objection at this
13   point.  If you continue to coach the witness, I have
14   told you this in previous depositions repeatedly, I
15   will seek sanctions.
16           MR. BERTLING:  Do what you need to do, Lori.
17   Ask your next question.
18   BY MS. RIFKIN:
19      Q    So, Dr. Roof, you I believe answered --
20           Can we have the last question prior to
21   Mr. Bertling speaking read back with the last answer,
22   please.
23           (Record read by the reporter as follows:
24           "Q. So in your opinion, given that
25               Mr. Claypole was suicidal on the 1st, not
```

```
1                    REPORTER'S CERTIFICATE

2          I, SHARON CABELLO, a Certified Shorthand

3   Reporter of the State of California, duly authorized to

4   administer oaths, do hereby certify:

5          That the foregoing proceedings were taken

6   before me at the time and place herein set forth;

7   that any witnesses in the foregoing proceedings,

8   prior to testifying, were duly sworn; that a record

9   of the proceedings was made by me using machine

10  shorthand which was thereafter transcribed under my

11  direction; that the foregoing transcript is a true

12  record of the testimony given.

13         Further, that if the foregoing pertains to the

14  original transcript of a deposition in a Federal

15  Case, before completion of the proceedings, review of

16  the transcript ( ) was ( ) was not requested.

17         I further certify I am neither financially

18  interested in the action nor a relative or employee

19  of any attorney or party to this action.

20         IN WITNESS WHEREOF, I have this date

21  subscribed my name.

