# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| Estate of JOSHUA CLAYPOLE, deceased, by and through SILVIA GUERSENZVAIG, as Administrator; and SILVIA GUERSENZVAIG, individually, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF SAN MATEO, et al., <br><br> Defendants. | Case No.  14-cv-02730-BLF <br><br> **ORDER GRANTING DEFENDANT HALL'S MOTION FOR SUMMARY JUDGMENT; DENYING CITY OF MONTEREY'S MOTION FOR SUMMARY JUDGMENT; AND DENYING PLAINTIFFS' MOTION FOR LEAVE TO SUBSTITUTE DETECTIVE KRUSE AS A DOE DEFENDANT** <br><br> [Re:  ECF 97, 108] |

This action arises from the suicide of twenty-year old Joshua Claypole ("Claypole") while he was detained in a Monterey County Jail cell.  Plaintiffs are the Estate of Joshua Claypole, by and through Silvia Guersenzvaig (Claypole's mother) as Administrator, and Silvia Guersenzvaig individually ("Plaintiffs").  Plaintiffs have sued a number of public employees and agencies that had contact with Claypole in the days leading up to his death.  Before the Court are two motions: (1) a motion for summary judgment, brought by Defendants City of Monterey ("City") and City of Monterey Police Officer Brent Hall ("Hall"),[1] and (2) a motion for leave to substitute City of Monterey Detective Bryan Kruse ("Kruse") as a Doe defendant, brought by Plaintiffs.  The Court has considered the parties' briefing, the relevant legal authorities, and the oral argument that was presented at the hearing on November 12, 2015.  For the reasons discussed below, Defendant Hall's motion for summary judgment is GRANTED, Defendant City's motion for summary judgment is DENIED, and Plaintiffs' motion for leave to substitute Kruse as a Doe defendant is DENIED.

---

[1] City of Monterey Police Chief Philip Penko ("Penko"), also named as a defendant in this action in his official capacity, has not moved for summary judgment.  However, the parties have stipulated that the Court's ruling with respect to the City shall bind and have the same force and effect as to Defendant Penko.  *See* Stipulation and Order, ECF 145.

## I.   BACKGROUND[2]

Prior to the events giving rise to this action, Claypole had been under the care of various psychiatrists and psychologists.  Guersenzvaig Dep. 46:23-47:6, ECF 105-4.  On the afternoon of April 28, 2013, Claypole left his home in Big Sur, where he lived with his mother.  *Id.* 36:8-24. On April 30, 2013, he was arrested in Redwood City, California, on suspicion of driving under the influence.  Drug Influence Evaluation, Exh. 85 to Tajsar Decl, ECF 105-3.  Claypole's vehicle was towed and he was taken to the San Mateo County Jail.  Police Report (Bowers), Exh. 45 to Tajsar Decl., ECF 105-3.  The arresting officer characterized Claypole as confused, with a "blank spacey stare," stated that Claypole did not appear to understand what was happening, and indicated that Claypole responded incoherently to questions.  *Id.*

It is not clear when Claypole was released from the San Mateo County Jail, but on May 1, 2013, he appeared at the Community Hospital of Monterey Peninsula ("CHOMP"), where he previously had received treatment.  Martin Dep. 70:7-20, ECF 105-4; Guersenzvaig Dep. 49:17-50:3, ECF 105-4.  He told the receptionist that he was being chased by someone with a knife. Martin Dep. 70:12-20, ECF 105-4.  CHOMP employees asked Claypole to leave, which he did. Moises Dep. 71:2-72:23, ECF 105-4.  Claypole then went to a nearby Wells Fargo Bank, withdrew money, and asked a bank employee to call him a taxi.  Police Report (Zook), Exh. 12 to Tajsar Decl., ECF 105-2.  The bank employee later described Claypole as "out of it" and "in and out of consciousness."  *Id.*  Claypole took the taxi to a local rental car company and there he fatally stabbed the taxi driver.  Police Report (Kruse), Exh. 11 to Tajsar Decl., ECF 105-2.

Shortly thereafter, Seaside Police Department officers stopped Claypole, who was driving a stolen pickup truck, and detained him pending arrival of City police officers.  Police Report (Hall), Exh. 9 to Tajsar Decl., ECF 105-2.  City of Monterey Police Officer Hall arrived at the scene and placed Claypole in the rear of his patrol vehicle.  *Id.*  Hall transported Claypole to the City of Monterey Jail for booking.  *Id.*  The booking process included a screening and assessment of Claypole conducted by a Police Service Technician ("PST") named Philip Bitter ("Bitter").  *Id.*;

---

[2] The background facts contained in this section are undisputed.

1   Booking Information, Exh. 15 to Tajsar Decl., ECF 105-2.  Bitter documented the screening on

2   the City's booking form, which contains a "medical screening" section listing a series of 34

3   checkboxes describing various medical issues.  Booking Information, Exh. 15 to Tajsar Decl.,

4   ECF 105-2.

5   　　　While in Hall's patrol car, during booking, and after booking while waiting to be

6   interviewed by a detective, Claypole made a number of spontaneous utterances, including the

7   following:  "Can you ask for the injection?"; "I had to do it."; "He told me to do it.  He just

8   wouldn't die."; "Should I go?"; and "I should just take the injection."  Hall Dep. 62:16-24, 73:21-

9   25, ECF 105-4.  Claypole also asked Hall whether his mother would get his remains, said that he

10  wanted to die by lethal injection, and said that he wanted to have his body cremated.  *Id.* 74:8-13.

11  　　　Claypole was interviewed by City of Monterey Detective Kruse and Sergeant William

12  Clark.  Police Report (Kruse), Exh. 11 to Tajsar Decl., ECF 105-2; Video Footage of Interview,

13  Exh. 81 to Tajsar Decl. (manually filed).  Claypole's *Miranda* rights were read to him several

14  times because he kept indicating that he did not understand them.  Police Report (Kruse), Exh. 11

15  to Tajsar Decl., ECF 105-2.  Once the interview began, Claypole said that he was trying to decide

16  if he was going to take lethal injection.  Kruse Dep. 181:14-25, ECF 105-4.  Claypole also said he

17  had been hallucinating.  *Id.* 183:1-9.  Claypole stated that he took medication, including

18  prescriptions for anxiety, and that he had been up for forty-eight hours.  *Id.* 185:7-11, 191:4-7.

19  Kruse observed that some of Claypole's responses to questions were completely off topic.  *Id.*

20  194:2-12.  For example, when Kruse asked Claypole whether he had used controlled substances

21  recently, he responded, "You're telling me that they found the dead bodies?"  *Id.*  Kruse elected

22  not to complete the interview because of the difficulty getting straight answers out of Claypole,

23  which Kruse thought might be due to the influence of a controlled substance.  *Id.* 132:3-14.

