UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSHUA CLAYPOLE, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>COUNTY OF MONTEREY, et al.,<br><br>    Defendants. | Case No. 14-cv-02730-BLF<br><br>**ORDER GRANTING MOTION FOR SANCTIONS AND TO COMPEL DISCOVERY**<br><br>**(Re: Docket No. 122)** |

The Northern District's Guidelines for Professional Conduct are just that: guidelines. They only "encourage[]" counsel to comply with them, and the court "does not anticipate that these Guidelines will be relied upon as the basis for a motion." A one-off lapse, then, may not be a big deal. Attorneys are people, and people make mistakes. But where, as here, an attorney repeatedly and unapologetically flouts guideline after guideline, it is a big deal—and the court has little choice but to do something about it.

Plaintiffs Silvia Guersenzvaig and the Estate of Joshua Claypole move to compel and for sanctions against Defendants California Forensic Medical Group and Taylor Fithian.[1] They cite numerous violations by Defendants' counsel, Peter Bertling, of not just the Guidelines for Professional Conduct, but also the Federal Rules of Civil Procedure and an order to follow those Rules. Defendants' opposition consists only of a declaration from Bertling that fails to explain, let alone excuse, his conduct.[2]

Discovery is hard enough, even without conduct like that outlined below. Plaintiffs' motion is GRANTED.

---

[1] *See* Docket No. 122.

[2] *See* Docket No. 133.

1
Case No. 14-cv-02730-BLF
ORDER GRANTING MOTION FOR SANCTIONS AND TO COMPEL DISCOVERY

## I.

This court has jurisdiction under 28 U.S.C. §§ 1331, 1343 and 1367. The undersigned was assigned discovery matters in this case pursuant to Fed. R. Civ. P. 72(a).

## II.

"A lawyer should promptly and completely comply with all discovery requirements of the Federal Rules of Civil Procedure."[3] In addition, "[a] lawyer should not delay producing documents to prevent opposing counsel from inspecting documents prior to scheduled depositions or for any other tactical reason."[4]

Plaintiffs deposed Defendants' expert, Dr. Richard Hayward, on October 16.[5] Along with the notice of deposition, Plaintiffs asked Hayward to produce all the documents he reviewed, relied on or created in the process of writing his report.[6] At the deposition, Bertling presented a physically cracked and unusable disc.[7] When Plaintiffs' counsel informed him of the problem, Bertling promised to send over the documents digitally the same day.[8]

That production did not happen for another six weeks. Despite Bertling's assurances, Defendants sent nothing over on October 16, the date of the deposition.[9] Even after Plaintiffs' counsel again prodded Bertling, on October 21, Defendants emailed four documents—Hayward's expert report, Plaintiffs' expert disclosure, Plaintiffs' expert report and certain emails between Hayward and Defendants' counsel—that they knew Plaintiffs already had.[10]

---

[3] N.D. Cal. Guidelines for Professional Conduct, § 9.

[4] *Id.*

[5] *See* Docket No. 122-1, Ex. D.

[6] *See id.*, Ex. A at 2-5.

[7] *See id.*, Ex. C.

[8] *See id.*, Ex. D at 8:1-18.

[9] *See* Docket No. 122-1 at ¶ 5.

[10] *See id.* at ¶ 7; *id.*, Ex. E.

When Plaintiffs' counsel protested that the production was obviously incomplete, Bertling responded on October 26, "What do you believe we should be producing that has not already been produced? You already have many of the documents referred to by Dr. Hayward in his report."[11] Plaintiffs' counsel again reminded Bertling that "[t]he request for production included, inter alia, requests for all materials relied upon by Dr. Hayward . . . , notes from his jail visits, incident reports reviewed, as well as specific documents he referenced that had not previously been produced to Plaintiffs."[12] This time, Bertling did not answer at all, and Hayward produced nothing further.[13]

With no other recourse available, on November 10, Plaintiffs moved under Fed. R. Civ. P. 37(a)(1) to compel Hayward to produce the documents.[14] Almost two weeks later, Bertling's colleague finally wrote to Plaintiffs' counsel that the broken disc had contained a number of documents that Defendants believed Plaintiffs already had, but that Defendants could produce them again if necessary.[15] But the very next day, Bertling filed his opposing declaration, in which he said that he had "recently learned" that Hayward did have some paper notes that Plaintiffs had not received before.[16] He promised that Hayward would produce those notes by December 4.[17] Those notes, along with sign-in sheets for training sessions that Hayward relied on but Plaintiffs had never seen, finally arrived on December 8—the day after Plaintiffs had to submit their opposition to Defendants' motion for summary judgment.[18] Bertling offered no explanation,

---

[11] *Id.*, Ex. E.

