**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| ESTATE OF JOSHUA CLAYPOLE, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF MONTEREY, et al.,<br><br>Defendants. | Case No. 14-cv-02730-BLF<br><br>**ORDER GRANTING IN PART COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' CROSS-MOTION; AND GRANTING IN PART MEDICAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' CROSS-MOTION**<br><br>[Re: ECF 124, 141, 142, 146] |

This action follows the tragic deaths of two people, one of whom was Plaintiff Silvia Guersenzvaig's son, Joshua Claypole. Claypole, a young man with a history of mental health issues, inexplicably killed a taxi driver named Daniel Garcia Huerta and then days later hanged himself in a Monterey County jail cell while detained for Huerta's murder. Guersenzvaig filed this action individually and on behalf of Claypole's estate, asserting that jail personnel and others were deliberately indifferent to Claypole's serious medical needs in violation of his federal constitutional rights and breached duties owed to him under state law.

Two sets of cross-motions for summary judgment are before the Court. Defendants Monterey County, Monterey County Sheriff Scott Miller, and Sergeant Erika Kaye – all involved in the operation of the jail – seek summary judgment against Plaintiffs, who in turn seek partial summary judgment against them. Additionally, Defendants Taylor Fithian and California Forensic Medical Group ("Medical Defendants") – the doctor and medical group who provide medical care at the jail – seek partial summary judgment against Plaintiffs, who in turn seek partial summary judgment against them.

For the reasons discussed below, the County Defendants' motion is GRANTED IN PART, Plaintiffs' cross-motion against the County Defendants is DENIED, the Medical Defendants' motion is GRANTED IN PART, and Plaintiffs' cross-motion against the Medical Defendants is DENIED.

## I.   BACKGROUND

The chronology of events leading up to Claypole's death is largely undisputed.[1]  On the afternoon of Wednesday, May 1, 2013, Claypole murdered Huerta for unknown reasons.  City of Monterey police officers took him into custody shortly afterward, held him for several hours, and then transported him to the Monterey County jail.  Claypole was taken into custody at the jail at approximately 9:00 p.m. on Wednesday night.  He was placed in a single cell, pending review.

First Placement on Suicide Watch (Wednesday, May 1)

At approximately 10:15 p.m. that night, Claypole met with his attorney, who thereafter told a jail employee named Candice McGregor that Claypole had said he wanted to kill himself.  McGregor called Defendant Kaye, the shift supervisor, and relayed what the attorney had said.  Kaye Dep. 79:13-23, Exh. F to Grant Decl., ECF 141-2.  Kaye immediately ordered that Claypole be moved to a safety cell and placed on suicide watch.  *Id.* 82:21-83:3.   Safety cells at the County jail are small cells with padded rubber walls.  They do not contain furniture, mattress, or blanket, and a grate in the floor is used in lieu of a toilet.  Detainees and inmates placed on suicide watch are clothed in safety smocks.  Kaye personally supervised Claypole's placement in a safety cell and she explained to him that he was being placed in the cell because of his attorney's concerns.  *Id.* 90:13-21.  Kaye or another deputy then advised the jail's medical staff via radio that someone had been placed in a safety cell for suicide watch.  *Id.* 97:20-98:6.

Monterey County contracts with Defendant California Forensic Medical Group ("CFMG") to provide health care at the jail, including mental health treatment.  In the very early hours of Thursday, May 2, 2013, Nurse Lavina Shene screened Claypole using CFMG's Nursing

---

[1] As discussed below, there are significant factual disputes with respect to material issues unrelated to chronology that preclude summary judgment on most of the claims addressed in these motions.

United States District Court
Northern District of California

Assessment of Psychiatric & Suicidal Inmate form.  Shene noted that Claypole reported a psychiatric history; had been diagnosed with anxiety, attention deficit disorder, and insomnia; was under the care of a psychiatrist; and had prescriptions for Klonopin, Seroquel, and Adderal, which he last had taken two days prior.  Shene noted that Claypole had poor eye contact, was calm, and had a flat affect.  She identified him as a danger to self on the suicide log and indicated that he was to remain on suicide watch.

At approximately 5:50 a.m., shortly before the end of her shift, Shene called Defendant Taylor Fithian, M.D., to inform him that Claypole had been placed on suicide watch.  Defendant Fithian is the president and co-founder of CFMG.  During the relevant time frame, he was CFMG's medical director as well as the psychiatrist and supervisor in charge of all other mental health staff at the jail.  Fithian was responsible for development of CFMG's policies and procedures and the overall day-to-day practice of medicine at the jail.

First Removal from Suicide Watch (Thursday, May 2)

Fithian met with Claypole at approximately 8:35 a.m. on Thursday, May 2, 2013, and discontinued suicide watch at approximately 9:00 a.m.  Claypole remained in the safety cell for some period of time – exactly how long is disputed by the parties – before he was transferred to cell A204 in "A-pod."  A-pod and B-pod are units consisting of single cells that predominantly are used to house individuals with mental health needs.  Bass Dep. 75:7-79:24, Exh. Vol. 3 to Rifkin Decl., ECF 147-5.  Other units, including C-pod, are used as overflow housing for individuals with mental health needs.  *Id.*  A-pod, B-pod, and C-pod are "lockdown" units, meaning that individuals housed there generally are locked in their cells for approximately twenty-three hours a day and permitted to use the dayroom, take a shower, or do other activities outside the cell for approximately one hour a day.  *Id.*  Individuals housed in lockdown units also are permitted to come out for visits, court or medical appointments, and certain jail events.  *Id.*  Individuals with mental health needs are housed in A-pod and B-pod because they are single cells, and thus the risks of assaults between inmates is lessened.  *Id.* 75:17-76:3.

The lockdown cells contain beds with sheets.  Bass Dep. 104:21-105:7, Exh. Vol. 3 to Rifkin Decl., ECF 147-5.  In 2013, when Claypole was housed in A-pod, the lockdown cells had

air vents in the walls or ceilings that could be used as attachment points for suicide by hanging. *Id.* 105:14-106:15, 110:7-19.  A single deputy is stationed in the corridor to monitor A-pod, B-pod, and C-pod.  *Id.*  From that station, the deputy can see into all of B-pod but only part of A-pod.  *Id.* 85:17-87:8.  The deputy cannot see into cell A204, where Claypole was housed, from the corridor.  *Id.* 86:25-87:8.  The deputy does hourly welfare and safety checks of the pod cells.  *Id.* 104:8-20.  Those hourly checks consist of walking through both tiers of each pod and can completed within one or two minutes.  *Id.* 90:2-19.  No additional safety checks are performed when an individual is placed in a lockdown cell upon release from suicide watch.  *Id.* 104:8-12.

Second Placement on Suicide Watch (Friday, May 3)

Claypole was not seen by mental health personnel again until Friday, May 3, 2013.  On Friday afternoon, he was visited by Kim Spano, a marriage and family therapist employed by CFMG.  Spano's notes reflect that Claypole was "odd," "in a bizarre state," "unsettled," and "[a]gitated, upset."  Spano Dep. 95:7-14, Exh. I to Grant Decl., ECF 149-1.  Spano felt that Claypole was "clearly deluded" and "clearly psychotic."  *Id.* 101:1-7.  Spano recalls calling Defendant Fithian and either speaking to him or leaving him a voicemail message regarding Claypole's condition.  *Id.* 101:13-102:4.  Fithian recalls that he and Spano spoke.  Fithian Decl. ¶ 6, ECF 152-4.  Fithian and Spano agreed that Claypole should be placed in a safety cell.  *Id.* Claypole was removed from cell A204 and placed in a safety cell.

When Nurse Shene came on duty the night of May 3, 2013, she reviewed the safety log but not Spano's progress notes, and she checked on Claypole twice during the early morning hours. Shene Dep. 76:5-78:5, Exh. J to Grant Decl., ECF 149-1.  At the 5:15 a.m. check, Shene spoke to Claypole and noted that he denied suicidal ideation, he verbally contracted for safety, and he agreed to let staff know if he felt like he was going to harm himself or others.  *Id.* 78:4-25. Claypole also asked to be removed from the safety cell and requested sleeping medication.  *Id.* 79:6-7.