22         Dated: October 16, 2015

23

24         _____
           SHARON CABELLO CSR #3080
25
```

Rifkin Decl. in Supp of Mtn to Compel
Discovery & for Sanctions

# Exh. J

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Estate of JOSHUA CLAYPOLE,      )
deceased, by and through SILVIA )
GUERSENZVAIG, as Administrator; )
SILVIA GUERSENZVAIG,            )
                                )
          Plaintiff,            )    No. CV 14-02730 BLF
                                )
     -vs-                       )
                                )
COUNTY OF SAN MATEO; SHERIFF    )
GREG MUNKS, in his individual   )
and official capacity; COUNTY OF)
MONTEREY; SHERIFF SCOTT MILLER, )
in his individual and official  )
capacity; SERGEANT E. KAYE, in  )
her individual capacity; CITY OF)
MONTEREY; MONTEREY POLICE       )
DEPARTMENT CHIEF PHILIP PENKO,  )
in his official capacity; BRENT )
HALL, in his individual and     )
official capacity; CALIFORNIA   )
FORENSIC MEDICAL GROUP; DR.     )
TAYLOR FITHIAN, in his          )
individual capacity; COMMUNITY  )
HOSPITAL OF MONTEREY PENINSULA; )
and DOES 1 through 30,          )
                                )
          Defendants.           )
_____)

DEPOSITION OF

WILLIAM TAYLOR FITHIAN, III, M.D.

As Person Most Knowledgeable 30(b)(6)

SAN JOSE, CALIFORNIA

JULY 31, 2015

Reported By:
MARTHA RUBLE
CSR-5145
NO. 15-36222

KARYN ABBOTT
& ASSOCIATES
COURT REPORTERS
70 S. Lake Avenue, 10th Floor
Pasadena, California 91101
Phone 213.749.1234 | 213.749.0644

1            THE WITNESS:   Custody staff were our partners in

2      helping to determine an inmate's potential risk for

3      suicide.   They were trained.   They are professionals.

4      And so, yes.

5      BY MS. RIFKIN:

6            Q.   As of 2013 did CFMG or Monterey County have a

7      formal suicide risk assessment tool that it used?

8            A.   Formal suicide what?

9            Q.   Risk assessment tool that it used.

10           A.   The intake health screening, the safety logs,

11     the nursing assessment, our mental status examination

12     provided by our providers, those were all a part of the

13     formal assessment tools utilized.

14           MS. RIFKIN:   Why don't we take a short break,

15     about five minutes.

16                         (Recess taken.)

17     BY MS. RIFKIN:

18           Q.   Okay.   We are going to switch gears for a second

19     or maybe more than a second and talk about the intake

20     health screening specifically.

21           A.   Yes, ma'am.

22           Q.   And do you know whose decision it was as between

23     CFMG and the County of Monterey that custody officers do

24     the initial health screening when an inmate comes into

25     the jail?

**KARYN ABBOTT & ASSOCIATES**                                    64

1      A.   You know, Counselor, that has been a pattern of

2    practice since 1981.   I think the intake health screening

3    prior to coming on board was done by custody

4    administration, custody staff.   I think we continued that

5    through the years.

6              MR. BERTLING:   You've answered the question.

7              THE WITNESS:   Did I answer the question?

8              MS. RIFKIN:   Yes.   Counsel, thank you for

9    cutting off your client.

10             MR. BERTLING:   Well, he has answered the

11   question.   I don't think you want him to ramble.

12             MS. RIFKIN:   I don't think I would like you to

13   advise your client on how to answer in the middle of him

14   answering a question.

15             MR. BERTLING:   I'm his attorney here to do what

16   I think is appropriate to represent the best interests of

17   my client.   I'll continue to do that.   Please move to

18   your next question.

19   BY MS. RIFKIN:

20     Q.   And I understand that that practice has recently

21   changed; is that correct?

22             MR. BERTLING:   I'm going to instruct him not to

23   answer that question.   It's irrelevant.   It has nothing

24   to do with the scope of this PMK designation.

25             MR. GRANT:   I'm going to join in that objection.

1  BY MS. RIFKIN:

2      Q.  And to the best of your recollection, what was

3  the response from the individuals that you expressed

4  these concerns to at Monterey County?

5      A.  I think always with an understanding and

6  appreciation we all shared the same concern.

7      Q.  And prior to May 2013 do you recall whether any

8  changes were made to that policy?

9      A.  Any what?

10     Q.  Whether any changes were made to that policy as

11  a result of those concerns.

12     A.  I don't believe so, Counselor.

13         MS. RIFKIN:  I think this would probably be a

14  good time for a lunch break.

15         MR. BERTLING:  Do you have an estimated time of

16  how much longer you're going to be when we return?

17         MS. RIFKIN:  Well, you said that you wanted to

18  go the full day and that to the extent that we ended the

19  PMK depo and we were going to do his individual depo.

20         MR. BERTLING:  No.  You said to me that that

21  wasn't going to happen.  So we are not going to go that

22  route today.  We will finish the PMK deposition today.

23  You required that he come back on August 31st for his

24  deposition as a defendant in this case.  And that's what

25  we are going to do.  So how much longer are you going to

1    have on the PMK, that's how long --

2         MS. RIFKIN:  Counsel, that's directly

3    contradicted by all of the written documents in which I

4    said we would do our best to get as much done as possible

5    today but I doubted we were going to finish his

6    individual deposition.

7         MR. BERTLING:  So he is not starting an

8    individual depo today.  We are doing PMK today.  He's

9    coming back for his defense deposition on the 31st.

10        MS. RIFKIN:  Counsel, let me just ask you a

11   practical question.  Since you're instructing him not to

12   answer certain questions, and CFMG has not produced all

13   of its electronic discovery yet, and there may be

14   questions as a PMK that he may be required to answer

15   after the hearing, that would -- if we don't start his

16   individual deposition today, that would potentially mean

17   we would need to bring Dr. Fithian back for a third day.

18        MR. BERTLING:  We are going to cross that bridge

19   if we come to it.  I don't think that's going to happen.

20   If there are any other questions, they are going to be

21   very limited.  I've only instructed him not to answer two

22   questions.

23        MS. RIFKIN:  So far.  There are questions I

24   haven't asked because you said those were off limits.

25        MR. BERTLING:  I mean we are going to finish him

```
 1   today as a PMK.  So based on the questions that you have

 2   him as a PMK --

 3           MS. RIFKIN:  That's fine, Counsel.  I just want

 4   it clearly stated on the record that we have consistently

 5   offered to begin his individual PMK today if we

 6   completed -- I mean, his individual deposition if we

 7   completed his PMK in less than a full day, and that we

 8   are willing to do so, and it is your choice that you're

 9   not allowing us to start doing that.  I just want that on

10   the record.

11           MR. BERTLING:  That's fine.  And I also think

12   that the record -- the written record establishes the

13   position we have taken on this.

14           But I appreciate that, Lori.  I'm just asking or

15   letting you know we are going to finish him today as a

16   PMK, hopefully.  And I'm just trying to get an estimate

17   for the doctor's sake, his personal scheduling, of how

18   much longer you anticipate being.

19           MS. RIFKIN:  I anticipate that we might go the

20   full time.

21           MR. BERTLING:  Okay.  That's --

22           MS. RIFKIN:  I'm not sure.  But I don't go for

23   the full time for the sake of going the full time, but I

24   don't know.