24  　　　Kruse and City of Monterey Officer Jeremiah Ruttschow ("Ruttschow") transported

25  Claypole to CHOMP for a blood draw.  Kruse Dep. 133:16-134:6, ECF 105-4.  While at CHOMP,

26  Claypole became upset and wanted to see a manager.  *Id.* 137:5-24.  He refused to have blood

27  drawn, stating that the officers were trying to kill him.  *Id.* 138:1-23.  He also resisted efforts to get

28  him back to the squad car.  *Id.* 138:24-139:8.  Kruse and Ruttschow physically removed Claypole

United States District Court
Northern District of California

3

United States District Court
Northern District of California

1   from CHOMP, placed him in the squad car, and transported him back to the City jail.  *Id.* 139:5- 8;

2   Ruttschow Dep. 168:9-18, ECF 105-4.

3       At approximately 9:00 p.m. that evening, Ruttschow transported Claypole to Monterey

4   County Jail.  Ruttschow Dep. 169:10-23, ECF 105-4.  When an arresting agency transfers a

5   suspect to the Monterey County Jail, the arresting agency completes and provides a "Pre-Booking

6   Sheet"[3] to the County.  Jackson Dep. 70:24-72:21, ECF 105-4.  The Pre-Booking Sheet for

7   Claypole was completed by PST Bitter, who signed the sheet "Bitter for Kruse."  Pre-Booking

8   Sheet, Exh. 6 to Tajsar Decl., ECF 105-3.  Out of the listed descriptors for demeanor, Bitter

9   circled "calm," and out of the listed descriptors for speech, Bitter circled "slow."  *Id.*  The Pre-

10  Booking Sheet did not describe any of Claypole's aberrant behavior and did not indicate that he

11  might be suffering from a mental health issue.  *Id.*

12      Claypole was screened when he arrived at the Monterey County Jail.  Intake Health

13  Screening, Exh. 32 to Tajsar Decl., ECF 105-3.  The intake health screening form completed that

14  night has the "no" box checked for the questions:  "Does behavior suggest a danger to self or

15  others?" and "Does inmate appear to be under the influence of drugs or alcohol?"  *Id.*  The box on

16  the intake health screening form for "psychiatric problems" is not checked.  *Id.*

17      After Claypole was booked into the Monterey County Jail, he met with his defense

18  attorney, John Klopfenstein ("Klopfenstein").  Bass Dep. 188:2-9, Defs.' Exh. N, ECF 98-10;

19  McGregor Memo., Defs.' Exh. Q, ECF 98-11.  Following that meeting, Klopfenstein told jail

20  personnel that Claypole had stated that he wanted to kill himself.  McGregor Memo., Defs.' Exh.

21  Q, ECF 98-11.  Claypole was placed in a safety cell on suicide watch that night.  Kaye Dep. 83:7-

22  10, 126:10-127:25, Defs.' Exh. O, ECF 98-10.  He was taken off suicide watch the following

23  morning, on May 2, 2013.  *Id.* 98:18-21, 137:12-138:21.  Claypole was placed on suicide watch a

24  second time on May 3, 2013.  Safety Cell Log, Defs.' Exh. S, ECF 98-11.  He again was removed

25  from suicide watch on May 4, 2013.  Interrog. Responses, Defs.' Exh. T, ECF 98-11.  Later on

26  May 4, Claypole was discovered to have hanged himself in his cell.  Inmate Injury Report, Defs.'

27  ─────────────────

28  [3] Also referred to in the papers as a "Pre-Booking Form."

4

1    Exh. U, ECF 98-11.

2        Plaintiffs' operative first amended complaint ("FAC") asserts the following claims:  (1) a §

3    1983[4] claim for deliberate indifference to serious medical and mental health needs in violation of

4    the Fourteenth Amendment ; (2) a § 1983 claim for failure to protect from harm in violation of the

5    Fourteenth Amendment; (3) a § 1983 claim for deprivation of substantive due process in violation

6    of the First and Fourteenth Amendments (causing loss of parent/child relationship); (4) a

7    professional negligence/medical malpractice claim under California law; (5) failure to furnish

8    medical care under California law; (6) negligent supervision, training, hiring, and retention under

9    California law; and (7) wrongful death under California Code of Civil Procedure § 377.60.

10       The City and Officer Hall are defendants to the second claim for failure to protect from

11   harm in violation of the Fourteenth Amendment and the third claim for deprivation of substantive

12   due process under the Fourteenth Amendment.  They seek summary judgment as to both claims.

13   In their opposition to the City Defendants' motion for summary judgment, Plaintiffs indicate that

14   they intend to dismiss Hall based upon information gained in discovery.  Plaintiffs instead wish to

15   seek individual liability against City of Monterey Detective Kruse, and they have filed a motion

16   seeking leave to substitute Kruse as a Doe defendant.  That motion is opposed by the City

17   Defendants.

18   **II.    CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

19       **A.    Legal Standard**

20       "A party is entitled to summary judgment if the 'movant shows that there is no genuine

21   dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *City of*

22   *Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting Fed. R. Civ.

23   P. 56(a)).  "The moving party initially bears the burden of proving the absence of a genuine issue

24   of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex*

25   *Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "Where the non-moving party bears the burden of

26   proof at trial, the moving party need only prove that there is an absence of evidence to support the

27

28   ────────────────
     [4] 42 U.S.C. § 1983.

                                    5

United States District Court
Northern District of California

non-moving party's case." *Id.* "Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial." *Id.* "[T]he non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.* "The court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor." *City of Pomona*, 750 F.3d at 1049. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

### B.   Officer Brent Hall

As noted above, Plaintiffs have indicated their intention to dismiss Hall from this case. Plaintiffs have not offered any substantive opposition to Hall's motion for summary judgment. Accordingly, the motion for summary judgment is GRANTED as to Hall.

### C.   City of Monterey

"A government entity may not be held liable under 42 U.S.C. § 1983, unless a policy, practice, or custom of the entity can be shown to be a moving force behind a violation of constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658 (1978)). "Municipal liability may be established on account of the city's deliberate acts or omissions." *Conn v. City of Reno*, 591 F.3d 1081, 1102 (9th Cir. 2009), *vacated*, 131 S. Ct. 1812 (2011), *reinstated in part and vacated in part*, 658 F.3d 897 (9th Cir. 2011); *see also Long v. Cnty. of Los Angeles*, 442 F.3d 1178 (9th Cir. 2006) ("A policy can be one of action or inaction."). "Municipal liability for a failure to act requires a showing '(1) that a [municipal] employee violated the plaintiff's constitutional rights; (2) that the [municipality] has customs or policies that amount to deliberate indifference; and (3) that these customs or policies were the moving force behind the employee's violation of constitutional rights.'" *Conn*, 591 F.3d at 1102 (quoting *Long*, 442 F.3d at 1186) (alterations in original).