[12] *Id.*

[13] *See* Docket No. 122-1 at ¶ 7.

[14] *See* Docket No. 122.

[15] *See* Docket No. 139-2.

[16] Docket No. 133 at ¶ 2.

[17] *See id.* at ¶ 3.

[18] *See* Docket Nos. 124, 142.

3
Case No. 14-cv-02730-BLF
ORDER GRANTING MOTION FOR SANCTIONS AND TO COMPEL DISCOVERY

either in his declaration or at the hearing on this motion, for Defendants' delay.[19]

Plaintiffs also seek to depose Hayward again so that Plaintiffs can ask him about the newly produced documents. Remarkably, despite this record of delay, Defendants object to the need for any further deposition. Their arguments are not persuasive.

Hayward's notes and the information about the training sessions certainly could have given rise to questions that Plaintiffs never got to ask at the first deposition. Defendants shall therefore make Hayward available for four more hours of deposition on any documents produced after the initial deposition within 14 days of this order. Plaintiffs are further awarded any fees and costs associated with taking the new deposition and filing this motion. And at least 7 days before the new deposition, Hayward must produce any remaining documents that he relied on and that are reasonably available to him or Defendants. This includes the sign-in sheets from training sessions as well as incident reports and other documents, to the extent Hayward has access to them and has not produced them already. Defendants have represented that Plaintiffs already have all the documents that were on the broken disc.[20] If that is true, and confirmed in a sworn declaration, Hayward need not produce them again. However, Hayward must identify specifically any documents that he relied on but can no longer access.

### III.

"A lawyer representing a deponent or another party should limit objections to those that are well founded and necessary for the protection of his or her client's interest."[21] "An objection must be stated concisely in a nonargumentative and nonsuggestive manner."[22] "Once a question is

---

[19] *See* Docket No. 133 at ¶¶ 2-3.

[20] *See* Docket No. 139-2.

[21] N.D. Cal. Guidelines for Professional Conduct, § 9.

[22] Fed. R. Civ. P. 30(c)(2); *see also Sec. Nat'l Bank of Sioux City v. Day*, 800 F.3d 936 (8th Cir. 2015) (citing Fed. R. Civ. P. 30(c)(2) advisory committee's note to 1993 amendment) ("[A]rgumentative objections, suggestive objections, and directions to a deponent not to answer, improperly disrupt, prolong, and frustrate deposition testimony.").

asked, a lawyer should not coach the deponent or suggest answers, whether through objections or other means."[23] "A lawyer should not direct a deponent to refuse to answer a question unless the question seeks privileged information, is manifestly irrelevant, or is calculated to harass."[24]

Bertling repeatedly ignored these standards. Plaintiffs' motion quotes dozens of deposition excerpts that show Bertling making extremely long speaking objections,[25] coaching witnesses,[26]

---

[23] N.D. Cal. Guidelines for Professional Conduct, § 9; *see also Funk v. Town of Paradise*, Case No. 09-cv-01000, 2011 WL 2580357, at *2 (E.D. Cal. June 28, 2011) (sanctioning counsel for "appalling" behavior where counsel "repeatedly interrupted the proceedings, interjected editorial comments, and coached or suggested information to the witnesses"); *Cotton v. City of Eureka*, Case No. 08-cv-04386, 2010 WL 2889498, at *1-3 (N.D. Cal. July 22, 2010) (noting that an attorney had violated Rule 30(c)(2) when she "interposed improper coaching objections and improper speaking objections"); *BNSF Ry. Co. v. San Joaquin Valley Ry. Co.*, Case No. 08-cv-01086, 2009 WL 3872043, at *4 (E.D. Cal. Nov. 17, 2009) ("[C]ounsel for the witness being deposed is prohibited from acting as an intermediary, interpreting questions, assisting the deponent with formulation of the answers, or deciding which questions should be answered.").

[24] N.D. Cal. Guidelines for Professional Conduct, § 9.