Second Removal from Suicide Watch (Saturday, May 4)

Shortly after 6:00 a.m. on Saturday, May 4, 2013, Shene called Defendant Fithian and reported that Claypole had denied suicidal ideation, verbally contracted for safety, said he was

4

really tired, and requested sleep medications.  Shene Dep. 83:21-84:11, Exh. J to Grant Decl., ECF 149-1.  Defendant Fithian, who had not seen Claypole since Thursday, May 2, gave Shene a verbal order to discontinue suicide watch.  *Id.* 84:12-14.  Claypole remained in the safety cell for some period of time – jail records are unclear as to how long – and then he was returned to cell A204 in A-pod.  While conducting a safety and welfare check of A-pod at approximately 2:30 p.m. that afternoon, Deputy Raymond Gordano saw Claypole hanging from a bedsheet affixed to a metal vent above the toilet/sink area.  Gordano used his radio to call another deputy for help and then called for medical help.  The deputies cut Claypole down and performed mouth-to-mouth breathing and chest compressions until medical staff arrived to relieve them.  Claypole died several days later when he was taken off life support.[2]

## II.    LEGAL STANDARD

"A party is entitled to summary judgment if the 'movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *City of Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)).  "The moving party initially bears the burden of proving the absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case."  *Id.*  "Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial."  *Id.*  "[T]he non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor."  *Id.*  "The court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the

---

[2] To the extent that any party has argued additional facts in its separate statement that were not presented in the briefs, those arguments are disregarded as violating this Court's Standing Order Re Civil Cases and Civil Local Rules.  *See* Standing Order Re Civil Cases ¶ F.3.a ("The Court will not consider evidence or argument presented in the Separate Statement that is not also contained in the briefs."); Civ. L.R. 7-2, 7-3 (limiting moving and opposing briefs to 25 pages).  The purpose of the separate statement is limited to providing the Court with a chart of relevant evidence set forth in the briefs.  It is not an augmentation of the briefs.

United States District Court
Northern District of California

nonmovant's favor." *City of Pomona*, 750 F.3d at 1049. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

### III.   CROSS-MOTIONS FOR SUMMARY JUDGMENT RE COUNTY DEFENDANTS

Plaintiffs assert claims against Monterey County, Monterey County Sheriff Miller in his official and individual capacities, and Sergeant Kaye under 42 U.S.C. § 1983 for deliberate indifference to Claypole's serious medical needs in violation of the Fourteenth Amendment (Claims 1 and 2) and deprivation of the parent/child relationship in violation of the First and Fourteenth Amendments (Claim 3). Plaintiffs also assert state law claims for failure to summon medical care in violation of California Government Code § 845.6 (Claim 5); negligent supervision, training, hiring, and retention under California law (Claim 6); wrongful death under California Civil Procedure Code § 377.60 (Claim 7); and negligence under California law (Claim 8). The County Defendants seek summary judgment on all of these claims, while Plaintiffs seek summary judgment on Claims 1-3 and 8.

### A.   Claims 1 and 2 – Deliberate Indifference

"The Eighth Amendment protects inmates from cruel and unusual punishment, which includes the denial of medical care." *Conn v. City of Reno*, 591 F.3d 1081, 1094 (9th Cir. 2009), *vacated*, 131 S. Ct. 1812 (2011), *reinstated in part and vacated in part*, 658 F.3d 897 (9th Cir. 2011). "Pretrial detainees, by contrast, are protected under the Due Process Clause of the Fourteenth Amendment." *Id.* Courts have borrowed from the Eighth Amendment jurisprudence to determine the minimum standard of care that must be given to a pretrial detainee under the Fourteenth Amendment. *Id.*; *Simmons v. Navajo Cnty.*, 609 F.3d 1011, 1017 (9th Cir. 2010) ("Although the Fourteenth Amendment's Due Process Clause, rather than the Eighth Amendment's protection against cruel and unusual punishment, applies to pretrial detainees, we apply the same standards in both cases.") (internal citation omitted); *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002) ("With regard to medical needs, the due process clause imposes, at minimum, the same duty as the Eighth Amendment imposes."). "The Eighth and

United States District Court
Northern District of California

United States District Court
Northern District of California

Fourteenth Amendments both guarantee that inmates and detainees receive constitutionally adequate medical and mental health care." *Conn*, 591 F.3d at 1094.

### 1. County of Monterey and Miller in his Official Capacity

Plaintiffs' claims against the County and against Sheriff Miller in his official capacity are essentially the same claims. *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978) ("official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent"). Accordingly, this order's discussion of Plaintiffs' claims against the "County" encompasses Plaintiffs' claims against Sheriff Miller in his official capacity. Plaintiffs and the County have filed cross-motions for summary judgment on Claims 1 and 2 for deliberate indifference.

Plaintiffs may recover against the County on their deliberate indifference claims under one of three theories of liability. *See Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010). "First, a local government may be held liable 'when implementation of its official policies or established customs inflicts the constitutional injury.'" *Id.* (quoting *Monell*, 436 U.S. at 708 (Powell, J. concurring)). Courts have "referred to these sorts of local government conduct as acts of 'commission.'" *Id.* "Second, under certain circumstances, a local government may be held liable under § 1983 for acts of 'omission,' when such omissions amount to the local government's own official policy." *Id.* "To impose liability on a local government for failure to adequately train its employees, the government's omission must amount to 'deliberate indifference' to a constitutional right." *Id.* "This standard is met when the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* (internal quotation marks and citation omitted). "Third, a local government may be held liable under § 1983 when the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it." *Id.* at 1250 (internal quotation marks and citation omitted).

Plaintiffs appear to be proceeding under both the first and second theories of liability set forth in *Clouthier*. Under the first theory, Plaintiffs challenge the County's jail policies and

procedures as constitutionally deficient.   Plaintiffs do not clearly identify the specific policies and procedures at issue.  In the operative first amended complaint, Plaintiffs identify the relevant policies and procedures extremely broadly, alleging that "Defendants have inadequate policies, procedures, and practices for identifying inmates in need of medical and mental health treatment and providing appropriate medical and mental health treatment."  FAC ¶ 83.  In some portions of their briefing, Plaintiffs narrow the challenged policy somewhat to:  "housing inmates with mental illness in segregation units such as the A and B pod lockdown units."  *See, e.g.,* Pls.' Mot. at 6, ECF 146; Pls.' Opp. at 9, ECF 148.  In other portions of their briefing, Plaintiffs narrow the challenged policy further to:  housing inmates with mental illness in lockdown cells with known suicide hazards, i.e., hanging points, upon releasing those inmates from suicide watch.  *See, e.g.*, Pls.' Mot. at 1, ECF 146; Pls.' Reply at 1, ECF 156.  Based upon the entirety of Plaintiffs' briefing on the pending motions, and the evidence upon which Plaintiffs rely, it appears that the latter characterization most effectively captures Plaintiffs' theory based upon an asserted unconstitutional jail policy.

Under the second theory set forth in *Clouthier*, Plaintiffs contend that the County failed to engage in adequate oversight of CFMG, the private entity with whom the County contracts to provide medical and mental health services at the jail.

The parties' cross-motions regarding Plaintiffs' claims based upon these two theories of liability are addressed as follows.