25           MR. BERTLING:  We have got your answer.
```

1          DEPOSITION OFFICER'S CERTIFICATE

2

3    State of California    )

4    County of Santa Clara  )

5

6         I, Martha Ruble, hereby certify:

7         I am a duly qualified Certified Shorthand

8    Reporter in the State of California, holder of

9    certificate number 5145, issued by the Court Reporters

10   Board of California and which is in full force and

11   effect.  (Bus. & Prof. Section 8016)

12        I am not financially interested in this action

13   and am not a relative or employee of any attorney of the

14   parties, or any of the parties.

15   (Civ. Proc Section 2025.320 (a))

16        I am authorized to administer oaths or

17   affirmations pursuant to California Code of Civil

18   Procedure, Section 2093 (b), and prior to being examined,

19   the witness was first duly sworn by me.

20   (Civ. Proc, Section 2025.320, 2025.5400 (a))

21        I am the deposition officer that

22   stenographically recorded the testimony in the foregoing

23   deposition, and the foregoing transcript is a true record

24   of the testimony given by the witness.

25   (Civ. Proc. Section 2025.540 (a))

```
 1          I have not, and shall not, offer or provide any
 2   services or products to any party's attorney or third
 3   party who is financing all or part of the action without
 4   first offering same to all parties or their attorneys
 5   attending the deposition and making same available at the
 6   same time to all parties or their attorneys.
 7   (Civ. Proc. Section 2025.320 (b))
 8          I shall not provide any service or product
 9   consisting of the deposition officer's notations or
10   comments regarding the demeanor of any witness, attorney,
11   or party present at the deposition to any party or
12   party's attorney or third party who is financing all or
13   part of the action, nor shall I collect any personal
14   identifying information about the witness as a service or
15   product to be provided to any party or third party who is
16   financing all or part of the action.
17   (Civ. Proc. Section 2025.320 (b))
18
19   Dated:  August 14, 2015
20
21
22   _____
23   Martha Ruble
24   CSR License No. 5145
25                  *  *  *
```

Rifkin Decl. in Supp of Mtn to Compel
Discovery & for Sanctions

# Exh. K

**LORI E. RIFKIN**

4217 Tompkins Avenue, Oakland, CA 94619

Phone: 415-515-0285   Email: lrifkin@rifkinlawoffice.com

---

## EXPERIENCE

---

**RIFKIN LAW OFFICE,** Oakland, CA

*Principal,* 2013-current

Founder of law practice focusing on civil rights litigation in federal and state court.  Specific areas include: prisoners' rights; police misconduct; juvenile justice; discrimination based on race, ethnicity, sex, gender, sexual orientation, gender identity, religion, disability, age; First Amendment; employment law.  Representative work includes: excessive force litigation; jail wrongful death cases; co-counsel representation of statewide class of prisoners with mental illness; student harassment & discrimination; employment contract advice & negotiation.

**CIVIL RIGHTS DIVISION, U.S. DEPARTMENT OF JUSTICE,** Washington, D.C.

*Senior Trial Attorney, Special Litigation Section* 2010-2013

Investigated and litigated civil rights violations by state & local correctional institutions, juvenile justice agencies, and law enforcement agencies; investigated and litigated violations of Freedom of Access to Clinic Entrances (FACE) Act.  Representative on Civil Rights Division-wide working group on LGBT issues and DOJ-wide working group on gender-biased policing issues.

**LEGAL AID SOCIETY-EMPLOYMENT LAW CENTER,** San Francisco, CA

*Attorney,* 2009-2010

One-year litigation position at organization primarily representing low-income workers.  Developed and litigated actions addressing employment discrimination based on gender identity; race & national origin; and pregnancy & sex.  Drafted federal complaints on behalf of class of domestic partners & same-sex spouses excluded from public employee long-term care program, and on behalf of pregnant employee refused accommodations and terminated.

**AMERICAN CIVIL LIBERTIES UNION OF SOUTHERN CALIFORNIA,** Los Angeles, CA

*Staff Attorney*, 2008-2009

Litigation and advocacy with focus on LGBT rights and women's rights.  Litigated and settled action against school district regarding discrimination and harassment; litigated and settled action against city regarding criminalization of chronically homeless individuals; litigated successful action against state agency to protect informational privacy regarding HIV status.  Other litigation and advocacy issues included Proposition 8 (CA same-sex marriage) and relationship recognition, discrimination and harassment in employment and public accommodations, treatment of LGBT individuals in prison, student free speech rights, and sexual health education in schools.