Claim 2 asserts that the City and its officers failed to protect Claypole from harm in

6

violation of the Fourteenth Amendment, *see* FAC ¶ 93, and Claim 3 asserts that Claypole's resulting death deprived Guersenzvaig of her liberty interest in the parent-child relationship in violation of her substantive due process rights under the Fourteenth Amendment, *see* FAC ¶ 99. The City seeks summary judgment on both claims, contending that no reasonable trier of fact could find for Plaintiffs on Claim 2, and that Claim 3 is wholly dependent on Claim 2.

### 1.      Claim 2 – Failure to Protect in Violation of Fourteenth Amendment

The Court thus begins its analysis with Claim 2, which alleges that the City and its officers "failed to take necessary precautions to ensure that Claypole would not harm himself or others after he communicated clearly suicidal thoughts to Monterey Police Department officers"; "failed to create minimally necessary policies and procedures for ensuring that other entities and municipalities were informed of suicide risks among Monterey Police Department arrestees who are transferred from their custody"; and "failed to adequately train and supervise officers to protect arrestees from harm." FAC ¶ 93.  At the hearing, Plaintiffs' counsel clarified that Plaintiffs' Fourteenth Amendment claim against the City is based upon their contention that the City lacks minimally necessary policies and procedures for identifying a detainee's mental health issues and responding to those issues appropriately by either transferring the detainee to a mental health facility or transmitting information regarding the detainee's mental health to the next custodian.

Applying the legal standard set forth above, the City may be liable on Claim 2 if (1) a City employee violated Claypole's rights under the Fourteenth Amendment, (2) the City has customs or policies that amount to deliberate indifference, and (3) those customs or policies were the moving force behind the City employee's violation of Claypole's Fourteenth Amendment rights.

### a.      City Employees' Violation of Fourteenth Amendment Rights

"The Eighth Amendment protects inmates from cruel and unusual punishment, which includes the denial of medical care." *Conn*, 591 F.3d at 1094.  "Pretrial detainees, by contrast, are protected under the Due Process Clause of the Fourteenth Amendment." *Id.*  Courts have borrowed from the Eighth Amendment jurisprudence to determine the minimum standard of care that must be given to a pretrial detainee under the Fourteenth Amendment.  *Id.*; *Simmons v. Navajo Cnty.*, 609 F.3d 1011, 1017 (9th Cir. 2010) ("Although the Fourteenth Amendment's Due

Process Clause, rather than the Eighth Amendment's protection against cruel and unusual punishment, applies to pretrial detainees, we apply the same standards in both cases.") (internal citation omitted); *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002) ("With regard to medical needs, the due process clause imposes, at minimum, the same duty as the Eighth Amendment imposes.").

"The Eighth and Fourteenth Amendments both guarantee that inmates and detainees receive constitutionally adequate medical and mental health care." *Conn*, 591 F.3d at 1094. "An official's deliberate indifference to a substantial risk of serious harm to an inmate – including the deprivation of a serious medical need – violates the Eighth Amendment, and a fortiori, the Fourteenth Amendment." *Id.*; *see also Gibson*, 290 F.3d at 1187 ("persons in custody have the established right to not have officials remain deliberately indifferent to their serious medical needs") (quotation marks, citation, and brackets omitted).

To set forth a constitutional claim under the Eighth Amendment – or, here, under the Fourteenth Amendment – a plaintiff must show (1) a serious medical need and (2) that an official's response to the need was deliberately indifferent. *Conn*, 591 F.3d at 1095; *see also Simmons*, 609 F.3d at 1017 ("We have long analyzed claims that correction facility officials violated pretrial detainees' constitutional rights by failing to address their medical needs (including suicide prevention) under a deliberate indifference standard.") (internal quotation marks and citation omitted). "The second prong requires both (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Conn*, 591 F.3d at 1095. Thus to make out a claim of deliberate indifference, a plaintiff must establish "serious medical need, indifference to that need, and harm caused by that indifference." *Id.*

Before turning the parties' evidence on these three elements, the Court briefly addresses the City's argument that it cannot be liable under a "special relationship" theory because the special relationship created by the City's custody of Claypole terminated when the City transferred custody of Claypole to Monterey County. *See* Defs.' Br. at 6-7, ECF 97. The City acknowledges that a special relationship existed during the period in which the City had custody of Claypole. *See DeShaney v. Winnebago Cnty. Dep't of Social Servs.*, 489 U.S. 189, 198 (1989) (recognizing

that although the Due Process clause generally does not confer an affirmative right to governmental aid, "the Eighth Amendment's prohibition against cruel and unusual punishment, made applicable to the States through the Fourteenth Amendment's Due Process Clause, requires the State to provide adequate medical care to incarcerated prisoners") (internal citation omitted). The City argues, however, that City officers' alleged knowledge that Claypole was a suicide risk did not create a continuing relationship after the City transferred custody to Monterey County. Plaintiffs do not assert the existence of a continuing relationship following transfer of Claypole's custody. *See* Pls.' Opp. at 17-18, ECF 105. Plaintiffs' theory of liability is that the City and its officers violated Claypole's Fourteenth Amendment rights by their deliberate indifference to his serious medical need *while* he was in the City's custody. That theory properly is evaluated under the standards set forth in *Conn, Simmons*, and *Gibson*, and discussed in detail below.

### i.    Serious Medical Need

A detainee has "a serious medical need if the failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Conn*, 591 F.3d at 1095 (internal quotation marks and citation omitted). "A heightened suicide risk or an attempted suicide is a serious medical need." *Id.*; *see also Simmons*, 609 F.3d at 1018 ("[W]e have previously recognized that a heightened suicide risk can present a serious medical need.").

The City argues that Claypole did not have a serious medical need while he was in the City's custody. *See* Defs.' Reply at 4-6, ECF 107. However, the Court has no difficulty concluding that a reasonable jury could find to the contrary. The evidence demonstrates that a reasonable inference could be drawn by the jury that Claypole was in the midst of a mental health crisis when he entered the City's custody. Claypole had a history of mental illness. *See* Guersenzvaig Dep. 46:23-47:6, ECF 105-4 (stating that Claypole had been under the care of various psychiatrists and psychologists). On April 28, 2013, he left his home in Big Sur for what would become a period of several days. *See id.* 36:8-24. When he was arrested two days later on suspicion of driving under the influence, he acted confused with a "blank spacey stare," did not appear to understand what was happening, and responded incoherently to questions. Police Report (Bowers), Exh. 45 to Tajsar Decl., ECF 105-3. On May 1, 2013, the date Claypole entered the

City's custody, he exhibited bizarre behavior at CHOMP, *see* Martin Dep. 70:7-20, and at Wells Fargo, *see* Police Report (Zook), Exh. 12 to Tajsar Decl., ECF 105-2.  Shortly thereafter, Claypole killed a man for reasons that remain unexplained.  Police Report (Kruse), Exh. 11 to Tajsar Decl., ECF 105-2.