[25] *See, e.g.*, Docket No. 122-1, Ex. D at 119:11-21 ("Q. So in your opinion, is Dr. Fithian reporting what Mr. Claypole was stating, or is Dr. Fithian making a clinical judgment that Mr. Claypole was stable? MR. BERTLING: Lacks foundation. Calls for speculation. Dr. Fithian could have been asking a number of questions that caused him to come to that conclusion."); *id.*, Ex. G at 79:19-80:6 ("Q. Are you familiar with the September 28th, 2014, suicide of Mikol Stewart in Sonoma County Jail? A. What jail? Q. Sonoma County Jail. MR. BERTLING: So we are not going to go through any other suicides. We are here today for the treatment and care that he provided to Mr. Claypole. That's what this deposition was for. The Court has allowed you to have a second—another deposition where that information was covered. We are not going to go over that today. You've asked nothing about Mr. Claypole, and it's about time that you did."); *id.* at 174:2-7 ("Q. Are you aware of whether any corrective action plan was identified or followed? MR. BERTLING: Lacks foundation that there was a need for any such corrective action plan to be identified or followed following the peer review of this case."); *id.*, Ex. H at 62:23-63:8 ("Q: . . . Do you know how, either specifically for this contract or in general, CFMG would come to the determination of putting in a specific time frame like that in a specific county? MR BERTLING: Well, let me just object that it's vague and ambiguous. Calls for speculation. This is also a juvenile facility as opposed to an adult facility with different titles and statutes that may be involved. But if you understand the question and can answer, please do, Dr. Fithian."); *see also* Docket No. 122 at 6-10 (quoting other examples).

[26] *See, e.g.*, Docket No. 122-1, Ex. D at 119:15-21 ("Q. So in your opinion, is Dr. Fithian reporting what Mr. Claypole was stating, or is Dr. Fithian making a clinical judgment that Mr. Claypole was stable? MR. BERTLING: Lacks foundation. Calls for speculation. Dr. Fithian could have been asking a number of questions that caused him to come to that conclusion."); *id.*,

5
Case No. 14-cv-02730-BLF
ORDER GRANTING MOTION FOR SANCTIONS AND TO COMPEL DISCOVERY

cutting off witnesses[27] and even answering for them.[28]  Bertling makes no attempt to defend any of this conduct.[29]

Rule 30(d)(2) allows a court to "impose an appropriate sanction—including the reasonable expenses and attorney's fees incurred by any party—on a person who impedes, delays, or

---

Ex. G at 139:9-141:22 (showing Bertling handing the witness a document to "help him respond" to a question); *id.* at 221:1-9 ("Q.  Did you do any of that in Joshua Claypole's case?  A.  I don't believe I did, ma'am.  MR. BERTLING:  Lacks foundation that there was time to do that before committing suicide. . . . Q.  And why didn't you do that?  A.  Again, Counselor, Mr. Claypole was in custody, I think, for about 48 hours."); *id.* at 226:16-21 ("Q.  And given those stark conditions, prior to May 1st, 2013, did you ever recommend to the County of Monterey that they modify their safety cells?  MR. BERTLING:  Lacks foundation that there was any way to modify.  But go ahead and answer her question."); *see also* Docket No. 122 at 6-12 (quoting other examples).

[27] *See, e.g.*, Docket No. 122-1, Ex. H at 40:23-41:8 ("Q.  Do you know if it began prior to May 1st, 2013?  A.  No, I—again, I don't know with any certainty that it began before 2013.  Staffing—  MR BERTLING:  You have answered the question."); *id.*, Ex. J at 64:22-65:18 ("Q.  And do you know whose decision it was as between CFMG and the County of Monterey that custody officers do the initial health screening when an inmate comes into the jail?  A.  You know, Counselor, that has been a pattern of practice since 1981.  I think the intake health screening prior to coming on board was done by custody administration, custody staff.  I think we continued that through the years.  MR. BERTLING:  You've answered the question. . . . I don't think you want him to ramble.").