> **a.**   **Policy of Housing Inmates with Mental Illness in Lockdown Cells with Known Suicide Hazards Upon Releasing those Inmates from Suicide Watch**

In order to establish their entitlement to summary judgment based upon the County's allegedly unconstitutional policy of housing inmates with mental illness in lockdown cells with known suicide hazards upon those inmates' release from suicide watch, Plaintiffs must demonstrate that the policy posed a substantial risk of harm to Claypole, the County was aware of the risk, and the policy in fact caused harm.  *See Gibson*, 290 F.3d at 1188-89.  Whether the County's policy violated Claypole's rights "does not hinge on whether County policymakers knew

United States District Court
Northern District of California

1   that the County's polic[y] would pose a substantial risk of serious harm to [Claypole], in

2   particular." *Id.* at 1191.  Plaintiffs must show only that the policy would pose a risk to someone in

3   Claypole's situation.[3]  *Id.*

4         Plaintiffs submit the following evidence in support of their motion and in opposition to the

5   County's motion.  Commander Bass, the County's Federal Rule of Civil Procedure 30(b)(6)

6   witness on the jail's policies and procedures, testified extensively regarding the types of housing

7   available at the jail and in particular the details of A-pod, where Claypole was housed after being

8   removed from suicide watch on May 2, 2013 and again on May 4, 2013.  A-pod consists of single

9   cells that predominantly are used to house individuals with mental health needs.  Bass Dep. 75:7-

10   79:24, Exh. Vol. 3 to Rifkin Decl., ECF 147-5.  A-pod is a "lockdown" unit, meaning that

11   individuals housed there generally are locked in their cells for approximately twenty-three hours a

12   day, although exceptions are permitted for visits, court or medical appointments, and certain jail

13   events.  *Id.*

14         A single deputy is stationed in the corridor to monitor A-pod as well as two other

15   lockdown units, B-pod, and C-pod.  Bass Dep. 85:10-16, Exh. Vol. 3 to Rifkin Decl., ECF 147-5.

16   From that station, the deputy can see into all of B-pod but only part of A-pod.  *Id.* 85:17-87:8.

17   The deputy cannot see into cell A204, where Claypole was housed, from the station in the

18   corridor.  *Id.* 86:25-87:8.  The deputy does hourly welfare and safety checks of the pod cells.  *Id.*

19   104:8-20.  Those hourly checks consist of walking through both tiers of each pod and can be done

20   as quickly as one or two minutes.  *Id.* 90:2-19.  No additional precautions or procedures are used

21   for individuals who are moved to A-pod after being discharged from suicide watch.  *Id.* 105:8-13.

22         The lockdown cells contain beds with sheets.  Bass Dep. 104:21-105:7, Exh. Vol. 3 to

23   Rifkin Decl., ECF 147-5.  In 2013, the lockdown cells also had air vents in the walls or ceilings

24   that could be used as attachment points for suicide by hanging.  *Id.* 105:14-106:15, 110:7-19.

25   Prior to 2013, there were at least two suicides by hanging in lockdown cells, one in 2010 and one

26

27    _____

28   [3] The Court notes that the County relies heavily on cases addressing the standards for determining whether an individual officer acted with deliberate indifference.  While those cases are relevant to the motions regarding the individual liability of Miller and Kaye, they do not set forth the proper standards for evaluating Plaintiffs' claim that the County's policy was constitutionally deficient.

in 2011.  *Id.* 110:1-19.  County records show that between 2011 and 2012 at least five other individuals attempted to hang themselves with bedsheets, at least three of which were attached to vent or grates in their cells.  Records, Exh. D to Rifkin Decl., ECF 147-8.  Dr. Richard Hayward[4], one of the Medical Defendants' retained experts, testified that the lockdown units at the jail contained suicide hazards.  Hayward Dep. 144:25-145:6, Exh. T to Grant Decl., ECF 149-1.

Absent conflicting evidence sufficient to demonstrate the existence of disputed issues of material fact, Plaintiffs' evidence is sufficient to establish that the County's challenged policy posed a substantial risk of harm to inmates, the County was aware of that risk, and the County's transfer of Claypole to A-pod after his release from suicide watch on May 4, 2013 (pursuant to the challenged policy) resulted in Claypole's suicide.

In opposition to Plaintiffs' motion and in support of its own motion, the County submits the declaration of Commander Johnathan Thornburg, who states that between 2010 and 2015, the County jail processed an average of 11,900 new detainees/inmates a year.  Thornburg Decl. ¶¶ 3-5, ECF 149-2.  During that six-year period, the County jail had a total of six suicides by hanging. *Id.*  The County argues that those statistics actually are very good, and certainly are not so extreme as to render obvious the risk of suicide posed by the lockdown units.

The County also submits the report and supplemental report of its expert, Richard S. Bryce.  *See* Bryce Report, Exh. L to Grant Decl., ECF 141-2; Bryce Suppl. Report, Exh. M To Grant Decl., ECF 141-2.  Mr. Bryce opines in his report that Sheriff Miller and all jail personnel "utilized all practices and facilities available to them to protect the welfare and safety of Mr. Claypole while he was in their custody."  Bryce Report at 1, Exh. L to Grant Decl., ECF 141-2. Mr. Bryce opines in his supplemental report that Claypole was the subject of more than 100

---

[4] Dr. Hayward previously authored a report on the mental health conditions of the Monterey County jail in connection with another case currently pending in this district, *Hernandez v. Cnty. of Monterey*, Case No. 5:13-CV-2354-PSG.  Plaintiffs quote the draft report in their operative first amended complaint and in their briefing on the present motions.  Fithian and CFMG object to Plaintiffs' reliance on the Hayward draft report, asserting that Plaintiffs rely upon portions of the draft report that were negated by the final report.  The Court concludes that the prior Hayward report is of limited value with respect to the pending motions.  The Court has reviewed the orders issued in *Hernandez* and the prior Hayward report only for the purpose of providing background context for the present case.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  welfare checks while confined at the jail.[5]  Bryce Suppl. Report at 1, Exh. M To Grant Decl., ECF

2  141-2.

3       Finally, the County points to its policy requiring medical clearance before an individual

4  can be moved from a safety cell into other housing.  *See* Inmate Services Policy § M-2, Exh. N to

5  Grant Decl., ECF 149-1.  It is undisputed that Dr. Fithian released Claypole from suicide watch

6  before he was moved back to A-pod.  The County argues that in moving Claypole back and forth

7  between safety cells and lockdown cells, the County reasonably relied on the decisions of medical

8  personnel.

9       On the latter point, the County cites *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d

10  1062 (9th Cir. 2013) for the proposition that reliance on medical staff bars a finding of deliberate

11  indifference.  In the cited portion of *Lemire*, the Ninth Circuit discussed the plaintiffs' deliberate

12  indifference claim against five correctional officers who failed to give CPR to an inmate found

13  unconscious on the floor of his cell with a sheet around his neck.  All five officers arrived at the

14  cell after the first medical staff responded, and while medical staff assisted the inmate the five

15  officers performed other functions such as securing the scene or documenting the incident.  Under

16  those circumstances, the Ninth Circuit concluded, the five correctional officers could not be found

17  to have acted deliberately indifferent to the inmate's medical needs "because they were reasonably

18  relying on the actions of the medical responders who were already treating" the inmate.  *Id.* at

19  1084.  The Ninth Circuit's holding clearly was based upon the particular facts of the case before it.

20  There is no indication that the holding was intended as a general statement that reliance upon

21  advice of medical staff raises an absolute bar to a deliberate indifference claim.  Thus the County's

22  reliance upon *Lemire* is misplaced.

23       However, the existence of the policy requiring medical clearance before moving inmates,

24  in combination with Dr. Fithian's order to release Claypole from suicide watch without any

25  accompanying orders regarding step down housing[6] or other additional precautions, could give

26

27  [5] Plaintiffs dispute that all of the claimed welfare checks actually occurred, pointing to evidence
    that the logs regarding Claypole's checks were incorrect in some respects and that the jail's logs
28  generally may be incorrect.  *See* Kaye Dep. 126:17-130:9, Miller Dep. 18:2-8, 52:2-20, 54:6-16.
    [6] Dr. Fithian states in his declaration that he could have ordered that Claypole be placed in a step

1    rise to an inference that that the County's policies did not cause Claypole's injury but rather Dr.

2    Fithian's medical decision did.  That inference is sufficient to create a disputed issue of fact as to

3    causation.  Moreover, the County's statistical evidence is sufficient to create a disputed issue of

4    fact as to the County's knowledge of the risk to inmates created by its policy of placing

5    individuals with mental health issues in A-pod upon release from suicide watch.  Finally, the

6    expert opinion of Mr. Bryce is sufficient to create a disputed issue of fact as to the constitutional

7    adequacy of the County's policies as a whole.