**ROSEN, BIEN & GALVAN, LLP**, San Francisco, CA

*Associate Attorney*, 2006-2008

Represented plaintiffs in civil rights cases including federal class actions on behalf of state inmates with mental illness and state parolees.  Litigated statewide prisoner release order before federal three-judge panel affirmed by the U.S. Supreme Court in *Brown v. Plata*, actively involved in formulating trial strategy, prepping expert reports, and conducting discovery including court appearances, briefing, and depositions.  Wrote briefs and supporting declarations successfully moving for referral of prisoner release order to three-judge panel.  Drafted briefs, declarations, and motions at trial and appellate levels; conducted prison monitoring tours and inmate interviews; worked with Special Master and court expert teams; negotiated with State defendants.

**AMERICAN CIVIL LIBERTIES UNION OF CONNECTICUT,** Hartford, CT

*Staff Attorney*, 2004-2005

Responsible for investigating, negotiating, and litigating broad spectrum of civil rights claims including First Amendment, sex discrimination, marriage equality, and prisoners' rights.  Drafted legislative testimony, supervised law student interns, performed community outreach and education, oversaw intake process, and represented ACLU-CT on statewide coalitions.

**SOUTHERN POVERTY LAW CENTER,** Montgomery, AL
*Law Clerk*, June-August 2003
Investigated potential lawsuits based on private race-based harassment, prisoners' rights, and Title IX discrimination in secondary school sports.  Researched legal questions and wrote arguments for ongoing litigation involving separation of church and state, juvenile justice, and federal habeas appeals.

**AMERICAN CIVIL LIBERTIES UNION,** New York, NY
*Law Clerk, Lesbian & Gay Rights and AIDS Projects,* February-August 2002, February-May 2003
Researched and wrote legal memoranda for cases related to sexual orientation and gender in areas such as employment discrimination, relationship recognition and family law, Eighth Amendment claims, schools and youth, and AIDS.  Wrote prototype letters to schools about dress codes, completed survey of public accommodations law as it covers sexual orientation.

*Legal Intern, National Legal Department, Race & Poverty Docket,* September 2002-May 2003
Worked with attorney Vince Warren to research litigation strategies around racially discriminatory effects of "zero tolerance" disciplinary measures in public schools.  In conjunction with Brennan Center Public Policy Advocacy Clinic.

EDUCATION

**NEW YORK UNIVERSITY SCHOOL OF LAW**, New York, NY
Academics:    J.D. Degree, May 2004.
Honors:        Eric Dean Bender Prize (commitment to public service-oriented cause outside of Law School
                      commitments, awarded for activism on *Solomon* amendment issues)
                      Dean's Scholarship Recipient, scholarship based upon academic merit
                      Workshop Leader, Yale Law School Rebellious Lawyering Conference 2003
Clinics:        Criminal Appellate Defender Clinic (with the Office of the Appellate Defender), Fall 2003
                      Brennan Center Public Policy Advocacy Clinic, Fall-Spring 2002-03
Note:           *Outing the Judicial Process: How and Why Judges Foreclose Title VII Sex Stereotyping Claims for
                      Nonheterosexual Plaintiffs*
Activities:     OUTLaw, Programming Chair; Straights and Queers United Against Discrimination, Organizer
                      Coalition for Legal Recruiting (faculty diversity); Law Women
                      IMPACT Caravan, Spring 2004 (felon re-enfranchisement and restoration of civil rights work in
                      Florida)

**HARVARD UNIVERSITY**, Cambridge, MA
Academics:    A.B. Degree *magna cum laude*, Social Studies and Women's Studies, June 2000
Honors:        Harvard College Scholarship and Agassiz Certificate of Merit for academic achievement
Activities:     Radcliffe Rugby Team, Forward Captain.  1998 National Champion Team
                      Harvard Speech and Parliamentary Debate Society, Executive Board Member
                      Harvard Women's Leadership Conference; Organizer, high school conferences on feminism

BAR ADMISSIONS
Ninth Circuit Court of Appeals; Eastern District of California, Northern District of California, Central District of California, District of Connecticut; California State Bar; New York State Bar; Connecticut State Bar

SELECTED AWARDS
2010 Public Justice Trial Lawyer of the Year Finalist (recognized as part of team litigating California prison overcrowding)
2012 National LGBT Bar Association Best LGBT Lawyers Under 40 Award

ADDITIONAL INFORMATION
Hometown:  Rockford, Illinois