While in the City's custody, Claypole made numerous statements to Officer Hall about dying by lethal injection, asking for lethal injection, and his mother getting his remains.  Hall Dep. 62:16-24, 73:21-25, 74:8-13, ECF 105-4.  Dr. W. Taylor Fithian, who provided mental health treatment to detainees at the Monterey County jail, testified that a patient's repeated statements of a desire to die and concern about what would happen to his remains are indicators of potential suicide risk.  Fithian Dep. 128:21-129:9, ECF 105-4.

Claypole exhibited other strange behavior as well.  After initially agreeing to a blood draw and being transported to a hospital for that purpose, Claypole became convinced that the blood draw actually was a lethal injection and he became so agitated that the blood draw could not be accomplished.  Kruse Dep. 133:16-134:6, 137:5-139:8, ECF 105-4; Ruttschow Dep. 168:9-18, ECF 105-4.  The video of Claypole's interview by Detective Kruse and Sergeant Clark is disturbing.  *See* Video Footage, Exh. 81 to Tajsar Decl. (manually filed).  At times during the interview Claypole did not seem to understand what was happening.  *Id.*  His responses to some questions were totally unrelated to what had been asked.  *Id.*  At various points during the interview Claypole stated that he had been awake for forty-eight hours, that he was hallucinating, and that he took prescription medications.  *Id.*

On the night of May 1, 2013, shortly after he had been transferred to the custody of Monterey County, Claypole told his lawyer that he wanted to kill himself.  McGregor Memo., Defs.' Exh. Q, ECF 98-11.  Claypole in fact hanged himself a few days later, on May 4, 2013.  Inmate Injury Report, Defs.' Exh. U, ECF 98-11.

Based upon this record, a reasonable trier of fact could conclude that Claypole was in the midst of a mental health crisis, and was a suicide risk, while he was in the City's custody on May 1, 2013.  The City attempts to distinguish this case factually from others in which a serious medical need was found, arguing for example that Claypole did not attempt to kill himself while in

1    custody as did the decedent in *Conn* and did not tell officers he was suicidal as did the decedent in

2    *Clouthier*.  *See Conn*, 591 F.3d at 1096 (decedent wrapped seatbelt around her neck in apparent

3    attempt to choke herself); *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1237 (9th Cir. 2010)

4    (decedent informed county mental health specialist that he was suicidal and had made prior suicide

5    attempts).

6           In *Clouthier*, it was undisputed that the decedent was at "substantial risk of serious harm."

7    *Clouthier*, 591 F.3d at 1244.  The question was whether the record contained sufficient evidence

8    from which a reasonable jury could conclude that the officers knew of and were deliberately

9    indifferent to that risk of harm.  *Id.*  Accordingly, *Clouthier* does not advance the City's argument

10   that Claypole did not have a serious medical need.  In *Conn*, the question of whether the decedent

11   had a serious medical need was disputed, and the court concluded that a reasonable jury could find

12   such a need "in light of all the circumstances."  *Conn*, 591 F.3d at 1096.  There is no indication in

13   the *Conn* decision that an actual suicidal attempt is required to establish a serious medical need.

14   Accordingly, because a reasonable jury evaluating all of the circumstances in this case could find

15   for Plaintiffs on this point, a triable issue of material fact exists as to whether Claypole had a

16   serious medical need while he was in the City's custody.

17           **ii.      Indifference to Serious Medical Need**

18           To demonstrate that the City's officers were indifferent to Claypole's serious medical

19   need, Plaintiffs "must show that the officers were (a) subjectively aware of the serious medical

20   need and (b) failed to adequately respond."  *Conn*, 591 F.3d at 1096 (citing *Farmer v. Brennan*,

21   511 U.S. 825, 838 (1994)).

22           **a.      Subjectively Aware**

23           In order to be subjectively aware of a serious medical need, an official "must both be

24   aware of facts from which the inference could be drawn that a substantial risk of serious harm

25   exists, *and* he must also draw the inference."  *Farmer*, 511 U.S. at 837 (emphasis added).  The

26   Court notes that the moving papers argue only the first part of this test, that Claypole's conduct

27   did not give rise to an inference that he was a suicide risk.  The moving papers do *not* argue that

28   the officers failed to draw the requisite inference.  Only in the reply brief does the City argue that

United States District Court
Northern District of California

11

1    Hall, Kruse, and Ruttschow – the officers who had the most contact with Claypole – did not

2    believe Claypole to be a suicide risk.  The reply brief cites the officers' deposition testimony as to

3    their subjective beliefs.  *See Hall Dep.* 72:19-75:3, 86:4-8, Defs.' Exh. W, ECF 107-4 (Hall did

4    not consider Claypole's conduct indicative of suicidal intent or desire but rather indicative of

5    knowledge that he had been caught and would be punished); Kruse Dep. 131:10-132:2, 139:25-

6    140:4, 182:2-7, Defs.' Exh. V, ECF 107-4 (Kruse did not consider Claypole to be a danger to

7    himself); Ruttschow Dep. 234:24-235:5, Defs.' Exh. X, ECF 107-4 (Ruttschow did not believe

8    Claypole was at risk for suicide).  Ordinarily, "where new evidence is presented in a reply to a

9    motion for summary judgment, the district court should not consider the new evidence without

10   giving the non-movant an opportunity to respond."  *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th

11   Cir. 1996) (internal quotation marks, citation, and brackets omitted).  However, Plaintiffs have not

12   objected to or otherwise challenged the City's introduction of the subject deposition testimony.

13   Their failure to do so waives any challenge to the admissibility of that evidence.  *See Getz v.*

14   *Boeing Co.*, 654 F.3d 852, 868 (9th Cir. 2011).

15        With respect to the City's argument that Claypole's behavior did not give rise to an

16   inference that he was at risk for suicide, the Court concludes that a reasonable jury could find to

17   the contrary.  As discussed above, during the City's custody of him, Claypole was fixated on the

18   idea of dying by lethal injection and what would happen to his remains.  *See Hall Dep.* 62:16-24,

19   73:21-25, 74:8-13, ECF 105-4.  Claypole acted strangely during his custodial interview and when

20   he was driven to the hospital for a blood draw.  *See* Video Footage, Exh. 81 to Tajsar Decl.

21   (manually filed); Kruse Dep. 133:16-134:6, 137:5-139:8, ECF 105-4; Ruttschow Dep. 168:9-18,

22   ECF 105-4.  That conduct certainly could be construed as indicative of a mental health crisis

23   involving suicidal ideation.

24        The City argues that Claypole's conduct did not indicate suicidal ideation but rather

25   suggested that "Claypole was resigned to the notion that the police and the court controlled his

26   fate, not himself."  Defs.' Br. at 9, ECF 97.  The City also argues that some of Claypole's conduct

27   – for example, refusing a blood draw because he feared it would kill him – showed that he did *not*

28   want to die.  *Id.*  The Court agrees that those inferences could have been drawn from the facts

United States District Court
Northern District of California

12

available to the officers.  However, an inference that Claypole was in the midst of a mental health crisis was equally plausible given Claypole's fixation on his own death and other behavior.