[28] *See, e.g.*, Docket No. 122-1, Ex. D at 129:1-5 ("Q.  Do you know if Dr. Fithian asked about any prior suicidal statements during his meeting with Mr. Claypole on the morning of May 2nd?  MR. BERTLING:  You mean other than what's in his record where he said he denied it?"); *id.* at 133:3-8 ("Q.  In conducting a suicide risk assessment of Mr. Claypole, subsequent to those statements that he made to Ms. Spano, in your opinion, should a suicide risk assessment have involved asking Mr. Claypole about the statements that he's made indicating suicidality?  MR. BERTLING:  Well, he did."); *id.*, Ex. G at 150:18-25 ("Q.  And what evaluation did any medical or mental health staff do of Josh at the time that he was placed back on suicide watch on May 3rd?  MR. BERTLING:  Other than what you just went over with Ms. Spano's note?"); *id.* at 182:3-11 ("Q.  Are you aware that the court found that conducting health and safety checks of inmates in segregation or lockdown units only once per hour violated correctional standards?  MR. BERTLING:  Objection.  Lacks foundation, calls for speculation.  That had nothing to do with CFMG.  If you know.  THE WITNESS:  I think, again, I think Mr. Bertling is correct."); *id.*, Ex. I at 101:12-16 ("Q[:]  What measures, if any, did CFMG or Dr. Fithian take to address that possibility?  MR. BERTLING:  You mean other than the fact that he was in a lock down cell being monitored by custody?"); *see also* Docket No. 122 at 6-16 (quoting other examples).

[29] *See* Docket No. 133.

6
Case No. 14-cv-02730-BLF
ORDER GRANTING MOTION FOR SANCTIONS AND TO COMPEL DISCOVERY

frustrates the fair examination of the deponent." By persisting in this behavior throughout discovery on behalf of his clients, Bertling crossed well into sanctionable territory.[30] The court awards Plaintiffs their attorney's fees and costs for the following depositions: (1) the Hayward deposition on October 16, 2015,[31] (2) the Fithian deposition on August 31, 2015[32] and (3) the Fithian deposition on September 7, 2015.[33] Defendants shall make full payment within 14 days.

## IV.

"Lawyers owe a duty of professionalism to their clients, opposing parties and their counsel, the courts, and the public as a whole."[34] "Those duties include, among others: civility, professional integrity, personal dignity, candor, diligence, respect, courtesy, cooperation and competence."[35] "The practice of law before this [c]ourt must be free from prejudice and bias. Treatment free of bias must be accorded all other attorneys, litigants, judicial officers, jurors and support personnel."[36] One could defend some of Bertling's conduct as merely vigorous

---

[30] *See Lund v. Matthews*, Case No. 13-cv-00144, 2014 WL 517569, at *4-6 (D. Neb. Feb. 7, 2014) (awarding sanctions where counsel whispered into deponent's ear, made objections with commentary that coached the deponent's answers and instructed the witness not to answer on the basis of an "asked and answered" objection); *Craig v. St. Anthony's Med. Ctr.*, Case No. 08-cv-00492, 2009 WL 690210, at *2 (E.D. Mo. Mar. 12, 2009) (awarding sanctions where counsel "disrupted the proceedings by making argumentative and suggestive objections, conducting private conversations with his client, instructing his client not to answer questions without asserting a privilege, and answering questions on behalf of his client"); *Cordova v. United States*, Case No. 05-cv-00563, 2006 WL 4109659, at *2 (D.N.M. July 30, 2006) (awarding sanctions where counsel coached the witness through speaking objections, conferred with the witness off the record during pending questions and impermissibly instructed the witness not to answer).

[31] *See* Docket No. 122-1, Ex. D.

[32] *See id.*, Ex. G.

[33] *See id.*, Ex. H. Plaintiffs also seek preclusive relief, but only the presiding judge can award that sanction.

[34] N.D. Cal. Guidelines for Professional Conduct.

[35] *Id.*

[36] Civ. L.R. 11-4(b).

7
Case No. 14-cv-02730-BLF
ORDER GRANTING MOTION FOR SANCTIONS AND TO COMPEL DISCOVERY

representation of his client, but Bertling also has stooped to an indefensible attack on opposing counsel.