8        A reasonable jury could resolve the disputed issues of material fact identified above in

9    favor of either Plaintiffs or the County, and thus could find for either Plaintiffs or the County on

10   Claims 1 and 2.  Accordingly, the parties' cross-motions for summary judgment on Claims 1 and 2

11   are DENIED as to the County and Sheriff Miller in his official capacity.

12                    **b.        Failure to Adequately Supervise CFMG**

13       In order to establish their entitlement to summary judgment based upon the County's

14   alleged failure to adequately supervise CFMG, Plaintiffs must demonstrate that the County's

15   failure to supervise violated its own obligation to provide adequate medical care and that the

16   failure resulted in harm to Claypole.  *See Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1074 (9th

17   Cir. 2010) ("[A] State cannot avoid its obligations under federal law by contracting with a third

18   party to perform its functions. The rights of individuals are not so ethereal nor so easily

19   avoided.").

20       In support of their motion and in opposition to the County's motion, Plaintiffs present

21   evidence that Sheriff Miller – the individual responsible for implementing the jail's policies and

22   procedures – did not review the mental health care provided to jail inmates by CFMG.  Miller

23   Dep. 30:9-12, 58:7-17, 59:11-60:10, ECF 147-6.  Neither Miller nor anyone else in the Sheriff's

24   Office was aware of how CFMG staffed the jail.  *Id.* 66:22-67:10.  Miller did not know that

25   CFMG did not staff the jail with mental health clinicians on weekends.  *Id.* 66:13-21.  Miller did

26

27   down unit.  Fithian Decl. ¶ 11, ECF 152-4.  Commander Bass, the County's Rule 30(b)(6) witness,
     testified that the jail does not have any kind of step down cells or transition cells between a safety
28   cell and a regular housing cell.  Bass Dep. 103:17-21, Exh. Vol. 3 to Rifkin Decl., ECF 147-5.

United States District Court
Northern District of California

1    not inquire of CFMG whether they had conducted an internal review following the 2010 and 2011

2    suicides at the jail.  *Id.* 116:9-119:16.

3           In opposition to Plaintiffs' motion and in support of its own motion, the County submits

4    Miller's deposition testimony that he reviewed jail conditions with shift supervisors and jail

5    command staff, reviewed written reports, attended quality assurance meetings, and instituted

6    investigations into all in-custody deaths.  Miller Dep. 25:20-30:5, 45:18-46:24, 55:20-58:25, 61:3-

7    62:1, 93:22-95:24, Exh. S to Grant Decl., ECF 149-1.

8           The competing excerpts of Sheriff Miller's deposition testimony cited by the parties create

9    a disputed issue of fact as to the extent of Miller's oversight of CFMG as part of his oversight of

10   the jail generally.  Moreover, with respect to the issue of causation, disputed issues of fact exist as

11   to the majority of Plaintiffs' claims against CFMG for the reasons discussed in section IV, below.

12   Those disputed issues preclude summary judgment for either party, because if CFMG provided

13   adequate medical care to Claypole, then no harm resulted from the County's alleged lack of

14   oversight over CFMG.

15          Accordingly, the parties' cross-motions for summary judgment on Claims 1 and 2 for

16   deliberate indifference based upon the County's alleged failure to adequately supervise CFMG are

17   DENIED.

18                        **2.      Sheriff Miller**

19          Plaintiffs sue Sheriff Miller in his individual capacity as well as his official capacity.

20   Plaintiffs and Miller have filed cross-motions for summary judgment on Claims 1 and 2.

21          In order to establish their entitlement to summary judgment against Miller in his individual

22   capacity, Plaintiffs must show that Miller set in motion acts which caused others to inflict

23   constitutional injury.  *Larez v. City of Los Angeles*, 946 F.2d 630, 645 (9th Cir. 1991).  Such

24   conduct may include culpable action or inaction in the training of subordinates, acquiescence in a

25   constitutional deprivation, or conduct showing indifference to the rights of others.  *Id.* at 646.

26          In support of their motion and in opposition to Miller's motion, Plaintiffs submit evidence

27   that Sheriff Miller was the individual responsible for implementing the jail's policies and

28   procedures.  Miller Dep. 30:9-12, ECF 147-6.  He could make changes to those policies and

1   procedures.  *Id.* 30:16-31:23.  Sheriff Miller admitted that he "was responsible for everything that

2   happened or didn't happen at the Sheriff's Office" while he was Sheriff.  *Id.* 31:21-23.  The

3   responsibilities of the Sheriff's Office included responsibility for the jail.  *Id.* 55:16-19.

4       Miller was aware that the jail's policy was to house inmates with mental health issues in

5   segregated, lockdown cells.  Miller Dep. 73:7-13, ECF 147-6.  He reviewed a Jail Needs

6   Assessment prepared in 2011 which indicated, among other things, that "Suicide hazard

7   elimination is not as stringent as it should be to prevent self-harm and the attendant liability."  *Id.*

8   78:3-23.  When Miller took office in December 2010, he was aware that an inmate had committed

9   suicide in August 2010.  *Id.* 91:14-17.  Miller also was informed when an inmate committed

10  suicide in 2011.  *Id.* 92:16-19.  As discussed above, some of Miller's testimony indicates that he

11  did not review the mental health care provided to jail inmates by CFMG.  Miller Dep. 58:7-17,

12  59:11-60:10, 66:22-67:10,116:9-119:16 ECF 147-6.

13      In opposition to Plaintiffs' motion and in support of his own motion, Miller submits

14  Commander Thornburg's declaration regarding the number of jail suicides compared to the total

15  number of inmates housed at the jail, and argues that the relatively few number of suicides at the

16  jail were insufficient to put him on notice that the policy posed a substantial risk of harm.  *See*

17  Thornburg Decl. ¶¶ 3-5, ECF 149-2.  Miller also submits declaration excerpts suggesting that he

18  did engage in at least some oversight of the medical care provided at the jail.  Miller Dep. 25:20-

19  30:5, 45:18-46:24, 55:20-58:25, 61:3-62:1, 93:22-95:24, Exh. S to Grant Decl., ECF 149-1.

20      Based upon the parties' evidence, there are disputed issues of fact as to Miller's knowledge

21  of the risk posed by the County's policy of housing inmates with mental illness – and in particular

22  those just released from suicide watch – in lockdown units with known suicide risks.  In addition,

23  there is a disputed issue of fact as to the extent of Miller's oversight over CFMG.  Finally, there is

24  a disputed issue as to whether any failure to supervise CFMG caused injury in light of the disputed

25  facts that preclude summary judgment on most of Plaintiffs' claims against CFMG, as discussed in

26  section IV, below.

27      Accordingly, the parties' cross-motions for summary judgment on Claims 1 and 2 against

28  Miller in his individual capacity are DENIED.

United States District Court
Northern District of California

14

United States District Court
Northern District of California

### 3.   Sergeant Kaye

Both Plaintiffs and Sergeant Kaye seek summary judgment on Claims 1 and 2.

"An official's deliberate indifference to a substantial risk of serious harm to an inmate – including the deprivation of a serious medical need – violates the Eighth Amendment, and a fortiori, the Fourteenth Amendment." *Conn*, 591 F.3d at 1094; *see also Gibson*, 290 F.3d at 1187 ("persons in custody have the established right to not have officials remain deliberately indifferent to their serious medical needs") (quotation marks, citation, and brackets omitted).

To demonstrate that Kaye was deliberately indifferent in this case, Plaintiffs must show that (1) Claypole had a serious medical need and (2) Kaye's official's response to the need was deliberately indifferent. *See Conn*, 591 F.3d at 1095; *see also Simmons*, 609 F.3d at 1017 ("We have long analyzed claims that correction facility officials violated pretrial detainees' constitutional rights by failing to address their medical needs (including suicide prevention) under a deliberate indifference standard.") (internal quotation marks and citation omitted). "The second prong requires both (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Conn*, 591 F.3d at 1095. Thus to make out a claim of deliberate indifference, Plaintiffs must establish "serious medical need, indifference to that need, and harm caused by that indifference." *Id.*

#### a.   Indifference to Serious Medical Need

To demonstrate the requisite indifference, Plaintiffs must show that Kaye was "(a) subjectively aware of the serious medical need and (b) failed to adequately respond." *Conn*, 591 F.3d at 1096 (citing *Farmer v. Brennan*, 511 U.S. 825, 838 (1994)). Plaintiffs contend that although Kaye clearly was aware of Claypole's serious medical need and responded to that need, her response was inadequate.