With respect to the City's argument that none of the officers actually drew the inference that Claypole was at risk of harming himself, the Ninth Circuit has held in a similar case that summary judgment on a deliberate indifference claim cannot be supported "simply on the basis of the defendants' assertions as to their own state of mind."  *Conn*, 591 F.3d at 1097.  In *Conn*, two police officers picked up a woman, Brenda Clustka, who was passed out drunk on the sidewalk. *Id.* at 1092.  While transporting Clustka to the county jail on a civil protective custody hold, the officers witnessed her wrap a seatbelt around her neck in an apparent attempt to choke herself.  *Id.* When the officers pulled over, unwrapped the seatbelt, and handcuffed her, Clustka screamed that the officers should kill her and that she would kill herself.  *Id.*  The officers did not report the incident to jail personnel when they handed off custody.  Clustka was held for several hours and then released.  *Id.* at 1093.  Clustka was arrested by other officers the following day.  Because she had been placed on suicide watch during a detention the previous month, Clustka was placed in the mental health unit in a red jumper to alert staff that she was a high risk detainee.  *Id.*  She was not placed on suicide watch.  *Id.*  She hanged herself with her bedsheet the following day.  *Id.* Clustka's children sued the police officers who witnessed the seatbelt incident for deliberate indifference to Clustka's serious medical need – her suicide risk – which they alleged caused her death.  *Id.* at 1094.

The Ninth Circuit reversed the district court's grant of summary judgment for the officers, holding that the officers' testimony that they did not subjectively believe Clustka to be a suicide risk was insufficient to establish their entitlement to judgment.  The court explained that "[p]roof of 'subjective awareness' is not limited to the purported recollections of the individuals involved." *Conn*, 591 F.3d at 1097.  Instead, the court stated, "[w]hether [an] official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence."  *Id.* (quoting *Farmer*, 511 U.S. at 842).  The court determined that a reasonable jury could conclude from the record evidence "that Clustka's medical need was so obvious that [the officers] must have been subjectively aware of it, despite

13

1    their later denial of that awareness." *Id.*  The court noted that "questions involving a person's state

2    of mind are generally factual issues inappropriate for resolution by summary judgment." *Id.* at

3    1098 (internal quotation marks and citation omitted).

4         In the present case, a reasonable jury likewise could conclude that Claypole's medical need

5    was so obvious that Hall, Kruse, and Ruttschow must have been subjectively aware of it despite

6    their later testimony to the contrary.  Particularly significant on this point is the evidence of

7    Claypole's utterances to Hall regarding lethal injection and the fate of his remains, and the

8    evidence of Claypole's behavior during his custodial interview with Kruse.  In the Court's view,

9    the videotape of the custodial interview is so chilling that it alone could support a jury's

10   determination that Kruse at least must have known that Claypole was in the midst of a mental

11   health crisis.[5]  Accordingly, a triable issue of material fact exists as to whether the City's officers

12   were subjectively aware of Claypole's serious medical need.

13                                  **b.        Failure to Respond**

14        In *Conn*, the Ninth Circuit concluded that the officers' failure to take Clustka to a medical

15   facility or to report her behavior to the next custodian – the county jail personnel – constituted a

16   failure to respond.  *Conn*, 591 F.3d at 1098.  The court noted that the defendant officers had not

17   argued that, if they were subjectively aware of Clustka's serious medical need, they nonetheless

18

19   [5] In addition to the evidence discussed above, Plaintiffs submit video footage taken from the on-

20   board dashboard camera in Officer Hall's squad car.  *See* Video Footage, Exh. 115 to Tajsar Decl.
     (submitted manually).  The footage shows Claypole being placed in the back of the squad car and

21   sitting there with his hands cuffed behind him while a conversation takes place off-camera.  In the
     off-camera conversation, one man is instructing another man to bag all of Claypole's clothing and

22   to take photographs of Claypole's hands "before he washes off all that blood." *Id.* 18:19-18:32.
     The man giving the instructions then tells the other man to "hang with him, make sure he doesn't

23   kill himself," and to "just hang with him, make sure he doesn't 5150 himself." *Id.* 18:32-18:52.
     Plaintiffs assert that the conversation was between another police officer and Hall and that it

24   shows Hall was put on notice that Claypole might be suicidal.  The City's objections the video
     footage are OVERRULED.  The City's argument that the video footage is unauthenticated is

25   without merit, as the City itself produced the footage to Plaintiffs during discovery, representing
     that it was true footage from Hall's squad car dashboard camera.  The City's argument that

26   Plaintiffs have not established the identities of the men in the conversation goes to the weight of
     the evidence rather than its admissibility.  The City's hearsay objection is without merit as the

27   evidence is not submitted for the truth of the matter – that Claypole actually was suicidal – but to
     show that Hall had notice of that possibility.  *See* Fed. R. Evid. 801 (precluding statements offered

28   to prove the truth of the matter asserted in statement).

United States District Court
Northern District of California

responded appropriately.  The City likewise has not argued in the present case that its officers' response was appropriate if they were subjectively aware of Claypole's serious medical need. Like the officers in *Conn*, Hall, Kruse, and Ruttschow failed to take Claypole to a mental health facility or to report his behavior to his next custodian, the County.

### iii.   Resulting Harm

The City argues that even if Plaintiffs could establish the other elements of a deliberate indifference claim, the officers' conduct could not have been the proximate cause of Claypole's death.  *See Clouthier*, 591 F.3d at 1245 n.3 ("to prevail on a § 1983 claim under a deliberate indifference theory, plaintiff must prove that the official's actions were both the actual and proximate cause of plaintiff's injuries") (citing *White v. Roper*, 901 F.2d 1501, 1505 (9th Cir. 1990)).  Specifically, the City contends that the actions of Monterey County in twice placing Claypole on, and then removing him from, suicide watch constituted a superseding cause that precludes any liability against the City.

In § 1983 actions, "[t]raditional tort law defines intervening causes that break the chain of proximate causation."  *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996) (citation omitted).  A defendant's conduct is not the proximate cause of the plaintiff's injury "if another cause intervenes and supersedes his liability for the subsequent events."  *White*, 901 F.2d at 1506. "However, 'foreseeable intervening causes . . . will not supersede the defendant's responsibility." *Conn*, 591 F.3d at 1101 (quoting *White*, 901 F.2d at 1506).  "If 'reasonable persons could differ' over the question of foreseeability, 'summary judgment is inappropriate and the question should be left to the jury.'"  *Id.* (quoting *White*, 901 F.2d at 1506).