At a contentious deposition, when Plaintiffs' counsel asked Bertling not to interrupt her, Bertling told her, "[D]on't raise your voice at me.  It's not becoming of a woman . . . ."[37]  There are several obvious problems with his statement, but, most saliently, Bertling endorsed the stereotype that women are subject to a different standard of behavior than their fellow attorneys.  To make matters worse, in his declaration in opposition to this motion, Bertling offered only a halfhearted politician's apology "if [he] offended" Plaintiff's counsel, and he nevertheless tried to justify the comment because it "was made in the context of [Plaintiff's counsel] literally yelling at [his] client and creating a hostile environment during the deposition."[38]

A sexist remark is not just a professional discourtesy, although that in itself is regrettable and all too common.  The bigger issue is that comments like Bertling's reflect and reinforce the male-dominated attitude of our profession.  A recent ABA report found that "inappropriate or stereotypical comments" towards women attorneys are among the more overt signifiers of the discrimination, both stated and implicit, that contributes to their underrepresentation in the legal field.[39]  When an attorney makes these kinds of comments, "it reflects not only on the attorney's lack of professionalism, but also tarnishes the image of the entire legal profession and disgraces our system of justice."[40]

---

[37] Docket No. 122-1, Ex. G at 28:5-21.  In full, Bertling said, "Move on with your next question and don't raise your voice at me.  It's not becoming of a woman or an attorney who is acting professionally under the rules of professional responsibility."  *Id.*

[38] Docket No. 133 at ¶ 4.  Other than his own characterization, Bertling offers no deposition excerpts or other evidence that suggests this.

[39] Stephanie A. Scharf & Roberta A. Liebenberg, Am. Bar Ass'n, *First Chairs at Trial: More Women Need Seats at the Table* 14-15 (2015), *available at* http://www.americanbar.org/content/dam/aba/marketing/women/first_chairs2015.authcheckdam.pdf.

[40] *Cruz-Aponte v. Caribbean Petroleum Corp.*, Case No. 09-cv-02092, 2015 WL 5006213, at *3 (D.P.R. Aug. 17, 2015).

8
Case No. 14-cv-02730-BLF
ORDER GRANTING MOTION FOR SANCTIONS AND TO COMPEL DISCOVERY

Sanctions may not fully compensate Plaintiffs' counsel for Bertling's conduct, but they might deter it in the future. "District courts have the inherent power to sanction a lawyer for a 'full range of litigation abuses.'"[41] Courts may exercise this power "even if procedural rules exist which sanction the same conduct."[42] Because the scope of the sanctioning power is so broad, the court must "exercise caution in invoking its inherent power, and it must comply with the mandates of due process."[43] Before it imposes sanctions, a court must "specifically find[] bad faith or conduct tantamount to bad faith."[44] And to satisfy due process, the court must ensure that the sanctioned party has notice of the challenged misconduct and the allegation of bad faith.[45] Subject to these safeguards, the court may "fashion an appropriate sanction for conduct which abuses the judicial process."[46]

Guided by these principles, the court finds that Bertling's conduct was in bad faith. In light of his other discovery misconduct and his failure to tender any meaningful apology—despite opportunities to do so on the papers and at the hearing—the remark was emblematic of an unacceptably disrespectful attitude towards Plaintiffs' counsel. Furthermore, the requirements of due process have been satisfied: Bertling had a full and fair opportunity to oppose the motion on the papers and at the hearing.

The only question, then, is what sanction to impose. The court already has awarded Plaintiffs their fees and costs in bringing this motion as well as a portion of their attorney's fees for the deposition during which Bertling made his sexist comment. Those sanctions help

---

[41] *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1035 (9th Cir. 2012) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 55 (1991)).

[42] *Chambers*, 501 U.S. at 49.

[43] *Id.* at 50.

[44] *Fink v. Gomez*, 239 F.3d 989, 994 (9th Cir. 2001).

[45] *See In re Deville*, 361 F.3d 539, 548-50 (9th Cir. 2004).

[46] *Chambers*, 501 U.S. at 44-45.

9
Case No. 14-cv-02730-BLF
ORDER GRANTING MOTION FOR SANCTIONS AND TO COMPEL DISCOVERY

compensate Plaintiffs for Defendants' violation of discovery rules and Bertling's other conduct during depositions, but a specific and appropriate sanction for Bertling's comment is required. To that end, within 28 days, Bertling shall donate $250 to the Women Lawyers Association of Los Angeles Foundation[47]—an organization in Bertling's region dedicated to women in the legal profession—and submit a declaration to the court confirming his compliance with this order.

**SO ORDERED.**

Dated: January 12, 2016

_____
PAUL S. GREWAL
United States Magistrate Judge

---

[47] Bertling may make his donation online at https://wlala.site-ym.com/donations/donate.asp?id=8677.

10
Case No. 14-cv-02730-BLF
ORDER GRANTING MOTION FOR SANCTIONS AND TO COMPEL DISCOVERY