In support of their own motion and in opposition to Kaye's motion, Plaintiffs present evidence that although Kaye informed medical staff that Claypole had been placed on suicide watch, she did not *also* document and inform medical staff that Claypole had made a suicidal statement to his attorney. In particular, Plaintiffs rely on Dr. Fithian's testimony that he believed Claypole was placed on suicide watch because of the charges against him rather than any suicidal

1    ideation, as well as Fithian's denial that medical staff was told of Claypole's statements to his

2    attorney. Fithian Dep. 124:21-126:9, ECF 143-10. Plaintiffs contend that under *Conn*, Kaye's

3    failure to inform medical staff of Claypole's suicidal statement to his attorney rendered inadequate

4    her response to Claypole's serious medical need.

5         Plaintiffs' reliance on *Conn* is misplaced. In *Conn*, two police officers were transporting a

6    woman named Brenda Clustka when she wrapped a seatbelt around her neck while screaming that

7    the officers should kill her or she would kill herself. *Conn*, 591 F.3d at 1092. The officers handed

8    Clustka off to jail personnel without reporting the incident, and days later Clustka hanged herself

9    in a jail cell. *Id.* Finding a triable issue of material fact as to the officers' subjective awareness of

10   Clustka's serious medical need, the Ninth Circuit held that a reasonable jury could conclude from

11   the record evidence "that Clustka's medical need was so obvious that [the officers] must have

12   been subjectively aware of it, despite their later denial of that awareness." *Id.* at 1097. The court

13   noted specifically that the officers had not argued that, if they were subjectively aware of

14   Clustka's serious medical need, they nonetheless responded appropriately. *Conn* thus offers no

15   support for Plaintiffs' challenge to the adequacy of Kaye's response to Claypole's medical need.

16        In support of her motion and in opposition to Plaintiffs' motion, Kaye submits evidence

17   that she was the shift supervisor responsible for the intake and release area of the Monterey

18   County jail when Claypole arrived on the night of May 1, 2013. Kaye Dep. 35:23-36:25. Kaye

19   was not involved in Claypole's intake. *Id.* 81:4-15. At some point after Claypole's intake, jail

20   employee McGregor called Kaye to report that an attorney had informed her that his client had

21   said he felt like hurting himself. *Id.* 79:13-23. Kaye's conversation with McGregor was very

22   short. *Id.* 81:16-19. Kaye does not recall whether McGregor mentioned Claypole's name at that

23   point. *Id.* 81:20-23. Immediately after hanging up with McGregor, Kaye walked out to the

24   receiving area and stated that the jail needed to put the person McGregor had called about on

25   suicide watch. *Id.* 82:21-83:3. Kaye ordered that Claypole be placed on suicide watch and stood

26   by while that occurred. *Id.* 83:4-13. When Claypole was placed in a safety cell, Kaye spoke to

27   him, explaining that he was being placed on suicide watch based upon his attorney's concerns. *Id.*

28   90:13-21. Kaye or another deputy then advised the jail's medical staff via radio that someone had

United States District Court
Northern District of California

1    been placed in a suicide cell for suicide watch.  *Id.* 97:20-98:6.  Kaye had no other involvement in

2    Claypole's detention.

3         Based upon this evidence, no reasonable jury could conclude that Kaye's response to

4    Claypole's serious medical need was inadequate.

5                    **b.      Resulting Harm**

6         "[T]o prevail on a § 1983 claim under a deliberate indifference theory, plaintiff must prove

7    that the official's actions were both the actual and proximate cause of plaintiff's injuries."

8    *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1245 n.3 (9th Cir. 2002) (citing *White v.*

9    *Roper*, 901 F.2d 1501, 1505 (9th Cir. 1990)).

10        Plaintiffs' theory is that had Kaye informed medical staff that she had placed Claypole on

11   suicide watch because he expressed suicidal ideation, Defendant Fithian would not have removed

12   Claypole from suicide watch on May 2 and May 4.  Plaintiffs again rely on *Conn*, in which the

13   Ninth Circuit held that by failing to pass on information regarding the seatbelt incident, the

14   defendant officers foreseeably undermined Clustka's access to effective medical evaluations and

15   adequate mental health care.  *Conn*, 591 F.3d at 1101.  The Ninth Circuit concluded that

16   notwithstanding medical evaluations that occurred between the seatbelt incident and Clustka's

17   suicide, a jury could conclude that the officers' conduct "was a moving force and proximate cause

18   of Clustka's suicide."  *Id.*

19        *Conn* is factually distinct from the present case, in which Kaye placed Claypole on suicide

20   watch and notified jail medical staff of that fact so that he would be evaluated.[7]  Plaintiff's expert,

21   Dr. Raymond Patterson, testified that he could not conclude based upon his knowledge of the case

22

23   _____

     [7] The Court notes that it did rely on *Conn* in denying the City of Monterey's motion for summary

24   judgment, concluding that a jury could conclude that the failure of City police officers to pass on
     information regarding Claypole's behavior while in their custody could have impaired the medical

25   evaluations that foreseeably were performed at the Monterey County jail.  However, the
     information withheld by City officers went well beyond the single third-hand comment upon

26   which Plaintiffs premise their claims against Kaye.  The City officers personally observed
     Claypole's bizarre behavior, which included numerous comments that arguably could be

27   characterized as suicidal ideation, over a period of several hours.  Unlike Kaye, the City officers
     did not place Claypole on suicide watch or take any action to ensure that he received a mental

28   health evaluation.  Plaintiffs' claims against the City officers thus are much closer factually to the
     claims against the defendants in *Conn*.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    that Kaye's actions or inactions contributed causally to Claypole's suicide.  Patterson Dep.

2    195:12-15, Exh. J to Grant Decl., ECF 141-2.

3        Based upon this record, and even viewing the facts in the light most favorable to Plaintiffs,

4    the Court concludes that Kaye has demonstrated her entitlement to summary judgment and that

5    Plaintiffs have failed to demonstrate the existence of disputed facts from which a reasonable jury

6    could find that Kaye's response to Claypole's serious medical need was constitutionally

7    inadequate.  Accordingly, Kaye's motion for summary judgment on Claims 1 and 2 is

8    GRANTED.  Plaintiffs' motion for summary judgment on Claims 1 and 2 is DENIED as to Kaye.

9        **B.**     **Claim 3 – Loss of Parent/Child Relationship**

10        The County Defendants and Plaintiffs seek summary judgment on Claim 3, which alleges

11    Guersenzvaig's loss of parent/child relationship in violation of the substantive due process clause

12    of the Fourteenth Amendment.

13        A parent may assert a Fourteenth Amendment substantive due process claim if she is

14    deprived of her liberty interest in the companionship of her child through official conduct.

15    *Lemire*, 726 F.3d at 1075. "Only official conduct that shocks the conscience is cognizable as a due

16    process violation." *Id.* (internal quotation marks and citation omitted).  "Just as the deliberate

17    indifference of prison officials may support Eighth Amendment liability, such indifference may

18    also rise to the conscience-shocking level required for substantive due process violation." *Id.*

19    (internal quotation marks and citation omitted).  "A prison official's deliberately indifferent

20    conduct will generally shock the conscience so as long as the prison official had time to deliberate

21    before acting or failing to act in a deliberately indifferent manner." *Id.* (internal quotation marks

22    and citation omitted).

23        Claim 3 is based on the County Defendants' alleged deliberate indifference to Claypole's

24    serious medical need and thus, for purposes of the present motions, rises or falls with Claims 1 and

25    2.  Based upon the foregoing discussion, the County Defendants' motion for summary judgment

26    on Claim 3 is DENIED as to the County and Miller and GRANTED as to Kaye.  Plaintiffs' motion

27    for summary judgment on Claim 3 is DENIED.