A reasonable jury applying these standards to the facts of this case easily could find for the City on causation given the lapse of time between the City's custody and Claypole's death and Monterey County's actions in twice placing Claypole on and twice removing him from suicide watch.  However, *Conn* strongly suggests that it must be left to the jury to make that finding.  As in the present case, the officers in *Conn* interacted with Clustka several days before her suicide. Clustka was medically evaluated three times after the choking incident and each time determined not to be at risk of suicide.  *Conn*, 591 F.3d at 1101.  The *Conn* court was not persuaded that those

United States District Court
Northern District of California

1    medical evaluations constituted a superseding cause, noting that "[w]hen medical examiners have

2    insufficient information about the patient they are diagnosing, they are likely to give an inaccurate

3    diagnosis." *Id.*  The court held that by failing to pass on relevant information, the officers

4    foreseeably undermined Clustka's access to effective medical evaluations and adequate mental

5    health care. *Id.*  The court concluded that notwithstanding the later medical evaluations, a jury

6    could conclude that the officers' failure to take action following the seatbelt incident "was a

7    moving force and proximate cause of Clustka's suicide." *Id.*

8        A jury similarly could conclude in the present case that the officers' failure to pass on

9    information regarding Claypole's behavior could have impaired the medical evaluations that

10   foreseeably were performed by Monterey County.  Dr. Fithian, the doctor who was responsible for

11   taking Claypole off suicide watch both times, testified that he was not aware that Claypole had

12   asked City officers about lethal injection, asked City officers what would happen to his remains, or

13   told City officers that he had been hallucinating.  Fithian Dep. 127:14-128:12, ECF 105-4.  When

14   asked whether that information would have made a difference to his assessment of Claypole's risk

15   of suicide, Dr. Fithian stated that "[e]very little bit of information is certainly – can be important."

16   *Id.* 128:13-17.  Dr. Fithian also testified that a patient's repeated statements of a desire to die and

17   concern about what would happen to his remains are indicators of risk for suicide.  *Id.* 12:1-9.

18       Thus while a jury ultimately may be persuaded at trial that Monterey County's conduct

19   was a superseding cause that precludes liability on the part of the City, the Court concludes that it

20   must be left to the jury to make that determination.  Because a reasonable jury could conclude that

21   the City officers' observations regarding Claypole's behavior would have made a difference to the

22   County's evaluation of Claypole's suicide risk, there is a triable issue of material fact which

23   precludes summary judgment on the issue of causation.

24                          **b.    Policy Amounting to Deliberate Indifference**

25       The Ninth Circuit has held that a lack of affirmative policies or procedures to guide

26   employees can amount to deliberate indifference even when other general policies are in place.

27   *See, e.g., Long*, 442 F.3d at 1189; *Gibson*, 290 F.3d at 1195-96.  "[W]hen the need to remedy the

28   omission 'is so obvious, and the inadequacy is so likely to result in the violation of constitutional

United States District Court
Northern District of California

16

rights, . . . the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" *Gibson*, 290 F.3d at 1195 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).  "The need to act may be obvious because any reasonable person would recognize the need." *Id.*  "Unlike the deliberate indifference standard used to determine if a violation of a detainee's rights to receive medical care took place, this standard does not contain a subjective component." *Id.*  "[T]he *Canton* standard assigns liability even when a municipality has constructive notice that it needs to remedy its omissions in order to avoid violations of constitutional rights." *Id.* at 1187 n.8; *see also Connick v. Thompson*, 563 U.S. 51, 1360 (2011) (holding that in the context of failure to train, a city may be deemed deliberately indifferent if its policymakers choose to retain a program despite "actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights").[6]

The City argues that its policies and procedures for addressing detainees' mental health needs are constitutionally adequate.  The City first points to its "Booking and Approval and Prisoner Release Policy," which at the time in question provided in relevant part that:

> Upon arrest, the investigating officer shall visually inspect and question the prisoner to determine if there are any obvious signs of injury, illness or preexisting illness requiring immediate medical attention. This includes extreme intoxication or narcotic influence.

> If any are found, the arresting officer shall immediately call emergency medical personnel to either treat the person in the field or transport to the hospital, depending upon the circumstances. The Watch Commander shall be notified immediately. . . .

> The Field Supervisor should make every attempt to meet an officer at the jail

> following each arrest to approve the booking and verify the arrestee does not require medical treatment prior to entry into the jail.  This can be done as part of the

---

[6] At the hearing, the Court asked the parties to submit supplemental briefing on the standard applicable to the deliberate indifference claim against the City in light of the Ninth Circuit's recent decision in *Castro v. Cnty. of Los Angeles*, 797 F.3d 654 (2015).  The Court read *Castro* to require that a municipality have actual knowledge that its policy caused a substantial risk of serious harm to inmates and to preclude liability based upon constructive knowledge.  Following the submission of the requested supplemental briefing, *en banc* review of the panel decision was granted.  *See Castro v. Cnty. of Los Angeles*, No. 12-56829, 2015 WL 9596184 (Dec. 28, 2015).  The panel decision may not be cited pending *en banc* review.  *See id.*  The Court thus applies the actual or constructive notice standard articulated above.

United States District Court
Northern District of California

1   normal booking process.

2   Once at the jail, the Police Service Technician (PST) shall promptly review any
    prior booking history in Net RMS involving the individual to determine if there
3   were prior preexisting medical conditions (i.e. delirium tremens, etc.) for which the
    arrestee was treated.  If such conditions are found, the PST shall notify the
4   Watch Commander who shall determine if a medical clearance is required prior to
    booking.

5

6   Defs.' Exh. H.

7       The City also cites to its Prisoner Transport Policy, which sets forth guidelines regarding

8   the logistics of transporting prisoners, including use of handcuffs, seating, and the maximum

9   number of prisoners that may be transported in one vehicle, *see* Defs.' Exh. I; the Pre-Booking

10  Sheet that accompanies detainees when they are transferred to Monterey County, *see* Defs.' Exh.

11  E; and its Operations Manual, containing a Medical Evaluation and Treatment Policy, *see* Defs.'

12  Exh. J.

13      Plaintiffs point out that none of these policies requires any evaluation of detainees for

14  mental health issues by a medical professional, and in fact no medical professional does evaluate

15  detainees held by the City.  *See* Jackson Dep. 68:3-70:6, 89:7-10, 98:12-19, ECF 105-4.

16  Moreover, Plaintiffs argue that the mental health assessment performed by PSTs is cursory and

17  wholly inadequate to identify detainees at risk for suicide.  Out of 34 check-boxes, only two relate

18  to mental health, one of which asks "Ever tried to hurt self?" while the other is simply labeled

19  "Mental" with a small space for notes.  Booking Information, Exh. 15 to Tajsar Decl., ECF 105-2.

20  Officer Hall's camera captured the audio of Claypole's screening by PST Bitter, which was fairly

21  cursory.  *See* Video Footage, Exh. 115 to Tajsar Decl. (submitted manually).