28

United States District Court
Northern District of California

### C.      Claim 5 – Failure to Summon Medical Care

The County Defendants seek summary judgment on Claim 5, which alleges failure to summon medical care in violation of California Government Code § 845.6.  Plaintiffs do not seek summary judgment on this claim.

Section 845.6, titled "Medical care for prisoners; failure to obtain," provides that "a public employee, and the public entity where the employee is acting within the scope of his employment, is liable if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care."  Cal. Gov't Code § 845.6.  "Liability under section 845.6 is limited to serious and obvious medical conditions requiring *immediate* care."  *Watson v. State of Cal.*, 21 Cal. App. 4th 836, 841 (1993) (emphasis added).  The statutory duty does not encompass a duty to provide reasonable medical care.  *Id.*

In support of their motion, the County Defendants assert that the record is devoid of evidence that they failed to respond to a situation in which Claypole needed immediate medical care.  Plaintiffs argue that "Claypole was in need of immediate medical care over the 65 hours he was in custody."  Pls.' Opp.  at 23, ECF 148.  However, it is undisputed that Claypole received medical care on numerous occasions during that sixty-five hour period.  Plaintiffs have failed to identify any particular moment in time when Claypole required *immediate* medical care that was not provided.

When questioned on this point at the hearing, Plaintiffs' counsel suggested that Claypole required immediate medical care the moment that Dr. Fithian removed him from suicide watch on May 4, 2013.  However, counsel did not cite any evidence that Claypole was in immediate distress at that moment, or any expert opinion or case law suggesting that all inmates released from suicide watch must be given immediate medical care.  Although it might be inferred that Claypole should not have been released from suicide watch, such a contention does not support this claim and rather would go to the reasonableness of Dr. Fithian's medical determination.

Based upon an absence of evidence in the record showing that the County Defendants failed to summon medical care in response to Claypole's immediate need for such care, and Plaintiffs' failure to identify evidence creating a triable issue of material fact, the County

1    Defendants' motion for summary judgment on Claim 5 is GRANTED.

2       **D.      Claim 6 – Negligent Supervision, Hiring, Training, and Retention;**

3             **Claim 7 – Wrongful Death; and Claim 8 – Negligence**

4       The County Defendants seek summary judgment on Claim 6, alleging negligent

5    supervision, hiring, training, and retention; Claim 7, alleging wrongful death; and Claim 8,

6    alleging negligence.  Plaintiffs do not seek summary judgment on Claims 6 or 7, but they do seek

7    summary judgment on Claim 8.

8       With respect to Claim 6, "California case law recognizes the theory that an employer can

9    be liable to a third person for negligently hiring, supervising, or retaining an unfit employee."  *Doe*

10   *v. Capital Cities*, 50 Cal. App. 1038, 1054 (1996).  "Liability is based upon the facts that the

11   employer knew or should have known that hiring the employee created a particular risk or hazard

12   and that particular harm materializes."  *Id.*  With respect to Claim 7, the elements of a wrongful

13   death claim are:  (1) a wrongful act or neglect that (2) causes (3) the death of another person.  *See*

14   Cal. Civ. P. Code § 377.60; *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 390 (1999).  Plaintiffs' brief

15   indicates that their wrongful death claim is based upon negligence.  Pls.' Br. at 24, ECF 148.

16   Finally, with respect to Claim 8, the elements of a negligence claim are a duty owed by the

17   defendant, breach of that duty, and resulting harm to the plaintiff.  *Raven H. v. Gamette*, 157 Cal.

18   App. 4th 1017, 1024-25 (2007).

19      In support of her motion, Kaye points to an absence of evidence in the record that she

20   breached any of the above duties to Claypole or otherwise acted wrongfully.  Plaintiffs' claims

21   against Kaye are based solely on her failure to relay to medical staff the suicidal comment reported

22   by Claypole's attorney on the night of his intake into the jail.  It is undisputed that upon being

23   informed of that comment Kaye immediately directed that Claypole be placed on suicide watch

24   and informed medical staff of that fact.  When the nonmoving party has the burden of proof at

25   trial, the moving party may meet its burden on summary judgment by demonstrating an absence of

26   evidence in the record to support the nonmoving party's case.  *In re Oracle Corp. Sec. Litig.*, 627

27   F.3d at 387.  Accordingly, Kaye has met her initial burden.

28      Although they oppose Kaye's motion and move for summary judgment against Kaye on

*United States District Court*
*Northern District of California*

20

United States District Court
Northern District of California

1   Claim 8, Plaintiffs do not explain how Kaye's failure to tell medical staff about the comment

2   reported by Claypole's attorney caused any harm to Claypole.  Plaintiffs' own expert, Dr.

3   Patterson, testified that he could not conclude based upon his knowledge of the case that Kaye's

4   actions or inactions contributed to Claypole's suicide.  Patterson Dep. 195:12-15, Exh. J to Grant

5   Decl., ECF 141-2.  Plaintiffs thus have failed to demonstrate the existence of disputed facts that

6   would preclude summary judgment for Kaye on these claims.

7            With respect to the County and Miller, Defendants' motion does not address the elements

8   of Plaintiffs' state law claims.  Defendants argue Claim 6 as though it were a claim for deliberate

9   indifference rather than a state common law claim.  *See* Cnty. Defs.' Mot. at 19-24, ECF 141.  For

10  example, they cite *Farmer*, *Gibson*, and other cases addressing theories of negligent supervision,

11  hiring, training, and retention in the deliberate indifference context.  The County and Miller

12  address Claims 7 and 8 only in general terms, asserting that they did not know or suspect that

13  Claypole might commit suicide and that they acted appropriately throughout his detention.

14  Defendants do not address Plaintiffs' theory that they acted negligently in placing Claypole – an

15  individual with mental health issues who had just been discharged from suicide watch – in a

16  lockdown cell containing suicide hazards.   Thus the County and Miller have not carried their

17  initial burden as to these claims.

18           Plaintiffs do address the elements of their negligence claim, as to which Plaintiffs seek

19  summary judgment, arguing that the County and Miller had a duty of care with respect to housing

20  and providing mental health treatment to Claypole.  Plaintiffs argue that Defendants breached that

21  duty by placing Claypole in an environment with known suicide risks.  However, as discussed

22  above, there are disputed factual issues as to whether the County and Miller were aware that the

23  policy of housing inmates with mental health issues in A-pod and B-pod upon release from suicide

24  watch posed a substantial risk of harm.  *See* Thornburg Decl. ¶¶ 3-5, ECF 149-2.  In addition,

25  there are disputed issues as to whether the County's policies met the standard of care.  *See* Bryce

26  Report at 1, Exh. L to Grant Decl., ECF 141-2.   Those disputed issues preclude summary

27  judgment for Plaintiffs on their negligence claim.

28           The County Defendants' motion for summary judgment on Claims 6-8 is GRANTED as to

1  Kaye and DENIED as to the County and Miller.  Plaintiffs' motion for summary judgment on

2  Claim 8 is DENIED.

3  **IV.   CROSS-MOTIONS FOR SUMMARY JUDGMENT RE DR. FITHIAN AND CFMG**

4  Plaintiffs assert claims against Dr. Fithian and CFMG for deliberate indifference to serious

5  medical needs in violation of the Fourteenth Amendment (Claims 1 and 2); deprivation of

6  parent/child relationship in violation of the First and Fourteenth Amendments (Claim 3); medical

7  malpractice under California law (Claim 4); failure to summon medical care in violation of

8  California Government Code § 845.6 (Claim 5); negligent supervision, training, hiring, and

9  retention under California law (Claim 6); and wrongful death under California Civil Procedure

10  Code § 377.60 (Claim 7).  Fithian and CFMG seek summary judgment on Claims 1-3 and 5, while

11  Plaintiffs seek summary judgment on Claims 1-4 and 7.  Plaintiffs also purport to seek summary

12  judgment on Claim 8, alleging negligence.  *See* Pls.' Opp. & Mot. at 34-35, ECF 142.  However,

13  Plaintiffs' operative first amended complaint does not name Fithian and CFMG as defendants to

14  Claim 8.  FAC ¶¶ 125-30.

15  **A.   Claims 1 and 2 – Deliberate Indifference**

16  Plaintiffs and the Medical Defendants seek summary judgment on Claims 1 and 2, which

17  assert deliberate indifference to Claypole's serious medical needs in violation of the Fourteenth

18  Amendment.

19  **1.   Dr. Fithian**

20  Private physicians employed to provide medical care to inmates are state actors for

21  purposes of § 1983.  *See West v. Atkins*, 487 U.S. 42, 54-55 (1988).  In order to make out a

22  deliberate indifference claim against Fithian, Plaintiffs must show that Claypole had a serious

23  medical need, Fithian's deliberate indifference, and resulting harm.  *See Conn*, 591 F.3d at 1095.