22      The "duty to provide medical care encompasses detainees' psychiatric needs." *Gibson*,

23  290 F.3d at 1187.  "Whether a local government has displayed a policy of deliberate indifference

24  to the constitutional rights of its citizens is generally a jury question." *Id.* at 1194-95.  For

25  example, in *Gibson*, the wife of a mentally ill detainee who died in a county jail brought a

26  deliberate indifference claim asserting in part that the county lacked a policy directing the nurse

27  who took control of prescription medications found on incoming detainees to consider those

28  medications in evaluating the detainees' mental health needs.  The Ninth Circuit held that county

United States District Court
Northern District of California

18

policymakers actually knew that some detainees who arrived at the jail would have urgent medical and mental health needs, as evidenced by the policies that the county had in place.  *Id.* at 1195. The court held that given that knowledge, the county's omission in policy could well result in a constitutional violation, particularly given another county policy forbidding medical evaluations on incoming detainees who are combative.  *Id.*  The court concluded that whether the county's policy amounted to deliberate indifference must go to a jury, noting that "[w]hen policymakers know that their medical staff members will encounter those with urgent mental health needs yet fail to provide for the identification of those needs, it is obvious that a constitutional violation could well result."  *Id.* at 1196.

Applying that rationale to the present case, the Court concludes that there are triable issues which must be resolved by a jury as to whether the City's failure to implement more rigorous mental health screening, or to require transmission of detainees' mental health information to the next custodian, amounted to deliberate indifference.

### c.   Policy as Moving Force

"For a policy to be the moving force behind the deprivation of a constitutional right, the identified deficiency in the policy must be 'closely related to the ultimate injury.'"  *Long*, 442 F.3d at 1190 (quoting *Gibson*, 290 F.3d at 1196).  "The plaintiff's burden is to establish that the injury would have been avoided had proper policies been implemented."  *Id.* (internal quotation marks and citation omitted).  The City does not argue this element of Plaintiffs' claim.

### 2.   Claim 3 – Loss of Parent/Child Relationship in Violation of Fourteenth Amendment

Parents may assert a Fourteenth Amendment substantive due process claim if they are deprived of their liberty interest in the companionship of their child through official conduct. *Lemire v. Cal. Dep't of Corr. and Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013).  "Only official conduct that shocks the conscience is cognizable as a due process violation."  *Id.* (internal quotation marks and citation omitted).  "Just as the deliberate indifference of prison officials may support Eighth Amendment liability, such indifference may also rise to the conscience-shocking level required for substantive due process violation."  *Id.* (internal quotation marks and citation

19

1   omitted).  "A prison official's deliberately indifferent conduct will generally shock the conscience

2   so as long as the prison official had time to deliberate before acting or failing to act in a

3   deliberately indifferent manner."  *Id.* (internal quotation marks and citation omitted).

4        The City seeks summary judgment on Claim 3 based upon its assertion that it is entitled to

5   summary judgment on Plaintiffs' deliberate indifference claim set forth in Claim 2.  As discussed

6   above, triable issues of material fact preclude summary judgment on Claim 2.  As a result, the City

7   has failed to establish that it is entitled to summary judgment on Claim 3.

8   **III.   PLAINTIFFS' MOTION TO SUBSTITUTE DETECTIVE KRUSE AS DOE**

9        Although Plaintiffs have elected not to pursue their § 1983 claims against Officer Hall,

10   they wish to substitute Detective Kruse as a Doe defendant so that they may pursue § 1983 claims

11   against him individually.  As discussed below, substitution of a new defendant in place of a Doe

12   defendant is a state law concept that permits the claims against the new defendant to "relate back"

13   to the filing of the original complaint.

14        **A.     Relation Back Under State Law**

15        Where, as here, state law provides the applicable statute of limitations,[7] an amended

16   complaint may relate back to the filing of the original complaint if it satisfies either state or federal

17   law on relation back.  *Butler v. Nat'l Cmty. Renaissance of Cal.*, 766 F.3d 1191, 1200 (9th Cir.

18   2014).  Under California law, "[t]he general rule is that an amended complaint that adds a new

19   defendant does not relate back to the date of filing the original complaint and the statute of

20   limitations is applied as of the date the amended complaint is filed, not the date the original

21   complaint is filed."  *Woo v. Sup. Ct.*, 75 Cal. App. 4th 169, 176 (1999); *see also Butler*, 766 F.3d

22   at 1201.  An exception to that general rule permits a plaintiff to substitute a new defendant for a

23   fictitious Doe defendant named in the original complaint.  *Woo*, 75 Cal. App. 4th at 176.

24   However, in order to come under that exception the plaintiff must have been "genuinely ignorant"

25   of the new defendant's identity at the time the plaintiff filed the original complaint.  *Id.* at 177.

26

27   ─────────────────

28   [7] Because § 1983 does not contain its own statute of limitations, claims brought under that statute
     are governed by California's statute of limitations for personal injury claims, which is two years.
     *Butler v. Nat'l Cmty. Renaissance of Cal.*, 766 F.3d 1191, 1198 (9th Cir. 2014).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    At the hearing, Plaintiffs' counsel argued that Plaintiffs tried to act responsibly by naming

2 only Hall in their initial complaint and refraining from a scattershot approach of naming all

3 officers mentioned in the police reports.  Counsel asserted that they were not convinced that Kruse

4 was a proper defendant until they deposed him in August 2015.  While it appreciates the motive

5 articulated by counsel, the Court is at a loss to understand why counsel did not feel that Plaintiffs

6 had enough information to assert a claim against Kruse based upon his police report, which

7 Plaintiffs admittedly had before filing their original complaint in June 2014.  Kruse's report,

8 which is seventeen pages long, provides extensive detail regarding his interaction with Claypole

9 on May 1, including the highlights of his interview with Claypole and an account of his trip to the

10 hospital with Claypole for the ultimately unsuccessful blood draw.  That report contained all the

11 information necessary to identify Kruse and his role in the case.

12    The Court notes that Plaintiffs' counsel acknowledged at the hearing that Plaintiffs

13 received the video footage of Kruse's custodial interview of Claypole in March 2015.  As

14 discussed above, that footage is among the most compelling evidence in the record that Claypole

15 was having a mental health crisis.  Yet Plaintiffs waited more than six more months after receiving

16 the video footage to file the present motion.  The fact that Plaintiffs waited so long even after

17 receiving the video footage undermines their representation that their delay in seeking to add

18 Kruse was caused by their ignorance of facts sufficient to put them on notice of their claim against

19 him.

20    Because Plaintiffs had Kruse's police report when they filed the original complaint, they

21 do not satisfy the requirements for relation back under state law.  *See Butler*, 766 F.3d at 1202

22 (plaintiff's addition of new defendants did not relate back under California law because plaintiff

23 "was not ignorant" of their names or identities at the time the original complaint was filed).

24    **B.    Relation Back Under Federal Law**

25    Nor do Plaintiffs satisfy the requirements for relation back under federal law, which is set

26 forth in Federal Rule of Civil Procedure 15(c).  Under that rule, an amended pleading relates back

27 to the filing of the original complaint if the following requirements are met:  "(1) the basic claim

28 must have arisen out of the conduct set forth in the original pleading; (2) the party to be brought in

must have received such notice that it will not be prejudiced in maintaining its defense; (3) that party must or should have known that, but for a mistake concerning identity, the action would have been brought against it." *Butler*, 766 F.3d at 1191.  Relation back under the federal rule thus "depends on what the party to be added knew or should have known, not on the amending party's knowledge or its timeliness in seeking to amend the pleading." *Krupski v. Costa Crociere*, 560 U.S. 538, 541 (2010).