24  To demonstrate that Fithian was deliberately indifferent to Claypole's serious medical need,

25  Plaintiffs must show that he was "(a) subjectively aware of the serious medical need and (b) failed

26  to adequately respond."  *Id.* at 1096 (citing *Farmer*, 511 U.S. at 838 (1994)).  In order to be

27  subjectively aware of a serious medical need, an official "must both be aware of facts from which

28  the inference could be drawn that a substantial risk of serious harm exists, *and* he must also draw

the inference." *Farmer*, 511 U.S. at 837 (emphasis added).

In support of their own motion and in opposition to Fithian's motion, Plaintiffs point to the undisputed facts that Fithian knew Claypole had been placed on suicide watch the night of May 1, 2013; removed from suicide watch (by Fithian) on May 2, 2013; and placed back on suicide watch on May 3, 2013. *See* Fithian Decl. ¶¶ 2-6, ECF 152-4.  The second suicide watch was based on Spano's telephone call to Fithian on the afternoon of May 3.  Spano reported that Claypole was acting strange and had stated that he wanted to kill himself.  *Id.* ¶ 6.  Based on Spano's report, Fithian agreed that Claypole should return to a safety cell.  *Id.*  Yet early the following morning Fithian ordered Claypole released from suicide watch.  Fithian had some additional information on Saturday morning that he did not have on Friday afternoon when he spoke to Spano.  Specifically, Fithian knew that Claypole had received two additional doses of Klonopin since seeing Spano, was calm, was requesting release from the safety cell, and was denying any suicidal ideation.  *Id.* at ¶ 8.

Plaintiffs also cite the testimony of the Medical Defendants' expert, Dr. Hayward, that when attempting to determine a patient's suicide risk, experienced doctors know not to ask about suicidal ideation directly, because if the patient is contemplating suicide he or she will not want to disclose that information.  Hayward Dep. 102:1-104:16, ECF 143-10.   Fithian himself testified that someone in a mental health crisis can have periods of suicidal thoughts and nonsuicidal thoughts during the same day.  Fithian Dep. 95:15-18, ECF 143-10.

Plaintiffs additionally present Fithian's testimony that he has authored training materials indicating that a white, twenty year old male held in pretrial detention is in a very high risk category for suicide.  Fithian Dep. 218:2-14, ECF 143-10.  Fithian testified that it is generally understood by forensic mental health experts that segregated or isolated conditions such those in a lockdown cell can increase suicide risk, and that he held that opinion in 2013.  *Id.* 83:20-86:11.  He also testified that it is generally understood in forensic mental health that the first seventy-two hours of incarceration are a time of increased suicide risk.  *Id.* 86:17-20.  According to Fithian, ninety percent of suicides in county jails throughout the country are accomplished by hanging.  *Id.* 48:22-24.   Fithian was aware of prior hangings at in the lockdown units at the County jail.  *Id.*

50:2021, 62:6-20, 72:0-74:17.

In support of his motion and in opposition to Plaintiffs' motion, Fithian argues that the record is devoid of evidence that he actually drew an inference that releasing Claypole from suicide watch on May 4, 2013 gave rise to a substantial risk of harm.[8]  Fithian submits his own declaration statement that, in his opinion, Claypole was not acutely suicidal when released from suicide watch on May 4, 2013.  Fithian Decl. ¶ 9, ECF 152-4.

The Ninth Circuit has held that summary judgment on a deliberate indifference claim cannot be supported "simply on the basis of the defendants' assertions as to their own state of mind." *Conn*, 591 F.3d at 1097.  In *Conn*, the Ninth Circuit reversed the district court's grant of summary judgment for the defendant officers, holding that the officers' testimony that they did not subjectively believe Clustka to be a suicide risk was insufficient to establish their entitlement to judgment.  The court explained that "[p]roof of 'subjective awareness' is not limited to the purported recollections of the individuals involved." *Conn*, 591 F.3d at 1097.  Instead, the court stated, "[w]hether [an] official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Id.* (quoting *Farmer*, 511 U.S. at 842).  The court determined that a reasonable jury could conclude from the record evidence "that Clustka's medical need was so obvious that [the officers] must have been subjectively aware of it, despite their later denial of that awareness." *Id.*

As in *Conn*, a jury confronted with the present record could accept Dr. Fithian's statements that he did not subjectively believe that Claypole was at substantial risk of harm if released from suicide watch and sent back to A-pod.  However, a jury alternatively could find that Claypole's risk of suicide was so obvious that Fithian must have been subjectively aware of it despite his protestations to the contrary.  "[Q]uestions involving a person's state of mind are generally factual issues inappropriate for resolution by summary judgment." *Conn* at 1098 (internal quotation

---

[8] The Court notes that Plaintiffs argue that the treatment provided by Fithian and CFMG fell below the standard of care and that Fithian and CFMG knew *or should have known* that Claypole was at risk when he was discharged from suicide watch on the morning of May 4, 2013. However, Plaintiffs' deliberate indifference claims require a showing that Fithian *actually* drew the inference that Claypole was at substantial risk of serious harm.

1    marks and citation omitted).  Because a triable issue of material fact exists as to whether Fithian

2    was subjectively aware that Claypole was at substantial risk of harm if released from suicide

3    watch on May 4, 2013, the parties' cross-motions for summary judgment on Claims 1 and 2 are

4    DENIED as to Fithian.[9]

5                    **2.    CFMG**

6           Courts have treated medical groups employed to provide prison medical services as local

7    government entities for purposes of deliberate indifference claims.  *See Carrea v. California*, No.

8    EDCV 07-1148-CAS (MAN), 2009 WL 1770130, at *8 & n.5 (C.D. Cal. June 18, 2009)

9    (collecting cases).  CFMG concedes that it may be sued under § 1983 and that *Monell* principles

10   apply to such claims.

11          As discussed above with respect to Plaintiffs' claims against the County, a plaintiff may

12   recover against a local government for deliberate indifference under one of three theories of

13   liability.  *See Clouthier*, 591 F.3d at 1249.  "First, a local government may be held liable 'when

14   implementation of its official policies or established customs inflicts the constitutional injury.'"

15   *Id.* (quoting *Monell*, 436 U.S. at 708 (Powell, J. concurring)).  "Second, under certain

16   circumstances, a local government may be held liable under § 1983 for acts of 'omission,' when

17   such omissions amount to the local government's own official policy."  *Id.*  "Third, a local

18   government may be held liable under § 1983 when the individual who committed the

19   constitutional tort was an official with final policy-making authority or such an official ratified a

20   subordinate's unconstitutional decision or action and the basis for it."  *Id.* at 1250 (internal

21   quotation marks and citation omitted).

22          Plaintiffs appear to be asserting liability against CFMG based upon its asserted de facto

23   policy of sending inmates with mental illness to A-pod or B-pod upon release from suicide

24   watch.  Plaintiffs also appear to be asserting that CFMG is liable for the acts of its policy maker, Fithian.

25

26   _____

27   [9] Fithian does not argue that, if Claypole was at substantial risk of harm on the morning of May 4, 2013, Fithian responded adequately by discharging Claypole from suicide watch knowing that he would go back to A-pod.