This action was filed in June 2014, a year and a half before Plaintiffs filed the present motion.  Kruse states in a declaration that he became aware of the lawsuit, and the fact that Officer Hall had been named as an individual defendant, in June 2014.  Kruse Decl. ¶ 6, ECF 114-1. Kruse "took a keen interest" in the lawsuit because he was the detective assigned to investigate the murder.  *Id.*  Kruse knew that he had prepared a lengthy police report setting forth his interactions with Claypole and his involvement in the investigation.  *Id.* ¶ 9.  Kruse thought that Plaintiffs could have and would have named him in the initial complaint had they wished to pursue claims against him.  *Id.*  Plaintiffs have not presented evidence suggesting that Kruse had any reason to believe that he would have been named as a defendant in the original complaint "but for a mistake concerning identity."

## C.    Amendment Under Rule 15(a)

In the event that the Court denies their request to substitute Kruse as a Doe defendant, Plaintiffs request leave to amend to add Kruse as a defendant under Federal Rule of Civil Procedure 15(a).  While a court should freely grant leave to amend when justice requires, Fed. R. Civ. P. 15(a)(2), leave need not be granted where amendment:  "(1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile." *AmerisourceBergen Corp. v. Dialysist West, Inc.*, 465 F.3d 946, 951 (9th Cir. 2006) (citation omitted).  The City argues that amendment to add Kruse would be futile because, absent relation back, Plaintiffs' proposed claims against Kruse are time-barred.

Plaintiffs' proposed § 1983 claims are subject to a two-year statute of limitations.  *See Butler*, 766 F.3d at 1198.  Claypole hanged himself on May 4, 2013.  If Plaintiffs' § 1983 claims against Kruse accrued on that date, the statute of limitations expired on May 4, 2015.  Plaintiffs

United States District Court
Northern District of California

1  assert that their claims against Kruse did not accrue until "the breadth of his involvement in

2  Claypole's arrest and custody were revealed during discovery."  Pls.' Reply at 4, ECF 115.

3  Plaintiffs rely on *Lukovsky*, *Wallace*, *Kubrick*, and *Davis*, ignoring that in each of those cases the

4  court found that the plaintiff's claims were time-barred.

5      Plaintiffs state accurately that federal law determines when a civil rights claim accrues.

6  *See Wallace v. Kato*, 549 U.S. 384, 388 (2007).  However, Plaintiffs fail to identify the actual

7  standards set forth by the Supreme Court and the Ninth Circuit.  Specifically, Plaintiffs ignore the

8  requirement of diligence in pursuing discovery of fault and instead rely on "stray remarks" from

9  the cited cases which do not address the issue at hand.  *See Lukovsky v. City & Cnty. of San*

10  *Francisco*, 535 F.3d 1044, 1051 (9th Cir. 2008).

11      Plaintiffs rely on *United States v. Kubrick*, 444 U.S. 111 (1979), a medical malpractice

12  case arising under the Federal Tort Claims Act in which the Supreme Court determined that:

13      We thus cannot hold that Congress intended that "accrual" of a claim must await
14      awareness by the plaintiff that his injury was negligently inflicted.  A plaintiff such
        as Kubrick, armed with the facts about the harm done to him, can protect himself
15      by seeking advice in the medical and legal community.  To excuse him from
        promptly doing so by postponing the accrual of his claim would undermine the
16      purpose of the limitations statute, which is to require the reasonably diligent
        presentation of tort claims against the Government.

17  *Id.* at 123 (footnote omitted).

18      In *Davis v. United States*, 642 F.2d 328 (9th Cir. 1981), the Ninth Circuit applied *Kubrick*

19  to bar the action as untimely, holding that "[i]n the absence of fraudulent concealment it is

20  plaintiff's burden, within the statutory period, to determine whether and whom to sue.  Kubrick

21  makes this plain."  *Id.* at 331.

22      In *Lukovsky*, the Ninth Circuit affirmed dismissal of an employment discrimination action,

23  holding that "a claim accrues under federal law when the plaintiff knows or has reason to know of

24  the actual injury."  *Lukovsky*, 535 F.3d at 1048.  Nothing in the *Lukovsky* decision supports

25  Plaintiffs' contention that there would be a separate accrual date for each potential individual

26  defendant where it was known on the date of the injury – termination in the *Lukovsky* case – that

27  the employer was the cause of the injury.  Moreover, to allow such a floating accrual date would

28  fly in the face of the Supreme Court's admonition:  "Were it otherwise, the statute would begin to

1    run only after a plaintiff became satisfied that he had been harmed enough, placing the supposed

2    statute of repose in the sole hands of the party seeking relief." *Wallace*, 549 U.S. at 391.

3         Entirely absent from the proposed amended complaint and Plaintiffs' argument is any

4    showing of diligence on their part in discovering Kruse's role in the case or any concealment by

5    the City.  Plaintiffs' reliance on the timing of discovery responses is insufficient.  No explanation

6    is offered why Plaintiffs delayed until late 2014 to seek written discovery and until August 2015 to

7    depose Kruse.  The evidence shows that within a few days of her son's death, Ms. Guersenzvaig

8    spoke to Kruse and learned that he was investigating the murder Claypole was alleged to have

9    committed.  Police Report (Kruse) at 13-15, Defs.' Exh. A, ECF 114-3.  As noted above, Plaintiffs

10   also had obtained a copy of Kruse's police report, documenting Kruse's substantial contact with

11   Claypole, prior to filing the original complaint.  Under these circumstances there is no evidence of

12   diligence sufficient to delay the accrual of Plaintiffs' claims against Kruse.

13        Because Plaintiffs' proposed claims against Kruse are time-barred and thus futile,

14   amendment is not warranted under Rule 15(a).

15        **D.   Conclusion**

16        Plaintiffs' proposed § 1983 claims against Kruse are time-barred and Plaintiffs do not

17   satisfy the requirements for relation back under either state or federal law.  Accordingly, their

18   motion to substitute Kruse as a Doe defendant or, alternatively, for leave to amend the complaint

19   is DENIED.

20   **V.   ORDER**

21        For the foregoing reasons, IT IS HEREBY ORDERED that:

22        (1)    Defendant Hall's motion for summary judgment is GRANTED;

23        (2)    Defendant City of Monterey's motion for summary judgment is DENIED; and

24        (3)    Plaintiffs' motion for leave to substitute Detective Bryan Kruse as a Doe defendant

25                is DENIED.

26

27   Dated:  January 12, 2016

28                                          _____
                                           BETH LABSON FREEMAN
                                           United States District Judge

United States District Court
Northern District of California

24