28

### a.    Policy

Plaintiffs present the following evidence in support of their own motion and in opposition to CFMG's motion.  They present the opinions of their expert, Dr. Patterson, that Claypole's medical treatment fell below the professional standard of care and that his suicide likely was foreseeable under the circumstances.  Patterson Report at 191-94, Exh. 117 to Rifkin Decl., ECF 143-9.  While Dr. Patterson does not opine as to the constitutionality of CFMG's policies, he does opine that Claypole's placement in a lockdown unit was inappropriate and contributed to his suicide.  *Id.*  Dr. Patterson's opinions could give rise to a reasonable inference that a policy of transitioning individuals from safety cells directly to lockdown cells without other attendant precautions amounts to deliberate indifference.[10]

In opposition to Plaintiffs' motion and in support of its own motion, CFMG presents the opinion of its expert, Dr. Hayward, that CFMG's policies meet minimal professional standards of care and constitutional standards.  *See* Hayward Report at 11, Exh. B to Bertling Decl., ECF 125; Hayward Dep. 54:13-55:19.  Another of CFMG's experts, Dr. Jason Roof, also opines that CFMG's policies meet professional standards of care and constitutional standards, and that the care rendered to Claypole was appropriate and within the standard of care.  Roof Report at 17, Exh. B to Bertling Decl., ECF 125.  CFMG also relies upon CFMG's written Policy and Procedure Manual, which incorporates in its Suicide Prevention section Monterey County's written plan for the prevention of suicide.  The plan specifies that an individual who shows potential risk of suicide must be referred to medical staff for assessment.  Fithian states in his declaration that in May 2013, he could have directed that an individual released from suicide watch be housed in "a variety of step down units."[11]  Fithian Decl. ¶ 11, ECF 152-4.

---

[10] The Medical Defendants assert that Dr. Patterson "has begrudgingly testified CFMG's suicide prevention program met constitutional standards."  Defs.' Mot. at 6, ECF 124-1.  In support for that assertion, Defendants cite to Dr. Patterson's report in its entirety and to a page of Dr. Patterson's deposition that does not support the assertion.  While Dr. Patterson has not opined specifically as to the ultimate question of whether CFMG's policies are constitutionally deficient, he has provided expert opinion that may be relied upon by a jury in making that determination.

[11] Commander Bass, the County's Rule 30(b)(6) witness, testified that the jail does not have any kind of step down cells or transition cells between a safety cell and a regular housing cell.  Bass Dep. 103:17-21, Exh. Vol. 3 to Rifkin Decl., ECF 147-5.

United States District Court
Northern District of California

1  The parties' evidence creates a triable issue of fact as to whether CFMG's policies were

2  constitutionally inadequate.

3  **b.     Acts of Dr. Fithian**

4  There is no dispute that Dr. Fithian has final policy-making authority with respect to

5  CFMG.  As discussed above, Fithian's deposition testimony and declaration statements create a

6  triable issue as to whether Fithian knew that transitioning individuals from safety cells to

7  lockdown cells creates a substantial risk of harm.  To the extent that he may be liable for

8  deliberate indifference, CFMG may be liable as well.

9  Accordingly, the parties' cross-motions for summary judgment on Claims 1 and 2 are

10  DENIED as to CFMG.

11  **B.     Claim 3 – Loss of Parent/Child Relationship**

12  Plaintiffs and the Medical Defendants seek summary judgment on Claim 3 for loss of

13  parent/child relationship.  As noted above, parents may assert a Fourteenth Amendment

14  substantive due process claim if they are deprived of their liberty interest in the companionship of

15  their child through official conduct.  *Lemire*, 726 F.3d at 1075. "Only official conduct that shocks

16  the conscience is cognizable as a due process violation." *Id.* (internal quotation marks and citation

17  omitted).  "A prison official's deliberately indifferent conduct will generally shock the conscience

18  so as long as the prison official had time to deliberate before acting or failing to act in a

19  deliberately indifferent manner." *Id.* (internal quotation marks and citation omitted).

20  Claim 3 is based on the Medical Defendants' alleged deliberate indifference to Claypole's

21  serious medical needs and thus, for purposes of the present motions, rises or falls with Claims 1

22  and 2.  Based upon the foregoing discussion, the parties' cross-motions for summary judgment on

23  Claim 3 are DENIED.

24  **C.     Claim 4 – Medical Malpractice**

25  Only Plaintiffs seek summary judgment on Claim 4, alleging medical malpractice.  Fithian

26  and CFMG do not seek summary judgment on this claim.

27

28

1    "The elements of a cause of action for medical malpractice are:  (1) a duty to use such

2    skill, prudence, and diligence as other members of the profession commonly possess and exercise;

3    (2) a breach of the duty; (3) a proximate causal connection between the negligent conduct and the

4    injury; and (4) resulting loss or damage."  *Chakalis v. Elevator Solutions, Inc.*, 205 Cal. App. 4th

5    1557, 1571 (2012) (internal quotation marks and citation omitted).

6    In support of their motion, Plaintiffs present the opinion of their expert that the medical

7    treatment provided to Claypole fell below the standard of care.  *See* Patterson Report at 7, Exh.

8    117 to Rifkin Decl., ECF 143-9.  This evidence is sufficient to meet Plaintiffs' initial burden.

9    However, in opposition to the motion, the Medical Defendants present expert opinion that the

10   medical treatment provided to Claypole met the standard of care.  *See* Hayward Report at 16, Exh.

11   B to Bertling Decl., ECF 125; Roof Report at 17, Exh. B to Bertling Decl., ECF 125.  Given these

12   competing expert opinions, a triable issue of material fact exists as to the question of breach of the

13   duty of care.

14   Plaintiffs' motion for summary judgment on Claim 4 is DENIED.

15   **D.    Claim 5 – Failure to Summon Medical Care**

16   Fithian and CFMG seek summary judgment on Claim 5 for failure to summon medical

17   care.  Plaintiffs do not seek summary judgment on this claim.

18   As discussed above, California Government Code § 845.6 provides that a public employee

19   may be liable for failure to respond to a prisoner's need for *immediate* medical care.  Cal. Gov't

20   Code § 845.6; *Watson*, 21 Cal. App. 4th at 841.  Plaintiffs have not identified a moment when

21   Fithian and CFMG failed to respond to Claypole's need for immediate medical care.  Moreover, it

22   simply makes no sense for Plaintiffs to assert liability against the Medical Defendants for failing

23   to summon *themselves*.  Plaintiffs have submitted no evidence to support the need to summon an

24   ambulance or other emergency medical service.

25   The Medical Defendants' motion for summary judgment on Claim 5 is GRANTED.

26   **E.    Claim 7 – Wrongful Death**

27   Only Plaintiffs seek summary judgment on Claim 7, for wrongful death.  Fithian and

28   CFMG do not seek judgment on this claim.

28

The elements of a wrongful death claim are:  (1) a wrongful act or neglect that (2) causes (3) the death of another person.  *See* Cal. Civ. P. Code § 377.60; *Norgart*, 21 Cal. 4th at 390.  In support of their motion, Plaintiffs submit their expert's opinion that the medical treatment provided to Claypole fell below the standard of care.  *See* Pls.' Br. at 34, ECF 142.  This evidence is sufficient to meet Plaintiffs' initial burden.  However, Fithian and CFMG have submitted conflicting expert opinions stating that the medical treatment provided to Claypole met the standard of care.  *See* Hayward Report at 16, Exh. B to Bertling Decl., ECF 125; Roof Report at 17, Exh. B to Bertling Decl., ECF 125.  Thus a triable issue of material fact exists as to an essential element of Plaintiffs' wrongful death claim.

Plaintiffs' motion for summary judgment on Claim 7 is DENIED.

**V.    ORDER**

For the foregoing reasons, IT IS HEREBY ORDERED that:

(1)    The County Defendants' motion is GRANTED IN PART as to all claims asserted against Kaye and as to Claim 5 and otherwise is DENIED, and Plaintiffs' cross-motion against the County Defendants is DENIED; and

(2)    The Medical Defendants' motion is GRANTED IN PART as to Claim 5 and otherwise is DENIED, and Plaintiffs' cross-motion against the Medical Defendants is DENIED.

Dated:  February 22, 2016

_____
BETH LABSON FREEMAN
United States District Judge